# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

_____

### Nos. 23-1115, 23-1139

_____

### UNITED STATES OF AMERICA,
**Appellee/Cross-Appellant**

*v.*

### DAVID DEQUATTRO,
**Defendant – Appellant/Cross-Appellee**

_____

**On Appeal from a Judgment of the United States District Court
for the District of Massachusetts**

_____

## BRIEF OF APPELLANT DAVID DEQUATTRO

_____

**Kimberly Homan**
**20 Park Plaza, Suite 1000**
**Boston, Massachusetts 02116**
**(617) 448-2812 (Telephone)**
**homanlaw@aol.com**

**Michael Pabian**
**20 Park Plaza, Suite 1000**
**Boston, Massachusetts 02116**
**(617) 227-3700 (Telephone)**
**pabianlaw38@gmail.com**

**Martin G. Weinberg**
**20 Park Plaza, Suite 1000**
**Boston, Massachusetts 02116**
**(617) 227-3700 (Telephone)**
**(617) 338-9538 (Fax)**
**owlmgw@att.net**

# TABLE OF CONTENTS

STATEMENT OF SUBJECT MATTER
        AND APPELLATE JURISDICTION…………………………………………1

STATEMENT OF ISSUES PRESENTED……………………………………...1

STATEMENT OF THE CASE……………………………………………….2

        Procedural Overview………………………………………………...2

        Trial Evidence…………………………………………………………3

SUMMARY OF ARGUMENT………………………………………...10

ARGUMENT……………………………………………………………...14

I.      THE EVIDENCE WAS INSUFFICIENT TO SUPPORT
        DEQUATTRO'S CONVICTION. ………………………………………...14

        A.      Standard of Review………………………………………………15

        B.      The District Court Misapprehended This Circuit's
                Judgment of Acquittal Jurisprudence………………………………16

        C.      The Evidence Did Not Suffice to Prove Quid-Pro-Quo
                Bribery Beyond a Reasonable Doubt………………………………..21

                1.      The BowFlex…………………………………………………28

                2.      The hotel stay………………………………………………33

                3.      Conclusion…………………………………………………34

i

D.   The Court Should Not Consider Evidence Relating Solely
     to the Counts on Which DeQuattro Was Acquitted in
     Assessing the Sufficiency of the Evidence on the Count of
     Conviction……………………………………………………...36

     1.   The government's theory is inherently flawed………………39

     2.   The sufficiency of the evidence as to the BowFlex
          and hotel stay must be evaluated as if they were
          the only charges………………………………………………43

     3.   Much, if not most, of the evidence relating solely to
          the acquitted conduct would not have been admitted
          in a separate trial of the BowFlex and hotel stay gifts………..44

II.  THERE WAS INSUFFICIENT EVIDENCE TO SATISFY §666's
     JURISDICTIONAL ELEMENT…………………………………………...47

III. THE DISTRICT COURT ERRONEOUSLY EXCLUDED
     TESTIMONY FROM THREE PROFFERED DEFENSE
     WITNESSES ……………………………………………………………57

     A.   The District Court Erroneously Excluded Testimony
          from Two Witnesses that They Gave Cromwell Gifts
          Virtually Identical to Those Underlying DeQuattro's
          Convictions without any Quid-Pro-Quo……………………………58

     B.   The District Court Erroneously Excluded a Defense
          Expert whose Testimony was Highly Relevant and
          Exculpatory………………………………………………………….64

     C.   Exclusion of the Foregoing Witness Testimony was
          not Harmless………………………………………………………...72

IV.   THE DISTRICT COURT ERRONEOUSLY AND IN FACIAL
      VIOLATION OF FED. R. CRIM. P. 31 PRECLUDED THE
      JURY FROM REACHING A VERDICT UNTIL RECEIVING
      WRITTEN INSTRUCTIONS…………………………………………...74

V.    THE DISTRICT COURT'S RESTITUTION ORDER WAS
      LEGALLY ERRONEOUS IN SEVERAL RESPECTS…………………...78

CONCLUSION……………………………………………………………...85

CERTIFICATE OF COMPLIANCE…………………………………………..87

CERTIFICATE OF SERVICE………………………………………………88

# TABLE OF AUTHORITIES

**<u>Cases</u>**

*Blakely v. Washington*, 542 U.S. 296 (2004) …………………………………………..40

*California v. Trombetta*, 467 U.S. 479 (1984) …………………………………………...72

*Dang Vang v. Vang Xiong X. Toyed*, 944 F.2d 476 (9th Cir. 1991) ……………...67

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) …………………66, 71

*Dowling v. United States*, 493 U.S. 342 (1990) …………………………………………40

*Dunn v. United States*, 284 U.S. 390 (1932) …………………………………………..43

*Fischer v. United States*, 529 U.S. 667 (2000) ………………………………………..47-48

*Gomez v. Rivera Rodriguez*, 344 F.3d 103 (1st Cir. 2003) ……………………….72

*Huddleston v. United States*, 485 U.S. 681 (1988) ……………………………………63

*Hughey v. United States*, 495 U.S. 411 (1990) ………………………………………..81, 84

*In re Akebia Therapeutics, Inc.*, 981 F.3d 32 (1st Cir. 2020) ……………79, 82, 85

*In re Winship*, 397 U.S. 358 (1970) ………………………………………………..14-15

*Jones v. United States*, 574 U.S. 948 (2014) ……………………………………………..44

*Katt v. City of New York*, 151 F. Supp. 2d 313 (S.D.N.Y. 2001) ……………..68-69

*Lagos v. United States*, 138 S. Ct. 1684 (2018) ………………………………………83-84

*Levin v. Dalva Bros., Inc.*, 459 F.3d 68 (1st Cir. 2006) …………………………………66

*Martinez v. Cui*, 608 F.3d 54 (1st Cir. 2010) ……………………………………47

*Martinez v. United States*, 33 F.4th 20 (1st Cir. 2022) …………………………...71

*McClinton v. United States*, 143 S. Ct. 2400 (2023) …………………..40-41, 43-44

*McDonnell v. United States*, 579 U.S. 550 (2016) …………………………………23

*Microfinancial, Inc. v. Premier Holidays Int'l, Inc.*, 385 F.3d 72
      (1st Cir. 2004) ………………………………………………………………..70

*Morillo v. Attorney General*, 751 F. App'x 335 (3d Cir. 2018) (unpublished)…...80

*Morgan v. Dickhaut*, 677 F.3d 39 (1st Cir. 2012) …………………………………..25

*O'Laughlin v. O'Brien*, 568 F.3d 287 (1st Cir. 2009) ………………………15, 25

*Pelletier v. Main St. Textiles, LP*, 470 F.3d 48 (1st Cir. 2006) …………………..67

*Pennsylvania v. Ritchie*, 480 U.S. 39 (1987) ………………………………………72

*Sabri v. United States*, 541 U.S. 600 (2004) ……………………………...48, 52-53

*Starr v. United States*, 153 U.S. 614 (1894) ………………………………………..75

*Stewart v. Coalter*, 48 F.3d 610 (1st Cir. 1995) ………………………….*passim*

*United States v. Abu-Shawish*, 507 F.3d 550 (7th Cir. 2007) ……………………49

*United States v. Acevedo-Hernandez*, 898 F.3d 150 (1st Cir. 2018) …………48, 52

*United States v. Adorno*, 950 F. Supp. 2d 426 (E.D.N.Y. 2013) …………...79-80

*United States v. Afriyie*, 27 F.4th 161 (2d Cir. 2022) ……………………………84

*United States v. Amuso*, 21 F.3d 1251 (2d Cir. 1994) ……………………………68

*United States v. Anderson*, 809 F.2d 1281 (7th Cir. 1987) ………………………61

*United States v. Andujar*, 49 F.3d 16 (1st Cir. 1995) ……………………………16

*United States v. Bagcho*, 923 F.3d 1131 (D.C. Cir. 2019) ……………................41

*United States v. Baker*, 82 F.3d 273 (8th Cir. 1996) ……………………………..61

*United States v. Becerra*, 939 F.3d 995 (9th Cir. 2019) …………………………76

*United States v. Bell*, 808 F.3d 926 (D.C. Cir. 2015) ………………………...41, 44

*United States v. Blasini-Lluberas*, 169 F.3d 57 (1st Cir. 1999) …………………15

*United States v. Booker*, 543 U.S. 220 (2005) …………………………………….41

*United States v. Bravo-Fernandez*, 913 F.3d 244 (1st Cir. 2019) …………….49, 55

*United States v. Burgos*, 703 F.3d 1 (1st Cir. 2012) ………………………….....19

*United States v. Canania*, 532 F.3d 764 (8th Cir. 2008) …………………………41

*United States v. Cardozo*, 68 F.4th 725 (1st Cir. 2023) …………………………83

*United States v. Collins*, 854 F.3d 1324 (11th Cir. 2017) …………………….79-80

*United States v. Comer*, 93 F.3d 1271 (6th Cir. 1996) …………………………...81

*United States v. Correia*, 55 F.4th 12 (1st Cir. 2022) ………………………...74, 77

*United States v. Cusick*, 2012 WL 442005 (D. Mass. Feb. 9, 2012) ………….43-44

*United States v. Cutter*, 313 F.3d 1 (1st Cir. 2002) ………………………………82

*United States v. David*, 940 F.2d 722 (1st Cir. 1991) …………………………60

*United States v. de la Cruz Paulino*, 61 F.3d 986 (1st Cir. 1995) ……………..19

*United States v. Doran*, 854 F.3d 1312 (11th Cir. 2017) …………………*passim*

*United States v. El Naddal*, 2023 WL 2541555 (D. Mass. Mar. 16, 2023) ………20

*United States v. Encarnacion*, 26 F.4th 490 (1st Cir. 2022) ……………….…..66

*United States v. Faust*, 456 F.3d 1342 (11th Cir. 2006) …………....................41

*United States v. Fernandez*, 722 F.3d 1 (1st Cir. 2013) ………………..21-23, 62

*United States v. Fernandez-Jorge*, 894 F.3d 36 (1st Cir. 2018) …………………18

*United States v. Flaherty*, 668 F.2d 566 (1st Cir. 1981) …………………………76

*United States v. Ford*, 435 F.3d 204 (2d Cir. 2006) ………………………...62

*United States v. Fortenberry*, 860 F.2d 628 (5th Cir. 1988) ……………………..47

*United States v. Frankhauser*, 80 F.3d 641 (1st Cir. 1996) ………………………45

*United States v. Garcia-Morales*, 382 F.3d 12 (1st Cir. 2004) …………………..67

*United States v. Garcia-Sierra*, 994 F.3d 17 (1st Cir. 2021) ……………………..73

*United States v. George*, 761 F.3d 42 (1st Cir. 2014) ……………………………46

*United States v. Gilbert*, 229 F.3d 15 (1st Cir. 2000) ……………………………46

*United States v. Gomes*, 969 F.2d 1290 (1st Cir. 1992) …………………………27

*United States v. Gonzalez-Sanchez*, 825 F.2d 572 (1st Cir. 1987) ………………60

*United States v. Guerrero-Narvaez*, 29 F.4th 1 (1st Cir. 2022) ………………….18

*United States v. Guzman-Ortiz*, 975 F.3d 43 (1st Cir. 2020) ……………15, 19, 36

*United States v. Hayes*, 219 F. App'x 114 (3d Cir. 2007) (unpublished) ………...63

*United States v. Haymond*, ___ U.S. ___, 139 S. Ct. 2369 (2019) ……………....41

*United States v. Hills*, 27 F.4th 1155 (6th Cir. 2022) ………………………….23

*United States v. Kilmartin*, 944 F.3d 315 (1st Cir. 2019) ………………………...27

*United States v. Koutsostamatis*, 956 F.3d 301 (5th Cir. 2020) ………………….84

*United States v. Mancillas*, 172 F.3d 341 (1st Cir. 1999) ………………………..81

*United States v. Marlinga*, 457 F. Supp. 2d 769 (E.D. Mich. 2006) …………….63

*United States v. Martinez*, 994 F.3d 1 (1st Cir. 2021) …………………………..22

*United States v. McDonough*, 727 F.3d 143 (1st Cir. 2013) ……………....21-22, 25

*United States v. McLean*, 802 F.3d 1228 (11th Cir. 2015) …………………....55-56

*United States v. Moffett*, 53 F.4th 679 (1st Cir. 2022) ……………….72-73, 75, 78

*United States v. Morillo*, 158 F.3d 18 (1st Cir. 1998)………….......................16

*United States v. Murphy*, 768 F.2d 1518 (7th Cir. 1985) ………………………...61

*United States v. Orlando-Figueroa*, 229 F.3d 33 (1st Cir. 2000) ……………62-63

*United States v. Pauling*, 924 F.3d 649 (2d Cir. 2019) ……………....................25

*United States v. Pennue*, 770 F.3d 985 (1st Cir. 2014) ……………....................76

*United States v. Perez-Melendez*, 599 F.3d 31 (1st Cir. 2010) ……………............15

*United States v. Pina-Nieves*, 59 F.4th 9 (1st Cir. 2023) ……………..............35, 72

*United States v. Pothier*, 919 F.3d 143 (1st Cir. 2019) ……………................*passim*

*United States v. Rodriguez-Cardona*, 924 F.2d 1148 (1st Cir. 1991) …………....46

*United States v. Rodriguez-Martinez*, 778 F.3d 367 (1st Cir. 2015) ……..18-19, 36

*United States v. Sabillon-Umana*, 772 F.3d 1328 (10th Cir. 2014) ……………...44

*United States v. Sawyer*, 85 F.3d 713 (1st Cir. 1996) ……………....................22, 61

*United States v. Schaffer*, 183 F.3d 833 (D.C. Cir. 1999) ……………...................62

*United States v. Scott*, 437 U.S. 82 (1978) ……………........................................43

*United States v. Shelton*, 997 F.3d 749 (7th Cir. 2021) ……………....................62

*United States v. Silver*, 948 F.3d 538 (2d Cir. 2020) ……………........................23

*United States v. Simon*, 12 F.4th 1 (1st Cir. 2021) ……………...........................16

*United States v. Soler-Montalvo*, 44 F.4th 1 (1st Cir. 2022) …………57, 63, 69, 72

*United States v. Spock*, 416 F.2d 165 (1st Cir. 1969) ……………………….....75

*United States v. Sullivan*, 911 F.2d 2 (7th Cir. 1990) ……………........................61

*United States v. Sun-Diamond Growers of Calif.*, 526 U.S. 398 (1999) ……..21, 62

*United States v. Teganya*, 997 F.3d 424 (1st Cir. 2021) ……………....................70

*United States v. Tetioukhine*, 725 F.3d 1 (1st Cir. 2013) ……………...................70

*United States v. Valerio,* 48 F.3d 58 (1st Cir.1995) ……………...........................15

*United States v. Varoudakis*, 233 F.3d 113 (1st Cir. 2000) ……………......44-45, 61

*United States v. Vest*, 842 F.2d 1319 (1st Cir. 1998) ……………........................61

*United States v. Vongsay*, 988 F.2d 126 (9th Cir. 1993) (unpublished) …………70

*United States v. Watts*, 519 U.S. 148 (1997) ……………......................................44

*United States v. Weller*, 40 F.4th 563 (7th Cir. 2022) ……………........................43

*United States v. Whitfield*, 590 F.3d 325 (5th Cir. 2009) ……………...............48-49

*Washington v. Texas,* 388 U.S. 14 (1967) ……………..........................................72

**Constitutional Provisions**

Fifth Amendment, United States Constitution……………...........................41, 72

Sixth Amendment, United States Constitution……………...........................*passim*

**Statutes and Rules**

18 U.S.C. § 666……………......................................................................*passim*

18 U.S.C. § 2264(b)(3) ……………......................................................................83

18 U.S.C. § 3663A(a)(2) ……………...............................................................80, 82

18 U.S.C. § 3663A(b)(4) ……………......................................................82-83, 84-85

18 U.S.C. § 3663A(c)(1) ……………................................................................79-80

Fed. R. Crim. P. 31(b)(1) ……………......................................................14, 74-75

Fed. R. Evid. 403…………….........................................................................*passim*

Fed. R. Evid. 404(b) …………….................................................................*passim*

Fed. R. Evid. 702…………….........................................................................66, 70

Fed. R. Evid. 704(b) …………….........................................................................69

## Other Authorities

Barry L. Johnson, *The Puzzling Persistence of Acquitted*
    *Conduct in Federal Sentencing, and What can be*
    *Done About It*, 49 Suffolk L. Rev. 1 (2016) …………….............................44

DOJ Criminal Resource Manual…………….................................................. 49, 53

S. Rep. No. 98-225 (1983) …………….....................................................................48

S. Rep. No. 104-179 (1995) …………….....................................................................81

Wright, Miller & Kane, *Fed. Prac. & Proc.* § 6264……………......................68-69

## Note on Citations to the Record

Material contained in the Addendum to the Brief is cited as "Add:____."

Material contained in the Joint Appendix is cited in the Brief as "App:____."

Material contained in the Sealed Appendix is cited as "SA:_____." "Doc.___"

designates the document referenced by that number on the district court's docket.

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

This appeal arises from a judgment of the district court entered on January 31, 2023, Add:1; appellant's timely notice of appeal was filed on February 1, 2023. App:2301. The district court had jurisdiction under 18 U.S.C. §3231. This Court has jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF ISSUES PRESENTED

1. Whether the district court misapplied this court's judgment of acquittal jurisprudence.

2. Whether the evidence was sufficient to support appellant's conviction.

3.  Whether, under the circumstances of this case, evidence relating solely to acquitted counts can supply the basis for upholding appellant's conviction.

4. Whether the evidence was sufficient to satisfy §666's jurisdictional element.

5. Whether the district court erroneously excluded three proffered defense witnesses.

6. Whether the district court abused its discretion by precluding the jury from reaching a verdict until it received supplemental written instructions.

7. Whether the district court's restitution order was erroneous.

## STATEMENT OF THE CASE

### Procedural Overview

David DeQuattro, a respected architect with the firm Robinson Green Beretta ("RGB"), was indicted on charges of conspiracy to commit federal program bribery (Count One) and federal program bribery in violation of 18 U.S.C. §666 (Counts Four and Five). App:44. The charges stemmed from monies and other things of value provided by DeQuattro to Cedric Cromwell, Chairman of the Mashpee Wampanoag Tribal Council and President of the Mashpee Wampanoag Gaming Authority ("the Gaming Authority") during the course of RGB's contract with the Gaming Authority to act as owner's representative with respect to the construction of a planned casino. The government alleged that these contributions and gifts were bribes, part of a quid-pro-quo agreement between DeQuattro and Cromwell in which, in exchange for money and gifts, Cromwell would "protect" RGB's contract with the Gaming Authority. DeQuattro contended that, on the contrary, there was never a quid-pro-quo agreement between himself and Cromwell, that there was no evidence that the contract was ever in need of "protection," and that the payments were not bribes but were instead lawful tribal campaign contributions or gifts borne out of personal friendship with Cromwell and the desire to cultivate future business opportunities

with the Tribe. The jury agreed with DeQuattro in substantial part, acquitting him of the Count One conspiracy—a charge that encompassed all the monies and gifts at issue—as well as on Count 4 and so much of Count Five as charged a $4,000 contribution, and convicting him only on so much of Count Five as charged gifts of a used BowFlex and a weekend stay at a Boston hotel. App:1390-91. DeQuattro moved for judgments of acquittal at the end of the defense case, App:1057, and at the close of all the evidence. App:1130. The court reserved decision on the motion. *Id.* DeQuattro renewed the motion post-trial. App:1848. After further hearing, App:1972-2022, the court again reserved decision, asking for further briefing with respect to the proper application of this Court's Rule 29 jurisprudence. App:1918, 1942, 2024-27. The court heard further argument at the time of sentencing, and denied the motion. App:2036-60.

DeQuattro was sentenced to a one-year probationary term with home confinement. Add:2-4. The court also ordered restitution in the amount of $140,707.79. Add:5. Sentence has been stayed pending appeal. App:36.

## Trial Evidence

In 2012, the Tribe decided to build a casino in Taunton, Massachusetts. The first step in the process was the creation of the Gaming Authority, a separate legal entity, of which Cromwell, as Chairman of the Tribal Council, automatically became

the President. App:330. The Gaming Authority selected an architect and an owner's representative, App:263-64, but over time dissatisfaction with both contractors developed.

The speed with which the casino project advanced was important to the Gaming Authority. App:276-78, 317. Because the architect had not yet, after two years, delivered its final design and because its design lacked the "wow factor" thought essential to outshining a potential competitor, the five-member Gaming Authority board voted 4-1 to terminate its contract with that architect in April 2014. App:265, 293-94, 301-02, 305, 333-35, 341, 372. The contract with D'Amato, the original owner's representative, was terminated at the same time because the function of the owner's representative was to monitor and oversee the entire project on behalf of the Gaming Authority, and it was widely perceived that D'Amato was more attuned to the interests of Genting, the company financing the casino project, than to those of the Gaming Authority. App:281, 294-96, 306, 333-34.

In April 2014, an earlier tribal project—the construction of a tribal government center—on which RGB was acting as owner's representative was nearing completion. App:380. That project was a great success, and tribal members were impressed with RGB's loyalty to the tribe and its responsiveness to the tribe's interests. App:380-81. That satisfaction led to the Gaming Authority's voting to

award RGB the contract to take over as owner's representative on the casino project. App:388. That contract provided that it could be canceled on seven days' notice for cause and thirty days' notice for "convenience." App:346. There was, however, never the slightest hint during the course of the project that RGB's contract might be in jeopardy; Gaming Authority members were entirely satisfied with RGB's work. App:347, 375, 389, 477, 494-95, 498.

During the course of their professional working relationship, a personal friendship developed between DeQuattro and Cromwell. DeQuattro was invited to such family functions as the fire ceremony on the death of Cromwell's mother and Cromwell's son's college graduation party. App:518, 637.

In July 2014 DeQuattro told Joseph Beretta, RGB's president, that Cromwell had asked for a $10,000 donation to his re-election campaign,[1] with the check payable to CM International Consulting ("CM"), a corporation created by Constantinos Mitrokostas, a friend of Cromwell's who had long been involved tribal affairs. App:524, 527, 607, 780, 843. Beretta consulted RGB's attorneys, who informed him that CM's corporate registration had expired and that they did not recommend making the contribution. App:779, 785-86,790.[2] DeQuattro

---

[1] Tribal chairman was an elected position. The Tribe had no rules or regulations governing or limiting campaign contributions. App:365.

[2] One of those attorneys, who was also Beretta's cousin, described this advice as

communicated directly with one of the attorneys, who told him to ensure that the contribution was made to an entity in good standing. App:908-09. Beretta told DeQuattro that he would not make the contribution and that if DeQuattro wished to do so, he should make sure that it was done correctly. App:791.[3]  There was no evidence that Beretta and DeQuattro ever had any conversations suggesting that they believed the contributions might be necessary to ensure the continuation of RGB's contract, and Beretta testified that he would never have agreed to the contributions had be thought they were in any way related to RGB's contract. App:846. There was also no further evidence regarding the content of any conversations between DeQuattro and Cromwell. DeQuattro subsequently made the contribution, writing a check payable to CM on his personal checking account, but only after verifying that CM's corporate status had been renewed. App:546-48, 554, 638, 877. Because RGB could not make political contributions directly, its practice was to reimburse Beretta and DeQuattro for the contributions they made personally and for business

_____

"pragmatic" rather than legal. App:919. See SA:39 (United States' Opposition to Defendants' Motion *in Limine* to Exclude Attorney Testimony describing attorney's advice as "more business advice than legal opinions").  Neither attorney suggested that such a contribution might be illegal; they were both civil lawyers with no experience in either criminal law or tribal election law. App:918-19.

[3] Much of Beretta's hesitation arose from his lack of knowledge of tribal law and whether there were any laws limiting tribal election campaign contributions. App:858.

development expenses; consistent with this practice, DeQuattro was reimbursed for his contribution through a bonus payment. App:704, 722, 777, 792, 864.[4]

About six weeks later, DeQuattro told Beretta that Cromwell had asked for another $10,000 re-election campaign donation; DeQuattro again wrote a personal check payable to CM and was reimbursed by RGB through a bonus payment. App:798-99. In October-November 2014 and January-February 2015, Cromwell again requested $10,000 contributions, which DeQuattro made via personal check payable to CM and was reimbursed by RGB through bonus payments. App:799-81, 844.

In November 2015, Cromwell requested a $10,000 contribution to One Nation Development, a corporation created by Cromwell. App:806-07.[5] Cromwell advised DeQuattro by letter that the contribution would be used for "food, campaigns, and

---

[4] The government devoted substantial portions of its case to showing the manner in which Mitrokostas transferred this and subsequent contributions to Cromwell and to how Cromwell spent the money. App:580-94, 959-67, 986-96. That evidence is not recounted here because DeQuattro was acquitted on all charges relating to the monetary contributions and because there was no evidence that DeQuattro knew what happened to the monies after he provided CM with the checks.

[5] Because DeQuattro was acquitted on the Count 1 conspiracy charge and on Count 4, which charged this contribution, and because DeQuattro was not shown to have known anything further about One Nation's activities (or lack thereof), DeQuattro does not here discuss the government's evidence relating to One Nation's structure and operational history.

elections." DeQuattro forwarded the letter to Beretta, who consulted one of RGB's corporate attorneys who told him that he needed a letter explaining how the funds would be used to advance the Tribe's goals. App:809-11. Cromwell sent DeQuattro another letter reciting essentially the same purposes as the prior letter. App:814-15. DeQuattro made the requested contribution, writing a check on his personal checking account, and was reimbursed by RGB through a salary check. App:812-17.

During the summer of 2016, Cromwell, who had recently had back surgery, told DeQuattro that he was looking for a BowFlex exercise machine. App:519-20, 823-34. Beretta located a used one on Craigslist for $1,700, and Beretta and DeQuattro split the cost. App:824, 827. DeQuattro went to Cromwell's home when the BowFlex was delivered and helped set up the machine, which Cromwell used to aid in his post-surgery rehabilitation. App:520. Cromwell pointed out that the machine was not new. App:826-27.

Cromwell was up for tribal re-election in February 2017, and in January 2017 DeQuattro made a $4,000 campaign contribution, via personal check payable to CM. App:597-98. DeQuattro was reimbursed by RGB through the weekly payroll. App:816-17.

Lastly, in May 2017 Cromwell asked DeQuattro for a nice hotel in Boston for

his birthday weekend. App:820. DeQuattro forwarded that text to Beretta, saying, "Joe, u can't think of this stuff. . . . what is next?" *Id.* RGB paid $1849.37 for a room at the Boston Seaport Hotel, using a corporate credit card in DeQuattro's name. App:821-23.

Throughout this time, the casino project was proceeding apace, to the complete satisfaction of the Gaming Authority board, the members of which were uniformly pleased with RGB's work. App:347, 380, 382, 388-89, 477, 494-95, 498. RGB was submitting invoices to the Gaming Authority for payment and was being paid regularly (until the Gaming Authority stopped paying RGB in late 2017, leaving about $111,000 owing to RGB for its services, App:839, 975, 1748), for a total of approximately $5,000,000 in gross revenues. App:717, 831-35.[6] Ultimately, work became limited to safety and environmental matters as the result of a federal court injunction. App:836. Also throughout this time DeQuattro, who was RGB's head of business development, was hoping to generate future business from the tribe. App:701-02, 852, 865-66. His efforts were successful, and RGB was awarded the contract for a tribal housing project in 2020. App:944.[7]

---

[6] This sum represented about 20% of RGB's 2014-17 revenues. App:717. RGB's net revenues after payment of expenses and consultants' and contractors' bills were about $3,900,000. App:1748.

[7] When DeQuattro was interviewed by the FBI, he said that he had never been directly solicited for money by Cromwell but acknowledged the contributions made

# SUMMARY OF ARGUMENT

I(B). The district court misapplied this Court's Rule 29 jurisprudence. It focused its analysis on two cases—*Stewart v. Coalter*, 48 F.3d 610 (1st Cir. 1995), and *United States v. Pothier*, 919 F.3d 143 (1st Cir. 2019)—which it viewed as applying differing standards, with *Pothier* prescribing a more rigorous standard and *Stewart* a more lenient view of the government's evidence. Contrary to the court's analysis, which applied what the court viewed as the *Stewart* standard, the standard for reviewing sufficiency of the evidence is a unitary, not binary, one: Where the evidence does not suffice to remove all reasonable doubt of the defendant's guilt or where the evidence is in equipoise (or nearly so), this Court will reverse the conviction. When the proper sufficiency-of-evidence analysis is applied, DeQuattro's conviction should be reversed.

I(C). The evidence did not support DeQuattro's conviction of quid-pro-quo bribery under 18 U.S.C. §666. The evidence did not suffice to prove beyond a

---

via CM and the amount; he also told the agents that he had never given Cromwell a loan or money. App:934-36. In responding as he did to the agents' questions, DeQuattro was drawing a distinction between Cromwell's asking for money to be paid directly to him and the campaign contributions donated via CM. App:934, 942. During the same interview, DeQuattro likened the payments to contributions to Rhode Island politicians and said that the purpose of the payments was not to influence the casino project. App:948-49.

reasonable doubt that at the time of the BowFlex gift in August 2016, 28 months after the inception of RGB's contract, or at the time of the hotel stay gift in May 2017, 37 months after the contract's inception, when work on the project was winding down, there existed a quid-pro-quo agreement between DeQuattro and Cromwell which called for DeQuattro to give Cromwell these gifts in exchange for Cromwell's official acts in protecting the contract and that DeQuattro gave those gifts to Cromwell with the specific intent to exchange them for Cromwell's "protection" of the contract. There was no evidence that the contract was in need of any "protection" whatsoever, given the Gaming Authority's complete satisfaction with RGB's work on the casino project, or that DeQuattro ever perceived any threat to the continuation of RGB's contract (or that Cromwell ever communicated or even intimated such a threat), or that DeQuattro gave the gifts with the required corrupt intent.

I(D). The Court should reject the government's invitation to consider evidence relating solely to the conduct on which DeQuattro was acquitted to augment the sufficiency of the evidence to support DeQuattro's conviction. Not only is consideration of such evidence constitutionally prohibited, but the government's theory runs directly contrary to the evidence introduced at trial. Moreover, most of the evidence bearing on the acquitted conduct would not be admitted at a separate

trial limited to the BowFlex and hotel stay gifts as it would be excluded under either Rule 404(b) or Rule 403.

II.  The evidence was not sufficient to satisfy 18 U.S.C. §666's jurisdictional element, requiring more than $10,000 in federal benefits flowing annually to the same organization impacted by the alleged bribe.  The only evidence of federal funding related to the Mashpee Wampanoag Tribe, and there was no proof of even one single federal dollar flowing to the Gaming Authority, a separate entity created by the Tribe to pursue its plan to build a casino.  By contrast, the only business or transaction allegedly impacted by bribery was the Gaming Authority's contract with RGB.  The Tribe, which  was the sole recipient of federal benefits, was not a party to the RGB-Gaming Authority contract, and that contract expressly provided it could not give rise to any liability for the Tribe.  The absence of any single entity satisfying all statutory elements requires reversal of DeQuattro's conviction.

III(A).  The district court erroneously excluded two witnesses who were prepared to testify that they had provided gifts to Cromwell materially indistinguishable from those for which DeQuattro was convicted and that such gifts were not part of any corrupt quid-pro-quo.  This evidence was admissible for a number of purposes.  First, DeQuattro's prior knowledge that one of the witnesses, a well-respected businessperson and CEO of the firm hired as the architect for the

casino project, had paid for a hotel reservation for Cromwell supported DeQuattro's good-faith belief in the legality of his own subsequent reservation of a hotel suite. Second, the testimony was admissible to establish a common plan by Cromwell to solicit and receive gifts and/or gratuities from business partners through legitimate cultivation of business and political friendships. Third, the witnesses' denial of any quid-pro-quo supported Cromwell's innocent intent, which was independently exculpatory with respect to DeQuattro given the requirement of an agreement to *exchange* things of value for official acts.

III(B). The district court similarly erred in excluding a defense expert who was prepared to testify, based on decades of practice as an attorney in the area of Indian law, that gift-giving in tribal culture is "accepted and in some instances expected" and that such gifts may be provided to cultivate a relationship with the legitimate hope of developing future business rather than as part of a quid-pro-quo. This proffered testimony would have provided the jury with an alternative explanation for DeQuattro's gifts to Cromwell, and the district court's reasons for excluding it were insufficient.

IV. The district court abused its discretion by precluding the jury from returning a verdict for approximately a day and a half after it had already received complete oral instructions until it received supplemental written instructions. The

court's action in this regard facially violated Fed. R. Crim. P. 31(b)(1), diminished the impact of the parties' closing arguments, unduly interfered with the jury's prerogative to deliberate how it chose, undermined the importance and primacy of the oral instructions, and elevated the importance of the issues covered by the supplemental instructions (*i.e.*, the offense definitions and elements) over other crucial matters such as proof beyond a reasonable doubt and the defendants' right not to testify.

V. The district court's restitution order was erroneous in a number of respects: (1) the alleged bribery at issue did not constitute "an offense against property" triggering the relevant restitution statute; (2) the government failed to prove that the Tribe suffered a direct pecuniary loss as required by the statute; (3) the government failed to connect the legal fees incurred by the Tribe to DeQuattro's sole offense of conviction; (4) legal fees like those claimed here do not constitute "other expenses" recoverable under the applicable statutory subsection; and (5) the restitution award included some expenses that were clearly not "necessary" to the Tribe's participation in this case.

## ARGUMENT

## I. THE EVIDENCE WAS INSUFFICIENT TO SUPPORT DEQUATTRO'S CONVICTION.

"[A] society that values the good name and freedom of every individual

should not condemn a man for commission of a crime when there is reasonable doubt about his guilt." *In re Winship*, 397 U.S. 358, 363-64 (1970). A factually innocent person who is nonetheless convicted of a crime suffers "a great wrong." *United States v. Pothier*, 919 F.3d 143, 149 (1st Cir. 2019). As the succeeding sections will demonstrate, such a wrong occurred here.

## A.    Standard of Review.

This Court reviews the denial of a motion for judgment of acquittal de novo. *E.g.*, *United States v. Perez-Melendez*, 599 F.3d 31, 40 (1st Cir. 2010). The question for the Court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *O'Laughlin v. O'Brien*, 568 F.3d 287, 299 (1st Cir. 2009). While the Court will draw all *reasonable* inferences in favor of the verdict, *United States v. Valerio,* 48 F.3d 58, 63-64 (1st Cir.1995), it will not "stack inference upon inference in order to uphold the jury's verdict," *United States v. Guzman-Ortiz*, 975 F.3d 43, 55 (1st Cir. 2020), and will "reject those evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative." *United States v. Blasini-Lluberas*, 169 F.3d 57, 62 (1st Cir. 1999). Appellate analysis of the sufficiency of the evidence to support a criminal conviction requires a "hard look at the record," *id.*, with "some degree of intellectual rigor."

*Pothier*, 919 F.3d at 146.

If, after undertaking this analysis, the Court finds that "'the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged,' this court must reverse the conviction," *United States v. Andujar*, 49 F.3d 16, 20 (1st Cir. 1995), because "where an equal or nearly equal theory of guilt and a theory of innocence is supported by the evidence viewed in the light most favorable to the prosecution, a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Morillo*, 158 F.3d 18, 22 (1st Cir. 1998). In upholding the sufficiency of the evidence,  the district court largely ignored this equipoise rule, which is "entrenched in this circuit's jurisprudence." *United States v. Simon*, 12 F.4th 1, 32 (1st Cir. 2021).

**B.    The District Court Misapprehended This Circuit's Judgment of Acquittal Jurisprudence.**

Because this was an entirely circumstantial case, the district court framed the question before it as "what to do about inferences," asking "how do I decide that [the jury's verdict] is not just a hunch but is a rational exclusion of all the alternatives and how do I evaluate that"? App:1973, 1976. While these questions correctly framed the issue, the court's analysis reached the wrong result as it relied on a misreading of this Court's Rule 29 jurisprudence. The court focused it analysis on

two cases—*Stewart v. Coalter*, 48 F.3d 610 (1st Cir. 1995), and *United States v. Pothier*, 919 F.3d 143 (1st Cir. 2019)—which it viewed as "polarities," with *Pothier* prescribing a more "rigorous standard" and *Stewart* a more "indulgent view of the evidence." App:1974-75; s*ee* App:2058 (describing *Stewart* and *Pothier* as "the Yin and Yang" of Rule 29 cases, with "*Pothier* at one end and *Stewart* at another"). While the court believed that the *Stewart* analysis might require it to find bribery sufficiently proven, it was uncertain whether *Pothier* would support such a result. App:1986.

Contrary to the district court's reasoning, the only real sense in which *Pothier* and *Stewart* represent polar opposites is in the results they reached: in *Stewart*—a case decided before this Court's adoption of the equipoise rule—the Court held the evidence sufficient under the *Jackson* standard and in *Pothier* it did not.[8]

At bottom, however, while the specifics of the Court's analyses differed in the two cases because of the differing fact patterns, the fundamentals of the analysis were the same: were the innocent explanations plausible, and, if so, was the government's evidence sufficient to exclude those innocent explanations beyond a

---

[8] In *Stewart*, this Court found the defendant's innocent explanations of his conduct before and after the murder with which he was charged flatly implausible; in *Pothier*, the Court concluded that the evidence did not disprove the defendant's plausible innocent explanation for the presence of child pornography on his computer.

reasonable doubt?[9] Where the evidence does not suffice to remove all reasonable doubt of the defendant's guilt or where the evidence is in equipoise (or nearly so), this Court will reverse the conviction. *See, e.g., United States v. Guerrero-Narvaez*, 29 F.4th 1, 12 (1st Cir. 2022)(reversing conviction where ambiguous and equivocal evidence would require court to "engage in impermissible evidence stacking" to find proof beyond a reasonable doubt); *Pothier*, 919 F.3d at 147 (reversing conviction where both inculpatory and exculpatory scenarios were plausible, and it would be impossible "to settle on one beyond a reasonable doubt" without guesswork); *United States v. Fernandez-Jorge*, 894 F.3d 36, 52 (1st Cir. 2018)(conviction reversed where upholding verdict would require court "to sanction both stacking inferences and choosing between two 'equal or nearly equal' theories"); *United States v. Rodriguez-Martinez*, 778 F.3d 367, 372-73 (1st Cir. 2015)(reversing conviction where evidence presented two equally plausible inferences, and evidence was insufficient to permit jury to rationally infer that one was more plausible than the

---

[9] *Pothier* cited *Stewart* for the proposition that "[g]uilt beyond a reasonable doubt cannot be premised on pure conjecture," 919 F.3d at 147, *quoting Stewart*, 48 F.3d at 615, *without the slightest suggestion that Stewart embodied a more stringent standard than that which the Court applied in Pothier.* In the 38 years since *Stewart* was decided, this Court has never so much as intimated that there is any tension between the analysis in *Stewart* and the analysis conducted in other sufficiency-of-the-evidence cases.

other); *United States v. Burgos*, 703 F.3d 1, 15 (1st Cir. 2012)(conviction reversed because "the piling of . . . unfounded and unsupported inferences on top of each other" is contrary to circuit precedent);*United States v. de la Cruz Paulino*, 61 F.3d 986, 1002 (1st Cir. 1995)(reversing conviction because, although the evidence "might raise a question in a reasonable man's mind," that was "not enough" to support the conviction).

As these and other cases demonstrate, "[t]he inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts?" *Guzman-Ortiz*, 975 F.3d at 55. *See Stewart*, 48 F.3d at 614-15 (ascribing the differing results reached by the courts that had previously reviewed the sufficiency of the evidence to "the different probabilities that each side implicitly assigns to the possible alternative versions of what happened"). Here, the district court found that there was "a plausible . . . innocent explanation" for the gifts of the BowFlex and the hotel stay,[10] App:1981, but concluded that the evidence sufficed to support the verdict "under . . . the *Stewart* Yin of the Yin and Yang of circumstantial evidence." App:2060.[11] The court offered no explanation for that

---

[10] At sentencing, the court recognized these innocent purposes, stating that it "[saw] payments that were made for purposes of advancing a business" and because DeQuattro "became overtaken with the desire to be a friend, to be supportive." App:2143.

[11] In a later case, the district court again examined the standard for assessing the

conclusion beyond stating at sentencing that its "reading of the circumstantial evidence leads to a finding that [DeQuattro] knew part of it was for the purposes of maintaining the kind of relationship that was necessary to maintain the contracts that he had, and they were of course diminishing over time." App:2143-45.

As will be demonstrated in the next section, that diminution over time—to the extent that DeQuattro ever perceived a need to give things of value to Cromwell to ensure the continuation of the casino contract, which DeQuattro contends he did not—dooms the district court's reasoning. As this court said in *Stewart*, "a conjecture consistent with the evidence becomes less and less a conjecture, and moves gradually toward proof, as alternative innocent explanations are discarded or made less likely." *Stewart*, 48 F.3d at 615-16. Here, in sharp contrast to *Stewart*, there were innocent explanations---personal friendship and the desire to cultivate

---

sufficiency of the evidence and reached the opposite conclusion, deciding, after extensive discussion of *Stewart* and *Pothier*, that *Pothier*, not *Stewart*, provided the proper analytical framework. *United States v. El Naddal*, 2023 WL 2541555 at *10 (D. Mass. Mar. 16, 2023). Relying "on *Pothier*'s analytical framework," the court "evaluate[d] the proof to determine whether the circumstantial evidence raises only 'hunches' against whether that evidence is susceptible to a reasonably plausible innocent interpretation that cannot be eliminated." *Id.* Analyzing the evidence under this standard, the court concluded that the evidence did not suffice to support the defendant's conviction. Had the court relied on the same analysis in this case, it would likely have granted a judgment of acquittal.

further business opportunities---that sufficed to provide a complete explanation for the gifts to the exclusion of a quid-pro-quo motivation to protect RGB's contract. Nor did the evidence suffice to overcome a third innocent explanation, *i.e.,* that these gifts were gratuities--- "a reward for some future act that the public official will take (and may already have determined to take), or for a past act that he has already taken," *United States v. Sun–Diamond Growers of California,* 526 U.S. 398, 404 (1999)---which do not violate §666. *United States v. Fernandez*, 722 F.3d 1, 26 (1st Cir. 2013). Unlike as in *Stewart*, these innocent explanations cannot be discarded and, in fact, became *more* likely with the passage of time. Any interpretation of the evidence to support DeQuattro's conviction would be "unreasonable, insupportable, [and] overly speculative." *Pothier*, 919 F.3d at 146.

## C. The Evidence Did Not Suffice to Prove Quid-Pro-Quo Bribery Beyond a Reasonable Doubt.

18 U.S.C. §666 criminalizes "corruptly giv[ing], offer[ing], or agree[ing] to give anything of value to any person with the intent to influence or reward an agent of an . . . Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such . . . government, or agency . . . ." In other words, bribery, the *sine qua non* of which is a quid-pro-quo agreement between the giver of the benefit and the recipient. *See United States v. McDonough*, 727 F.3d 143, 153 (1st Cir. 2013)("What is needed is an agreement . . . which can

be formal or informal, written or oral."); *see also United States v. Martinez*, 994 F.3d 1, 9 (1st Cir. 2021)(upholding bribery conviction where the evidence permitted reasonable inference of existence of agreement to provide favorable treatment in exchange for things of value). DeQuattro could not properly be convicted on Count 5 unless the evidence demonstrated, beyond a reasonable doubt, that he, when he gave Cromwell the BowFlex or the hotel stay, had the "specific intent to give . . . something of value in exchange for an official act," *United States v. Fernandez*, 722 F.3d 1, 19 (1st Cir. 2013), here, safeguarding RGB's casino contract from termination.[12] It did not.

Bribery does not encompass gifts given "simply to cultivate a business or political 'friendship' with the [official]." *United States v. Sawyer*, 85 F.3d 713, 741 (1st Cir. 1996). *See* App:1825 (court instructs jury that it can consider, *inter alia*, whether the gifts to Cromwell represented "expressions of friendship, concern for

---

[12] The district court's oral instructions to the jury, given a day and a half before the court provided the jury with written instructions, told the jury that it could consider actions with respect to payment of RGB's invoices as "official acts." App:1243. Upon defense objection, the government candidly conceded that its theory was not based on payment of invoices but rather on protection of the contract from termination. App:1312; *see also* App:1079. In its written instructions, which the court told the jury should control its deliberations, App:1384, the court told the jury only that "[a] decision whether or not to protect the First Light casino contract may be . . . an official act," App:1814, thus removing actions related to payments of RGB's invoices from consideration as "official acts."

health, . . . or desire to cultivate future business opportunities"). Nor does §666

bribery encompass the giving of gratuities. *Fernandez*, 722 F.3d at 19.

The government agreed that, in order to convict the defendants, the jury had

to find that Cromwell communicated to DeQuattro his intent to protect the contract

and that DeQuattro provided the things of value in exchange for Cromwell's

performing (or not performing) official acts to ensure that result. App:1079. Because

the government expressly disavowed reliance on a "stream of benefits" bribery

theory, App:1028-29, 1079-80, the sufficiency analysis must focus specifically on

matters as they stood in August 2016, when Cromwell told DeQuattro that he was

looking for a BowFlex, and in May 2017 when RGB paid for a hotel reservation for

Cromwell. *See, e.g., McDonnell v. United States*, 579 U.S. 550, 572-73 (2016)(jury

must "determine whether the public official agreed to perform an 'official act' *at the

time of the alleged quid pro quo*" (emphasis added)); *United States v. Hills*, 27 F.4th

1155, 1179 (6th Cir. 2022)("[T]he official must make a decision or take action, or

promise to do so, on the particular matter *at the time* he receives payment or other

things of value." (emphasis added));*United States v. Silver*, 948 F.3d 538, 558  (2d

Cir. 2020)("[A] particular question or matter must be identified *at the time* the

official makes a promise or accepts a payment." (emphasis added)).

Thus, to convict DeQuattro on Count 5, the jury was required to find beyond

a reasonable doubt that, *at the time of the BowFlex and/or hotel stay gifts*, Cromwell in some fashion communicated to DeQuattro that he would, in exchange for the gift, undertake official acts to ensure continuation of RGB's contract and that DeQuattro intended those gifts to be part of a quid-pro-quo exchange aimed at protecting the contract. *See* App:1814 (jury instructed that to convict DeQuattro it had to find that he "engaged in corrupt activity in which Mr. Cromwell clearly and unequivocally promised that he would perform an official act in exchange for a benefit" and that DeQuattro intended the benefit to be part of a quid-pro-quo exchange). The evidence did not suffice to prove either proposition beyond a reasonable doubt.

As to neither request by Cromwell was there any direct evidence of a quid-pro-quo agreement between Cromwell and DeQuattro, nor was there any direct evidence that DeQuattro conferred those things of value on Cromwell with the understanding that he was doing so in exchange for Cromwell's protection of RGB's contract. There was no evidence of any further communications between DeQuattro and Cromwell at the time of these gifts, nor was there any evidence of communications between DeQuattro and Beretta indicating any belief on their part that RGB's contract was in need of protection or that the gifts were necessary to ensure the continuation of RGB's contract. Beretta, who had a close working relationship with DeQuattro, did not testify to any such conversations, as he would

have done as an immunized government witness had such conversations taken place, instead testifying that he never indicated to DeQuattro that he expected any benefit in return for the contributions *and telling the FBI that he would never have agreed to the contributions had he believed they were related to RGB's casino contract.* App:846. And, critically, there was no evidence whatsoever that the contract was in need of protection or that DeQuattro had any reason to think it was.

While this Court has noted that proof of a corrupt quid-pro-quo agreement is "usually circumstantial," *McDonough*, 727 F.3d at 153, "there are limits to the probative value of circumstantial evidence." *Morgan v. Dickhaut*, 677 F.3d 39, 47 (1st Cir. 2012). "[T]here are times that it amounts to only a reasonable speculation and not to sufficient evidence." *O'Laughlin*, 568 F.3d at 302. Critically, where, as here, "a fact to be proved is also an element of the offense . . . *it is not enough that the inferences in the government's favor are permissible*." *United States v. Pauling*, 924 F.3d 649, 657 (2d Cir. 2019)(emphasis added). On the contrary: this Court "must also be satisfied that the inferences are sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt." *Id.* The evidence here does not rise to this constitutionally-mandated level.

Thus, the question becomes whether there was sufficient circumstantial support for a beyond-a-reasonable-doubt conclusion that in August 2016, 28 months

after the inception of RGB's contract, or May 2017, when work on the project was winding down, there existed a quid-pro-quo agreement between DeQuattro and Cromwell which called for DeQuattro to give Cromwell, respectively, the BowFlex or the hotel stay in exchange for Cromwell's official acts in protecting the contract and that DeQuattro gave those gifts to Cromwell with the specific intent to exchange them for Cromwell's "protection" of the contract.

To answer that question, we must first look to the district court's instructions to the jury. The jury was instructed that to find guilt on any of the counts charged, it was required to find that

- "the defendant engaged in corrupt activity in which Mr. Cromwell *clearly and unequivocally promised* that he would perform an official act in exchange for a benefit", App:1242, 1814 (emphasis added);

- the official entered into a "*clear and unequivocal*" agreement to exchange an official act for the benefit, App:1245 (oral instructions; emphasis added);

- "[t]he agreement need not be explicit, but it must be established *clearly and unequivocally* beyond a reasonable doubt," App:1815 (written instructions; emphasis added); *see* App:1820-26 (same);

- the agreement "must be *clear and unequivocal* from the evidence," App:1245, 1815 (emphasis added);

- "the government has to show from the evidence *clearly and unequivocally* that there was such an agreement," App:1249 (oral instructions; emphasis added).

Thus, under the court's instructions, DeQuattro could not be found guilty on Count 5 unless the government proved, beyond a reasonable doubt, that there was a "clear and unequivocal" agreement between DeQuattro and Cromwell that Cromwell, in exchange for the BowFlex and/or the hotel stay, would "protect" RGB's contract from termination.

These instructions are law of the case for purposes of this appeal. "It is settled that when a cause is submitted to the jury under an instruction, not patently incorrect or internally inconsistent, to which no timely objection has been lodged, the instruction becomes the law of the case." *United States v. Kilmartin*, 944 F.3d 315, 328-29 (1st Cir. 2019). These instructions were neither patently incorrect nor internally inconsistent, and the government did not object to them. Indeed, it acquiesced in the "clear and unequivocal" standard. *See* App:1333 (government says "[t]here has to be a clear and unequivocal understanding"); App:1335 (government suggests that court instruct jury that the government was required to prove that "it is clear and unequivocal that Mr. Cromwell . . . ."). This is, therefore, the standard that should govern this Court's assessment of the sufficiency of the evidence to support DeQuattro's Count 5 conviction. *See, e.g., United States v. Gomes*, 969 F.2d 1290, 1295 (1st Cir. 1992).

As the next sections will demonstrate, there was insufficient evidence to

support the proposition that there was *any* quid-pro-quo agreement or understanding between DeQuattro and Cromwell at the time of the BowFlex and hotel stay gifts, much less a clear and unequivocal one.

### 1. The BowFlex.

In August 2016, when Cromwell told DeQuattro that he was looking for a BowFlex, construction of the casino had been proceeding apace for more than two years, to the complete satisfaction of the Gaming Authority. App:347, 375, 382, 388-89, 473, 477, 494-95, 497-98. There had never been the slightest hint that RGB's contract could be in jeopardy. Far from indicating any dissatisfaction with RGB's performance, the Gaming Authority devolved on RGB additional responsibilities as time passed. App:1636-37. Termination of the contract at that juncture (or at any point after construction began) would have been a disastrous setback for the Gaming Authority, likely dooming its goal to open a five-star casino before a competing casino could open. In short, there was never any reason shown by the evidence that DeQuattro would fear that Cromwell would take any steps to terminate RGB's contract if he did not acquiesce in Cromwell's requests or that the contract needed protection from complaints by other board members (which had been and remained non-existent), and certainly no reason for him to believe so in August 2016. *See* App:1079-80 (government agrees that, as to substantive counts, jury "absolutely"

had to consider whether any threat "ha[d] not been attenuated").

The government's efforts to close this gaping lacuna in its evidentiary presentation centered on two themes: (1) that the termination of the contracts of the prior architect and D'Amato, the prior owner's representative, would give DeQuattro reason to fear that the same could happen to RGB; and (2) that Cromwell exercised such outsize influence on the Gaming Authority board that he could bend it to his will if he so chose. Neither of these theories withstand scrutiny.

As to the first, the government attempted to suggest that there was something arbitrary in those earlier terminations that would give DeQuattro reason to fear similar caprice. The evidence showed, however, that there were valid reasons for dissatisfaction with both the architect and D'Amato which led to the vote to terminate their contracts. *See* page 4, *supra*. DeQuattro and RGB, in sharp contrast, had demonstrated their loyalty to the Tribe's interests during the prior project in which RGB had acted as owner's representative and communicated well with the Gaming Authority during the casino project. App:375, 380-82, 389, 477. Critically, D'Amato himself admitted that if a change were to be made, the time to do it was then, before construction started. App:316. While change at that stage would not result in delay, termination of RGB's contract once construction began would have

been a serious setback for the Gaming Authority. *See* App:316-17, 339.[13] The circumstances surrounding RGB's contract were so wholly different from those which led to D'Amato's termination that they would have given DeQuattro no reason to fear that RGB's contract could meet the same fate if he did not give Cromwell what he asked for.

As for the second, the government sought to suggest that Cromwell was such a dominant and vocal force on the Gaming Authority board that he could have brought about the termination of RGB's contract if he so chose. *See* App:1145-47. Cromwell could not, of course, terminate RGB's contract unilaterally; that would require a majority vote of the board. While Cromwell was one of the more vocal members of the board, board members testified to the collegiality of the meetings, at which all members felt free to express their views, App:304-05, 331, 452, 455, 466, 492, and to exercise their own independent judgment. *See, e.g.,* App:338 (board member who rejected Cromwell's opinion that the prior contractors were not up to the job and voted against termination of their contracts); App:475 (another board member testified that her vote to terminate the prior contracts was made independently in the best interests of the Gaming Authority and the Tribe); App:490-

---

[13] RGB was unanimously selected to take over from D'Amato through a competitive process. App:387-88. The government did not allege any impropriety in the process through which RGB was awarded the contract.

92 (another board member testified that his vote to terminate was made independently after listening to the experts). It is simply inconceivable that in August 2016, when construction was well-advanced and there was complete satisfaction with RGB's performance, there would be any threat that Cromwell would seek to have the board terminate RGB's contract, given the complete absence of any plausible basis for such a request, *see Guerrero-Narvaez*, 29 F.4th at 14 ("[A]n individual's capacity to do harm tells us nothing about his intention to cause harm at that particular time."), much less that he could convince a majority of the board to act in a manner so wholly antithetical to the Gaming Authority's interests.

Against the weakness of the government's case must be set the strength of the evidence of innocent intent and motivation on DeQuattro's part. As of August 2016, DeQuattro was the person primarily responsible for generating business for RGB; the Tribe was an important client, and DeQuattro obviously wanted RGB to continue to be considered for future projects. In addition, over the years a personal friendship had developed between DeQuattro and Cromwell, a relationship sufficiently close that DeQuattro was invited to important family events, App:518, 637-38; *see also* App:2143 (court acknowledges that the friendship between DeQuattro and Cromwell played a part in the giving of the two gifts); App:948 (DeQuattro told FBI he considered Cromwell a friend). At the time he mentioned looking for a BowFlex,

Cromwell was suffering from physical ailments that exercise could ameliorate and had recently had back surgery. App:519-20. Both these motives—desire to cultivate future business opportunities and personal friendship—suffice to explain the gift of the BowFlex.[14]

The government repeatedly characterized Cromwell's requests and these gifts as "outrageous," App:1985, 1987, 1988, 1998, 2003, as if outrageousness could substitute for beyond-a-reasonable-doubt proof of the existence of a quid-pro-quo agreement. It of course cannot, and in any event, the evidence showed that the BowFlex gift was consistent with RGB's legitimate business practices. Beretta testified that RGB, and businesses in general, routinely gave gifts to clients and potential clients in the hope of securing future business, App:863-64, 866-67, and the price of the BowFlex was consistent with the value of other such gifts that RGB had given to clients. *See* App:159 (RGB business record showing 21 business development expenses exceeding $1,800 from 2014-17).

After Cromwell's mention of a BowFlex, DeQuattro and Beretta looked for a used, rather than a new, machine, an unlikely choice if their goal was to ensure

---

[14] Beretta testified that DeQuattro told him several times that Cromwell was planning a future development project and that RGB would be able to bid on it, App:865-66, and in the event RGB was working on another Tribe project by 2020. App:944.

Cromwell's continued protection of the contract. If that were the reason for the gift, why would they risk angering Cromwell and potentially jeopardizing RGB's contract rather than spend a few extra dollars? Moreover, the purchase of the BowFlex was entirely transparent; Beretta openly sought and paid for the machine through Craigslist, and DeQuattro met the seller at Cromwell's house to help set it up. App:520.

## 2. The hotel stay.

The government's theory becomes even more untenable by the time of the hotel stay gift in May 2017. By this time, RGB had been successfully acting as owner's representative for more than three years. Construction had been halted because of a federal court injunction. Not only was RGB's contract not in need of protection at this juncture, there was little left to "protect." Yes, DeQuattro expressed frustration at Cromwell's request, but, given the absence of *any* evidence that Cromwell communicated to DeQuattro that he would protect the contract in exchange for the hotel stay and the corresponding absence of evidence that DeQuattro acquiesced in Cromwell's request with the intent to influence Cromwell's official acts with respect to the RGB contract, Cromwell's request shows no more than his being, as the district court put it, "graspy." App:1989. As with the BowFlex, there was no concealment, the hotel reservation being paid for with an RGB

corporate credit card in DeQuattro's name. App:823. Moreover, the cost of the hotel stay was consistent with RGB's gift-giving practices with its clients.

It is also noteworthy that in the months after the hotel stay gift, the Gaming Authority failed to pay several RGB invoices, App:839, 975, 1748, yet there was no evidence that DeQuattro or anyone else from RGB asked Cromwell to ensure that these invoices were paid, as might be expected had the prior gifts actually been part of a corrupt quid-pro-quo exchange.

### 3. Conclusion.

At this juncture, it is important to recall that, as the government disavowed reliance on a stream-of-benefits theory, the sufficiency of the evidence of quid-pro-quo bribery must be assessed as of the dates of the two gifts—August 2016 for the BowFlex and May 2017 for the hotel stay. To convict DeQuattro based on the BowFlex and/or hotel stay gifts, the jury would have had to infer that (a) DeQuattro feared that if he did not acquiesce in Cromwell's requests, RGB's contract could be terminated, despite the absence of any evidence that such a risk ever existed, (b) that fear still existed in August 2016, 28 months after the contract was signed, when construction was well underway and there was complete satisfaction with RGB's performance, and in May 2017, more than three years later when the project was grinding to a halt as the result of a federal court injunction, (c) Cromwell, in telling

DeQuattro that he was looking for a BowFlex and/or asking for a weekend in a nice hotel, clearly and unequivocally conveyed to DeQuattro a promise (or understanding) that he would protect the contract in exchange for the gift, and (d) DeQuattro provided Cromwell the BowFlex and/or the hotel stay in exchange for Cromwell's official acts in protecting the contract. Based on the evidence at trial, no rational jury could have found these inferences supportable beyond a reasonable doubt. The jury could not find that these gifts to Cromwell were in any part motivated by an intent to exchange the gift for the promise of an official act in protecting RGB's contract without making "speculative leaps" or "stacking . . . inference upon inference." *United States v. Pina-Nieves*, 59 F.4th 9, 15 (1st Cir. 2023).

The insufficiency of the evidence to support DeQuattro's conviction comes into even sharper focus when the strength of the evidence supporting reasonable inferences that the gifts were motivated entirely by innocent purposes is considered. Those innocent purposes—personal friendship and the desire to cultivate future business opportunities with the Tribe or, through Cromwell, with other tribes, *see* App:1629-31—suffice to provide a complete explanation for the gifts, and the evidence does not suffice to show beyond a reasonable doubt that a corrupt quid-pro-quo exchange formed any part of their purpose. The evidence surrounding these

gifts cannot, therefore, support DeQuattro's conviction on Count 5.

The government's case as to both gifts was so weak that the evidence was not even in equipoise but instead skewed so heavily against any rational conclusion that DeQuattro gave Cromwell these gifts in exchange for his official acts in protecting the contract that his conviction should be reversed. However, even should the Court view the evidence as more supportive of the verdict than DeQuattro has argued, the evidence cannot be found to be any more than in equipoise; there is no "additional circumstantial evidence from which the jury could rationally infer that" the government's theory of bribery was "more supportable than" the theory that the gifts had entirely legitimate purposes. *Rodríguez-Martinez*, 778 F.3d at 373. Accordingly, at minimum, the equipoise rule requires that DeQuattro's conviction be reversed. Possibilities or even probabilities do not suffice. *See Guzman-Ortiz*, 975 F.3d at 55. There must be proof beyond a reasonable doubt that DeQuattro gave Cromwell these gifts as part of a corrupt quid-pro-quo exchange, and that proof was lacking here.

**D.** **The Court Should Not Consider Evidence Relating Solely to the Counts on Which DeQuattro Was Acquitted in Assessing the Sufficiency of the Evidence on the Count of Conviction.**

In its response to DeQuattro's post-trial Rule 29 motion, the government focused predominantly on the evidence relating to the six campaign contributions made by DeQuattro, making little effort to justify DeQuattro's conviction with

respect to the BowFlex and hotel stay gifts independently of the evidence relating to the acquitted payments. *See* App:1881. The government expressly invited the court to "consider the context of the preceding payments" in evaluating the sufficiency of the evidence to prove that DeQuattro had the specific intent to commit quid-pro-quo bribery when he provided Cromwell with the BowFlex and the hotel stay. App:1898 n.8. At the Rule 29 hearing, DeQuattro argued that the court should not consider the evidence relating to the acquitted payments. App:1978-81; *see also* App:1850-51, 1909-12. In response the government developed at length its theory that "increasing toxicity" from the prior payments demonstrated DeQuattro's knowledge and intent to commit bribery with the two gifts. App:1981-2003. During further hearing on the Rule 29 motion on the day of sentencing, the government returned to its "increasing toxicity" theme, App:2054-58, contending that the court "ha[d] to look at it as a cumulative set of bribes." App:2058. In its sentencing memorandum, the government effectively conceded that the evidence relating to the two gifts was not, without consideration of the evidence relating to the acquitted contributions, sufficient to support the Count 5 conviction. *See* Doc. 280 at 1 ("The fact that these items were bribes in exchange for Cromwell's promise to protect the contract as the jury found makes no sense if viewed in isolation. They only make sense when viewed as part of the government's proof.").

The extent to which the court relied on evidence relating solely to the acquitted contributions in denying DeQuattro's Rule 29 motion is not entirely clear. Initially, the court indicated its belief that "under some case law within the First Circuit" it was permissible "to view this kind of increased toxicity as justifiable for the verdict," App:2058,[15] but it later said that it did not "necessarily see increased toxicity." App:2143. However, because its "reading of the circumstantial evidence" led it to conclude that DeQuattro knew that the two gifts were, in part, bribes, App:2143-44, and because the circumstantial evidence surrounding the two gifts would not rationally support such a conclusion, the evidence relating to the acquitted conduct must have played a role in the court's denial of the Rule 29 motion. DeQuattro anticipates that the government will once again contend that evidence relating solely to the acquitted contributions should be considered in evaluating the sufficiency of the evidence to support his conviction. This Court should reject that contention.

_____

[15] The court did not specify the caselaw to which it was referring. In its opposition to DeQuattro's Rule 29 motion, the only cases cited by the government to counter DeQuattro's argument that the court should not consider the evidence relating to the acquitted contributions were cases dealing with inconsistent verdicts. App:1896. DeQuattro was not, however, advancing an inconsistent verdict argument, as he expressly told the court. App:2044-45. Rather, he contends that the government should not be permitted to rely on the evidence rejected by the jury in rendering its acquittals to save the conviction for the two gifts.

## 1.    The government's theory is inherently flawed.

The government's theory suffers from several inherent flaws which compel its rejection. First, this was *not* a case involving "a cumulative set of bribes." On the contrary, as addressed above, the government expressly disavowed reliance on a stream-of-benefits theory. That being the case, the BowFlex and hotel stay gifts must be evaluated as individual, stand-alone transactions, not as part of a continuing series of transactions.

Second, there is an even more fundamental reason why the evidence cannot be viewed as "a cumulative set of bribes": *the jury's verdicts say that the monetary contributions of July 2014, September 2014, October-November 2014, January-February 2015, November 2015, and January 2017 were not bribes.*[16] There is,

---

[16] There can be no doubt that a conclusion that DeQuattro did not agree or intend to commit quid-pro-quo bribery was the basis for the jury's acquittals. As to the two contributions charged substantively in Counts 4 and 5 ($10,000 in November 2015 and $4,000 in January 2017), the sole contested question before the jury was whether the government "prove[d] beyond a reasonable doubt that Mr. DeQuattro agreed to give Mr. Cromwell something of value in exchange for what he understood to be a promise of his official action in protecting the contract." App:1824; *see* App:1169-95. There was no dispute that the contributions were made, that the Tribe received more than $10,000 a year in federal benefits or that the value of the casino contract exceeded $5,000; while DeQuattro argued to the court (and argues herein, *see* Section II, *infra*), that Cromwell was not acting as an agent of the Tribe but rather of the Gaming Authority, he did not argue this question to the jury, and, in any event, the guilty verdicts returned by the jury indicate that it found this element satisfied. *See* App:1823-24 (instructions listing elements of §666 offense). As for the four contributions encompassed within the Count 1 conspiracy charge, the jury must

simply, no authority that permits the government to resurrect acquitted conduct, treat it as if it had been the subject of convictions, and then expressly rely on the evidence *rejected* by the jury to salvage a conviction otherwise unsupported by sufficient evidence.[17] This is not merely an evidentiary issue, but also a constitutional one. The Sixth Amendment right to trial by jury "is no mere procedural formality, but a fundamental reservation of power in our constitutional structure." *Blakely v, Washington*, 542 U.S. 296, 305-06 (2004). Treating the evidence as showing "a cumulative series of bribes," as the government urged below, when the jury, through its acquittals, has plainly said that it was not, and upholding DeQuattro's conviction on that basis is fundamentally inconsistent with the historical function of juries, *see, e.g., McClinton v. United States*, 143 S.Ct. 2400 (2023)(Statement of Sotomayor, J.,

---

necessarily have found that DeQuattro did not enter into a conspiratorial agreement with Cromwell to commit federal program bribery and that he either did not intend that federal program bribery be committed or that he did not intend to agree to that object. *See* App:1828.

[17] *Dowling v. United States*, 493 U.S. 342 (1990), and the cases that followed it, are not to the contrary. The issue in *Dowling* was the admissibility, under Rule 404(b), of evidence relating to conduct of which the defendant had been acquitted in a separate case in the subsequent trial of another offense. As such, it has no bearing on the issue presented here, the sufficiency of the evidence to support DeQuattro's conviction in a single trial of acquitted and convicted counts. Permitting the jury to hear evidence of acquitted conduct in support of an otherwise viable prosecution is one thing, but relying on such conduct to hold the evidence minimally sufficient to support a conviction is quite another.

respecting the denial of certiorari), and with the Sixth Amendment that guarantees that right. If the evidence cannot be found sufficient to support the conviction without reliance on acquitted conduct, then the acquitted conduct becomes "essential to [DeQuattro's] punishment" on the remaining count of conviction. Accordingly, the Sixth Amendment required it to be found by the jury beyond a reasonable doubt, *United States v. Booker*, 543 U.S. 220, 232 (2005), as the sentence imposed on DeQuattro was "not solely based on facts reflected in the jury verdict or admitted by the defendant." *Id. See United States v. Haymond*, ___ U.S. ___, 139 S. Ct. 2369, 2376 (2019)(plurality)("A judge's authority to issue a sentence derives from, and is limited by, the jury's factual findings of criminal conduct."). Reliance on acquitted conduct to save an otherwise unsustainable conviction also has serious Fifth Amendment due process implications. *See, e.g.*, *United States v. Bagcho*, 923 F.3d 1131, 1141 (D.C.Cir. 2019)(Millett, J, concurring); *United States v. Bell*, 808 F.3d 926, 928 (D.C.Cir. 2015)(Kavanaugh, J., concurring in denial of rehearing *en banc*); *United States v. Canania*, 532 F.3d 764, 776-77 (8th Cir. 2008)(Bright, J., concurring); *United States v. Faust*, 456 F.3d 1342, 1349 (11th Cir. 2006)(Barkett, J., concurring). If, as these and other judges believe, increasing a defendant's sentence based on acquitted conduct violates due process, then how much more profound a violation occurs when the very conviction itself cannot be sustained

absent reliance on acquitted conduct.

Third, the government's theory simply makes no sense. It beggars belief that the jury would, as the government argued below, give DeQuattro the benefit of the doubt as to $10,000 contributions over a 16 month period (July 2014-November 2015) and then conclude that, eight months later, in August 2016, DeQuattro must have realized that Cromwell's request for a BowFlex—a far more modest request than those preceding it—was in fact the solicitation of a bribe and that DeQuattro, in response, supplied the used BowFlex with the specific intent to engage in a quid-pro-quo exchange for protection of the contract. And the government's theory becomes even more untenable when one considers that the jury then leapfrogged over the BowFlex gift to acquit DeQuattro of the $4,000 contribution made in January 2017 and then convicted him with respect to the hotel stay.

Fourth, instead of "increasing toxicity," there was, if anything, *decreasing* toxicity. As previously explained, by the time of the August 2016 BowFlex gift and the May 2017 hotel reservation, there was simply no reason for DeQuattro to fear that RGB's contract could be in jeopardy if he did not accede to Cromwell's requests or to have understood that he was being asked for bribes to ensure continuation of the contract, which by May 2017 was already on its way to termination with the cessation of construction.

**2.** **The sufficiency of the evidence as to the BowFlex and hotel stay must be evaluated as if they were the only charges.**

The law has traditionally "attache[d] particular significance to an acquittal." *United States v. Scott*, 437 U.S. 82, 91 (1978). While DeQuattro does not contend that double jeopardy principles are applicable here, there is a fundamental unfairness in ignoring the jury's acquittals entirely. Acquittals must mean *something*. At minimum, they must mean that a court reviewing the sufficiency of the evidence on a convicted count should not consider evidence admitted solely as to the acquitted counts and which would not have been admissible in a separate trial of the convicted count. "Each count in an indictment is regarded as if it was a separate indictment." *Dunn v. United States*, 284 U.S. 390, 393 (1932). *See United States v. Weller*, 40 F.4th 563, 566 (7th Cir. 2022)(where defendant was convicted of conspiracy but acquitted of all substantive charges, court (Easterbrook, J.) states that "[w]e must assess the conspiracy conviction as if it had been the only charge"). Although consideration of acquitted conduct in imposing sentence is currently authorized (although perhaps for not much longer, as the Sentencing Commission will consider the issue this year),[18] "that presents a different question than determining beyond a

---

[18] The use of acquitted conduct to increase a defendant's sentence has come under increasing attack. Many judges, including several current and former Supreme Court justices, have been highly critical of the practice. *See, e.g., McClinton v. United States*, 143 S.Ct. 2400 (2023)(Statement of Sotomayor, J., respecting the denial of

reasonable doubt that the evidence supports a jury verdict and basing that conclusion, in part, on acquitted conduct." *United States v. Cusick*, 2012 WL 442005 at *5 n.3 (D.Mass. Feb. 9, 2012)(court rejects government proposition where the only evidence the government cited in support was conduct for which the defendant had been acquitted).

### 3. Much, if not most, of the evidence relating solely to the acquitted conduct would not have been admitted in a separate trial of the BowFlex and hotel stay gifts.

Had the two gifts been the only bribery charges, much, if not most, of the evidence relating to the temporally and substantively distinct acquitted contributions would have been excluded under Fed. R. Evid. 404(b) or 403. The question of admissibility under Rule 404(b) is a two-step inquiry. "First, the evidence must have 'special relevance' to an issue in the case" that does "not include bad character or

_____

certiorari; Statement of Kavanaugh, Gorsuch, and Barrett, JJ, respecting the denial of certiorari); *United States v. Watts*, 519 U.S. 148, 170 (1997)(Kennedy, J., dissenting); *Jones v. United States*, 574 U.S. 948 at *9 (2014)(Scalia, J., with whom Thomas, J. and Ginsburg, J., joined, dissenting from denial of *certiorari*); *Bell*, 808 F.3d at 928 (Kavanaugh, J., concurring in denial of rehearing *en banc*); *United States v. Sabillon-Umana*, 772 F.3d 1328, 1331 (10th Cir. 2014)(Gorsuch, J.). Legal scholars have also joined the attack. *See, e.g.,* Barry L. Johnson, *The Puzzling Persistence of Acquitted Conduct in Federal Sentencing, and What can be Done About It*, 49 Suffolk L. Rev. 1 (2016). The unfairness in increasing a defendant's sentence based on conduct of which a jury has acquitted him is obvious; even more palpable is the unfairness inherent in upholding the conviction itself by relying on acquitted conduct.

propensity as a necessary link in the chain." *United States v. Varoudakis*, 233 F.3d 113, 118 (1st Cir. 2000). "Second, under Rule 403" the evidence "may still be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." *Id.* This Court "focuse[s] on two factors to determine the probative value of prior bad act evidence: 'the remoteness in time of the other act and the degree of resemblance to the crime charged.'" *Id.* at 119, *quoting United States v. Frankhauser*, 80 F.3d 641, 648 (1st Cir. 1996).

Under this analysis, while some of the evidence relating to the acquitted contributions might have some relevance as background to show the relationship between DeQuattro and Cromwell and the formation and progress of RGB's contract, large swaths of that evidence would doubtless have been excluded. First, the contributions were entirely different in kind from the two gifts based on which DeQuattro was convicted. Evidence relating to the use of CM, the involvement of Mitrokostas, the manner in which Mitrokostas structured the payments to Cromwell (of which there was no evidence that DeQuattro was aware), the business advice given by RGB's attorneys (which pertained solely to two of the contributions), the purported concealment through use of CM and RGB's reimbursement of DeQuattro (the BowFlex and hotel stay gifts being entirely transparent), and Cromwell's use of the money for personal expenditures (about which DeQuattro also had no

knowledge) were irrelevant to the question whether DeQuattro intended to commit quid-pro-quo bribery when he gave Cromwell the BowFlex and the hotel stay.

The acquitted contributions were also temporally remote from the two gifts. The first five donations occurred 25 months, 23 months, 21 months, 19 months, and 9 months before the August 2016 BowFlex gift, and the smaller $4,000 donation (which the government acknowledged at trial had been used for campaign purposes, App:1164) occurred four months before the May 2017 hotel reservation. These significant temporal gaps reinforce the lack of connection between the gifts and the contributions. *See, e.g., United States v. Rodriguez-Cardona*, 924 F.2d 1148, 1151-53 (1st Cir. 1991)(referring to acts occurring "some four months after the last of the four transactions for which the indictment was issued" as "remote in time").

Evidence may also be excluded under Rule 403 if it would "confus[e] the issues, mislead[] the jury, [cause] undue delay, [or] wast[e] time." Such concerns are of paramount importance when the admission of extrinsic evidence would involve a "minitrial" in which the defendant would be forced to defend against crimes not charged against him, and this Court has upheld the exclusion of evidence or ruled evidence improperly admitted on this basis. *See, e.g., United States v. George*, 761 F.3d 42, 57 (1st Cir. 2014); *United States v. Gilbert*, 229 F.3d 15, 24 (1st Cir. 2000).

Here, in a separate trial of the BowFlex and hotel stay charges, the problem

would be infinitely worse: a "maxitrial" of the acquitted conduct in which the actual charges against DeQuattro would "get lost in the details of the 'maxitrial,' which would [be] unduly prejudicial and likely to confuse the issues and mislead the jury." *Martinez v. Cui*, 608 F.3d 54, 61 (1st Cir. 2010). The BowFlex and hotel stay evidence occupies a combined total of fifteen transcript pages in the testimony of two witnesses (out of hundreds of pages of witness testimony). *See* App:520, 818, 820-27, 866-70. Only six of the 93 exhibits introduced (Exs. 55-60, App:1581-98) relate to the two gifts. Admission of evidence surrounding the acquitted contributions would truly be the tail wagging the dog. *See United States v. Fortenberry*, 860 F.2d 628, 632 (5th Cir. 1988)(where evidence of other crimes was "of a magnitude far greater than the charged offenses" and "occupied more of the jury's time than the evidence of the charged offenses," evidence held erroneously admitted because "[i]n terms both of time in the courtroom and capacity to impress the jury, this tail wagged the dog").

The Court should not, therefore, consider the evidence pertaining solely to the acquitted conduct in assessing the sufficiency of the evidence as to the BowFlex and hotel stay gifts. DeQuattro's conviction should be reversed.

## II. THERE WAS INSUFFICIENT EVIDENCE TO SATISFY §666'S JURISDICTIONAL ELEMENT.

As the Supreme Court has expressly recognized, §666 does not "turn almost

every act of . . . bribery into a federal offense." *Fischer v. United States*, 529 U.S. 667, 681 (2000). Rather, Congress intended the statute to "protect the integrity of the vast sums of money distributed through Federal programs from theft, fraud, and undue influence by bribery." *Sabri v. United States*, 541 U.S. 600, 606 (2004)(quoting S. Rep. No. 98-225, 370 (1983)). To be sure, the government need not prove a specific connection between the federal funds disbursed to the entity in question and the alleged act of bribery. This is because "[m]oney is fungible," and "bribed officials are untrustworthy stewards of federal funds." *Id. But the statute, on its face, does require that federal funds flow to the same organization impacted by the bribe. See* 18 U.S.C. §666(a)(2) and (b)(requiring that bribery occur "in connection with any business, transaction, or series of transactions of" an "organization, government, or agency" receiving $10,000 in federal benefits annually); *United States v. Acevedo-Hernandez*, 898 F.3d 150, 162 (1st Cir. 2018)("A bribe under this statute must be made in connection with any business, transaction, or series of transactions of the covered organization, government, or agency . . . ." (citation omitted)); *United States v. Doran*, 854 F.3d 1312, 1315 (11th Cir. 2017)("[T]he Government must prove among other elements that the organization which was victimized received federal benefits in excess of $10,000."); *United States v. Whitfield*, 590 F.3d 325, 346 (5th Cir. 2009)(holding that judges'

acceptance of bribes in their judicial capacity "had no 'connection with any business, transaction, or series of transactions' of the" state Administrative Office of the Courts, which received federal funds); *United States v. Abu-Shawish*, 507 F.3d 550, 556 (7th Cir. 2007)("[T]he statute mentions only one organization, which implies that all three relevant attributes attach to the organization: it has custody of the funds, its agent committed the fraud, and it is victimized by the fraud.").[19]  This Court reviews *de novo* preserved challenges to the sufficiency of the evidence to satisfy this jurisdictional element.  *See United States v. Bravo-Fernandez*, 913 F.3d 244, 247 (1st Cir. 2019).

Here, the only evidence of federal funding related to the Tribe itself, not the Gaming Authority.  Indeed, the government failed to prove that a single federal dollar flowed to the Gaming Authority during the approximately three-year term of the RGB contract.  Nor was there even any trial evidence of funds flowing from the Tribe to the Gaming Authority.[20]  Instead, the casino project – and the Gaming

---

[19] *See also* DOJ Criminal Resource Manual 1014 (requiring that organization also "administer" funds).

[20] In opposing DeQuattro's Rule 29 Motion, the government did submit a handful of bank records, showing a single transfer of funds from the Tribe to the Gaming Authority but the government did not seek at any time to admit these records into evidence nor to demonstrate any relationship of these funds to federal programs. *See* App:1803.

Authority as a whole – was funded by Genting, a third-party entity. *See* App:269-70, 362-63, 495, 713, 1146.

Accordingly, the district court appropriately instructed the jury that, in order to convict DeQuattro, it was required to find, among other things:

- that Mr. DeQuattro gave, offered, or agreed to give something of value to Mr. Cromwell *in connection with the business of the Mashpee Wampanoag Tribe*; [and]

- [that the Gaming Authority's] First Light casino contract with RGB . . . *constituted business of the Mashpee Wampanoag Tribe*.

App:1823(emphasis added). Because the Tribe was the only identified recipient of federal benefits, the alleged bribery was required to affect the "business" of the Tribe, and not the separate Gaming Authority. *See infra* pages 52-54.

The government's proof was utterly lacking in this regard. As the district court's instructions recognized, the only "business, transaction, or series of transactions" allegedly impacted by the bribery was the Gaming Authority's contract with RGB. *See also* App:229(government identifying "protection of the RGB casino contract" as the only purported official act exchanged for payment). *Not only was the Tribe not party to the RGB-Gaming Authority contract, but that contract expressly provided that it could not give rise to any liability for the Tribe*:

MWTGA [an acronym used to refer to the Gaming

Authority] ***IS AN ENTITY CREATED AND EXISTING UNDER THE LAWS OF THE MASHPEE WAMPANOAG TRIBE . . . THAT IS SEPARATE AND APART FROM THE TRIBE.*** ANY WAIVER OF SOVEREIGN IMMUNITY OR CONSENT TO ANY DISPUTE RESOLUTION PROCEDURES OR LEGAL PROCESS IN THIS AGREEMENT BY THE MWTGA IS NOT A WAIVER OR CONSENT TO SUCH MATTERS BY THE TRIBE. NO WAIVER OF SOVEREIGN IMMUNITY OR CONSENT TO ANY DISPUTE RESOLUTION PROCEDURES OR LEGAL PROCESS WITH RESPECT TO ANY CLAIM OR ACTION OF ANY NATURE BY THE MWTGA, REGARDLESS OF ANY REPRESENTATIONS OR CONDUCT TO THE CONTRARY BY THE MWTGA, THE TRIBE OR ANYONE ELSE, SHALL EVER PERMIT ENFORCEMENT OF ANY JUDGEMENT, AWARD, ORDER OR OTHER LEGAL PROCESS AS AGAINST THE TRIBE OR ANY MEMBER OF THE TRIBE IN SUCH MEMBER'S INDIVIDUAL CAPACITY EXCEPT AS AGAINST GAMING ENTERPRISE ASSETS AS DEFINED IN THE TRIBAL GAMING AUTHORITY ORDINANCE.

App:1527(emphasis added). This contractual provision expressly exempted the

Tribe and its federal funds from any liability to RGB. This is consistent with the

relevant tribal ordinance, which similarly provides:

> ***No obligation or liability of the Authority*** . . . of any nature, whether arising by reason of contract, tort, law, equity or otherwise, ***shall constitute . . . an obligation or liability of or shall be enforceable or constitute a basis for a claim against any property . . . of any Tribal Party other than the Authority,*** except as otherwise expressly provided in a duly adopted written resolution of the Tribal Council, and except for Gaming Enterprise Assets

> constituting personal property owned or held by a Tribal
> Party other than the Authority.

App:1451(emphasis added). Robert Hendricks, the Gaming Authority Treasurer, testified that the entity was created for the specific purpose of protecting the Tribe from all gaming-related liabilities. *See* App:328.

The government conceded in district court that the Gaming Authority and the Tribe were "legally separate entit[ies]." App:1802.[21] This fact alone, coupled with the complete absence of evidence of any federal funds flowing to the Gaming Authority, and the complete insulation of such funds from being used by the Gaming Authority to support its gambling-related construction, was dispositive on the face of the statute, which requires that the ***same*** "organization, government, ***or agency***" impacted by the bribe receive more than $10,000 in federal benefits. 18 U.S.C. §666(b)(emphasis added). Crucially, the statute does not purport to apply to bribery affecting an agency of a larger organization, where the organization as a whole, but not the specific agency at issue, receives the required federal support. *See, e.g.*, *Acevedo-Hernandez*, 898 F.3d at 162. This omission is entirely consistent with the express Congressional purpose of protecting the integrity of federal funds. *See*

---

[21] The government contended that, notwithstanding this legal separateness, the two entities were "in no way independent." App:1802. Assuming, contrary to the defense argument, that this Court finds it necessary to consider the interrelationship between the two separate entities, this contention is addressed *infra* pages 53-54.

*Sabri*, 541 U.S. at 606. This goal is simply not implicated where, as here, there is no evidence that the specific entity victimized by bribery received any federal benefits. *See* DOJ Criminal Resource Manual 1001("A narrower reading, consistent with the stated congressional intent, requires that the agent must have illegally obtained cash or property from the agency that received the necessary Federal assistance."). All of RGB's invoices were sent to the Gaming Authority, and RGB was exclusively paid via checks from the Gaming Authority. In short, even assuming *arguendo* that Cromwell was corrupt in his dealings with DeQuattro and RGB, there was not a shred of evidence in the trial record that such corruption could conceivably have impacted even a single federal dollar. This is because there was no evidence that RGB could seek funds of any kind from the Tribe, the sole recipient of federal benefits in this case.

While the defense contends that the legal independence of the two entities alone is sufficient to require reversal, it also notes that the Gaming Authority exercised a number of independent powers and a strong measure of independence with respect to its financial affairs, including ownership of "all Gaming Enterprise Assets other than any interest in real property," as well as the "full power of acquisition, disposition or encumbrance" of such assets. App:1448. It also had the explicit power "to hire, fire, discipline or appoint employees, contractors,

consultants, attorneys and accountants or other agents of the Authority, prescribe their duties and compensation, and indemnify the same." App:1449. In fact, "[a]s between the Authority and any other Tribal Party, the Authority in its own name" was granted "the ***exclusive power*** to do ***any and all things*** necessary or desirable in connection with the development, design, financing, construction, equipping, leasing, operation, management (other than engaging a Third Party Manager), maintenance, and promotion of the Gaming Facilities and the operation or conduct of the Gaming Enterprise." App:1449 (emphasis added).

Two highly persuasive and materially indistinguishable decisions from the Eleventh Circuit, consistent with the foregoing reasoning, strongly suggest that DeQuattro's convictions must be reversed.

*United States v. Doran*, 854 F.3d 1312 (11th Cir. 2017), involved alleged embezzlement, in violation of §666(a)(1)(A), by a university professor. The defendant, in addition to his role as a professor, also served as director and officer of "a non-profit corporation established by [the university] for charitable and educational purposes." *Id.* at 1314. It was the non-profit entity, not the university itself, from which the defendant allegedly embezzled funds. The interrelationship between the two entities was reminiscent of that between the Tribe and the Gaming Authority here. Just like the Gaming Authority, the non-profit in *Doran* was funded

by "private donors." *Id.* at 1314. Its board of directors, however, consisted exclusively of university employees and/or their designees. *See id.* Also similar to the relationship between the Tribe and the Gaming Authority, the university explicitly "assume[d] no financial liability for the" non-profit. *Id.* The government argued in *Doran* that, although the non-profit itself received no federal benefits, it "was closely affiliated with [the university] which did receive millions of federal dollars and that [the professor] was acting as an agent of [the university] when he committed the crime in issue." *Id.* The Eleventh Circuit squarely rejected this argument, notwithstanding the connection between the university and the non-profit it created, including the overlapping personnel, holding instead that the government failed to prove "that the relevant local organization, the [non-profit], received any federal benefits." *Id.* at 1316.

In reaching this result, the *Doran* court relied on *United States v. McLean*, 802 F.3d 1228 (11th Cir. 2015). *See also Bravo-Fernandez*, 913 F.3d at 251 n.3 (citing *McLean* regarding "jurisdictional element" generally and requirement that funds received constitute cognizable "benefits"). There, the defendant City Commissioner was charged with violating §666 by allegedly accepting bribes in exchange for grants awarded by a redevelopment agency. The Eleventh Circuit held that the agency's receipt of bus shelters constructed with federal funds was insufficient to support

conviction given the absence of evidence tying such use to "whatever federal program authorized the distribution of funds." *McLean*, 802 F.3d at 1244. Crucially for present purposes, despite the fact that the City itself also received federal funds, the *McLean* court "identified the [agency] as the relevant local organization under §666 and not the City." *Doran*, 854 F.3d at 1315. It therefore "did not consider significant in its analysis the federal funds retained by the City for its own use." *Id.* Here, there was no evidence that the Gaming Authority received any federal funds whatsoever, unlike the agency in *McLean*.

Notably, the connection between the City and the agency in *McLean* was closer than that between the Tribe and the Gaming Authority here. The redevelopment agency was "a component of the City" and "part of the government's operations." 802 F.3d at 1241. Unlike the Gaming Authority, which was independent and supported by funds from a private developer (and the non-profit in *Doran*), the agency was also "financially dependent upon the City." *Id.* at 1242. Additionally, "[e]ach City Commissioner simultaneously served on" the agency's board. *Id.* at 1232. By contrast, while certain Tribal officers were "automatically" appointed to the Gaming Authority board, not all Tribal Council members were also Gaming Authority board members or *vice versa*. *See* App:1802. Notwithstanding the foregoing connections, the *McLean* court declined to "conflate the City and the"

agency.  *Doran*, 854 F.3d at 1315.  There is, therefore, no way to square these Eleventh Circuit precedents with the government's contention that the Gaming Authority's purported lack of independence negates the need to prove the statutory jurisdictional element with respect to that specific entity.

In short, the entity that alone had a business transaction that could have been impacted by an illegal bribe received *no* federal program benefit and the entity that alone received federal benefits had *no* business transaction with the defendant at all that related to the alleged payment of a thing of value to Cromwell.  In these circumstances, DeQuattro's conviction cannot stand.

## III.  THE DISTRICT COURT ERRONEOUSLY EXCLUDED TESTIMONY FROM THREE PROFFERED DEFENSE WITNESSES.

The district court excluded testimony from three proffered witnesses who would have supported DeQuattro's defense that the BowFlex and hotel reservation were gifts, or at worst gratuities, as opposed to quid-pro-quo bribes.  This Court reviews such evidentiary rulings for abuse of discretion.  *See United States v. Soler-Montalvo*, 44 F.4th 1, 14 (1st Cir. 2022).

**A.** **The District Court Erroneously Excluded Testimony from Two Witnesses that They Gave Cromwell Gifts Virtually Identical to Those Underlying DeQuattro's Convictions without any Quid-Pro-Quo.**

Paul Steelman, the CEO of the firm hired as the architect on the casino project, was prepared to testify that, in addition to making no-strings-attached tribal political donations to Cromwell in circumstances similar to DeQuattro, he agreed to Cromwell's requests to pay for hotel reservations and to lend Cromwell his car when Cromwell attended conferences in Las Vegas. *See* App:1110. DeQuattro proffered an exhibit establishing that, before either of the gifts underlying his conviction, he received an email reflecting one such hotel reservation made by Steelman's company for Cromwell. *See* SA:21. Steelman also placed a $400 Super Bowl bet on Cromwell's behalf. *See* App:1110. Steelman would have testified that he has had many other clients ask for similar accommodations, and that he did not view Cromwell's requests as unusual. *See* App:1110-11.

Mark Tilden, an attorney for the Tribe, similarly was prepared to testify that, in addition to making a campaign donation, he recalled offering to help Cromwell pay for a piece of exercise equipment to assist in his recovery from back surgery, though he could not recall whether he did in fact contribute to the purchase. *See* App:1113. Tilden would have further testified that he viewed this offer as an act of friendship. *See* App:1113. Tilden also purchased a blanket for Cromwell's

mother's funeral, which he believed cost between $200 and $300, and purchased a plane ticket for Cromwell, at an estimated cost of $300 to $400, after unexpectedly encountering him at the airport. *See* App:1112.

The government moved to exclude evidence of others' (*e.g.*, Steelman and Tilden's) campaign contributions pursuant to Fed. R. Evid. 401 and 403. *See* SA:1-2. It also argued that, under Fed. R. Evid. 404(b), "prior 'good acts' generally may not be used to show a predisposition not to commit crimes." SA:3(citation omitted). DeQuattro opposed the government motion arguing, among other things, (1) that Rule 404(b) should not be applied to exclude evidence proffered by the defense; (2) that Steelman's provision of a similar gift to Cromwell, of which DeQuattro had prior knowledge, constituted "powerful evidence" of DeQuattro's good faith; (3) that the evidence was relevant to establish a common plan by Cromwell to solicit tribal campaign contributions and gratuities but not bribes from business partners; and (4) that the evidence was relevant to Cromwell's intent, a required element for DeQuattro to be convicted of engaging with him in a quid-pro-quo "***exchange***." *See* SA:7-17 (emphasis added).

Undersigned counsel raised the issue again at a mid-trial conference prior to the beginning of the defense case, proffering Steelman and Tilden's anticipated testimony. *See* App:1109-13. The district court excluded it, acknowledging that

the proffered evidence was "sufficient to . . . suggest that what Mr. Steelman [wa]s engaged in is precisely what is alleged against Mr. DeQuattro," but holding that admission of the evidence would "create[] the potential for a minitrial over Mr. Steelman's activities" and lead the jury to speculate as to why Steelman was not charged. *See* App:1111.

The evidence proffered here was relevant and admissible for several of the same non-propensity purposes frequently invoked by the government to introduce evidence of prior ***bad*** acts by a criminal defendant. Whether or not Rule 404(b) strictly applies to evidence proffered by a defendant,[22] these bases of non-propensity relevance frame the analysis for admissibility under Rule 403.

First, with respect to Steelman, there can be little question that DeQuattro's prior knowledge that another well-respected businessperson had provided virtually identical accommodations to Cromwell supported the defense argument that DeQuattro harbored a good-faith belief in the legality of his own subsequent actions. The district court did not address this aspect of the defense proffer in excluding Steelman's testimony.

---

[22] This Court has stated that "Rule 404(b) does not exclude evidence of prior crimes of persons other than the defendant." *United States v. Gonzalez-Sanchez*, 825 F.2d 572, 583 (1st Cir. 1987); *see also United States v. David*, 940 F.2d 722, 736 (1st Cir. 1991)("Objections based on Rule 404(b) may be raised only by the person whose 'other crimes, wrongs, or acts' are attempted to be revealed.").

Moreover, Steelman and Tilden's proffered testimony was admissible to show a "common . . . plan" by Cromwell to solicit and receive gifts and/or gratuities from business partners. *United States v. Vest*, 842 F.2d 1319, 1327 (1st Cir. 1998); *see also United States v. Anderson*, 809 F.2d 1281, 1285 (7th Cir. 1987); *United States v. Murphy*, 768 F.2d 1518, 1535 (7th Cir. 1985). Crucially, testimony from the excluded witnesses would have demonstrated that Cromwell achieved this goal, not through bribery, but through legitimate and permissible cultivation of business and political friendships. *See United States v. Sawyer*, 85 F.3d 713, 741 (1st Cir. 1996)("[I]f [the defendant] had th[e] limited intent . . . to cultivate friendship rather than to influence an official act . . . the federal statutes here involved would not be violated."). The "remarkabl[e] similar[ity]" of the proffered testimony and the government's allegations against DeQuattro bolsters the case for admissibility on this basis. *United States v. Baker*, 82 F.3d 273, 276 (8th Cir. 1996); *see also Varoudakis*, 233 F.3d at 119; *United States v. Sullivan*, 911 F.2d 2, 6 (7th Cir. 1990)(finding admissible evidence that "was similar to and virtually contemporaneous with the other acts of bribery solicitation by" the defendant). Testimony that Steelman and Tilden viewed their interactions with Cromwell as legitimate acts of friendship and/or business development would have strongly supported DeQuattro's defense that he believed the BowFlex and hotel reservation

were gifts, not bribes. The manner in which these similarly situated witnesses interpreted Cromwell's overtures was highly relevant to how DeQuattro understood those same signals and, ultimately, whether he corruptly intended for the items to be provided in exchange for official acts.

The proffered testimony was also relevant to Cromwell's state of mind. And §666's demand for a *quid pro quo* "*exchange*," *United States v. Fernandez*, 722 F.3d 1, 19 (1st Cir. 2013)(quoting *United States v. Sun-Diamond Growers of Calif.*, 526 U.S. 398, 404-05 (1999)), renders evidence of Cromwell's innocent intent independently exculpatory with respect to DeQuattro. *See United States v. Shelton*, 997 F.3d 749, 777 (7th Cir. 2021)(stating that alleged conduct "would not constitute honest services fraud unless the defendants intended to take official acts"); *United States v. Ford*, 435 F.3d 204, 212 (2d Cir. 2006)("The government was . . . required to prove beyond a reasonable doubt that [the defendant] accepted . . . services 'intending to be influenced' in her official duties."); *United States v. Schaffer*, 183 F.3d 833, 841 (D.C. Cir. 1999), *vacated as moot* (describing bribery as "having a two-way nexus").

Courts have frequently, at the government's invitation, admitted evidence of similar ***bad*** acts in bribery cases to prove knowledge, intent, and/or lack of mistake. *See, e.g.*, *United States v. Orlando-Figueroa*, 229 F.3d 33, 45 (1st Cir.

2000)(holding in §666 case that "[t]he district court acted well within its discretion in admitting" evidence of defendant's prior demand for a bribe as proof that the defendant "had the state of mind or intent to commit the crime"). This is because "[e]xtrinsic acts evidence may be critical to the establishment of the truth as to . . . the actor's state of mind [where] the only means of ascertaining that mental state is by drawing inferences from conduct." *Huddleston v. United States*, 485 U.S. 681, 685 (1988). This logic is in no way dependent upon which party is proffering the evidence. *See United States v. Hayes*, 219 F. App'x 114, 117 (3d Cir. 2007) (unpublished)(explaining that so-called "reverse 404(b)" evidence is "no less relevant merely because it is exculpatory and undermines [the defendant's] participation in the alleged conspiracy"); *United States v. Marlinga*, 457 F. Supp. 2d 769, 775 (E.D. Mich. 2006)(finding prior acts evidence relevant to the defendant's "innocent state of mind and lack of criminal intent" in bribery case).

In light of the foregoing significant probative value, the evidence should not have been excluded pursuant to Fed. R. Evid 403. "[T]he standard for exclusion under Rule 403 is a high one." *Soler-Montalvo*, 44 F.4th at 16. "[T]he default rule is that relevant evidence will be admitted." *Id.* Indeed, it is not even enough to justify exclusion "that the evidence's dangers of unfair prejudice or confusion *somewhat* outweigh the probative value of the evidence." *Id.* Rather, the rule

permits exclusion only where such probative value is "*substantially* outweighed" by countervailing factors. *Id.* (quoting Rule 403). Here, neither the government nor the district court articulated unfair prejudice to any party, and there was none. The district court's concern about a "minitrial" was not sufficient to justify exclusion of the relatively narrow proffered testimony of these two witnesses. Such concern could have and should have been addressed via "less restrictive means," including cautionary instructions and cross-examination. *Id.* at 18-19 (citation omitted).

## B.   The District Court Erroneously Excluded a Defense Expert whose Testimony was Highly Relevant and Exculpatory.

The government also moved to exclude the proffered testimony of defense expert Skip Durocher, an attorney who had practiced in the area of Indian law for 27 years, during which time he worked with approximately 25-30 different Tribes. *See* App:106-07.  Durocher was expected to testify based on this experience "that many tribes are wary of doing business with non-Indian individuals and companies that have not otherwise established reputations for reliability, trustworthiness, and a commitment to being a responsible member of the tribal business community." App:107.  This reluctance is born partially from the "well-known and well-documented history of exploitation of Indian tribes in the United States at the hands of both the federal and state governments, as well as by countless private businesses

and individuals." App:107. The defense intended to offer this testimony to, among other things, provide a potential explanation for DeQuattro's gifts other than the government's theory of quid-pro-quo bribery. *See* App:113.

The district court held an evidentiary hearing on the government's motion to exclude Durocher's testimony. Durocher testified at the hearing that, based on his experience, "gift-giving in the tribal culture is generally understood and accepted and in some instances expected." App:134. He further explained that "it makes sense in Indian Country for someone to try to establish a rapport and a relationship with someone like Chairman Cromwell to benefit their future business and not to secure some quid pro quo." App:159.

At the conclusion of the hearing, the district court preliminarily ruled that it would exclude Durocher's testimony. It reasoned that Durocher's "statements with respect to future opportunities, business opportunities is interesting but, on the basis of what is available to me right now, not material" because the issue at hand was whether there was "a payoff in this case." App:165. The court also cited Durocher's lack of specific familiarity with the Mashpee Wampanoag Tribe, despite Durocher's testimony that his opinion was based on shared characteristics of the dozens of tribes he had worked with over the course of his career. *See* App:166. Undersigned counsel raised the issue of Durocher's testimony again before the beginning of the

defense case. *See* App:1107. The district court stood by its decision to exclude the testimony. *See* App:1108.

Under Fed. R. Evid. 702, a qualified expert[23] may provide testimony that "rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). The rule "has been interpreted liberally in favor of the admission of expert testimony," and it does not demand "overly specialized knowledge." *Levin v. Dalva Bros., Inc.*, 459 F.3d 68, 78 (1st Cir. 2006). Proffered testimony is relevant so long as it "will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592. The reliability inquiry is "a flexible one," which "must be tailored to fit the circumstances of each particular case." *United States v. Encarnacion*, 26 F.4th 490, 505 (1st Cir. 2022)(citation omitted). This is because there are a "wide variety of matters on which expert testimony may be useful." *Id.* Flexibility is particularly important for experts "outside of scientific fields." *Id.*

Here, Durocher's testimony was relevant. It provided the jury with an alternative explanation for DeQuattro's gifts to Cromwell, other than the government's allegation of quid-pro-quo bribery. If, as Durocher testified at the *Daubert* hearing, "gift-giving in the tribal culture is generally understood and

---

[23] The government raised no challenge to Durocher's qualifications.

accepted and in some instances expected," App:134, that would support an inference that DeQuattro may not have sought to bribe Cromwell. Durocher's experiential knowledge on this point was beyond the ken of the typical District of Massachusetts juror lacking decades of experience working and interacting with Native American tribes. *See United States v. Garcia-Morales*, 382 F.3d 12, 19 (1st Cir. 2004)("Considering that most jurors are likely unfamiliar with the drug trade, [expert's] testimony provided relevant context for the subsequent evidence about [the defendant's] participation."); *Dang Vang v. Vang Xiong X. Toyed*, 944 F.2d 476, 481-82 (9th Cir. 1991)(affirming admission of expert testimony providing "a general explanation of Hmong culture and the role of women in that culture" as "relevant to assist the trier of fact to understand certain behavior of the parties . . . that might otherwise be confusing, and to explain the cause, effect, and nature of long term Hmong reliance on governmental agencies for support" (footnote omitted)); *cf. Pelletier v. Main St. Textiles, LP*, 470 F.3d 48, 55 (1st Cir. 2006)("[I]n general, the customs and practices of an industry are proper subjects for expert testimony.").

The district court's insistence that a jury finding of quid-pro-quo bribery would moot Durocher's testimony simply begged the question. The jury was entitled to consider the various alternative motivations supported by the evidence

to decide whether or not a quid-pro-quo was a co-existing motivation.[24]  Absent Durocher's testimony, the jury did not have the basis to fully understand that a gift to Cromwell would be important in motivating him to open up business opportunities with other tribes not just the Mashpee tribe – one of several non-criminal motivations for the gifts.   The trial evidence established that DeQuattro and Cromwell had pursued business opportunities together that were unrelated to the Mashpee Wampanoag Tribe, though those opportunities ultimately did not materialize.  *See* App:1629-31.

Similarly, the district court's reliance upon prospective jurors' general awareness of mistreatment experienced by Native American tribes, *see* App:166, should not have precluded the defense from providing further elaboration regarding how this historical backdrop affects non-tribal members doing business with tribes in the present context.  *See United States v. Amuso*, 21 F.3d 1251, 1264 (2d Cir. 1994)("Despite the prevalence of organized crime stories in the news and popular media, [operational methods of organized crime families] remain proper subjects for expert testimony."); *Katt v. City of New York*, 151 F. Supp. 2d 313, 358 (S.D.N.Y. 2001)("[E]xpert testimony helps even where the jury has knowledge of

---

[24] *See* pages 31-32 *supra*.

the subject, but that knowledge may be incomplete or inaccurate." (quoting Wright, Miller & Kane, *Fed. Prac. & Proc.* §6264, at 213)).

Contrary to the government's argument in district court, the foregoing testimony would not have "invade[d] the province of the Court" or jury. App:101. Fed. R. Evid. 704(b) prohibits experts from "stat[ing] an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense." But Durocher's proffer did not include any such opinion. Rather, he was prepared to testify that DeQuattro's gifts to Cromwell were "consistent with" his experience of legitimate gift-giving and business development in tribal culture, App:162-63, "allowing the jury to infer the defendant's state of mind." *Soler-Montalvo*, 44 F.4th at 14. Such testimony "does not violate Rule 704(b)'s ultimate-issue prohibition." *Id.*; *see also id.*("[W]e have held time and again that although Rule 704(b) bars a witness from characterizing the defendant's intent, . . . it does not . . . apply to predicate facts from which a jury might infer such intent." (citation omitted)). Indeed, this Court has permitted the government to offer functionally identical expert testimony in different contexts. *See id.* ("[W]e have held that a qualified expert does not violate Rule 704(b) by expressing an opinion as to whether predicate facts are consistent with drug distribution rather than mere possession" (citation omitted)); *id.*(citing precedent

holding "an expert's testimony that recorded conversations involved loansharking" admissible (citation omitted)); *United States v. Teganya*, 997 F.3d 424, 429-30 (1st Cir. 2021)(affirming government expert's testimony "regarding the Rwandan genocide and its aftermath" where the expert "did not purport to be testifying . . . about [the defendant] specifically," and instead was "merely providing context that might prove counter-intuitive to a layperson").[25]

Durocher's lack of specific familiarity with the Mashpee Wampanoag Tribe did not sufficiently undercut the reliability of his testimony to render it inadmissible. *See Microfinancial, Inc. v. Premier Holidays Int'l, Inc.*, 385 F.3d 72, 80 (1st Cir. 2004)(holding that expert "need not have . . . first-hand dealings with the precise type of event . . . at issue"). Indeed, Durocher testified that, in his experience with dozens of other tribes, they "share many common characteristics." App:131; *see also* App:163-65. And DeQuattro's argument for admissibility was expressly predicated upon Durocher's tendency to prove the possible motivation of improving

---

[25] This Court has observed, "[o]f course, the relevance of expert testimony regarding cultural matters is context-dependent and must be assessed on a case-by-case basis." *United States v. Tetioukhine*, 725 F.3d 1, 7 (1st Cir. 2013). This necessarily follows from the face of Rule 702, which generally applies to all expert testimony and does not single out any particular type of testimony for differential treatment. Accordingly, suggestions in Ninth Circuit opinions that expert testimony regarding cultural issues is always subject to exclusion are unpersuasive and should be rejected. *See, e.g.*, *United States v. Vongsay*, 988 F.2d 126 (9th Cir. 1993) (unpublished).

"his company's potential opportunity for future business with either the Mashpee Wampanoag Tribe *or other Tribes that Mr. Cromwell would be in a position to further* . . . ." App:119 (emphasis added); *see also* App:108(expert disclosure explaining, "Persons who donate time and resources to a particular tribal community or individual within that community, . . . may also eventually benefit through introductions or referrals to other tribal governments and businesses in other areas of the country"); App:153-54 (Durocher testifying "I do believe that [developing a relationship with Cromwell] could help open the doors through referrals and through publicity and marketing with other tribes that know that Mr. DeQuattro has done good work for the Mashpee tribe and that Chairman Cromwell would vouch for him").  Durocher's lack of specific experience with the Mashpee Wampanoags did nothing to undermine the probative value of his testimony on the latter point.  Even if the government (or the court) found the "factual underpinning" of Durocher's opinion weak, this was "a matter affecting the weight and credibility of the testimony – a question to be resolved by the jury." *Martinez v. United States*, 33 F.4th 20, 24 (1st Cir. 2022)(citation omitted); *see also Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Neither could Durocher's testimony have been permissibly excluded under Rule 403. As an initial matter, the district court did not rely on this rule, so it conducted no balancing of probative value against potential unfair prejudice or jury confusion for this Court to defer to. *See Gomez v. Rivera Rodriguez*, 344 F.3d 103, 115 (1st Cir. 2003). In any event, the government made no showing that it would have been unfairly prejudiced by admission of Durocher's testimony, and any possibility of jury confusion could have been readily addressed via cautionary instructions. *See Soler-Montalvo*, 44 F.4th at 18-19.

### C.     Exclusion of the Foregoing Witness Testimony was not Harmless.

There can be no credible claim that exclusion of the foregoing testimony was harmless. Because the district court's error was "of a constitutional dimension," implicating DeQuattro's Fifth and Sixth Amendment right to present a complete defense, *see California v. Trombetta*, 467 U.S. 479, 485 (1984),[26] the government bears the burden of establishing harmlessness "beyond a reasonable doubt." *United States v. Moffett*, 53 F.4th 679, 691 (1st Cir. 2022)(citation omitted); *see also United States v. Pina-Nieves*, 59 F.4th 9, 24 n.1 (1st Cir. 2023)(acknowledging but not addressing similar argument). To meet its burden, the government "must show that

---

[26] *See also, e.g.*, *Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987); *Washington v. Texas*, 388 U.S. 14, 19 (1967).

. . . there is no reasonable possibility that the error at issue influenced the jury in reaching the verdict." *Moffett*, 53 F.4th at 691(citation omitted). As set forth above, the evidence against DeQuattro in this case was, assuming *arguendo* the Court rejects DeQuattro's Rule 29 argument, only minimally sufficient to go to the jury. In this context, there is, at the very least, a reasonable possibility that testimony that others gave Cromwell gifts materially indistinguishable from those for which DeQuattro was convicted without asking for or receiving anything in exchange would have impacted the jury's deliberations. The same is true of expert testimony that "gift-giving in the tribal culture is generally understood and accepted and in some instances expected." App:134.[27] Accordingly, the district court's error requires reversal.

---

[27] For these same reasons, the government would be unable to establish harmlessness even under the somewhat less exacting standard for non-constitutional errors. There can be no assurance to a "high[] probab[ility]" that exclusion of the three proffered witnesses' testimony, alone or in combination, "did not contribute to the verdict." *United States v. Garcia-Sierra*, 994 F.3d 17, 35 (1st Cir. 2021)(citation omitted).

## IV. THE DISTRICT COURT ERRONEOUSLY AND IN FACIAL VIOLATION OF FED. R. CRIM. P. 31 PRECLUDED THE JURY FROM REACHING A VERDICT UNTIL RECEIVING WRITTEN INSTRUCTIONS.

The district court, over objection, *see* App:1304, 1366, instructed the jury that it was not permitted to return a verdict for approximately a day and a half until it received supplemental written instructions. *See* App:1306-07.[28] This constituted an abuse of discretion. *See United States v. Correia*, 55 F.4th 12, 42 (1st Cir. 2022)(stating that similar asserted error "engenders review for abuse of discretion").

Fed. R. Crim. P. 31(b)(1) provides that, "[i]f there are multiple defendants, the jury may return a verdict *at any time* during its deliberations as to any defendant about whom it has agreed." (Emphasis added). The district court's instruction, over objection, that the jury "may not return a verdict" until it received written instructions constituted a facial violation of Rule 31. Ultimately, the jury was not

---

[28] The court recessed at 3:18pm on May 3 after the oral instructions and counsel's objections thereto. *See* App:1291. At that time, the court suggested that jurors begin deliberations without taking a vote. See App:1275, 1279. The next day, over objection, it informed jurors that the written instructions were still being worked on and said, "in the interim, I'm of the view that you can continue deliberating even without those documents . . . . But I must tell you that you may not return a verdict until you have the written instructions that I'm going to provide you . . . ." App:1306. It later reiterated, "so until you have the additional instructions in writing that I'm going to give you . . . , I'm instructing you not to return a verdict in this case." App:1307. Finally, at approximately 9:19 am on May 5, the jury was told it was permitted to reach a verdict. *See* App:1383.

permitted to return a verdict until May 5, 2022, a day and a half after counsel's summation and the court's oral instructions. This delay had the inevitable effect of diminishing the jurors' recollection of the parties' arguments and emphasizing the written instructions over the prior oral ones. The district court's clear violation of Rule 31, in itself, constitutes an abuse of discretion.

The court's error is rendered more problematic by the potential undue influence upon jurors. "[U]nder any system of jury trials the influence of the trial judge on the jury is necessarily and properly of great weight." *Moffett*, 53 F.4th at 685 (quoting *Starr v. United States*, 153 U.S. 614, 626 (1894)). Not only must the jury be "free . . . from 'direct control in its verdict' by the district court but also 'from judicial pressure' '[i]n the exercise of its functions.'" *Id.*(quoting *United States v. Spock*, 416 F.2d 165, 181 (1st Cir. 1969)). This requirement is rooted in the Sixth Amendment. *See id.* at 684-85. Here, the district court's instruction that the jury was not permitted to return a verdict improperly invaded the prerogative of the jury to deliberate however it chooses. Respectfully, it was not the court's role, absent a request from either party, to *sua sponte* prohibit the jury from returning a verdict for such a substantial period of time.

The court's action was inconsistent with the general recognition in the law that the oral instructions should be the jury's primary source of direction, with

written instructions serving as an optional supplement that the court may choose to utilize in an exercise of its discretion. *See United States v. Pennue*, 770 F.3d 985, 990 (1st Cir. 2014)(stating that this Court "would hesitate to rely on written instructions alone as a basis for concluding that the jury was not likely to be misled by an incorrect oral instruction," in part because of "concern that jurors may not read written instructions"); *United States v. Becerra*, 939 F.3d 995, 1000-01 (9th Cir. 2019)("Since before the founding of our Republic, courts have universally met the need to educate jurors by orally advising jurors in the presence of the parties, the counsel, and all others . . . in matters of law arising upon th[e] evidence. There are excellent reasons this feature of our trial process endures.").

Repeatedly admonishing the jurors that they could not conclude their deliberations until receiving the written instructions could only serve to further emphasize the importance of that document and, by implication, minimize the import of oral instructions not repeated therein. This is consistent with this Court's observation decades ago that "the troubling aspects" of non-oral instructions are generally "errors of omission rather than of commission." *United States v. Flaherty*, 668 F.2d 566, 600 (1st Cir. 1981). The Court recently reaffirmed that submission of

"fractional written instructions to a jury is always a risky business." *Correia*, 55 F.4th at 43.[29]

Here, the written instructions focused narrowly on the definitions of the offenses charged against DeQuattro and his co-defendant. To be sure, they also included reminders regarding the presumption of innocence, *see* App:1813, and the defense of good faith, *see* App:1835, but the vast majority of the document was devoted to defining the crimes that the government alleged the defendants had committed. The written instructions omitted any reference to other crucial aspects of the oral instructions, including the defendants' right not to testify, *see* App:1229, and the need to evaluate cooperating witnesses' testimony "with great care," *see* App:1231-32. The cardinal principle of proof beyond a reasonable doubt, while referenced in passing, was not explained in anything close to the level of detail reflected in the oral instructions. *See* App:1270-73.[30] Notwithstanding the court's

---

[29] While *Correia* ultimately found that the district court's use of written instructions did not constitute an abuse of discretion in the case at hand, it expressly recognized the "case-by-case" nature of the inquiry. 55 F.4th at 43. And the appellate claim in *Correia* did not appear to include any prohibition on returning a verdict similar to that at issue here.

[30] At the request of counsel for Cromwell, the district court did draw the jury's attention to the pages of the oral instruction transcript discussing the requirement of proof beyond a reasonable doubt, though it declined to include extended discussion of that concept in the written instructions themselves. *See* App:1384.

statement that the jury should consider all of its prior instructions, the practical effect of the procedure followed here was to improperly elevate the material covered in the written instructions above the rest. *Cf. Moffett*, 53 F.4th at 685 ("[A] district court may cross the constitutional line without in effect directing the jury to consider *only* the government's evidence. We have indicated that the constitutional line also may be crossed whenever the district court . . . places undue weight on portions of the government's evidence and thereby tilts the trial in that party's favor" (citation omitted)).

Because this error implicates the Sixth Amendment, the government must prove harmlessness beyond a reasonable doubt. *See id.* at 691. In light of the "great weight" of influence that a trial judge holds with the jury, *see id.* at 685(citation omitted), and (assuming the Court rejects DeQuattro's Rule 29 argument) the minimally sufficient evidence in this case, *see* pages 21-36 *supra*, the defense submits that the government cannot satisfy this burden.

## V. THE DISTRICT COURT'S RESTITUTION ORDER WAS LEGALLY ERRONEOUS IN SEVERAL RESPECTS.

The district court ordered, pursuant to the Mandatory Victims Restitution Act ("MVRA"), that DeQuattro be jointly and severally liable for more than $140,000 in legal expenses incurred by the Tribe during the course of the investigation giving rise to this case and the subsequent criminal prosecution. In doing so, the court

violated several aspects of the MVRA. Restitution orders are reviewed "for abuse of discretion," with factual findings upheld absent "clear error," but legal conclusions examined "*de novo*." *In re Akebia Therapeutics, Inc.*, 981 F.3d 32, 36 (1st Cir. 2020).

First, the alleged bribery here did not constitute "an offense against property," one of several threshold requirements to the MVRA's applicability. 18 U.S.C. §3663A(c)(1). Persuasive authorities reflect a consensus that some, but not all, bribery constitutes an offense against property. *United States v. Collins*, 854 F.3d 1324, 1335 (11th Cir. 2017)(observing that it is "not readily apparent" that bribery "will always trigger" this statutory provision); *United States v. Adorno*, 950 F. Supp. 2d 426, 429 (E.D.N.Y. 2013)(explaining that "the elements of" §666 "do not make it an offense against property").

In order to satisfy the statute, the defendant's conduct must be "'in opposition to' or 'contrary to' the classic property rights of ownership and possession." *Collins*, 854 F.3d at 1331. In this case, the government took the position that conviction did not require a showing that Cromwell's "official conduct" was "influenced" by DeQuattro's purported bribery. *See Adorno*, 950 F. Supp. 2d at 430; App:1901 ("The government was not required to prove that the BowFlex and paid hotel stay caused Cromwell to refrain from doing something he otherwise

would have done.").  And there was no evidence that any action by Cromwell was so influenced.  In fact, the trial evidence evinced no indication that termination of RGB's contract was ever considered by anyone at any time and established that stakeholders in the casino project were completely satisfied with RGB's performance.  *See* page 5 *supra*.  This lack of evidence that DeQuattro's actions implicated another person or entity's property interest renders the MVRA inapplicable.  *See Adorno*, 950 F. Supp. 2d at 430; *Collins*, 854 F.3d at 1335 (suggesting that statute may not apply where the government fails to "demonstrate[e] that any improperly influenced transaction implicated someone else's property.").

A second, separate threshold requirement to application of the MVRA is "an identifiable victim or victims" that "has suffered a physical injury or pecuniary loss." 18 U.S.C. §3663A(c)(1)(B).  The statute defines "victim" as limited to "a person directly and proximately harmed as a result of the commission of an offense." §3663A(a)(2).  Accordingly, courts have construed it to require that pecuniary loss follow as a direct and proximate result from the offense of conviction.  *See, e.g.*, *Morillo v. Attorney General*, 751 F. App'x 335, 338 (3d Cir. 2018) (unpublished)(crediting government argument that "a court can order restitution only if it 'finds that an identifiable victim or victims has suffered a . . . pecuniary

loss as a direct[] and proximate[] result of the offense.'"); S. Rep. 104-179, 19 (1995)("The committee intends this provision to mean . . . that mandatory restitution provisions apply only in those instances where a named, identifiable victim suffers a . . . pecuniary loss directly and proximately caused by the course of conduct under the count or counts for which the offender is convicted."). Here, the government conceded in district court that the Tribe's legal fees for which it sought restitution were a "indirect" pecuniary loss. App:2237. This, in itself, should have precluded recovery under the MVRA.

Third, even assuming, contrary to the above, that the threshold statutory requirements are satisfied, an award of restitution must be limited to "the loss caused by the specific conduct that is the basis of the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 413 (1990). Accordingly, "a defendant who is charged with multiple offenses but who is convicted of only one offense" cannot be required "to make restitution for losses related to the other alleged offenses." *Id.* at 412-13; *see also United States v. Mancillas*, 172 F.3d 341, 343 (1st Cir. 1999)(applying *Hughey* to MVRA); *United States v. Comer*, 93 F.3d 1271, 1279 (6th Cir. 1996)(vacating restitution award "based on losses occasioned by conduct that was not charged in the indictment and losses that resulted from a charge of which the defendant was acquitted"). While the permissible basis for restitution may be

somewhat broader when the offense of conviction "involves as an element a scheme, conspiracy, or pattern of criminal activity," 18 U.S.C. §3663A(a)(2), that is not the case here. DeQuattro was acquitted of conspiracy, acquitted of all the counts predicated upon tribal political donations, and convicted of a single count of substantive bribery in connection with two standalone gifts: a used BowFlex machine and a hotel reservation.

In these circumstances, the government was required to prove that the claimed loss "would not have occurred but for" DeQuattro's two gifts and that "the loss is not too attenuated (either factually or temporally)" from those gifts. *United States v. Cutter*, 313 F.3d 1, 7 (1st Cir. 2002)(citation omitted). But neither the government nor the district court made any attempt to tie the Tribe's legal fees to the specific conduct underlying DeQuattro's offense of conviction. That omission alone should have doomed the restitution claim under *Hughey*.

Fourth, the defense contends that the nature of the legal fees and costs claimed is outside the scope of reimbursable expenses under the MVRA. This is currently an open issue in the First Circuit. *See Akebia*, 981 F.3d at 38 n.4 ("assum[ing] without deciding that attorney's fees are" recoverable). The relevant subsection permits the victim to recover "for lost income and necessary childcare, transportation, and other expenses incurred during participation in the investigation

or prosecution of the offense or attendance at proceedings related to the offense."
18 U.S.C. §3663A(b)(4). The Supreme Court has held that the statutory terms
"investigation" and "proceedings" "are limited to government investigations and
criminal proceedings," as opposed to "private investigations and civil proceedings."
*Lagos v. United States*, 138 S. Ct. 1684, 1687 (2018). In reaching this result, it
observed:

> Lost income, child care expenses, and transportation expenses are precisely the kind of expenses that a victim would be likely to incur when he or she . . . misses work and travels to talk to government investigators, to participate in a government criminal investigation, or to testify before a grand jury or attend a criminal trial. At the same time, ***the statute says nothing about*** the kinds of expenses a victim would often incur when private investigations . . . are at issue, namely, ***the costs of hiring private investigators, attorneys, or accountants***.

*Id.* at 1688(emphasis added).[31] *Lagos* also noted that a "broad reading" of the statute
"would create significant administrative burdens" because the recoverable expenses
must be "*necessary*," and application of the statute to private investigations would
"invite disputes" regarding the necessity of particular costs which "may become

---

[31] In this regard, the MVRA is readily distinguishable from the different
restitution statute at issue in *United States v. Cardozo*, 68 F.4th 725, 733 (1st Cir.
2023)(quoting 18 U.S.C. §2264(b)(3)), which specifically includes "attorneys' fees"
within the types of loss recoverable.

burdensome in cases involving multimillion dollar investigation expenses for teams of lawyers and accountants." *Id.* at 1689.

While the present case does not implicate *Lagos*'s holding, both the legal and pragmatic aspects of the Court's rationale are equally applicable to the issue presented here: whether "other expenses" may include legal fees and related costs incurred during a government investigation and prosecution. *See also United States v. Koutsostamatis*, 956 F.3d 301, 306 (5th Cir. 2020)(applying *Lagos* to hold that "other expenses" did not include costs incurred by organizational victim assisting the FBI in investigating an alleged hacker).[32] To the extent the Court finds any statutory ambiguity on this issue (or any other issue regarding the MVRA), the rule of lenity requires it to be resolved in DeQuattro's favor. *See Hughey*, 495 U.S. at 422.

Even assuming the Court rules against DeQuattro on every one of the foregoing legal issues, the restitution order must, at the very least, be vacated and remanded for the district court to exclude expenses that were clearly not "necessary" to the Tribe's "participation in the investigation or prosecution." 18 U.S.C.

---

[32] *Koutsostamatis* does not, to be sure, represent a consensus view. Other circuits have narrowed *Lagos* to the private-investigation context and reaffirmed pre-existing precedents holding attorney fees incurred in government investigations recoverable. *See, e.g.*, *United States v. Afriyie*, 27 F.4th 161, 166 (2d Cir. 2022). But this Court is not constrained by any analogous circuit precedent.

§3663A(b)(4)*; see also Akebia*, 981 F.3d at 37.  These expenses include:

- "[E]xtend[ing] thanks [to prosecutors] on behalf of the Tribe" after the guilty verdict.  SA:304.

- Analysis of "strategic issues" regarding potential indictment of Cromwell, "including public relations" and "potential dissolution of relationship with RGB."  SA:305.

- Preparation for and attendance at Tribal meetings and/or other communications with Tribal members, akin to client relations.  *See* App:2251.

- Research and analysis of sovereign immunity issues, presumably in an effort to resist, not comply with, the government subpoenas.  *See* App:2208.

- Pre-trial interviews or "prep sessions" with witnesses.  *See* App:2255; *Akebia*, 981 F.3d at 38-39(affirming exclusion of time spent on similar task).

- Attendance at trial or other court proceedings.  *See id.* at 39(affirming exclusion of time spent attending criminal proceedings).

## CONCLUSION

For the foregoing reasons, DeQuattro's conviction should be reversed. At minimum, the conviction and restitution order should be vacated and the matter remanded for a new trial.

Respectfully submitted,
David DeQuattro
By his Attorneys,

**/s/ Kimberly Homan**
Kimberly Homan
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 448-2812 (Telephone)
homanlaw@aol.com

**/s/ Michael Pabian**
Michael Pabian
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 227-3700 (Telephone)
pabianlaw38@gmail.com

**/s/ Martin G. Weinberg**
Martin G. Weinberg
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 227-3700 (Telephone)
(617) 338-9538 (Fax)
owlmgw@att.net

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

1. This document complies with Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), the document contains 19,971 words (Motion for Leave granted).

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because the document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman, 14-point font.

**/s/ Michael Pabian**
Michael Pabian

Dated:  August 4, 2023

# CERTIFICATE OF SERVICE

I, Michael Pabian, hereby certify that on this 4th day of August 2023, this Brief was filed with the Court through its CM/ECF system, thus effectuating service on all parties to this appeal.

**/s/ Michael Pabian**
Michael Pabian

Dated: August 4, 2023

# ADDENDUM

# TABLE OF CONTENTS

**<u>Caption</u>**                                                                                                          **<u>Page</u>**

Judgment…………………………………………………………………………….1

AO 245B (Rev. 02/18)   Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

## District of Massachusetts

| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
|---|---|---|
| **v.** | ) | |
| | ) | Case Number: **1**  **20  CR  10271**  -  **02**  - DPW |
| DAVID DEQUATTRO | ) | USM Number:  17245-509 |
| | ) | |
| | ) | Martin G. Weinberg and Maksim Nemtsev |
| | ) | Defendant's Attorney |

**THE DEFENDANT:**

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
  which was accepted by the court.

☑ was found guilty on count(s)   5 of the Superseding Indictment
  after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. §666(a)(2) | Bribery Concerning Programs Receiving Federal Funds | 05/18/17 | 5s |

The defendant is sentenced as provided in pages 2 through ___6___ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☑ The defendant has been found not guilty on count(s)   1 and 4 of the Superseding Indictment (jury verdict)

☑ Count(s)   1, 4, 5 of the Indictment   ☐ is   ☑ are dismissed on the motion of the United States.

　　　It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

1/18/2023
_____
Date of Imposition of Judgment

/s/ Douglas P. Woodlock
_____
Signature of Judge

The Honorable Douglas P. Woodlock
Judge, U.S. District Court
_____
Name and Title of Judge

1/31/2023
_____
Date

AO 245B (Rev. 02/18)   Judgment in a Criminal Case
Sheet 4—Probation

Judgment—Page ___2___ of ___6___

DEFENDANT:   DAVID DEQUATTRO
CASE NUMBER:   **1  20  CR  10271   - 02   - DPW**

## PROBATION

You are hereby sentenced to probation for a term of :          1    year(s)

## MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of placement on probation and at least two periodic drug tests thereafter, as determined by the court.

   ☑ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*

4. ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
5. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq*.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
6. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*
7. ☐ You must make restitution in accordance with 18 U.S.C. §§ 2248, 2259, 2264, 2327, 3663, 3663A, and 3664. *(check if applicable)*
8. You must pay the assessment imposed in accordance with 18 U.S.C. § 3013.
9. If this judgment imposes a fine, you must pay in accordance with the Schedule of Payments sheet of this judgment.
10. You must notify the court of any material change in your economic circumstances that might affect your ability to pay restitution, fines, or special assessments.

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

AO 245B (Rev. 02/18)   Judgment in a Criminal Case
Sheet 4A — Probation

Judgment—Page ___3___ of ___6___

DEFENDANT:   DAVID DEQUATTRO
CASE NUMBER:   1 20 CR 10271  - 02  - DPW

# STANDARD CONDITIONS OF SUPERVISION

As part of your probation, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of the time you were sentenced, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature   _____   Date   _____

AO 245B (Rev. 02/18)   Judgment in a Criminal Case
Sheet 4D — Probation

DEFENDANT:   DAVID DEQUATTRO
CASE NUMBER:   1  20 CR 10271   - 02   - DPW

Judgment—Page   4   of   6

## SPECIAL CONDITIONS OF SUPERVISION

1.  You shall be placed on home confinement with location monitoring as directed by the probation office during the period of probation.  You are restricted to your residence at all times except for employment, religious services, medical appointments or other activities approved in advance by the probation office.  You shall pay for the cost of the monitoring as determined by the probation office.

2. You must pay the balance of any fine and restitution imposed according to a court-ordered repayment schedule.

3. You are prohibited from incurring new credit charges or opening additional lines of credit without the approval of the Probation Office while any financial obligations remain outstanding.

4. You must provide the Probation Office access to any requested financial information, which may be shared with the Asset Recovery Unit of the U.S. Attorney's Office.

AO 245B (Rev. 02/18)   Judgment in a Criminal Case
　　　　　　　Sheet 5 — Criminal Monetary Penalties

Judgment — Page  5  of  6

DEFENDANT:　DAVID DEQUATTRO
CASE NUMBER:　**1  20 CR  10271  - 02  - DPW**

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | JVTA Assessment* | Fine | Restitution |
|---|---|---|---|---|
| **TOTALS** | $ 100.00 | $ 0.00 | $ 50,000.00 | $ 140,707.79 |

☐　The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☑　The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

　　If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below.  However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| Mashpee Wampanoag Tribe | | $140,707.79 | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| **TOTALS** | $　　　0.00 | $　140,707.79 | |

☐　Restitution amount ordered pursuant to plea agreement  $ _____

☐　The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☑　The court determined that the defendant does not have the ability to pay interest and it is ordered that:

　　☑　the interest requirement is waived for the　　☑　fine　　☑　restitution.

　　☐　the interest requirement for the　　☐　fine　　☐　restitution is modified as follows:

* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (Rev. 02/18)   Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page ___6___ of ___6___

DEFENDANT:   DAVID DEQUATTRO
CASE NUMBER:   **1  20  CR  10271  - 02  - DPW**

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A   ☑   Lump sum payment of $  190,807.79  due immediately, balance due

         ☐   not later than _____ , or
         ☑   in accordance with   ☑   C,   ☐   D,   ☐   E, or   ☐   F below; or

B   ☐   Payment to begin immediately (may be combined with   ☐ C,   ☐ D, or   ☐ F below); or

C   ☑   Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
    1 year *(e.g., months or years)*, to commence  30 days  *(e.g., 30 or 60 days)* after the execution of this judgment;
                                                                              or

D   ☐   Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
    _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a
    term of supervision; or

E   ☐   Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from
    imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F   ☐   Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☑   Joint and Several

    Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

    Co-Defendant Cedric Cromwell, Joint and Several Amount = $140,707.79 to the Mashpee Wampanoag Tribe.

☐   The defendant shall pay the cost of prosecution.

☐   The defendant shall pay the following court cost(s):

☐   The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) JVTA assessment, (8) penalties, and (9) costs, including cost of prosecution and court costs.