# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

─────────────────

### Nos. 23-1115
### 23-1116
### 23-1138
### 23-1139

─────────────────

### UNITED STATES,
### Appellee/Cross-Appellant,

### v.

### David DeQuattro; Cedric Cromwell,
### Defendants-Appellants/Cross-Appellees.

─────────────────

### JOINT
### APPENDIX
### VOLUME I
### (Pages 1 - 406)

─────────────────

**Kimberly Homan**
**20 Park Plaza, Suite 1000**
**Boston, Massachusetts 02116**
**(617) 448-2812 (Telephone)**
**homanlaw@aol.com**

**Martin G. Weinberg**
**20 Park Plaza, Suite 1000**
**Boston, Massachusetts 02116**
**(617) 227-3700 (Telephone)**
**owlmgw@att.net**

**Michael Pabian**
**20 Park Plaza, Suite 1000**
**Boston, Massachusetts 02116**
**(617) 227-3700 (Telephone)**
**pabianlaw38@gmail.com**

**Counsel for David DeQuattro**

Karen L. Eisenstadt, AUSA
US Attorney's Office MA
1 Courthouse Way Suite 9200
Boston, Massachusetts 02210
(617) 748-3412 (Telephone)
karen.eisenstadt@usdoj.gov


Counsel for United States

Robert F. Hennessy
25 Bank Row, Ste. 2S Boston,
Greenfield, Massachusetts 01301
(413)325-8541 (Telephone)
rhennessy@schnipperhennessy.com


Counsel for Cedric Cromwell

# TABLE OF CONTENTS

**Caption**                                                                    **Page**

**VOLUME I**

Docket Entries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      1

Indictment, Document 1 . . . . . . . . . . . . . . . . . . . .                    44

Superseding Indictment, Document 65 . . . . . . . . . . . .                       67

Motion, Document 131. . . . . . . . . . . . . . . . . . . . . . . .               98

Opposition to Motion, Document 143 . . . . . . . . . . . . .                      111

Pretrial Hearing Memo, Document 169 . . . . . . . . . . .                         116

Motion Hearing, Document 172 . . . . . . . . . . . . . . . . .                    121

Trial Transcript, 4/22/22. . . . . . . . . . . . . . . . . . . . . . .            182

**VOLUME II**

Trial Transcript, 4/25/22. . . . . . . . . . . . . . . . . . . . . . .            407

Trial Transcript, 4/26/22 . . . . . . . . . . . . . . . . . . . . . . .           567

**VOLUME III**

Trial Transcript, 4/27/22 . . . . . . . . . . . . . . . . . . . . . . .           750

Trial Transcript, 4/28/22 . . . . . . . . . . . . . . . . . . . . . . .           927

Hearing Transcript, 4/29/22 . . . . . . . . . . . . . . . . . . . .               1006

**VOLUME IV**

Trial Transcript, 5/3/22 . . . . . . . . . . . . . . . . . . . . . . . .          1123

Trial Transcript, 5/4/22 . . . . . . . . . . . . . . . . . . . . . . . .          1296

Trial Transcript, 5/5/22 . . . . . . . . . . . . . . . . . . . . . . . .          1378

Exhibit 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1400

Exhibit 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1406

Exhibit 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1413

Exhibit 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1414

Exhibit 5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1415

Exhibit 6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1416

Exhibit 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1417

Exhibit 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1418

Exhibit 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1419

Exhibit 13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1421

Exhibit 14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1438

Exhibit 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1455

Exhibit 16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1458

Exhibit 17 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1460

Exhibit 18 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1462

Exhibit 19 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1464

Exhibit 20 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1466

Exhibit 21 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1473

Exhibit 22 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1475

Exhibit 23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1477

Exhibit 24 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1479

Exhibit 25 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1481

Exhibit 27 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1522

Exhibit 28 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1523

Exhibit 31 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1524

Exhibit 32 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1557

Exhibit 33 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1559

Exhibit 39 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1560

Exhibit 43 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1568

Exhibit 48 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1571

Exhibit 49 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1573

Exhibit 50 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1578

Exhibit 51 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1580

Exhibit 55 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1581

Exhibit 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1585

Exhibit 57 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1586

Exhibit 58 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1587

Exhibit 59 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1590

Exhibit 60 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1592

Exhibit 63 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1599

Exhibit 67 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1608

Exhibit 68 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1622

Exhibit 69 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1623

Exhibit 71 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1627

Exhibit 102 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1628

Exhibit 104 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1629

**<u>VOLUME V</u>**

Exhibit 105 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1631

Exhibit 109 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1633

Exhibit 122 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1634

Exhibit 125 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1636

Exhibit 134 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1637

Exhibit 147 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1638

Exhibit 164 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1639

Exhibit 166 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1692

Exhibit 174 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1695

Exhibit 183 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1748

Exhibit 184 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1751

Exhibit 188 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1753

Exhibit 199 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1754

Exhibit 201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1758

Exhibit 301 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1760

Exhibit 302 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1768

Exhibit 303 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1769

Exhibit 304 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1771

Exhibit 305 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1774

Exhibit 306 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1775

Exhibit 307 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1776

Exhibit 308 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1778

Exhibit 309 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1780

Exhibit 310 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1785

Exhibit 311 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1787

Exhibit 312 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1789

Exhibit 313 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1790

Exhibit 314 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1792

Exhibit 320 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1794

Exhibit 321 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1799

Exhibit 322 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1800

Government Brief . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1801

Verdict, Document 235 . . . . . . . . . . . . . . . . . . . . . . . . .     1809

Jury Instructions, Document 238 . . . . . . . . . . . . . . . . . . .     1813

Redacted Indictment, Document 239 . . . . . . . . . . . . . . . .     1836

Motion, Document 242 . . . . . . . . . . . . . . . . . . . . . . . . .     1846

Defendant DeQuattro's Post-Trial Memo, Document 252
. . . . . . . . . . . . . . . . .                                    1848

Defendant Cromwell's Post-Trial Memo, Document 253
. . . . . . . . . . . . . . . . .                                    1870

Govt Opp. to DeQuattro's Post-Trial Memo, Document 258
. . . . . . . . . . . . . . . . .                                    1881

Defendant DeQuattro's Reply to Govt Opp., Document 262
. . . . . . . . . . . . . . . . .                                    1905

Defendant DeQuattro's Supp. Memo, Document 272
. . . . . . . . . . . . . . . . .                                    1918

Supp. Opp. to Defendant's Post-Trial Memos, Document 273
. . . . . . . . . . . . . . . . .                                    1942

Defendant Cromwell's Supp. Memo, Document 274
. . . . . . . . . . . . . . . . .                                    1955

Motion Hearing, Document 286 . . . . . . . . . . . . . . . . .       1970

## **VOLUME VI**

Sentencing Transcript, 11/15/22 . . . . . . . . . . . . . . . . .    2029

Govt's Statement, Document 288 . . . . . . . . . . . . . . . .       2152

Teleconference Transcript, 11/22/22 . . . . . . . . . . . . . .      2154

Govt's Supp. Brief, Document 301 . . . . . . . . . . . . . . . .     2180

Govt's Brief on Restitution, Document 307 . . . . . . . . .          2188

Defendant DeQuattro's Response, Document 313                         2194
. . . . . . . . . . . . . . . . .

Govt's Supp. Brief, Document 314 . . . . . . . . . . . . . . .       2213

Transcript of Status Conference, 12/20/22 . . . . . . . . .          2214

Govt's Reply, Document 323  . . . . . . . . . . . . . . . . . .      2234

Defendant DeQuattro's Sur-Reply, Document 326 . .      2249

Govt's 2nd Supp. Brief, Document 328 . . . . . . . . . . .      2257

Hearing Transcript, 1/18/23 . . . . . . . . . . . . . . . . . . . .      2259

Defendants' Notices of Appeal . . . . . . . . . . . . . . . . . . . .      2301

# United States District Court
## District of Massachusetts (Boston)
## CRIMINAL DOCKET FOR CASE #: 1:20-cr-10271-NMG All Defendants

Case title: USA v. Cromwell, et. al.                Date Filed: 11/12/2020

---

Assigned to: Judge Nathaniel M. Gorton

Appeals court case numbers: 23-1116
USCA - First Circuit, 23-1138 USCA -
First Circuit

### Defendant (1)

**Cedric Cromwell**              represented by    **Daniel J. Cloherty**
Cloherty & Steinberg LLP
33 Arch Street
Suite 3150
Boston, MA 02110
617-481-0160
Email: dcloherty@clohertysteinberg.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Timothy R. Flaherty**
699 Boylston Street, 12th Flr.
Boston, MA 02116
617-227-1800
Fax: 617-227-1844
Email: timothyrflaherty@gmail.com
*TERMINATED: 02/03/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

### Pending Counts

18:666(a)(1)(B); 18:2 - BRIBERY
CONCERNING PROGRAMS
RECEIVING FEDERAL FUNDS;
AIDING AND ABETTING
(2s-3s)

26:7206(1) - FILING FALSE TAX
RETURNS
(11s-14s)

### Disposition

Thirty-six (36) months of imprisonment
followed by one (1) year of supervised
release with standard and special
conditions; fine in the amount of $25,000;
special assessment in the amount of $200;
restitution in the amount of $209,678.54.

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |
| 18 U.S.C. § 371- CONSPIRACY TO COMMIT FEDERAL PROGRAMS BRIBERY (1) | Dismissed upon gov't motion |
| 18:371 - CONSPIRACY TO COMMIT FEDERAL PROGRAMS BRIBERY (1s) | Acquitted by jury verdict |
| 18 U.S.C. § 666(a)(1)(B); 18 U.S.C. § 2- BRIBERY CONCERNING PROGRAMS RECEIVING FEDERAL FUNDS; AIDING AND ABETTING (2-3) | Dismissed upon gov't motion |
| 18 U.S.C. § 1951- CONSPIRACY TO COMMIT EXTORTION (6) | Dismissed upon gov't motion |
| 18:1951 - CONSPIRACY TO COMMIT EXTORTION (6s) | Acquitted upon Rule 29 Motion |
| 18 U.S.C. § 1951- EXTORTION (7-10) | Dismissed upon gov't motion |
| 18:1951 - EXTORTION (7s-8s) | Acquitted upon Rule 29 Motion |
| 18:1951 - EXTORTION (9s) | Acquitted by jury verdict |
| 18:1951 - EXTORTION (10s) | Acquitted upon Rule 29 Motion |

**Highest Offense Level (Terminated)**

Felony

| **Complaints** | **Disposition** |
| --- | --- |
| None | |

Assigned to: Judge Nathaniel M. Gorton

Appeals court case numbers: 23-1115 USCA - First Circuit, 23-1139 USCA - First Circuit

**Defendant (2)**

**David Dequattro**
*TERMINATED: 01/31/2023*

represented by **Martin G. Weinberg**
Martin G. Weinberg, PC
20 Park Plaza
Suite 1000
Boston, MA 02116
617-227-3700
Fax: 617-338-9538
Email: owlmgw@att.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Maksim Nemtsev**
20 Park Plaza, Suite 1000
Boston, MA 02116
347-251-4800
Email: menemtsev@gmail.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Michael Pabian**
Michael Pabian Law Office, LLC
20 Park Plaza, Suite 1000
Boston, MA 02116
339-227-0642
Email: pabianlaw38@gmail.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**William F. Sinnott**
Hinckley Allen
28 State Street
Boston, MA 02109
617-378-4159
Email: wsinnott@hinckleyallen.com
*TERMINATED: 12/31/2020*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Pending Counts**

18:666(a)(2); 18:2 - BRIBERY
CONCERNING PROGRAMS
RECEIVING FEDERAL FUNDS;
AIDING AND ABETTING
(5s)

**Highest Offense Level (Opening)**

**Disposition**

One (1) year probation with standard and
special conditions; fine in the amount of
$50,000; special assessment in the amount
of $100; restitution in the amount
$140,707.79.

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| 18 U.S.C. § 371- CONSPIRACY TO COMMIT FEDERAL PROGRAMS BRIBERY (1) | Dismissed upon gov't motion |
| 18:371 - CONSPIRACY TO COMMIT FEDERAL PROGRAMS BRIBERY (1s) | Acquitted by jury verdict |
| 18 U.S.C. § 666(a)(2); 18 U.S.C. § 2- BRIBERY CONCERNING PROGRAMS RECEIVING FEDERAL FUNDS; AIDING AND ABETTING (4-5) | Dismissed upon gov't motion |
| 18:666(a)(2); 18:2 - BRIBERY CONCERNING PROGRAMS RECEIVING FEDERAL FUNDS; AIDING AND ABETTING (4s) | Acquitted by jury verdict |

**Highest Offense Level (Terminated)**

Felony

| **Complaints** | **Disposition** |
|---|---|
| None | |

---

**Interested Party**

**Carlton Hendricks**
*Enrolled Member of the Mashpee Wampanoag Tribe*
*TERMINATED: 01/31/2023*

---

**Plaintiff**

**USA**       represented by **Christine J. Wichers**
United States Attorney's Office MA
1 Courthouse Way
Suite 9200
Boston, MA 02210
617-748-3278
Email: christine.wichers@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Jared C. Dolan**
United States Attorney's Office MA
1 Courthouse Way
Suite 9200
Boston, MA 02210
617-748-3220
Email: jared.dolan@usdoj.gov
*ATTORNEY TO BE NOTICED*

Email All Attorneys

Email All Attorneys and Additional Recipients

| Date Filed | # | Docket Text |
|---|---|---|
| 11/12/2020 | 1 | SEALED INDICTMENT as to Cedric Cromwell (1) count(s) 1, 2-3, 6, 7-10, David Dequattro (2) count(s) 1, 4-5. (Attachments: # 1 JS45)(DaSilva, Carolina) (Entered: 11/12/2020) |
| 11/12/2020 | 2 | MOTION to Seal as to Cedric Cromwell, David Dequattro by USA. (DaSilva, Carolina) (Entered: 11/12/2020) |
| 11/12/2020 | 3 | Magistrate Judge Judith G. Dein: ELECTRONIC ORDER entered ALLOWING 2 Motion to Seal as to Cedric Cromwell (1), David Dequattro (2) (DaSilva, Carolina) (Entered: 11/12/2020) |
| 11/12/2020 | 4 | Arrest Warrant Issued by Magistrate Judge Judith G. Dein as to Cedric Cromwell, David Dequattro. (DaSilva, Carolina) (Entered: 11/12/2020) |
| 11/12/2020 | 5 | ELECTRONIC NOTICE of Case Assignment as to Cedric Cromwell, David Dequattro; Judge Douglas P. Woodlock assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge Marianne B. Bowler. (Finn, Mary) (Entered: 11/12/2020) |
| 11/12/2020 | 6 | Judge Douglas P. Woodlock: ELECTRONIC ORDER entered. Order Referring Case to Magistrate Judge Marianne B. Bowler Reason for referral: Full Pretrial Proceedings as to Cedric Cromwell, David Dequattro (DaSilva, Carolina) (Entered: 11/12/2020) |
| 11/13/2020 | 7 | MOTION to Unseal Case as to Cedric Cromwell, David Dequattro by USA. (Belpedio, Lisa) (Entered: 11/13/2020) |
| 11/13/2020 | 8 | Magistrate Judge Marianne B. Bowler: ELECTRONIC ORDER entered granting 7 Motion to Unseal Case as to Cedric Cromwell (1), David Dequattro (2) (Belpedio, Lisa) (Entered: 11/13/2020) |
| 11/13/2020 |  | Arrest of Cedric Cromwell, David Dequattro (Belpedio, Lisa) (Entered: 11/13/2020) |
| 11/13/2020 | 9 | ELECTRONIC NOTICE OF HEARING as to Cedric Cromwell, David Dequattro<br><br>This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible. |

| | | Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html. |
|---|---|---|
| | | For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov. |
| | | Initial Appearance set for 11/13/2020 02:00 PM before Magistrate Judge Marianne B. Bowler. (Belpedio, Lisa) (Entered: 11/13/2020) |
| 11/13/2020 | 10 | NOTICE OF ATTORNEY APPEARANCE: William F. Sinnott appearing for David Dequattro. Type of Appearance: Retained. (Sinnott, William) (Entered: 11/13/2020) |
| 11/13/2020 | 11 | NOTICE OF ATTORNEY APPEARANCE: Timothy R. Flaherty appearing for Cedric Cromwell. Type of Appearance: Retained. (Flaherty, Timothy) (Entered: 11/13/2020) |
| 11/13/2020 | 12 | Electronic Clerk's Notes for proceedings held before Magistrate Judge Marianne B. Bowler: Initial Appearance/Arraignment as to Cedric Cromwell (1) Count 1,2-3,6,7-10 and David Dequattro (2) Count 1,4-5 held on 11/13/2020, Case called, Counsel PO Sousa/Thompson & Defendants appear, Court conducts colloquy with each defendant and finds that each one knowingly and voluntarily waives his right to be physically present in the courtroom. Hearing proceeds by video. Defendants are notified of their rights, charges and maximum penalties, Each Defendant sworn and The Court inquires, Not Guilty Plea entered by Cedric Cromwell (1) to Counts 1,2-3,6,7-10, Not Guilty Plea David Dequattro (2) to Counts 1,4-5, On the record, court instructs parties regarding the provisions of the Due Process Protections Act, Written order to issue. Status Conference set for 12/22/2020 at 2:15 PM. Government is not seeking detention, The Court reviews conditions, Defendants released on Conditions and Unsecured bond. (Attorneys present: Wichers, Flaherty, Sinnott. )Court Reporter Name and Contact information: Marianne Kusa-Ryll at justicehill@aol.com. (Belpedio, Lisa) (Entered: 11/14/2020) |
| 11/13/2020 | 13 | Magistrate Judge Marianne B. Bowler: ORDER Setting Conditions of Release as to Cedric Cromwell. (Belpedio, Lisa) (Entered: 11/14/2020) |
| 11/13/2020 | 14 | Unsecured Bond Entered as to Cedric Cromwell in amount of $ 25,000. (Belpedio, Lisa) (Entered: 11/14/2020) |
| 11/13/2020 | 15 | Magistrate Judge Marianne B. Bowler: ORDER Setting Conditions of Release as to David Dequattro. (Belpedio, Lisa) (Entered: 11/14/2020) |
| 11/13/2020 | 16 | Unsecured Bond Entered as to David Dequattro in amount of $ 25,000. (Belpedio, Lisa) (Entered: 11/14/2020) |
| 11/13/2020 | 17 | ELECTRONIC NOTICE OF HEARING as to Cedric Cromwell, David Dequattro Status Conference set for 12/22/2020 02:15 PM before Magistrate Judge Marianne B. Bowler.. ALL COUNSEL ARE DIRECTED TO APPEAR BY PHONE by calling 888-675-2535 approximately five minutes prior to the conference, using Access Code 6641794. If, for some reason, the call is disconnected, dial back in. NOTE that yours may not be the first case called, but please remain on the line until it is (Belpedio, Lisa) (Entered: 11/14/2020) |

| 11/19/2020 | 18 | Arrest Warrant Returned Executed on 11/13/2020 as to Cedric Cromwell. (McDonagh, Christina) (Entered: 11/19/2020) |
|---|---|---|
| 11/19/2020 | 19 | Arrest Warrant Returned Executed on 11/13/2020 as to David Dequattro. (McDonagh, Christina) (Entered: 11/19/2020) |
| 12/08/2020 | 20 | NOTICE OF ATTORNEY APPEARANCE: Martin G. Weinberg appearing for David Dequattro. Type of Appearance: Retained. (Weinberg, Martin) (Entered: 12/08/2020) |
| 12/14/2020 | 21 | ELECTRONIC NOTICE OF RESCHEDULING OF TIME ONLY as to Cedric Cromwell, David Dequattro. Status Conference set for 12/22/2020 03:30 PM before Magistrate Judge Marianne B. Bowler. COUNSEL ARE DIRECTED TO APPEAR BY PHONE by calling 888-675-2535 approximately five minutes prior to the conference, using Access Code 6641794. If, for some reason, the call is disconnected, dial back in. NOTE that yours may not be the first case called, but please remain on the line until it is.(Belpedio, Lisa) (Entered: 12/14/2020) |
| 12/18/2020 | 22 | Assented to MOTION for Excludable Delay from 11/13/20 to 12/22/20 as to Cedric Cromwell, David Dequattro by USA. (Wichers, Christine) (Entered: 12/18/2020) |
| 12/18/2020 | 23 | JOINT MEMORANDUM of the parties pursuant to Local Rule 116.5(a) re Initial Status Conference as to Cedric Cromwell, David Dequattro (Wichers, Christine) (Entered: 12/18/2020) |
| 12/22/2020 | 24 | Electronic Clerk's Notes for proceedings held before Magistrate Judge Marianne B. Bowler: Status Conference as to Cedric Cromwell, David Dequattro held on 12/22/2020. Court acknowledges 23 Joint Memorandum. Government reports that automatic discovery is complete. Further date set. Government to file assented to motion to exclude the time from this date until 2/4/2021. (Status Conference set for 2/4/2021 03:00 PM before Magistrate Judge Marianne B. Bowler. ALL COUNSEL ARE DIRECTED TO APPEAR BY PHONE by calling 888-675-2535 approximately five minutes prior to the conference, using Access Code 6641794. If, for some reason, the call is disconnected, dial back in. NOTE that yours may not be the first case called, but please remain on the line until it is.) (Attorneys present: Wichers, Flaherty, Weinberg, Sinnott.) Court Reporter Name and Contact or digital recording information: Kathleen Silva at kathysilva@verizon.net. (Putnam, Harold) (Entered: 12/22/2020) |
| 12/22/2020 | 25 | Assented to MOTION for Excludable Delay from 12/22/20 to 2/4/21 as to Cedric Cromwell, David Dequattro by USA. (Wichers, Christine) (Entered: 12/22/2020) |
| 12/23/2020 | 26 | Assented to MOTION for Protective Order as to Cedric Cromwell, David Dequattro by USA. (Attachments: # 1 Text of Proposed Order)(Wichers, Christine) (Entered: 12/23/2020) |
| 12/23/2020 | 27 | Magistrate Judge Marianne B. Bowler: ORDER PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 5 as to Cedric Cromwell, David Dequattro. (Putnam, Harold) (Entered: 12/23/2020) |
| 12/24/2020 | 28 | Magistrate Judge Marianne B. Bowler: ELECTRONIC ORDER entered granting 26 Motion for Protective Order as to Cedric Cromwell (1) and David Dequattro (2). (Bowler, Marianne) (Entered: 12/24/2020) |
| 12/31/2020 | 29 | NOTICE of Withdrawal of Appearance of Attorney William Sinnott as to David Dequattro (Sinnott, William) (Entered: 12/31/2020) |

| | | |
|---|---|---|
| 12/31/2020 | | Attorney update in case as to David Dequattro. Attorney William F. Sinnott terminated. (McDonagh, Christina) (Entered: 12/31/2020) |
| 01/04/2021 | 30 | Magistrate Judge Marianne B. Bowler: ORDER entered. PROTECTIVE ORDER as to Cedric Cromwell, David Dequattro (Putnam, Harold) (Entered: 01/05/2021) |
| 01/11/2021 | 31 | Magistrate Judge Marianne B. Bowler: ELECTRONIC ORDER entered granting 22 Motion to Exclude as to Cedric Cromwell (1), David Dequattro (2) (Putnam, Harold) (Entered: 01/11/2021) |
| 01/11/2021 | 32 | Magistrate Judge Marianne B. Bowler: ELECTRONIC ORDER entered granting 25 Motion to Exclude as to Cedric Cromwell (1), David Dequattro (2) (Putnam, Harold) (Entered: 01/11/2021) |
| 01/11/2021 | 33 | Magistrate Judge Marianne B. Bowler: ORDER entered. ORDER ON EXCLUDABLE DELAY as to Cedric Cromwell, David Dequattro. Time excluded from 11/13/2020 until 2/4/2021. Reason for entry of order on excludable delay: 18 USC 3161(h)(7)(A) Interests of justice. (Putnam, Harold) (Entered: 01/11/2021) |
| 01/19/2021 | 34 | MOTION to Dismiss as to David Dequattro. (Weinberg, Martin) (Entered: 01/19/2021) |
| 01/19/2021 | 35 | MOTION Join Motion to Dismiss as to Cedric Cromwell. (Flaherty, Timothy) (Entered: 01/19/2021) |
| 01/25/2021 | 36 | Opposition by USA as to Cedric Cromwell, David Dequattro re 34 MOTION to Dismiss , 35 MOTION Join Motion to Dismiss (Wichers, Christine) (Entered: 01/25/2021) |
| 01/26/2021 | 37 | Assented to MOTION for Leave to File *Reply* as to David Dequattro. (Weinberg, Martin) (Entered: 01/26/2021) |
| 01/27/2021 | 38 | Judge Douglas P. Woodlock: ORDER granting 37 Assented to Motion for Leave to Reply to Government's Opposition to Motion to Dismiss. The Reply Brief, represented to be no more than seven pages, shall be filed by February 4, 2021. (Beatty, Barbara) (Entered: 01/27/2021) |
| 01/28/2021 | 39 | MOTION to Release Certain information in a Criminal Case as to Cedric Cromwell by Carlton Hendricks Jr. (McDonagh, Christina) (Entered: 01/28/2021) |
| 01/29/2021 | 40 | Magistrate Judge Marianne B. Bowler: ELECTRONIC ORDER entered denying 39 Motion as to Cedric Cromwell (1). The individual filing this motion is not a party to this action and therefore is only entitled to examine the public record. As a courtesy a copy of the docket will be mailed to the filer along with a copy of this ruling. (Bowler, Marianne) (Entered: 01/29/2021) |
| 02/03/2021 | 41 | REPLY TO RESPONSE to Motion by David Dequattro re 34 MOTION to Dismiss (Weinberg, Martin) (Entered: 02/03/2021) |
| 02/04/2021 | 42 | MOTION to Dismiss as to Cedric Cromwell, David Dequattro by Cedric Cromwell. (Flaherty, Timothy) (Entered: 02/04/2021) |
| 02/04/2021 | 43 | MOTION for Bill of Particulars as to Cedric Cromwell, David Dequattro by Cedric Cromwell. (Flaherty, Timothy) (Entered: 02/04/2021) |
| 02/04/2021 | 44 | MOTION Join as to Cedric Cromwell, David Dequattro by Cedric Cromwell. (Flaherty, Timothy) (Entered: 02/04/2021) |

| 02/04/2021 | 45 | Assented to MOTION for Excludable Delay from 2/4/21 to 4/5/21 as to Cedric Cromwell, David Dequattro by USA. (Wichers, Christine) (Entered: 02/04/2021) |
|---|---|---|
| 02/04/2021 | 49 | Electronic Clerk's Notes for proceedings held before Magistrate Judge Marianne B. Bowler: Status Conference as to Cedric Cromwell, David Dequattro held on 2/4/2021. Counsel report on progress of discovery, request further date. Government to file assented to motion to exclude the time from this date until 4/5/2021. (Status Conference set for 4/5/2021 02:30 PM before Magistrate Judge Marianne B. Bowler. ALL COUNSEL ARE DIRECTED TO APPEAR BY PHONE by calling 888-675-2535 approximately five minutes prior to the conference, using Access Code 6641794. If, for some reason, the call is disconnected, dial back in. NOTE that yours may not be the first case called, but please remain on the line until it is.) (Attorneys present: Wichers, Flaherty, Weinberg.) Court Reporter Name and Contact or digital recording information: Joan Daly at joanmdaly62@gmail.com. (Putnam, Harold) (Entered: 02/14/2021) |
| 02/05/2021 | 46 | Magistrate Judge Marianne B. Bowler: ELECTRONIC ORDER entered granting 35 Motion as to Cedric Cromwell (1) and granting 44 Motion as to Cedric Cromwell (1), David Dequattro (2). (Bowler, Marianne) (Entered: 02/05/2021) |
| 02/08/2021 | 47 | Magistrate Judge Marianne B. Bowler: ELECTRONIC ORDER entered granting 45 Assented to MOTION for Excludable Delay from 2/4/21 to 4/5/21 as to Cedric Cromwell (1), David Dequattro (2) (Belpedio, Lisa) (Entered: 02/08/2021) |
| 02/08/2021 | 48 | Magistrate Judge Marianne B. Bowler: ORDER ON EXCLUDABLE DELAY as to Cedric Cromwell, David Dequattro. Time excluded from February 4, 2021 until April 5, 2021. Reason for entry of order on excludable delay: 18 USC 3161(h)(7)(A) Interests of justice. (Belpedio, Lisa) (Entered: 02/08/2021) |
| 02/17/2021 | 50 | Opposition by USA as to Cedric Cromwell re 42 MOTION to Dismiss , 43 MOTION for Bill of Particulars (Wichers, Christine) (Entered: 02/17/2021) |
| 02/19/2021 | 51 | Assented to MOTION for Leave to File *to Reply To Governments Opposition to Motion to Dismiss Counts 6-10* as to Cedric Cromwell, David Dequattro by Cedric Cromwell. (Flaherty, Timothy) (Entered: 02/19/2021) |
| 02/23/2021 | 52 | Judge Douglas P. Woodlock: ORDER granting 51 Assented to Motion for Leave to File Reply to Government's Opposition to Motion to Dismiss Counts 6-10 as to Cedric Cromwell (1) on or before February 26, 2021. (Beatty, Barbara) (Entered: 02/23/2021) |
| 02/23/2021 | 53 | Letter requesting additional discovery pursuant to Local Rule 116.3 as to Cedric Cromwell (Wichers, Christine) (Entered: 02/23/2021) |
| 02/23/2021 | 54 | Letter requesting additional discovery pursuant to Local Rule 116.3 as to David Dequattro (Wichers, Christine) (Entered: 02/23/2021) |
| 02/23/2021 | 55 | MOTION Join and Supplement Motion for Bill of Particulars re 43 MOTION for Bill of Particulars as to David Dequattro. (Weinberg, Martin) (Entered: 02/23/2021) |
| 02/24/2021 | 56 | Magistrate Judge Marianne B. Bowler: ELECTRONIC ORDER entered granting 55 Motion as to David Dequattro (2). (Bowler, Marianne) (Entered: 02/24/2021) |
| 02/25/2021 | 57 | Response as to Cedric Cromwell, David Dequattro: (Flaherty, Timothy) (Entered: 02/25/2021) |

| 03/01/2021 | 58 | MOTION to Withdraw 39 MOTION to Release Certain information in a Criminal Case as to Cedric Cromwell by Carlton Hendricks. (McDonagh, Christina) (Entered: 03/01/2021) |
|------------|-----|------------------------------------------------------------------------------------------------------------------------------------|
| 03/02/2021 | 59 | Magistrate Judge Marianne B. Bowler: ELECTRONIC ORDER entered granting 58 Motion to Withdraw Document as to Cedric Cromwell (1). (Bowler, Marianne) (Entered: 03/02/2021) |
| 03/09/2021 | 60 | Opposition by USA as to David Dequattro re 55 MOTION Join and Supplement Motion for Bill of Particulars re 43 MOTION for Bill of Particulars (Wichers, Christine) (Entered: 03/09/2021) |
| 03/10/2021 | 61 | Assented to MOTION for Leave to File *Reply to Government's Opposition to Motion for Bill of Particulars* as to David Dequattro. (Weinberg, Martin) (Entered: 03/10/2021) |
| 03/11/2021 | 62 | Magistrate Judge Marianne B. Bowler: ELECTRONIC ORDER entered granting 61 Motion for Leave to File. Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document as to David Dequattro (2). (Bowler, Marianne) (Entered: 03/11/2021) |
| 03/12/2021 | 63 | REPLY TO RESPONSE to Motion by David Dequattro re 55 MOTION Join and Supplement Motion for Bill of Particulars re 43 MOTION for Bill of Particulars (Weinberg, Martin) (Entered: 03/12/2021) |
| 03/15/2021 | 64 | MOTION for Exculpatory Evidence as to David Dequattro. (Weinberg, Martin) (Entered: 03/15/2021) |
| 03/22/2021 | 65 | SUPERSEDING INDICTMENT as to Cedric Cromwell (1) count(s) 1s, 2s-3s, 6s, 7s-10s, 11s-14s, David Dequattro (2) count(s) 1s, 4s-5s. (Attachments: # 1 JS45, # 2 JS45)(Alves-Baptista, Antonia) (Entered: 03/22/2021) |
| 03/22/2021 | 66 | Judge Douglas P. Woodlock: ELECTRONIC ORDER entered. Order Referring Case to Magistrate Judge Marianne B. Bowler Reason for referral: Full Pretrial Proceedings as to Cedric Cromwell, David Dequattro (Alves-Baptista, Antonia) (Entered: 03/22/2021) |
| 03/23/2021 | 67 | NOTICE by David Dequattro re 34 MOTION to Dismiss , 55 MOTION Join and Supplement Motion for Bill of Particulars re 43 MOTION for Bill of Particulars , 64 MOTION for Exculpatory Evidence (Weinberg, Martin) (Entered: 03/23/2021) |
| 03/23/2021 | 68 | ELECTRONIC NOTICE OF HEARING as to Cedric Cromwell, David Dequattro. Arraignment set for 4/1/2021 11:30 AM before Magistrate Judge Marianne B. Bowler.<br><br>This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible.<br><br>Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html. |

| | | For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov.<br><br>(Putnam, Harold) (Entered: 03/23/2021) |
|---|---|---|
| 03/26/2021 | 69 | MOTION for Speedy Trial as to David Dequattro. (Weinberg, Martin) (Entered: 03/26/2021) |
| 03/29/2021 | 70 | Opposition by USA as to David Dequattro re 64 MOTION for Exculpatory Evidence (Wichers, Christine) (Entered: 03/29/2021) |
| 03/30/2021 | 71 | Assented to MOTION for Leave to File *Reply* as to David Dequattro. (Weinberg, Martin) (Entered: 03/30/2021) |
| 03/30/2021 | 72 | Magistrate Judge Marianne B. Bowler: ELECTRONIC ORDER entered granting 71 Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document as to David Dequattro (2) (Putnam, Harold) (Entered: 03/30/2021) |
| 03/30/2021 | 73 | ELECTRONIC NOTICE OF HEARING ON MOTION as to David Dequattro 64 MOTION for Exculpatory Evidence . Motion Hearing set for 4/1/2021 11:30 AM before Magistrate Judge Marianne B. Bowler.<br><br>This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible.<br><br>Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.<br><br>For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov.<br><br>(Putnam, Harold) (Entered: 03/30/2021) |
| 03/31/2021 | 74 | REPLY TO RESPONSE to Motion by David Dequattro re 64 MOTION for Exculpatory Evidence (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Weinberg, Martin) (Entered: 03/31/2021) |
| 04/01/2021 | 75 | MOTION for Excludable Delay from 4/1/21 to 5/18/21 as to Cedric Cromwell, David Dequattro by USA. (Wichers, Christine) (Entered: 04/01/2021) |
| 04/01/2021 | 76 | Magistrate Judge Marianne B. Bowler: ELECTRONIC ORDER entered granting 51 Motion for Leave to File and denying 64 Motion for Exculpatory Evidence after hearing for the reasons stated by the government in its opposition (Docket Entry # 70) and reiterated in open court at the hearing on this date. (Bowler, Marianne) (Entered: 04/01/2021) |

| 04/01/2021 | 77 | Electronic Clerk's Notes for proceedings held before Magistrate Judge Marianne B. Bowler: Motion hearing and Arraignment as to Cedric Cromwell (1) Count 1s,2s-3s,6s,7s-10s,11s-14s and David Dequattro (2) Count 1s,4s-5s held on 4/1/2021. Court conducts colloquy with defendants, finds that they knowingly and voluntarily waive their rights to be physically present in the courtroom. Hearing proceeds by video. Government states maximum penalties as to both defendants, anticipates a trial lasting two weeks, and anticipates calling 30 witnesses. Government intends to provide additional discovery within two weeks. Pleas entered by Cedric Cromwell, David Dequattro: not guilty as to all superseding counts. On the record, court instructs parties regarding the provisions of the Due Process Protections Act. Written order to issue. Court hears argument on motions 43 and 64 , takes 43 under advisement, denies 64 for the reasons stated by the government in its opposition. Parties request that the matter be returned to the district judge, though court sets additional status conference for 5/8/2021 before the Magistrate Judge. Government to file motion (not assented to by either defendant) to exclude the time from this date until 5/8/2021. (Attorneys present: Wichers, Flaherty, Weinberg.) Court Reporter Name and Contact or digital recording information: Joan Daly at joanmdaly62@gmail.com. (Putnam, Harold) (Entered: 04/02/2021) |
| --- | --- | --- |
| 04/01/2021 | 78 | Magistrate Judge Marianne B. Bowler: ORDER PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 5ORDER entered as to Cedric Cromwell, David Dequattro. (Putnam, Harold) (Entered: 04/02/2021) |
| 04/01/2021 | 79 | Magistrate Judge Marianne B. Bowler: ORDER entered. REPORT AND ORDER on Status Conference as to Cedric Cromwell, David Dequattro. (Putnam, Harold) (Entered: 04/02/2021) |
| 04/01/2021 | 80 | ELECTRONIC NOTICE OF HEARING as to Cedric Cromwell, David Dequattro. In lieu of 4/5/2021 Status Conference, new Conference set for 5/18/2021 03:00 PM before Magistrate Judge Marianne B. Bowler. ALL COUNSEL ARE DIRECTED TO APPEAR BY PHONE by calling 888-675-2535 approximately five minutes prior to the conference, using Access Code 6641794. If, for some reason, the call is disconnected, dial back in. NOTE that yours may not be the first case called, but please remain on the line until it is.(Putnam, Harold) (Entered: 04/02/2021) |
| 04/02/2021 | 81 | Magistrate Judge Marianne B. Bowler: ELECTRONIC ORDER entered denying 43 Motion for Bill of Particulars as to Cedric Cromwell (1), David Dequattro (2).

In a motion for a bill of particulars (Docket Entry # 43), defendant Cedric Cromwell requests additional information with respect to Counts One through Three and Six through Ten of a Superceding Indictment (Docket Entry # 65). Defendant David DeQuattro joins the motion and asserts two targeted requests for particularity. (Docket Entry ## 55, 63).

The motion (Docket Entry # 43) is DENIED for reasons stated by the government in its oppositions (Docket Entry ## 50, 60) and in open court on April 1, 2021. A motion for a bill of particulars, which is "seldom employed in modern practice," is allowed "only if the accused, in the absence of a more detailed specification, will be disabled from preparing a defense, caught by unfair surprise at trial, or hampered in seeking the shelter of the Double Jeopardy Clause." United States v. Sepulveda, 15 F.3d 1161, 1192-1193 (1st Cir. 1993); accord United States v. Savarese, 686 F.3d 1, 6 (1st Cir. 2012) (indictment "adequate if it specifies" elements of offenses, "fairly apprises the defendant of the charge[s]," and allows him to contest charges "without fear of double |

| | | |
|---|---|---|
| | | jeopardy") (citing <u>Sepulveda</u>, 15 F.3d at 1192). Hence, an indictment is ordinarily sufficiently detailed "'if it elucidates the elements of the crime, enlightens a defendant as to the nature of the charge against which [the defendant] must defend, and enables [the defendant] to plead double jeopardy in bar of future prosecutions for the same offense.'" <u>United States v. Poulin</u>, 588 F. Supp. 2d 64, 66 (D. Me. 2008) (quoting <u>Sepulveda</u>, 15 F.3d at 1192).<br><br>The specific, detailed, and lengthy Superseding Indictment adequately depicts the elements of the charged offenses, informs defendants about the nature of the charges, and enables them to prepare their defense and plead double jeopardy. Furthermore, to the extent not included in the Superseding Indictment, the government states it provided the defendants with the requisite information during discovery and that discovery is complete, except with respect to the tax charges in Counts 11 to 14. <u>See</u> <u>Sepulveda</u>, 15 F.3d at 1193. The government outlines and identifies the substantial discovery provided, which it represents it provided in electronic and searchable format. (Docket Entry # 50, pp. 10-15) (Docket Entry # 60, pp. 1-3). Accordingly, a bill of particulars pertaining to the categories of material sought by each defendant is neither required nor necessary. (Putnam, Harold) (Entered: 04/02/2021) |
| 04/05/2021 | 82 | NOTICE OF STATUS CONFERENCE as to Cedric Cromwell and David Dequattro:<br><br>This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible.<br><br>Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.<br><br>For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov.<br><br>Status Conference is SCHEDULED for 4/6/2021 at 9:00 a.m. in Remote Proceeding : Boston before Judge Douglas P. Woodlock. (Beatty, Barbara) (Entered: 04/05/2021) |
| 04/05/2021 | 83 | APPEAL OF MAGISTRATE JUDGE DECISION to District Court by David Dequattro Appeal of order: 81 Order on Motion for Bill of Particulars,,,,,,,,,,,, (Weinberg, Martin) (Entered: 04/05/2021) |
| 04/06/2021 | 84 | Magistrate Judge Marianne B. Bowler: ELECTRONIC ORDER entered re: Motion for Excludable Delay from 4/1/21 to 5/18/21 as to Cedric Cromwell, David Dequattro by USA (Docket Entry # 75 ). ALLOWED. The ends of justice for excluding this time period "outweigh the best interests of the public and the defendant in a speedy trial" in order to afford the government a reasonable time period "for effective preparation, taking into account the exercise of due diligence." 18 U.S.C. § 3161(h)(7)(A), (B)(iv); <u>accord</u> <i>Plan for Prompt Disposition of Criminal Cases</i>, United States District Court for the District of Massachusetts, ¶¶ 5(b)(7)(B), (C)(iv) (2009). (Patton, Christine) (Entered: 04/06/2021) |
| 04/06/2021 | 85 | Clerk's Notes for Status Conference held via Zoom before Judge Douglas P. Woodlock: Court acknowledges the 79 Report and Order on Final Status Conference |

| | | by Magistrate Judge as to Cedric Cromwell (1) and David DeQuattro (2). Court addresses speedy trial issues and will tentatively set the trial for September after addressing the pending motions. Gov't to respond to Motion for Speedy Trial 69 no later than 4/9/2021. Motion for Excludable Time through 5/18/2021 75 GRANTED. Parties provided an opportunity to file reply briefs no later than 4/13/2021 to Motions to Dismiss 34 and 42 . Defendant Cromwell to file an appeal from the 81 Magistrate Judge's denial of the Motion for Bill of Particulars. Defendant DeQuattro may file a Motion to Sever for Trial. Hearing on all pending motions scheduled for 4/23/2021 at 3:00 p.m.(Attorneys present: AUSA Wichers, Flaherty, Weinberg)Court Reporter Name and Contact or digital recording information: Lee Marzilli at leemarz@aol.com. (Beatty, Barbara) (Entered: 04/06/2021) |
|---|---|---|
| 04/06/2021 | 86 | NOTICE OF MOTION HEARING as to Cedric Cromwell and David Dequattro:<br><br>This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible.<br><br>Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.<br><br>For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov.<br><br>Motion Hearing is SCHEDULED for 4/23/2021 at 3:00 p.m. in Remote Proceeding : Boston before Judge Douglas P. Woodlock. (Beatty, Barbara) (Entered: 04/06/2021) |
| 04/08/2021 | 87 | NOTICE *of Supplemental Authority* by David Dequattro re 34 MOTION to Dismiss , 83 Appeal of Magistrate Judge Decision to District Court - Magistrate Judge Order (Weinberg, Martin) (Entered: 04/08/2021) |
| 04/08/2021 | 88 | RESPONSE to Motion by USA as to David Dequattro re 69 MOTION for Speedy Trial (Wichers, Christine) (Entered: 04/08/2021) |
| 04/13/2021 | 89 | NOTICE *(Second) of Supplemental Authority* by David Dequattro re 34 MOTION to Dismiss , 83 Appeal of Magistrate Judge Decision to District Court - Magistrate Judge Order (Weinberg, Martin) (Entered: 04/13/2021) |
| 04/13/2021 | 90 | MOTION re 83 Appeal of Magistrate Judge Decision to District Court - Magistrate Judge Order as to Cedric Cromwell, David Dequattro by Cedric Cromwell. (Flaherty, Timothy) (Entered: 04/13/2021) |
| 04/13/2021 | 91 | NOTICE *Response to David DeQuattro's First and Second Notices of Supplemental Authority (Docket Nos. 87, 89)* by USA as to David Dequattro (Wichers, Christine) (Entered: 04/13/2021) |
| 04/23/2021 | 92 | Clerk's Notes for Motion Hearing held before Judge Douglas P. Woodlock: Court hears argument on all pending motions. Court OVERRULES 83 Objections to the Appeal of Magistrate Judge's Order Denying Defendant's Motion for Bill of Particulars (Motion to Join Appeal 90 filed by defendant Cromwell granted). Motions to Dismiss 34 and 42 DENIED. Motion for Speedy Trial 69 DENIED, in light of a trial date being established with an agreement of the parties. Jury Selection to begin the week of |

| | | 8/30/2021 and Trial to begin on 9/7/2021.(Attorneys present: AUSA Wichers, Flaherty, Weinberg)Court Reporter Name and Contact or digital recording information: Kelly Mortellite at mortellite@gmail.com. (Beatty, Barbara) (Entered: 04/30/2021) |
|---|---|---|
| 05/04/2021 | 93 | Judge Douglas P. Woodlock: ORDER SETTING CRIMINAL JURY TRIAL as to Cedric Cromwell and David Dequattro. Jury Selection commencing the week of Monday, August 30, 2021, and jury trial commencing the week of Tuesday, September 7, 2021. Pretrial Conference is SCHEDULED for 8/19/2021 at 11:00 a.m. (Beatty, Barbara) (Entered: 05/04/2021) |
| 05/11/2021 | 94 | Transcript of Hearing as to Cedric Cromwell, David Dequattro held on April 23, 2021, before Judge Douglas P. Woodlock. Court Reporter Name and Contact Information: Kelly Mortellite at mortellite@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 6/1/2021. Redacted Transcript Deadline set for 6/11/2021. Release of Transcript Restriction set for 8/9/2021. (Coppola, Katelyn) (Entered: 05/14/2021) |
| 05/11/2021 | 95 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/caseinfo/transcripts.htm (Coppola, Katelyn) (Entered: 05/14/2021) |
| 05/18/2021 | 96 | Electronic Clerk's Notes for proceedings held before Magistrate Judge Marianne B. Bowler: Status Conference as to Cedric Cromwell, David Dequattro held on 5/18/2021. Court hears from counsel, government to file assented to motion to exclude the time from this date until the first appearance before the district judge. (Attorneys present: Wichers, Flaherty, Weinberg.) Court Reporter Name and Contact or digital recording information: Alice Moran at alice.moran@verizon.net. (Putnam, Harold) (Entered: 05/19/2021) |
| 05/19/2021 | 97 | Assented to MOTION for Excludable Delay from 5/18/21 to 8/30/21 as to Cedric Cromwell, David Dequattro by USA. (Wichers, Christine) (Entered: 05/19/2021) |
| 06/01/2021 | 98 | Magistrate Judge Marianne B. Bowler: ELECTRONIC ORDER entered granting 97 Assented to MOTION for Excludable Delay from 5/18/21 to 8/30/21 as to Cedric Cromwell (1), David Dequattro (2) (Belpedio, Lisa) (Entered: 06/02/2021) |
| 06/01/2021 | 99 | Magistrate Judge Marianne B. Bowler: ORDER ON EXCLUDABLE DELAY as to Cedric Cromwell, David Dequattro. Time excluded from May 18, 2021 until August 30, 2021. Reason for entry of order on excludable delay: 18 USC 3161(h)(7)(A) Interests of justice. (Belpedio, Lisa) (Entered: 06/02/2021) |
| 06/01/2021 | 100 | Transcript of Hearing as to Cedric Cromwell held on April 1, 2021, before Magistrate Judge Marianne B. Bowler. Court Reporter Name and Contact Information: Joan Daly at joanmdaly62@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 6/22/2021. Redacted Transcript Deadline set for 7/2/2021. Release of Transcript Restriction set for 8/30/2021. (Coppola, Katelyn) (Coppola, Katelyn). (Entered: 06/03/2021) |
| 06/01/2021 | 101 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at |

| | | http://www.mad.uscourts.gov/caseinfo/transcripts.htm (Coppola, Katelyn) (Entered: 06/03/2021) |
|---|---|---|
| 07/06/2021 | 102 | NOTICE OF SCHEDULING CONFERENCE as to Cedric Cromwell and David Dequattro:<br><br>This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible.<br><br>Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.<br><br>For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov.<br><br>Scheduling Conference is SCHEDULED for 7/8/2021 at 12:00 p.m. in Remote Proceeding : Boston before Judge Douglas P. Woodlock. (Beatty, Barbara) (Entered: 07/06/2021) |
| 07/07/2021 | 103 | MOTION to Sever *Counts* as to Cedric Cromwell, David Dequattro by David Dequattro. (Weinberg, Martin) (Entered: 07/07/2021) |
| 07/08/2021 | 104 | Clerk's Notes for Scheduling Conference held via Zoom held before Judge Douglas P. Woodlock: Court reviews length of witnesses' testimony with counsel while addressing the Defendants' Motion to Sever Counts 103 . Government to file opposition to motion to sever by 7/12/2021. Court proposes the use of juror questionnaire in this case and will forward an example questionnaire to counsel. Parties to work out an accelerated time table for producing Jencks material and other pretrial deadlines. Parties to submit by email a revised witness list. Further pretrial conference SCHEDULED for 7/14/2021 at 2:00 p.m. in a Remote Proceeding: Boston.<br><br>This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible.<br><br>Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.<br><br>For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov.<br><br>(Attorneys present: AUSA Wichers, Flaherty, Weinberg)Court Reporter Name and Contact or digital recording information: Kelly Mortellite at mortellite@gmail.com. (Beatty, Barbara) (Entered: 07/09/2021) |

| 07/09/2021 | 105 | Joint Request to Revise Order Setting Criminal Jury Trial (Dkt. 93)(Beatty, Barbara) (Entered: 07/09/2021) |
|---|---|---|
| 07/09/2021 | 106 | Judge Douglas P. Woodlock: ELECTRONIC ORDER entered re 105 Joint Request to Revise Order Setting Criminal Jury Trial (Dkt. 93) as to Cedric Cromwell and David Dequattro. Joint Request ALLOWED AND SO ORDERED. (Beatty, Barbara) (Entered: 07/09/2021) |
| 07/12/2021 | 107 | Opposition by USA as to David Dequattro re 103 MOTION to Sever *Counts* (Wichers, Christine) (Entered: 07/12/2021) |
| 07/12/2021 | 108 | Assented to MOTION for Leave to File *Reply* as to Cedric Cromwell, David Dequattro by David Dequattro. (Weinberg, Martin) (Entered: 07/12/2021) |
| 07/12/2021 | 109 | Judge Douglas P. Woodlock: ORDER granting 108 Motion for Leave to Reply Brief. Reply brief shall be filed no later than 12:00 noon on 7/14/2021. (Beatty, Barbara) (Entered: 07/12/2021) |
| 07/12/2021 | 110 | Joint REPLY TO RESPONSE to Motion by Cedric Cromwell, David Dequattro re 103 MOTION to Sever *Counts* (Weinberg, Martin) (Entered: 07/12/2021) |
| 07/14/2021 | 111 | Electronic Clerk's Notes for Pretrial Conference as to Cedric Cromwell and David Dequattro held via Zoom before Judge Douglas P. Woodlock: Ex-Parte hearing held with Atty Weinberg. All counsel present. Defendant's Motion to Sever 103 ALLOWED, case to proceed to trial on the original indictment. Special jury question will be drafted for Counts 3,4 and 5. Court to provide drafts of the juror questionnaire and the redacted indictment for counsel for review. Court to consider additional peremptory challenges if the parties agree. By the first week of August, counsel to email the tentative order of proof, providing the order of the witnesses for each trial day. Court anticipates full trial days. (Attorneys present: AUSA Wichers, Flaherty, Weinberg)Court Reporter Name and Contact or digital recording information: Robert Paschal at rwp.reporter@gmail.com. (Beatty, Barbara) (Entered: 07/19/2021) |
| 07/21/2021 | 112 | NOTICE OF ATTORNEY APPEARANCE Jared C. Dolan appearing for USA. (Dolan, Jared) (Entered: 07/21/2021) |
| 07/26/2021 | 113 | NOTICE OF PRETRIAL CONFERENCE as to Cedric Cromwell, David Dequattro: <br><br>This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible. <br><br>Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html. <br><br>For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov. <br><br>Pretrial Conference is SCHEDULED for 8/4/2021 at 11:00 a.m. in Remote Proceeding : Boston before Judge Douglas P. Woodlock. (Beatty, Barbara) (Entered: 07/26/2021) |

| 07/28/2021 | 114 | Assented to MOTION for Leave to File *Under Seal* as to David Dequattro. (Weinberg, Martin) (Entered: 07/28/2021) |
| --- | --- | --- |
| 07/28/2021 | 115 | Judge Douglas P. Woodlock: ELECTRONIC ORDER entered granting 114 Assented to MOTION for Leave to File Under Seal ; Counsel must include - Leave to file granted on (date of order)- in the caption of the document as to David Dequattro (2) (McDonagh, Christina) (Entered: 07/28/2021) |
| 08/03/2021 | 117 | Memorandum regarding Forfeiture as to Cedric Cromwell, David Dequattro (Head, Carol) (Entered: 08/03/2021) |
| 08/04/2021 | 119 | NOTICE OF ATTORNEY APPEARANCE: Maksim Nemtsev appearing for David Dequattro. Type of Appearance: Retained. (Nemtsev, Maksim) (Entered: 08/04/2021) |
| 08/04/2021 | 122 | Clerk's Notes for Further Pretrial Conference held before Judge Douglas P. Woodlock: Motion In Limine 116 DENIED. Court discusses Order of Proof, Proposed Verdict Slip and Redacted Indictment with counsel. Forfeiture claims will not be presented to the jury. Final pretrial conference scheduled for 8/19/2021 at 11:00 a.m. (Attorneys present: AUSA Wichers, AUSA Dolan, Flaherty, Weinberg)Court Reporter Name and Contact or digital recording information: Kelly Mortellite at mortellite@gmail.com. (Beatty, Barbara) (Entered: 08/04/2021) |
| 08/06/2021 | 123 | Proposed Jury Instructions by USA as to Cedric Cromwell, David Dequattro (Wichers, Christine) (Entered: 08/06/2021) |
| 08/06/2021 | 124 | Proposed Jury Instructions by David Dequattro (Weinberg, Martin) (Entered: 08/06/2021) |
| 08/09/2021 | 125 | Assented to MOTION for Leave to File *Documents Under Seal* as to Cedric Cromwell, David Dequattro by David Dequattro. (Weinberg, Martin) (Entered: 08/09/2021) |
| 08/09/2021 | 126 | Judge Douglas P. Woodlock: ELECTRONIC ORDER entered granting 125 Assented to MOTION for Leave to File Documents Under Seal ; Counsel must include - Leave to file granted on (date of order)- in the caption of the document as to Cedric Cromwell (1), David Dequattro (2) (McDonagh, Christina) (Entered: 08/09/2021) |
| 08/09/2021 | 127 | Assented to MOTION for Leave to File *motions in limine and trial brief under seal* as to Cedric Cromwell, David Dequattro by USA. (Dolan, Jared) (Entered: 08/09/2021) |
| 08/09/2021 | 128 | Judge Douglas P. Woodlock: ELECTRONIC ORDER entered granting 127 Assented to MOTION for Leave to File motions in limine and trial brief under seal; Counsel must include - Leave to file granted on (date of order)- in the caption of the document as to Cedric Cromwell (1), David Dequattro (2) (McDonagh, Christina) (Entered: 08/09/2021) |
| 08/09/2021 | 129 | Objection as to David Dequattro: 123 Proposed Jury Instructions filed by USA. (Weinberg, Martin) (Entered: 08/09/2021) |
| 08/09/2021 | 131 | MOTION in Limine to Partially Exclude Defense Expert as to Cedric Cromwell, David Dequattro by USA. (McDonagh, Christina) (Entered: 08/10/2021) |
| 08/09/2021 | 132 | MOTION in Limine to Preclude Testimony or other Evidence regarding pending Civil Litigation between Defendant Dequattro and Joseph Beretta as to Cedric Cromwell, David Dequattro by USA. (McDonagh, Christina) (Entered: 08/10/2021) |

| 08/16/2021 | 140 | Judge Douglas P. Woodlock: PROCEDURAL ORDER (Woodlock, Douglas) (Entered: 08/16/2021) |
|---|---|---|
| 08/16/2021 | 142 | Opposition by David Dequattro re 132 MOTION in Limine to Preclude Testimony or other Evidence regarding pending Civil Litigation between Defendant Dequattro and Joseph Beretta. (McDonagh, Christina) (Entered: 08/16/2021) |
| 08/16/2021 | 143 | Opposition by David Dequattro re 131 MOTION in Limine to Partially Exclude Defense Expert (McDonagh, Christina) (Entered: 08/16/2021) |
| 08/19/2021 | 149 | Clerk's Notes for Pretrial Conference held via Zoom before Judge Douglas P. Woodlock: Court reviews upcoming hearings to take place. Further Pretrial Conference SCHEDULED for 8/30/2021 at 9:00 a.m. Counsel and trial participants allowed in the Courtroom but the public will register for Zoom. Daubert/Motion Hearing SCHEDULED for 10/13/2021 at 9:30 a.m. Court addresses the sealing of certain motions and related filings. (Attorneys present: AUSA Wichers, AUSA Dolan, Flaherty, Weinberg, Nemtsev)Court Reporter Name and Contact or digital recording information: Kelly Mortellite at mortellite@gmail.com. (Beatty, Barbara) (Entered: 08/19/2021) |
| 08/19/2021 | 150 | Case as to Cedric Cromwell, David Dequattro no longer referred to Magistrate Judge Marianne B. Bowler. (Belpedio, Lisa) (Entered: 08/19/2021) |
| 08/19/2021 | 157 | Transcript of Pretrial Videoconference as to Cedric Cromwell, David Dequattro held on July 14, 2021, before Judge Douglas P. Woodlock. Court Reporter Name and Contact Information: Robert Paschal at rwp.reporter@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 9/9/2021. Redacted Transcript Deadline set for 9/20/2021. Release of Transcript Restriction set for 11/17/2021. (Coppola, Katelyn) (Entered: 08/31/2021) |
| 08/19/2021 | 158 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/caseinfo/transcripts.htm (Coppola, Katelyn) (Entered: 08/31/2021) |
| 08/20/2021 | 151 | MOTION to Dismiss *Count 5* as to David Dequattro. (Weinberg, Martin) (Entered: 08/20/2021) |
| 08/26/2021 | 153 | Objection as to David Dequattro: 124 Proposed Jury Instructions filed by David Dequattro. (Wichers, Christine) (Entered: 08/26/2021) |
| 08/26/2021 | 154 | Opposition by USA as to David Dequattro re 151 MOTION to Dismiss *Count 5* (Wichers, Christine) (Entered: 08/26/2021) |
| 08/27/2021 | 155 | Response as to David Dequattro: 153 Objection (unrelated to a motion). (Weinberg, Martin) (Entered: 08/27/2021) |
| 08/30/2021 | 156 | Clerk's Notes for Further Pretrial Conference held before Judge Douglas P. Woodlock: Court addresses and hears argument on pending motions and enters rulings as follows: 130 Motions in Limine, ALLOWED without prejudice, subject to the opportunity for defense to raise questions with underlying documents; 136 DENIED, without prejudice, subject to the opportunity for defense to raise questions with underlying documents; 132 Motion in Limine, DENIED, as instructed, admissible for |

| | | |
|---|---|---|
| | | impeachment purposes, and the government, by 12:00 noon on 9/7/2021, shall provide a statement re the admissible evidence for impeachment purposes; and, 151 Motion to Dismiss Count 5, DENIED, special questions to be presented to the Jury. Court discusses counsel's trial schedules and proposes alternate trial date of 10/12/2021 as a possibility to be further explored.(Attorneys present: AUSA Wichers, AUSA Dolan, Flaherty, Weinberg, Nemtsev)Court Reporter Name and Contact or digital recording information: Kelly Mortellite at mortellite@gmail.com. (Beatty, Barbara) (Entered: 08/31/2021) |
| 09/16/2021 | 163 | NOTICE OF IN CAMERA STATUS HEARING as to Cedric Cromwell, David Dequattro: <br><br> This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible. <br><br> Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html. <br><br> For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov. <br><br> In Camera Hearing is SCHEDULED for 10/6/2021 at 12:00 p.m. in Remote Proceeding : Boston before Judge Douglas P. Woodlock. (Beatty, Barbara) (Entered: 09/16/2021) |
| 09/16/2021 | 164 | NOTICE OF RESCHEDULING DAUBERT HEARING: Daubert Hearing re 131 Motion in Limine as to Cedric Cromwell and David Dequattro is RESCHEDULED until 10/14/2021 at 1:00 p.m. in Courtroom 1 before Judge Douglas P. Woodlock. (Beatty, Barbara) (Entered: 09/16/2021) |
| 10/01/2021 | 165 | MOTION for Reconsideration re 111 Order on Motion for Leave to File,,,, Order on Motion to Sever,,,, Pretrial Conference,,, as to Cedric Cromwell, David Dequattro by USA. (Attachments: # 1 Exhibit A: Transcript of 7/14/21 Hearing)(Wichers, Christine) (Entered: 10/01/2021) |
| 10/04/2021 | 166 | Opposition by David Dequattro re 165 MOTION for Reconsideration re 111 Order on Motion for Leave to File,,,, Order on Motion to Sever,,,, Pretrial Conference,,, (Weinberg, Martin) (Entered: 10/04/2021) |
| 10/05/2021 | 167 | MOTION Motion to Join re 166 Opposition to Motion *DEFENDANTS OPPOSITION TO THE GOVERNMENTS MOTION FOR RECONSIDERATION OF COURTS ORDER TO SEVER COUNTA* as to Cedric Cromwell, David Dequattro by Cedric Cromwell. (Flaherty, Timothy) (Entered: 10/05/2021) |
| 10/05/2021 | 168 | NOTICE CANCELING HEARING - Hearing previously scheduled for 10/6/21 is hereby CANCELLED as to Cedric Cromwell and David Dequattro. (Beatty, Barbara) (Entered: 10/05/2021) |

| 10/08/2021 | [169](#) | PRETRIAL MEMORANDUM *(PRETRIAL HEARING MEMORANDUM OF LAW ON DEFENSE EXPERT)* by David Dequattro (Weinberg, Martin) (Entered: 10/08/2021) |
|---|---|---|
| 10/15/2021 | 170 | NOTICE OF RESCHEDULING MOTION HEARING: Hearing on all Pending Motions is RESCHEDULED until 11/3/2021 at 1:00 p.m. as to Cedric Cromwell and David Dequattro in Courtroom 1 (In person with remote access provided) before Judge Douglas P. Woodlock. (Due to technical difficulties this hearing is being rescheduled from 10/14/2021.)(Beatty, Barbara) (Entered: 10/15/2021) |
| 11/03/2021 | 171 | Clerk's Notes for Motion/Evidentiary Hearing held before Judge Douglas P. Woodlock: Court sets parameters for expert testimony of Attorney Skip Durocher. Attorney Durocher sworn and testifies. Attorney Durocher allowed to file a amicus brief if necessary. Based upon the present state of the record, the Court's preliminary view is not to allow Attorney Durocher to testify re [131](#) Gov't Motion to Exclude Defense Expert. Counts in indictment remain severed for trial. With respect to the Motion re 404(b) evidence 133 , Court inclined not to allow the evidence to be introduced in the case in chief. Court to set further hearing to address all outstanding issues and motions in December.(Attorneys present: AUSA Wichers, AUSA Dolan, Flaherty, Weinberg, Nemtsev. )Court Reporter Name and Contact or digital recording information: Kelly Mortellite at mortellite@gmail.com. (Beatty, Barbara) (Entered: 11/08/2021) |
| 11/08/2021 | [172](#) | Transcript of Motion Hearing as to Cedric Cromwell, David Dequattro held on November 3, 2021, before Judge Douglas P. Woodlock. Court Reporter Name and Contact Information: Kelly Mortellite at mortellite@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 11/29/2021. Redacted Transcript Deadline set for 12/9/2021. Release of Transcript Restriction set for 2/7/2022. (Coppola, Katelyn) (Entered: 11/10/2021) |
| 11/08/2021 | 173 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/caseinfo/transcripts.htm (Coppola, Katelyn) (Entered: 11/10/2021) |
| 11/15/2021 | [174](#) | Assented to MOTION for Leave to File *Under Seal* as to Cedric Cromwell, David Dequattro. (Weinberg, Martin) (Entered: 11/15/2021) |
| 11/15/2021 | 175 | Judge Douglas P. Woodlock: ELECTRONIC ORDER granting [174](#) Motion for Leave to File Under Seal. (Beatty, Barbara) (Entered: 11/15/2021) |
| 11/19/2021 | 177 | NOTICE OF HEARING as to Cedric Cromwell and David Dequattro: <br><br>This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible. <br><br>Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html. |

| | | |
|---|---|---|
| | | For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov. <br><br> Interim Pretrial Conference is SCHEDULED for 12/3/2021 at 1:30 p.m. in Remote Proceeding : Boston before Judge Douglas P. Woodlock. This hearing will be in camera and for counsel of record only. (Beatty, Barbara) (Entered: 11/19/2021) |
| 11/23/2021 | 178 | Assented to MOTION for Leave to File *Opposition Under Seal* as to Cedric Cromwell, David Dequattro by USA. (Wichers, Christine) (Entered: 11/23/2021) |
| 11/24/2021 | 179 | Judge Douglas P. Woodlock: ORDER granting 178 Assented to MOTION for Leave to File Opposition Under Seal. (Beatty, Barbara) (Entered: 11/24/2021) |
| 11/30/2021 | 181 | Assented to MOTION for Leave to File *Reply Under Seal* as to Cedric Cromwell, David Dequattro. (Weinberg, Martin) (Entered: 11/30/2021) |
| 12/01/2021 | 182 | Judge Douglas P. Woodlock: ELECTRONIC ORDER granting 181 Assented to Motion for Leave to File Reply Under Seal as to Cedric Cromwell (1) and David Dequattro (2) (Beatty, Barbara) (Entered: 12/01/2021) |
| 12/03/2021 | 184 | Assented to MOTION for Leave to File *Under Seal* as to David Dequattro. (Weinberg, Martin) (Entered: 12/03/2021) |
| 12/03/2021 | 185 | Judge Douglas P. Woodlock: ELECTRONIC ORDER entered granting 184 Assented to MOTION for Leave to File Under Seal as to David Dequattro (2) (McDonagh, Christina) (Entered: 12/03/2021) |
| 12/22/2021 | 189 | Assented to MOTION for Excludable Delay to 4/19/22 as to Cedric Cromwell, David Dequattro by USA. (Wichers, Christine) (Entered: 12/22/2021) |
| 12/23/2021 | 191 | Judge Douglas P. Woodlock: ELECTRONIC ORDER granting 189 Government's Assented to Motion to Exclusion of Time Under the Speedy Trial Act as to Cedric Cromwell (1) and David Dequattro (2). ORDER ON EXCLUDABLE DELAY: Time excluded from 1/18/2022 until 4/19/2022. Reason for entry of order on excludable delay: 18 USC 3161(h)(7)(A) Interests of justice.(Beatty, Barbara) (Entered: 12/23/2021) |
| 04/01/2022 | 193 | NOTICE OF HEARING - Final Pretrial Conference as to Cedric Cromwell and David Dequattro is SCHEDULED for 4/18/2022 at 9:30 a.m. in Courtroom 1 (In person only) before Judge Douglas P. Woodlock. (Beatty, Barbara) (Entered: 04/01/2022) |
| 04/04/2022 | 194 | Assented to MOTION for Judicial Notice as to David Dequattro. (Weinberg, Martin) (Entered: 04/04/2022) |
| 04/07/2022 | 195 | Proposed Jury Instructions by David Dequattro (Weinberg, Martin) (Entered: 04/07/2022) |
| 04/11/2022 | 196 | NOTICE OF HEARING - Final Pretrial Conference as to Cedric Cromwel and David Dequattro is SCHEDULED for 4/14/2022 at 8:30 a.m. in Courtroom 1 (In person only) before Judge Douglas P. Woodlock. (Beatty, Barbara) (Entered: 04/11/2022) |
| 04/13/2022 | 197 | Proposed Jury Instructions by Cedric Cromwell as to Cedric Cromwell, David Dequattro (Flaherty, Timothy) (Entered: 04/13/2022) |

| 04/14/2022 | 198 | Clerk's Notes for Final Pretrial Conference held in person as to Cedric Cromwell and David Dequattro before Judge Douglas P. Woodlock: Court discusses juror questionnaire, jury empanelment and trial procedure. Unless any issues arise, the pretrial conference scheduled for 4/18/2022 in CANCELED. Jury empanelment to begin 4/19/2022. (Attorneys present: AUSA Wichers, AUSA Dolan, Weinberg, Flaherty)Court Reporter Name and Contact or digital recording information: Linda Walsh at lwalshsteno@gmail.com. (Beatty, Barbara) (Entered: 04/14/2022) |
|---|---|---|
| 04/18/2022 | 199 | Transcript of Final Pretrial Conference as to Cedric Cromwell, David Dequattro held on April 14, 2022, before Judge Douglas P. Woodlock. Court Reporter Name and Contact Information: Linda Walsh at lwalshsteno@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 5/9/2022. Redacted Transcript Deadline set for 5/19/2022. Release of Transcript Restriction set for 7/18/2022. (Coppola, Katelyn) (Entered: 04/22/2022) |
| 04/18/2022 | 200 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/caseinfo/transcripts.htm (Coppola, Katelyn) (Entered: 04/22/2022) |
| 04/19/2022 | 201 | JURY TRIAL DAY ONE as to Cedric Cromwell and David DeQuattro before Judge Douglas P. Woodlock: Jury Selection Day One - Voir dire panel sworn. Court provides preliminary instructions to the panel regarding the jury selection process and completion of the juror questionnaire. Jurors complete questionnaires. Copies of completed questionnaires provided to counsel. Hearing held to discuss challenges for cause (27 jurors excused). Individual voir dire scheduled to begin 4/20/2022 at 9:00 a.m.(Attorneys present: AUSA Wichers, AUSA Dolan, Weinberg, Nemtsev, Flaherty)Court Reporter Name and Contact or digital recording information: Kelly Mortellite at mortellite@gmail.com. (Beatty, Barbara) Modified to correct date (Beatty, Barbara). (Entered: 04/22/2022) |
| 04/20/2022 | 202 | JURY TRIAL DAY TWO as to Cedric Cromwell and David DeQuattro before Judge Douglas P. Woodlock: Jury Selection Day Two - Individual voir dire of prospective jurors conducted by Judge with counsel present. Challenges for cause exercised (17 jurors excused). Individual vior dire continues 4/21/2022. (Attorneys present: AUSA Wichers, AUSA Dolan, Weinberg, Nemtsev, Flaherty)Court Reporter Name and Contact or digital recording information: Kelly Mortellite at mortellite@gmail.com. (Beatty, Barbara) (Entered: 04/22/2022) |
| 04/21/2022 | 203 | JURY TRIAL DAY THREE as to Cedric Cromwell and David DeQuattro before Judge Douglas P. Woodlock: Jury Selection Day Three - Individual voir dire of prospective jurors conducted by Judge with counsel present. Challenges for cause exercised (6 jurors excused). Voir dire panel returns 4/22/2022 at 9:00 a.m. for the exercise of peremptory challenges. Court will consider granting additional challenges. Opening statements and witness testimony thereafter.(Attorneys present: AUSA Wichers, AUSA Dolan, Weinberg, Nemtsev, Flaherty)Court Reporter Name and Contact or digital recording information: Kelly Mortellite at mortellite@gmail.com. (Beatty, Barbara) (Entered: 04/22/2022) |
| 04/22/2022 | 204 | JURY TRIAL DAY FOUR as to Cedric Cromwell and David DeQuattro before Judge Douglas P. Woodlock: Jury Selection Day Four - Counsel present. Court excuses an |

| | | |
|---|---|---|
| | | additional three jurors for cause. Remaining voir dire panel seated. Defendants set to the Bar. Counsel exercises peremptory challenges. All parties decline the use of extra challenges offered by the Court. Jury panel of 12 plus 4 alternates sworn. Opening statements by AUSA Dolan, Attys Weinberg and Flaherty. Testimony of William Dow, Michael D'Amato and Robert Hendricks.(Attorneys present: AUSA Wichers, Dolan, Weinberg, Nemtsev. Flaherty)Court Reporter Name and Contact or digital recording information: Kelly Mortellite at mortellite@gmail.com. (Beatty, Barbara) (Entered: 04/25/2022) |
| 04/25/2022 | 212 | Memorandum regarding Request for Instructions to the Jury Regarding the Requirement of an Explicit Quid Pro Quo as to David Dequattro (Weinberg, Martin) (Entered: 04/25/2022) |
| 04/25/2022 | 213 | JURY TRIAL DAY FIVE as to Cedric Cromwell and David DeQuattro before Judge Douglas P. Woodlock: Jury not present. Court discusses protocol to be followed in light of positive Covid test with one juror. Juror #32 discharged. All remaining jurors tested for Covid and results were negative. Hearing held on 207 Motion for Immunity Order. Witness sworn with counsel present and court conducts colloquy. Motion 207 ALLOWED, Order entered. Further hearing held on 208 Motion in Limine. After argument heard, Court gives direction to the parties regarding subject matter of the Motion in Limine. Court addresses jury without counsel present re Covid protocol. Jury present. Testimony of Patricia (Trish) Keliinui, Charles Foster, Cameron Frye and Constantinos Mitrokostas.(Attorneys present: AUSA Wichers, AUSA Dolan, Weinberg, Nemtsev, Flaherty)Court Reporter Name and Contact or digital recording information: Kelly Mortellite at mortellite@gmail.com. (Beatty, Barbara) (Entered: 04/26/2022) |
| 04/26/2022 | 214 | JURY TRIAL DAY SIX as to Cedric Cromwell and David DeQuattro before Judge Douglas P. Woodlock: Jury not present. Court addresses evidentiary issues with counsel. Jury present. Continued testimony of Constantinos Mitrokostas. Testimony of Stephania Sfiridis and Joseph Beretta. Jury excused for the day. Proposed drafts of redacted indictment and verdict slip distributed to counsel. Argument heard in camera regarding further testimony of Joseph Beretta. (Attorneys present: AUSA Wichers, AUSA Dolan, Weinberg, Nemtsev, Flaherty)Court Reporter Name and Contact or digital recording information: Kelly Mortellite at mortellite@gmail.com. (Beatty, Barbara) (Entered: 04/26/2022) |
| 04/27/2022 | 216 | JURY TRIAL DAY SEVEN as to Cedric Cromwell and David DeQuattro before Judge Douglas P. Woodlock: Jury not present. Court addresses evidentiary issues with counsel. Jury present. Continued testimony of Joseph Beretta. Testimony of Sarah (Sally) Dowling and Richard Beretta. (Attorneys present: AUSA Wichers. AUSA Dolan, Weinberg, Nemtsev, Flaherty)Court Reporter Name and Contact or digital recording information: Kelly Mortellite at mortellite@gmail.com. (Beatty, Barbara) (Entered: 04/27/2022) |
| 04/28/2022 | 217 | JURY TRIAL DAY EIGHT as to Cedric Cromwell and David DeQuattro before Judge Douglas P. Woodlock: Jury not present. Court addresses evidentiary issues with counsel. Jury present. Testimony of Wes Hogan, Lisa Crandall, Laura Little and Bryan Moran. Government rests. Jury excused until 5/3/2022 at 9:00 a.m. In Camera Hearing SCHEDULED for 4/29/2022 at 9:00 a.m. in Courtroom 1 (In person only) before Judge Douglas P. Woodlock. (Attorneys present: AUSA Wichers, AUSA Dolan, Weinberg, Nemtsev, Flaherty)Court Reporter Name and Contact or digital recording information: Kelly Mortellite at mortellite@gmail.com. (Beatty, Barbara) (Entered: |

| | | 04/28/2022) |
|---|---|---|
| 04/28/2022 | 218 | MOTION for Acquittal as to David Dequattro. (Weinberg, Martin) (Entered: 04/28/2022) |
| 04/28/2022 | 219 | NOTICE OF ATTORNEY APPEARANCE: Michael Pabian appearing for David Dequattro. Type of Appearance: Retained. (Pabian, Michael) (Entered: 04/28/2022) |
| 04/28/2022 | 220 | MOTION for Acquittal as to Cedric Cromwell. (Flaherty, Timothy) (Entered: 04/28/2022) |
| 04/28/2022 | 221 | MEMORANDUM in Support re 218 MOTION for Acquittal as to David Dequattro . (Beatty, Barbara) (Entered: 04/29/2022) |
| 04/29/2022 | | NOTICE OF HEARING: In Camera Hearing set for 5/2/2022 10:00 AM in Courtroom 1 (In person only) before Judge Douglas P. Woodlock. (McManus, Caetlin) (Entered: 04/29/2022) |
| 04/30/2022 | 228 | United States' Brief Addressing Jurisdictional Issues Raised in the Defendants' Motions for Acquittal 218 220 (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Beatty, Barbara) (Entered: 04/30/2022) |
| 05/01/2022 | 229 | Defendant David DeQuattro's Sealed Response to Government's Brief 228 Addressing Jurisdictional Issues Raised in the Defendant's Motions for Acquittal. (Beatty, Barbara) (Entered: 05/01/2022) |
| 05/03/2022 | 232 | JURY TRIAL DAY NINE as to Cedric Cromwell and David DeQuattro before Judge Douglas P. Woodlock: Jury not present. Final charging issues discussed with counsel. Final version of redacted indictment and verdict slip distributed to counsel. Jury present. Defendants offer exhibits into evidence and admitted by the Court. Defendants rest. Closings by AUSA Wichers, Attorneys Weinberg and Flaherty. Rebuttal argument by AUSA Dolan. Jury receives jury instructions and sent to deliberate at 3:00 p.m. Counsel states objections to jury instructions. Jury dismissed for the day at 4:15 p.m.(Attorneys present: AUSA Wichers, AUSA Dolan, Weinberg, Nemtsev, Flaherty)Court Reporter Name and Contact or digital recording information: Kelly Mortellite at mortellite@gmail.com. (Beatty, Barbara) (Entered: 05/04/2022) |
| 05/04/2022 | 233 | JURY TRIAL DAY TEN as to Cedric Cromwell and David DeQuattro before Judge Douglas P. Woodlock: Jury not present. Court discusses written jury instructions and production of applicable trial transcript. Jury present. Court outlines procedure for deliberations while materials are assembled for them. Jury continues deliberations. Jury not present. Court reviews written jury instructions with counsel and incorporates revisions. Note from jury requesting to be excused for the day at 3:00 p.m. Jury excused for the day in open court. Court continues discussing the revisions made to the written jury instructions with counsel.(Attorneys present: AUSA Wichers, AUSA Dolan, Weinberg, Nemtsev, Flaherty)Court Reporter Name and Contact or digital recording information: Kelly Mortellite at mortellite@gmail.com. (Beatty, Barbara) (Entered: 05/05/2022) |
| 05/05/2022 | 234 | JURY TRIAL DAY ELEVEN as to Cedric Cromwell and David DeQuattro before Judge Douglas P. Woodlock: Jury not present. Final version of written instructions provided and discussed with counsel. Jury present. Court provides written instructions and transcript of the charge to the jury. Jury sent to deliberate at 9:25 a.m. Verdict returned at 2:15 p.m. Jury dismissed by the Court. Defendants' memoranda in support of motions for acquittal or for new trial to be filed by 6/3/2022 and government's |

| | | response by 6/17/2022. (Attorneys present: AUSA Wichers, AUSA Dolan, Weinberg, Nemtsev, Flaherty)Court Reporter Name and Contact or digital recording information: Kelly Mortellite at mortellite@gmail.com. (Beatty, Barbara) Modified on 5/20/2022 for clarity as to deadlines (McManus, Caetlin). (Entered: 05/05/2022) |
|---|---|---|
| 05/05/2022 | 235 | JURY VERDICT as to Cedric Cromwell (1) Guilty on Count 2s-3s,6s,7s-8s,10s and David Dequattro (2) Guilty on Count 5s. Cedric Cromwell (1) Not Guilty on Count 1s,9s and David Dequattro (2) Not Guilty on Count 1s,4s. (Beatty, Barbara) (Entered: 05/05/2022) |
| 05/05/2022 | 236 | Judge Douglas P. Woodlock: PROCEDURAL ORDER RE SENTENCING HEARING - Sentencing as to Cedric Cromwell and David Dequattro is SCHEDULED for 9/9/2022 at 10:00 a.m. in Courtroom 1 (In person only). (Beatty, Barbara) (Entered: 05/05/2022) |
| 05/09/2022 | 237 | TRIAL EXHIBIT/WITNESS LIST as to Cedric Cromwell and David Dequattro. (Beatty, Barbara) (Additional attachment(s) added on 5/10/2022: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5) (Beatty, Barbara). (Entered: 05/10/2022) |
| 05/09/2022 | 238 | Written Jury Instructions as to Counts of Indictment provided to the Jury on 5/5/2022. (Beatty, Barbara) (Entered: 05/10/2022) |
| 05/09/2022 | 239 | Indictment (Redacted) provided to the Jury by the Court on 5/3/2022 as to Cedric Cromwell and David Dequattro. (Beatty, Barbara) (Entered: 05/10/2022) |
| 05/09/2022 | 240 | Juror Questionnaire provided to Voir Dire Panel on 4/19/2022. (Beatty, Barbara) (Entered: 05/10/2022) |
| 05/16/2022 | 241 | MOTION for Acquittal *and for Conditional Grant of New Trial* as to David Dequattro. (Weinberg, Martin)(Defendants' Memorandum in support due by 6/3/2022. Government's Response due by 6/17/2022) Modified on 5/20/2022 for clarity as to deadlines (McManus, Caetlin). (Entered: 05/16/2022) |
| 05/19/2022 | 242 | MOTION for Acquittal *and*, MOTION for New Trial as to Cedric Cromwell, David Dequattro by Cedric Cromwell. (Flaherty, Timothy) ( Defendants' Memorandum in support due by 6/3/2022. Government's Response due by 6/17/2022) Modified on 5/20/2022 for clarity as to deadlines (McManus, Caetlin). (Entered: 05/19/2022) |
| 05/19/2022 | 243 | EXCERPT Transcript of Jury Trial - Day 4 (Governments Opening Statement) as to Cedric Cromwell, David Dequattro held on April 22, 2022, before Judge Douglas P. Woodlock. Court Reporter Name and Contact Information: Kelly Mortellite at mortellite@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 6/9/2022. Redacted Transcript Deadline set for 6/20/2022. Release of Transcript Restriction set for 8/17/2022. (Coppola, Katelyn) (Entered: 05/26/2022) |
| 05/19/2022 | 244 | EXCERPT Transcript of Jury Trial - Day 4 (Defendant David DeQuattro Opening Statement) as to Cedric Cromwell, David Dequattro held on April 22, 2022, before Judge Douglas P. Woodlock. Court Reporter Name and Contact Information: Kelly Mortellite at mortellite@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 6/9/2022. Redacted Transcript Deadline set for 6/20/2022. Release of Transcript Restriction set for 8/17/2022. (Coppola, Katelyn) (Entered: 05/26/2022) |

| 05/19/2022 | [245](#) | Transcript of Testimony of Constantinos Mitrokostas as to Cedric Cromwell, David Dequattro held on April 25, 2022, before Judge Douglas P. Woodlock. Court Reporter Name and Contact Information: Kelly Mortellite at mortellite@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 6/9/2022. Redacted Transcript Deadline set for 6/20/2022. Release of Transcript Restriction set for 8/17/2022. (Coppola, Katelyn) (Entered: 05/26/2022) |
|---|---|---|
| 05/19/2022 | [246](#) | Transcript of Testimony of Constantinos Mitrokostas as to Cedric Cromwell, David Dequattro held on April 26, 2022, before Judge Douglas P. Woodlock. Court Reporter Name and Contact Information: Kelly Mortellite at mortellite@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 6/9/2022. Redacted Transcript Deadline set for 6/20/2022. Release of Transcript Restriction set for 8/17/2022. (Coppola, Katelyn) (Entered: 05/26/2022) |
| 05/19/2022 | [247](#) | Transcript of Testimony of Joseph Beretta as to Cedric Cromwell, David Dequattro held on April 26, 2022, before Judge Douglas P. Woodlock. Court Reporter Name and Contact Information: Kelly Mortellite at mortellite@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 6/9/2022. Redacted Transcript Deadline set for 6/20/2022. Release of Transcript Restriction set for 8/17/2022. (Coppola, Katelyn) (Entered: 05/26/2022) |
| 05/19/2022 | [248](#) | Transcript of Testimony of Sarah Dowling as to Cedric Cromwell, David Dequattro held on April 27, 2022, before Judge Douglas P. Woodlock. Court Reporter Name and Contact Information: Kelly Mortellite at mortellite@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 6/9/2022. Redacted Transcript Deadline set for 6/20/2022. Release of Transcript Restriction set for 8/17/2022. (Coppola, Katelyn) (Entered: 05/26/2022) |
| 05/19/2022 | [249](#) | Transcript of Testimony of Richard Beretta as to Cedric Cromwell, David Dequattro held on April 27, 2022, before Judge Douglas P. Woodlock. Court Reporter Name and Contact Information: Kelly Mortellite at mortellite@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 6/9/2022. Redacted Transcript Deadline set for 6/20/2022. Release of Transcript Restriction set for 8/17/2022. (Coppola, Katelyn) (Entered: 05/26/2022) |
| 05/19/2022 | [250](#) | Transcript of Testimony of Joseph Beretta as to Cedric Cromwell, David Dequattro held on April 27, 2022, before Judge Douglas P. Woodlock. Court Reporter Name and Contact Information: Kelly Mortellite at mortellite@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 6/9/2022. Redacted Transcript Deadline set for 6/20/2022. Release of Transcript Restriction set for 8/17/2022. (Coppola, Katelyn) (Entered: 05/26/2022) |
| 05/19/2022 | 251 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/caseinfo/transcripts.htm (Coppola, Katelyn) (Entered: 05/26/2022) |

| | | |
|---|---|---|
| 06/02/2022 | 252 | MEMORANDUM in Support by David Dequattro re 241 MOTION for Acquittal *and for Conditional Grant of New Trial* (Weinberg, Martin) (Entered: 06/02/2022) |
| 06/03/2022 | 253 | MEMORANDUM in Support by Cedric Cromwell as to Cedric Cromwell, David Dequattro re 242 MOTION for Acquittal *and* MOTION for New Trial (Flaherty, Timothy) (Entered: 06/03/2022) |
| 06/13/2022 | 256 | Transcript of Jury Trial - Day 11 as to Cedric Cromwell, David Dequattro held on May 5, 2022, before Judge Douglas P. Woodlock. Court Reporter Name and Contact Information: Kelly Mortellite at mortellite@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 7/5/2022. Redacted Transcript Deadline set for 7/14/2022. Release of Transcript Restriction set for 9/12/2022. (Coppola, Katelyn) (Entered: 06/17/2022) |
| 06/13/2022 | 257 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/caseinfo/transcripts.htm (Coppola, Katelyn) (Entered: 06/17/2022) |
| 06/16/2022 | 254 | Assented to MOTION for Leave to File *Extra Pages* as to Cedric Cromwell, David Dequattro by USA. (Wichers, Christine) (Entered: 06/16/2022) |
| 06/16/2022 | 255 | Judge Douglas P. Woodlock: ELECTRONIC ORDER granting 254 Government's Assented to Motion for Leave to File Extra Pages. (Beatty, Barbara) (Entered: 06/16/2022) |
| 06/17/2022 | 258 | MEMORANDUM in Opposition by USA as to David Dequattro re 241 MOTION for Acquittal *and for Conditional Grant of New Trial* (Wichers, Christine) (Entered: 06/17/2022) |
| 06/17/2022 | 259 | MEMORANDUM in Opposition by USA as to Cedric Cromwell re 242 MOTION for Acquittal *and* MOTION for New Trial (Wichers, Christine) (Entered: 06/17/2022) |
| 06/20/2022 | 260 | Assented to MOTION for Leave to File *Reply of up to 12 pages* as to David Dequattro. (Weinberg, Martin) (Entered: 06/20/2022) |
| 06/21/2022 | 261 | Judge Douglas P. Woodlock: ELECTRONIC ORDER granting 260 Assented to Motion for Leave to File Reply of Up to 12 Pages; Counsel using the Electronic Case Filing System should now file the reply memorandum no later than June 24, 2022, for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document as to David Dequattro (2) (Beatty, Barbara) (Entered: 06/21/2022) |
| 06/23/2022 | 262 | REPLY TO RESPONSE to Motion by David Dequattro re 241 MOTION for Acquittal *and for Conditional Grant of New Trial* (Weinberg, Martin) (Entered: 06/23/2022) |
| 06/28/2022 | 263 | NOTICE *of Supplemental Authority* by David Dequattro re 252 Memorandum in Support (Weinberg, Martin) (Entered: 06/28/2022) |
| 06/28/2022 | 264 | Assented to MOTION to Unseal Document *Filings regarding Motion for Judgment of Acquittal* as to David Dequattro. (Weinberg, Martin) (Entered: 06/28/2022) |

| | | |
|---|---|---|
| 06/28/2022 | 265 | Transcript of Jury Trial - Day 10 as to Cedric Cromwell, David Dequattro held on May 4, 2022, before Judge Douglas P. Woodlock. Court Reporter Name and Contact Information: Kelly Mortellite at mortellite@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 7/19/2022. Redacted Transcript Deadline set for 7/29/2022. Release of Transcript Restriction set for 9/26/2022. (Coppola, Katelyn) (Entered: 07/06/2022) |
| 06/28/2022 | 266 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/caseinfo/transcripts.htm (Coppola, Katelyn) (Entered: 07/06/2022) |
| 08/04/2022 | 267 | NOTICE OF RESCHEDULING SENTENCING HEARING - At the request by probation, the Sentencing as to Cedric Cromwell and David Dequattro is RESCHEDULED until 11/3/2022 at 2:00 p.m. in Courtroom 1 (In person only) before Judge Douglas P. Woodlock. (Beatty, Barbara) (Entered: 08/04/2022) |
| 08/04/2022 | 268 | NOTICE OF MOTION HEARING - Hearing on all Motions for Acquittal and for a New Trial as to Cedric Cromwell and David Dequattro is SCHEDULED for 9/9/2022 at 10:00 a.m. in Courtroom 1 (In person only) before Judge Douglas P. Woodlock. (Beatty, Barbara) (Entered: 08/04/2022) |
| 09/09/2022 | 269 | Clerk's Notes for Motion Hearing held in person before Judge Douglas P. Woodlock: Court addresses issues with counsel and hears argument on the pending Motions for Acquittal or New Trial as to Cedric Cromwell 220 242 and as to David Dequattro 218 241 242 . Further briefing to be filed no later than 9/23/2022.(Attorneys present: AUSA Wichers, AUSA Dolan, Weinberg, Flaherty)Court Reporter Name and Contact or digital recording information: Kelly Mortellite at mortellite@gmail.com. (Beatty, Barbara) (Entered: 09/12/2022) |
| 09/22/2022 | 270 | Assented to MOTION for Leave to File *23-Page Supplemental Memorandum* as to David Dequattro. (Weinberg, Martin) (Entered: 09/22/2022) |
| 09/23/2022 | 271 | Judge Douglas P. Woodlock: ELECTRONIC ORDER granting 270 Assented to Motion for Leave to File 23-Page Supplemental Memorandum as to David Dequattro (2). (Beatty, Barbara) (Entered: 09/23/2022) |
| 09/23/2022 | 272 | Supplemental MEMORANDUM in Support by David Dequattro re 241 MOTION for Acquittal *and for Conditional Grant of New Trial* (Weinberg, Martin) (Entered: 09/23/2022) |
| 09/23/2022 | 273 | Supplemental Opposition by USA as to Cedric Cromwell, David Dequattro re 242 MOTION for Acquittal *and* MOTION for New Trial (Wichers, Christine) (Entered: 09/23/2022) |
| 09/23/2022 | 274 | Supplemental MEMORANDUM in Support by Cedric Cromwell re 242 MOTION for Acquittal *and* MOTION for New Trial (Flaherty, Timothy) (Entered: 09/23/2022) |
| 10/21/2022 | 275 | MOTION for Forfeiture of Property *(Preliminary Order of Forfeiture and Order of Forfeiture (Money Judgment))* as to Cedric Cromwell by USA. (Attachments: # 1 Proposed Order, # 2 Proposed Order)(Head, Carol) (Entered: 10/21/2022) |

| 10/27/2022 | 276 | SENTENCING MEMORANDUM by Cedric Cromwell (Attachments: # 1 Exhibit) (Flaherty, Timothy) Docket text modified on 10/28/2022 (McManus, Caetlin). (Entered: 10/27/2022) |
|---|---|---|
| 10/27/2022 | 277 | SENTENCING MEMORANDUM by David Dequattro (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13)(Weinberg, Martin) (Entered: 10/27/2022) |
| 10/28/2022 | 278 | NOTICE OF RESCHEDULING SENTENCING HEARING - Sentencing as to Cedric Cromwell and David Dequattro is RESCHEDULED until 11/15/2022 at 10:00 a.m. in Courtroom 1 (In person only) before Judge Douglas P. Woodlock. (Beatty, Barbara) (Entered: 10/28/2022) |
| 11/04/2022 | 279 | SENTENCING MEMORANDUM by USA as to Cedric Cromwell (Wichers, Christine) (Entered: 11/04/2022) |
| 11/04/2022 | 280 | SENTENCING MEMORANDUM by USA as to David Dequattro (Attachments: # 1 Exhibit A: RGB team, from website)(Wichers, Christine) (Entered: 11/04/2022) |
| 11/08/2022 | 281 | RESPONSE TO SENTENCING MEMORANDUM by David Dequattro *(Supplemental Sentencing Memorandum)* (Attachments: # 1 Exhibit A)(Weinberg, Martin) (Entered: 11/08/2022) |
| 11/09/2022 | 286 | Transcript of Motion Hearing as to Cedric Cromwell, David Dequattro held on September 9, 2022, before Judge Douglas P. Woodlock. Court Reporter Name and Contact Information: Kelly Mortellite at mortellite@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 11/30/2022. Redacted Transcript Deadline set for 12/12/2022. Release of Transcript Restriction set for 2/7/2023. (Coppola, Katelyn) (Entered: 11/18/2022) |
| 11/09/2022 | 287 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/caseinfo/transcripts.htm (Coppola, Katelyn) (Entered: 11/18/2022) |
| 11/10/2022 | 282 | SENTENCING MEMORANDUM by Cedric Cromwell as to Cedric Cromwell, David Dequattro (Flaherty, Timothy) (Entered: 11/10/2022) |
| 11/14/2022 | 283 | Letter (non-motion) regarding sentencing submitted by the Mashpee Wampanoag Tribe as to Cedric Cromwell (Wichers, Christine) (Entered: 11/14/2022) |
| 11/14/2022 | 284 | Victim Impact Statement from Aaron Tobey, Jr. regarding Cedric Cromwell. (Beatty, Barbara) (Entered: 11/16/2022) |
| 11/15/2022 | 289 | Clerks Notes for Sentencing Hearing as to Cedric Cromwell and David DeQuattro held in-person before Judge Douglas P. Woodlock: Court ALLOWS 264 Assented to Motion to Unseal relating to Motion for Judgment of Acquittal. Court addresses victim impact statements received and strikes statements not designated to be filed publicly. Further discussion on the issue of tribe immunity with respect to Hobbs Act extortion. Court GRANTS 242 Defendant Cromwells Motion for Acquittal as to Counts 6s, 7s, 8s and 10s, the Hobbs Act counts of conviction, and DENIES as to Counts 2s and 3s, the federal program bribery counts of conviction. Court DENIES 241 Defendant |

| | | DeQuattros Motion for Acquittal and for Conditional Grant of New Trial as to Count 5s, the federal program bribery counts of conviction. Court hears objections to Presentence Report regarding enhancement as a public official (sustained), multiple bribes (overruled) and amount of loss (sustained) and other criminal activity (overruled), for the reasons stated on the record. Revised sentencing guidelines calculated by the Court and Probation. Government to seek restitution for the Tribe in the Final Judgment against defendant Cromwell. Victim impact statements by Carlton Hendricks and Aaron Tobey Jr.presented in open court. AUSA Wichers, Attorney Flaherty and Attorney Weinberg argue their respective recommendations for the appropriate sentences. Defendant Cromwell and DeQuattro address the Court. As to defendant Cromwell: Court announces a thirty-six (36) months sentence of imprisonment followed by one (1) year of supervised release with standard and special conditions; fine in the amount of $25,000; special assessment in the amount of $200; restitution and forfeiture to be addressed at a later date at the request of government. As to defendant DeQuattro: Court announces sentence of one (1) year probation with standard and special conditions, including home detention; fine in the amount of $50,000; special assessment in the amount of $100. Court inclined to allow bail pending appeal for both defendants upon the filing of a formal motion. Parties to consult on timeline for full briefing as to stay pending appeal and restitution/forfeiture and report back to the Court promptly.(Attorneys present: AUSA Wichers, AUSA Dolan, Flaherty, Weinberg, Nemtsev, PO Victoria)Court Reporter Name and Contact or digital recording information: Kelly Mortellite at mortellite@gmail.com. (Beatty, Barbara) (Entered: 11/18/2022) |
|---|---|---|
| 11/16/2022 | 285 | PROPOSED ORDER(S) submitted by USA as to Cedric Cromwell (Head, Carol) (Entered: 11/16/2022) |
| 11/18/2022 | 288 | MOTION for Hearing *on Restitution, and Statement re Revised Forfeiture Money Judgment Amount, and Motion for Excludable Delay* as to Cedric Cromwell, David Dequattro by USA. (Wichers, Christine) (Entered: 11/18/2022) |
| 11/18/2022 | 290 | Assented to MOTION Stay of Sentence Pending Appeal as to David Dequattro. (Weinberg, Martin) (Entered: 11/18/2022) |
| 11/21/2022 | 291 | NOTICE OF STATUS CONFERENCE - |
| | | This conference will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible. |
| | | Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html. |
| | | For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov. |
| | | Status Conference is SCHEDULED for 11/22/2022 at 10:00 a.m. in Remote Proceeding : Boston before Judge Douglas P. Woodlock. (Beatty, Barbara) (Entered: 11/21/2022) |

| | | |
|---|---|---|
| 11/21/2022 | 292 | MOTION *For Stay and Bail* as to Cedric Cromwell, David Dequattro by Cedric Cromwell. (Flaherty, Timothy) (Entered: 11/21/2022) |
| 11/21/2022 | 293 | Transcript of Jury Trial - Day 9 as to Cedric Cromwell, David Dequattro held on May 3, 2022, before Judge Douglas P. Woodlock. Court Reporter Name and Contact Information: Kelly Mortellite at mortellite@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 12/12/2022. Redacted Transcript Deadline set for 12/22/2022. Release of Transcript Restriction set for 2/21/2023. (Coppola, Katelyn) (Entered: 11/21/2022) |
| 11/21/2022 | 294 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/caseinfo/transcripts.htm (Coppola, Katelyn) (Entered: 11/21/2022) |
| 11/21/2022 | 295 | Opposition by USA as to Cedric Cromwell re 292 MOTION *For Stay and Bail* (Wichers, Christine) (Entered: 11/21/2022) |
| 11/22/2022 | 296 | Clerk's Notes for Status Conference held via Zoom as to Cedric Cromwell and David Dequattro before Judge Douglas P. Woodlock: Discussion of the status of two Hobbs Act cases, issues for appeal, fine, restitution and forfeiture. Further submissions on these issues to be filed no later than 12/2/2022 and responses to be filed no later than 12/16/2022. (Attorneys present: AUSA Wichers, Flaherty, Weinberg, PO Victoria)Court Reporter Name and Contact or digital recording information: Kelly Mortellite at mortellite@gmail.com. (Beatty, Barbara) (Entered: 11/22/2022) |
| 11/29/2022 | 297 | Transcript of Telephone Status Conference as to Cedric Cromwell, David Dequattro held on November 22, 2022, before Judge Douglas P. Woodlock. Court Reporter Name and Contact Information: Kelly Mortellite at mortellite@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 12/20/2022. Redacted Transcript Deadline set for 12/30/2022. Release of Transcript Restriction set for 2/27/2023. (McDonagh, Christina) (Entered: 11/29/2022) |
| 11/29/2022 | 298 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/caseinfo/transcripts.htm (McDonagh, Christina) (Entered: 11/29/2022) |
| 11/30/2022 | 299 | Memorandum regarding Court's November 22, 2022 Request as to David Dequattro (Weinberg, Martin) (Entered: 11/30/2022) |
| 12/01/2022 | 301 | Memorandum regarding Supplemental Brief Addressing the Hobbs Act Counts as to Cedric Cromwell (Attachments: # 1 Exhibit A: Docket sheet in US v. James (W.D. Okla.))(Wichers, Christine) (Entered: 12/01/2022) |
| 12/02/2022 | 302 | Assented to MOTION Stay Fine as to David Dequattro. (Weinberg, Martin) (Entered: 12/02/2022) |
| 12/02/2022 | 303 | Assented to MOTION for Extension of Time to 12/5/2022 to File Government's Brief on Restitution *and to File Supporting Invoices Under Seal* as to Cedric Cromwell, David Dequattro by USA. (Wichers, Christine) (Entered: 12/02/2022) |

| 12/02/2022 | 304 | Judge Douglas P. Woodlock: ELECTRONIC ORDER entered granting 303 Motion for Extension of Time to File as to Cedric Cromwell (1), David Dequattro (2) (Woodlock, Douglas) (Entered: 12/02/2022) |
|---|---|---|
| 12/03/2022 | 305 | NOTICE *of Supplemental Authority* by David Dequattro re 299 Memorandum (not related to a motion) (Weinberg, Martin) (Entered: 12/03/2022) |
| 12/05/2022 | 306 | Defendant Cedric Cromwell's MOTION to Join Defendant David DeQuattro's Supplemental Memorandum 299 . (Flaherty, Timothy) Docket text modified to reflect document on 12/5/2022 (McManus, Caetlin). (Entered: 12/05/2022) |
| 12/05/2022 | 307 | Memorandum regarding Restitution as to Cedric Cromwell, David Dequattro (Wichers, Christine) (Entered: 12/05/2022) |
| 12/12/2022 | 310 | Assented to MOTION for Leave to File *Partially Under Seal* as to David Dequattro. (Attachments: # 1 Exhibit 1)(Weinberg, Martin) (Entered: 12/12/2022) |
| 12/12/2022 | 311 | Memorandum regarding Pleadings in US v. Overton James (W.D. Okla.) as to Cedric Cromwell (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5)(Wichers, Christine) (Entered: 12/12/2022) |
| 12/12/2022 | 312 | Judge Douglas P. Woodlock: ELECTRONIC ORDER entered granting 306 Motion to join as to Cedric Cromwell (1); granting 310 Motion for Leave to File; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document as to David Dequattro (2) (Woodlock, Douglas) (Entered: 12/12/2022) |
| 12/12/2022 | 313 | Response as to David Dequattro: 307 Memorandum (not related to a motion). (Weinberg, Martin) (Additional attachment(s) added on 12/12/2022: # 1 Unredacted Opposition (Filed Under Seal)) (McManus, Caetlin). (Entered: 12/12/2022) |
| 12/15/2022 | 314 | Memorandum regarding Restitution (U.S. Supplemental Brief) as to Cedric Cromwell, David Dequattro (Wichers, Christine) (Entered: 12/15/2022) |
| 12/16/2022 | 316 | Response as to Cedric Cromwell, David Dequattro: 307 Memorandum (not related to a motion). (Attachments: # 1 Exhibit a)(Flaherty, Timothy) (Entered: 12/16/2022) |
| 12/16/2022 | 317 | Assented to MOTION for Leave to File *Reply Brief in Support of Request for Restitution* as to Cedric Cromwell, David Dequattro by USA. (Wichers, Christine) (Entered: 12/16/2022) |

| 12/19/2022 | 318 | NOTICE OF STATUS HEARING as to Cedric Cromwell and David Dequattro: |
|---|---|---|
| | | This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible. |
| | | Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html. |
| | | For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov. |
| | | Status Conference is SCHEDULED for 12/20/2022 at 11:30 a.m. in Remote Proceeding : Boston before Judge Douglas P. Woodlock. (Beatty, Barbara) (Entered: 12/19/2022) |
| 12/20/2022 | 319 | Clerk's Notes for Status Conference held before Judge Douglas P. Woodlock: Court GRANTS 317 Government's Assented to Motion for Leave to File Reply Brief. Reply brief to be filed tomorrow, 12/21/2022. Court further discusses the status of other proceedings and the entry of final judgments in this case. Hearing on the Government's Request for Restitution SCHEDULED for 1/18/2023 at 11:00 a.m. in Courtroom 1 (In person only). Court will also schedule Ex Parte Hearing with Government to discuss the Rankin & Sultan invoices submitted relating to restitution. Government to submit in camera the grand jury subpoenas relating to this issue. (Attorneys present: AUSA Wichers, Flaherty, Weinberg, Nemtsev, Pabian)Court Reporter Name and Contact or digital recording information: James Gibbons at jamesgibbonsrpr@gmail.com. (Beatty, Barbara) (Entered: 12/21/2022) |
| 12/21/2022 | 320 | NOTICE OF EX PARTE HEARING - As discussed at the Status Conference on 12/20/2022, the Ex Parte Hearing with the government's attorney is SCHEDULED for 1/5/2023 at 1:30 p.m. in Remote Proceeding : Boston before Judge Douglas P. Woodlock. (Beatty, Barbara) (Entered: 12/21/2022) |
| 12/21/2022 | 321 | Transcript of Sentencing as to Cedric Cromwell, David Dequattro held on November 15, 2022, before Judge Douglas P. Woodlock. Court Reporter Name and Contact Information: Kelly Mortellite at mortellite@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 1/11/2023. Redacted Transcript Deadline set for 1/23/2023. Release of Transcript Restriction set for 3/21/2023. (McDonagh, Christina) (Entered: 12/21/2022) |
| 12/21/2022 | 322 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/caseinfo/transcripts.htm (McDonagh, Christina) (Entered: 12/21/2022) |
| 12/21/2022 | 323 | Memorandum regarding Government's Request for Restitution (Reply Brief) as to Cedric Cromwell, David Dequattro (Wichers, Christine) (Entered: 12/21/2022) |

| 12/22/2022 | 324 | Assented to MOTION for Leave to File *Sur-Reply* as to David Dequattro. (Weinberg, Martin) (Entered: 12/22/2022) |
|---|---|---|
| 12/22/2022 | 325 | Judge Douglas P. Woodlock: ELECTRONIC ORDER entered granting 324 Motion for Leave to File Sur-Reply as to David Dequattro (2) ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (McManus, Caetlin) (Entered: 12/22/2022) |
| 12/30/2022 | 326 | Memorandum regarding Sur-Reply Regarding Restitution as to David Dequattro (Weinberg, Martin) (Additional attachment(s) added on 1/5/2023: # 1 Unredacted Sur-reply Re Restitution (Filed Under Seal)) (McManus, Caetlin). (Entered: 12/30/2022) |
| 01/09/2023 | 328 | Memorandum regarding Restitution (Government's Second Supplemental Brief) as to Cedric Cromwell, David Dequattro (Wichers, Christine) (Entered: 01/09/2023) |
| 01/17/2023 | 331 | NOTICE OF RESCHEDULING TIME OF HEARING - Hearing as to Cedric Cromwell and David Dequattro is RESCHEDULED, as to TIME ONLY, until 2:00 p.m. on 1/18/2023 in Courtroom 1 (In person only) before Judge Douglas P. Woodlock. (Beatty, Barbara) (Entered: 01/17/2023) |
| 01/18/2023 | 332 | PROPOSED ORDER(S) submitted by USA as to Cedric Cromwell (Wichers, Christine) (Entered: 01/18/2023) |
| 01/18/2023 | 335 | Clerks Notes for Hearing held in person before Judge Douglas P. Woodlock: Court addresses pending motions. Motion in Limine 208 DENIED, to the extent instructions provided during the course of trial. Motion for Forfeiture 275 effectively superseded by new Motion 285 . Court will enter Preliminary Order of Forfeiture from 275 and Money Judgment Order from 285 . Motion for Hearing 288 GRANTED. Court restates the sentences to be imposed. As to defendant Cromwell: Thirty-six (36) months of imprisonment followed by one (1) year of supervised release with standard and special conditions; fine in the amount of $25,000; special assessment in the amount of $200; restitution and forfeiture to be further addressed. As to defendant DeQuattro: One (1) year probation with standard and special conditions; fine in the amount of $50,000; special assessment in the amount of $100. Defendant DeQuattro is prepared to put fine amount in escrow pending appeal and the special assessment will be paid immediately. Court hears further argument regarding restitution and determines the invoices from Rankin & Sultan will not be included in the final restitution amount. In addition, after hearing argument the Court determines restitution, for the invoices submitted by the two remaining law firms, shall be imposed as to both defendants, but as to defendant DeQuattro, the amount will be joint and several with defendant Cromwell, from August 10, 2020. Government and defense counsel will report back no later than 5:00 p.m. on Friday, January 20th, as to the specific restitution amounts to be imposed and whether any portion of the restitution will also be held in escrow pending appeal. Judgment to be entered and the Court will STAY 290 292 302 the judgment pending appeal as to both defendants but reserves on the issue of staying the restitution payments until review of restitution submissions. Government to file a Motion for Excludable Delay as to the tax counts against defendant.(Attorneys present: AUSA Wichers, Weinberg, Flaherty)Court Reporter Name and Contact or digital recording information: Kelly Mortellite at mortellite@gmail.com. (Beatty, Barbara) (Entered: 01/31/2023) |

| 01/26/2023 | 333 | Judge Douglas P. Woodlock: ORDER OF FORFEITURE (MONEY JUDGMENT) as to Cedric Cromwell re 285 275 . (Beatty, Barbara) (Entered: 01/26/2023) |
|---|---|---|
| 01/26/2023 | 334 | Judge Douglas P. Woodlock: PRELIMINARY ORDER OF FORFEITURE as to Cedric Cromwell (1), granting 275 Motion for Forfeiture of Property. (Beatty, Barbara) (Entered: 01/26/2023) |
| 01/31/2023 | 336 | Judge Douglas P. Woodlock: JUDGMENT IN A CRIMINAL CASE as to Cedric Cromwell (1), Count(s) 1, 2-3, 6, 7-10, Dismissed upon gov't motion; Count(s) 6s, 7s-8s, 10s, Acquitted upon Rule 29 Motion; Count(s) 1s, 9s, Acquitted by jury verdict; Count(s) 2s-3s, Thirty-six (36) months of imprisonment followed by one (1) year of supervised release with standard and special conditions; fine in the amount of $25,000; special assessment in the amount of $200; restitution in the amount of $209,678.54. (Beatty, Barbara) (Entered: 01/31/2023) |
| 01/31/2023 | 338 | Judge Douglas P. Woodlock: JUDGMENT IN A CRIMINAL CASE as to David Dequattro (2), Count(s) 1, 4-5, Dismissed upon gov't motion; Count(s) 1s, 4s, Acquitted by jury verdict; Count(s) 5s, One (1) year probation with standard and special conditions; fine in the amount of $50,000; special assessment in the amount of $100; restitution in the amount $140,707.79. (Beatty, Barbara) (Entered: 01/31/2023) |
| 02/01/2023 | 340 | Judge Douglas P. Woodlock: ELECTRONIC ORDER entered reserving ruling on 292 Motion for stay pending appeal as to Cedric Cromwell (1), David Dequattro (2); reserving ruling on 302 Motion for stay pending appeal as to David Dequattro (2); reserving ruling on 290 Motion for stay pending appeal as to David Dequattro (2). As discussed during the several hearings and conferences in this matter, I am prepared to grant the motions of the Defendant Cromwell (Dkt No. 292) and the Defendant DeQuattro (Dkt Nos. 290 and 302)for stay of their respective sentences pending appeal. Judgment having entered, the Defendants are now in a position to notice appeals and thereby provide the formal predicate for a stay. Upon such notice the Court will entertain specific proposals for securing the financial dimensions to sentences imposed. The Court is aware that Defendant DeQuattro appears to have developed such a proposal satisfactory to the Government; no proposal for security for Defendant Cromwell appears to have crystallized as yet. Until Notices of Appeal and fully developed proposals for security are offered by the Defendants for consideration, there will not be a basis to act affirmatively upon the pending motions for stay. Accordingly, the Defendants shall on or before close of business (5 pm), Friday February 3, 2023 satisfy the requisite predicates for action on their motions, failing which the motions will be denied without prejudice to resubmission once the predicates have been satisfied. The Government shall file opposition to any initial submission(s) by Defendants received on or before February 3, 2023 in this regard by on or before noon Tuesday, February 7, 2023. (Woodlock, Douglas) (Entered: 02/01/2023) |
| 02/01/2023 | 341 | NOTICE OF APPEAL by David Dequattro re 338 Judgment, Filing fee: $ 505, receipt number AMADC-9696752 (Fee Status: Filing Fee paid) NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf.** US District Court Clerk to deliver official record to Court of Appeals by 2/21/2023. |

| | | (Weinberg, Martin) (Entered: 02/01/2023) |
|---|---|---|
| 02/01/2023 | 342 | Assented to MOTION Stay of Sentence Pending Appeal *(Renewed)* as to David Dequattro. (Weinberg, Martin) (Entered: 02/01/2023) |
| 02/01/2023 | 343 | Certified and Transmitted Abbreviated Electronic Record on Appeal as to David Dequattro to US Court of Appeals re 341 Notice of Appeal - Final Judgment (Paine, Matthew) (Entered: 02/01/2023) |
| 02/01/2023 | 344 | NOTICE OF APPEAL 336 JUDGMENT by Cedric Cromwell Filing fee: $ 505, receipt number AMADC-9698173 (Fee Status: Filing Fee paid). NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf.** **US District Court Clerk to deliver official record to Court of Appeals by 2/21/2023. (Flaherty, Timothy)** **Modified on 2/2/2023 to Correct Docket Text and Add CM/ECF Document Link to Judgment Being Appealed as Counsel Flaherty Failed to Follow the CM/ECF NextGen Prompts When Filing the Notice of Appeal in Violation of Court Rules and CM/ECF NextGen Administrative Procedures (Paine, Matthew). (Entered: 02/01/2023)** |
| 02/01/2023 | 345 | MOTION to Withdraw as Attorney by Timothy R. Flaherty as to Cedric Cromwell. (Flaherty, Timothy) (Entered: 02/01/2023) |
| 02/02/2023 | 346 | USCA Case Number as to David Dequattro 23-1115 for 341 Notice of Appeal - Final Judgment filed by David Dequattro. (Paine, Matthew) (Entered: 02/02/2023) |
| 02/02/2023 | 347 | Certified and Transmitted Abbreviated Electronic Record on Appeal as to Cedric Cromwell to US Court of Appeals re 344 Notice of Appeal. (Paine, Matthew) (Entered: 02/02/2023) |
| 02/02/2023 | 348 | Transcript of Motion Hearing as to Cedric Cromwell, David Dequattro held on January 18, 2023, before Judge Douglas P. Woodlock. Court Reporter Name and Contact Information: Kelly Mortellite at mortellite@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 2/23/2023. Redacted Transcript Deadline set for 3/6/2023. Release of Transcript Restriction set for 5/3/2023. (McDonagh, Christina) (Entered: 02/02/2023) |
| 02/02/2023 | 349 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/caseinfo/transcripts.htm (McDonagh, Christina) (Entered: 02/02/2023) |
| 02/02/2023 | 350 | USCA Case Number as to Cedric Cromwell 23-1116 for 344 Notice of Appeal. (Paine, Matthew) (Entered: 02/02/2023) |

| | | |
|---|---|---|
| 02/02/2023 | 351 | MOTION Stay of sentence as to Cedric Cromwell. (Flaherty, Timothy) (Incorrect version filed in error, Main Document 351 replaced by clerk with correct document on 2/2/2023) (McManus, Caetlin). (Entered: 02/02/2023) |
| 02/02/2023 | 352 | Transcript of Jury Trial Four as to Cedric Cromwell, David Dequattro held on April 22, 2022, before Judge Douglas P. Woodlock. COA Case No. 23-1115 and 23-1116. Court Reporter Name and Contact Information: Kelly Mortellite at mortellite@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 2/23/2023. Redacted Transcript Deadline set for 3/6/2023. Release of Transcript Restriction set for 5/3/2023. (Dore, Samantha) (Entered: 02/02/2023) |
| 02/02/2023 | 353 | Transcript of Jury Trial Day Five as to Cedric Cromwell, David Dequattro held on April 25, 2022, before Judge Douglas P. Woodlock. COA Case No. 23-1115 and 23-1116. Court Reporter Name and Contact Information: Kelly Mortellite at mortellite@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 2/23/2023. Redacted Transcript Deadline set for 3/6/2023. Release of Transcript Restriction set for 5/3/2023. (Dore, Samantha) (Entered: 02/02/2023) |
| 02/02/2023 | 354 | Filed in error (McManus, Caetlin). (Entered: 02/02/2023) |
| 02/02/2023 | 355 | Transcript of Jury Trial Day Six as to Cedric Cromwell, David Dequattro held on April 26, 202, before Judge Douglas P. Woodlock. COA Case No. 23-1115 and 23-1116. Court Reporter Name and Contact Information: Kelly Mortellite at mortellite@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 2/23/2023. Redacted Transcript Deadline set for 3/6/2023. Release of Transcript Restriction set for 5/3/2023. (Dore, Samantha) (Entered: 02/02/2023) |
| 02/02/2023 | 356 | Transcript of Jury Trial Day Seven as to Cedric Cromwell, David Dequattro held on April 27, 2022, before Judge Douglas P. Woodlock. COA Case No. 23-1115 and 23-1116. Court Reporter Name and Contact Information: Kelly Mortellite at mortellite@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 2/23/2023. Redacted Transcript Deadline set for 3/6/2023. Release of Transcript Restriction set for 5/3/2023. (Dore, Samantha) (Entered: 02/02/2023) |
| 02/02/2023 | 357 | Transcript of Jury Trial Day Eight as to Cedric Cromwell, David Dequattro held on April 28, 2022, before Judge Douglas P. Woodlock. COA Case No. 23-1115 and 23-1116. Court Reporter Name and Contact Information: Kelly Mortellite at mortellite@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 2/23/2023. Redacted Transcript Deadline set for 3/6/2023. Release of Transcript Restriction set for 5/3/2023. (Dore, Samantha) (Entered: 02/02/2023) |
| 02/02/2023 | 358 | Transcript of Hearing as to Cedric Cromwell, David Dequattro held on April 29, 2022, before Judge Douglas P. Woodlock. COA Case No. 23-1115 and 23-1116. Court Reporter Name and Contact Information: Kelly Mortellite at mortellite@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 2/23/2023. Redacted Transcript Deadline set for 3/6/2023. Release of Transcript Restriction set for 5/3/2023. (Dore, Samantha) (Entered: 02/02/2023) |

| 02/02/2023 | 359 | Transcript of Jury Trial Day Nine as to Cedric Cromwell, David Dequattro held on May 3, 2022, before Judge Douglas P. Woodlock. COA Case No. 23-1115 and 23-1116. Court Reporter Name and Contact Information: Kelly Mortellite at mortellite@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 2/23/2023. Redacted Transcript Deadline set for 3/6/2023. Release of Transcript Restriction set for 5/3/2023. (Dore, Samantha) (Entered: 02/02/2023) |
|---|---|---|
| 02/02/2023 | 360 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/caseinfo/transcripts.htm (Dore, Samantha) (Entered: 02/02/2023) |
| 02/03/2023 | 362 | Judge Douglas P. Woodlock: ELECTRONIC ORDER entered granting in part 345 Motion to Withdraw as Attorney as to Cedric Cromwell (1), this grant is made to only so much of this motion as may properly be addressed by this Court now that the matter is on appeal, specifically finding that the defendant's affidavit appears to entitle him to the appointment of counsel by the Court of Appeals; and further finding that the assets identified by the defendant appear available to provide security for the financial dimension to his sentence and as such will be considered in connection with the fashioning of conditions for release pending appeal. (Woodlock, Douglas) (Entered: 02/03/2023) |
| 02/03/2023 | 363 | Transmitted Supplemental Record on Appeal as to Cedric Cromwell re 344 Notice of Appeal. Documents included: ECF No. 362 (Paine, Matthew) (Entered: 02/03/2023) |
| 02/03/2023 | | Attorney update in case as to Cedric Cromwell. Attorney Timothy R. Flaherty terminated. (Lima, Christine) (Entered: 07/12/2023) |
| 02/06/2023 | 364 | NOTICE OF APPEAL by USA as to Cedric Cromwell, David Dequattro re re 289 ELECTRONIC CLERKS NOTES/ORDER 335 ELECTRONIC CLERKS NOTES/ORDER 338 Judgment, 336 Judgment. NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf.** US District Court Clerk to deliver official record to Court of Appeals by 2/27/2023. (Danieli, Chris) Modified on 2/7/2023 (Paine, Matthew). (Entered: 02/07/2023) |
| 02/07/2023 | 365 | Certified and Transmitted Abbreviated Electronic Record on Appeal as to Cedric Cromwell to US Court of Appeals re 364 Notice of Appeal. (Paine, Matthew) (Entered: 02/07/2023) |
| 02/07/2023 | 366 | Certified and Transmitted Abbreviated Electronic Record on Appeal as to David Dequattro to US Court of Appeals re 364 Notice of Appeal (Paine, Matthew) (Entered: 02/07/2023) |
| 02/08/2023 | 367 | Judge Douglas P. Woodlock: ELECTRONIC ORDER - Upon the assent of the Government, as stated in the "Compliance with Local Rule 7.1(a)(2)", 351 Defendant Cedric Cromwell's Renewed and Assented to Motion for Stay of Sentence and Bail Pending Appeal is GRANTED. (Beatty, Barbara) (Entered: 02/08/2023) |

| 02/08/2023 | 368 | Judge Douglas P. Woodlock: ELECTRONIC ORDER finding as moot 292 Defendant Cedric Cromwell's Motion for Stay of Sentence and Bail Pending Appeal, in light of the 367 GRANTING of the Renewed Motion for Stay this day. (Beatty, Barbara) (Entered: 02/08/2023) |
|---|---|---|
| 02/08/2023 | 369 | Judge Douglas P. Woodlock: ELECTRONIC ORDER - Upon the assent of the Government, as stated in the "Compliance with Local Rule 7.1(a)(2)", 342 Defendant David DeQuattro's Renewed Assented to Motion for Stay of Sentence Pending Appeal is GRANTED.(Beatty, Barbara) (Entered: 02/08/2023) |
| 02/08/2023 | 370 | Judge Douglas P. Woodlock: ELECTRONIC ORDER finding as moot 290 Defendant David DeQuattro's Assented to Motion for Stay of Sentence Pending Appeal and finding as moot 302 Assented to Motion to Stay Fine, in light of the 369 GRANTING of the Renewed Motion for Stay this day. (Beatty, Barbara) (Entered: 02/08/2023) |
| 02/08/2023 | 371 | USCA Case Number as to Cedric Cromwell 23-1138 for 364 Notice of Appeal filed by USA. (Paine, Matthew) (Entered: 02/08/2023) |
| 02/08/2023 | 372 | USCA Case Number as to David Dequattro 23-1139 for 364 Notice of Appeal filed by USA. (Paine, Matthew) (Entered: 02/08/2023) |
| 02/08/2023 | 373 | Transmitted Supplemental Record on Appeal as to Cedric Cromwell re 364 Notice of Appeal, 344 Notice of Appeal Documents included: ECF No. 367 (Paine, Matthew) Modified on 2/8/2023 to Correct Docket Text (Paine, Matthew). (Entered: 02/08/2023) |
| 02/08/2023 | 374 | Transmitted Supplemental Record on Appeal as to David Dequattro re 341 Notice of Appeal - Final Judgment, 364 Notice of Appeal, Documents included: ECF No. 369 (Paine, Matthew) (Entered: 02/08/2023) |
| 02/17/2023 | 375 | ORDER of USCA as to Cedric Cromwell re 344 Notice of Appeal. (Paine, Matthew)<br><br>**Treating appellant's financial affidavit as a motion to proceed on appeal in forma pauperis ("IFP"), we transmit said request to the district court (Docket No. 1:20-cr-10271-DPW-1 (D. Mass.)) for action in the first instance. See Fed. R. App. P. 24(a)(1). Copies of the district court's ruling shall be forwarded to this court. The district court, if it denies the motion, is requested to state its reasons in writing. Fed. R. App. P. 24(a)(2). If appellant is not granted in forma pauperis status by the district court, appellant may file a motion to proceed in forma pauperis in this court in accordance with Fed. R. App. P. 24(a)(5).**<br><br>(Additional attachment(s) added on 2/18/2023: # 1 Financial Affidavit) (Paine, Matthew). (Entered: 02/18/2023) |
| 02/22/2023 | 376 | Judge Douglas P. Woodlock: ELECTRONIC ORDER entered re 375 ...REQUEST GRANTED. (Beatty, Barbara) (Entered: 02/22/2023) |
| 02/23/2023 | 377 | Transmitted Supplemental Record on Appeal as to Cedric Cromwell re 344 Notice of Appeal Documents included: ECF Nos. 375 and 376 (Paine, Matthew) (Entered: 02/23/2023) |
| 03/07/2023 | 378 | Transcript of Proceedings as to Cedric Cromwell, David Dequattro held on December 20, 2022, before Judge Douglas P. Woodlock. COA Case No. 23-1138 and 23-1139. Court Reporter Name and Contact Information: James Gibbons at jamesgibbonsrpr@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. |

| | | |
|---|---|---|
| | | Redaction Request due 3/28/2023. Redacted Transcript Deadline set for 4/7/2023. Release of Transcript Restriction set for 6/5/2023. (Dore, Samantha) (Entered: 03/07/2023) |
| 03/07/2023 | 379 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (Dore, Samantha) (Entered: 03/07/2023) |
| 03/17/2023 | 380 | US Marshal Process Receipt and Return for Preliminary Order of Forfeiture re. One Bowflex Revolution Home Gym served, delivered on 3/1/2023. (Not in USMS Custody) (McManus, Caetlin) (Entered: 03/17/2023) |
| 03/22/2023 | 381 | MOTION for Hearing *(Status Conference re: Tax Charges)* as to Cedric Cromwell by USA. (Wichers, Christine) (Entered: 03/22/2023) |
| 03/23/2023 | 382 | Judge Douglas P. Woodlock: CJA APPOINTMENT OF COUNSEL - Appointment of Attorney Daniel Cloherty as to Cedric Cromwell. This appointment is subject to counsel's consultation with the defendant Cedric Cromwell regarding any potential conflicts and report back to the Court no later than April 7, 2023. (Beatty, Barbara) (Entered: 03/23/2023) |
| 03/30/2023 | 384 | Notice of Service of Process filed by USA as to Cedric Cromwell. Individual(s)/Entities served: Atty. Timothy R. Flaherty; Cedric Cromwell, c/o Atty. Timothy R. Flaherty. (Head, Carol) (Entered: 03/30/2023) |
| 03/30/2023 | 385 | Service by Publication as to Cedric Cromwell. (Head, Carol) (Entered: 03/30/2023) |
| 03/30/2023 | 386 | MOTION for Forfeiture of Property *(Final Order of Forfeiture)* as to Cedric Cromwell by USA. (Attachments: # 1 Proposed Order)(Head, Carol) (Entered: 03/30/2023) |
| 03/31/2023 | 387 | Judge Douglas P. Woodlock: FINAL ORDER OF FORFEITURE granting 386 Motion for Forfeiture of Property as to Cedric Cromwell (1). (Beatty, Barbara) (Entered: 03/31/2023) |
| 04/05/2023 | | Clerks Notes: Pursuant to the Courts CJA Appointment of Counsel 382 , Attorney Cloherty reports back to the Court that after consultation with Mr. Cromwell, Mr. Cromwell does not believe there is anything in Attorney Clohertys past activity and professional associations that creates any conflict with his representation of Mr. Cromwell at this point. Given the filing of appellate counsels Docketing Statements and Transcript Order forms, Attorney Cloherty (who will have access under the CJA to all transcripts prepared) should at the outset determine whether additional transcripts are necessary to his trial court representation; the Court will conduct a conflict hearing with Mr. Cromwell and Mr. Cloherty once transcripts ordered are in hand. (Beatty, Barbara) (Entered: 04/06/2023) |
| 04/24/2023 | 388 | Transcript of Jury Trial Day One as to Cedric Cromwell, David Dequattro held on April 19, 2022, before Judge Douglas P. Woodlock. COA Case No. 23-1116 and 23-1138. Court Reporter Name and Contact Information: Kelly Mortellite at mortellite@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 5/15/2023. Redacted Transcript Deadline set for 5/25/2023. Release of Transcript Restriction set for 7/24/2023. (Dore, Samantha) (Entered: 04/24/2023) |

| 04/24/2023 | [389](#) | Transcript of Jury Trial Day Two as to Cedric Cromwell, David Dequattro held on April 20, 2022, before Judge Douglas P. Woodlock. COA Case No. 23-1116 and 23-1138. Court Reporter Name and Contact Information: Kelly Mortellite at mortellite@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 5/15/2023. Redacted Transcript Deadline set for 5/25/2023. Release of Transcript Restriction set for 7/24/2023. (Dore, Samantha) (Entered: 04/24/2023) |
|---|---|---|
| 04/24/2023 | [390](#) | Transcript of Jury Trial Day Three as to Cedric Cromwell, David Dequattro held on April 21, 2022, before Judge Douglas P. Woodlock. COA Case No. 23-1116 and 23-1138. Court Reporter Name and Contact Information: Kelly Mortellite at mortellite@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 5/15/2023. Redacted Transcript Deadline set for 5/25/2023. Release of Transcript Restriction set for 7/24/2023. (Dore, Samantha) (Entered: 04/24/2023) |
| 04/24/2023 | [391](#) | Transcript of Hearing as to Cedric Cromwell, David Dequattro held on August 30, 2021, before Judge Douglas P. Woodlock. COA Case No. 23-1116 and 23-1138. Court Reporter Name and Contact Information: Kelly Mortellite at mortellite@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 5/15/2023. Redacted Transcript Deadline set for 5/25/2023. Release of Transcript Restriction set for 7/24/2023. (Dore, Samantha) (Entered: 04/24/2023) |
| 04/24/2023 | [392](#) | Transcript of Jury Trial Day Seven as to Cedric Cromwell, David Dequattro held on April 27, 2022, before Judge Douglas P. Woodlock. COA Case No. 23-1116 and 23-1138. Court Reporter Name and Contact Information: Kelly Mortellite at mortellite@gmail.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 5/15/2023. Redacted Transcript Deadline set for 5/25/2023. Release of Transcript Restriction set for 7/24/2023. (Dore, Samantha) (Entered: 04/24/2023) |
| 04/24/2023 | 393 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (Dore, Samantha) (Entered: 04/24/2023) |
| 05/25/2023 | [396](#) | Transcript of Status Conference as to Cedric Cromwell, David Dequattro held on April 6, 2021, before Judge Douglas P. Woodlock. COA Case No. 23-1116 and 23-1138. Court Reporter Name and Contact Information: Lee Marzilli at leemarz@aol.com The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 6/15/2023. Redacted Transcript Deadline set for 6/26/2023. Release of Transcript Restriction set for 8/23/2023. (Dore, Samantha) (Entered: 05/25/2023) |
| 05/25/2023 | 397 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (Dore, Samantha) (Entered: 05/25/2023) |

| 06/22/2023 | 398 | Notice of Reassignment as to Cedric Cromwell, David Dequattro. Judge Nathaniel M. Gorton added. Judge Douglas P. Woodlock no longer assigned to case. Case redrawn according to Local Rule 40.1(i)(1). (adminn, ) (Entered: 06/22/2023) |
|---|---|---|
| 06/29/2023 | 399 | ELECTRONIC NOTICE OF HEARING as to Cedric Cromwell Status Conference set for 7/11/2023 11:15 AM in Courtroom 4 (In person only) before Judge Nathaniel M. Gorton. (Lima, Christine) (Entered: 06/29/2023) |
| 07/11/2023 | 400 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Status Conference as to Cedric Cromwell held on 7/11/2023. Matter is under appeal to the First Circuit. Defendant's appeals memo deadline is due by 8/4/23; Government to respond in 30 days. Counts 11-14 have not been tried. Government proposes to hold tax counts until the appeal comes back. Defendant has no objection to this proposal. Government to file motion to exclude all time between 7/11/23 and 1/10/24. Further Status Conference set for 1/10/2024 03:00 PM in Courtroom 4 (In person only) before Judge Nathaniel M. Gorton. (Attorneys present: Cloherty, Wichers, Dolan. )Court Reporter Name and Contact or digital recording information: Kristin Kelley at kmob929@gmail.com. (Lima, Christine) (Entered: 07/12/2023) |
| 07/19/2023 | 401 | Assented to MOTION for Excludable Delay from 1/18/2023 to 1/10/2024 as to Cedric Cromwell by USA. (Wichers, Christine) (Entered: 07/19/2023) |

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>(1) CEDRIC CROMWELL and<br>(2) DAVID DEQUATTRO,<br><br>Defendants | Criminal No.   20cr10271<br><br>Violations:<br><br>Count One: Conspiracy to Commit Federal Programs Bribery<br>(18 U.S.C. § 371)<br><br>Counts Two-Three: Bribery Concerning Programs Receiving Federal Funds;<br>Aiding and Abetting<br>(18 U.S.C. § 666(a)(1)(B); 18 U.S.C. § 2)<br><br>Counts Four-Five: Bribery Concerning Programs Receiving Federal Funds;<br>Aiding and Abetting<br>(18 U.S.C. § 666(a)(2); 18 U.S.C. § 2)<br><br>Count Six: Conspiracy to Commit Extortion<br>(18 U.S.C. § 1951)<br><br>Counts Seven-Ten: Extortion<br>(18 U.S.C. § 1951)<br><br>Forfeiture Allegation:<br>(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461) |

INDICTMENT

At all times relevant to this Indictment:

General Allegations

1.    Defendant CEDRIC CROMWELL was a resident of Attleboro, Massachusetts.

2.    Defendant DAVID DEQUATTRO was a resident of Warwick, Rhode Island.

3.    The Mashpee Wampanoag Tribe (the "Tribe") was a Native American tribe based

1

in Mashpee, Massachusetts. The Tribe had approximately 3,000 members. In 2007, the U.S. Secretary of the Interior recognized the Tribe as an Indian Tribe under federal law.

4.       In each of 2014, 2015, 2016, 2017, and 2018, the Tribe received federal grants totaling more than $10,000.

5.       The governing body of the Tribe was the Mashpee Wampanoag Tribal Council (the "Tribal Council"), all of whom were members of the Tribe. Chairperson of the Tribal Council, also known as Chairperson of the Tribe, was a four-year elected position.

6.       The Tribal membership elected CROMWELL as their Chairman in 2009. He was reelected in 2013 and 2017.

7.       The Tribe's Constitution gave CROMWELL the authority to "preside over all meetings of the Tribal Council" and "perform the usual duties of a Chairperson, including but not limited to, acting as the official spokesperson for the Tribe, engaging in public relations, serving as coordinator over all Tribal government activities, and exercising any authority delegated to [him] by the Tribal Council."

8.       DEQUATTRO was a licensed architect and a shareholder, officer, and director of an architecture and design firm in Providence, Rhode Island (the "Company"). The Company engaged in interstate commerce.

9.       The President and Controller of the Company (the "Company President"), who was also a shareholder and director, had the authority to direct, and did direct, the payment of Company funds, including for employee payroll purposes.

2

### The Company's Contract with the Mashpee Wampanoag Gaming Authority to Serve as Owner's Representative for the First Light Casino Project

10.     Prior to 2012, the Tribal membership voted to build and operate a resort and casino in Taunton, Massachusetts, which they planned to call the First Light Resort and Casino, to generate revenue for the Tribe.

11.     In 2012, the Tribal Council adopted Mashpee Wampanoag Tribal Gaming Authority Ordinance 2012-ORD-004 (as amended, the "Ordinance"), which created the Mashpee Wampanoag Gaming Authority (the "Gaming Authority") as an unincorporated limited liability company wholly owned by the Tribe.

12.     The Ordinance provided that the Gaming Authority would be governed and managed by a Board of Directors consisting of between three and five Tribal members, including the Chairman of the Tribal Council, who would automatically serve as the President of the Board of Directors. All members of the Board of Directors, including the President, were voting members.

13.     At all times relevant to this Indictment, CROMWELL was a voting member, and the President, of the Gaming Authority's five-member Board of Directors.

14.     The Ordinance gave the Gaming Authority, acting through its Board of Directors, exclusive power, to, among other things, "do any and all things necessary or desirable in connection with the development, design, financing, construction, equipping, leasing, operation, management . . . , maintenance, and promotion" of the First Light Resort and Casino, including to "hire [and] fire . . . consultants, . . . [and] prescribe their duties and compensation."

15.     The Gaming Authority and the Company entered into a Consultant Services

3

Agreement dated May 7, 2014, for the Company to serve as the "owner's representative" for the Gaming Authority during both the preconstruction and construction phases of the casino project (the "Contract"). The Contract was signed by CROMWELL on behalf of the Gaming Authority and DEQUATTRO on behalf of the Company.

16.     The Contract did not have a termination date. It stated that either party could terminate the Contract for cause with seven days' notice, or "for convenience" with one month's notice.

Objects and Purposes of the Conspiracies
to Commit Federal Programs Bribery and Extortion

17.     The objects of the conspiracy to commit federal programs bribery were for CROMWELL to use his position and influence as Chairman of the Tribe and President of the Gaming Authority to solicit and accept payments and other things of value from the Company through DEQUATTRO, in exchange for favorable action or inaction on the Contract by the Gaming Authority, and for DEQUATTRO to give money and other things of value from the Company to CROMWELL in exchange for favorable action or inaction on the Contract by the Gaming Authority. The purpose of the conspiracy was for CROMWELL, DEQUATTRO, and the Company President to enrich themselves personally.

18.     The object of the conspiracy to commit extortion was for CROMWELL to use his position and influence as Chairman of the Tribe and President of the Gaming Authority to obtain property not due to him, from the Company, with the consent of DEQUATTRO and the Company President, in exchange for favorable action or inaction on the Contract by the Gaming Authority. The purpose of the conspiracy was for CROMWELL to enrich himself personally.

Manner and Means of the Conspiracies<br>to Commit Federal Programs Bribery and Extortion

19.    Among the manner and means by which CROMWELL, DEQUATTRO, and others known and unknown to the Grand Jury carried out the conspiracies were the following:

a.  Between on or about July 26, 2014, and on or about May 18, 2017, the Company, through DEQUATTRO, provided CROMWELL with a stream of payments and in-kind benefits valued at not less than $57,549.37, and, in exchange, between on or about July 18, 2014, and on or about February 15, 2018, the Company was paid approximately $4,966,287.16 under the Contract.

b.  CROMWELL incorporated One Nation Development LLC ("One Nation Development") and was its sole shareholder, officer, and director. CROMWELL used One Nation Development as a shell entity to collect payments, including from DEQUATTRO. One Nation Development was not a Section 501(c)(3) charitable organization. CROMWELL spent all One Nation Development funds on personal expenses, including payments to his mistress.

c.  CROMWELL solicited payments from the Company through DEQUATTRO under the pretext that they were donations to his reelection campaign and/or charitable contributions to One Nation Development. DEQUATTRO agreed to make the payments knowing they were neither donations to CROMWELL's reelection campaign nor charitable contributions.

d.  CROMWELL and DEQUATTRO agreed to disguise the identity of the payer by using checks written on DEQUATTRO's personal account instead of

5

Company checks.

e.  DEQUATTRO and the Company President agreed that the Company would reimburse DEQUATTRO for his payments to CROMWELL.

f.  CROMWELL and DEQUATTRO agreed that DEQUATTRO would pay CROMWELL through an intermediary called CM International Consulting LLC ("CM International"), which CROMWELL's friend ("Friend A") owned.

g.  DEQUATTRO wrote personal checks payable to CM International knowing the money would go to CROMWELL.

h.  At CROMWELL's direction, Friend A deposited DEQUATTRO's checks into a CM International account and used the funds to buy treasurer's checks payable to CROMWELL or One Nation Development.

i.  CROMWELL deposited the treasurer's checks in two accounts, an account he held jointly with his wife and an account opened in the name of One Nation Development. CROMWELL spent the funds on personal expenses.

j.  DEQUATTRO and the Company President agreed to disguise the Company's reimbursement payments to DEQUATTRO by characterizing them as employee bonus payments or single-paycheck salary increases and recording them on the Company's books as payroll expenses. The reimbursements were paid either in Company checks that DEQUATTRO deposited into his personal account, or in paychecks that were direct-deposited into DEQUATTRO's personal account.

6

<u>Overt Acts in Furtherance of the Conspiracy to Commit Federal Programs Bribery,
and Acts in Furtherance of the Conspiracy to Commit Extortion</u>

20.     Between on or before July 1, 2014, and on or about August 18, 2017, CROMWELL, DEQUATTRO, and coconspirators known and unknown to the Grand Jury committed and caused to be committed the following overt acts, among others, in furtherance of the conspiracy to commit federal programs bribery, and acts in furtherance of the conspiracy to commit extortion:

*The First $10,000 Check*

21.     On or before July 1, 2014, CROMWELL asked DEQUATTRO for $10,000.

22.     On or before July 1, 2014, Friend A, acting at CROMWELL's direction, told DEQUATTRO to make the $10,000 check payable to CM International.

23.     On or about July 26, 2014, DEQUATTRO wrote a personal check for $10,000 payable to CM International.

24.     On or about July 28, 2014, Friend A, acting at CROMWELL's direction, deposited DEQUATTRO's check into a CM International bank account.

25.     On or about August 5, 2014, Friend A, acting at CROMWELL's direction, bought a $4,000 treasurer's check payable to CROMWELL.

26.     On or about August 5, 2014, CROMWELL deposited the $4,000 check into a checking account he held jointly with his wife. CROMWELL spent the funds on personal expenses.

27.     On or about August 12, 2014, Friend A, acting at CROMWELL's direction, bought two $3,000 treasurer's checks payable to CROMWELL.

28.     On or about August 12, 2014, CROMWELL deposited the two $3,000 checks into a checking account he held jointly with his wife. CROMWELL spent the funds on personal expenses.

29.     On or about July 23, 2014, the Company President authorized and signed a Company check payable to DEQUATTRO to reimburse DEQUATTRO for his $10,000 bribe payment to CROMWELL. The Company President processed the reimbursement as an employee bonus check, and recorded it on the Company's books as a payroll expense, to conceal its true nature.

30.     On or about July 24, 2014, DEQUATTRO deposited the "bonus" check into his savings account to reimburse himself for paying the $10,000 bribe to CROMWELL.

### The Second $10,000 Check

31.     On or before September 1, 2014, CROMWELL asked DEQUATTRO for another $10,000.

32.     On or about September 1, 2014, DEQUATTRO wrote a personal check for $10,000 payable to CM International.

33.     On or about September 3, 2014, Friend A, acting at CROMWELL's direction, deposited DEQUATTRO's check into a CM International bank account.

34.     On or about September 3, 2014, Friend A, acting at CROMWELL's direction, bought two $5,000 treasurer's checks payable to CROMWELL.

35.     On or about September 3, 2014, CROMWELL deposited the two $5,000 checks into a checking account he held jointly with his wife. CROMWELL spent the funds on personal expenses.

8

36.     On or about September 3, 2014, the Company President authorized and signed a Company check payable to DEQUATTRO to reimburse DEQUATTRO for his second $10,000 bribe payment to CROMWELL. The Company President processed the reimbursement as an employee bonus check, and recorded it on the Company's books as a payroll expense, to conceal its true nature.

37.     On or about September 5, 2014, DEQUATTRO deposited the "bonus" check into his savings account to reimburse himself for paying the second $10,000 bribe to CROMWELL.

*The Third $10,000 Check*

38.     On or before October 31, 2014, CROMWELL asked DEQUATTRO for another $10,000.

39.     On or about October 31, 2014, DEQUATTRO wrote a personal check for $10,000 payable to CM International.

40.     On or about November 1, 2014, Friend A, acting at CROMWELL's direction, deposited DEQUATTRO's check into a CM International bank account.

41.     On or about November 1, 2014, Friend A, acting at CROMWELL's direction, bought a treasurer's check for $8,800 payable to CROMWELL.

42.     On or about November 3, 2014, CROMWELL deposited the $8,800 check into a checking account he held jointly with his wife. CROMWELL spent the funds on personal expenses.

43.     On or about November 17, 2014, the Company President authorized and signed a Company check payable to DEQUATTRO to reimburse DEQUATTRO for his third $10,000 payment to CROMWELL. The Company President processed the reimbursement as an employee

9

bonus check, and recorded it on the Company's books as a payroll expense, to conceal its true nature.

44.    On or about November 19, 2014, DEQUATTRO deposited the "bonus" check into his savings account to reimburse himself for paying the third $10,000 bribe to CROMWELL.

*The Fourth $10,000 Check*

45.    On or about September 16, 2014, CROMWELL incorporated One Nation Development.

46.    On or about December 8, 2014, CROMWELL opened a bank account in the name of Cedric D. CROMWELL dba One Nation Development (the "One Nation Development account").

47.    On or before January 6, 2015, CROMWELL asked DEQUATTRO for another $10,000.

48.    On or about January 6, 2015, DEQUATTRO wrote a personal check for $10,000 payable to CM International.

49.    On or about January 6, 2015, Friend A, acting at CROMWELL's direction, deposited DEQUATTRO's check into a CM International bank account.

50.    On or about January 6, 2015, Friend A, acting at CROMWELL's direction, bought a treasurer's check for $10,000 payable to One Nation Development.

51.    On or about January 6, 2015, CROMWELL deposited the $10,000 treasurer's check into the One Nation Development account. CROMWELL spent the funds on personal expenses.

0053

52.     On or about February 18, 2015, the Company President authorized and signed a Company check payable to DEQUATTRO to reimburse DEQUATTRO for his fourth $10,000 bribe payment to CROMWELL. The Company President processed the reimbursement as an employee bonus check, and recorded it on the Company's books as a payroll expense, to conceal its true nature.

53.     On or about February 19, 2015, DEQUATTRO deposited the "bonus" check into his savings account to reimburse himself for paying the fourth $10,000 bribe to CROMWELL.

54.     On or about March 27, 2015, CROMWELL signed Gaming Authority check no. 51544 payable to the Company for $179,838.42 invoiced under the Contract.

*The Fifth $10,000 Check*

55.     On or about November 12, 2015, CROMWELL sent DEQUATTRO an email, attaching an unsigned letter that was not on letterhead. It stated: "Dear Dave, One Development will use the $10,000.00 dollar donation for Political Action Committee food towards food, campaigns and elections. Regards, Cedric Cromwell, One Nation Development."

56.     On or about November 13, 2015, DEQUATTRO wrote a personal check for $10,000 payable to One Nation Development.

57.     On or about November 14, 2015, CROMWELL negotiated the check, depositing $9,500 into the One Nation Development account and withdrawing $500 in cash.

58.     On or about November 16, 2015, the Company President authorized a Company payment to reimburse DEQUATTRO for his fifth $10,000 bribe payment to CROMWELL. The Company President processed the reimbursement as a single-paycheck salary increase, and recorded it on the Company's books as a payroll expense, to conceal its true nature.

11

59.     On or about November 18, 2015, the artificially increased paycheck was direct-deposited into DEQUATTRO's checking account to reimburse him for his fifth $10,000 bribe payment to CROMWELL.

60.     On or about January 29, 2016, CROMWELL cosigned Gaming Authority check no. 52001 to the Company for $324,387.01 invoiced under the Contract.

61.     On or about April 22, 2016, CROMWELL cosigned Gaming Authority check no. 52160 to the Company for $126,355.77 invoiced under the Contract.

62.     On or about May 20, 2016, CROMWELL cosigned Gaming Authority check no. 52234 to the Company for $184,858.87 invoiced under the Contract.

63.     On or about June 24, 2016, CROMWELL cosigned Gaming Authority check no. 52309 to the Company for $127,002.05 invoiced under the Contract.

*The Bowflex Revolution Home Gym*

64.     On or before August 2, 2016, CROMWELL asked DEQUATTRO for exercise equipment for CROMWELL's personal use. DEQUATTRO told the Company President about CROMWELL's request.

65.     On or about August 2, 2016, the Company President responded to a Craigslist post advertising the sale of a used Bowflex Revolution home gym, with free delivery.

66.     On or about August 3, 2016, the Company President emailed the seller to arrange for purchase of the Bowflex Revolution, to be delivered to CROMWELL's home in Attleboro, Massachusetts.

67.     On or about August 5, 2016, the seller delivered the Bowflex Revolution to CROMWELL's home. DEQUATTRO met the seller there and paid him $1,700 cash. The Company President reimbursed DEQUATTRO for half the price.

68.     On or about August 5, 2016, CROMWELL cosigned Gaming Authority check no. 52411 to the Company for $122,772.77 invoiced under the Contract.

69.     On or about September 9, 2016, CROMWELL cosigned Gaming Authority check no. 52485 to the Company for $166,500.21 invoiced under the Contract.

70.     On or about October 7, 2016, CROMWELL cosigned Gaming Authority check no. 52534 to the Company for $292,955.32 invoiced under the Contract.

71.     On or about November 18, 2016, CROMWELL cosigned Gaming Authority check no. 52582 to the Company for $84,401.00 invoiced under the Contract.

*The Sixth Check*

72.     On or about December 23, 2016, a friend of CROMWELL's who worked as the Gaming Authority's Program Manager ("Friend B"), acting at CROMWELL's direction, texted DEQUATTRO: "Below is the name of the pizza place in case you need it for the fundraiser[:] Barnstable pizza and pasta co inc . . . ."

73.     On or about January 3, 2017, Friend B, acting at CROMWELL's direction, texted DEQUATTRO: "Another option is the [sic] cut the check to the following Company[:] CM International LLC . . . . Note: Chairman Cedric Cromwell Campaign. Either way let me know by end of day by phone."

74.     On or about January 12, 2017, DEQUATTRO wrote a personal check for $4,000 payable to CM International.

13

75.    On or about January 17, 2017, Friend A, acting at CROMWELL's direction, deposited DEQUATTRO's check into a CM International account and withdrew $4,000 in cash.

76.    On or about January 17, 2017, the Company President authorized a payment to reimburse DEQUATTRO for his $4,000 bribe payment to CROMWELL. The Company President processed the reimbursement as an employee bonus payment rolled into DEQUATTRO's weekly paycheck, and recorded it on the Company's books as a payroll expense, to conceal its true nature.

77.    On or about January 18, 2017, the artificially increased paycheck was direct-deposited into DEQUATTRO's checking account to reimburse him for his $4,000 bribe payment to CROMWELL.

78.    On or about January 20, 2017, CROMWELL cosigned Gaming Authority check no. 52680 to the Company for $215,583.03 invoiced under the Contract.

79.    On or about March 31, 2017, CROMWELL cosigned Gaming Authority check no. 52756 to the Company for $71,772.89 invoiced under the Contract.

*CROMWELL's Birthday Weekend at the Seaport Boston Hotel*

80.    On or about May 15, 2017, CROMWELL texted DEQUATTRO: "Hello Dave. I hope all is well. My Birthday is coming up this Friday May 19th and I wanted to spend Friday through Monday at a very nice hotel in Boston on for my Birthday weekend. Is it possible that you can get me a nice hotel room at the Four Seasons or a suite at the Seaport Hotel? I am going to have a special guest with me. Please let me know and Thank You."

81.    On or about May 15, 2017, DEQUATTRO texted CROMWELL's message to the Company President, adding "Guess who" and "u can't think of this stuff.......what is next?"

14

82.     On or about May 17, 2017, the Seaport Boston Hotel sent an email to DEQUATTRO confirming a reservation for CROMWELL for May 19-22, 2017, room type "Executive Suite King – Harbor View," listing a nightly room rate of $530 for May 19, $548 for May 20, and $530 for May 21.

83.     On or about May 18, 2017, DEQUATTRO used the Company's credit card to pay $1,849.37 of the Seaport Boston Hotel invoice totaling $2,467.17, which included expenses for valet parking, room service breakfast and dinner, and a tab at the hotel's Tamo Lounge.

84.     On or about May 26, 2017, CROMWELL cosigned Gaming Authority check no. 52813 to the Company for $156,908.84 invoiced under the Contract.

85.     On or about May 26, 2017, CROMWELL cosigned Gaming Authority check no. 52847 to the Company for $140,147.29 invoiced under the Contract.

86.     On or about August 18, 2017, CROMWELL cosigned Gaming Authority check no. 52968 to the Company for $74,816.87 invoiced under the Contract.

15

Case 1:20-cr-10271-DPW   Document 1   Filed 11/12/20   Page 16 of 23


COUNT ONE
Conspiracy to Commit Federal Programs Bribery
(18 U.S.C. § 371)

The Grand Jury charges:

87.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-86 of this

Indictment.

88.     From on or about July 1, 2014, through on or about August 18, 2017, in the

District of Massachusetts, and elsewhere, the defendants,

(1) CEDRIC CROMWELL and
(2) DAVID DEQUATTRO,

conspired with each other and with others known and unknown to the Grand Jury to commit

offenses against the United States, to wit, violations of Title 18, United States Code, Sections

666(a)(1)(B) and (a)(2), that is:

a.  being an agent of an Indian tribal government, to corruptly solicit and demand for the

benefit of any person, and accept and agree to accept, anything of value from any person,

intending to be influenced and rewarded in connection with any business, transaction and

series of transactions of such Indian tribal government involving anything of value of

$5,000 or more, where such Indian tribal government received benefits in excess of

$10,000 under a Federal program involving a grant, contract, subsidy, loan guarantee,

insurance or other form of Federal assistance in any one-year period; and

b.  to corruptly give, offer, and agree to give anything of value of to any person, with intent

to influence and reward an agent of an Indian tribal government, in connection with any

business, transaction and series of transactions of such Indian tribal government

involving anything of value of $5,000 or more, where such Indian tribal government

16

received benefits in excess of $10,000 under a Federal program involving a grant,
contract, subsidy, loan guarantee, insurance or other form of Federal assistance in any
one-year period.

All in violation of Title 18, United States Code, Section 371.

17

## COUNTS TWO-THREE
Bribery Concerning Programs Receiving Federal Funds; Aiding and Abetting
(18 U.S.C. § 666(a)(1)(B); 18 U.S.C. § 2)

The Grand Jury further charges:

89.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-86 of this Indictment.

90.    On or about the following dates, in the District of Massachusetts, and elsewhere, the defendant,

## CEDRIC CROMWELL,

being an agent of an Indian tribal government, or any agency thereof, namely, the Mashpee Wampanoag Tribe, corruptly solicited and demanded for the benefit of any person, and accepted and agreed to accept, anything of value from any person, intending to be influenced and rewarded in connection with any business, transaction and series of transactions of such tribal government involving anything of value of $5,000 or more, where such tribal government received benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan guarantee, insurance or other form of Federal assistance in any one-year period:

| Count | Transaction |
|-------|-------------|
| 2 | $10,000 bribe from the Company through DEQUATTRO on or about 11/13/15 |
| 3 | Bribes from the Company through DEQUATTRO of a Bowflex Revolution home gym valued at $1,700 on or about 8/5/16; $4,000 on or about 1/12/17; and $1,849.37 paid on or about 5/18/17 for a stay at the Seaport Boston Hotel |

All in violation of Title 18, United States Code, Sections 666(a)(1)(B) and 2.

18

COUNTS FOUR-FIVE
Bribery Concerning Programs Receiving Federal Funds; Aiding and Abetting
(18 U.S.C. § 666(a)(2); 18 U.S.C. § 2)

The Grand Jury further charges:

91.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-86 of this
Indictment.

92.     On or about the following dates, in the District of Massachusetts, and elsewhere,
the defendant,

DAVID DEQUATTRO,

corruptly gave, offered, and agreed to give anything of value to any person, with intent to influence
and reward an agent of an Indian tribal government, or any agency thereof, namely, the Mashpee
Wampanoag Tribe, in connection with any business, transaction and series of transactions of such
tribal government involving anything of value of $5,000 or more, where such tribal government
received benefits in excess of $10,000 under a Federal program involving a grant, contract,
subsidy, loan guarantee, insurance or other form of Federal assistance in any one-year period:

| Count | Transaction |
|-------|-------------|
| 4 | $10,000 bribe from the Company to CROMWELL on or about 11/13/15 |
| 5 | Bribes from the Company to CROMWELL of a Bowflex Revolution home gym valued at $1,700 on or about 8/5/16; $4,000 on or about 1/12/17; and $1,849.37 paid on or about 5/18/17 for a stay at the Seaport Boston Hotel |

All in violation of Title 18, United States Code, Sections 666(a)(2) and 2.

19

COUNT SIX
Conspiracy to Commit Extortion
(18 U.S.C. § 1951)

The Grand Jury further charges:

93.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-86 of this Indictment.

94.     From on or about July 1, 2014, through on or about August 18, 2017, in the District of Massachusetts, and elsewhere, the defendant,

CEDRIC CROMWELL,

conspired with others known and unknown to the Grand Jury to obstruct, delay, and affect, and attempt to obstruct, delay, and affect, in any way and degree, commerce and the movement of any article and commodity in commerce, by extortion, as that term is defined in Title 18, United States Code, section 1951; that is, by obtaining property not due to the defendant, from the Company, with the consent of DEQUATTRO and the Company President, under color of official right.

All in violation of Title 18, United States Code, Section 1951.

20

COUNTS SEVEN-TEN
Extortion
(18 U.S.C. § 1951)

The Grand Jury further charges:

95.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-86 of this

Indictment.

96.     On or about the following dates, in the District of Massachusetts, and elsewhere,

the defendant,

CEDRIC CROMWELL,

did obstruct, delay and affect, and attempt to obstruct delay and affect, in any way and degree,

commerce and the movement of any article and commodity in commerce, by extortion, as that

term is defined in Title 18, United States Code, section 1951; that is, by obtaining property not due

to the defendant, from the Company, with the consent of DEQUATTRO and the Company

President, under color of official right:

| Count | Transaction |
|---|---|
| 7 | $10,000 payment on or about 11/13/15 |
| 8 | Bowflex Revolution home gym valued at $1,700 on or about 8/5/16 |
| 9 | $4,000 payment on or about 1/12/17 |
| 10 | $1,849.37 payment on or about 5/18/17 for a stay at the Seaport Boston Hotel |

All in violation of Title 18, United States Code, Section 1951.

21

FORFEITURE ALLEGATION
(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

1.      Upon conviction of one or more of the offenses in violation Title 18, United States Code, Sections 2, 371, 666, and 1951, set forth in Counts One through Ten, the defendants,

CEDRIC CROMWELL and
DAVID DEQUATTRO,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property constituting, or derived from, proceeds traceable to the offenses. The property to be forfeited includes, but is not limited to, the following:

   a.  An amount to be determined as sentencing, to be entered in the form of a forfeiture money judgment.

2.      If any of the property described in Paragraph 1, above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendants --

   a.  cannot be located upon the exercise of due diligence;

   b.  has been transferred or sold to, or deposited with, a third party;

   c.  has been placed beyond the jurisdiction of the Court;

   d.  has been substantially diminished in value; or

   e.  has been commingled with other property which cannot be divided without difficulty;

22

0065

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c),

incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property

of the defendants up to the value of the property described in Paragraph 1 above.

    All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United

States Code, Section 2461(c).

A TRUE BILL

FOREPERSON

CHRISTINE WICHERS
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF MASSACHUSETTS

District of Massachusetts: NOVEMBER 12, 2020
Returned into the District Court by the Grand Jurors and filed.

/s/ Thomas F. Quinn 11/12/20 @ 4:20pm
DEPUTY CLERK

23

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>(1) CEDRIC CROMWELL and<br>(2) DAVID DEQUATTRO,<br><br>             Defendants | Criminal No. 20-10271-DPW<br><br>Violations:<br><br><u>Count One</u>: Conspiracy to Commit Federal<br>Programs Bribery<br>(18 U.S.C. § 371)<br><br><u>Counts Two-Three</u>: Bribery Concerning<br>Programs Receiving Federal Funds;<br>Aiding and Abetting<br>(18 U.S.C. § 666(a)(1)(B); 18 U.S.C. § 2)<br><br><u>Counts Four-Five</u>: Bribery Concerning Programs<br>Receiving Federal Funds;<br>Aiding and Abetting<br>(18 U.S.C. § 666(a)(2); 18 U.S.C. § 2)<br><br><u>Count Six</u>: Conspiracy to Commit Extortion<br>(18 U.S.C. § 1951)<br><br><u>Counts Seven-Ten</u>: Extortion<br>(18 U.S.C. § 1951)<br><br><u>Counts Eleven-Fourteen</u>: Filing False Tax<br>Returns<br>(26 U.S.C. § 7206(1))<br><br><u>Forfeiture Allegation:</u><br>(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461) |

<u>SUPERSEDING INDICTMENT</u>

At all times relevant to this Superseding Indictment:

<u>General Allegations</u>

1.      Defendant CEDRIC CROMWELL was a resident of Attleboro, Massachusetts.

2.      Defendant DAVID DEQUATTRO was a resident of Warwick, Rhode Island.

1

3.      The Mashpee Wampanoag Tribe (the "Tribe") was a Native American tribe based in Mashpee, Massachusetts. The Tribe had approximately 3,000 members. In 2007, the U.S. Secretary of the Interior recognized the Tribe as an Indian Tribe under federal law.

4.      In each of 2014, 2015, 2016, 2017, and 2018, the Tribe received federal grants totaling more than $10,000.

5.      The governing body of the Tribe was the Mashpee Wampanoag Tribal Council (the "Tribal Council"), all of whom were members of the Tribe. Chairperson of the Tribal Council, also known as Chairperson of the Tribe, was a four-year elected position.

6.      The Tribal membership elected CROMWELL as their Chairman in 2009. He was reelected in 2013 and 2017.

7.      In federal personal income tax returns, Forms 1040, filed jointly with his wife, CROMWELL reported receiving the following salary from the Tribe in 2014-2017:

| 2014 | $130,624 |
| 2015 | $147,677 |
| 2016 | $182,027 |
| 2017 | $180,377 |

8.      The Tribe's Constitution gave CROMWELL the authority to "preside over all meetings of the Tribal Council" and "perform the usual duties of a Chairperson, including but not limited to, acting as the official spokesperson for the Tribe, engaging in public relations, serving as coordinator over all Tribal government activities, and exercising any authority delegated to [him] by the Tribal Council."

9.      DEQUATTRO was a licensed architect and a shareholder, officer, and director of an architecture and design firm in Providence, Rhode Island (the "Company"). The Company engaged in interstate commerce.

2

10. The President and Controller of the Company (the "Company President"), who was also a shareholder and director, had the authority to direct, and did direct, the payment of Company funds, including for employee payroll purposes.

### The Company's Contract with the Mashpee Wampanoag Gaming Authority to Serve as Owner's Representative for the First Light Casino Project

11. Prior to 2012, the Tribal membership voted to build and operate a resort and casino in Taunton, Massachusetts, which they planned to call the First Light Resort and Casino, to generate revenue for the Tribe.

12. In 2012, the Tribal Council adopted Mashpee Wampanoag Tribal Gaming Authority Ordinance 2012-ORD-004 (as amended, the "Ordinance"), which created the Mashpee Wampanoag Gaming Authority (the "Gaming Authority") as an unincorporated limited liability company wholly owned by the Tribe.

13. The Ordinance provided that the Gaming Authority would be governed and managed by a Board of Directors consisting of between three and five Tribal members, including the Chairman of the Tribal Council, who would automatically serve as the President of the Board of Directors. All members of the Board of Directors, including the President, were voting members.

14. CROMWELL was a voting member, and the President, of the Gaming Authority's five-member Board of Directors.

15. The Ordinance gave the Gaming Authority, acting through its Board of Directors, exclusive power, to, among other things, "do any and all things necessary or desirable in connection with the development, design, financing, construction, equipping, leasing, operation, management . . . , maintenance, and promotion" of the First Light Resort and Casino, including

3

to "hire [and] fire . . . consultants, . . . [and] prescribe their duties and compensation."

16.     The Gaming Authority and the Company entered into a Consultant Services Agreement dated May 7, 2014, for the Company to serve as the "owner's representative" for the Gaming Authority during both the preconstruction and construction phases of the casino project (the "Contract"). The Contract was signed by CROMWELL on behalf of the Gaming Authority and DEQUATTRO on behalf of the Company.

17.     The Contract did not have a termination date. It stated that either party could terminate the Contract for cause with seven days' notice, or "for convenience" with one month's notice.

<u>CROMWELL'S Three Limited Liability Companies</u>

18.     On or about September 16, 2014, CROMWELL formed One Nation Development LLC ("One Nation Development") under Delaware law. CROMWELL dissolved One Nation Development on or about December 16, 2016.

19.     On or about January 1, 2017, CROMWELL formed New Light Concepts LLC ("New Light Concepts") under Delaware law. CROMWELL dissolved New Light Concepts on or about October 11, 2017.

20.     On or about October 9, 2017, CROMWELL formed Lite Works LLC ("Lite Works") under Delaware law. CROMWELL dissolved Lite Works on or about January 17, 2019.

21.     On or about October 15, 2018, in answers to interrogatories in a civil lawsuit, CROMWELL represented that his position with his three limited liability companies was the same: "Consultant\owner," and, more specifically, "Consultant on Carbon Sequestration. Indian Country liaison to Tribal Carbon Forestry Markets."

4

22.     CROMWELL opened a bank account for One Nation Development on or about December 8, 2014. CROMWELL was the only authorized signatory. CROMWELL closed the account on or about September 30, 2016.

23.     CROMWELL opened a bank account for New Light Concepts on or about January 10, 2017. CROMWELL and his wife were the only authorized signatories. CROMWELL closed the account on or about October 4, 2017.

24.     CROMWELL opened a bank account for Lite Works on or about October 12, 2017. CROMWELL was the only authorized signatory. CROMWELL closed the account on or about November 28, 2018.

25.     On his 2017 personal income tax return, Form 1040, CROMWELL reported receiving $114,000 in gross income through Lite Works, a business he described as "support activities for forestry."

<u>Objects and Purposes of the Conspiracies</u>
<u>to Commit Federal Programs Bribery and Extortion</u>

26.     The objects of the conspiracy to commit federal programs bribery were for CROMWELL to use his position and influence as Chairman of the Tribe and President of the Gaming Authority to solicit and accept payments and other things of value from the Company through DEQUATTRO, in exchange for favorable action or inaction on the Contract by the Gaming Authority, and for DEQUATTRO to give money and other things of value from the Company to CROMWELL in exchange for favorable action or inaction on the Contract by the Gaming Authority. The purpose of the conspiracy was for CROMWELL, DEQUATTRO, and the Company President to enrich themselves personally.

5

27.     The object of the conspiracy to commit extortion was for CROMWELL to use his position and influence as Chairman of the Tribe and President of the Gaming Authority to obtain property not due to him, from the Company, with the consent of DEQUATTRO and the Company President, in exchange for favorable action or inaction on the Contract by the Gaming Authority. The purpose of the conspiracy was for CROMWELL to enrich himself personally.

Manner and Means of the Conspiracies
to Commit Federal Programs Bribery and Extortion

28.     Among the manner and means by which CROMWELL, DEQUATTRO, and others known and unknown to the Grand Jury carried out the conspiracies were the following:

a.  Between on or about July 26, 2014, and on or about May 18, 2017, the Company, through DEQUATTRO, provided CROMWELL with a stream of payments and in-kind benefits valued at not less than $57,549.37, and, in exchange, between on or about July 18, 2014, and on or about February 15, 2018, the Company was paid approximately $4,966,287.16 under the Contract.

b.  CROMWELL used One Nation Development as a shell entity to collect payments, including from DEQUATTRO. One Nation Development was not a Section 501(c)(3) charitable organization. CROMWELL spent One Nation Development funds on personal expenses, including payments to his mistress.

c.  CROMWELL solicited payments from the Company through DEQUATTRO under the pretext that they were donations to his reelection campaign and/or charitable contributions to One Nation Development. DEQUATTRO agreed to make the payments knowing they were neither donations to CROMWELL's reelection campaign nor charitable contributions.

6

   d. CROMWELL and DEQUATTRO agreed to disguise the identity of the payer by using checks written on DEQUATTRO's personal account instead of Company checks.

   e. DEQUATTRO and the Company President agreed that the Company would reimburse DEQUATTRO for his payments to CROMWELL.

   f. CROMWELL and DEQUATTRO agreed that DEQUATTRO would pay CROMWELL through an intermediary called CM International Consulting LLC ("CM International"), which CROMWELL's friend ("Friend A") owned.

   g. DEQUATTRO wrote personal checks payable to CM International knowing the money would go to CROMWELL.

   h. At CROMWELL's direction, Friend A deposited DEQUATTRO's checks into a CM International account and used the funds to buy treasurer's checks payable to CROMWELL or One Nation Development.

   i. CROMWELL deposited the treasurer's checks in two bank accounts, an account he held jointly with his wife and his One Nation Development account. CROMWELL spent the funds on personal expenses.

   j. DEQUATTRO and the Company President agreed to disguise the Company's reimbursement payments to DEQUATTRO by characterizing them as employee bonus payments or single-paycheck salary increases and recording them on the Company's books as payroll expenses. The reimbursements were paid either in Company checks that DEQUATTRO deposited into his personal account, or in paychecks that were direct-deposited into DEQUATTRO's

personal account.

Overt Acts in Furtherance of the Conspiracy to Commit Federal Programs Bribery,
and Acts in Furtherance of the Conspiracy to Commit Extortion

29.     Between on or before July 1, 2014, and on or about August 18, 2017,
CROMWELL, DEQUATTRO, and coconspirators known and unknown to the Grand Jury
committed and caused to be committed the following overt acts, among others, in furtherance of
the conspiracy to commit federal programs bribery, and acts in furtherance of the conspiracy to
commit extortion:

*The First $10,000 Check*

30.     On or before July 1, 2014, CROMWELL asked DEQUATTRO for $10,000.

31.     On or before July 1, 2014, Friend A, acting at CROMWELL's direction, told
DEQUATTRO to make the $10,000 check payable to CM International.

32.     On or about July 26, 2014, DEQUATTRO wrote a personal check for $10,000
payable to CM International.

33.     On or about July 28, 2014, Friend A, acting at CROMWELL's direction, deposited
DEQUATTRO's check into a CM International bank account.

34.     On or about August 5, 2014, Friend A, acting at CROMWELL's direction, bought
a $4,000 treasurer's check payable to CROMWELL.

35.     On or about August 5, 2014, CROMWELL deposited the $4,000 check into a
checking account he held jointly with his wife. CROMWELL spent the funds on personal
expenses.

36.     On or about August 12, 2014, Friend A, acting at CROMWELL's direction, bought
two $3,000 treasurer's checks payable to CROMWELL.

8

37.     On or about August 12, 2014, CROMWELL deposited the two $3,000 checks into a checking account he held jointly with his wife. CROMWELL spent the funds on personal expenses.

38.     On or about July 23, 2014, the Company President authorized and signed a Company check payable to DEQUATTRO to reimburse DEQUATTRO for his $10,000 bribe payment to CROMWELL. The Company President processed the reimbursement as an employee bonus check, and recorded it on the Company's books as a payroll expense, to conceal its true nature.

39.     On or about July 24, 2014, DEQUATTRO deposited the "bonus" check into his savings account to reimburse himself for paying the $10,000 bribe to CROMWELL.

*The Second $10,000 Check*

40.     On or before September 1, 2014, CROMWELL asked DEQUATTRO for another $10,000.

41.     On or about September 1, 2014, DEQUATTRO wrote a personal check for $10,000 payable to CM International.

42.     On or about September 3, 2014, Friend A, acting at CROMWELL's direction, deposited DEQUATTRO's check into a CM International bank account.

43.     On or about September 3, 2014, Friend A, acting at CROMWELL's direction, bought two $5,000 treasurer's checks payable to CROMWELL.

44.     On or about September 3, 2014, CROMWELL deposited the two $5,000 checks into a checking account he held jointly with his wife. CROMWELL spent the funds on personal expenses.

9

45.     On or about September 3, 2014, the Company President authorized and signed a Company check payable to DEQUATTRO to reimburse DEQUATTRO for his second $10,000 bribe payment to CROMWELL. The Company President processed the reimbursement as an employee bonus check, and recorded it on the Company's books as a payroll expense, to conceal its true nature.

46.     On or about September 5, 2014, DEQUATTRO deposited the "bonus" check into his savings account to reimburse himself for paying the second $10,000 bribe to CROMWELL.

*The Third $10,000 Check*

47.     On or before October 31, 2014, CROMWELL asked DEQUATTRO for another $10,000.

48.     On or about October 31, 2014, DEQUATTRO wrote a personal check for $10,000 payable to CM International.

49.     On or about November 1, 2014, Friend A, acting at CROMWELL's direction, deposited DEQUATTRO's check into a CM International bank account.

50.     On or about November 1, 2014, Friend A, acting at CROMWELL's direction, bought a treasurer's check for $8,800 payable to CROMWELL.

51.     On or about November 3, 2014, CROMWELL deposited the $8,800 check into a checking account he held jointly with his wife. CROMWELL spent the funds on personal expenses.

52.     On or about November 17, 2014, the Company President authorized and signed a Company check payable to DEQUATTRO to reimburse DEQUATTRO for his third $10,000 bribe payment to CROMWELL. The Company President processed the reimbursement as an employee

10

bonus check, and recorded it on the Company's books as a payroll expense, to conceal its true nature.

53.     On or about November 19, 2014, DEQUATTRO deposited the "bonus" check into his savings account to reimburse himself for paying the third $10,000 bribe to CROMWELL.

*The Fourth $10,000 Check*

54.     On or before January 6, 2015, approximately one month after opening the bank account for One Nation Development, CROMWELL asked DEQUATTRO for another $10,000.

55.     On or about January 6, 2015, DEQUATTRO wrote a personal check for $10,000 payable to CM International.

56.     On or about January 6, 2015, Friend A, acting at CROMWELL's direction, deposited DEQUATTRO's check into a CM International bank account.

57.     On or about January 6, 2015, Friend A, acting at CROMWELL's direction, bought a treasurer's check for $10,000 payable to One Nation Development.

58.     On or about January 6, 2015, CROMWELL deposited the $10,000 treasurer's check into the One Nation Development account. CROMWELL spent the funds on personal expenses.

59.     On or about February 18, 2015, the Company President authorized and signed a Company check payable to DEQUATTRO to reimburse DEQUATTRO for his fourth $10,000 bribe payment to CROMWELL. The Company President processed the reimbursement as an employee bonus check, and recorded it on the Company's books as a payroll expense, to conceal its true nature.

11

60.     On or about February 19, 2015, DEQUATTRO deposited the "bonus" check into his savings account to reimburse himself for paying the fourth $10,000 bribe to CROMWELL.

61.     On or about March 27, 2015, CROMWELL signed Gaming Authority check no. 51544 payable to the Company for $179,838.42 invoiced under the Contract.

*The Fifth $10,000 Check*

62.     On or about November 12, 2015, CROMWELL sent DEQUATTRO an email, attaching an unsigned letter that was not on letterhead. It stated: "Dear Dave, One Development will use the $10,000.00 dollar donation for Political Action Committee food towards food, campaigns and elections. Regards, Cedric Cromwell, One Nation Development."

63.     On or about November 13, 2015, DEQUATTRO wrote a personal check for $10,000 payable to One Nation Development.

64.     On or about November 14, 2015, CROMWELL negotiated the check, depositing $9,500 into the One Nation Development account and withdrawing $500 in cash.

65.     On or about November 16, 2015, the Company President authorized a Company payment to reimburse DEQUATTRO for his fifth $10,000 bribe payment to CROMWELL. The Company President processed the reimbursement as a single-paycheck salary increase, and recorded it on the Company's books as a payroll expense, to conceal its true nature.

66.     On or about November 18, 2015, the artificially increased paycheck was direct-deposited into DEQUATTRO's checking account to reimburse him for his fifth $10,000 bribe payment to CROMWELL.

67.     On or about January 29, 2016, CROMWELL cosigned Gaming Authority check no. 52001 to the Company for $324,387.01 invoiced under the Contract.

12

68.    On or about April 22, 2016, CROMWELL cosigned Gaming Authority check no. 52160 to the Company for $126,355.77 invoiced under the Contract.

69.    On or about May 20, 2016, CROMWELL cosigned Gaming Authority check no. 52234 to the Company for $184,858.87 invoiced under the Contract.

70.    On or about June 24, 2016, CROMWELL cosigned Gaming Authority check no. 52309 to the Company for $127,002.05 invoiced under the Contract.

*The Bowflex Revolution Home Gym*

71.    On or before August 2, 2016, CROMWELL asked DEQUATTRO for exercise equipment for CROMWELL's personal use. DEQUATTRO told the Company President about CROMWELL's request.

72.    On or about August 2, 2016, the Company President responded to a Craigslist post advertising the sale of a used Bowflex Revolution home gym, with free delivery.

73.    On or about August 3, 2016, the Company President emailed the seller to arrange for purchase of the Bowflex Revolution, to be delivered to CROMWELL's home in Attleboro, Massachusetts.

74.    On or about August 5, 2016, the seller delivered the Bowflex Revolution to CROMWELL's home. DEQUATTRO met the seller there and paid him $1,700 cash. The Company President reimbursed DEQUATTRO for half the price.

75.    On or about August 5, 2016, CROMWELL cosigned Gaming Authority check no. 52411 to the Company for $122,772.77 invoiced under the Contract.

76.    On or about September 9, 2016, CROMWELL cosigned Gaming Authority check no. 52485 to the Company for $166,500.21 invoiced under the Contract.

13

77.     On or about October 7, 2016, CROMWELL cosigned Gaming Authority check no. 52534 to the Company for $292,955.32 invoiced under the Contract.

78.     On or about November 18, 2016, CROMWELL cosigned Gaming Authority check no. 52582 to the Company for $84,401.00 invoiced under the Contract.

*The Sixth Check*

79.     On or about December 23, 2016, a friend of CROMWELL's who worked as the Gaming Authority's Program Manager ("Friend B"), acting at CROMWELL's direction, texted DEQUATTRO: "Below is the name of the pizza place in case you need it for the fundraiser[:] Barnstable pizza and pasta co inc . . . ."

80.     On or about January 3, 2017, Friend B, acting at CROMWELL's direction, texted DEQUATTRO: "Another option is the [sic] cut the check to the following Company[:] CM International LLC . . . . Note: Chairman Cedric Cromwell Campaign. Either way let me know by end of day by phone."

81.     On or about January 12, 2017, DEQUATTRO wrote a personal check for $4,000 payable to CM International.

82.     On or about January 17, 2017, Friend A, acting at CROMWELL's direction, deposited DEQUATTRO's check into a CM International account and withdrew $4,000 in cash.

83.     On or about January 17, 2017, the Company President authorized a payment to reimburse DEQUATTRO for his $4,000 bribe payment to CROMWELL. The Company President processed the reimbursement as an employee bonus payment rolled into DEQUATTRO's weekly paycheck, and recorded it on the Company's books as a payroll expense, to conceal its true nature.

14

84.     On or about January 18, 2017, the artificially increased paycheck was direct-deposited into DEQUATTRO's checking account to reimburse him for his $4,000 bribe payment to CROMWELL.

85.     On or about January 20, 2017, CROMWELL cosigned Gaming Authority check no. 52680 to the Company for $215,583.03 invoiced under the Contract.

86.     On or about March 31, 2017, CROMWELL cosigned Gaming Authority check no. 52756 to the Company for $71,772.89 invoiced under the Contract.

*CROMWELL's Birthday Weekend at the Seaport Boston Hotel*

87.     On or about May 15, 2017, CROMWELL texted DEQUATTRO: "Hello Dave. I hope all is well. My Birthday is coming up this Friday May 19th and I wanted to spend Friday through Monday at a very nice hotel in Boston on for my Birthday weekend. Is it possible that you can get me a nice hotel room at the Four Seasons or a suite at the Seaport Hotel? I am going to have a special guest with me. Please let me know and Thank You."

88.     On or about May 15, 2017, DEQUATTRO texted CROMWELL's message to the Company President, adding "Guess who" and "u can't think of this stuff.......what is next?"

89.     On or about May 17, 2017, the Seaport Boston Hotel sent an email to DEQUATTRO confirming a reservation for CROMWELL for May 19-22, 2017, room type "Executive Suite King – Harbor View," listing a nightly room rate of $530 for May 19, $548 for May 20, and $530 for May 21.

90.     On or about May 18, 2017, DEQUATTRO used the Company's credit card to pay $1,849.37 of the Seaport Boston Hotel invoice totaling $2,467.17, which included expenses for valet parking, room service breakfast and dinner, and a tab at the hotel's Tamo Lounge.

15

91.     On or about May 26, 2017, CROMWELL cosigned Gaming Authority check no. 52813 to the Company for $156,908.84 invoiced under the Contract.

92.     On or about May 26, 2017, CROMWELL cosigned Gaming Authority check no. 52847 to the Company for $140,147.29 invoiced under the Contract.

93.     On or about August 18, 2017, CROMWELL cosigned Gaming Authority check no. 52968 to the Company for $74,816.87 invoiced under the Contract.

<u>CROMWELL's Unreported Income</u>

*Income from the Carbon Offsets Company*

94.     In 2011-2012, a lawyer who became a business associate of CROMWELL's (the "Business Associate") formed two limited partnerships under Delaware law, "P-Co." and "P-Co. Shell Company."

95.     In 2012, P-Co. entered into a "Consultant Agreement" with a company that develops and supplies forest carbon offsets (the "Carbon Offsets Company").[1] Under the Consultant Agreement, P-Co. agreed to: identify Native American tribes owning significant forest acreage; introduce such tribes to the Carbon Offsets Company and its business model; help negotiate carbon offset contracts between such tribes and the Carbon Offsets Company; and interface with the federal Bureau of Indian Affairs in support of those projects. The Consultant Agreement provided that the Carbon Offsets Company would pay P-Co. a "success fee" when

---

[1] Under California's cap-and-trade program, carbon-emitting companies must cap their emissions at a certain level. They may also buy a limited number of carbon-offset credits. One offset credit is currently equivalent to the removal of one metric ton of carbon dioxide from the atmosphere. Private owners of forest land who agree to maintain their forests, which reduce pollution because trees absorb carbon dioxide from the atmosphere, can sell carbon offsets through the California agency that regulates this program.

16

carbon offsets under a successful contract were monetized. In addition, the Carbon Offsets Company would pay P-Co.'s expenses. The Business Associate signed the Consultant Agreement on behalf of P-Co.

96.     Not later than April 2014, the Business Associate began submitting P-Co. expense reports to the Carbon Offsets Company. At the request of the Business Associate, the Carbon Offsets Company reimbursed the expenses with checks payable to the P-Co. Shell Company. The Business Associate deposited the checks into a bank account he had opened in the name of the P-Co. Shell Company for which he was the only authorized signatory (the "P-Co. Shell Company Account").

97.     In or about October 2014, the Business Associate submitted a P-Co. expense report to the Carbon Offsets Company seeking reimbursement for $5,000 incurred on October 1, 2014, for "consulting services for NCAI Conference," for which CROMWELL was identified as the vendor. The Business Associate asked the Carbon Offsets Company to pay the $5,000 by wiring the money to the P-Co. Shell Company Account.

98.     On or about October 23, 2014, the Carbon Offsets Company wired $5,000 to the P-Co. Shell Company Account. On the same day, the Business Associate bought a $5,000 official check, which identified the "remitter" as the P-Co. Shell Company, payable to Friend A.

99.     On or about October 24, 2014, acting at CROMWELL's direction, Friend A deposited the $5,000 official check into his personal bank account, and bought a $5,000 treasurer's check payable to CROMWELL.

100.    On or about October 24, 2014, CROMWELL deposited the $5,000 treasurer's check into a checking account he held jointly with his wife.

17

101.    The Business Associate communicated with the Carbon Offsets Company not only on behalf of P-Co., but also on behalf of a P-Co. affiliate incorporated in Canada ("P-Co. Canada").

102.    In 2016, the Carbon Offsets Company and P-Co. Canada entered into an "Amended and Restated Consultant Agreement" which said that it amended and restated the 2012 Consultant Agreement between the Carbon Offsets Company and P-Co. The Business Associate signed this agreement (the "2016 Amended Agreement") on behalf of P-Co. Canada.

103.    The 2016 Amended Agreement stated that P-Co. "either has engaged or intends to engage" three "Referral Agents," one of whom was CROMWELL, "in connection with the provision of" P-Co.'s consulting services.

104.    The 2016 Amended Agreement provided that the Carbon Offsets Company would pay each Referral Agent, through P-Co., $4,000 per month as an advance against any future success fee, with the total of such advances to all three Referral Agents not to exceed $72,000.

105.    In 2016, the Carbon Offsets Company wired the P-Co. Shell Company Account a total of $72,000, and issued a Form 1099 to the P-Co. Shell Company for this amount.

106.    On or about the following dates, the following amounts were wired from the P-Co. Shell Company Account to the One Nation Development bank account controlled by CROMWELL:

| Date | Amount |
| --- | --- |
| 02/26/16 | $2,000.00 |
| 03/14/16 | $4,000.00 |
| 03/31/16 | $4,000.00 |
| 05/03/16 | $4,000.00 |
| 06/03/16 | $4,000.00 |
| 07/13/16 | $3,536.00 |
| Total: | $21,536.00 |

18

107.    On or about the following dates, P-Co. Canada and/or P-Co. Shell Company wired the following amounts to the New Light Concepts bank account controlled by CROMWELL:

| Date | Amount |
|------|--------|
| 01/11/17 | $32,315.20 |
| 03/22/17 | $4,000.00 |
| 04/28/17 | $3,990.00 |
| 05/17/17 | $3,990.00 |
| 06/07/17 | $3,990.00 |
| Total: | $48,285.20 |

108.    CROMWELL gave a sworn deposition in a civil lawsuit on December 3, 2018. When asked about P-Co., he testified: "I think they – to the best of my knowledge, they know the carbon sequestration market." When asked to define that term, CROMWELL answered: "It's about forestry management, about carbon offsets that forests provide based on carbon offenders. So there's a whole market out there, and I'm not that great at it. So I'm not an expert at that." When asked what he did for P-Co., CROMWELL testified: "You know, I knew a lot of people across Indian country, so I could make phone calls to them to introduce them to carbon sequestration." When asked about a $55,000 payment that he said he was expecting from P-Co. as of the date of the deposition, CROMWELL testified that P-Co. was "still trying to figure out" when he would receive the payment. When asked what he meant by that, CROMWELL answered: "It means when these carbon offsets are going to be sold, at what pricing and the California resource market. It's a bunch of gobbledygook at that point to me. I just want my money."

109.    CROMWELL did not report any of the income described in paragraphs 97-100 and 106-107 above, totaling approximately $74,821.20, to the IRS.

*Income from the CEO of the Firm that that Won*
*the Architect Contract for the First Light Casino Project*

110.    The Gaming Authority entered into an "Architect of Record Agreement for Architecture and Design Services" dated May 7, 2014, for an architecture firm based in Las Vegas, Nevada (the "Architecture Firm") to serve as the architect for the casino project.

111.    The CEO and controlling shareholder of the Architecture Firm was the only authorized signatory on a bank account held in the name of an investment holding company in Las Vegas (the "Investment Holding Company").

112.    On multiple occasions between December 2014 and January 2016, the Investment Holding Company wired money to a Florida limited partnership (the "Florida LP"), which wired money to the P-Co. Shell Company Account, which wired money to the One Nation Development account controlled by CROMWELL. Specifically:

| Date | From | To | Amount |
|---|---|---|---|
| 12/02/14 | Investment Holding Co. | Florida LP | $20,000.00 |
| 12/08/14 | Florida LP | P-Co. Shell Company | $11,500.00 |
| **12/08/14** | **P-Co. Shell Company** | **One Nation Development** | **$4,000.00** |
| 01/02/15 | Investment Holding Co. | Florida LP | $20,000.00 |
| 01/05/15 | Florida LP | P-Co. Shell Company | $11,500.00 |
| **01/05/15** | **P-Co. Shell Company** | **One Nation Development** | **$4,000.00** |
| 02/09/15 | Investment Holding Co. | Florida LP | $20,000.00 |
| 02/10/15 | Florida LP | P-Co. Shell Company | $11,500.00 |
| **02/10/15** | **P-Co. Shell Company** | **One Nation Development** | **$4,000.00** |
| 03/04/15 | Investment Holding Co. | Florida LP | $20,000.00 |
| 03/05/15 | Florida LP | P-Co. Shell Company | $11,500.00 |
| **03/05/15[2]** | **P-Co. Shell Company** | **One Nation Development** | **$4,000.00** |

---

[2] This payment was a treasurer's check dated March 5, 2015, for which P-Co. Shell Company was the "remitter." CROMWELL negotiated the check on or about March 13, 2015.

20

| Date | From | To | Amount |
|------|------|----|--------|
| 04/28/15 | Florida LP | P-Co. Shell Company | $4,000.00 |
| **04/29/15** | **P-Co. Shell Company** | **One Nation Development** | **$3,900.00** |
| 05/01/15 | Investment Holding Co. | Florida LP | $40,000.00 |
| 05/04/15 | Florida LP | P-Co. Shell Company | $11,500.00 |
| **05/04/15** | **P-Co. Shell Company** | **One Nation Development** | **$4,000.00** |
| 06/04/15 | Investment Holding Co. | Florida LP | $20,000.00 |
| 06/05/15 | Florida LP | P-Co. Shell Company | $9,000.00 |
| **06/05/15** | **P-Co. Shell Company** | **One Nation Development** | **$4,000.00** |
| 07/06/15 | Investment Holding Co. | Florida LP | $20,000.00 |
| 07/07/15 | Florida LP | P-Co. Shell Company | $5,000.00 |
| **07/08/15** | **P-Co. Shell Company** | **One Nation Development** | **$3,000.00** |
| **07/14/15** | **P-Co. Shell Company** | **One Nation Development** | **$1,622.27** |
| 08/06/15 | Investment Holding Co. | Florida LP | $20,000.00 |
| 08/07/15 | Florida LP | P-Co. Shell Company | $16,500.00 |
| **08/10/15** | **P-Co. Shell Company** | **One Nation Development** | **$4,000.00** |
| 09/04/15 | Investment Holding Co. | Florida LP | $20,000.00 |
| 09/04/15 | Florida LP | P-Co. Shell Company | $6,500.00 |
| 09/10/15 | Florida LP | P-Co. Shell Company | $4,000.00 |
| **09/22/15** | **P-Co. Shell Company** | **One Nation Development** | **$2,000.00** |
| 10/02/15 | Investment Holding Co. | Florida LP | $20,000.00 |
| 10/06/15 | Florida LP | P-Co. Shell Company | $10,500.00 |
| **10/06/15** | **P-Co. Shell Company** | **One Nation Development** | **$2,000.00** |
| **10/15/15** | **P-Co. Shell Company** | **One Nation Development** | **$852.31** |
| 01/05/16 | Investment Holding Co. | Florida LP | $20,000.00 |
| 01/06/16 | Florida LP | P-Co. Shell Company | $6,500.00 |
| **01/08/16** | **P-Co. Shell Company** | **One Nation Development** | **$1,648.49** |
| **01/29/16** | **P-Co. Shell Company** | **One Nation Development** | **$2,000.00** |
| | | **Total payments to One Nation Development:** | **$45,023.07** |

113.   CROMWELL did not report any of the income described in paragraph 112 above,

totaling $45,023.07, to the IRS.

21

*Additional Unreported Income - Bribes*

114.    CROMWELL did not report to the IRS any of the bribes paid to him by the Company through DeQuattro, including the six checks, the value of the Bowflex gym, or the value of the partly paid hotel stay, totaling approximately $57,549.37, as described in paragraphs 30-93 above.

*CROMWELL's Total Unreported Income*

115.    From 2014 through 2017, CROMWELL failed to report a total of approximately $176,193.64 in income to the IRS, as set forth below:

| | |
|---|---|
| 2014 | $39,000.00 |
| 2015 | $57,374.58 |
| 2016 | $26,884.49 |
| 2017 | $54,134.57 |
| Total: | $177,393.64 |

22

COUNT ONE
Conspiracy to Commit Federal Programs Bribery
(18 U.S.C. § 371)

The Grand Jury charges:

116.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-115 of this Superseding Indictment.

117.     From on or about July 1, 2014, through on or about August 18, 2017, in the District of Massachusetts, and elsewhere, the defendants,

(1) CEDRIC CROMWELL and
(2) DAVID DEQUATTRO,

conspired with each other and with others known and unknown to the Grand Jury to commit offenses against the United States, to wit, violations of Title 18, United States Code, Sections 666(a)(1)(B) and (a)(2), that is:

a.   being an agent of an Indian tribal government, to corruptly solicit and demand for the benefit of any person, and accept and agree to accept, anything of value from any person, intending to be influenced and rewarded in connection with any business, transaction and series of transactions of such Indian tribal government involving anything of value of $5,000 or more, where such Indian tribal government received benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan guarantee, insurance or other form of Federal assistance in any one-year period; and

b.   to corruptly give, offer, and agree to give anything of value of to any person, with intent to influence and reward an agent of an Indian tribal government, in connection with any business, transaction and series of transactions of such Indian tribal government involving anything of value of $5,000 or more, where such Indian tribal government received benefits

23

in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan guarantee, insurance or other form of Federal assistance in any one-year period.

All in violation of Title 18, United States Code, Section 371.

24

COUNTS TWO-THREE
Bribery Concerning Programs Receiving Federal Funds; Aiding and Abetting
(18 U.S.C. § 666(a)(1)(B); 18 U.S.C. § 2)

The Grand Jury further charges:

118.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-115 of this Superseding Indictment.

119.    On or about the following dates, in the District of Massachusetts, and elsewhere, the defendant,

CEDRIC CROMWELL,

being an agent of an Indian tribal government, or any agency thereof, namely, the Mashpee Wampanoag Tribe, corruptly solicited and demanded for the benefit of any person, and accepted and agreed to accept, anything of value from any person, intending to be influenced and rewarded in connection with any business, transaction and series of transactions of such tribal government involving anything of value of $5,000 or more, where such tribal government received benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan guarantee, insurance or other form of Federal assistance in any one-year period:

| Count | Transaction |
|-------|-------------|
| 2 | $10,000 bribe from the Company through DEQUATTRO on or about 11/13/15 |
| 3 | Bribes from the Company through DEQUATTRO of a Bowflex Revolution home gym valued at $1,700 on or about 8/5/16; $4,000 on or about 1/12/17; and $1,849.37 paid on or about 5/18/17 for a stay at the Seaport Boston Hotel |

All in violation of Title 18, United States Code, Sections 666(a)(1)(B) and 2.

25

COUNTS FOUR-FIVE
Bribery Concerning Programs Receiving Federal Funds; Aiding and Abetting
(18 U.S.C. § 666(a)(2); 18 U.S.C. § 2)

The Grand Jury further charges:

120.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-115 of this

Superseding Indictment.

121.    On or about the following dates, in the District of Massachusetts, and elsewhere,

the defendant,

DAVID DEQUATTRO,

corruptly gave, offered, and agreed to give anything of value to any person, with intent to influence

and reward an agent of an Indian tribal government, or any agency thereof, namely, the Mashpee

Wampanoag Tribe, in connection with any business, transaction and series of transactions of such

tribal government involving anything of value of $5,000 or more, where such tribal government

received benefits in excess of $10,000 under a Federal program involving a grant, contract,

subsidy, loan guarantee, insurance or other form of Federal assistance in any one-year period:

| Count | Transaction |
|-------|-------------|
| 4 | $10,000 bribe from the Company to CROMWELL on or about 11/13/15 |
| 5 | Bribes from the Company to CROMWELL of a Bowflex Revolution home gym valued at $1,700 on or about 8/5/16; $4,000 on or about 1/12/17; and $1,849.37 paid on or about 5/18/17 for a stay at the Seaport Boston Hotel |

All in violation of Title 18, United States Code, Sections 666(a)(2) and 2.

26

<u>COUNT SIX</u>
Conspiracy to Commit Extortion
(18 U.S.C. § 1951)

The Grand Jury further charges:

122.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-115 of this Superseding Indictment.

123.    From on or about July 1, 2014, through on or about August 18, 2017, in the District of Massachusetts, and elsewhere, the defendant,

CEDRIC CROMWELL,

conspired with others known and unknown to the Grand Jury to obstruct, delay, and affect, and attempt to obstruct, delay, and affect, in any way and degree, commerce and the movement of any article and commodity in commerce, by extortion, as that term is defined in Title 18, United States Code, section 1951; that is, by obtaining property not due to the defendant, from the Company, with the consent of DEQUATTRO and the Company President, under color of official right.

All in violation of Title 18, United States Code, Section 1951.

27

COUNTS SEVEN-TEN
Extortion
(18 U.S.C. § 1951)

The Grand Jury further charges:

124.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-115 of this Superseding Indictment.

125.    On or about the following dates, in the District of Massachusetts, and elsewhere, the defendant,

CEDRIC CROMWELL,

did obstruct, delay and affect, and attempt to obstruct delay and affect, in any way and degree, commerce and the movement of any article and commodity in commerce, by extortion, as that term is defined in Title 18, United States Code, section 1951; that is, by obtaining property not due to the defendant, from the Company, with the consent of DEQUATTRO and the Company President, under color of official right:

| Count | Transaction |
| --- | --- |
| 7 | $10,000 payment on or about 11/13/15 |
| 8 | Bowflex Revolution home gym valued at $1,700 on or about 8/5/16 |
| 9 | $4,000 payment on or about 1/12/17 |
| 10 | $1,849.37 payment on or about 5/18/17 for a stay at the Seaport Boston Hotel |

All in violation of Title 18, United States Code, Section 1951.

28

0094

COUNTS ELEVEN-FOURTEEN
Filing False Tax Returns
(26 U.S.C. § 7206(1))

The Grand Jury further charges:

126.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-115 of this Superseding Indictment.

127.    On or about the dates set forth below, in the District of Massachusetts, and elsewhere, the defendant,

CEDRIC CROMWELL,

did willfully make and subscribe a U.S. Individual Tax Return, Form 1040, for the calendar years set forth below, each of which was verified by a written declaration that it was made under penalties of perjury and was filed with the Internal Revenue Service, and each of which the defendant did not believe to be true and correct as to every material matter in that each return understated defendant's total income, as a result of which each return understated the amount of taxes due and owing for that year.

| Count | Calendar Year | Approximate Filing Date |
|-------|---------------|-------------------------|
| 11    | 2014          | 4/14/15                 |
| 12    | 2015          | 4/13/16                 |
| 13    | 2016          | 4/15/17                 |
| 14    | 2017          | 4/18/18                 |

All in violation of Title 26, United States Code, Section 7206(1).

29

FORFEITURE ALLEGATION
(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

1.      Upon conviction of one or more of the offenses in violation Title 18, United States

Code, Sections 2, 371, 666, and 1951, set forth in Counts One through Ten, the defendants,

CEDRIC CROMWELL and
DAVID DEQUATTRO,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C),

and Title 28, United States Code, Section 2461(c), any property constituting, or derived from,

proceeds traceable to the offenses. The property to be forfeited includes, but is not limited to, the

following:

      a.   An amount to be determined as sentencing, to be entered in the form of a
         forfeiture money judgment.

2.      If any of the property described in Paragraph 1, above, as being forfeitable pursuant

to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section

2461(c), as a result of any act or omission of the defendants --

      a.   cannot be located upon the exercise of due diligence;

      b.   has been transferred or sold to, or deposited with, a third party;

      c.   has been placed beyond the jurisdiction of the Court;

      d.   has been substantially diminished in value; or

      e.   has been commingled with other property which cannot be divided without
         difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c),

incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property

of the defendants up to the value of the property described in Paragraph 1 above.

30

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

A TRUE BILL

_____
FOREPERSON

_____
CHRISTINE WICHERS
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF MASSACHUSETTS

District of Massachusetts: MARCH 22, 2021
Returned into the District Court by the Grand Jurors and filed.

_____   3/22/21
DEPUTY CLERK

31

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL No. 20-10271-DPW |
| CEDRIC CROMWELL, DAVID DEQUATTRO, | **FILED UNDER SEAL** |
| Defendants | |

## MOTION IN LIMINE TO PARTIALLY EXCLUDE DEFENSE EXPERT
*(Leave to File Granted on August 9, 2021)*

### Introduction

Defendant David DeQuattro has proffered a defense expert who will testify that it is "not uncommon" and lawful for non-Indians to give Indian tribes gifts and political contributions in order to procure their business, a necessary expense because of the deep distrust Indian tribes may harbor based on a long history of exploitation. This explosive assertion fails any meaningful test for expert testimony under the Federal Rules of Evidence and should be excluded under Rules 702 and 403. But even on its own terms, evidence that "everybody does it" is both irrelevant and invades the duty of the Court to tell the jury what the law is.[1]

### Factual Background

On July 23, 2021, the defendant provided expert notice regarding two experts. See Exh. 1. One expert, Mr. Becker, is mostly unobjectionable. The second expert is either Skip Durocher or Mary Streitz. Durocher/Streitz are partners at a law firm in Minnesota and practice in Indian law. Exh. 1 at 3. Based on the expert notice, Durocher/Streitz will testify that many

---

[1] The government has no objection to the proposed expert testimony regarding the National Congress of American Indans

Indian tribes are reluctant to do business with non-Indians.  Exh. 1 at 4.  Durocher/Streitz opine

that "[t]his is based on a well-known and well-documented history of exploitation of Indian

tribes in the United States at the hands of both the federal and state governments, as well as by

countless private businesses and individuals." *Id.*  Because of this long history of oppression,

dating back to "the days of the fur traders," Durocher/Streitz opine that "Indian tribes and tribal

businesses have developed a deep distrust in doing business with non-Indian individuals or

businesses, particularly those with whom they do not have a long and comfortable history." *Id.*

At 4-5.

Durocher/Streitz believe that because of that history of oppression, financial support to

tribal causes is necessary for non-Indians to win the trust of the business community in Indian

country.  *Id.* at 5.  Durocher/Streitz state that such financial support, including donations to tribal

charities, tribal entities, and donations to individuals running in tribal political campaigns is a

common practice.  *Id.*   Durocher/Streitz state that the practice of making payments as requested

by Indian tribes "is a legitimate business practice, and lawful financial support that facilitates

such development is not uncommon in Indian country."

Durocher/Streitz are also expected to testify that Federal and State campaign laws and

contribution limits are not applicable to Tribal elections and that the Mashpee Wampanoag did

not have any such laws or regulations.

## Legal Standard

Federal Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact
> to understand the evidence or to determine a fact in issue, a witness qualified as
> an expert by knowledge, skill, experience, training, or education, may testify
> thereto in the form of an opinion or otherwise, if (1) the testimony is based on
> sufficient facts or data, (2) the testimony is the product of reliable principles and

methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702 (codifying *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). This Court exercises a "gatekeeping" function that requires it to determine, as an initial matter, whether proposed expert testimony meets the standards for admissibility contained in the rule. The proponent of the testimony bears the burden of demonstrating, by a preponderance of the evidence, (1) that the expert is qualified; (2) that the proposed testimony is "reliable"; and (3) that the proposed testimony "fits" with the facts of the case, rendering it helpful to the jury. *See Daubert*, 509 U.S. at 592 & n.10.

## Argument

### The Proffered Testimony of Durchoer/Streitz would violate Rules 702 and 403.

Much of the expert testimony proffered by DeQuattro as to Durocher/Streitz is outrageous and cannot be allowed.  Specifically, the basis for the Durocher/Streitz opinion, that gifts and political contributions help build trust with Indian tribes and are necessary because of their history of exploitation, is wholly irrelevant to the facts at issue in this case and unfairly prejudicial.  *See Bird v. Glacier Elec. Coop., Inc.*, 255 F.3d 1136 (9th Cir. 2001) (reversing trial verdict based on improper closing argument where lawyer appealed to bias and referenced Custer, slavery, "white man's magic," and "the wealth of the Indian people being taken by the 'conquering people'").  The propriety of such inflammatory rhetoric does not increase when it is offered from the witness stand instead of the courtroom well.  While none can dispute the tragic history of Native American tribes, that history has little place in this trial.

But even robbed of its inflammatory context, the testimony that it is a regular and lawful practice in Indian country to make payments in exchange for favorable business

3

consideration should be excluded.  "It is black-letter law that it is not for witnesses to

instruct the jury as to applicable principles of law, but for the judge."  *Nieves-Villanueva*

*v. Soto-Rivera*, 133 F.3d 92, 99 (1st Cir. 1997) (internal marks omitted).  Expert

testimony that practices such as the defendant employed in this case are common and

lawful invades the province of the Court.  Even if Durocher/Streitz do not provide that

ultimate opinion, their testimony as to the pattern and practice of other businesses and

other tribes has the same effect.  In that case, by urging the jury to adopt an unstated

inference about the lawfulness of pay-for-play in Indian country, it is merely an attempt

to use an expert to put the defense theory before the jury.  It is not only unwise but likely

an abuse of discretion under Rules 702 and 403.  *See United States v. Montas*, 41 F.3d

775, 784 (1st Cir. 1994) ("By appearing to put the expert's stamp of approval on the

government's theory, such testimony might unduly influence the jury's own assessment

of the inference that is being urged.").  The excuse that everyone else does it, and the

adjacent inference that therefore, it must be lawful, is prohibited.

Further, there is no evidence that DeQuattro knew of or relied upon any such

practice when he engaged in the conduct at issue in this case.  Without a link to

DeQuattro's subjective knowledge, the asserted practice is not relevant to DeQuattro's

good faith.  *See United States v. Gaw*, 817 F.3d 1, 10-11 (1st Cir. 2016).

<u>The proposed testimony does not fit the facts of this case</u>

Even if the Court finds that the expert testimony is relevant and factual, it should

still be excluded because it does not fit the facts of this case.  Specifically, the proposed

expert testimony states that business development payments for tribal and community

support are lawful and commonplace in Indian country.  However, the expert testimony

refers to a number of such expenditures that are wholly irrelevant to the facts of this case, including tribal powwows, native dancing groups, and charity golf tournaments. The expert notice goes on to lump those categories of payments in with donations to political campaigns and "gifts to tribal entities and/or members." This is not a case about a charity golf tournament. Unless the expert testimony will be that payments similar to the ones made by DeQuattro are commonplace in Indian country, customs regarding other types of charitable giving is irrelevant. At minimum, a <u>Daubert</u> hearing is required to ensure that the expert's proposed testimony is sufficiently related to the facts of this case as to be helpful to the jury.

<u>Testimony about the inapplicability of federal election law is unnecessary</u>

Finally, the Durocher/Streitz testimony regarding federal election law or the law of the Mashpee Wampanoag is unnecessary. The inapplicability of federal election law to Indian tribes is undisputed. The Court can provide an appropriate instruction about what the law is. Expert testimony on this point is unnecessary and cumulative.

## **Conclusion**

The Court should exclude the defendant's experts under Rule 702 and 403 of the Federal Rules of Evidence.

Respectfully submitted,

NATHANIEL R. MENDELL
Acting United States Attorney

By:     /s/ Jared C. Dolan
        CHRISTINE WICHERS
        JARED C. DOLAN
        Assistant United States Attorneys

5

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document will be emailed to defense counsel.

/s/ Jared C. Dolan
JARED C. DOLAN
Assistant United States Attorney

Date: August 9, 2021

# MARTIN G. WEINBERG, P.C.
## ATTORNEY AT LAW

*20 PARK PLAZA, SUITE 1000*
*ADDRESSES:*
*BOSTON, MASSACHUSETTS 02116*
—————

*(617) 227-3700*
—————

*FAX (617) 338-9538*
—————

*NIGHT EMERGENCY:*
*(617) 901-3472*

*EMAIL*
—————
*owlmcb@att.net*
*owlmgw@att.net*

July 23, 2021

<u>**Via Email**</u>
Christine Wichers
Assistant U.S. Attorney
John Joseph Moakley
United States Federal Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210

RE:   <u>**United States v. DeQuattro, 20-CR-10271 (D. Mass.)**</u>

Dear Ms. Wichers:

Pursuant to Fed. R. Crim. P. 16(b)(1)(C)(i), Mr. DeQuattro provides notice that, should there be a defense case, he may call the below-listed expert witnesses.  Mr. DeQuattro reserves all rights, including the right to update, amend, and/or supplement the summaries of testimony set forth below based on further developments, including additional documents received or Court orders.

1)   <u>**Robert Becker**</u>

    a)   <u>Qualifications</u>

Mr. Becker has spent 40 years working in the construction industry.  He currently owns his own construction consulting firm, NEPA Engineering, which he founded in 2000.  Mr. Becker has served as an owner's representative for a number of projects, including a $270 million casino project in Pennsylvania for Mohegan Sun.  He also

1

provided design/construction consulting services in connection with the First Light casino project at issue in the present case.

A copy of Mr. Becker's CV is attached.

b) <u>Summary of Opinions and Bases Therefor</u>:  Mr. Becker holds each of the following opinions and is prepared to offer them if called to testify.

1. <u>Role of Owner's Representative</u>:  Based upon his education, training, and experience, Mr. Becker may offer his expert opinion on the role served by an owner's representative in large construction projects, including casino projects.  Mr. Becker may testify that an owner's representative is a firm of design and/or construction professionals that serves as an advocate for the client and brings knowledge of construction and design that many clients (including the Mashpee Wampanoag Tribe) do not have.  The owner's representative is deeply involved in initial programing, budgeting, and planning of the project.  It is involved in drafting RFPs, vetting candidates for architect and construction manager and/or other roles, and directing the design and construction services of the construction manager and architect/engineer. The owner's representative ensures that the owner responsibilities under the architect and construction manager contracts are fulfilled.  An effective owner's representative will ensure the owner's project expectations are achieved.  Tracking costs, weighing the cost vs. value of optional project components, setting priorities, and managing change orders are all examples of ongoing owner representative duties throughout the life of a project.

2. <u>Budgeting and Compensation</u>: Based upon his education, training, and experience, Mr. Becker may testify that budgeting for professional services in the construction of a large casino is an imprecise exercise.  The most significant aspect of the cost for professional services is time spent working at an hourly rate.  It is typical in the industry for an owner's representative and other professional services providers to be paid hourly. The development of the Mohegan Sun casino at Pocono Downs required extensive time and efforts on the part of the in-house casino staff. Existing employees responsible for construction, maintenance, and operation of its casino facility were mobilized to perform a multitude of tasks.  Since the Mashpee Wampanoag Tribe had no existing casino facility to draw upon for owner representation duties, the need for outside, contracted owner representation was far greater.  A 2% fee for owner's representative services under these circumstances is reasonable and

2

consistent with professional norms.  Time is also very valuable in owner's representative work generally, as well as in casino construction in particular.  In working on the Mohegan Sun project, Mr. Becker understood that any delay would cost approximately $400,000/day in lost profits.

3. Relationship Between Owner's Representative and Client:  Based upon his education, training, and experience, Mr. Becker may testify that faith and trust are extremely important to any relationship between an owner's representative and a client.  Mr. Becker, who spent approximately eighteen months working on First Light, believed that such a trusting relationship existed between the Mashpee Wampanoag Tribe and RGB. Mr. Becker saw no indication that RGB was padding its bills or otherwise failing to act in the Tribe's best interest.

2) **Skip Durocher and Mary Streitz**

a)  Qualifications

Mr. Durocher and Ms. Streitz are partners with the law firm of Dorsey & Whitney LLP. Dorsey & Whitney is an international law firm with 19 offices worldwide. Its largest office is located in Minneapolis, Minnesota. Mr. Durocher is the co-head of that office. Mr. Durocher and Ms. Streitz are also the co-chairs of the Indian and Alaska Native Practice Group at Dorsey. Dorsey was the first Am Law100 firm to develop a full-service Indian and Alaska Native practice. Dorsey has received recognition for its longstanding, nationwide commitment to Native American law, including being ranked one of the best Native American law practices in the United States by U.S. News and World Report and Chambers and Partners. Dorsey features a full-service law firm with deep experience representing both Indian tribes and Alaska Native corporations and villages, and other entities doing business in Indian country.

Mr. Durocher has practiced in the area of Indian law for the past 27 years. Over the years, he has represented numerous Indian tribes across the United States, including several in the northeastern United States. He has also represented tribal corporations, individual Native Americans, and non-tribal entities doing business in Indian country. Mr. Durocher has counseled and represented Indian tribes and others in Indian country on a variety of litigated and non-litigated matters, including economic development, tribal governance, elections, enrollment, employment and criminal matters. Mr. Durocher speaks often at national conferences involving Indian law issues, and is one of the ten lawyers in the country recognized by Chambers and Partners in its highest tier (Band 1) of Native American law practitioners. Ms. Streitz

3

has practiced in the area of Indian law for the past 30 years. She has represented numerous Indian tribes, tribal corporations, individual Native Americans, and non-tribal entities doing business in Indian country on a variety of litigated and non-litigated matters, including federal, state, and tribal tax matters, business and investment tax planning, and compliance with applicable federal and state tax laws, often collaborating with Mr. Durocher in litigated matters.  She speaks often at national conferences involving Indian law issues, and is the highest ranked tax specialist recognized by Chambers and Partners among its nationally ranked Indian law practitioners (in Band 2).  She also is listed in Best Lawyers in America in both Native American Law and Tax Law.

A copy of Mr. Durocher's CV is located at the following link: https://www.dorsey.com/people/d/durocher-skip

A copy of Ms. Streitz's CV is located at the following link: https://www.dorsey.com/people/s/streitz-mary-j

b) <u>Summary of Opinions and Bases Therefor</u>:  Mr. Durocher and Ms. Streitz hold the following opinions and are prepared to offer them if called to testify at trial.

1. <u>Business Dealings with Indian Tribes</u>: Based upon their education, training, and experience working with approximately 25-30 Indian Tribes, Mr. Durocher and Ms. Streitz are expected to testify that many tribes are wary of doing business with non-Indian individuals and companies that have not otherwise established reputations for reliability, trustworthiness, and a commitment to being a responsible member of the tribal business community. This is based on a well-known and well-documented history of exploitation of Indian tribes in the United States at the hands of both the federal and state governments, as well as by countless private businesses and individuals. History is replete with examples of the United States breaching its solemn treaties with Indian tribes whenever it was expedient for it to do so. Similarly, state and local governments have pursued taxing and other regulatory schemes designed to wrongfully acquire tribal lands and to raid tribal treasuries. And ever since the days of the fur traders, outsiders have used alcohol and trickery to take advantage of, and obtain valuable resources from, Native Americans. This exploitation has had long lasting and devastating effects on economic development in Indian country, effects that are still felt today on almost every Indian reservation in the country. Unfortunately, there are still companies and individuals who pursue opportunities in Indian country in order to defraud or otherwise take advantage of tribal business partners or customers. As a

4

result of this longstanding (and ongoing) oppression, Indian tribes and tribal businesses have developed a deep distrust in doing business with non-Indian individuals or businesses, particularly those with whom they do not have a long and comfortable history.

For this reason, people who care about developing long-term business success in Indian country understand that they need to become involved in tribal communities outside the narrow context of performing a specific contract or providing a specific service. There are many ways to do this, including financial support to tribal charities, contributions to organizations supporting tribal interests, and donations to individuals running in tribal political campaigns, among others. Making donations to such worthy organizations and causes demonstrates an effort to learn about and become meaningfully involved in the tribal community.

While the underlying motivation for providing such financial support may be based in part on business development in Indian country, it does not imply an expectation that such support will automatically result in new business opportunities. Rather, by providing financial support, non-Indian business partners hope to earn credibility as part of the business community in Indian country. Persons who donate time and resources to a particular tribal community or individual within that community, and form strong relationships within that community, may also eventually benefit through introductions or referrals to other tribal governments and businesses in other areas of the country. Developing such relationships is a legitimate business practice, and lawful financial support that facilitates such development is not uncommon in Indian country.

Requests for donations and other forms of tribal and community support by tribal leaders to vendors and service providers are commonplace in Indian country. Donations for tribal powwows, native dancing groups, golf tournaments that raise money for Indian scholarships, and political campaigns are routinely made, as are gifts to tribal entities and/or members.

2. Applicability of Campaign Laws and Limits:  Based upon their education, training, experience, and review of relevant law, Mr. Durocher and Ms. Streitz are expected to testify that Federal and State campaign laws and contribution limitations are inapplicable to Tribal elections or their donors. For example, the Federal Election Campaign Act ("FECA") regulates contributions to campaigns for federal offices and to certain organizations

5

for the purpose of influencing elections for federal offices. 52 U.S.C. §§ 30101(1)-(4); (8)(A); 30116. Contributions made by Mr. DeQuattro or any other donor for the purpose of promoting elections for leadership of the Mashpee Wampanoag Tribe and/or the National Congress of American Indian ("NCAI") are not governed by FECA or other Federal or State campaign laws. No Tribal or NCAI office is a "federal office" under the FECA, and thus donations made for the purpose of supporting a bid for election for Tribal or NCAI office are not subject to the limitations, reporting, or disclosure requirements of the FECA. 52 U.S.C. § 30101(3) ("'Federal office' means the office of President or Vice President, or of Senator or Representative in, or Delegate or Resident Commissioner to, the Congress."). Chairman Cromwell would not fall within the definition of a "candidate," and the processes in which he was involved relating to NCAI and tribal office would not fall within the definition of "elections," for purposes of the FECA. *See* 11 C.F.R. §§ 100.2, 100.3. Similarly, State election laws govern elections of State leaders. Federal and State election laws' inapplicability to Chairman Cromwell and the Mashpee and NCAI elections is consistent with the principle that Indian tribes, as independent sovereign nations exercising inherent powers, regulate their own elections with few exceptions.

3. <u>Mashpee Wampanoag Tribe's Laws and Regulations</u>: Based upon their education, training, experience, and review of laws and regulations governing the Mashpee Wampanoag Tribe, available at https://mashpeewampanoagtribe-nsn.gov/law-and-policies, Mr. Durocher and Ms. Streitz  are expected to testify that the Mashpee Wampanoag Tribe has no laws or regulations that govern campaign contributions, including laws and regulations that specify contribution limits, entities or persons that are permitted to solicit or accept campaign contributions, or any reporting requirements.

4. <u>National Congress of American Indian</u>: Based upon their education, training, and experience, Mr. Durocher and Ms. Streitz are expected to testify the NCAI has 250 member tribes and thousands of individual members. Any individual member can run for one of the 16 elected offices or seek appointment for a position in support of one of those offices. Such positions are highly sought-after, and competition is fierce. Obtaining a position of prominence within NCAI is a remarkable achievement. For a member of the Mashpee Wampanoag, a small Indian tribe that only received federal recognition in 2007, to obtain such a position would be an incredible accomplishment, and would bring both the individual and the

6

Tribe national preeminence. Chairman Cromwell was appointed assistant to the Vice President for the New England Region of the NCAI, which is a position that benefited his and the Mashpee Wampanoag's standing and reputation within Indian country.

Additionally, Mr. Durocher's October 6, 2020 letter to AUSA Christine Wichers is incorporated herein.

Yours truly,

Martin G. Weinberg

7

FILED
IN CLERKS OFFICE

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS AUG 16 PM 2: 44

U.S. DISTRICT COURT
DISTRICT OF MASS.

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | )     Criminal No. 20-CR-10271 |
| DAVID DEQUATTRO, | ) |
|          Defendant | )     **Filed Under Seal** |
| | ) |

### OPPOSITION TO MOTION IN LIMINE TO PARTIALLY EXCLUDE DEFNSE EXPERT

Now comes the Defendant, David DeQuattro, by and through undersigned counsel and hereby respectfully opposes the Government's Motion in Limine to Partially Exclude Defense Expert. The Government's objections relate solely to two of Mr. DeQuattro's expert witnesses – Attorney Skip Durocher and Attorney Mary Streitz – who are, according to the Government intending to testify to "explosive assertion[s]" in violation of Fed R. Evid. 702 and 403. Specifically, the Government argues that the proposed testimony concerning the common nature of gifts and political contribution from non-tribal vendors and business partners to tribes and tribal members is irrelevant and unfairly prejudicial, that it would infringe on matters reserved for the Judge and jury, and that the proposed testimony does not fit the facts of this case. Importantly, the Government does not contest Attorney Durocher's or Attorney Streitz's qualifications, [1] whether they possess specialized knowledge and experience that would assist the trier of fact, or their proffered opinions concerning the inapplicability of Federal, State, or internal Mashpee Wampanoag campaign finance laws or regulations to the transactions at issue

---

[1] The defense noticed both Attorney Durocher and Attorney Streitz as part of its expert disclosure in the event one of them was unable to testify as a result of scheduling conflicts. Based on the current schedule, the defense believes that Attorney Durocher will be the expert that testifies at trial.

1

in this case.[2] As detailed below, the objected-to testimony is relevant, helpful to the jury, not conclusive on the ultimate issues in this case, and is properly admissible as testimony regarding the customs and practices of conducting business in Indian country.

Expert testimony is relevant if it "logically advances a material aspect of the proposing party's case." *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995). "The requirement that the opinion testimony assist the trier of fact goes primarily to relevance." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010). Expert testimony must also have a "reliable basis in the knowledge and experience of [the expert's] discipline." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993) "[T]he test of reliability is flexible," and this court is granted "broad latitude when it decides *how* to determine reliability" as well as "in respect to its ultimate reliability determination." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141-42 (1999) (citations omitted) (emphasis in original); *see also United States v. Montas*, 41 F.3d 775, 784 (1st Cir. 1994) ("the trial court enjoys vast discretion in deciding whether to admit expert testimony under Rules 702 and 403.") Where "experts are retained to offer non-scientific testimony, the reliability inquiry will 'depend[ ] heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it.' " *Bona Fide Conglomerate, Inc. v. SourceAmerica*, No. 14-CV-00751-GPC-AGS, 2019 WL 1369007, at *2 (S.D. Cal. Mar. 26, 2019) (quoting *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004)). "Disputes as to the strength of an expert's credentials, faults in his use of a particular methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility,

---

[2] In a footnote, the Government also states it has no objection to the proposed expert testimony regarding the National Congress of American Indians.

of his testimony." *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1231 (9th Cir. 1998) (citation and brackets omitted).

Attorney Durocher's and Attorney Streitz's decades of practical experience advising and representing tribal corporations, individual Native Americans, and non-tribal entities doing business in Indian country is undoubtable helpful to the jury in understanding the facts and circumstances of this case. While jurors may have had experience with political donations and business development gifts in the context of their ordinary lives, it is unlikely that any juror was solicited or contributed to the election efforts of a tribal leader or his political allies, conducted business with Native American tribes, understands the customs and practices of conducting business in Indian country, or understands the lack of laws and regulations governing tribal elections and political donations. Indeed, none of proposed expert opinions are "within the bounds of a jury's ordinary experience." *Montas*, 41 F.3d at 784. Accordingly, the testimony of a prominent attorney with decades of experience traversing this complicated space, who could explain how routine and commonplace gifts and political donations are in Indian country as a way to gain trust and to become meaningfully involved in the tribal community is not only relevant, but essential to help the jury understand the facts of this particular case.

The Government argues that Mr. DeQuattro's experts should not be allowed to testify on these issues because it would "invade[] the province of the Court." While Fed. R. Evid. 704(a) provides that "[a]n opinion is not objectionable just because it embraces an ultimate issue," here, Mr. DeQuattro's expert does not seek to testify on the ultimate issue, *i.e.* whether Mr. DeQuattro did or did not violate 18 USC 666 or whether he did or did not possess the required corrupt intent. Indeed, experts like Attorney Durocher are commonly allowed to provide testimony about the customs and practices of conducting business in a particular environment. *See e.g., The Shaw*

3

*Group, Inc. v. Marcum,* 516 F.3d 1061 (8th Cir.2008) (affirming admission of expert testimony as "ordinary business practices"); *Royal Marco Point 1 Condo. Ass'n v. QBE Ins. Corp.,* No. 2:07–cv–16–FtM–99SPC, 2011 WL 470561, *4 (M.D.Fla. Feb.2, 2011) (allowing expert to compare party's conduct to what he "has seen in his experience to be standard and typical in the industry" so long as he did not testify as to ultimate legal conclusion); *CDX Liquidating Trust ex rel. CDX Liquidating Trusee v. Venrock Assoc.,* 411 B.R. 571, 589 (N.D.Ill.2009) (expert could properly "testify about [d]efendants' conduct in light of industry ... standards"); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944 JST, 2017 WL 2616916, at *1 (N.D. Cal. Apr. 5, 2017) (admitting expert testimony regarding Korean family-controlled business groups based, in part, on "cultural factors such as rigidly hierarchical forms of corporate organization and strong deference to superiors, including the group patriarch."); *Milton H. Greene Archives, Inc. v. BPI Commc'ns, Inc.*, 378 F. Supp. 2d 1189, 1198 n.9 (C.D. Cal. 2005) ("[a] court may admit expert testimony of business customs and practices where it will aid the trier of fact in understanding the business in which the claims at issue arose.").

Furthermore, the Government assertion that there "is no evidence that DeQuattro knew of or relied upon any such practice when he engaged in the conduct at issue in this case," or that the proposed testimony "does not fit the facts of this case," Motion at 4, is inaccurate. Mr. DeQuattro and the RGB worked for the Mashpee Wampanoag tribe prior to the casino project and certainly knew and understood the importance of supporting the tribe. Mr. DeQuattro and RGB not only made political donation to Mr. Cromwell, but also numerous other contributions to other tribal causes including its powwow and its annual ball. The Government views Mr. DeQuattro's transactions in isolation, labelling them bribe payments, even though RGB, like

4

many other non-tribal vendors and service providers, supported the tribe before one of its owners made any political contribution.

Finally, that the Government does not dispute the "inapplicability of federal election law to Indian tribes," does not make the proposed testimony irrelevant, cumulative, or unnecessary. Motion at 5. The defense should be allowed to present its case in full without stipulating away its "full evidentiary force." *Old Chief v. United States*, 519 U.S. 172, 186–87 (1997).

Based on all of the foregoing, Mr. DeQuattro respectfully requests this Honorable Court to deny the Government's Motion in Limine to Partially Exclude Defense Expert.

Respectfully Submitted,

**/s/ Martin G. Weinberg**
Martin G. Weinberg
Mass. Bar No. 519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net

Dated: August 16, 2021

## CERTIFICATE OF SERVICE

I, Martin G. Weinberg, hereby certify that on this date, August 16, 2021, a copy of the foregoing documents has been served emailed to all relevant parties.

**/s/ Martin G. Weinberg**
Martin G. Weinberg

5

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

UNITED STATES OF AMERICA        )
                                )
        v.                      )
                                )        Criminal No. 20-CR-10271
DAVID DEQUATTRO,                )
            Defendant           )
_____)

**PRETRIAL HEARING MEMORANDUM OF LAW ON DEFENSE EXPERT**

Now comes the Defendant, David DeQuattro, by and through undersigned counsel and

hereby respectfully submits this Pretrial Hearing Memorandum of Law concerning the

admissibility of the expert testimony of Attorney Skip Durocher.

The cornerstone purpose of expert testimony is to " 'assist the trier of fact to understand

the evidence or determine a fact in issue.' " *Jazmin Campbell v. Metro. Prop. & Cas. Ins Co.,*

239 F.3d 179, 183 (2d Cir. 2001) (quoting Fed. R. Evid R 702) (citing *Daubert v. Merrell Dow*

*Pharm., Inc.,* 509 U.S. 579 (1993)). In *Daubert,* the Supreme Court recognized that Rule 702

intends to relax "the traditional barriers to 'opinion' testimony," thus "reinforc[ing] the idea that

there should be a presumption of admissibility" of expert testimony. *Borawick v. Shay,* 68 F.3d

597, 610 (2d Cir.1995) (citing *Daubert,* 509 U.S. at 588).

Expert witness testimony "that shed[s] light on activities not within the common

knowledge of the average juror" are particularly admissible. *United States v. Duncan*, 42 F.3d

97, 102 n.3 (2d. Cir. 1994). Expert witness testimony is similarly admissible "even where the

jury might have general knowledge of the subject at issue, so long as such knowledge may be

incomplete or inaccurate given the particular facts and circumstances relevant to the particular

case for which expert testimony is offered." *Katt v. City of New York*, 151 F. Supp. 2d 313, 358

1

(S.D.N.Y. 2001), *aff'd in part sub nom. Krohn v. New York City Police Dep't*, 60 F. App'x 357 (2d Cir. 2003), and *aff'd sub nom. Krohn v. New York City Police Dep't*, 372 F.3d 83 (2d Cir. 2004) (allowing an expert to testify to the code of silence of police organizations rejecting the contention that a jury could "readily understand" the code without the help of an expert).  The testimony that Attorney Durocher intends to proffer concerning the customs and practices of conducting business in Indian country and the need to support tribes in order to gain trust and further business opportunities is informed by his 27 years of professional experience as an Indian Law expert as well his personal and professional experience as a non-tribal member building a business in Indian country, as well as his representation of both Tribes conducting RFP decision-making and non-Tribal businesses endeavoring to be selected for Tribal business.  This is certainly not within the common knowledge of the average juror. Even if jurors have some knowledge regarding business development or the importance of supporting business partners, it is unlikely that any juror has had these experiences in the context of Native American tribes.

Courts have widely permitted the sort of testimony regarding the unique cultural and business practices that Attorney Skip Durocher intends to proffer.  *See Bowoto v. Chevron Corp.,* No. C 99-02506 SI, 2006 WL 2604592, at *3 (N.D. Cal. Aug. 23, 2006) ("Numerous courts have allowed expert testimony on background material, when cultures or locations would be foreign to a jury"). In *Bowoto*, the court allowed testimony regarding practices in Nigeria that were relevant to provide a context for the events alleged but excluded certain additional testimony on background issues "only tenuously related to this lawsuit". 2006 WL 2604592, at *2-4. In *Ji v. Bose Corp.*, the district court permitted two experts to "testify to the ordinary custom and practice of the modeling industry," when the ordinary practices in the modeling industry were relevant to the likely interpretation of a contract. 538 F. Supp. 354, 358 (D. Mass. 2008). In

2

*Dang Vang v. Vang Xiong X. Toyed*, the court admitted expert testimony concerning the Hmong culture and role of women in that culture, which was relevant to assist trier of fact in understanding certain behavior of parties that might otherwise be confusing. 944 F.2d 476 (9th Cir. 1991); *see also United States Equal Emp. Opportunity Comm'n v. Placer ARC,* 147 F. Supp. 3d 1053 (E.D. Cal. 2015) (admitting expert testimony on deaf culture in the United States); *Katt*, 151 F. Supp. 2d 313 (admitting expert testimony on unique organizational culture and practices of the New York City police department); *The Shaw Grp., Inc. v. Marcum*, 516 F.3d 1061 (8th Cir. 2008) (admitting expert testimony as to ordinary business practices of those engaged in private contracting with military); *Royal Marco Point 1 Condo. Ass'n v. QBE Ins. Corp*, No. 2:07-CV-16-FTM-99SPC, 2011 WL 470561, at *4 (M.D. Fla. Feb. 2, 2011) (admitting expert testimony on standard and typical practices in the insurance industry); *WH Smith Hotel Servs., Inc. v. Wendy's Int'l, Inc.*, 25 F.3d 422, 429 (7th Cir. 1994) (affirming admission of expert testimony on customs in the commercial real estate industry). Attorney Durocher is preeminently qualified to speak to the cultural and business practices of Native American tribes having previously litigated and studied issues involving tribal law, having participated in evaluating business proposals in connection with his representation of tribes, as well as representing non-tribal entities that seek to do business in Indian country.

Importantly, Attorney Durocher also has decades of personal experience as a non-tribal member conducting and building a business in Indian country. *In Den Norske Bank AS v. First Nat. Bank of Bos.*, the court admitted expert testimony on certain banking industry standards relevant to the litigation based on the experts' forty-years of experience in the banking industry. 75 F.3d 49, 57 (1st Cir. 1996); *see also Goldberg v. 401 North Wabash Venture LLC*, 2013 WL 212912, at *5 (N.D. Ill. Jan. 18, 2013) (rejecting defendant's argument that expert's

3

"methodology is unreliable because he applies personal experience and knowledge of industry customs and practices to actions taken by defendants," finding that the expert's opinion is "not inherently unsound if he draws upon his experience and industry knowledge rather than a proven formula, surveys, or established data."); *Baldonado v. Wyeth*, 2012 WL 3234240, at *3–6 (N.D. Ill. Aug. 6, 2012) (denying *Daubert* challenge to expert who would opine on the standard of care in the pharmaceutical industry where expert "[brought] to bear her experience and training on the issue" and "repeatedly emphasized during her testimony that her opinions are not subjective, but are instead based on training and experience and having done the same process"); *Harms v. Lab. Corp. of Am.*, 155 F. Supp. 2d 891, 903–04 (N.D. Ill. 2001) ("[T]estimony on the general standards of care in the industry would come from [the expert's] professional knowledge... This is classic expert testimony."). Again, it is unlikely that any juror possesses the unique knowledge and experiences that Attorney Durocher could testify to concerning his experiences in building business relationship with Native American clients. Accordingly, Attorney Durocher's testimony is outside the realm of common knowledge and would assist the trier of fact in determining the facts at issue in this matter, *i.e.,* whether it was reasonable for Mr. DeQuattro to make political donations, upon request, in order to improve his company's potential opportunity for future business with either the Mashpee Wampanoag Tribe or other Tribes that Mr. Cromwell would be in a position to further rather than – as the Government claims – the only plausible reasons for the donations must be a *quid pro quo* bribes.

Finally, to the extent the Government "quibble[s]" with Attorney Skip Durocher's background or the bases for his opinions, those challenges go to "weight and credibility" of testimony "not its admissibility." *McCullock v. H.B. Fuller Co*., 61 F.3d 1038, 1043 (2d Cir. 1995); *see also Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 186

4

(2d Cir. 2001) ("to the extent that [defendant] asserts that there were gaps or inconsistencies in the reasoning leading to [expert witness's] opinion such arguments go to the weight of the evidence, not its admissibility"); *Ji v. Bose Corp.*, 538 F. Supp. 2d 354, 359 (D. Mass. 2008) (questions of reliability and credibility "are for the jury to decide").

For all of the foregoing reasons and the reasons detailed in Mr. DeQuattro's initial Opposition to the Government's Motion in Limine to Partially Exclude Defense Expert, the defense respectfully requests this Honorable Court to deny the Government's Motion in Limine and to admit the expert testimony of Attorney Durocher.

Respectfully Submitted,

**/s/ Martin G. Weinberg**
Martin G. Weinberg
Mass. Bar No. 519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net

Dated: October 8, 2021

## CERTIFICATE OF SERVICE

I, Martin G. Weinberg, hereby certify that on this date, October 8, 2021, a copy of the foregoing documents has been served via pacer on all relevant parties.

**/s/ Martin G. Weinberg**
Martin G. Weinberg

5

0120

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


```
                                )
UNITED STATES OF AMERICA,       )
                                )              Criminal Action
          Plaintiff,            )              No. 20-10271-DPW
                                )
v.                              )
                                )
CEDRIC CROMWELL and             )
DAVID DEQUATTRO,                )
                                )
          Defendants.           )
                                )
```


BEFORE THE HONORABLE DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE


MOTION HEARING


November 3, 2021
1:12 p.m.



John J. Moakley United States Courthouse
Courtroom No. 1
One Courthouse Way
Boston, Massachusetts  02210

Kelly Mortellite, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 3200
Boston, Massachusetts  02210
mortellite@gmail.com

```
 1    APPEARANCES:

 2    Counsel on behalf of United States:
      Christine J. Wichers
 3    Jared C. Dolan
      United States Attorney's Office MA
 4    1 Courthouse Way
      Suite 9200
 5    Boston, MA 02210
      617-748-3278
 6    christine.wichers@usdoj.gov
      jared.dolan@usdoj.gov
 7
      Counsel on behalf of Defendant Cedric Cromwell:
 8    Timothy R. Flaherty
      699 Boylston Street, 12th Flr.
 9    Boston, MA 02116
      617-227-1800
10    timothyrflaherty@gmail.com

11    Counsel on behalf of Defendant David DeQuattro:
      Martin G. Weinberg
12    Martin G. Weinberg, PC
      20 Park Plaza
13    Suite 1000
      Boston, MA 02116
14    617-227-3700
      owlmgw@att.net
15

16

17

18

19

20

21

22

23

24

25
```

<pre>
 1                    P R O C E E D I N G S
 2            COURTROOM CLERK:  Criminal Action Number 20-10271,
 3   United States v. Cedric Cromwell and David Dequattro.
 4            THE COURT:  Well, the terms of engagement have
 5   remained the same.  That is to say if people are comfortable
 6   with masks on or not masks on, that's up to you.  I leave that
 7   to you in terms of the way in which you want to be in the
 8   courtroom.  We've got a limited number of people in the
 9   courtroom now.
10            And as you can see, Ms. Beatty and Ms. Mortellite and
11   I will not be wearing masks here because we've worked together
12   in various ways.  That doesn't necessarily define how the trial
13   itself is going to be run, but at this stage that seems to be
14   the appropriate way to proceed.
15            What I hope to accomplish today is to be able to
16   address the questions that are presented by Mr. Durocher.  And
17   I think I probably can narrow this a bit.  My general view is
18   that, except for anything having to do with some knowledge
19   about the way in which relationships and gift-giving perhaps in
20   the context of tribal affairs takes place, that what
21   Mr. Durocher has to offer to me is in the nature of legal
22   argument.
23            I'll be happy to receive an amicus brief from him, but
24   it's not going to be in the form of expert testimony.  I tell
25   the jury what the law is.  I try to be as informed as I can be,
</pre>

```
1    but I don't play the role of Edgar Bergen to Mr. Durocher's
2    Charlie McCarthy.  So on that, I think we don't have to deal
3    with that issue.
4          What we do have to deal with is what Mr. Durocher has
5    to offer that's admissible with respect to the
6    interrelationships in tribal culture that might in some fashion
7    impact what's considered to be a gratuity or a bribe or simply
8    hospitality or accommodation.
9          I'm not sure that this is the subject of admissible
10   expertise here, but I wanted to afford the opportunity to the
11   government to inquire on the basis of the proffer that's been
12   given so far because that's going to define the metes and
13   bounds of this.  And so I'm going to look to the government to
14   examine Mr. Durocher.  Assume that I'm familiar with his
15   proffer.  You can bring out whatever you think you want to
16   bring out as bearing on those issues, and if there are other
17   matters covered by cross-examination, not by a desire to
18   enhance the previous submission, I'll listen to those as well.
19         So I don't know who is going to be doing the
20   examination.
21             MR. DOLAN:  I am, Your Honor.
22             THE COURT:  And is Mr. Durocher under oath at this
23   point?
24             COURTROOM CLERK:  Not yet.
25             THE COURT:  Okay.
```

```
 1              VERNLE SKIP DUROCHER, Sworn
 2              COURTROOM CLERK:  Please state your full name.
 3              THE WITNESS:  My name is -- it's actually Vernle Skip
 4    Durocher.  I go by "Skip."
 5    EXAMINATION BY MR. DOLAN:
 6    Q.   Mr. Durocher, can you hear me?
 7    A.   I can hear you fine, yes, thank you.
 8    Q.   My name is Jared Dolan.  I'm one of the prosecutors on the
 9    case.  I guess my first question is how did you become involved
10    in this case?
11    A.   Oh, about -- I don't know the timing, but I would say it
12    was over probably a year ago or maybe a year ago I was
13    contacted by an attorney for Mr. Dequattro who asked me a
14    little bit about my background and practice and ultimately
15    whether I would be willing to provide expert testimony in the
16    case.
17    Q.   And that was before the indictment was returned, correct?
18    A.   I believe that's the case.
19    Q.   Are you being paid in return for your expertise and your
20    participation in this matter?
21    A.   I am.
22    Q.   How much?
23              MR. WEINBERG:  I object to relevance for a Daubert
24    hearing.
25              THE COURT:  Yes, I think --
```

```
 1              MR. DOLAN:  That's fine, Your Honor.  I'll withdraw
 2       the question.
 3              THE COURT:  That may or may not be something that will
 4       be of interest to the jury.  It's not to me.
 5       Q.   Mr. Durocher, what documents or evidence did you rely on
 6       in forming your opinion?
 7       A.   Let's see, not a lot of documents.  I think ultimately I
 8       perhaps did see the indictment.  I've seen some reports that
 9       relate to some financial contributions or donations that
10       several attorneys made to Chairman Cromwell or to what they
11       thought was his campaign fund, some research that I did on my
12       own with respect to, you know, I looked at the federal statute
13       involved here.  Right now I don't know that I recall anything
14       else that I looked at.
15       Q.   When you say -- you mean the statute that is the subject
16       of the indictment?
17       A.   Correct.
18       Q.   Okay.
19       A.   Oh, and I also did look at the Mashpee laws to determine
20       whether there was any laws of the Mashpee Tribe that related to
21       political contributions.
22       Q.   I want to talk for a moment about the nature of your
23       practice.  Are you involved in criminal matters?
24       A.   Very rarely.  Certainly not on my non-Indian practice.
25       Just so you know, I've been doing Indian law for about 27 or 28
```

1    years I think.  But I do have a practice outside of Indian law

2    as well, and most of my practice on the outside of Indian law

3    relates to civil litigation, commercial litigation.  With

4    respect to tribal matters, on occasion I have had some criminal

5    law involvement but very little.

6    Q.   When you say "very little," approximately how often have

7    you appeared on criminal matters in tribal courts or federal

8    courts or state courts or any courts?

9    A.   Yeah.  No, I never -- I should always be careful about

10   saying "never."  I don't believe I've ever appeared on

11   behalf -- I take that back.  I did appear once on behalf of a

12   tribal member who was being indicted in federal court at an

13   initial appearance just to assist with respect to entering a

14   not guilty plea.  Otherwise, I have represented tribes and

15   tribal enterprises in matters that had criminal exposure.

16   Q.   And can you describe what those matters are.

17   A.   To the best of my memory, they were all tax-related.  So

18   that I was retained by either a tribe or a tribal enterprise or

19   in some instances individuals within the tribe who were being

20   charged by a state with state law criminal claims or criminal

21   prosecutions.

22   Q.   Anything related to anti-corruption?

23   A.   No.

24   Q.   Have you ever served as an expert before?

25   A.   I don't think I have.

1    Q.   And is that limited to the subject of your proposed

2    testimony in this matter or ever in relation to anything ever?

3    A.   Ever in relation to anything ever?

4    Q.   Have you ever written on the subject of elections and

5    campaign contributions related to Indian law?

6    A.   I have not.

7    Q.   You reviewed the expert disclosure in this case, correct?

8    A.   I did.

9    Q.   And that disclosure stated that you have experience

10   working with between 25 and 30 Indian tribes?

11   A.   That's correct.

12   Q.   And that's actually -- well, which tribes are those?  Can

13   you provide a few of those just to explain the breadth of your

14   experience.

15   A.   Sure.  It's a nationwide practice.  I've represented, for

16   example, the Las Vegas Paiute Tribe in Nevada, the Shakopee

17   Mdewakanton Sioux Tribe here in Minnesota, the Mashantucket

18   Pequot Tribe in Connecticut.

19   Q.   If you could slow down for one moment, if not for me, then

20   for the court reporter who is going to need to spell some of

21   those.

22   A.   I apologize.  Yes.  I was just mentioning the Keweenaw Bay

23   Indian community in Michigan, the Bay Mills Indian Tribe in

24   Michigan, the Winnebago Nebraska Tribe in Nebraska, the Oneida

25   Tribe in Wisconsin, let's see, the Meskwaki Tribe in Iowa.  I

1    can keep going on if you'd like.

2    Q.   That's fine for now.  You note before this case you didn't

3    have any prior experience with the Mashpee Wampanoag Tribe,

4    correct?

5    A.   No, other than just general knowledge about what was

6    happening with respect to that tribe.

7    Q.   Now, with the tribes you've named, you said you could keep

8    going on, so let's talk about your experience as a whole.  Did

9    you personally represent all of those tribes?

10   A.   Yeah, the ones I mentioned, I personally represented, yes.

11   Q.   Now, does your practice also include working with

12   businesses that want to do business in Indian country?

13   A.   Yes, or that do do business in Indian Country, both I

14   guess.

15   Q.   And when you were saying between 25 and 30 Indian tribes,

16   were you including those tribes in that list?

17   A.   No.  That would be -- the 25 or so tribes that I've

18   represented -- the 25 tribes that are mentioned are tribes that

19   I've represented.  In addition to that, I have worked with

20   various entities that are either doing business in Indian

21   Country or want to do business in Indian Country, and those are

22   probably with other tribes.

23   Q.   When you think of the tribes that you've personally

24   represented, are all of those tribes federally recognized?

25   A.   No.  There's a couple actually that were not federally

```
 1   recognized, and my work with those tribes -- and the two I'm
 2   thinking about, Schaghticoke Tribe and the Golden Hill
 3   Paugussett Tribe, both in the Northeast, neither of those were
 4   recognized, and I was working with them on federal recognition
 5   matters.
 6   Q.   Is it fair to say that doing business with Indian tribes
 7   is complex?
 8   A.   Yes.
 9   Q.   Each tribe is a sovereign nation?
10   A.   Correct, if it's -- well, yes.
11   Q.   Each tribe has a unique history?
12   A.   Correct.
13   Q.   Each tribe has unique laws?
14   A.   Well, I should say -- both with respect to history and the
15   laws, generally that is correct that they have unique
16   characteristics.  They also, I think many of them have common
17   characteristics on both laws and histories.
18   Q.   So some things in common, some things unique?
19   A.   Correct.
20   Q.   Same question as to rules within the tribe.
21   A.   To rules?
22   Q.   For example, they all have, many of them have their own
23   unique tribal courts, correct?
24   A.   Yes, many tribes have their own tribal courts.  Not all
25   but many.
```

1    Q.   And each of those tribes that have tribal courts have

2    different rules that apply within those tribal courts?

3    A.   Many of them have -- it's sort of the same answer I gave

4    before.  Many of them share many common characteristics, but

5    oftentimes there may be distinctions.

6    Q.   And they have unique customs with some similarities?

7    A.   Correct.  Some tribes, there may be similarities,

8    particularly among tribes who share a common background, but

9    different tribes have different customs.

10   Q.   There's approximately 538 federally recognized Indian

11   tribes?

12   A.   Yes, that's correct.

13   Q.   You have experience with less than 10 percent of those?

14   A.   I would say I have experience with more than -- well, I

15   don't know if 10 percent is correct.  It depends on what kind

16   of experience you're talking about.

17        As far as my specific representation of tribes, I've

18   mentioned the number that I've represented.  In addition to

19   that there would be other tribes that I have interacted with

20   when I've been representing entities, businesses or individuals

21   who are doing business with those tribes.

22        And then in addition to that, I have a lot of interaction

23   with tribes with whom I don't have a representation.  For

24   example, I attend conferences each year such as NCAIs, you

25   know, national conference, NAFOA National Conference, and many

1    of the tribes attend, and so I will have interaction with

2    tribes beyond just those tribes that I represent.

3    Q.   So I guess, so you represented less than 10 percent, but

4    you have general experience with more than that.

5    A.   That's correct.

6    Q.   In the course of your entire experience, is it fair to say

7    that there are a few, call them best practices that you've been

8    familiar with doing business with Indian tribes?

9    A.   Maybe you can be a little bit more specific on what you

10   mean by "best practices."

11   Q.   Sure.  So in your experience, is it fair to say that most

12   tribes expect non-Indians to support the internal

13   capacity-building of their tribe when they're doing business

14   with non-Indians?

15   A.   What do you mean by "internal capacity-building"?

16   Q.   Well, okay.  I'll provide an example.  Non-Indians are

17   expected to pay for the time and expenses of tribal officials

18   often?

19   A.   No.  I guess I'm not -- if I understand your question, I'm

20   not aware of that.

21   Q.   Okay.  What about attorneys' fees?

22   A.   What about attorneys' fees?

23   Q.   If a non-Indian business is doing business with a tribe,

24   what's the expectation of that business as to pay for the fees

25   and expenses of tribal officials during the transaction?

1    A.    Oh, well, I think that is probably specific to the types

2    of transactions that we're talking about.  For example, I've

3    done a fair number, fair amount of work with tribal Indian

4    Gaming Commissions where the tribal Gaming Commission's job is

5    to investigate the background of management companies for the

6    tribe.

7          And as part of the arrangement there for them to be doing

8    business with the tribe, the management company is required and

9    was required to pay the expenses, including attorneys' fees, of

10   the Gaming Commission.  So there --

11   Q.    There -- go ahead.  Sorry.  I cut you off.

12   A.    That's all right.  So that's just one example.  I'm sure

13   there are others as well if I thought about it where there were

14   arrangements where there was an expectation that the outside

15   entity would be paying the fees for the tribe or the tribal

16   entity or enterprise with whom it's doing business.

17   Q.    Do you know who Troy Eid is?

18   A.    Yes.

19   Q.    He's a partner with Greenberg Traurig?

20   A.    Yes, out of their Denver office, I believe.

21   Q.    Like you, he co-chairs his firm's Indian law practice

22   group?

23   A.    I think that's right.  I'm a co-chair, by the way, and I

24   can't remember if he's the chair or co-chair, but I do

25   understand he has a management role with the Native Indian

1    practice.

2    Q.    Is it fair to say that he's a prominent and respected

3    person in the field of Indian law?

4    A.    I think that's fair to say.

5    Q.    So gift-giving is another common custom for many of the

6    tribes that you've encountered?

7    A.    Yes, I think that is fair to say.

8    Q.    It's typical for that to happen when doing business with a

9    tribal official?

10   A.    I think it's not unusual for it to happen, going both ways

11   actually.  I think gift-giving in the tribal culture is

12   generally understood and accepted and in some instances

13   expected.  And so I think there's been situations where tribal

14   members, tribes and tribal members will give gifts to people

15   with whom they do business and vice versa.

16   Q.    And is that true even for elected officials within a

17   tribe?

18   A.    Yes, I believe it is.

19   Q.    Fair to say that the monetary value of those gifts is

20   typically between $50 and $300?

21   A.    Most of my experience, I would say, would fall within that

22   range generally.  It may exceed 300, but my own personal

23   experience has probably been somewhat in that range.

24   Q.    Fair to say that some tribes don't allow gifts to elected

25   officials at all?

1   A.   Yes.  There are some tribes, for example, at least that I

2   believe the Navajo have laws that prohibit donations or

3   contributions particularly for a political campaign, so I think

4   you do need to look at what the tribe's laws are with respect

5   to such things.

6   Q.   It depends on the tribe?

7   A.   With respect to that particular issue, yes.  That's one of

8   the things I would do.  If I were being asked to make a

9   contribution, I would look to the tribe's laws to see if there

10  was anything that would prohibit it.

11  Q.   Let's focus a little bit more on the payment of

12  non-Indians to tribal elected officials in the context of

13  campaign contributions.  Do you understand the area I'm going

14  to focus on now?

15  A.   Yeah, I think so.

16  Q.   This is probably the least common form of contributions

17  that happen in the context of this line of work, correct?

18  A.   You know, I don't know that that's the case.  It very well

19  could be, and I say that only from my own personal experience.

20  I have not been asked to make such a donation.  I am aware that

21  others have been asked to and have in fact made such donations.

22  So I know it happens, and I know that other types of gifts and

23  donations are made as well.  I don't know that I could tell

24  you, you know, what percentage falls into one category and what

25  percentage falls into another.

1    Q.    Is it fair to say that it can be an ethically gray area?

2    A.    No, I don't know that I'd say it's an ethically gray area.

3    Again, you know, what I can tell you is that if I were asked to

4    make a donation, I could tell you the steps I would go through.

5    And as I've mentioned, I would first look to see if there was

6    anything in the tribe's laws that prohibit it.

7         And like I said, I know, for example, Navajo, I believe

8    there are laws that prohibit it.  With respect to Mashpee, you

9    know, I looked at their constitution and ordinances and saw

10   nothing that prohibits it.  So that's the first thing I would

11   look at.

12        And then if that was okay, I would look perhaps to see if

13   there was any other federal or state laws that might apply, but

14   I wouldn't ordinarily expect there could be federal or state

15   laws that would apply to my -- to a potential donation by me to

16   a tribal official.

17        And then, you know, the next thing I would do, again, just

18   from my own perspective, would be to make sort of a, maybe

19   you'd call it a political assessment of whether it would be a

20   wise thing for me, you know, from a political standpoint to

21   make such a donation because, you know, you've got to be

22   careful about perception of who you may be supporting or not

23   supporting within a tribal community.

24        And then the last thing probably for me would be checking

25   with my -- if it was going to be a reimbursable matter, so if I

1    was going to make a donation and I viewed it as something the

2    firm would reimburse me for, I would probably check with, you

3    know, perhaps my firm management to make sure they didn't have

4    a problem with it, depending on the size of the contribution.

5         If it was going to be a personal one, I can tell you the

6    person I would then check with would be my wife because she may

7    or may not agree with what I'm proposing.

8         But I don't know from an ethics standpoint.  I mean, I

9    guess it could become an ethics issue if there were laws that

10   prohibited it.  But I don't know that otherwise, unless it was

11   connected to a quid pro quo, you do this for me and I'll do

12   something back for you, then I believe it could have ethical

13   implications.  But without a quid pro quo and without laws

14   prohibiting it, I don't know that I would consider it an

15   ethically gray area.

16   Q.   And let's be clear, this is an area that has been criminal

17   in the past regarding tribes, correct?  Campaign

18   contributions --

19   A.   I assume that it has been --  I'm sorry, I didn't mean --

20   Q.   I'm sorry.  I just want to make sure I'm clear with the

21   question I'm asking you.  Regarding campaign contributions by

22   non-Indians to tribal leaders, that's a potentially criminal

23   area in the past in your experience, right?

24   A.   I assume it could be, depending on the laws at issue and

25   the tribal laws at issue.  It could be, I suppose, civil or

1    criminal.  And again, if it was a quid pro quo and an attempt

2    to do a bribe, that would be a different story.  But just a

3    pure political contribution, again, if there was no tribal

4    prohibition, I'm not sure that it would rise to a criminal

5    issue.

6    Q.   Well, that has happened in some of the tribes that you've

7    represented, albeit not with tribes during the course of your

8    representation, true?

9              MR. WEINBERG:  I object, relevance.

10             THE COURT:  Well, no.  He can answer.  We're exploring

11   the degree of his familiarity with the practice, so I'll permit

12   him to answer that question.

13   A.   I guess I'd have to say I'm not aware of that.  I'm not

14   saying it did or didn't, I'm not aware of a particular instance

15   of that.

16   Q.   You're not familiar with the name Timothy White Eagle?

17   A.   Yes, yes, I am.

18   Q.   And so that involved a member of the tribal council

19   accepting bribes in the form of campaign contributions, right?

20   A.   You're right.  Many years ago, but you're right, what was

21   then called the Wisconsin Winnebago Tribe, now called the

22   Ho-Chunk Tribe.

23   Q.   One of the tribes you represented or have represented?

24   A.   Represented, correct.

25   Q.   You're familiar with the name Fred Dakota?

1    A.    I am.  He recently passed away.

2    Q.    He did, recently, I believe, semi-recently.

3    A.    Yeah.

4    Q.    But back in the day he was also convicted of accepting

5    bribes related to gaming.

6    A.    Yeah.  I don't know the circumstances of that.  I know

7    Fred Dakota went to federal prison many years ago with respect

8    to a gaming-related matter, but I don't know the details of it.

9    It was before I was representing that tribe.

10   Q.    And that's not something you made a point to become

11   familiar with in the context of forming your opinion?

12   A.    No.  That Mr. Dakota went to prison?

13   Q.    Or any tribal leaders that have accepted or -- have

14   accepted a campaign contribution and subsequently been

15   convicted of federal crimes.

16   A.    No.  My opinions here are based upon the analysis that I

17   just mentioned that I would go through when deciding whether I

18   might make a contribution.

19   Q.    So regardless, when non-Indians make campaign

20   contributions to tribal leaders, in your experience -- and by

21   "experience," I suppose I mean what you've heard of since you

22   don't have personal experience -- such payments are typically

23   small?

24   A.    What do you mean by "small"?

25   Q.    A few hundred dollars.

1  A.   Yeah, I think, you know, there's not a lot of information

2  out there, I guess I'd say, as to the size of contributions.

3       My recollection from the Mashpee interview notes that I've

4  seen involving Chairman Cromwell involved Kent Richey from

5  Faegre, which I think the amount of his contribution was like

6  $250 or something like that.  My recollection of the Tilden

7  McCoy contribution was more substantial.  I want to say that

8  one was maybe $5,000 or thereabouts.

9       But, so I think they probably run the gamut, would be my

10 guess, depending on the nature of the election, the

11 relationship between the attorney or the vendor and the tribal

12 council member and other things.

13 Q.   When you say there's not a lot of information out there

14 about that, you're aware that there are many tribes that have

15 campaign finance rules, correct?

16 A.   Yes.  I already mentioned the Navajo that do, and I assume

17 there are others that do as well.  What I meant by that was

18 that I don't know that -- at least -- what I would know mostly

19 about would be other attorneys because I have a fair amount of

20 interaction with other attorneys who practice Indian law.  It's

21 a relatively small Indian Bar.  And I don't know that attorneys

22 really go out and advertise or, you know, share with one

23 another how much money they might contribute to a political

24 campaign.

25 Q.   Well, you're aware that many of the tribes that do have

```
 1    campaign finance laws, they also have public disclosure of the
 2    amount of the campaign contributions, aren't you?
 3               MR. WEINBERG:  I object, Your Honor.  This is
 4    irrelevant to Mashpee.
 5               THE COURT:  It may or may not be, but in any event,
 6    I'll permit it as to Mr. Durocher's awareness of practices
 7    generally.
 8    A.   Could you repeat the question, please.
 9    Q.   You're aware that there are -- that many of the tribes
10    that have campaign finance laws have public disclosure of the
11    amounts that are contributed to individuals running in tribal
12    elections, aren't you?
13    A.   Yeah.  No, I don't know that I'm aware of that.  I know
14    different tribes have different laws with respect to what can
15    and can't be disclosed -- or can't be contributed.  I don't
16    know about the disclosure aspect.
17    Q.   And you're not familiar with those laws?
18    A.   Which laws?
19    Q.   The laws regarding campaign finance as to other tribes
20    regarding what can and can't be disclosed and what can and
21    can't be given, other than the Navajo that you previously
22    mentioned.
23    A.   Yeah, no.  As you mentioned earlier, there's some 538
24    federally recognized tribes.  Each tribe has its own laws, and
25    some may have laws with respect to campaign contributions.
```

1    Many do not.

2         And so the only reason I would have to look at them is if

3    I were asked to make a campaign contribution, or I suppose if a

4    client asked for that, but I'm generally aware that some tribes

5    have such laws; some tribes do not.

6    Q.   And yet, in your expert disclosure you said, I'll quote it

7    for you if you don't have it in front of you, "Donations for

8    tribal powwows, native dancing groups, golf tournaments that

9    raise money for Indian scholarships and political campaigns are

10   routinely made."

11   A.   Yes.

12   Q.   Can you -- I mean, based on what you've said today, can

13   you say that donations for political campaigns are routinely

14   made?

15   A.   Oh, yes, I can.  I do believe based upon my understanding

16   in Indian Country that donations for political campaigns are

17   routinely made.

18   Q.   And you've never been asked for a donation?

19   A.   I have not, no.

20   Q.   And you've heard hearsay from others that they may have

21   provided donations?

22   A.   Correct, and I'm aware of the particular donations with

23   respect to Chairman Cromwell.  Mr. Richey who I know pretty

24   well from Faegre and Tilden McCoy that I'm familiar with, and

25   that's consistent with my understanding that not just lawyers

1    but other vendors and, you know, service providers are asked to
2    make political contributions and do make political
3    contributions.
4    Q.   But you understand that your expert testimony doesn't just
5    apply to the Mashpee.  It applies to Indian tribes generally,
6    correct?
7    A.   Correct.  Just what I believe to be a common practice or
8    what I understand to be common practices in Indian Country and
9    the reason for those and that sort of thing, so yes.
10   Q.   Of the over 500 recognized tribes in the United States,
11   538 as we previously said, are you aware that at least 100 of
12   those tribes have created written ethics related laws or other
13   guidance on this matter?
14   A.   I'm not aware of that number, but I wouldn't argue with
15   you about that.  It wouldn't surprise me.
16   Q.   How many of those did you commit -- did you consult in
17   forming your opinion about the propriety of donations to tribal
18   leaders?
19   A.   I didn't consult any of those.  As I mentioned, I
20   consulted the Mashpee laws to make sure that there were no
21   prohibitions there.  What I've testified to is that there are
22   some 500 Indian tribes in the country.  It doesn't surprise me,
23   it wouldn't surprise me that some of the more sophisticated
24   tribes would have passed some sort of ethics requirements or
25   rules with respect to political contributions.  It also means

1   that there's some 400 that have not done so.  And that would be
2   consistent with my general understanding in Indian Country that
3   political donations are requested and made with respect to
4   tribes.
5   Q.   But I believe your testimony is that they are routinely
6   made.
7   A.   Okay.
8   Q.   Is that true?
9   A.   I think I already answered that question, that, yes.  And
10  I certainly didn't testify that they are routinely made with
11  tribes who do have laws that prohibit such donations or
12  contributions.  They certainly may be made, I suppose, if
13  someone is not aware of that or disregards it, but it also
14  means that four-fifths of the tribes in the country don't have
15  such laws if I accept your number.  So I think that my
16  statement is a fair statement.
17  Q.   And other than the Mashpee Tribe, which you only became
18  familiar with in connection -- on this matter, only become
19  familiar with in connection with this litigation, you can't say
20  at all or you can't give any opinion as to the typical amount
21  of those contributions regarding tribal leaders as a whole?
22  A.   I'm -- I'm sorry.  I think I've lost you in your question.
23  Q.   So other than the familiarity you gained with the Mashpee
24  Tribe as to the amounts that Chairman Cromwell received --
25  A.   Right.

1    Q.    -- you don't have any information as to the typical

2    donation amounts given to tribal leaders in Indian Country as a

3    whole?

4    A.    No, I do not have that information at hand and could not

5    testify to what the typical amount is or the average amount.

6              MR. DOLAN:  Okay.  One moment, Your Honor.

7              (Government counsel confer off the record.)

8              MR. DOLAN:  Your Honor, I don't have anything further

9    at this time.

10             THE COURT:  All right.  Mr. Weinberg.

11             MR. WEINBERG:  Thank you, Your Honor.

12   EXAMINATION BY MR. WEINBERG:

13   Q.    Good afternoon, Mr. Durocher.

14   A.    Good afternoon.

15   Q.    Is there anything unique about tribal decisionmaking when

16   there is an RFP out and non-tribal businesses are competing or

17   seeking business with a tribe?

18   A.    In my experience, yes.

19   Q.    And quickly, how vast is your experience at being present

20   when tribes make decisions on RFPs where different non-tribal

21   businesses are competing?

22   A.    Right.  I guess my experience is twofold.  One is

23   assisting tribes when they are making decisions with respect to

24   retaining some outside vendor, whether it's a banker, an

25   insurance broker, private investigator, an accounting firm, so

1    I have participated with some of my tribal clients in helping

2    them make those decisions and observing them in tribal council

3    meetings make those decisions.

4         And then my other part of that would be my own submission

5    of RFPs, responses to RFPs with tribes and then talking to

6    tribes afterward about why perhaps my firm was or was not

7    selected.  So I think it's probably two types of experience I

8    have.

9    Q.   And is there anything unique when you contrast

10   decisionmaking on RFPs for non-tribal decisionmakers in

11   contrast to tribal decisionmakers deciding whether or not to

12   select, retain and contract with a non-tribal business?

13   A.   I would say yes.  In my experience with -- on both sides

14   of the coin that I just mentioned, I would say that tribes put

15   a lot more emphasis on the vendor's experience in Indian

16   Country, its involvement in Indian Country, its interest in

17   Indian Country as opposed to experience -- my experiences

18   outside of Indian Country and with tribes is that there's more

19   emphasis placed on just, you know, what's this lawyer's

20   experience or this vendor's experience, how much is it going to

21   cost me?  Those are a lot of times what are focused on outside

22   of Indian Country.

23        Inside Indian Country there's a lot more emphasis placed

24   on, you know, is this just a white person trying to take

25   advantage of my tribe versus, you know, have they demonstrated

1    that they have a commitment to Indian Country and perhaps a

2    connection to Indian Country.

3    Q.   What significance to a non-tribal business without a great

4    deal of experience in Indian Country would a referral from an

5    Indian tribe leader in one tribe have for a business competing

6    for business with other tribes?

7    A.   It can carry a lot of weight.  If it's someone who is

8    going to vouch for you, if you will, who is highly respected in

9    Indian Country and can talk about not just how good you are at

10   what you do but that they personally have a trust, have built

11   up a trust with you, have a longstanding relationship with you,

12   in my view, in my experience that can go a long way toward

13   another tribe or tribal council who perhaps doesn't have

14   experience with you.  It can go a long way toward them taking

15   comfort and having more interest in retaining you.

16   Q.   How would a non-tribal business, in what ways would a

17   non-tribal business, you know, what would they do in your

18   experience to gain the credibility, to gain the trust and to

19   gain the referral of credible and important tribal leaders if

20   you were looking for businesses with other tribes?

21   A.   Again, in my experience, and this is based on my own

22   practice and observations, is building up a rapport and a

23   personal relationship with whoever it is that might be

24   providing you that referral.

25        In my own experience, you know, do I spend time with this

1   person where I'm not billing them; do I take a personal

2   interest in their lives; do I attend a retirement party with

3   them or someone in their family; do I attend a funeral, those

4   sorts of things; do I take them to dinner, break bread with

5   them?  Those are the kinds of things that --

6           MR. DOLAN:  I would object as to relevance.

7           THE COURT:  No.  I'm going to permit it.

8   A.   Those are the kinds of things that in my experience have

9   built up my relationships with tribal clients who I think then

10  can go a long way toward them having confidence in me and

11  confidence in my interest in helping Indian Country.

12  Q.   Are you familiar with non-tribal businesses giving gifts,

13  giving gratuities, giving --

14          THE COURT:  Is the term you want to use "gratuity"?

15          MR. WEINBERG:  Yes, Your Honor.

16  Q.   Giving gifts, giving gratuities, giving campaign

17  contributions, any of the above, to tribal leaders in a hope

18  that they would promote or support the business with other

19  tribal leaders?

20          MR. DOLAN:  I would object as a compound question.

21          THE COURT:  Well, I'll hear the answer.  But of course

22  the core of this is whether or not he has any view with respect

23  to quid pro quo because that's all this case is about is quid

24  pro quo.  Context is another matter.  But we're dealing with

25  the requirement that the government prove a quid pro quo, and I

1    don't understand him to be saying that if the government proves

2    a quid pro quo that that is countenanced in Indian Country.

3    But maybe you'll develop that information.

4         MR. WEINBERG:  And to be clear, Your Honor, I'm

5    offering this expert to demonstrate the reasons why a

6    businessperson would give campaign contributions.

7         THE COURT:  That may be so, but that's not what this

8    case is going to be going to the jury on.  It's going to be

9    going to the jury on whether or not there is evidence of a quid

10   pro quo.  So the focus of the testimony has to be on that.

11   I'll listen to whatever he has to say, but so far I haven't

12   heard anything that goes to the core of the case.

13        MR. WEINBERG:  Respectfully, Your Honor, so I at least

14   can explain our position, which is, that the key is whether or

15   not Mr. Dequattro gave donations to Mr. Cromwell --

16        THE COURT:  That may be so, but it's not going to be

17   proved by somebody saying that sometimes it happens and

18   sometimes it doesn't.  There's going to have to be substantial

19   evidence that puts that into dispute.

20        MR. WEINBERG:  And I will --

21        THE COURT:  So the point is, I'll listen to the

22   government's case in chief.  If they prove or offer sufficient

23   proof of a quid pro quo, then maybe we'll think about other

24   matters.  But the meandering conversations by someone who is

25   familiar with NAIC, if I'm correct about that, which is 250

1    tribes and all of the recognized tribes, 538, but yet we

2    haven't heard anything about familiarity with actual practices

3    in Mashpee, and we've heard a great deal about differences

4    among customs and history and that sort of thing.

5         So I want to be clear that I'm looking at this in

6    terms of the government's case in chief.  And if it comes in in

7    some other fashion or is admissible in some other fashion, I'll

8    think about it in some other fashion.  But right now it's got

9    to be focused on that.

10        MR. WEINBERG:  It's being offered not to -- frankly,

11   Judge, I think the government has no direct evidence of a quid

12   pro quo.

13        THE COURT:  That may be so.  That's why we have

14   trials.  And so that's why we have order of proof.  And the

15   order of proof in this case rests with the government

16   initially.  On the other hand, a criminal defendant does not

17   have the capacity or the right or the authority to introduce

18   his own scienter, contention of his scienter through a cat's

19   paw in the form of a purported expert.

20        So that's the line that I'm kind of drawing, and I'll

21   continue to evaluate it, but this kind of generalized

22   discussion has not advanced that position.

23        MR. WEINBERG:  I would ask the Court to defer any

24   final rules on the expert --

25        THE COURT:  Nothing is over until it's over, but I

1    want to give the parties what they're entitled to for a motion

2    in limine, which is an understanding of the way in which the

3    case is likely to unfold and an opportunity to respond to it.

4           MR. WEINBERG:  I will produce evidence that as a

5    predicate that I think is a necessary foundation for any expert

6    testimony that Mr. Dequattro was in fact seeking from

7    Mr. Cromwell future opening of doors to other tribes so that

8    they could --

9           THE COURT:  We'll see when that comes in.  It's not

10   before me now.  And this witness, I don't believe, is familiar

11   with it.  But maybe you can ask this witness whether he's

12   familiar with this evidence that you say might be coming in at

13   some future point.

14          MR. WEINBERG:  Well, he's not specifically familiar

15   with the --

16          THE COURT:  Then I can't look to him, and he hasn't

17   been presented with a hypothetical on that, and he's certainly

18   not an expert on scienter.

19   BY MR. WEINBERG:

20   Q.   Are you familiar with -- you've represented non-tribal

21   businesses trying to do businesses with tribes, have you not?

22   A.   I have.

23   Q.   And you've guided them and provided legal opinions and

24   business strategical opinions to them as to how they can

25   overcome the tribe's distrust and earn an opportunity to do

1    business, have you not?

2    A.    I have.

3    Q.    Casino businesses are profitable for a wide variety of

4    vendors, are they not?

5    A.    They certainly can be.

6    Q.    And many of the vendors are non-tribal vendors, non-tribal

7    contractors who are seeking to sign contracts and do business

8    with tribes as they build casinos, correct?

9    A.    Yes, that is correct.  There are some tribal ones as well

10   now, and there can be some competition between the tribal and

11   non-tribal, and that can be a challenge for the non-tribal as

12   well to get business from tribes when they have tribal

13   competitors.  But, yes, there are still many non-tribal

14   entities out there with sophistication and experience who are

15   trying to do business with tribes in the gaming world.

16   Q.    So assume the following few facts:

17         One, that Mr. Dequattro was the principal owner of an

18   architectural and owner's representative firm that was

19   assisting the Mashpee Gaming Authority and the Mashpee Tribe in

20   their construction of a casino in the years 2014 through 2016.

21         Assume further that Mr. Dequattro and his business, RGB,

22   saw the work for Mashpee as potentially leading to similar work

23   for other tribes which would generate income and generate a new

24   specialty for their overall business.

25         Assume that Mr. Dequattro and RGB had no other

1    affiliations with any tribes other than Mashpee and no

2    affiliation with any tribal decisionmakers other than

3    Mr. Cromwell.

4        Assume that Mr. Cromwell asked Mr. Dequattro for political

5    donations, asking specifically on a number of occasions to

6    please fund his campaigns, either his own personal campaigns or

7    the campaigns of others that he was supporting in elections

8    that occurred during the time period.

9        Do you have an opinion as to whether or not

10   Mr. Dequattro's ability to motivate Mr. Cromwell to open the

11   gates to other business with other tribes would be positively

12   or negatively affected by his agreeing to give such donations

13   upon Mr. Cromwell's request?

14   A.   Yes, yes, I do have an opinion on that, and it's this:

15   that the business, architectural business, developer business,

16   management business in the gaming world can be very lucrative.

17   And if you can develop an expertise and a niche in the gaming

18   world to provide services to a tribe that is involved in gaming

19   -- there's, as we talked about, I think, you know, 538 tribes,

20   and many of them do gaming -- it opens up the door for you to

21   do business with more of those tribes.

22       And so in my opinion, if Mr. Dequattro could develop a

23   good relationship with Chairman Cromwell and Chairman Cromwell

24   has a reputation in Indian Country that he's developing through

25   his work with NCAI, I do believe that that could help open the

doors through referrals and through publicity and marketing
with other tribes that know that Mr. Dequattro has done good
work for the Mashpee Tribe and that Chairman Cromwell would
vouch for him.

Q.   And if his company, Mr. Dequattro's company had only
experience in assisting in casinos with a single tribe and no
other experience or widespread experience in tribal affairs and
was competing with architects or owner's reps that had multiple
experiences with different tribes, would the referral by
Mr. Cromwell have any particular significance in contrast to a
referral to a non-tribal decisionmaker in parallel but
different circumstances?

A.   Yes.  And this goes back to the comment I made earlier
that when you're trying to break into Indian Country and
provide services in Indian Country, I think in my experience,
based on the tribes I have worked with or tried to work with,
there's much more trust and willingness to work with entities
and persons who have a demonstrated involvement in Indian
Country.

      So if you have just involvement with one tribe, the fact
that you can have a good referral from that tribe, and
particularly from someone who has a sort of a national
preeminence or a reputation from that tribe, can go along way.
So yes, I do think that it would carry a lot of significance.

Q.   One last hypothetical.  Assume the following:

1          That Mr. Cromwell, the tribal leader of Mashpee, asked
2     Mr. Dequattro for political donations in the amount of $10,000
3     on multiple occasions.
4          Assume that Mr. Cromwell did not threaten Mr. Dequattro,
5     there's no evidence, assume there's no evidence that
6     Mr. Cromwell pressured him or threatened him or promised to do
7     anything in exchange for these political donations.
8          Assume further Mr. Cromwell did nothing for him.  Assume
9     there is no evidence that Mr. Cromwell acted any different for
10    his company than any of the other multiple vendors or
11    contractors on the casino project.  Assume they had a contract
12    that had been signed before the first request for a donation.
13         Assume further that the Gaming Authority as a whole and
14    the developers, Genting in particular, were all very happy with
15    the competence and the performance of RGB, Mr. Dequattro's
16    company, throughout the term of their work on behalf of the
17    Gaming Authority.
18         Assume that Mashpee has no ordinances that prohibit gifts
19    or contributions or political donations.  Assume further that
20    there are no rules in the State of Massachusetts that prohibit
21    campaign contributions or, in that fact, companies reimbursing
22    campaign contributions.  And assume, as you know, that there's
23    no federal regulation of contributions by companies or
24    individuals to tribes.
25         Assume that Mr. Dequattro, like Mr. Cromwell, believed him

1    to be a forceful leader and believed that his re-election would

2    be in the best interests of the tribe.

3            THE COURT:  There will be evidence of this?

4            MR. WEINBERG:  There will be evidence --

5            THE COURT:  That Mr. Dequattro believed him to be a

6    forceful leader and that he was good for -- where would this

7    evidence come from?

8            MR. WEINBERG:  The evidence will come from persons who

9    Mr. Dequattro worked with, spoke with.

10           THE COURT:  To whom he spoke and expressed these

11   views, is that it?

12           MR. WEINBERG:  Yes.

13           THE COURT:  Okay.  This is -- I'll listen to the

14   answer to this question, but this is a question of a witness

15   who is being asked, assume that the case is one in which there

16   is evidence of a quid pro quo.  Has the defendant in this case

17   acted properly if he has as a collateral and future desire to

18   deal with other Indian tribes?

19           MR. WEINBERG:  With all due respect, Your Honor --

20           THE COURT:  With all due respect, that's what this

21   case is about.  This is not about creating a context that is

22   dehors the record.

23           So I want to be as clear as possible.  You can make

24   whatever record you want.  I'm going to test that record very

25   carefully, but I must tell you that this is not an occasion to

1    avoid the responsibility of a party to introduce the relevant

2    evidence in a case before it goes to the jury.  And right now

3    you've told me that Mr. Dequattro had said nice things about

4    Mr. Cromwell to other friends and that's going to be the

5    evidence that supports a lack of scienter.

6              MR. WEINBERG:  Along with all of the other predicates

7    to the hypothetical, Your Honor, but there will be no evidence

8    of quid pro quo.

9              THE COURT:  So you say.  If that's the case, then

10   there will be a motion for a judgment of acquittal at the

11   conclusion of the government's case, and I'll act on it.

12             MR. WEINBERG:  And it will be a serious one, Judge.

13             THE COURT:  It may well be.  I assume that most people

14   don't submit to me humorous motions for judgment of acquittal.

15   So yes, I assume it wouldn't be mounted unless there was a good

16   faith basis for mounting it.

17             But I want to be as clear as possible that we don't

18   present lawyers to offer hypothetical answers to questions that

19   go to scienter.

20             MR. WEINBERG:  And I will not, Your Honor.

21   Q.   I'm asking about, would it be to the business benefit of

22   Mr. Dequattro and RGB were they to provide donations that were

23   requested by Mr. Cromwell with no quid pro quo in exchange and

24   no threat and no extortion and no bribery in order to enhance

25   RGB's opportunities through referrals for Mr. Cromwell to get

1    future business.

2    A.    And based on the hypothetical and the facts that you've

3    asked me to assume, the answer would be yes, that there would

4    be a lucrative market out there for Mr. Dequattro to hopefully

5    exploit, and that market would be made more available to him if

6    he had a proponent such as Chairman Cromwell who had built up

7    faith and trust in him.

8              MR. WEINBERG:  Thank you very much, Mr. Durocher.

9              THE COURT:  Let me ask a further question then.  Does

10   your answer remain the same if the contribution to Mr. Cromwell

11   was a quid pro quo?  That is to say would it be helpful in

12   developing business to make quid pro quo payments to members of

13   the tribe and then count on those members of the tribe in the

14   future to provide vouching services?

15             THE WITNESS:  So I'm having trouble seeing -- is that

16   Your Honor that's asking that question?

17             THE COURT:  Yes.  I'm sorry.  This is Judge Woodlock

18   wondering whether your answer would change if there was an

19   undisclosed quid pro quo that was paid by someone like

20   Mr. Dequattro to Mr. Cromwell both for a particular contract

21   that is one under the control or supervision of Mr. Cromwell

22   and the opportunity for future vouching services.

23             THE WITNESS:  Yeah.  Let me think about that for a

24   second.  Because I think what I'm saying, Your Honor -- and I

25   don't know if this will be directly answering your question,

1    but you'll tell me if it's not.

2          What I'm saying is that there is certainly an

3    independent basis for Mr. Dequattro to make a political

4    donation or contribution that would be independent of any quid

5    pro quo and just to seek the referral source or, you know,

6    Chairman Cromwell vouching for him, and that alone could be

7    very lucrative for Mr. Dequattro and his business.

8          So I think maybe what I'm saying is I can understand

9    why someone, and I think it makes sense in Indian Country for

10   someone to try to establish a rapport and a relationship with

11   someone like Chairman Cromwell to benefit their future business

12   and not to secure some quid pro quo.

13          THE COURT:  You say "not to secure some quid pro quo."

14   Are you telling me that they would never do that?  Because I've

15   asked really a question that has to do with perhaps a dual

16   purpose.

17          THE WITNESS:  Correct.

18          THE COURT:  And what you're saying is, as long as

19   there's one purpose, that's sufficient; it excludes the other

20   purpose?

21          THE WITNESS:  I think what I'm saying is, as long as

22   there's one purpose such as that, it would make a lot of sense

23   in Indian Country.

24          THE COURT:  I'm asking a different question.  Are you

25   saying that it's your opinion that the existence of one

1    purpose, which is not a quid pro quo, is sufficient to justify

2    a quid pro quo payment?

3         THE WITNESS:  I think -- and again, I want to make

4    sure I'm answering this correctly.  I don't know that I can say

5    that, you know, if what he's trying to do is secure the

6    referral source or Chairman Cromwell to vouch for him for

7    future work, I suppose that doesn't necessarily exclude some

8    other reason for also doing it, if that's what you're asking.

9         I can't say just because he wants to get future work

10   that that means that it's mutually exclusive of some quid pro

11   quo.  But what I'm saying is that I certainly can see why

12   someone, because of the way tribes generally view who they

13   would hire and why they would hire them, I can see why someone

14   would seek to obtain a referral source like Chairman Cromwell

15   for future work from that tribe or other tribes.

16        THE COURT:  Okay.  So this is really directed at a

17   kind of, is it fair to say a stereotype of what transpires in

18   Indian Country?  For example, would one say the same thing

19   about certain ethnic groups who certainly want to be assured

20   that they're someone they can break bread with?

21        THE WITNESS:  Yes, if I understand your question

22   correctly.  I think that that is particularly -- and believe

23   me, on my own RFPs, I do them with tribes and I do them with

24   many non-tribal clients.  And I do think there is a different

25   way that tribes look at who they will hire and who they will

1      put their trust in.  And if they don't have a longstanding

2      history with that person providing the services, then they look

3      to other demonstrations of good faith and, you know, bases for

4      trust.  And having a referral source or a voucher, someone who

5      vouches for you, such as Chairman Cromwell, could be very

6      beneficial and I think would help both Mr. Dequattro in, you

7      know, trying to secure such business and helping other tribes

8      make a decision on whether to hire Mr. Dequattro.

9              THE COURT:  Okay.  So if one has a prior experience

10     that involves quid pro quo -- which I take it you agree is

11     illegal?

12             THE WITNESS:  Right.

13             THE COURT:  -- a quid pro quo transaction, whether in

14     tribal country or in traditional construction, non-tribal

15     areas, if one has such an experience, then that is valuable for

16     purposes of future relationships with other tribal entities.

17     Is that basically what you're saying?

18             THE WITNESS:  Again, I just have to make sure I

19     understand.

20             THE COURT:  Let me be clear.  I think I have been.

21     This case is about whether or not in this particular

22     circumstance what was involved was a quid pro quo.  That some

23     other goals were being looked at, too, or might have been

24     looked at, too, is in some ways irrelevant.  It's the quid pro

25     quo here that I'm dealing with.

1          Now, if in the future case, that is the case in which

2     the referral turned out to be a successful one, there was no

3     complicity on the part of the second tribal entity in a quid

4     pro quo, that's a different case.  But that's the one that you

5     seem to be directing yourself to.  That is, what value there

6     would be for a future case.  And I'm concerned with the

7     relevance and materiality of your testimony here in this case.

8          THE WITNESS:  Right.

9          THE COURT:  So that's the distinction that I'm

10    drawing.  You are directing us to what might happen in some

11    future circumstance, and I'm trying to keep the focus of this

12    case on what happens here.

13         THE WITNESS:  Right.  I understand, Your Honor, and I

14    guess -- again, all I can do is tell you what my testimony and

15    opinion would be, and I think I've done that.  But I think I

16    certainly can't testify as to Mr. Dequattro's scienter or

17    whether there was a quid pro quo here.  That is not what I

18    understand my job to be.

19         What I have been asked to do I think is to present an

20    opinion that would show the jury that if Mr. Dequattro were to

21    testify that the only reason he did what he did was in the hope

22    of securing business elsewhere down the road and by doing that,

23    by creating this relationship with Chairman Cromwell, he hoped

24    to be able to garner business down the road, my opinion would

25    be that would be fully consistent with my experience in Indian

1    Country and with vendors trying to get business from tribes and

2    tribal entities.

3              THE COURT:  And your opinion depends on the exclusion

4    of the initial quid pro quo?

5              THE WITNESS:  My opinion assumes there was no quid pro

6    quo.

7              THE COURT:  Okay.  Now let me turn to a second

8    question.  We've talked a bit about or there's been testimony

9    with respect to a bit of the dimensions and variety of

10   structures within tribal organizations.  And your responses, as

11   I have understood them, have been that within areas of shared

12   history or shared custom or something like that, that there are

13   comparisons that can meaningfully be drawn, I suppose, is one

14   way of saying it, but there really are a variety of sovereigns

15   involved here, and sovereigns can be sovereign.

16             Are there any tribes with which you have previously

17   dealt that share history or you know to share custom with the

18   Mashpee Wampanoag?

19             THE WITNESS:  I guess what I'd say there, Your Honor,

20   is that I don't know from an ethnohistorical standpoint whether

21   some of the tribes in the Northeast that I've done work with,

22   you know, the Schaghticoke or Golden Hill Paugussett or the

23   Mashantucket and the Seneca are the ones -- and the Cayuga are

24   the ones in the Northeast that I've worked with.  I don't know

25   whether from an ethnohistorical standpoint they share a common

1    history.  I believe, based upon my experience, there are

2    certain more general customs that I believe tribes share.

3            THE COURT:  Well, that would apply to any tribe

4    anywhere, as I understand it.  And now I'm trying to focus on

5    your experience with tribes as to which you have knowledge

6    about their shared history.  And it may or may not be that the

7    Seneca share a history with the Mashpee Wampanoag, but you

8    don't know that, I take it.

9            THE WITNESS:  Yes.  No, no.  The shared history that I

10   think would be relevant here in my view is the oppression of

11   the tribes by federal and state governments.

12           THE COURT:  But that's true of every tribe, isn't it?

13           THE WITNESS:  Right.

14           THE COURT:  So what I'm trying to get at is what

15   distinguishes your expertise in this area as a result of

16   whatever experience you've had as a lawyer or someone who is

17   familiar with and tries to keep up with what's happening in

18   Indian Country generally that would distinguish you from

19   anybody else who takes a look at the documents that are

20   involved in the case.

21           THE WITNESS:  I think the shared history that I've

22   just mentioned, the oppression of tribes and the distrust

23   generally that tribes have because of their hundreds of years

24   of maltreatment, they have developed a general distrust.  And

25   that is why I think they make different decisions or they have

1    a different way of making decisions than other entities that a

2    jury or any factfinder might be familiar with or comfortable

3    understanding.

4         I do think that shared general history does create a

5    common approach to how tribes decide who they're going to work

6    with and what are the relevant factors in making that decision.

7         THE COURT:  Okay.  Anything further?

8         MR. DOLAN:  One moment, Your Honor.

9         MR. WEINBERG:  Not from the defense, Your Honor.

10   Thank you.

11        MR. DOLAN:  No, Your Honor.  Thank you.

12        THE COURT:  Okay.  So I obviously want to deal with

13   the transcript in the case.  I also want to move the case along

14   so that the parties know what I'm thinking about.  I don't see

15   that Mr. Durocher will be testifying in this case on the basis

16   of what I now know here, of course it always depends upon what

17   evidence is submitted, but on two grounds.

18        Number one, it seems to me that his statements with

19   respect to future opportunities, business opportunities is

20   interesting but, on the basis of what is available to me right

21   now, not material to the case.  The issues are ones of, was

22   there a payoff in this case?  Did someone think that they'd

23   curry favor with somebody else in the future as a result of

24   that, that's a different issue.  Call it a dual purpose, if you

25   will, but that seems to me to be what's involved here, and I'm

1    not, on the present state of the record, going to do that,

2    going to permit it.

3         On the second element, that is Mr. Durocher's

4    familiarity with those particularized kinds of concerns that

5    would offer special expertise, I can't find that either.  The

6    Mashpee Wampanoag are a particular tribe.  They have a

7    particular history.  Mr. Durocher is not familiar with that

8    particular history, particularized.

9         He is familiar with, as frankly I suspect every member

10   of the jury is, familiar with the history of oppression that

11   has been visited upon the Native American population of the

12   United States.  That's not something beyond the canon of jurors

13   any more than it's beyond the canon of jurors to learn about or

14   be instructed with respect to racial bias.  Unless there is

15   particularized something new, something in addition to be

16   offered, I'm resistant to doing it.

17        Now, I state these so the parties understand what

18   they're dealing with and they can address it at the appropriate

19   time.  But for purposes of preparing for trial, I just want you

20   to be understanding what it is that I'm likely to do, which is,

21   I'm likely to benefit from briefing that Mr. Durocher might

22   offer on various legal matters, although frankly I'm not sure

23   that they are so complex that they require that kind of

24   briefing, but I certainly look at that, but I do not believe

25   that he falls within the range of experts that I would permit

1    here for those broad reasons.  Not a final determination

2    because there isn't a final determination on the question of in

3    limine, but to put it at a rough sort of way in the kind of

4    sequencing of trial, in opening statements the government will

5    say whatever it's going to say.  I do not on the basis of what

6    I now know believe that defense counsel can say, "We're going

7    to have an expert who says something different."  That depends

8    on development of evidence in the case.

9         It may well be that you'll convince me otherwise on

10   it.  I don't mean to exclude it, but I want to be as clear as

11   possible that I'm not particularly sympathetic to the idea of

12   what I will call stereotyping expertise testimony in the

13   absence of some particularized foundation that is unusual even

14   among those people who work in the broad area of tribal

15   transactions.

16        So I'm not sure there's more to say.  I have every

17   reason to believe that I'll get lots of argument about this at

18   the appropriate time.  That's number one.

19        Number two, severance remains in this case.  Put to

20   one side whether the motion for reconsideration was belated, it

21   seems to me that it is very important that the jury be focused

22   on the particular charges that are at the core of this case and

23   not be distracted by discussions, particularly in deference to

24   Mr. Dequattro, not be distracted by disputes over income tax.

25   They can be taken up at some future point if that's necessary,

1    but the severance remains, so that you understand what the case

2    is that you're going to be trying here.

3            So those are the two kind of basic outlines of this.

4    I still have lots of work to do on this, but I think you pretty

5    clearly understand what my shaping of this case will be, at

6    least enough to be able to continue to develop your witnesses

7    in the case.  And I'm sure that -- I'm not sure but I

8    anticipate and wouldn't be surprised to have Mr. Durocher

9    remain advising the defense.

10           I will say one thing.  Unless we're talking about

11   outrageous amounts of money, you know, that raise their own

12   problems, I'm not particularly taken one way or the other with

13   the idea that someone gets paid for their time and services.

14   That's part of this.  But sometimes people think that that's

15   useful cross-examination, and in cases of inflated billing, it

16   is or can be.  But I frequently tell the jury that people who

17   have expertise, they receive compensation for the presentation

18   of their expertise, and that's not disqualifying.

19           They may look at it and say what does that mean in

20   terms of whether or not someone is biased or prejudice, but

21   bias or prejudice can appear in a variety of ways.  And I

22   suppose one of the ways it could appear, at least following

23   Mr. Durocher's analysis, is that someone who stands up to

24   testify on behalf of a tribal leader might be expected to

25   receive special consideration in his dealings with other tribal

1    entities in the practice of law.  But that's a different issue.

2         I want the parties simply to be aware of the way in

3    which I might approach the instruction of jurors on that.  But

4    I'll let it happen.  You want to ask questions about the amount

5    of money, you can ask questions about the amount of money.

6    It's not irrelevant in front of the jury.  It may not be, from

7    my perspective, significant, and I'll try to rectify any

8    balance that's necessary to focus them on the fundamental issue

9    of bias and prejudice on the part of an expert.

10        So are there other things that we need to talk about

11   at this point here?  Obviously I'm going to have further

12   pretrials but in a fashion that's consistent with your

13   experience.  I gather Ms. Wichers now has freed up a little bit

14   from her prior trial responsibilities.

15        I'm sorry, Mr. Durocher.  It's fine for you to stay

16   and hear my disembodied voice or leave if you want to.  That's

17   really up to you.  You may obviously want to consult with

18   Mr. Weinberg or Mr. Flaherty at a later point.  It's up to you.

19   Ms. Beatty, who is concerned about trying to manage this

20   technological marvel that we had that we could not manage

21   before you were here, just wants to know whether or not you

22   wish to stay on at this point.

23        THE WITNESS:  My guess is Mr. Weinberg -- if the Court

24   doesn't need me anymore and Mr. Weinberg doesn't need me

25   anymore, I'll say my goodbyes.

1      THE COURT:  Thank you very much for testifying.  As I

2  think you would understand, I feel I can talk bluntly and

3  straightforwardly with counsel in the case because we're all

4  professionals and understand what the rules of the game are, a

5  somewhat different setting obviously if I'm dealing with jurors

6  here.  And I don't do the cross-examination during jury trials,

7  I can assure you.  Okay?

8      THE WITNESS:  Understood, Your Honor.

9      THE COURT:  Thank you.  You're free to go.

10      THE WITNESS:  Thank you.

11      THE COURT:  Okay.  Other matters?

12      MR. WEINBERG:  The only other matter I mention, Your

13  Honor, is -- there's two, and I know Your Honor is reaching

14  these motions in limine.  The two big ones, if I could call

15  them, are the Defendant Cromwell's motion to exclude 404(b)

16  evidence and Mr. Dequattro's opposition to the government's

17  motion in limine to exclude defense witnesses, including those

18  who made donations to Mr. Cromwell without any evidence that

19  they were either extorted or bribed.

20      THE COURT:  I think I have to know more.  I have to be

21  more fully informed.  As to the 404(b) stuff, my general

22  inclination is likely to be, to say to the government it

23  doesn't come in until there's been a dispute about it.  They

24  have to prove whatever they have to prove, but they can't come

25  in and say, "And he did a bunch of other things, so he must

```
 1    have scienter," or offer it for other purposes.  So it's not
 2    likely to come in in the government's case in chief.  That's my
 3    general view.  Unless the government can say there's something
 4    specific here as to that.
 5         With respect to the defendant's witnesses, a kind of
 6    prior good acts, I suppose, or we did it and we're good guys,
 7    so he must be a good guy because he did the same thing, or
 8    someone might argue it, I'm not so sure what I think about that
 9    until I know a little bit more about it.
10         The short of it is this is a lean case until there's a
11    justification to putting lard on it.  And "lean" means unlikely
12    to have 404(b) evidence in the government's case in chief,
13    unlikely to have examination about would it make a difference
14    to you if you knew that X gave money and he didn't get anything
15    in return, but I'll review that at a later point.  Mr. Dolan?
16         MR. WEINBERG:  We would of course contend, Your Honor,
17    that it's not good act or reputation.  It goes directly to the
18    intent of Mr. Cromwell when he asked for donations --
19         THE COURT:  It is, and that brings me back to 403,
20    which is, is this an effort -- not an effort, but would this --
21    initiatives or whatever people want to choose is an issue, so I
22    won't say an effort.  I will say does it have the tendency to
23    mislead the jury, create cumulative evidence in the case and
24    otherwise distract the jury from the core issue in this case is
25    quid pro quo, as I will keep saying to the jury.
```

1         MR. WEINBERG:  I would just also add, Your Honor's

2    consideration, that it also goes to the identity of the

3    behavior because there were gifts made by others, gym

4    equipment, hotel rooms, cars, that Mr. Cromwell received with

5    no evidence that he extracted promises.

6         THE COURT:  He wasn't successful in doing that or not

7    or that he drove a harder bargain with other people, all of

8    that is an invitation to think about success or lack of success

9    in extortion under color of official right, which is by

10   consent.  And consent means something as far as I'm concerned

11   in this context.

12        So the short of it is, just by way of shaping your

13   case, that's where it is, but I'm certainly going to be dealing

14   with that sufficiently in advance of the trial in a more

15   specific way when I know precisely who the witnesses are and

16   what they're precisely going to say and what it means in the

17   context of it.

18        MR. WEINBERG:  If in any way the Court would be

19   assisted by argument, we're here any time the Court wants,

20   because that's the pivotal issue, I think.

21        THE COURT:  And I trust that, but this is a case, like

22   most of these cases that I've had, dealing with emerging issues

23   in the Supreme Court in which you'll have pretrial until you

24   say uncle, and even then you'll have pretrial because I want to

25   be sure that I get it right and I haven't missed something.  So

1    I will welcome all the assistance I can get.  I may not accept

2    the assistance, but I will welcome it.

3             MR. WEINBERG:  This is an unusual fact pattern.

4    There's no direct evidence.  It's circumstantial.  And these

5    witnesses --

6             THE COURT:  I just recently -- not that you need to

7    hear from the collected works of Judge Woodlock, but I just

8    recently had occasion to refer to an observation that Chief

9    Judge Howard made in another circumstantial case.  He was

10   channeling I think Thoreau, in which he said, "You don't have

11   to find a trout in the milk to have reached the conclusion that

12   it's been watered."  And so circumstantial evidence can be

13   sufficient.  You don't need direct evidence on that.  But of

14   course I look at all the evidence in the larger context of the

15   evidence.

16            MR. WEINBERG:  That's what makes the conversations

17   between Mr. Cromwell and these equally situated contractors and

18   vendors, architects, and lawyers important because we have --

19            THE COURT:  It may or may not.  It may or may not.

20   And probably I'm going to be thinking very heavily about the

21   idea of do we get to try each one of these as a failed

22   extortion case, because that's the flip side of all of this.

23   In any event, we try some other transaction, we're concerned

24   with this transaction with Mr. Dequattro in this setting.

25   That's what we're concerned with.  And I'm going to try to keep

1    it to that without being distracted by other experiences with

2    other individuals.

3         MR. WEINBERG:  I'd only make one last comment, which

4    is that I understand color of law and extortion, and that's one

5    of the charges against Mr. Cromwell.  He's charged with 666 --

6         THE COURT:  Right.

7         MR. WEINBERG:  -- which requires evidence of an

8    exchange, evidence of an agreement for a corrupt intent to

9    exchange official acts or at least performance of something in

10   exchange for money.  There's no evidence of official acts here.

11   Your Honor needs to make --

12        THE COURT:  I will have to make a determination about

13   the official acts here, but I would be less than candid if I

14   didn't say that what has been outlined to me is colorable on

15   the part of the government as official acts.  So that it

16   wasn't, "Here is $10,000 in exchange for me giving you this

17   contract," it could be, "Here is $10,000 and our expectation is

18   that you will use your best offices to assure that we're not

19   canned."  But I have to listen to the evidence before I can

20   make that.  It's absolutely the case that it is not a direct

21   case on a direct matter.

22        MR. WEINBERG:  And the key I think, with that as the

23   framework, Your Honor, is whether or not there is evidence,

24   circumstantial or direct, that Mr. Cromwell made a promise to

25   him that he wouldn't terminate the contract.  Because in a 666,

1    a conspiracy to violate 666, his unilateral intent, beliefs,

2    aren't enough.  You need the exchange.  The pro quo, not just

3    the quid.

4         THE COURT:  Right.  It does not have to be expressed

5    of, "Do you promise," or, "Do you accept the promise?"  It

6    doesn't have to be expressed that way to prove a 666 or any

7    bribery case.

8         MR. WEINBERG:  It's got to be explicit if it's in the

9    context of a campaign contribution.

10        THE COURT:  It has to be sufficient, not explicit if

11   explicit means direct evidence of, "Here is money.  Give me

12   that," and, "I will give you that.  Give me the money."

13        MR. WEINBERG:  I agree, and it needs to be clearly

14   understood.  And I think these witnesses provide powerful

15   circumstantial evidence that it was not his routine and

16   practice to shake people --

17        THE COURT:  Maybe, maybe.  As I've indicated to give

18   you what I think you're entitled to is kind of a temperature of

19   the judge on what he's going to do, but it's a running

20   temperature, depending upon my exposure to toxins in the air.

21        Right now my view is that it's going to be a harder

22   case.  There may be particular witnesses who are more

23   successful than others on that, but that's something I have to

24   parse at a later point.

25        MR. WEINBERG:  Thank you, Judge.

```
1              THE COURT:  Okay.

2              MR. DOLAN:  One thing, hopefully not raising or

3    lowering the Court's temperature, but on the 404(b) issue,

4    there's two buckets I would say.  One that is classic kind of

5    404(b) which has to do with a later extortion attempt.  I fully

6    understand the Court's ruling, and I'm not surprised by it --

7    or I understand the Court's temperature on that, and I am not

8    surprised by it.

9              The government's view, just for the Court's

10   consideration, is looking at the financial evidence of what

11   happened with the money, what happened going forward, the

12   government views that quite differently as not 404(b), and I

13   don't want to argue it now.

14             THE COURT:  So --

15             MR. DOLAN:  But I want to raise it that I

16   understand --

17             THE COURT:  I don't mean to be -- I'm not being

18   dismissive of anything that Mr. Weinberg had to say or anything

19   that you had to say.  But I want you both to understand, you

20   know, kind of how I'm looking at this.  And I guess I have to

21   say that with respect to 404(b) evidence, a ruse by any other

22   name is a ruse.  That is that there's something that somebody

23   can say that it is useful for some other purpose than to bring

24   to the attention of the jury bad acts, other bad acts of the

25   defendant.  Whether or not it's 403 or not is not sufficient
```

1    from my perspective.  I want to be sure that it goes to the

2    case itself.

3              These cases permit, particularly when there are lots

4    and lots of transactions, supports the opportunity to be

5    presented with the field of rabbit holes, all of which we can

6    go running down into in theory but not in practice in this

7    courthouse, this courtroom.  That's my larger view, but I will

8    be looking at it from that perspective.

9              As I say, I don't mean to be dismissive to the

10   arguments that are made.  On the other hand, I want to manage

11   expectations and curb enthusiasms that may not be altogether

12   successful here so that people spend their time on things that

13   are likely to be productive rather than things that aren't.

14             MR. DOLAN:  I understand that, and the only thing, and

15   I promise -- well, I shouldn't promise.  This may be the last

16   thing that I will say.

17             THE COURT:  I think if this were a false statement

18   case, you would ask the advice of Ms. Wichers to advise you

19   about the danger of saying, "This is the last thing I'll say."

20             MR. DOLAN:  Well, now I have to be very careful.  I

21   understand.  As to the extortion and the other act that's --

22   just because someone calls something another act doesn't make

23   it so.  That's the government's view as to the financial

24   evidence.

25             THE COURT:  It doesn't make it evidence either that's

1    admissible.

2            MR. DOLAN:  Very true, Your Honor.

3            THE COURT:  Okay.  Mr. Flaherty, you've stayed out of

4    the line of fire.  Do you want to --

5            MR. FLAHERTY:  Judge, I was raised in a household

6    where I was taught don't speak until you're spoken to so --

7            THE COURT:  Well, you're spoken to.  You can speak

8    back if you want.  That's not this household, as you can see.

9            MR. FLAHERTY:  Obviously.  I'm happy to address this

10   in due course, Judge.  I've tried enough cases to understand

11   exactly where the Court is coming from.

12           THE COURT:  Okay.  So my expectation is next month

13   we'll try to set a hearing in which I can be a little bit more

14   explicit about it.  And I will have an opportunity to review, I

15   assume that the parties will be ordering the testimony of

16   Mr. Durocher.  I'll have a chance to review the transcript as

17   well, not in a gotcha sort of way but to be sure that I've

18   absorbed what he had to say.  Okay?  Unless somebody says, "No,

19   we're not going to order the transcript," but I assume it's

20   going to be ordered.  Is that fair?

21           MR. WEINBERG:  Thank you very much, Your Honor.

22           THE COURT:  Right.  Okay.  And I think probably --

23   although I probably shouldn't be organizing it, but I think

24   it's a joint obligation of the parties on this.  Both of you

25   are going to want that transcript, and it seems to me that you

```
 1      should pay equally for it.  Any objection to it?
 2               MR. WEINBERG:  No, Your Honor.
 3               MR. DOLAN:  No, Your Honor.
 4               THE COURT:  Okay.  All right.  So we'll be in recess
 5      at this point, and we'll try to set up a time relatively soon
 6      to take the case up.
 7               MR. DOLAN:  Your Honor, just on that, when the Court
 8      says "relatively soon," Ms. Wichers, her trial has gone away --
 9               THE COURT:  So tell me about your schedule.
10      Ordinarily I'd leave it to Ms. Beatty to kind of administrate
11      it, but if there are blackout times for the parties in the next
12      month, it becomes a blackout time for me in December because
13      I'm going to be trying the Andrade case.
14               MR. DOLAN:  Your Honor, in light of that comment, an
15      attorney for the government will be able to appear.  I start
16      trial next week in front of Judge Gorton.  It's about a week
17      and a half trial, and then I'm leaving the country.
18               THE COURT:  Not as a result of this or that trial?
19               MR. DOLAN:  As a result of this hearing, on my iPad I
20      ordered the tickets.  No.  For a preplanned vacation.
21               THE COURT:  How long will you be gone?
22               MR. DOLAN:  For the Thanksgiving holiday, the week of
23      Thanksgiving.
24               MS. WICHERS:  This could be problematic because it
25      looks like I'm going to be out of the country as well from the
```

```
 1    19th to the 29th of November.

 2              THE COURT:  Okay.  So it may be that it's going to be

 3    closer to the middle part of December to have a firm thing,

 4    because I'm going to try -- Andrade is the co-defendant in the

 5    Correia trial, and I'm going to be trying that basically all

 6    day, and I want to give you the attention.  So is that last

 7    week before Christmas or even the week of Christmas possible

 8    for the parties?  I'm not extorting that, but you've already

 9    had a vacation as far as I can understand, and I haven't.

10              MR. DOLAN:  I'll be available.

11              MS. WICHERS:  I will be available.

12              THE COURT:  Mr. Flaherty?

13              MR. FLAHERTY:  I've got to try a case in front of

14    Judge Mastroianni December 6, Judge, but I'm sure I'll be done

15    by then.

16              THE COURT:  So that's probably what I'm going to be

17    shooting for then here, understanding what's involved.

18              MR. DOLAN:  I apologize.

19              THE COURT:  No apologies.  Nothing but envy on my part

20    in all of this.  At the vacation, not the trial itself.

21              MR. DOLAN:  It's been a while.  Thank you.

22              THE COURT:  You're left to your own devices in the

23    trial.  Okay.  Thank you.  We will be in recess.

24              (Adjourned, 2:46 p.m.)

25
```

1               CERTIFICATE OF OFFICIAL REPORTER

2

3          I, Kelly Mortellite, Registered Merit Reporter

4   and Certified Realtime Reporter, in and for the United States

5   District Court for the District of Massachusetts, do hereby

6   certify that the foregoing transcript is a true and correct

7   transcript of the stenographically reported proceedings held in

8   the above-entitled matter to the best of my skill and ability.

9                   Dated this 8th day of November, 2021.

10

11                   /s/ Kelly Mortellite

12                   _____

13                   Kelly Mortellite, RMR, CRR

14                   Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                               )
UNITED STATES OF AMERICA,      )
                               )            Criminal Action
          Plaintiff,           )            No. 20-10271-DPW
                               )
v.                             )
                               )
CEDRIC CROMWELL and            )
DAVID DEQUATTRO,               )
                               )
          Defendants.          )
                               )
```

BEFORE THE HONORABLE DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

JURY TRIAL DAY FOUR
April 22, 2022

John J. Moakley United States Courthouse
Courtroom No. 1
One Courthouse Way
Boston, Massachusetts  02210

Kelly Mortellite, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 3200
Boston, Massachusetts  02210
mortellite@gmail.com

```
 1    APPEARANCES:

 2    Counsel on behalf of United States:
      Christine J. Wichers
 3    Jared C. Dolan
      United States Attorney's Office MA
 4    1 Courthouse Way
      Suite 9200
 5    Boston, MA 02210
      617-748-3278
 6    christine.wichers@usdoj.gov
      jared.dolan@usdoj.gov
 7
      Counsel on behalf of Defendant Cedric Cromwell:
 8    Timothy R. Flaherty
      699 Boylston Street, 12th Flr.
 9    Boston, MA 02116
      617-227-1800
10    timothyrflaherty@gmail.com

11    Counsel on behalf of Defendant David DeQuattro:
      Martin G. Weinberg
12    Martin G. Weinberg, PC
      20 Park Plaza
13    Suite 1000
      Boston, MA 02116
14    617-227-3700
      owlmgw@att.net
15

16

17

18

19

20

21

22

23

24

25
```

1

2                          INDEX
   WITNESS                                              PAGE

3
   WILLIAM DOW
4
      Direct Examination By Ms. Wichers                81
5     Cross-Examination By Mr. Flaherty                84
      Cross-Examination By Mr. Weinberg                91
6     Redirect Examination By Ms. Wichers              98
      Recross-Examination By Ms. Wichers               98
7
   MICHAEL D'AMATO
8
      Direct Examination By Mr. Dolan                  99
9     Cross-Examination By Mr. Flaherty               119
      Cross-Examination By Mr. Weinberg               131
10
   ROBERT HENDRICKS
11
      Direct Examination By Mr. Dolan                 137
12    Cross-Examination By Mr. Flaherty               170
      Cross-Examination By Mr. Weinberg               198
13    Redirect Examination By Mr. Dolan               211
      Recross-Examination By Mr. Flaherty             214
14


15   E X H I B I T S

16   Exhibit No.          Received

17

        27                  113
18      28                  116
        13                  140
19      15                  142
        16                  145
20      14                  148
        19                  152
21      17                  155
        18                  156
22      20                  157
        21                  158
23      22                  159
        23                  160
24      24                  161

25      (Continued)

Exhibits

| | |
|---|---|
| 25 | 162 |
| 26 | 163 |
| 31 | 164 |
| 33.1 | 166 |
| 32.1 | 168 |
| 147 | 185 |
| 134 | 203 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1                    P R O C E E D I N G S
 2              (The following proceedings were held in open court
 3      before the Honorable Douglas P. Woodlock, United States
 4      District Judge, United States District Court, District of
 5      Massachusetts, at the John J. Moakley United States Courthouse,
 6      One Courthouse Way, Courtroom 10, Boston, Massachusetts, on
 7      April 22, 2022.)
 8              THE COURT:  Well, I want to deal with the final issues
 9      with respect to cause.  They were raised by questions of our
10      questionnaire as to which we've imposed confidentiality pending
11      the development of the case.  So I'm going have to ask those
12      who are in the courtroom who are not affiliated with any of the
13      parties here to leave at this point.  We'll I think be able to
14      deal with this within ten minutes or so, and then the jury
15      peremptory challenges will be exercised, but there are some
16      confidential issues that need to be taken up.
17      SEALED:
18              So Ms. Beatty I understand communicated to you that I
19      made a decision yesterday afternoon with respect to Jurors
20      Number 53 and 55 that I would excuse them for cause.  We had
21      some extensive discussion about it, and I don't mean to
22      recapitulate entirely that discussion, but I want to state
23      briefly on the record why I did what I did so that the parties
24      can understand it, but it is my determination here, after
25      listening to what the parties had to say and thinking about
```

1    what the proper way to proceed would be.

2          With respect to Juror Number 53, you'll recall that

3    the issue was raised concerning whether or not the juror should

4    be seated in light of the potential for a bar under the statute

5    for a correction officer, prison guard.

6          It's not an entirely clear matter.  I've thought about

7    it.  I indicated my own views and reservations about treatment

8    of the statute that would bar prison guards as police officers.

9    That's the theory in which some advice has been given

10   internally within the administrative office and among juror

11   administrators.

12         I emphasize that this is not Juror Number 53's fault

13   that this didn't arise and come to our attention until a bit

14   later, and it's really not a matter of fault at all.  It's a

15   matter of uncertainty.  But the juror clearly identified

16   himself as a corrections officer, and he also answered no to

17   the question of whether or not he was a police or fire officer.

18   I'm going to mark as an exhibit the questionnaire that he

19   filled out so that the record is clear with respect to that.

20         I thought about this quite a bit in terms of what my

21   responsibilities were, and I think the argument for prudence

22   and caution is the proper one.  If there's no need to create an

23   issue, then why create an issue?  And my evaluation of the

24   question of plain language here, including some consideration

25   of what would be the definition of a police officer at the time

1  that the statute was introduced, suggests to me that,

2  particularly in light of the care with which the Supreme Court

3  in particular and certain members of the Supreme Court are

4  engaging in evaluation of such plain meaning, leaves me with a

5  sense that I cannot be sure what the outcome would be here.

6      So then the question is whether or not to simply avoid

7  the issue.  The parties seemed to be prepared to do that.  I'm

8  not relying on that willingness of the parties to do that,

9  although I note it here.  But I don't want to introduce into

10 the trial needlessly something that could be viewed as a

11 structural problem in the selection of the jury.  So for that

12 reason -- an outside person came in and I want to exclude that

13 person from this discussion.  (Pause.)

14     So for that reason, it seems to me the better part of

15 wisdom to exclude that juror, and I did so of course after

16 reviewing his statements in rough draft form of the transcript

17 here.  I also considered questions of CORI information here.  I

18 don't consider that the juror was other than candid in

19 response, and so I'm not relying on CORI matters.  He brought

20 to our attention everything that was meaningful in this area I

21 think.  So that's a rough statement of my view with respect to

22 that juror.

23     When I go through all of these -- there are three that

24 I'm going through.  If the parties want to state at that time

25 an objection, I'll hear it, but it's so that the record is

1   clear as to what your position is.

2         The second issue is Juror Number 55.  We had extensive

3   discussion about that juror, and you'll recall that when we

4   were having voir dire I left it that the matter was not

5   resolved.  The language I used at the end of the discussion was

6   that the government was not then ready to share the database of

7   information that it had, and so I'm going to treat this juror

8   as being no challenge for cause at that point, but I'll permit

9   a challenge for cause at a later point if that becomes

10  necessary.  So it was open on the record.

11        I was, before the kerfuffle over the disclosure of the

12  database information, quite troubled by the juror's

13  presentation.  It could be called one of demeanor, but it

14  seemed to me to go more fundamentally to the juror's

15  willingness, candidly, to participate in the selection process

16  in a fashion that would be consistent with the responsibilities

17  of jurors to be civil in their discussions and not subject to

18  extreme volatility in the way in which they approach any

19  question that is raised in some fashion or disappointment in

20  the way in which actual court proceedings proceed as being

21  dissimilar from the way in which they proceed on, say, Court

22  TV, which seems to be part of her concern.

23        In short, I did not believe that at that time that she

24  would be an appropriate juror.  Then there was provided the

25  CORI information.  I don't make a judgment about whether or not

1   she is in fact disqualified or has not had her civil rights

2   restored with respect to any of the matters.  There's not

3   enough information for me to make that determination, and I

4   don't make that determination on that basis, this determination

5   on that basis.

6       I make it on the basis that the array of criminal

7   encounters that are shown by this witness or this juror's

8   background as reflected in the CORI matter is so extensive that

9   it seems to me that there is no justification, no way to

10  explain why she simply didn't include it, except that she

11  decided not to bring it to our attention for whatever reason.

12      I gave some thought and I talked about it yesterday of

13  having further voir dire.  It seemed to me that further voir

14  dire would only serve to inflame the juror's views of the

15  criminal justice system and her involvement in the criminal

16  justice system, and it seemed to me imprudent to have her

17  brought in under these circumstances, particularly as we reach

18  the final stage of jury selection.

19      So, briefly stated, those are the reasons that I

20  excluded her.  The jury clerks called the number that she

21  provided.  There was no answer to the number that she provided,

22  and I informed the jury clerks that they should be prepared to

23  separate her from the other jurors if she came in to avoid any

24  difficulties which I thought, based on my exposure to her, were

25  real possibilities.

1        The short of it is I simply don't believe that she

2    could fairly and impartially sit as a juror in this case, and I

3    have reason to be concerned about her candor in the way in

4    which she responded to information that we've tried to keep

5    confidential here and I tried to make clear it would be

6    confidential.  So for that reason I have made the determination

7    to excuse Juror Number 55 for cause.

8        Finally, we received this morning, the jury clerks did

9    this morning, an email communication from Juror Number 62, who

10   you will recall is a person with a job of substantial authority

11   at one of the universities and I had found him qualified for

12   cause.  He reflected on it overnight and said that he felt that

13   it would be a burden that he simply had not been fully aware of

14   at the time that he had the conversation.

15       I found him to be candid, forthright, responsive and

16   frankly civic-minded in his willingness to serve, given the job

17   that he had.  You will recall that I excused another person who

18   is affiliated with the university here because she was much

19   more forceful in her concerns, expressed concerns ahead of

20   time.  I did not excuse him, although I understood that it was

21   a tough job.

22       The short of it is I'm prepared to -- but I'll hear

23   anything that you want to say, prepared to excuse him as well

24   from the jury panel for cause with the instruction that he'll

25   be called back at a later point, as I did with the other

1  university employee.

2          So those are, briefly stated, the reasons that I'm

3  dealing with those three jurors.  If the parties have anything

4  that you want to say with respect to it, I'll hear you at this

5  point.

6          MR. DOLAN:  We have no objection to any of the three.

7          THE COURT:  Okay.

8          MR. FLAHERTY:  Your Honor, on behalf of Mr. Cromwell,

9  I would just note that Juror Number 55 is a black female,

10  African American.  I note it and I respect and appreciate the

11  Court's statement on its evaluation of that witness.  I said

12  yesterday I have a different perspective.  I only note that her

13  exclusion from this pool would reduce, by my count, the number

14  of African Americans by 25 percent.  So for that reason, on

15  behalf -- to perfect the record, on behalf of Mr. Cromwell, I

16  object.

17          THE COURT:  Okay.  Mr. Weinberg, anything?

18          MR. WEINBERG:  I have no objection.

19          THE COURT:  Okay.  So with respect to the observation

20  that Mr. Flaherty has made, it's a prudent observation.  We

21  have to be attentive at all times to any possibility that there

22  seeps into the jury selection process something that could be

23  considered to be -- and I'll use language actually that the

24  First Circuit earlier this week made reference to in a case

25  dealing with Batson challenges.  It's a case called *Hollis v.*

1   *Magnusson.*  It arose in the context of habeas corpus

2   constraints on Batson challenges, but the Court, First Circuit,

3   referred to the Supreme Court's references to *Miller-El* and

4   noted that the Court has explained that racial discrimination

5   in jury selection not only compromises the right of trial by

6   impartial jury but also establishes state-sponsored group

7   stereotypes rooted in and reflective of historical prejudice.

8          And given the gravity of this harm, and this is

9   referenced to *Foster v. Chatman*, the constitution forbids

10   striking even a single prospective juror for a discriminatory

11   purpose.  I've given a great deal of thought, obviously, to

12   that to be sure that in my own mind that I'm not in some

13   fashion compromising the right to impartial jury in this

14   fashion or establishing in some fashion or reflecting or

15   managing to continue some sort of group stereotype reflective

16   of historical prejudice.

17          I'm satisfied that in my evaluation of this juror that

18   that is not a factor in doing so, and I consider it to be a

19   very significant issue, as I've said here, but for those

20   reasons as well.  After careful, as I refer to some of the

21   jurors, self-interrogation, I've decided that this is not a

22   matter of reflecting group stereotype or historical prejudice

23   but rather the way in which the juror presented herself, the

24   way in which she answered the questions, the lack of candor

25   that I've referenced already.  So I recognize that but wanted

1   to be able to respond specifically to the concern you've

2   expressed.

3         MR. WEINBERG:  If I could just augment my lack of

4   objection because I respect the Court's statement that it

5   exercised discretion after careful consideration and the racial

6   issue was not the reason, obviously, for the Court's decision.

7   I do think there is a potential Batson challenge here that we

8   don't waive for Mr. DeQuattro who is charged with being in the

9   conspiracy with Mr. Cromwell if the government challenges the

10  remaining blacks that are on the venire.  So I'm not waiving a

11  potential future challenge.  I'm just saying that it's not

12  based on Juror 55.

13        THE COURT:  Right.  I think I understand that, and I

14  appreciate the record being clear about it.  But now we're at

15  the micro level rather than the macro level in dealing with

16  this kind of thing.  Each one of the challenges, if there is a

17  challenge, will have to be justified in some fashion that

18  doesn't implicate the language that I've just read that is

19  animating the First Circuit.

20        I should add that the decision is written by Judge

21  Lopez, and then Judge Lopez also filed his own concurrence with

22  the decision in which he went a bit farther saying this is what

23  I have to do under habeas corpus analysis.  That's different

24  from direct analysis in this case.

25        The short of it is there is no question that the

1    courts in this circuit and under Supreme Court precedent I

2    think, although as I said I've made reference earlier to the

3    decision on April 18 in *Love v. Texas* that involved rather

4    strong dissent by Justice Sotomayor, that the courts are

5    concerned about this.  Certainly it's been expressed in vivid

6    terms by the First Circuit recently and well before that.  So

7    we're all on point.

8            The government, which may be thought of as the party

9    who is concerned about or would be the object of a Batson

10   objection to any exercise of a peremptory as to any person who

11   appears as a person of color, I'll put that in that context, is

12   on notice for what they will have to do by way of

13   justification, and I'll make an evaluation of whether the

14   justification satisfies me.  If it doesn't, then I won't uphold

15   the challenge.  That's how we'll deal with that issue.  I think

16   that is responsive to the point that you made, Mr. Weinberg.

17           MR. WEINBERG:  Thank you, Your Honor.

18   (End of sealed discussion.)

19   **OPEN COURT:**

20           THE COURT:  All right.  So I think we're ready to

21   bring the jury in.  I think we've got some folks in the

22   courtroom, and I don't know, Ms. Beatty, are they a bit too

23   close to the first two rows, do you think?  Yes.  If you can

24   sit in the back row.  I understand or maybe I should understand

25   who they are.

1       MR. WEINBERG:  An attorney and a paralegal who work

2   with me who came to court today to observe the proceedings.

3       THE COURT:  That's fine, and I understand that they

4   understand that they're subject to the same responsibilities of

5   confidentiality here, but just because we're going to be

6   bringing in the jury, I don't want to have them so close to the

7   jury.  So maybe if you can get in the back row there.  There

8   were some individuals I excluded earlier.  I'm going to have

9   them brought back as well.

10      So what's going to happen is the jurors are going to

11  come in and they're going to be lined up without the three

12  jurors that I've excused here in the order so you cross them

13  off the order here.  The public generally has been told to stay

14  back until the jurors are brought into the courtroom and then

15  they will be brought in, and we may kind of array them a little

16  bit for social distancing reasons as well.

17      The problem that is presented I think for people who

18  were in the courtroom is, if they are on the left-hand side as

19  I face the gallery, it's hard for them to see the jurors.  And

20  so I may, if there's room, permit people to move over into the

21  other rows behind.  That's generally where the press has sat or

22  the media has sat, and there were persons who identified as

23  members of the media here as well but other people who left the

24  courtroom.

25      So we'll have the jurors come in here.  Then I'll

1  permit members of the public, and then we'll move on to the

2  exercise of peremptory challenges.  Because there was some,

3  perhaps induced by me, mis -- not misunderstanding but lack of

4  clarity with respect to the way in which the challenges will

5  proceed, I'll go over it again.

6         It is going to start with the government first, one

7  challenge, then the defendants with two, then the government

8  with one, and then the defendants with two, and back and forth

9  until the government exercises its sixth challenge, and then

10  the defendants will exercise their last two, and we'll see

11  where we stand at that point.

12         MR. WEINBERG:  Respectfully, Your Honor, my arithmetic

13  -- and I'm not a mathematician -- is that the government will

14  have exercised its fifth challenge when we exercise our ninth

15  and tenth, leaving the government with the last challenge.

16         THE COURT:  I apologize for that.  I stand corrected,

17  as always.  So we will end with the government's one challenge

18  after the defendants exercise their last two.

19         MR. WEINBERG:  Would Your Honor consider requiring the

20  government to exercise its last two challenges after the

21  defendant has exercised his eighth challenge, leaving the last

22  challenges for the defense?

23         THE COURT:  No.  The order that we're going to do it

24  is this order, and that was the sense that I had with that

25  correction that you've provided.  And I will add what I said

1  earlier, that I will consider the question of additional

2  challenges here if the parties ask for them, but right now

3  we're going forward with the ordinary structure of the

4  challenges, and the defendants will share their challenges and

5  do them jointly.

6          MR. FLAHERTY:  Last thing, Judge, before the jurors

7  are brought in.  I know the Court is going to give a charge,

8  resumption charge, whether or not they've been influenced or

9  saw anything in the media.  I just want to say for the record

10  there was an article that appeared in the front page of

11  yesterday's Boston Globe, and, you know, obviously I have no

12  idea whether or not any of the jurors read it.  I just put it

13  on the record, that's all.

14          THE COURT:  All right.

15          MR. FLAHERTY:  An article about this case.

16          THE COURT:  I think that the way I'd like to proceed

17  on that, because there is some media attention not merely in

18  The Globe but elsewhere, is that if the parties want me to

19  inquire specifically about a specific article or something like

20  that, I'll entertain that.  But I'll leave it to the jurors to

21  respond to us.  And to the degree that somebody thinks that

22  there should be a record made of what was in the paper, we can

23  do that as well.

24          The danger always is, to ask a specific question is to

25  encourage the jurors to think about what it is that might have

1  been in the newspaper that they didn't read or did read, and

2  I'd prefer not to do that unless it's so incendiary to be

3  problematic.

4          I will note that The Globe story went beyond at least

5  initially what the evidence will be in this case.  It may not

6  have gone beyond what the evidence will ultimately be in this

7  case, and the time to reflect on that probably is at the end if

8  there's any issue.  But I leave it to you to bring to my

9  attention anything that you think I should do to go beyond the

10 question that I will ask the jurors.  If somebody says that

11 they saw it, then we're going to be talking about it with that

12 juror.

13         MR. FLAHERTY:  Thank you very much, Your Honor.

14         THE COURT:  Okay.

15         (Court and Clerk discussion off the record.)

16         THE COURT:  Concern is expressed how we do the seating

17 so we make sure it works as seamless as possible.  We're going

18 to identify the jurors by names here as well as number, but the

19 names will be redacted from the record in the case, and then

20 only the numbers will appear.  But you'll get a chance to hear

21 Ms. Beatty tell them what names are involved and where they're

22 seated so you can use your own charts to pull that information

23 together.

24         (Jury enters the courtroom.)

25         THE COURT:  So ladies and gentlemen, let me just give

you the briefest of introductions. We've seated you and we're

now about to move into the public part of this process. That

is, members of the public will be permitted in the courtroom.

People who may have an interest in the case, including the

media, and I will be referring to you and the lawyers will as

well during the course of this process by your juror number

rather than by your names. But we wanted to be sure that

everybody was seated properly here.

And I'll give an explanation to the members of the

public when they come in here where we are and what we're up to

for today, but I'm not going to be speaking more than that

until they're brought in.

So let me explain on the record what we've been up to

and where we are now because we're now moving into the public

part of the trial itself. We've conducted voir dire of the

jurors over the last three days. We've used questionnaires.

The questionnaires have asked for confidential, private

potentially embarrassing information, and I've solicited from

the jurors candor in doing that.

In order to obtain that kind of candor it seemed to me

important to provide those questionnaires in that fashion in a

confidential and anonymous way, so we'll be referring to the

jurors, to the degree that there's reference to any particular

juror, by the juror number that's been assigned to that

individual. The jurors are arrayed in the jury box and in the

1    front row and second row of the courtroom.

2         There have been other people other than the parties

3    themselves and their counsel in the courtroom during the course

4    of the jury selection process, but those have been people who

5    have been affiliated with one or the other of the parties and

6    are subject to my order that they not disclose anything that

7    transpired during the course of the individual voir dire that

8    was conducted of each one of the jurors in this case.

9         The final action that was taken this morning was

10   discussion of three juror challenges that I had to consider,

11   and I have excused three jurors for cause here.  So we have now

12   a group of people who are going to be the panel from which the

13   jury is chosen, and we'll move on to that process.  But I want

14   to do a couple of things to orient the jurors as well, although

15   I tried to initially when we first were involved.

16        I want you to understand who is in the courtroom.

17   I've talked to you about it before, but I'll explain it again.

18   You've got me.  I'm the judge.  My responsibility is to rule on

19   questions of law and try to make the case move as quickly and

20   as fairly as it possibly can.  And I'll do the best I can on

21   that.  Sitting in front of me is Ms. Beatty, who is the

22   courtroom deputy.  You've met Ms. Beatty before.  She's the

23   person who executes whatever orders I give and is responsible

24   for making sure that this moves as efficiently and as fairly as

25   it possibly can with a special consideration to your

1   responsibility as jurors in trying to deal with any issues that

2   pop up.  As well she deals with counsel in arranging things

3   before we get going in the court.

4        You've been introduced to the parties and counsel

5   themselves in this case.  I'll introduce only the parties and

6   themselves and counsel again, and I'm not going to ask anybody

7   to stand here, but just raise your hand when I make reference

8   to you.  But we have Mr. Dolan, Jared Dolan, who is an

9   Assistant United States Attorney representing the government,

10  and Christine Wichers, also an Assistant United States Attorney

11  representing the government.

12       We have Max Nemtsev -- Nemtsev, I'm sorry --

13  representing Mr. DeQuattro.  Mr. DeQuattro is a defendant in

14  this case.  And we have Martin Weinberg who is representing

15  Mr. DeQuattro as well.

16       Then in the back row behind we have closest to you

17  Timothy Flaherty who is counsel for Mr. Cromwell.  And

18  Mr. Cromwell, if you'd raise your hand as well.  Mr. Cromwell

19  is a defendant in this case.

20       In addition, as I mentioned, we have two

21  representatives of the government here for purposes of

22  developing a kind of facilitating I guess the introduction of

23  evidence and getting witnesses and that sort of thing, also to

24  deal with questions of electronics in the case, and Mr. Nemtsev

25  is also going to be involved in that sort of thing.  Those are

1  the people in the well you've been introduced to before on

2  Monday, Tuesday.

3          I didn't introduce the court stenographer, the court

4  reporter.  And that is Ms. Mortellite.  Ms. Mortellite will be

5  here on a regular basis.  She's taking a stenographic record of

6  all that transpires.  She's already taken a stenographic record

7  of all that has transpired in this case.

8          I didn't introduce her specifically before because I

9  wanted to be sure that we got to you as quickly and as

10 efficiently as possible, but she's going to be here, or in the

11 circumstance in which it may be necessary to have another court

12 reporter, some reasonable facsimile of Ms. Mortellite.  There

13 really isn't a reasonable facsimile of Ms. Mortellite.  She's a

14 superb reporter.  But something you should understand about her

15 presence here, while she's creating a stenographic record of

16 the case, it's not something that's going to be available to

17 you in your deliberations.  You've got to listen very

18 carefully.

19          Second, you have to understand that -- and I mean no

20 disrespect.  I think she will probably say this herself -- that

21 she is a little bit like the furniture here in the courtroom.

22 She's doesn't serve anybody, except to make sure that it's

23 efficient and comfortable for us to conduct a proceeding that's

24 meant to be public, but she is not a party or partisan in any

25 way, shouldn't be understood to be partisan or a party in any

1    way.

2            Beyond Ms. Mortellite, and I should have introduced

3    them as well, but over in the far side are my two law clerks.

4    They're Ms. Collins and Mr. Veitch, and they're recent

5    graduates of law school and actually have had some practice

6    themselves.  They provide support for me in this case.  They

7    will be in and out from time to time.  They've got other

8    responsibilities that they may have to be attending to, but

9    they'll be here on a regular basis.

10           In addition, you've seen perhaps during the course of

11   the proceedings people who are affiliated with the parties who

12   were here observing jury voir dire early on, the individual

13   voir dire.  They were subject to the same duties of

14   confidentiality in the case.  And now we have other persons who

15   are interested in the case, people from the media, people who

16   are representing other interested parties in the case are

17   permitted in the courtroom because it's a public proceeding at

18   this point.

19           Now, let me just go back to something that I said

20   earlier on in this case.  I told you that my responsibility is

21   to make sure there's a fair and impartial trial, and we talked

22   a little bit about what the rules are here, and you can

23   anticipate that you're going to be asked a question pretty soon

24   about precisely that issue.  But that's not the only thing I

25   do.  I have a responsibility to provide I think a safe

1    environment for everybody in the courtroom.

2         So let me explain one thing that has been done here

3    and one thing that we're leaving to a kind of local option for

4    the jurors.  You'll see that the people who are in the

5    courtroom are socially distanced.  The other people who are in

6    the courtroom are socially distanced.  The jurors are going to

7    be sitting ultimately in the jury box over there, the people

8    who are going to be sitting to decide this case.

9         In discussion with counsel we determined that we would

10   exclude -- that I would exclude any person who was not fully

11   vaccinated, and you'll recall that you received inquiry about

12   vaccination status here in addition to the customary question

13   every day of do you have any of the symptoms that might

14   associate with COVID.  That, it seems to me, is pretty

15   fundamental here.  And while it's a contested matter, it's not

16   contested in this case.  So you should understand that none of

17   you potential jurors have reported to us that you're not fully

18   vaccinated.

19        Now, there's a second issue, masks.  You'll see I

20   don't have a mask on.  Ms. Beatty doesn't have a mask on.  Part

21   of that is that you can consider us in a pod.  We've been

22   working together in various ways throughout, and so we've

23   chosen not to wear masks, and we're far enough apart and we

24   don't have that kind of interaction.  Similarly with

25   Ms. Mortellite.  The law clerks have made differential choices

in this case, as you can see here. Counsel have made their own

choices about whether or not they have masks on or not.

They're all fully vaccinated, that's for sure, and I've made

that inquiry about everyone else who is in the courtroom.

There is no one in the courtroom now, including jurors, who can

be anything other than fully vaccinated.

But back to masks. One of my colleagues in Florida

has issued an order earlier this week indicating that the CDC

could not generate guidelines that would require masks on

public transportation, or at least for airlines. It's a hotly

contested issue. I don't mean to get involved in all of that.

I just have to navigate my way through what's available here.

We also have instructions in the Commonwealth that

changed for purposes of the MBTA just yesterday. I've come

down to this, which is, I leave it to each one of you what your

choice is. We all know that there are risks. We all know that

there is a potential that someone, even if they're not subject

to COVID themselves, may be spreading COVID. Everyone has to

make their own choice about that.

You're going to be sitting that close, as you can see,

in the jury box, and you may want to choose to do whatever you

want. I am not imposing a standard on that certainly at this

point. I'm raising it, and I'm leaving it up to you in this.

And I want to emphasize as strongly as I can, I've said this

before because of the job title I have, I'm not being

1    judgmental about it.  I don't mean to be judgmental about it.

2          I mean to say this is what it means to be a group of

3    people in a democracy under difficult kinds of circumstances

4    and we make our choices about what we think is appropriate for

5    us in the way in which we engage with others.  So I'm leaving

6    that entirely to your judgment with the kinds of structures

7    that I've given.

8          As I said, that's the other important aspect of my

9    responsibility here, is to maintain a safe environment.  Before

10   the pandemic, that meant making sure nobody with guns shows up

11   in the courtroom.  Now I've got a little bit more to think

12   about here, and that's how I've thought about it, and that's

13   how I've resolved it so that you understand what we're dealing

14   with.

15         So let me start with the question I told you all I was

16   going to ask every day in this case, which is the one that has

17   to do with whether or not you've been exposed in any way to any

18   communications outside of the courtroom that touches on this

19   case other than what you've already disclosed when we've had

20   discussions here.  And that, as you will recall, means nobody

21   talking to you at home.  You can't talk among yourselves about

22   this case until all of the evidence is in.

23         The whole purpose of this is to make sure that you

24   don't make your decisions or start to make your decisions on a

25   preliminary basis until all of the evidence is in and that we

1    know what it is that you've been exposed to, that you not

2    inadvertently or maybe make a mistake and just blurt out

3    something about the case to somebody and engage in a

4    conversation, that you stay off social media altogether, except

5    as I've instructed more specifically about that, so that you

6    don't find yourself in a position that would expose you to

7    outside influence.

8         An outside influence is not merely predispositions

9    that you may bring into the courtroom or have otherwise brought

10   into the courtroom.  We explored that during the individual

11   voir dire.  But it's also media accounts or conversations that

12   are going on, anything like that.  You've got to keep yourself

13   insulated from that.

14        There's a balance that we have to draw, and it's an

15   important balance.  We have a responsibility to provide for

16   fair and transparent court proceedings, and the balance is one

17   I have to strike in this area.  There is an importance to the

18   presence of media as the representatives of the public, but the

19   public themselves, if they choose to come in here, being here

20   to observe what's going on.  At the same time, I want to ensure

21   that there is no influence on the jurors themselves and no

22   potential for the jurors feeling somehow intimidated by the

23   availability of outside information.

24        So there's the balance that I've struck or an

25   explanation that's apart from the folks who haven't been here

1   yet but are here now about how we're going to be conducting

2   these proceedings.

3         So, have any of you been exposed in any way to any

4   outside information described in the way that I've described it

5   before, conversations, any kind of exposure, any kind of

6   exposure to media, anything on the various social media

7   platforms whose numbers I've lost track of and the identities

8   of which I'm not fully familiar with, but you know what I'm

9   talking about.  Have any of you been exposed in any way?  And

10  if you have, I'd ask you to raise your hand, and we'll take the

11  next step.

12        I see no response to that, so I find that the jury has

13  not been so exposed.

14        So the next thing that we're going to do is what we

15  talked about -- I shouldn't say "we."  You probably saw and

16  recall seeing in the video here the process of selecting a jury

17  has got at least two parts.  It's got more than that, as you

18  can understand now, but two basic parts.  The first is the

19  determination of those persons who are qualified for cause.

20  That's the decision ultimately I make, whether or not someone

21  can be a fair and impartial juror.  I've made that decision

22  with respect to all of you.  That's why you're here now.

23        What that means is I made a determination that you can

24  be fair and impartial in this case.  But that's only the

25  beginning.  The next step is something that has existed in our

law for over a thousand years.  And that is the opportunity

that the parties have to influence the way in which the jury

panel is selected, and it's called peremptory challenges.  It

means, peremptory means they don't have to explain for the most

part why they say, Gee, I don't think I'd like to have this

juror or that juror on the jury.  And so I'm going to go

through a process with the parties here, and we'll do it over

at the sidebar here with counsel as well.  I don't think there

will be a necessity, unless the parties have something to say

about having the parties themselves present at the sidebar.

MR. WEINBERG:  It's not necessary, Your Honor.

THE COURT:  And Mr. Flaherty?

MR. FLAHERTY:  Not necessary, Your Honor.

THE COURT:  Right.  Okay.  So I'll be talking to

counsel over at the sidebar.  We'll be with Ms. Mortellite.

She'll be taking down the notes and that sort of thing.

One thing I want to say to you, I say it not

jocularly.  I just want to emphasize this.  The process of

peremptory challenges has always been mysterious to me.  I've

done it myself as a lawyer, both as a prosecutor and defense

counsel.  I've watched it as a judge for some 35 years.  I've

even been a juror and watched it down in a courtroom.  And so

I'll tell you a story about appearing as a juror.  I used to

get called all the time as a juror, every three years in the

state court.  You probably all have the same experience.  You

1  kind of think who would want another judge in the courtroom,
2  but I show up to show that I'm responsive.
3       And one time I showed up in the courtroom from the
4  panel, and one of my colleagues was there.  And he was seated,
5  and they went through the process, and somebody exercised a
6  peremptory against him.  One of the lawyers exercised a
7  peremptory against him, and he was kind of startled.  He was
8  walking out through the process, and he turned to me and he
9  said, I don't understand that.  I mean, we're in the fairness
10 business.  What is it that someone is excusing me for?  And I
11 didn't obviously say, Well, it's a discriminating set of
12 lawyers.  I said, That's the way it works.  And of course he
13 understood that.  It was a joke.  I didn't get as far as you
14 guys did.  I wasn't in the group of people who dealt with this,
15 but what I mean by that is don't take it personally if it comes
16 to this.
17      This is part of the process that gives flex in the
18 joints of the selection process that makes it possible for the
19 parties themselves to influence the composition of the jury,
20 and that's where we're going now.  And so what I'd like to have
21 happen at this point is, Ms. Beatty will call the defendants to
22 the bar, there's no need to rise in connection with that, so
23 that they understand and you understand what it is that we're
24 about at this stage.  Ms. Beatty.
25      THE CLERK:  Cedric Cromwell and David DeQuattro, you

are now set to the bar to be tried, and these good jurors whom
I have called are to pass between the United States and you
upon your trial.  If you object to any of them, you must do so
before they are sworn.

THE COURT:  Okay.  So what we'll do now is turn to the
exercise of peremptory challenges.  We do this in a kind of
rolling basis, I should tell you, but I think we all know
enough about what's involved here that it can run quickly.  But
as I said, don't speculate about what's going on and what the
lawyers are thinking about in this case.  So I'll see counsel
at the sidebar.

**SIDEBAR:**

THE COURT:  What I'd like you to do is identify both
the name and the number.  The name will be redacted here, but
just so we're all sure about that because there can sometimes
be slippage.

MR. DOLAN:  I did not even write the names down.

THE CLERK:  I'll clarify it.

MR. DOLAN:  That would be great.

THE COURT:  Government goes first.

MR. DOLAN:  The government would like to -- I'm not
going to say -- Juror Number 29.

THE COURT:  That's ▮▮▮▮▮▮▮▮, is that right, Seat 12.

MR. NEMTSEV:  Juror 14 and 16.  ▮▮▮▮▮▮▮▮▮▮▮▮ and
▮▮▮▮▮▮▮▮▮▮.

1          THE COURT:  Government?

2          MR. DOLAN:  Juror Number 38 in Seat 17.

3          THE CLERK:  ████████████.

4          THE COURT:  That's ████████████.

5          MR. NEMTSEV:  Juror Number 25 and 26.

6          THE CLERK:  ████████.

7          MR. NEMTSEV:  And ████████████████.

8          MR. DOLAN:  Yes, Your Honor.  Juror Number 47.

9          THE COURT:  Seat 21, ████████████████.  You don't have

10  it, but I'll note it.

11         MR. NEMTSEV:  Juror Number 15 and 48.

12         THE COURT:  15.

13         MR. NEMTSEV:  ████████████████, and 48 is ████████

14  ████████.

15         THE COURT:  Right.

16         MS. WICHERS:  What are we up to, is it our fifth?

17         THE CLERK:  You have three more.

18         MR. DOLAN:  Three more.  Juror Number 49.

19         THE COURT:  That's ████████ seated in Seat 23.

20         MR. NEMTSEV:  Juror Number 54 and 63.

21         THE COURT:  54 and 63.  Okay.  And that's ████████████

22  is 54, and Mr. -- sorry, give me that again.

23         MR. NEMTSEV:  63.

24         THE COURT:  63, that's ████████.  One last one.

25         MR. DOLAN:  One more or two more for us?

```
 1          THE CLERK:  Two more.

 2          MR. DOLAN:  Okay.

 3          THE COURT:  Hold on.

 4          MR. DOLAN:  Two more.  Okay.  Juror Number 22, Seat 8.

 5          THE COURT:  That's ██████████ in Juror Seat 8.

 6          MS. WICHERS:  Yes, Your Honor.

 7          THE CLERK:  Are we going right into the alternates?

 8          THE COURT:  I'm going to talk about the question of

 9   additional peremptories.

10          MR. NEMTSEV:  Okay.  41 and 82.

11          THE COURT:  Juror Number 41 is ██████████, who is in

12   Seat Number 19.  And sorry, the other one?

13          MR. NEMTSEV:  82.

14          THE COURT:  82 is ██████████████, who is in seat number

15   41 here.

16          MR. DOLAN:  Juror Number 46.

17          THE COURT:  Juror Number 46 is ██████████████ in Seat

18   Number 20.  Okay.  So I'm prepared to afford for each party

19   separately, for the defendants as well, one additional

20   peremptory as to the main jury here if you want to.

21          MR. WEINBERG:  We don't request one, Your Honor.

22          THE COURT:  All right.

23          MR. WEINBERG:  We're content with the jury.

24          THE COURT:  So let's move on to the question of

25   alternates now.  So what you have available for purposes of
```

1  alternates is two together.  One, the government here is going

2  to go first.

3          THE CLERK:  We're going one/one.

4          THE COURT:  One/one.  Then the government again and

5  the defendant the last.  Okay?

6          We'll take up the question of back-strikes.  I want to

7  be sure that you understand there's no back-strikes that are

8  going to be exercised with respect to the panel that has been

9  chosen as the jurors here.  Now we're dealing separately with

10  the question of the alternates.

11          MR. DOLAN:  We're content.

12          THE COURT:  Okay.  Government says it's content.

13          MR. NEMTSEV:  74.

14          THE COURT:  74 is ███████.

15          THE CLERK:  You won't even get to that.

16          THE COURT:  Okay.  Defendants, anything further?

17          MR. NEMTSEV:  76, Your Honor.

18          THE COURT:  I don't mean to second-guess.  Those

19  people are not likely to be reached.  Okay.  76.  All right.

20          So what's going to happen now is that I will have Ms.

21  Beatty identify the persons who are going to be excused from

22  the jury, and that will include everybody that's been

23  challenged here, plus anybody over the number of 34 that we

24  need --

25          THE CLERK:  36.

1          THE COURT:  -- 36 that we need, right.

2          THE CLERK:  Sorry.

3          THE COURT:  We're going to have four alternates after

4    this.  Everybody else is going to be excluded, even the people

5    who are much farther down on the line.

6          THE CLERK:  Right.  So there are five I'm kicking out.

7          THE COURT:  Effectively starts with seat number --

8          THE CLERK:  Seat 35.

9          THE COURT:  -- seat 35 are all gone in addition.

10         MR. FLAHERTY:  Before we go into openings, I hate to

11   do it --

12         THE CLERK:  We're taking a break.  I have to seat

13   them.

14         MR. WEINBERG:  Is there any problem with my doing my

15   opening before Mr. Flaherty?

16         THE COURT:  Which one of you?

17         MR. WEINBERG:  I would go first.

18         MR. FLAHERTY:  Whatever you want to do.

19         THE COURT:  I'll leave it up to you.  Mr. Dolan is

20   going to go first, of course, but thereafter then Mr. Weinberg

21   and then Mr. Flaherty.

22         MR. FLAHERTY:  Beauty before wisdom.

23         MR. WEINBERG:  Age before handsomeness.

24         THE COURT:  I keep thinking of Dorothy Parker who says

25   pearls before swine.  Different set of issues.

1    (End of sidebar.)

2          THE COURT:  So, ladies and gentlemen, the parties have

3    exercised their peremptory challenges, and what's going to

4    happen is Ms. Beatty will identify the jurors here who are

5    excused from further service in the case.

6          So in order to maintain the confidentiality and so on

7    here, Ms. Beatty will use the number, and she'll point to the

8    particular juror so we're not using names on the record here on

9    the assumption that you may not remember your juror number in

10   this case.

11         What I'd like you to do is, if your number is called,

12   if you could just step out here, out of the jury box or out of

13   the front row, second row, and then I'll give you further

14   instructions because what's going to happen is you'll go down

15   to the jury room, and you'll get further instructions from the

16   jury clerks.  But you've served your service in this case, more

17   than your service in this case.

18         It's been, I realize, a very difficult process of

19   selecting a jury but an important process, and I want to thank

20   you on behalf of the Court and the parties as well for your

21   jury service ahead of time.

22         So Ms. Beatty will identify those people who should

23   get out of their seats now and get in line and get ready to go

24   downstairs.

25         THE CLERK:  When I call your name, if you could just

1  stand, and we'll go to row by row.  Juror Number 14, if you

2  could stand, Juror Number 15, Kristin; Juror Number 16, Daniel;

3  Juror Number 21 -- Juror Number 22, Barbara, the four of you

4  can go back down to the jury room.

5        THE COURT:  As I said, I think I'd just like to have

6  you all --

7        THE CLERK:  They can go.

8        THE COURT:  -- so you're free to go down to the jury

9  room again.  Thank you for your attendance.

10        THE CLERK:  Just to avoid mass exodus, Number 25,

11  Number 26, Number 29 -- sorry -- Number 38, and Number 40, you

12  may go back down to the jury room.  Wait a minute.  Did I do

13  that wrong?  Sorry.  Just 38, not 40.  Thank you.

14        First row, I'm just going to point to you, 41, 46, 47,

15  48, 49, 54, Number 63.

16        Number 69, Number 74, Number 75, Number 76, 77, 79,

17  82, and 86 back to the jury room.  You're number 86, you can

18  go.

19        THE COURT:  So ladies and gentlemen, you're the panel

20  that's going to decide this case.  I will swear you, or more

21  accurately, Ms. Beatty will swear you shortly, but I think Ms.

22  Beatty, before the break, do you want to get the jurors in

23  order in their seats or not?

24        THE CLERK:  I was going to do it later.  Okay.  I can

25  do it now.

1        THE COURT:  Up to you.  Want to take a break?

2        THE CLERK:  Yes.

3        THE COURT:  So what we're going to do is what I hope

4   we're not going to be doing very much of, taking breaks, but

5   we'll take a break at this point to get things straightened

6   away generally with the parties, and we're going to start with

7   the oath that's going to be delivered to you.  It's your duty

8   to decide this case fairly and impartially.  And second, that

9   we're going to start with the opening statements of counsel.

10       I'll explain a little bit about that when we come back

11  in the session, which I think will be maybe ten minutes, 15

12  minutes, something like that, but you're going to be taken now

13  to the jury room.  You were by there before, but that's the

14  door right out here.  That's the way you're going to be coming

15  in and out of the courtroom, and there's obviously a court

16  security officer who will be attending you in connection with

17  the case.

18       (Jury exits the courtroom.)

19       THE COURT:  Anything we need to talk about before the

20  break?  Why don't you try to be back here by 10:20, okay?

21       (Recess, 10:04 a.m. - 10:23 a.m.)

22       THE COURT:  Anything before we bring the jury in?

23       MR. DOLAN:  No, Your Honor.

24       THE COURT:  So Ms. Beatty will line them up and bring

25  them in.

1    (Jury enters the courtroom.)

2    THE COURT:  So ladies and gentlemen, we're about to

3  begin the trial.  As I indicated, I'm going to have Ms. Beatty

4  swear you as the jury.  Let me just outline a couple of things

5  for the next step.  The next step is opening statements by

6  counsel.  We'll hear first from Mr. Dolan, and then I think

7  we'll hear from Mr. Weinberg and then from Mr. Flaherty.

8    What's an opening statement?  Well, it's an outline of

9  where the parties think the evidence is going to go.  I have a

10  standard way I explain it to the jurors.  And in fact, one of

11  your colleagues anticipated it because I talked about it a

12  little bit.  And he said, you know, I guess it's like a jigsaw

13  puzzle.  I'm supposed to wait and see how all the pieces fit

14  together.  And that's exactly it.

15    The way in which an opening statement works is the

16  lawyers outline what they think the evidence is going to be,

17  and it is like the top of a jigsaw puzzle box.  It gives you a

18  preview of where they think this is going to end up, but if

19  you've had the kind of experience I've had with jigsaw puzzles,

20  sometimes not all of the pieces are there, and sometimes the

21  pieces that are in the box that you find don't fit together the

22  way you think they're going to fit together or the top says

23  they're going to fit together.

24    That's by way of a warning because the opening

25  statement isn't evidence.  It's just kind of a way of telling

1  you here's where we think we're going in the case.  In this

2  case I'm going to permit you to take notes.  I'll tell you at a

3  later point how that works.  It's up to you.  Some people take

4  notes.  Some people don't.  And those notes aren't notes of the

5  entire case, but they're ways to remind you about the case if

6  you want to use them.

7      But the point is, the evidence is what you hear from

8  witnesses on the stand, documents that you see here, maybe

9  agreements that the parties have.  But it's not what is said in

10  opening statement.  I don't want to diminish the importance of

11  opening statement.  In fact, it's very important in a case like

12  this for you to get oriented.  But that's the rule of the

13  opening statement at this point.

14      We'll take a break after the opening statements, I

15  think, and then we'll proceed after that with the presentation

16  of evidence, and I'll give you a little bit more by way of

17  instruction at that point.  But at this point Ms. Beatty is

18  going to give you the oath, that is the oath that we have for

19  those people who are going to be hearing and considering the

20  evidence.  Ms. Beatty.

21      (Jury duly sworn.)

22      THE COURT:  Mr. Dolan.

23      MR. DOLAN:  Yes, Your Honor, thank you.

24      THE COURT:  Let me explain the monitors a little bit.

25  When people used to fly on airplanes they had monitors a little

1    bit like this.  But they turn back and forth, and you'll share

2    them.  So for instance, I see you all have them, the folks in

3    the back have them kind of sideways.  I think some of the

4    lawyers are going to be using references to computer graphics

5    and materials, so what you might want to do is just pull them

6    around so you can both look at them and pull them down a little

7    bit.

8            But one thing you should do is, when you get up and

9    leave, turn them back so that we don't have a problem with you

10   bumping into the monitors and stuff.  The folks in the front

11   row of course have their own monitors to look at there.  Okay?

12           MR. DOLAN:  Thank you.

13           THE COURT:  You may proceed.

14           MR. DOLAN:  Members of the jury, opportunity plus

15   greed equals corruption.  When he was the leader of the Mashpee

16   Wampanoag Tribe, Cedric Cromwell was in a position of power.

17   The tribe was in the middle of preparing to build a

18   billion-dollar casino in Taunton.  Chairman Cromwell was the

19   president of the Tribal Gaming Authority, and David DeQuattro's

20   architecture firm had just been selected to work a lucrative

21   contract related to that casino.  Millions of dollars were at

22   stake.  That's the opportunity.

23           The evidence will show that shortly after that

24   multimillion-dollar contract was signed, Chairman Cromwell told

25   David DeQuattro that he wanted $10,000.  That's the greed.  But

1   DeQuattro did not just write a check to the chairman.  Instead,
2   the evidence will show that the money went to a shell company
3   and was converted to treasury checks to conceal their source
4   before being deposited in the chairman's bank account.
5           They also said that the money was for the chairman's
6   re-election campaign.  That wasn't true.  The evidence will
7   show that shortly after getting that $10,000 from DeQuattro,
8   Chairman Cromwell spent the money on himself and his interests.
9   After spending that $10,000, he went back to DeQuattro again
10  and again and again.
11          Through the evidence and testimony at this trial, the
12  government will prove the steps that the defendants took to
13  conceal that money flow.  All told, Chairman Cromwell received
14  over $50,000 from DeQuattro's architecture firm, and the
15  architecture firm was paid over 4 million from the casino
16  contract.  That's the corruption.
17          During the course of this trial, you will learn a lot
18  about the Mashpee Wampanoag Tribe.  The tribe is based
19  primarily in Mashpee, Massachusetts.  As a federally recognized
20  Native American tribe, the Mashpee Wampanoag is considered a
21  sovereign nation.  The tribe has about 3,000 enrolled members
22  and its own system of government.  Representatives that serve
23  on the Tribal Council are elected to four-year terms, including
24  the chairman.  Around 700 people vote in a typical election.
25  In 2009, Cedric Cromwell was first elected chairman.  He was

1    re-elected in 2013.

2          Now, in addition to owning land in Mashpee, the tribe

3    also owns land in Taunton.  In 2012, the Tribal Council passed

4    a law to create a separate legal entity called the Mashpee

5    Wampanoag Tribal Gaming Authority.  The creation of the Gaming

6    Authority was part of the tribe's efforts to build a

7    billion-dollar casino on their land in Taunton.

8          The Gaming Authority has the power to make all

9    decisions for the casino project by majority vote.  The Gaming

10   Authority consisted of five members in total during the

11   relevant time period.  As chairman of the tribe, Cromwell was

12   also president of the Gaming Authority.  In 2014, the Gaming

13   Authority fired the original architect on the casino project as

14   well as what is called the owner's representative.

15         During this trial, you will learn that the owner's rep

16   is an important part of a project of this scope.  The owner's

17   rep represents the interests of the tribe in every aspect of

18   the construction process, big and small, contractor selection,

19   budgeting, every detail.  You'll learn that it is lucrative

20   work.

21         After soliciting bids, the Gaming Authority, led by

22   Chairman Cromwell, selected a firm called Robinson Green

23   Beretta to be the owner's rep.  After negotiations, Robinson

24   Green Beretta, or RGB, entered into a contract with the Gaming

25   Authority in May of 2014.  Chairman Cromwell signed on behalf

1    of the Gaming Authority.  DeQuattro, who is one of the owners

2    of RGB, signed on behalf of the firm.  You'll have an

3    opportunity to review that contract during the course of this

4    trial.  There is no end date.  The contract allowed either

5    party to cancel it for convenience with one month's notice.  No

6    cause was necessary.

7         The first request came in July of 2014.  DeQuattro

8    walked into the office of Joseph Beretta, the other owner of

9    RGB.  DeQuattro told Beretta that the chairman wanted a $10,000

10   contribution for his re-election campaign to be deposited into

11   a corporate account, CM International LLC.  Beretta told

12   DeQuattro that he was not sure about the request and told

13   DeQuattro that he would check into the company.  Beretta looked

14   into it, and he found out that the company was inactive and

15   behind in its corporate filings.  Beretta told DeQuattro that

16   the company was dead.

17        A short time later, DeQuattro gave Beretta the name of

18   another company to receive the money.  It turns out that

19   company was dead, too.  About ten days later, CM International

20   LLC was reinstated as a legal entity in good standing.  Shortly

21   after that, the owner of -- we'll show that the owner of CM

22   International LLC -- I'm sorry, I lost my spot for a moment.

23        After it was reinstated, the owner of that company,

24   Constantinos Mitrokostas, sent DeQuattro a fax that CM

25   International had been reinstated with all filing fees up to

1 date.  The evidence will show that CM International LLC had no

2 employees and no income.  Mitrokostas, the owner, is a close

3 friend of Chairman Cromwell.  He goes by the nickname Dino and

4 owns a pizza restaurant in Mashpee.

5 　　　　Meanwhile, DeQuattro told Beretta that the chairman

6 was continuing to put pressure on him to make the payment.

7 DeQuattro said they had to make the payment.  Eventually,

8 Beretta acquiesced.  Shortly thereafter, DeQuattro made the

9 first payment of $10,000 to CM International.  Beretta

10 authorized reimbursement of that payment to DeQuattro from RGB,

11 but that reimbursement did not say anything specific about

12 Project First Light or the casino project or Chairman Cromwell.

13 It was characterized as a bonus.

14 　　　　After that first payment, work continued on the casino

15 project.  But so did Cromwell's requests for money.  And

16 DeQuattro kept writing those checks.  Two months after the

17 first check, $10,000; a month after that, $10,000; three months

18 after that, $10,000, all made payable to CM International, the

19 company owned by Dino, the pizza guy.  Chairman Cromwell's next

20 election was two years away, an election where most of the

21 constituents have known each other for decades, and around 700

22 people typically vote.

23 　　　　After passing through CM International, the evidence

24 will show that the money ended up in the chairman's account.

25 The November 2015 check was a little bit different.  This time,

1    DeQuattro made the check payable to One Nation Development.

2    The evidence will show that One Nation Development was just

3    another shell company.  It never had any employees, and the

4    only signer on the bank account was the chairman.  That check

5    was deposited in November 2015, over a year before the

6    chairman's next election.  Like all the rest, the chairman

7    spent the money for his personal benefit.

8            There are other things, Celtics tickets, Patriots

9    tickets.  One time the chairman texted DeQuattro and said he

10   wanted a nice hotel or suite at the Seaport for his birthday

11   weekend.  $1,800, RGB paid.  On another occasion, Chairman

12   Cromwell told DeQuattro that he wanted exercise equipment.

13   Beretta picked out a Bowflex Revolution, home gym, on

14   craigslist for $1,700 and had it delivered to Chairman

15   Cromwell's house.

16           Unlike the others, the final payment actually did

17   occur close to the election, in January of 2017.  DeQuattro

18   wrote a $4,000 check again to CM International.  At this point

19   the work on the casino had largely stopped due to litigation,

20   but everyone hoped it would restart in the future.  Regardless,

21   RGB reimbursed DeQuattro for that payment, too.  During the

22   course of all these payments to the chairman, RGB received over

23   4.8 million in fees from the casino contract.

24           Now, I expect that the judge will give you a preview

25   of the charges in this case in a moment, and he'll certainly

1   give you full instructions about it at the close of all the

2   evidence.  And those instructions will center around the

3   conduct that I just described, a conspiracy to commit bribery,

4   an extortion scheme, and there's various counts, but they all

5   relate to that.  And the essence of what the government must

6   prove in this case is a quid pro quo:  this for that.  Here,

7   money and luxury items for protection of the RGB casino

8   contract.  That's the quid pro quo.

9        The government will prove these charges through the

10  testimony of a variety of witnesses.  I'm not going to discuss

11  every witness that the government will call during the course

12  of this trial, but let me summarize a few of them.

13       You'll hear testimony from many of the figures that

14  surrounded Chairman Cromwell at the time of these payments.

15  Some of them will testify about bank accounts, business

16  ventures that never got off the ground, corporate filings for

17  the companies involved in this case, CM International LLC and

18  One Nation Development.

19       The evidence will show that Chairman Cromwell used

20  these entities created by his associates to conceal the money

21  he was receiving from DeQuattro.  You'll hear testimony from

22  some of the other members of the Gaming Authority that served

23  with Chairman Cromwell.  They will tell you that he set the

24  agenda for the meetings, that he had the vision for the

25  project, that he had the strongest point of view.

1     You'll learn that it was Chairman Cromwell that

2     recommended that the prior architect and owner's rep be fired

3     with very little notice.  In large part, the other members of

4     the Gaming Authority do not even remember the specifics of why.

5     Joseph Beretta will testify.  He was the president of

6     RGB and DeQuattro's business partner.  He will walk you through

7     the business of RGB, including the typical costs and donations

8     that it incurred as business expenses.  He will talk about the

9     importance of the owner's rep contract to RGB.  And he will

10    testify about his personal interactions with DeQuattro when

11    Cedric Cromwell stepped forward with his hand out for these

12    payments.

13    Now, in exchange for his testimony, Beretta has

14    received immunity from prosecution for lying to the FBI when he

15    was first approached about these payments to the chairman.  I

16    expect that at the end of this case, when the judge instructs

17    you on the law, he will tell you that you should look at the

18    testimony of a witness like this with greater caution than that

19    of other witnesses because of that immunity agreement.  But

20    you'll find that the testimony of Beretta will be corroborated

21    by the financial records in this case.

22    Specifically, an FBI forensic accountant will testify

23    and walk you through the money trail of the payments made by

24    DeQuattro.  So, for example, the first payment, you'll see that

25    DeQuattro wrote a check to CM International LLC from his

1  personal bank account.  The signer of that account, Dino, the

2  pizza guy, he took that money and split it up into three

3  treasury checks payable to Chairman Cromwell.  Those three

4  treasury checks were deposited on separate days into Chairman

5  Cromwell's personal bank account.  On the face of those

6  treasury checks, there is no indication as to where they came

7  from.  If you just look at Chairman Cromwell's bank account,

8  you would never know they came from DeQuattro and RGB.

9       That's not the end of the financial analysis.  Another

10 agent will testify about the examination of the accounts where

11 the payments were ultimately sent, Chairman Cromwell's personal

12 bank account and the One Nation Development account.  You'll

13 see a summary of the spending out of those accounts, both the

14 total and a zoomed-out amount -- or zoomed-in amount close in

15 time to the date of the actual payments.  The evidence will

16 show that Chairman Cromwell spent the money on himself and his

17 interests with only a few thousand dollars going to any

18 potential campaign expenses.

19      Finally, an FBI agent will testify about interviewing

20 DeQuattro about the payments.  DeQuattro said he was never

21 personally solicited for money by Chairman Cromwell.  He said

22 that he did not know that Dino, the pizza guy, owned CM

23 International.  DeQuattro said that he was solicited for money

24 at a fundraiser on the water but he does not remember who

25 asked.

1          Those statements and the clandestine nature of the

2   payments to Cromwell, those facts are part of how the

3   government will prove during the course of this trial how the

4   defendants acted with corrupt intent.  But it also goes

5   directly to the nature of the agreement, their understanding of

6   what the quid pro quo was.

7          When DeQuattro told Beretta about the chairman's

8   request, that very first ask, Beretta did not ask why.  He did

9   not ask what for.  He already knew:  the protection of the

10   casino contract, the 4.8 million.

11          Now, at the end of this case, my colleague, Ms.

12   Wichers, will have the opportunity to address you during her

13   closing argument.  At that time she will ask you to return the

14   only verdict consistent with the law and the evidence.  The

15   government has the burden of proof to prove it beyond a

16   reasonable doubt.  And at the end of this trial, my colleague

17   will ask you to return a verdict consistent with that burden

18   and consistent with the law and the facts as you'll find them:

19   that the defendants are guilty of the charges in the

20   indictment.

21          THE COURT:  Thank you Mr. Dolan.  Mr. Weinberg.

22          MR. WEINBERG:  Thank you, Your Honor.

23          Good morning, ladies and gentlemen of the jury.  I'm

24   going to speak for a little longer than the government, and I'm

25   going to try to navigate you through some of the testimony that

1    you're going to hear for the next week or two weeks from the

2    various witnesses.

3         But let me start by saying that the defense for

4    Mr. DeQuattro is simple.  It's straight and simple.  He is not

5    guilty of bribing Mr. Cromwell, that there are few horrors

6    greater in a democracy than for an innocent man to be accused

7    of crimes he did not commit, and the evidence will clearly and

8    compellingly show that Mr. DeQuattro is not only presumed

9    innocent but actually innocent of these serious charges.

10        At its essence, this case boils down to an absence of

11   evidence, to a large gaping hole at the center of the

12   prosecutor's case.  We contend that the case against

13   Mr. DeQuattro is based on the quicksand of a prosecution's

14   conjecture about why donations were given by Mr. DeQuattro to

15   Mr. Cromwell.  That's not disputed.  The donations were given.

16   Several gifts were given.

17        What is disputed is that the government can prove what

18   they alleged, federal bribery, a quid pro quo conspiracy or

19   that they have any evidence that Mr. DeQuattro's motive was to

20   protect a contract.  Not every donation, not every gift made or

21   paid by a businessman or a business to a client they're doing

22   work with, even profitable work, even sizable gifts in

23   donations, are federal crimes.

24        Despite the enormous resources of the FBI, the most

25   powerful domestic law enforcement agency of the U.S., if not

1   the world, despite the availability to the U.S. Attorney of a

2   grand jury to subpoena witnesses and subpoena documents, you

3   will not receive one text, one email, one recording, one

4   document, one memorandum that in any respect will show you that

5   accompanying the donations which occurred over a three-year

6   period, not one text or email accompanying a gift will show you

7   that Mr. DeQuattro asked or requested anything at all of

8   Mr. Cromwell.  It's the fatal hole in the government's case.

9       He gave donations.  He gave gifts.  He never once

10  asked Chairman Cromwell, one of five Gaming Authority members,

11  for any favors, any benefits, any preferences, anything at all

12  during the life of the casino project, which, as I said,

13  occurred over a three-year period.  So we're not just dealing

14  with a snapshot.  He didn't ask for something on the day he

15  gave a donation.  We're dealing with over three years of an

16  absolute failure for the government to prove that Mr. DeQuattro

17  asked for anything in exchange for any of the donations or

18  gifts.

19      There's a second failure of proof.  They've alleged

20  conspiracy.  Mr. Dolan has been quite frank saying you need

21  proof of a quid pro quo, that in exchange for something, you

22  get something.  There is no proof Mr. Cromwell did anything for

23  RGB for over three years, no email, no text, no witness, no

24  recording.  No proof, despite Gaming Authority meetings that

25  were in public, despite a three-year casino project that had

1  dozens of witnesses, consultants, contractors, architects,

2  vendors, no proof that for all of those years Mr. DeQuattro

3  asked for anything and no proof that Mr. Cromwell gave anything

4  for these donations.

5         These are gaping holes in the government's case.  It's

6  not a federal crime to give a large gift, to give a large

7  donation even, when you're doing business with somebody.  It's

8  part of the DNA of businesses.  We may not like it.  We may not

9  in our own sensibilities approve of the way businesses work,

10  what they give to clients, how politics works or whether large

11  donations are good or bad in our system, but we're here under

12  the guidance of one of the most experienced and wisest of the

13  federal judges in this building.  You're here in a sacred role

14  as jurors to determine whether or not the government has proven

15  not some elements but every element of the crime charged.

16         I listened hard for evidence of the government's

17  theory that the purpose of the donations was to protect the

18  contract.  The allegations in the indictment, and it's their

19  burden to prove the conspiracy as they allege them, a citizen

20  is entitled to that proof and entitled to remain presumed

21  innocent unless there's that proof beyond a reasonable doubt,

22  the allegation in the indictment was the donations were given,

23  quote, "in exchange for 'favorable action or inaction' on the

24  contract by the Gaming Authority."  Pretty close to what the

25  prosecutor said, protecting the contract, but that language is

1 at the heart of the conspiracy charge.

2 They have not prosecuted the man for donations, large

3 donations or gifts.  They're prosecuting him because it's the

4 government's claim that they need to prove to you beyond a

5 reasonable doubt that there was an exchange here of the

6 donations for, quote, "favorable action or inaction."  That's

7 what a quid pro quo bribery conspiracy is foundationed at, and

8 that's the fatal hole in this case, that they cannot and will

9 not prove what they've alleged.

10 The evidence instead will show that there are other

11 reasons for Mr. DeQuattro to have given donations.  One,

12 Mr. Cromwell treated him like a friend, sent him invitations to

13 family events, worked with him for years, not only on the

14 casino project but for two years before that project where RGB

15 was involved in erecting the Government Center for the Mashpee

16 Tribe, the source of enormous pride for the tribe.  A beautiful

17 building in Mashpee that became the center of the tribe's

18 activities.

19 So Mr. DeQuattro, who is the chief of the architects

20 at RGB and the head of their business development, knew

21 Mr. Cromwell for a number of years.  No evidence of any

22 requests for a donation during this period and no evidence --

23 and this is important -- from Mr. Cromwell seeking a donation

24 before RGB was selected to be the owner's representative in the

25 casino project.

1    The donation requests began after RGB was selected,

2   not before.  The donations, in a quick look at the timeline,

3   the donations preceded two different sets of elections, not

4   just the 2017 election to re-elect Mr. Cromwell but also a 2015

5   election of the Tribal Council.  And the first four of the

6   donations were given in the months preceding the first February

7   2015 election.  The fifth donation was in November of 2015, the

8   beginning of Mr. Cromwell's campaign to get re-elected in

9   February of 2017.  And then there were no requests for

10  donations after Mr. Cromwell's re-election.

11   Second, Mr. Cromwell was the leader of the Mashpee

12  Tribe.  He was campaigning on principles that Mr. DeQuattro

13  understood publicly campaigning and trying to use the casino as

14  a basis for the tribe to transcend its history, to gain

15  economic self-sufficiency, to empower the tribe.  One of his

16  campaign promises was to use the casino profits to educate

17  every young child, to make sure that their college education

18  was funded, to fight drug and alcohol addiction, to make the

19  tribe respectful.

20   Mr. DeQuattro was there.  He understood that.  He

21  heard that.  That's another reason why you give political

22  donations.  Yes, Mr. Cromwell, like a politician, asked for

23  lots of donations.  Mr. DeQuattro gave him multiple donations.

24  But there was also a business reason.  Mr. DeQuattro was head

25  of development at RGB.

1      The casino project, as the government has told you,

2   generated proceeds for RGB.  Not 4.8 million.  Almost a million

3   of that was payments for expenses and payments for consultants.

4   It wasn't straight fees, but there were a large amount of fees

5   over a more than three-year period.  RGB was getting an

6   expertise in casinos, and the casino projects were going on

7   with other tribes, as was other forms of economic development.

8      There is nothing illegal about a business paying gifts

9   and donations to a client, as Mr. DeQuattro did to

10  Mr. Cromwell, hoping for goodwill, hoping for an advantage when

11  the next project got discussed, whether the next project was

12  with the tribe or whether the next project instead was with

13  other tribes.  So there was an economic purpose.  That's

14  business.  You may not like it, it may not be pretty, but

15  businesses wine and dine and travel and take their clients on

16  expensive Super Bowl trips, et cetera, hoping -- not a bribe,

17  not a bribe for some benefit with a pending project, and again

18  there's no evidence that Mr. DeQuattro asked for a favor, any

19  benefit or received one in the matter that the government has

20  prosecuted, but there was an economic hope that RGB, which had

21  no ability to open doors with other tribes, Mr. Cromwell might

22  do that for them and they might get future projects.

23      I want to talk briefly about RGB's work at the

24  project.  They didn't need any favors.  They were trusted and

25  liked, and you will hear witnesses say their performance was

exactly what was required by the contract.  It's not as if RGB
was falling apart and needed a favor and had to pay to keep or
maintain the contract or, in the government's word, protect it.

They were trusted and liked.  Every month they were
getting more and more responsibilities.  They were traveling
with the Gaming Authority people to look at model casinos in
Bimini.  They were traveling with the Gaming Authority as their
trusted advisors to meet the architects in Las Vegas.  They
were chosen, Mr. DeQuattro was chosen to pick the construction
manager, the most important role in this kind of massive
complex building project.  And then both the Gaming Authority
and Genting, which is the name for a Malaysian company that was
funding the entire casino project, they were giving loans to
the tribe to fund this massive project.  Both representatives
of Genting, the financial people, and the Gaming Authority
asked RGB to validate all of the other expert invoices from the
architects' invoices to the consultants' invoices.  The point
being that Mr. DeQuattro understood that RGB was being trusted
by the Gaming Authority.

They were in the center of the entire project.  They
had no reason to fear for the contract.  Nobody in three years
ever talked at a Gaming Authority meeting to the RGB people
that were there daily, one of them was even a tribe member, no
one ever threatened the contract.  No one ever discussed
cancelling the contract.  No one ever created any reason for

1   Mr. DeQuattro to be concerned about the contract.

2        Mr. Beretta, who is sitting back in Providence, who

3   never went to the Taunton construction site, who almost never

4   went to Mashpee, who never had a one-to-one conversation with

5   Mr. Cromwell, who sits at Monday meetings at the business, RGB,

6   no one ever suggested to him that the contract was in peril.

7        If Mr. Beretta was afraid for the contract, it was a

8   baseless fear.  He didn't have any understanding, which

9   Mr. DeQuattro did, that the contract was not at risk; that

10  RGB's performance was welcome, it was expanding.  And what's

11  more, the evidence will be indisputable that schedule was

12  important.  The tribe wanted to finish at least the first part

13  of the casino to start generating the proceeds that would allow

14  them to build the hotels and restaurants and the rest of the

15  casino with the profits of the casino.  They didn't want delay.

16       And year after year, while donations are given, to

17  fire RGB -- and Mr. DeQuattro knew this -- would have been

18  completely in conflict with the priority, the critical priority

19  to get this casino built.  You don't fire the owner's rep who

20  are in the middle of the entirety of the project when you're

21  happy with them, when their performance works, when all the

22  feedback from the client is positive.

23       And the reason I'm saying this, and I don't know that

24  the government's going to dispute it, is that from

25  Mr. DeQuattro's perspective, there was absolutely no risk to

1  the continuation of the project and the continuation of the

2  contract.  And to give a donation, the government must prove

3  quid pro quo, and the quo that they are alleging in exchange

4  for the donation is simply based on theory.  It's not based on

5  any witness, any document, any fact.  And the next two weeks of

6  evidence will show that to you.

7       Let me briefly address Mr. Beretta, who is the chief

8  witness for the government.  Mr. Beretta was the principal

9  owner of RGB.  Mr. DeQuattro at the time of the first donation

10 was a 14 percent owner.  Mr. Beretta, as I explained, is not an

11 architect, didn't go to the project site, never talked to any

12 of the clients, never had any personal knowledge about the

13 state of the contract and whether or not there was any risk to

14 it.

15      You are the judges of credibility.  The government

16 candidly told you that Mr. Beretta was a witness that they

17 conferred immunity on.  And you can consider Mr. Beretta's

18 motivation and his bias and his interest in assessing his

19 trustworthiness when he tells you of conversations he had with

20 Mr. DeQuattro.

21      He was the president of RGB for many decades.  Before

22 that, his father was the president of RGB.  But today, through

23 tireless work by Mr. DeQuattro and the retirement of

24 Mr. Beretta, Mr. DeQuattro has taken over the position of being

25 the head of Robinson Green & Beretta, the company that carried

1    Mr. Beretta's name.

2            Mr. Beretta sued Mr. DeQuattro in the aftermath of his

3    retirement and the breakup of the firm for over $2 million,

4    claiming lost profits, lost bonuses.  Mr. DeQuattro also has a

5    lawsuit against Mr. Beretta.  We're not here to resolve that

6    civil lawsuit or the business dispute.  But the point, when we

7    talk about Mr. Beretta's bias, is that he is seeking $2 million

8    from Mr. DeQuattro and well believes that he would be in a

9    better position to win a future civil lawsuit with

10   Mr. DeQuattro convicted and Mr. Beretta immunized than with

11   Mr. Beretta prosecuted for the lies that he told to the FBI

12   that the government threatened to prosecute him about that

13   motivated him to go and cut what I contend was a cynical deal

14   with a linchpin of the government's prosecution in this case,

15   the only person who will tell you anything about conversations

16   with Mr. DeQuattro that talk about the project and the contract

17   in anything other than positive words.

18           RGB was doing its job for three years.  Mr. Beretta,

19   as the defense contends, you should look at his testimony, and

20   we'll hear it next week, with great skepticism because not only

21   does he have a multimillion-dollar monetary motive to give

22   false testimony about Mr. DeQuattro, but he also had a motive

23   to please the prosecutors.

24           I don't get to confer immunity on government

25   witnesses.  Mr. Beretta was fearing going to jail having being

1    indicted for lies to the FBI, a crime.  The prosecutor has the

2    power.  They can confer immunity.  They can withhold immunity.

3    You can infer they're more likely to confer immunity if

4    somebody gives them testimony that conforms to their theory of

5    prosecution.  But the one thing that's uncontested is that the

6    linchpin of this prosecution against Mr. DeQuattro is an

7    admitted liar:  Mr. Beretta.  A liar with motives that are

8    monetary and motives to please the prosecutor in the

9    presentation of his testimony.

10            So I want to finish by saying at bottom line this case

11   is complex in one area but simple in another because the

12   defense contends that the government can't prove the quo or the

13   exchange of a donation, the alleged quid for a quo, which is

14   protecting the contract or Mr. Cromwell's acting in a manner

15   that would protect RGB's contract.

16            So I ask you please to keep focused on the absence of

17   evidence because in this democracy, in this criminal justice

18   system, as Judge Woodlock so eloquently told you on Tuesday,

19   the burdens are squarely on the government.  He sits there

20   accused but presumed innocent.  They have to prove each and

21   every element beyond a reasonable doubt, not just one element

22   or two elements.  They need to prove that he asked for

23   something, that he requested something, and that something was

24   to protect the contract.  That's the allegation.

25            There's no evidence, nobody will say that Mr. Cromwell

1  threatened him, no one will say that he asked Mr. Cromwell to

2  protect the contract, and no document will prove that.  It is,

3  as I say in ending, a gaping hole.  The government simply can't

4  prove what they charge.  They may suspect it.  They may think

5  it's possible.  They may think it's probable.  They make

6  conjecture, why would he give $50,000 in donations.  But that

7  kind of level of suspicion is not a principle predicate in an

8  American courtroom to extinguish someone's liberty.  Proof

9  beyond a reasonable doubt alone on each element alone can

10  satisfy the government's burden.

11      We're here in historical circumstances, in this

12  courthouse, this beautiful courthouse, a stone's throw from

13  Bunker Hill, from the Boston Harbor, where they fought to give

14  people like Mr. DeQuattro and Mr. Cromwell their rights, rights

15  in an American democracy, rights that our forefathers in their

16  wisdom gave to defendants charged with crimes; and that's that

17  they're presumed innocent unless and until the government

18  proves every element of its federal prosecutorial charge.

19      The defense says they won't.  This case remains

20  unproven.  And when cases are not proven in an American

21  courtroom, the verdict is not guilty.  Thank you very much for

22  your attention.  I appreciate it.

23      THE COURT:  Thank you Mr. Weinberg.  Mr. Flaherty.

24      MR. FLAHERTY:  Yes, sir.

25      This case is about a failure of the federal

1  government.  A failure that's so significant and so compelling

2  that it's driving this prosecution.  These allegations, these

3  accusations, this entire indictment, excuse me, is not based on

4  proof.  It's not based on evidence.  It comes to you formed

5  from conjecture, speculation, surmise.  The government's case

6  here in this courtroom is constructed entirely from invalid

7  assumptions, unreliable conclusions, and it fails to understand

8  and appreciate a simple human fact.

9      And that fact is this:  that David DeQuattro, a white

10  man, empathized with the plight of the Mashpee Wampanoag Tribe,

11  and he recognized in Cedric Cromwell, a Native American, the

12  chairman of that tribe, an undeniable and an uncommon talent

13  and ability to execute on behalf of his nation.

14      Mr. DeQuattro, through his work with the tribe,

15  realized that his ambitions and the ambitions of RGB were

16  perfectly aligned with Mr. Cromwell's aspirations, goals, hopes

17  and dreams.  And because of that, one man and another man liked

18  and admired one another, they befriended one another, and

19  Mr. DeQuattro supported Mr. Cromwell.  That's a simple fact.

20      Now, good morning.  I know you're very well aware my

21  name is Timothy Flaherty.  I'm an attorney.  I represent

22  Mr. Cromwell.  And I also know that you're very well aware this

23  is a criminal case and, because of that, that there are two

24  very important principles at play in this proceeding right now,

25  right here in this courtroom, and these are the cardinal

1  principles of our American justice system.

2        These are not high-minded ideals.  These are not

3  notions that are discussed in some dusty law library or which

4  occupy the space between the ears of academics or lawyers.

5  These are real rights.  They're your rights, they're my rights,

6  they're Judge Woodlock's rights and Mr. Cromwell's rights.

7        And number one, he is presumed innocent.  As he sits

8  here, he is innocent.  And the evidence will show that he is

9  truly innocent.  That doesn't change, unless and until the

10  government proves otherwise.  He need not do a thing, say a

11  word, call a witness, to meet this case based upon invalid

12  assumptions and unreliable conclusions.

13        Number two, each and every accusation brought by the

14  government against Mr. Cromwell must be proved beyond a

15  reasonable doubt.  That's the highest standard of proof known

16  in our justice system.  That burden never changes, never

17  shifts.  And again, Mr. Cromwell need not say a word, call a

18  witness or produce any evidence.  That is his right.

19        You'll learn during this trial that Mr. Cromwell was

20  the elected chairman of the Mashpee Wampanoag Tribe.  They are

21  a sovereign nation.  They have their own government.  They have

22  their own health care services.  They have a police force.

23  They have a tribal court, and they make their own laws.  You

24  will hear, and I'm sure that no one needs a civics lesson from

25  me, that the Mashpee Wampanoag Tribe suffered oppression,

1    atrocities, a taking of their tribal land by English colonists

2    some 400 years ago simply because they had a reserve that was

3    rich in natural preserves like wood and game and fish, and

4    sometime, maybe 50 years ago or so, they began a legal

5    challenge to reclaim their tribal lands.  And ultimately, after

6    many decades and a long and difficult legal challenge, they

7    were recognized, received federal recognition as a Native

8    American tribe.

9         This was important because then they could begin the

10   process of petitioning the federal government to place land

11   into trust, have an Indian reservation and potentially pursue

12   gaming.  Now, this led to Mr. Cromwell and others advocating

13   forcefully and intelligently on behalf of his nation before the

14   United States Congress, the Department of Interior, state and

15   local governments.  And ultimately about 150 acres in Mashpee

16   were placed into trust for an Indian reservation on behalf of

17   the Mashpee Wampanoag Tribe and another maybe 150 or 170 acres

18   were placed in Taunton.

19        At the time, Mr. Cromwell was also effective and able

20   to negotiate a compact with the then Commonwealth of

21   Massachusetts Governor, Deval Patrick, to get the exclusive

22   right for a gaming license in the southeastern region of

23   Massachusetts.  This is a competitive industry.  But

24   Mr. Cromwell had the ability to accomplish these things for his

25   nation.

1          Thereafter, Mr. Cromwell, with the assistance of

2    others, was able to secure a partnership with Genting

3    International, which is a gaming company that has casino

4    interests all over the world, and they decided to be involved

5    with this small tribe here on Cape Cod, land in Taunton, to

6    develop a casino.

7          This opportunity was transformative for the

8    Wampanoags.  This opportunity provided much needed resources.

9    After years of living in poverty for some of these people,

10   through Mr. Cromwell's efforts and the tribe's efforts and the

11   hopeful development of a casino, this nation would now be able

12   to provide better access to health care, more educational

13   opportunities, substance abuse treatment and prevention, free

14   college education for children, massive capital improvements,

15   housing.  Everything would change for the tribe.

16          And in the process of all of this, the tribe, as

17   you've heard already from the other people who spoke before me,

18   began, with the assistance of Genting, through this development

19   process, they established a Gaming Authority.  The Gaming

20   Authority was a five-member board that had votes and public

21   meetings, discussion.  And Mr. Cromwell, because of his role as

22   chairman of the tribe, was president of the Gaming Authority.

23   He was one vote of five.

24          And ultimately, the Gaming Authority decided to enter

25   into a contract with RGB, Robinson Green Beretta, the architect

1  firm of which Mr. DeQuattro was a principal at the time, and

2  RGB served as the owner's project manager for this development.

3      A contract was executed between the Gaming Authority

4  and RGB.  It was signed by Mr. Cromwell and Mr. DeQuattro, but

5  all of this occurred prior to any political donations.

6      Now, what the government I think wants you to believe

7  is that somehow or another, despite the evidence you'll hear

8  about the Gaming Authority and how it functions and the rules

9  and procedures put in place by Genting, that Mr. Cromwell had

10  some sort of independent or autonomous authority with respect

11  to the tribe.  Simply unsupported.  It's a false narrative.

12      You'll hear about the drawdown process.  You'll hear

13  about how Genting was involved, how a team of tribal members

14  was involved, and ultimately, you'll conclude that the Gaming

15  Authority makes all these decisions related to any casino

16  business, not Cedric Cromwell.

17      Now, it's undisputed that RGB was paid for its work

18  somewhere over $4 million.  It's also undisputed that RGB

19  performed expertly on behalf of the tribe, above and beyond

20  what was expected of them, and their responsibilities expanded.

21  It's also undisputed that David DeQuattro made political

22  donations and gave gifts to Cedric Cromwell.

23      And finally, it's undisputed that Cedric Cromwell is a

24  human being.  He has flaws just like each and every one of us.

25  And in spite of being a very skilled and gifted leader, he

1    didn't pay particular attention to his personal finances.  He
2    was undisciplined with some of his political monies.  He
3    commingled that with his personal monies and used some of it
4    for his personal expenses.  It's undisputed.  But what this
5    case is not about, ladies and gentlemen, what it is not about,
6    is whether or not you agree with gaming, whether or not you
7    agree with the Mashpee Wampanoag Tribe's decision not to create
8    any type of political rules or regulations related to political
9    fundraisings.
10          There is no agency that some of you may be familiar
11   with, a corollary, like an Office of Campaign and Political
12   Finance with the tribe.  There is no Federal Elections
13   Commission.  This is a sovereign nation which makes its own
14   laws.  This is not a case about whether or not you agree or
15   disagree with Mr. Cromwell's undisciplined handling of
16   political monies.  It's not what this case is about.
17          This case is about an accusation that has been brought
18   by the government against Mr. Cromwell that is unsupported by
19   any evidence.  As you've heard already, the government has
20   charged him with bribery and extortion.  And as you've heard
21   already, what that requires is a quid pro quo, something for
22   something.  You will hear no evidence.  You'll see not a single
23   text.  You won't hear from a witness.  You won't see a
24   memorandum, a note, a telephone call, a recording, absolutely
25   nothing that demonstrates that Mr. Cromwell either performed an

official act, promised, made an explicit promise to perform an
official act or did anything on behalf of RGB in exchange for
political donations.  The reason why you won't hear any of that
is because it doesn't exist.  And the reason why it doesn't
exist is because it didn't happen.

Now, the government in its opening and during this
case will make mention of CM International, which was a
business that was operated by a close political ally and
personal friend of Chairman Cromwell's who acted in some sense
as a de facto, not that it was required, as a de facto campaign
treasurer.  He received donations.  Some of it was used for
political monies, for political activities.  Others of it was
given to Mr. Cromwell.  And this is not in violation of any of
the standards, rules and regulations of the tribe.

The government will suggest to you that, as they did
in their opening, these couldn't have been political
contributions because at the time Mr. Cromwell wasn't running
for re-election as chairman of the tribe.  But what it fails to
understand and appreciate and recognize was that Mr. Cromwell
at this time, after being so successful on behalf of the
Mashpee Wampanoag Tribe, was a rising star with national
aspirations, that Mr. Cromwell had in his own mind an idea to
brand his experience through One Nation Development to bring
this to other tribal nations across the country, to assist them
in securing land into trust, pursuing gaming, pursuing other

1  areas of economic development for these many tribes across the

2  country.

3       Now, this theory that the government has that these

4  political donations were somehow connected or made in exchange

5  for an action or an inaction on the contract simply doesn't

6  hold water.  Maybe it has a false bottom.  I expect the

7  government to call a witness in this case by the name of Joseph

8  Beretta, who you just heard a moment ago, who was a former

9  partner of David DeQuattro who has never had more than an

10  exchange of pleasantries with Mr. Cromwell, nothing more than a

11  passing hello, probably wouldn't recognize him if he walked

12  past him on the street.  But Mr. Beretta says one thing to a

13  federal agent, and then quite a different story is given after

14  he enters into an immunity agreement once he's confronted with

15  telling a lie and being threatened with prosecution.

16       You will never hear any evidence in this case about

17  Cedric Cromwell making any promises, making any threats or

18  doing anything either in favor of or against the contract with

19  RGB.  In short, the government is asking you to infer from a

20  series of invalid assumptions, unreliable conclusions that

21  Mr. Cromwell participated in some scheme to commit bribery and

22  extortion.  Again, this rings hollow for many reasons but none

23  which is more important than the following:

24       The contract between RGB and the Gaming Authority had

25  been executed prior to any political donations.  And anyone

1   anywhere near this project, even with a limited understanding

2   of the controls put in place by the Gaming Authority, Genting,

3   and the involvement of the multiple people in any of the

4   decisions in the drawdown activities and the vote by the Gaming

5   Authority will understand and know that Mr. Cromwell simply

6   didn't have any authority.  No power whatsoever to do anything

7   one way or the other.  And everyone knows that.

8           Robbie Hendricks, who is no fan of Cedric Cromwell's,

9   maybe a political opponent, certainly not in his camp, who was

10  also a member of the Gaming Authority and was the treasurer of

11  the tribe, will explain to you the process that he went through

12  in checking everything that happened with respect to this

13  contract and payments.  And I expect that he will testify that

14  he never heard of Mr. Cromwell ever threatening anything about

15  the contract, that the contract was never at risk, that he was

16  pleased with the work that RGB did, that he worked closely with

17  the members of RGB that were performing these important tasks

18  on behalf of the Gaming Authority and the casino, and that

19  Mr. Cromwell never advocated in support of RGB or against RGB.

20  He simply had no authority to do anything of that sort.  And

21  everyone knows that, including Joe Beretta.

22          This case, ladies and gentlemen, is based upon

23  speculation, conjecture, surmise, invalid assumptions,

24  unreliable conclusions.  Not evidence.  It's not a case about

25  the misuse of political funds or the inability to particularly

1  pay attention to personal finances.  It's not about those

2  judgments.  Cedric Cromwell may be imperfect, and he may have

3  made some errors, but he did not participate in a scheme or

4  commit bribery or extortion.

5       THE COURT:  Thank you, Mr. Flaherty.  So ladies and

6  gentlemen, I think we'll take a break at this point.

7       So we're going to take maybe a ten-minute break at

8  this point, and then we'll start with the evidence.  We've had

9  discussions all along about instructions that I'm giving you,

10  instructions from the very moment we've met.  But I'm trying to

11  give them to you in an orderly fashion so that you're not

12  overwhelmed by instructions.  And so I'm not going to be giving

13  you extensive instructions about the law in this area.  You've

14  heard the parties referring to the general legal issues here.

15  I'll leave it at that at this point.

16       I will give you a little bit of instruction about

17  evidence in the case because we're about to start the evidence

18  in this case.  We're about to start with materials that you

19  need to make your own decisions about whether or not the

20  government can prove its case.  As I indicated, I permit you to

21  take notes if you want to.  Ms. Beatty will provide you with

22  notebooks if you want to use them.  I have to say that some

23  people take terrific notes between, say, 11:45 and 11:47 and

24  then it kind of falls off after that.  Other people take very

25  detailed notes, and some people don't want to take notes at

all.

One thing I want you to do is understand that it's
what you see, what you hear that counts here. And if taking
notes is distracting from following the witness and observing
the witness and observing the witness's demeanor, because
demeanor is going to be a major issue in this case, I would
suggest to you how you size up what a witness is, then perhaps
you'll want to think about the way in which you take the notes.

The short of it is this is up to you. They're your
notes. They're not things that are supposed to be used in the
course of the discussion with jurors, saying, See, it's right
here in my notebook. You can't do that. But you can remind
yourselves about things you think are important.

We'll have more discussion about notes at a later
point, and I will discuss in a broad brush what evidence is
about in this case, but for now we're going to take a break so
we can get set up here. And I should tell you that we'll have
lunch at 1:00, and then we'll probably take a break at maybe
2:30, something like that. We're going to go until 4:00 today
so that we can take advantage of the fact that we've imposed on
bringing you in today. Next week it's 9:00 to 1:00.

One issue that Ms. Beatty raised, and I'm going to be
the heavy on this one, is concerns the jurors have. You had
your telephones taken from you, and, as a consequence, you
can't make telephone calls or that sort of thing. I'm going to

1    continue that.  Can't be done at the break.

2          The reason, if you think about it, is pretty clear.

3    There's always this nature that there's going to be

4    communications of some sort in some area of the building that

5    might compromise the case.  You'll have the chance to get them

6    back on the phone afterwards when you finish for the day, but

7    I'm going to enforce that rule.  It's part of the larger rules

8    in this case, not distracting you from your duty to remain

9    insulated from anything else that might distract you here.

10          But otherwise, I think we feed you pretty well, and

11   you'll see -- I'm sure you'll vote on that, too.  But we're

12   going to try to provide the kind of setting that's conducive to

13   orderly and considered judgment in the case, given all of the

14   various factors that may affect it.  So we will take our

15   ten-minute break at this point, and then we'll be back to start

16   with the government's first witness.

17          (Jury exits the courtroom.)

18          THE COURT:  So a brief statement.  I think I will talk

19   a little bit about direct evidence and circumstantial evidence,

20   which is raised by the discussions that we've had here, the

21   anodyne discussions about it.  I have some more detailed ones

22   that I use in the course of closing instructions just to orient

23   the jury about the things that they're thinking, that it's not

24   merely things that are directly said in court but their use of

25   common sense in connection with bringing bits and pieces of

      1   evidence together to draw reasonable conclusions.  Not
      2   speculative contributions.

      3        But beyond that and reiterating it's about a quid pro
      4   quo here, and it's not about something that happens afterwards,
      5   it has to be directly in anticipation of some activity of some
      6   sort or inaction of some sort as was presented.  I'm not going
      7   to go beyond that at this stage.  It's far too much material,
      8   from my perspective, for the jury to absorb for the first day.
      9   We'll move on from that.  Okay.  We'll be in recess until,
     10   let's say 11:45, be back.

     11        (Recess, 11:36 a.m. - 11:54 a.m.)

     12        THE COURT:  First witness on the stand.  Just as a
     13   general matter, I'd like to have the witnesses on the stand
     14   when we come back in here so we can get moving.  And I'll have
     15   some things to say to the jury before that.  But are there any
     16   things that we need to take up before we bring the jury in?

     17        MR. DOLAN:  I don't think so, Your Honor.

     18        MR. WEINBERG:  Not from the defense, Your Honor.

     19        THE COURT:  I will inquire, the government calls the
     20   witness, and you'll identify who the witness is before Ms.
     21   Beatty swears the witness.

     22        (Jury enters the courtroom.)

     23        THE COURT:  So ladies and gentlemen, even after your
     24   first break I'm going to ask you a question because I've given
     25   you instructions not to talk about this case in any way, even

1   among yourselves here.  But have any of you been exposed to any

2   discussions concerning this case since we last talked?  And I

3   see no response to that, so I take it that you have not.

4        You now have your notebooks.  What Ms. Beatty has done

5   is put them on your seats with pens and pencils, I guess, some

6   form of writing material that you can use.  But I encourage you

7   again to understand, don't let it distract you from the

8   testimony in this case.  And if you take notes, don't try to

9   take comprehensive stenographic notes.  And more than that,

10  understand that these are your notes, not anybody else's notes,

11  they're your notes.

12       And what's going to happen is, when you leave the

13  courtroom, for instance on breaks, you're going to leave the

14  notebooks here in the courtroom.  At the end of the day, Ms.

15  Beatty will pick up the notebooks, or perhaps a security

16  officer will, but in any event, they'll be picked up.  They're

17  going to be put into a vault and kept by the court to keep

18  confidential anything that you have in there.  Nobody's going

19  to look at those notes, except you.

20       And when you get time for jury deliberations, you may

21  look at the notes to refresh your recollection, but you should

22  understand that what is involved here is a collective

23  recollection.  That's what you're going to be looking for, not,

24  See, I got it right here in my notes, that's the truth.  It is

25  to listen to other people and be able to contribute to the

1    conversation.  But it is not the notes that count.  It's the

2    way in which you discuss the case with your colleagues when it

3    comes time for discussing the case with your colleagues.  And

4    that's when all of the evidence is in.

5         Now, there's been some reference here about further

6    instructions that I'll give you.  I will be merciful at this

7    point in the number of instructions.  I've told you a bit about

8    the issues in the case.  The parties have focused on what

9    probably is the crux of the case, although the government has

10   to prove each essential element of the offense charged against

11   the defendants beyond a reasonable doubt.  And I'll tell you

12   about all of the various elements, but they focused on this

13   idea of quid pro quo, which is a simple way of saying for

14   something you get something.

15        And the idea here is that the government has to prove

16   that there was some form of quid pro quo.  You'll listen very

17   carefully because this is contextual, clearly, in this case.

18   But you'll listen to all of the evidence that's presented in

19   the case.  Now, the evidence, you know, parties refer to it, it

20   could include things like sworn testimony of witnesses.  I'll

21   give you instruction.  I've already given you some instruction

22   on how you treat testimony of witnesses.

23        There may be documents that are submitted in the case.

24   You look at those documents in some ways the way you look at a

25   witness.  Who wrote the document?  Can I rely on this document?

1   What's the source of this document?  The point is that you will

2   be using a discriminating analysis of all the bits and pieces

3   of evidence that come in here.

4        There may be forms of what are called stipulations,

5   the parties agree to something that's not in dispute.  Well,

6   you're entitled to rely on those stipulations.  But unless I

7   tell you otherwise, you can make your own judgment about the

8   stipulation because it's up to you to make the determination

9   about whether or not to accept something that is admitted in

10  evidence.  That's what it means to be the final finders of

11  fact.

12       Now, I want to talk about the way in which lawyers and

13  judges and the law thinks about evidence at the largest level.

14  You're the people, as I said, who are the final finders of

15  fact.  You'll make your own judgments in this case.  And you're

16  going to decide how much weight, if anything, you give to any

17  bit or piece of evidence.

18       But when I talked about witness testimony, when I

19  talked about documents, when I talked about stipulations, I'm

20  talking about what the law sometimes refers to as direct

21  evidence.  There's a second type of evidence.  It's called

22  circumstantial evidence.  If you think about it, it's pretty

23  easy to understand, but its importance is something you've got

24  to have in mind.

25       Direct evidence is a bit or piece of evidence, and you

1    can put those bits and pieces of evidence together and draw

2    inferences that, you know, what the philosophers call

3    influences, I think everybody else calls common sense.  What do

4    you draw from the bits and pieces in evidence in deciding

5    whether something is true or not true?  And in that connection

6    you're going to rely on your reason and your common sense.  You

7    may say, Well, if this fact exists, then that fact exists.  Or

8    you may not.  You certainly are not going to engage in

9    speculation or make it up in some sort of way to draw

10    connections.

11         I'm going to talk to you at some length about the

12    process of evaluating circumstantial evidence, but I want you

13    to be aware that by your receiving direct evidence, you're also

14    in a position to start developing an understanding of the

15    circumstantial evidence that may be involved in this case.

16         Ultimately, the law permits you to give weight to

17    both, and it's up to you how much weight you give to either.

18    That's what it means to be the final finders of fact.  But you

19    have that opportunity in evaluating the evidence.  Don't do it

20    from the get-go.  You're here to receive the evidence now.

21    That's why I'm not spending a lot of time talking to you about

22    the specifics of the charges here.  You know what is at the

23    core of that the parties are contesting.  You heard opening

24    statements about the relative positions of the parties.  Now

25    let's see what the evidence shows, and you'll be receiving that

1  evidence with the first witness.  So Mr. Dolan, if you could

2  introduce the first witness.  Sorry.  Ms. Wichers.

3          MS. WICHERS:  The government calls William Dow.

4          WILLIAM DOW, Sworn

5          THE CLERK:  Please state your full name and spell your

6  last name.

7          THE WITNESS:  William M. Dow, D-O-W.

8          THE COURT:  Can you put the microphone closer to you

9  so we can pick up your voice.

10         THE WITNESS:  Sure.  William M. Dow, D-O-W.

11         THE COURT:  You may inquire.

12         MS. WICHERS:  Thank you, sir.

13 DIRECT EXAMINATION BY MS. WICHERS:

14 Q.   Good morning, sir.

15 A.   Good morning.

16 Q.   Where do you live?

17 A.   Essex, Connecticut.

18 Q.   What is your position?

19 A.   I'm an architect.

20 Q.   Are you currently employed?

21 A.   Self-employed, yes.

22 Q.   Are you familiar with a company called JCJ Architects?

23 A.   Yes.

24 Q.   How are you familiar with JCJ?

25 A.   I worked there approximately 30 years.

1  Q.  Sorry.

2  A.  Sorry.  Go ahead.

3  Q.  Did I cut you off?

4  A.  No.

5  Q.  What was your last position with JCJ?

6  A.  Principal in the firm.

7  Q.  You said 30 years.  Are you familiar with the Mashpee

8  Wampanoag Tribe?

9  A.  Yes.

10  Q.  How are you familiar with the tribe?

11  A.  Well, I was with JCJ.  We were hired as a planner and

12  architect to help develop options for their casino in

13  Massachusetts.

14  Q.  And what entity did JCJ contract with in connection with

15  that casino?

16  A.  I believe it was their Gaming Authority -- the Gaming

17  Authority was, I think that was what was listed on our

18  contract.  I mean, it was with the Mashpee Tribe Gaming

19  Authority.

20  Q.  And what experience, what casino experience did JCJ have

21  before working on this casino project for the Mashpee

22  Wampanoag?

23  A.  Extensive, I mean, over 5 billion in construction, worked

24  with over 40 tribes throughout the country, lots of large

25  projects of similar size and nature.

1    Q.   Could you give us some examples.

2    A.   Sure.  We did the Seneca Niagara Casino in Niagara Falls

3    for the Seneca nation, Seneca Allegany Casino in Salamanca, the

4    Pocono, Mohegan Sun Pocono, couple of projects out west,

5    Downstream Resort Casino for the Quapuck Tribe, Wild Horse Pass

6    outside of Tucson for the Gila River Tribe.  Many others.

7    Q.   What was the name, if you remember, of the Mashpee

8    Wampanoag Tribe casino project?

9    A.   Project First Light was what it was called when I was

10   working on it.

11   Q.   What is an owner's rep?

12   A.   It's a sort of a project manager or agent that's hired by

13   the owner to manage and oversee projects of this type.  They

14   usually have good knowledge of construction and what design

15   teams responsibilities are and so on, act as an agent for the

16   owner.

17   Q.   Did the Mashpee Wampanoag Tribal Gaming Authority have an

18   owner's representative for this Project First Light?

19   A.   Yes.  They hired a firm called D'Amato Builders &

20   Advisors.

21   Q.   Do you recall when JCJ entered into its contract with the

22   Gaming Authority?

23   A.   I think it was 2012.

24   Q.   And at some point did JCJ stop working on Project First

25   Light?

```
 1   A.    Yes.  When we were finishing up our design development
 2   package we were terminated.
 3   Q.    Why?
 4   A.    I don't really know.
 5         MS. WICHERS:  Nothing further, Your Honor.
 6         THE COURT:  All right.  Just in terms of order.  Do
 7   the defense counsel have order when you do witnesses.  I just
 8   don't want you to stumble over each other or me asking who will
 9   be next.  So ordinarily it will be Mr. Flaherty first and then
10   Mr. Weinberg; is that it?  Okay.  Mr. Flaherty.
11         MR. FLAHERTY:  Thank you, Your Honor.
12   CROSS-EXAMINATION BY MR. FLAHERTY:
13   Q.    Good afternoon, Mr. Dow.  My name is Timothy Flaherty.
14   I'm an attorney.  I represent Cedric Cromwell.  If I ask you
15   questions you don't understand, let me know, and I'll try to
16   rephrase them.  Okay?
17   A.    Okay.
18   Q.    Now, you're an architect with JCJ, correct?
19   A.    Yes.
20   Q.    And you're no longer with JCJ?
21   A.    Correct.
22   Q.    You're self-employed?
23   A.    Yes.
24   Q.    Did you retire from JCJ?
25   A.    Essentially.
```

1    Q.   And when you say "essentially," what do you mean, were you

2    terminated?

3    A.   Yeah.  I mean, I was told it was time to move on to

4    something else.

5    Q.   Okay.  And with respect to the project with the Mashpee

6    Wampanoag Gaming Authority, this was called Project First

7    Light, right?

8    A.   When I was working on it, yes.

9    Q.   Right.  And you first entered into a contract or I guess

10   JCJ entered into a contract with the Mashpee Wampanoag Tribe in

11   2012, right?

12   A.   I believe so, yes.

13   Q.   Now, were you working for the Mashpee Wampanoag Tribe

14   under a different entity at some point?

15   A.   We had a master plan that was done for a property down, I

16   think it was off -- I forget, I'm now forgetting what town it

17   was in.  North of Central Falls.  There was some master

18   planning done under Chelan Concepts.

19   Q.   Is that your company?

20   A.   It was set up as my company, yes.

21   Q.   Is that the company you work for now when you say you're

22   self-employed?

23   A.   No.

24   Q.   No.  Okay.  Is Chelan Concepts still in existence as a

25   company?

A.    No, sir.

Q.    All right.  Now, if I understand correctly, the reason why you did the master planning work under Chelan Concepts and not JCJ was because JCJ was then working with another competing group that was trying to get the casino license in the same region in Massachusetts; is that right?

A.    I honestly can't remember if we were actually working with them or we were trying to get work from them.

Q.    Okay.  And so JCJ, I guess, because of that relationship with the competitor, was not able to do any work with the Mashpee Wampanoags, right?

A.    They felt uncomfortable doing that, yes.

Q.    But you felt comfortable doing it under your company, right?

A.    Yeah.

Q.    All right.  But at the time that you were doing it under your company, weren't you an employee of JCJ?

A.    Yes.

Q.    All right.  Would that be a conflict of interest, sir?

A.    I mean, in the design profession I guess it's -- it's -- I don't know if I can answer that.  I mean, I don't -- we didn't feel it was when we were reviewing that specific issue.

Q.    Okay.  Now, ultimately when JCJ's relationship with that other competing interest was over and never materialized, then JCJ was hired by the Mashpee Wampanoag Tribe, right?

1  A.   Correct.

2  Q.   And you were hired to be the architect on the job, right?

3  A.   Correct.

4  Q.   All right.  Were you primarily the chief architect in

5  charge of this development?

6  A.   You know, we used to structure the projects differently.

7  I believe Peter Stevens was listed as our principal in charge,

8  but he's not a registered architect, so I would have been the

9  lead architect on the project.  But Jim LaPosta, who is the

10 present of JCJ, was the one actually stamping the drawings, so

11 he had the oversight on the project.

12 Q.   All right.  Isn't it fair to say that at the time that JCJ

13 was working with Mashpee Wampanoag Tribe that you were spread a

14 little thin?

15 A.   I did not feel we were spread a little thin, no, sir.

16 Q.   All right.  Were you working on other projects at the same

17 time?

18 A.   Yes.

19 Q.   How many other projects were you working on at the same

20 time?

21 A.   I couldn't tell you.

22 Q.   You had casino interests or casino developments all across

23 the country.  You went through a quick list with us just a

24 moment ago, right?

25 A.   Yes.

1  Q.   And is it fair to say that JCJ at the time was less

2  robustly staffed than they are today?

3  A.   I don't know that I could answer that.  I'm not there

4  today.

5  Q.   Because you're no longer employed by JCJ?

6  A.   Correct.

7  Q.   Fair enough.  Now, you worked I think on behalf of the

8  Gaming Authority for a couple of years, right?

9  A.   Yeah.

10  Q.   And obviously you were paid for your services, right?

11  A.   Correct.

12  Q.   And you're familiar with Genting, this Malaysian company,

13  because you had worked with them in the past?

14  A.   Correct.

15  Q.   Matt Speller is a person from Genting that worked with you

16  in the past on other projects developing casinos; is that

17  right?

18  A.   Correct.

19  Q.   And you're familiar with Genting's role in these types of

20  projects, right?

21  A.   I mean, I think I am, but, you know, it's a complicated

22  company, so I don't know if I know the exact structures of

23  things.

24  Q.   Fair enough.  You'd agree with me, wouldn't you, that

25  because Genting essentially pays the bills, Genting's involved

1  in all of the major decisions, right?

2  A.   I would agree with that.

3  Q.   And with respect to your involvement with the Mashpee

4  Wampanoag Tribe, Genting, through Mike Speller, was involved in

5  all aspects of this project, correct?

6  A.   I would say so, yes.

7  Q.   All right.  And at some point, sir, there was a conflict,

8  and correct me if I'm wrong, or a disagreement between you and

9  Mr. D'Amato from D'Amato Builders & Advisers about the plan for

10  this development of two S-curved towers; is that right?

11  A.   No.  They were two half-round towers so it became an S

12  essentially, yeah.

13  Q.   Okay.  And you and D'Amato had differing views or

14  differing opinions about that, right?

15  A.   I don't recall that.

16  Q.   All right.  You don't have any memory of D'Amato thinking

17  one thing and you thinking the other?

18  A.   I mean, there were discussions about whether it was more

19  expensive to build a curved tower versus a straight tower, and

20  we went over the variations and costs that that usually

21  entails.  We had those discussions, but I wouldn't say there

22  was a conflict about it.  I don't recall one that got any

23  deeper than that.

24  Q.   All right.  And you appeared and made presentations at

25  Gaming Authority meetings, right?

90

1  A.   Quite often, yes.

2  Q.   And did Mr. D'Amato show up as well?

3  A.   Yeah.

4  Q.   Is it true that sometimes because he was stretched thin he

5  would only appear by telephone?  Do you recall any of that?

6  A.   I would guess that it's possible, but I don't recall those

7  occurrences, no.

8  Q.   And do you recall receiving any feedback from members of

9  the Gaming Authority about deliverables and timing of

10  deliverables by JCJ?

11  A.   No.

12  Q.   Nobody ever explained about how long it was taking to get

13  these D and D docs done, design and development docs?

14  A.   Not that I recall, no.

15  Q.   And the process, you say when you were let go, this was

16  maybe two years into your work with the Gaming Authority?

17  A.   The timeframe sounds about right, but I don't have the

18  specific dates.

19  Q.   Okay.  And I think you mentioned in direct examination

20  that at the time you were let go, you hadn't yet completed your

21  package of design and development docs, right?

22  A.   I thought we were -- I believe we were nearly 100 percent

23  complete on DD.

24  Q.   Right.  But they were not complete after two years of

25  working for the tribe, correct?

1    A.   Well, I mean, I'd have to have the set of drawings in

2    front of me to remember.  I really don't remember.

3    Q.   Okay.  But your testimony a minute ago when you remembered

4    it in response to questions to Ms. Wichers was we didn't have

5    our design and development docs completed yet, and that would

6    be two years after you began.  Was that your testimony a minute

7    ago?

8    A.   I don't recall saying that.

9         MR. FLAHERTY:  Okay.  No further questions, Your

10   Honor.

11        THE COURT:  All right.  Mr. Weinberg.

12        MR. WEINBERG:  Thank you, Your Honor.

13   CROSS-EXAMINATION BY MR. WEINBERG:

14   Q.   Good afternoon, Mr. Dow.

15   A.   Good afternoon.

16   Q.   I represent Mr. DeQuattro.  Do you recognize Mr. DeQuattro

17   who sits right in front of you?

18   A.   No, sir.

19   Q.   You mentioned that while you were working for JCJ there

20   was a contract between JCJ and the Gaming Authority; is that

21   correct?

22   A.   Yes, sir.

23   Q.   Was there an end date to the contract, a hard end date?

24   A.   I would -- at this point I'd have to look at it to recall

25   if it was there or not.

1  Q.  Are there termination clauses in the normal JCJ contracts?

2  A.  Yes.

3  Q.  Seven days for cause?

4  A.  I believe so.

5  Q.  Couple of weeks without cause?

6  A.  Don't remember the without cause language.

7  Q.  You don't remember how many days --

8  A.  No, sorry.

9  Q.  -- that there are, but there are --

10 A.  There are terms in there, in the contract, yeah.

11 Q.  So it would not be unusual for you to have your company

12 sign a contract with the Gaming Authority on a casino project

13 having termination clauses, correct?

14 A.  No, it would not be unusual.

15 Q.  Okay.  Mike Speller from Genting, you know him?

16 A.  Yes, sir.

17 Q.  He attended some of the Gaming Authority meetings when you

18 did?

19 A.  Yeah.

20 Q.  Ran them?

21 A.  At the beginning very regular before D'Amato was hired as

22 an owner's rep, and then I'd say it was a little more random

23 after that.

24 Q.  Did you ever see anyone else from the D'Amato group appear

25 at any of the Gaming Authority meetings except Mr. D'Amato?

1    A.    I don't recall for sure.  I mean, you know, I've had them

2    as owner's rep on a couple of projects.  Now I'm not sure which

3    meetings they were in.  So I'd say it would just be a guess at

4    this point, too long ago.

5    Q.    Fair enough.  The owner's rep role is to stand between the

6    client and the other contractor's architects, vendors,

7    builders, consultants on projects; is that correct?

8    A.    It really depends how the contract is written.  That is

9    certainly one role they can serve.

10   Q.    To in essence be eyes and ears of the client?

11   A.    Correct.

12   Q.    To have some expertise to assist the client in navigating

13   through the complexities of a complicated casino project?

14   A.    I would say so.

15   Q.    And you've had experience with casinos, correct?

16   A.    Yes.

17   Q.    You've gotten referrals from one tribe to another to

18   build, to do the architectural work in casinos?

19   A.    Yes.

20   Q.    You've gotten referrals from developers like Genting who

21   relied on you with one casino and then wanted to rely on you

22   for another, correct?

23   A.    I mean, honestly, in that case I'd say not many, but

24   they've certainly hired us more than once.

25   Q.    How about Mr. Speller and Genting that hired you for

1  Resort Worlds in New York and then hired you for the Project

2  Light in Taunton?

3  A.   Yeah.

4  Q.   In other words, you understand that you were originally

5  selected at the recommendation of Genting and Mr. Speller,

6  correct?

7  A.   You know, back then it was probably Mickey Brown, but I'm

8  not sure exactly who was the recommender.

9  Q.   Who is Mickey Brown?

10 A.   Mickey Brown was a former present and CEO of Foxwoods who

11 served as kind of an agent to help some of the tribes get their

12 projects going.

13 Q.   But neither you nor your company had any prior

14 relationship to the Gaming Authority of the Mashpee Wampanoag

15 Tribe?

16 A.   No, no, we did not.

17 Q.   So however you got referred to them, it came from the

18 developer end or from people you had briefly done business with

19 that gave you a vote of confidence, a referral, and that's how

20 you got hired for the Project Light Casino project, correct?

21 A.   I believe so.

22 Q.   You were interviewed several times by the government, were

23 you not?

24 A.   Sorry?

25 Q.   You were interviewed, were you not, by either FBI Agent

1  Ott or one of his colleagues?

2  A.   We had two meetings.

3  Q.   Once by phone and once in person?

4  A.   Correct.

5  Q.   Do you remember telling the FBI that delivering results

6  quickly is important in casino projects?

7  A.   I would believe I said it, but I don't recall saying it,

8  yes.

9  Q.   Had you said it, it would have been accurate, correct?

10 A.   Yes.

11 Q.   Because casino projects don't generate income until

12 casinos are open, correct?

13 A.   Correct.

14 Q.   But they cost a lot to build?

15 A.   It can.

16 Q.   And the developers are generally loaning the tribes money

17 during this pre-construction or pre-opening phase?

18 A.   Yeah.

19 Q.   The tribes are anxious to stop borrowing and start having

20 the gaming generate income to pay the developer?

21 A.   Correct.

22 Q.   And the developer has equally or greater interest in

23 having the beginnings of the gaming proceeds, correct?

24 A.   Yes.

25 Q.   So things that cause delay are not generally in the

interests of either the developer, Genting, or the client,
correct?

A.    Yes.

Q.    And terminating owner's reps who have been working for the
tribe for a year, two years during the construction phase or
the immediate pre-construction phase has the potential to cause
delay, correct?

A.    I would say so.

        MR. WEINBERG:  Okay.  If I can just have a moment,
Your Honor.

        THE COURT:  Yes.

Q.    Did you know here at any time before -- strike that.

      Mr. Speller from Genting informed you of the termination,
correct?

A.    There was a phone call.  Now I can't remember if it was
with Peter Stevens or just with me, but yes, we got a call from
Mike Speller.

Q.    Okay.  The time that you were working on this project,
which was roughly 2012 to about April 3 of 2014, if you recall
the date?

A.    I don't recall the date, but I'll take your word for it.

Q.    Okay.  You understood that this project was targeted to be
a four-star project, correct?

A.    We did discuss four-star properties.

Q.    Okay.  And the Wynn casino that was intended to be opening

1   and then was opened in nearby Everett is a five-star casino,

2   correct?

3   A.   They often tout themselves as five-star, yes.

4   Q.   Fair enough.  Did you hear members of the Gaming Authority

5   tell you they wanted to open their casino before the Wynn group

6   opened their casino?

7   A.   I don't know if it was members of the Authority, but it

8   was certainly a comment that came up in one or two of those

9   meetings.

10  Q.   If not the members of the Authority, then the Genting

11  represents --

12  A.   Yeah, somebody said that.

13  Q.   -- including Mr. Speller.  They wanted to be the first to

14  open in the Boston area to attract and create loyalty with

15  customers, correct?

16  A.   Yeah, that would have been a good thing.

17  Q.   And there was -- did you ever learn that the Genting group

18  decided they wanted a casino as extravagant, a five-star

19  casino, to better compete with Wynn than the four-star casino

20  that you were working on back in 2012 and 2013?

21  A.   It wasn't discussed with us, no.

22  Q.   Okay.  Do you know they hired Paul Steelman, a Genting

23  veteran architect from Las Vegas to replace you on the project?

24  A.   We did hear that, yes.

25  Q.   And Mr. Steelman, you knew, worked on another Genting

1    casino, the Resort World Las Vegas Casino, correct?

2    A.   Yeah, I would have said that was well after this, but yes.

3    Q.   And he's a competitor.  I don't mean that negatively, but

4    he's another architect with a casino --

5    A.   Agreed.

6    Q.   -- specialty like JCJ, correct?

7    A.   Yes.

8         MR. WEINBERG:  Thank you.  No other questions.

9         THE COURT:  Ms. Wichers.

10   REDIRECT EXAMINATION BY MS. WICHERS:

11   Q.   Mr. Dow, how much notice did JCJ have before being

12   terminated?

13   A.   I'd say that it was just the phone call.  I mean, there

14   really was no notice before that.

15        MS. WICHERS:  Nothing further.

16        THE COURT:  All right.  Anything further?

17        MR. FLAHERTY:  Not for Mr. Cromwell.

18        MR. WEINBERG:  Just one question.  Can I ask it from

19   here?

20        THE COURT:  You may.

21   RECROSS-EXAMINATION BY MS. WICHERS:

22   Q.   After being terminated, JCJ entered negotiations with the

23   Gaming Authority to exchange its design for a financial

24   resolution, correct?

25   A.   I believe so, yes.

1    Q.    That went on for a couple of months, right?

2    A.    Yes.

3          MR. WEINBERG:  Thank you, sir.

4          THE COURT:  All right.  You may step down.  Thank you

5    very much.

6          MR. DOLAN:  United States calls Michael D'Amato.

7          MICHAEL D'AMATO, Sworn

8          THE CLERK:  Please be seated and state your full name

9    and spell your last name.

10         THE WITNESS:  My name is Michael D'Amato.  Spelling is

11   D-'-A-m-a-t-o.

12         THE COURT:  You may inquire, Mr. Dolan.

13         MR. DOLAN:  Thank you, Your Honor.

14   DIRECT EXAMINATION BY MR. DOLAN:

15   Q.    Sir, where do you live, city and state?

16   A.    I live in Niantic, Connecticut.

17   Q.    How are you employed?

18   A.    I'm self-employed right now, retired as a consultant.

19   Q.    Before you retired and became a consultant, how were you

20   employed?

21   A.    I had my own company starting in 2005 through 2020,

22   construction company called D'Amato Builders & Advisers.

23   Q.    Now, you said it's a construction company, but what did

24   D'Amato Builders & Advisers do for work?

25   A.    We did general contracting, construction management and

1    provided owner's representative services.

2    Q.    How big was D'Amato Builders & Associates?

3    A.    I had about 36 full-time employees in Connecticut, another

4    12 in New York.  We did a variety of projects.  I think our

5    maximum year we did about 22 million in volume.

6    Q.    Now, you characterized kind of three of the general things

7    that D'Amato Builders & Associates did.  Can you break those

8    down?

9    A.    Yes.  As I said, the company was really three parts.

10   General contracting was considered what we would do if we were

11   self-performing, such as doing carpentry work, labor work,

12   whether it was doing drywall or whatever, but we would

13   self-perform.

14        Construction management was when we had a contract with an

15   owner to build a specific building.  It could be construction

16   management at risk where we would put up a bond or guaranteed

17   maximum price, or it could be a construction management just

18   for a fee.  Owner's representative services, totally different

19   structure, we would be a representative of an owner monitoring

20   and overseeing a project on behalf of the owner.

21   Q.    And when you say "monitoring and overseeing a project on

22   behalf of the owner," what does that practically look like?

23   A.    I think the big thing about an owner's rep is

24   responsibility and liability and how that breaks down.  But the

25   way we look at -- and many, many people look at owner's

1    representative services a different way -- depends on your

2    scope of work.  But we were really a liaison between the owner

3    trying to take his vision for a project and translating that

4    vision to the other consultants and people that worked on the

5    project.

6    Q.   Why can't the owner just talk to the consultants him or

7    herself?

8    A.   A lot of times they speak a different language.

9    Q.   What do you mean?

10   A.   There's a lot of technical terms, a lot of processes to go

11   through, a lot of owners haven't had that experience.  So being

12   able to assist the owner and apply some expertise to that

13   usually helps the project move forward.

14   Q.   Did D'Amato Builders & Advisers have a lot of gaming work?

15   A.   Yes.

16   Q.   What did that look like for D'Amato Builders & Associates?

17   A.   A lot of my background from the very beginning of my

18   career has been involved in gaming and hospitality.  But as

19   D'Amato Builders & Advisers, we did the Downstream Casino as an

20   owner's representative in Oklahoma.  We worked on the Healing

21   River Indian Reservation in Arizona.  We worked with the

22   Remington racetrack as an owner's representative also in

23   Oklahoma.  We did some owner's rep work at Foxwoods.  That was

24   pretty much with D'Amato Builders & Advisers.  We were also

25   owner's representatives for Resorts World Casino.

1  Q.   You said "downstream."  What does downstream --

2  A.   Just the name of a casino down in Oklahoma.

3  Q.   Okay.  Are you familiar with Project First Light?

4  A.   Yes.

5  Q.   What is Project First Light?

6  A.   Project First Light was a casino proposed in Taunton,

7  Massachusetts, to be built by the Mashpee Wampanoag Tribe.

8  Q.   And what involvement if any did you have in Project First

9  Light?

10  A.   I was employed as the owner's representative for that

11  project.

12  Q.   How did you become involved in Project First Light?

13  A.   There was a request for proposal that went out for owner's

14  representatives.  We responded to the request for proposal,

15  were interviewed for the project and then selected.

16  Q.   I want to break that down into parts.  How did -- how did

17  you -- was it you that found out about the request for proposal

18  or one of your staff, if you know?

19  A.   I believe I did.

20  Q.   Okay.  How did you find out about the RFP?

21  A.   We were working at the time with Resorts World, and I was

22  informed by them that there was an RFP coming up.

23  Q.   What is Resorts World?

24  A.   Resorts World is a brand name for a casino hotel.  It's

25  actually a company that operates and manages casinos and

1  hotels.

2  Q.   Is Genting connected with Resorts World?

3  A.   Genting owns Resorts World.

4  Q.   What is Genting?

5  A.   Genting is a Malaysian company that has casino holdings

6  throughout the world as well as other businesses.  They're a

7  multinational corporation with multiple levels of business.

8  Q.   In the context of your involvement with Resorts World and

9  Genting, before Project First Light, did you work with Genting

10  on a regular basis?

11  A.   I started working with Genting when I was involved in the

12  construction of Foxwoods Resort and Casino.  Genting was

13  involved in that project.  That's when I first met them.  Then

14  I was involved in building the Seneca Niagara Casino in upstate

15  New York.  Genting was involved in that.  And then when I was

16  involved in the Downstream Casino, Genting was somewhat

17  involved with that, kind of like an adviser on that.

18  Q.   And so you mentioned that Genting is a Malaysian company.

19  Most of those casinos are obviously United States-based.  What

20  is Genting's role in these projects?

21  A.   They vary from project to project.  It could be where

22  they're just a lender and bring capital to the project.  Other

23  projects, such as Resorts World Casino New York, which is

24  located in Queens, New York, they have the license for the

25  casino and fully operate the casino.

1  Q.   What was their involvement in Project First Light?

2  A.   In Project First Light they were going to be -- I believe

3  they were assisting in the financing as well.  But they were

4  going to be the operator of the casino on behalf of the tribe.

5  Q.   After you sent in the RFP to become involved as the

6  owner's rep, what was the next step in your hiring process?

7  A.   The next step was to be called in for an interview and go

8  through an interview process.

9  Q.   Where did that occur?

10  A.   I don't recall the location of where it occurred.

11  Q.   Who was involved in that interview process?

12  A.   The representatives of the Mashpee Wampanoag Gaming

13  Authority as well as representatives of Genting.

14  Q.   Do you recall who was involved from the Mashpee Wampanoag

15  Gaming Authority?

16  A.   Mike Speller -- oh, from the Wampanoag Gaming -- Cedric

17  Cromwell was there, Chairman Cromwell was there, and the others

18  I don't recall totally.  I believe it was Mark Harding, but I'm

19  not sure.

20  Q.   Do you recognize Chairman Cromwell in the courtroom today?

21  A.   Yes, I do.

22  Q.   Can you please point to him and identify an article of

23  clothing he's wearing.

24  A.   Yeah.  He's wearing a blue tie, blue jacket, and he's

25  sitting right here.

1          MR. DOLAN:  May the record reflect that the witness

2     has identified Mr. Cromwell.

3          THE COURT:  It will without objection.

4          MR. FLAHERTY:  No objection.

5          THE COURT:  All right.

6     Q.   Before I go to that, who was there from Genting at the

7     interview?

8     A.   Mike Speller was there as a representative of Genting, and

9     I can't recall anyone else.

10    Q.   Do you recall if it was multiple interviews or if it was

11    just the single interview?

12    A.   It was a single interview.

13    Q.   Do you recall how long it took you to find out whether you

14    were hired?

15    A.   I don't.

16    Q.   Were you hired?

17    A.   Yes.

18    Q.   Are you familiar with the term "land in trust"?

19    A.   I am.

20    Q.   And does that term have significance to Project First

21    Light?

22    A.   Yes, it is significant to Project First Light and most

23    other Native American casinos.  When land is in trust, it's

24    land that is held by the Department of Interior for the benefit

25    of the tribe so the land is really then part of the tribe's

1   sovereign nation when it is held in trust and it gives the

2   tribe the authority to operate on that land for the benefit of

3   the tribe.

4   Q.   Why -- you answered it a little bit in your question, but

5   just to make sure we understand, why is that important?

6   A.   That gives the tribe the right to build a casino on that

7   property or build other things on that property as long as what

8   they were building is also allowed in the state in which that

9   sovereign land resides.

10  Q.   Was that something that was a foundation for Project First

11  Light to be built in Taunton?

12  A.   Yes.

13  Q.   Do you recall approximately when you started your service

14  as owner's rep for Project First Light in the Mashpee

15  Wampanoag?

16  A.   It was in 2012.

17  Q.   Okay.  When you were working as owner's rep, what was the

18  nature of your work on the project?

19  A.   The nature of my work was really to work with the design

20  team, the various members of the design team, you know, the

21  architects, the engineers and other consultants to help

22  coordinate them and assist them in getting the project to a

23  point where it can be approved.  The early on aspects of the

24  project were really working on the environmental impact

25  statements both for the state of Massachusetts and also for the

1  national environmental impact.

2  Q.   What's the payment structure for this kind of work?

3  A.   The payment structure is usually a billable rate which is

4  an hourly rate, and then sometimes there's a fee associated as

5  well.

6  Q.   Were you the only one working on this project from D'Amato

7  Builders & Associates, or did you have staff working on the

8  project as well?

9  A.   At that particular time I was the primary individual

10 involved.  I may go back to someone in my office when we were

11 working on an estimate and have my estimating staff work on it,

12 too.  But the primary contact and day to day at that point in

13 time was myself.

14 Q.   Why is that?

15 A.   Well, it's really what I did.  I had the level of

16 experience to do it on a regular basis.  The other people in my

17 office were working on other projects.  And the Mashpee I was

18 taking a personal lead on.

19 Q.   Are you familiar with JCJ?

20 A.   Yes, I am.

21 Q.   What is JCJ?

22 A.   JCJ is an architectural firm.

23 Q.   What involvement, if any, did they have in Project First

24 Light?

25 A.   They were the architect of record on the project.

1  Q.   And what level of interaction did you have to have as

2  owner's representative with JCJ on the project?

3  A.   It was almost daily that I would be involved either in a

4  phone call or meeting or something with JCJ throughout the

5  entire process.

6  Q.   What about with Genting, your level of interaction

7  involvement with Genting?

8  A.   Had a lot of interaction with Genting in terms of keeping

9  them up to date in terms of what the design team and engineers

10  were doing on the various elements of the project.

11  Q.   Who is your -- who was your client on Project First Light?

12  A.   My client was the Gaming Authority.

13  Q.   Can you describe how -- I mean, if you're having most of

14  your interactions with Genting and with the architect, can you

15  describe kind of how that interacts with your responsibility as

16  having the tribe -- the Gaming Authority as the client?

17  A.   Mm-hmm.  My responsibility, as I said earlier, primarily

18  as an owner's representative was to take the vision of the

19  Gaming Authority and translate that to the other various team

20  members.

21      In order for me to translate that vision, I had to

22  communicate on a regular basis not only with the design team

23  but with the operator in terms of what the operator needed to

24  make this project a successful, financially viable project.

25  The information I would obtain from that, I would then transmit

1  to the Gaming Authority, which was my client, either at

2  meetings or through weekly reports.

3  Q.   Does D'Amato Builders & Associates have other non-gaming

4  work that they serve as owner's rep for?

5  A.   Yes.

6  Q.   Where does gaming work and casino construction fall on the

7  level of complexity compared to some of the other work that you

8  do?

9  A.   The gaming work and hospitality work associated with a

10  casino would be at a much higher level than the other owner's

11  rep work I was doing, which was primarily doing apartments and

12  renovations of housing projects.

13  Q.   Why is that?

14  A.   There was a lot more pieces, a lot more to understand in

15  terms of what had to be done.  A casino is a very complicated

16  structure.  In terms of, you know, back of the house supporting

17  the front of the house, the size of various elements to support

18  each other and again to make it an economically viable project.

19  Q.   Who was your main point of contact with the Gaming

20  Authority?

21  A.   Main point of contact was Chairman Cromwell.

22  Q.   How often did you have interactions with Chairman

23  Cromwell?

24  A.   Well, certainly at every meeting we attended and then at

25  other times there were some phone calls, not often but some.

1  Q.   Did you have interaction with other members of the tribe?

2  A.   Yes.

3  Q.   Can you describe the level of frequency of interactions

4  you had with other members of the tribe?

5  A.   Primarily at the meetings that we attended, and we would

6  communicate obviously with every member that was there.  And I

7  did have some other conversations with members from time to

8  time that may have a question and call and ask or, if I had a

9  question, I would call and ask.  But the primary contact would

10  be Chairman Cromwell.

11  Q.   You said it in your last answer, but you attended meetings

12  of the Gaming Authority in the context of your work as owner's

13  rep.

14  A.   In the context of my work, yes.

15  Q.   Can you describe what those were like?

16  A.   Yes.  We would have regular meetings.  The design team

17  would be there.  The other various consultants would be there.

18  The members of the Gaming Authority would be there.  We would

19  go through what transpired over the last period of time.

20       JCJ would often present the latest status of the drawings

21  in terms of what they had in terms of concept, design and so

22  forth.  The environmental engineers were working very hard and

23  the traffic engineers to make sure everything got submitted to

24  the various government agencies having jurisdiction so that we

25  could finish the project and get the project approved.

1   Q.  Who led the meetings of the Gaming Authority that you

2   attended?

3   A.  The meetings were led by Chairman Cromwell.

4   Q.  Can you describe how Chairman Cromwell led those meetings?

5   A.  He usually started off with an introduction where the

6   Gaming Authority was in their side of the process, and then we

7   would go through an agenda.  The various consultants would

8   present.  Questions would be asked by Chairman Cromwell and

9   other members of the authority, and there would be a pretty

10   open dialogue throughout those meetings.

11   Q.  Were any members of the Gaming Authority more outspoken

12   than others based on what you saw during attendance at those

13   meetings?

14   A.  I would say yes, some were more outspoken.  All

15   participated, but some were more active than others.

16   Q.  Who would you say is the most active participant from the

17   Gaming Authority?

18   A.  The most active would have been Chairman Cromwell, but

19   there was another member that was treasurer at the time, Mark

20   Harding.  He was very active, very verbal.  Then when his seat

21   was replaced, the new treasurer came in, and he was very active

22   as well.

23   Q.  Do you recall when the lead architect for Project First

24   Light, JCJ, was terminated?

25   A.  Yes.

1    Q.    Was that termination decision a surprise to you?

2    A.    It was a surprise when I first heard about it, but there

3    had been some conversations between various parties about the

4    direction the project was taking and some of the design

5    elements in the project.

6    Q.    Can you describe what those concerns were at a general

7    level?

8    A.    Well, it was important for the project to compete with the

9    two other casinos that were going to be built in the

10   Commonwealth of Massachusetts at the time.  One would be the

11   Wynn casino here in Boston.  The other one was the MGM in

12   Springfield.  Those are very well known operators of casinos

13   with very high-end design and a lot of money behind them to

14   build those casinos.

15        It was important, there were two things for the Mashpee

16   casino that we talked about every meeting.  We wanted to be

17   first to market, and when people walked in that casino, the

18   first thing we wanted them to say was "Wow," they're

19   overwhelmed by the beauty and the aspects of the casino.  And

20   there was some concern that that, quote, "wow" piece was

21   missing in some of the design elements.

22   Q.    Do you recall who expressed that concern to you?

23   A.    It was expressed at our meetings by Chairman Cromwell.  It

24   was expressed at meetings by other members of the Gaming

25   Authority as well.

1    Q.   Were you in the room for the vote when JCJ was terminated?

2    A.   No.

3    Q.   Do you recall when you were terminated from Project First

4    Light?

5    A.   Yes, I do.

6         MR. DOLAN:  Your Honor, at this time I move Exhibit 27

7    into evidence.  I believe it's by agreement.

8         THE COURT:  All right.  It's received.

9         (Exhibit 27 admitted into evidence.)

10        MR. DOLAN:  Can we publish it, please.

11   Q.   Do you recognize Exhibit 27?

12   A.   Yes, I do.

13   Q.   What is it?

14   A.   It's the letter informing me that my company was

15   terminated.

16   Q.   It refers to your company here as construction manager.

17   Do you see that?

18   A.   Yes, I do.

19   Q.   Were you the construction manager on Project First Light?

20   A.   I was not.

21   Q.   What is the difference between a construction manager and

22   an owner's rep?

23   A.   This actually goes back to when the contract was first

24   formed.  The attorney working with the Gaming Authority at the

25   time really wanted to use a standard form of contract which is

0294

1    called an AIA, American Institute of Architect standard form

2    contract.  The one he wanted to use really pertained to a

3    construction manager, which has different liabilities and

4    responsibilities on a project than an owner's rep.

5        So to correct that in the contract, we referenced an

6    exhibit that was placed in the contract that identified the

7    scope of services that would be performed by the owner's rep,

8    but the boilerplate of the contract really was standard

9    language in the industry.

10   Q.   So it called you a construction manager, but the duties of

11   your contract were for an owner's rep?

12   A.   That is correct.

13   Q.   How much notice did you receive prior to being terminated

14   from Project First Light?

15   A.   I don't recall.

16   Q.   Did you receive notice prior to this letter?

17   A.   I do remember getting a phone call and being informed that

18   we were being terminated and then a letter followed that phone

19   call.

20   Q.   Who if anyone did you speak with from the Gaming Authority

21   regarding your termination?

22   A.   I did -- I recall a conversation with Chairman Cromwell

23   about it, simply because they had requested that I, even though

24   being terminated, stay involved to help in the transition to

25   the new owner's rep.

1  Q.   Did Chairman Cromwell indicate to you why you were being

2  terminated?

3  A.   I don't really recall the specific reasons as to why,

4  other than they were making a change.

5  Q.   Were you surprised at your termination?

6  A.   I was.

7  Q.   Why?

8          MR. WEINBERG:  Objection.

9          THE COURT:  No.  He may answer that question.

10  A.   I was surprised because I felt, you know, I was doing a

11  reasonably good job, and that was a project that we seemed to

12  have developed a good rapport with all the various members of

13  the team and it was working very well.

14  Q.   Before you were terminated had Chairman Cromwell indicated

15  any sort of dissatisfaction with your level of performance for

16  the project?

17  A.   Chairman Cromwell and I did have a conversation.  He was

18  concerned about my making sure that I was aware that my client

19  was the Gaming Authority and not Genting and that he expressed

20  to me that he felt I was having some conversations directly

21  with the representatives of Genting that I should have been

22  having first with my client, the Gaming Authority.

23  Q.   Why did he say that was a problem?

24  A.   I think it was just knowing who my client was and I should

25  be loyal to my client because my contract is with them.

1          MR. DOLAN:  Can we take that exhibit down, please.

2          THE COURT:  I'm sorry?

3          MR. DOLAN:  I'm sorry.  Thank you.

4          Your Honor, at this time --

5     Q.   Let me ask you this.  You mentioned you had conversations

6     after you were terminated.  Were you aware that there was going

7     to be a new owner's rep hired for the Project First Light?

8     A.   Yes, I was informed of that.

9     Q.   And what, if any, was your role going to be in the

10    transition?

11    A.   The role in transition, there was kind of a scope of work

12    that they wanted in terms of bringing the new owner's rep up to

13    speed in terms of work that was done and who was doing various

14    aspects of the project.

15         MR. DOLAN:  Your Honor, I ask to admit Exhibit 28 per

16    agreement.

17         THE COURT:  It's received.

18         (Exhibit 28 admitted into evidence.)

19         MR. DOLAN:  Publish it, please.

20    Q.   Do you see this email, Update for RGB and Steelman

21    Partners?

22    A.   Yes.

23    Q.   Okay.  Just to talk about the players for a moment, do you

24    know what RGB is?

25    A.   Robinson Green Beretta.

```
 1   Q.   And what do you know, if anything, about their involvement
 2   in Project First Light?
 3           MR. WEINBERG:  I object.
 4           THE COURT:  What's the time period that you're
 5   speaking of?
 6           MR. DOLAN:  I was --
 7           THE COURT:  As of the date of this document?
 8           MR. DOLAN:  Yes.
 9           THE COURT:  I'll permit the answer.
10   A.   My knowledge was that they were going to be replacing me
11   as the owner's representative.
12   Q.   What about Steelman Partners?
13   A.   Steelman is an architectural firm that specializes in the
14   gaming design.
15           MR. DOLAN:  Okay.  We can zoom back out, please, for a
16   moment.
17   Q.   You see in this email to you there is statements about
18   D'Amato & Associates helping with the transition to RGB?
19   A.   Yes.
20   Q.   What kind of transition took place with D'Amato &
21   Associates transitioning to RGB?
22   A.   My recollection was there was just one phone call.
23           MR. DOLAN:  Can I have one moment, Your Honor?
24           THE COURT:  You may.
25           MR. DOLAN:  Nothing further.
```

```
 1              THE COURT:  All right.  Ms. Beatty.
 2              (Court and Clerk discussion off the record.)
 3              THE COURT:  So I think we're going to break for lunch
 4    at this time to provide a clean break.  Again, don't discuss
 5    this case.  You just started to hear evidence in the case.  You
 6    can talk about anything other than the case among yourselves.
 7    You can speculate about when it is that the Red Sox are really
 8    going to break our heart as opposed to simply start off by
 9    disappointing us in the spring.  So things like that you can
10    talk about, but you can't talk about this case.  And leave your
11    notebooks on the chairs as you leave.  We'll take until 1:30.
12              (Jury exits the courtroom.)
13              THE COURT:  You may be seated.  Are there any matters
14    that the parties want to take up with me at this point?  I'm
15    sorry, Mr. Dolan.
16              MR. DOLAN:  Not at this time.
17              THE COURT:  I want to emphasize something that of
18    course we have agreed upon and you should understand as well,
19    Mr. D'Amato.  You're now going to be on cross-examination.  You
20    can't talk to anybody about the case.  You can't talk to the
21    government about the case.  You're insulated from that.
22              THE WITNESS:  I understand.
23              THE COURT:  And so the parties understand they're the
24    principal people responsible for sequestration here.  I don't
25    know the witness, so I'm going to look to you to make sure
```

1  there's sequestration of any witnesses that should be

2  sequestered here.  Okay.  So we'll be back at 1:30.  Thank you.

3  (Recess, 12:56 p.m. - 1:37 p.m.)

4  THE COURT:  Are we ready for the jury?  Okay.

5  Ms. Beatty will capture them.

6  (Jury enters the courtroom.)

7  THE COURT:  Mr. Flaherty, you may inquire.

8  MR. FLAHERTY:  Thank you, Your Honor.

9  THE COURT:  The scenic route.

10  CROSS-EXAMINATION BY MR. FLAHERTY:

11  Q.   Mr. D'Amato, good afternoon.  My name is Timothy Flaherty.

12  I am an attorney.  I represent Mr. Cromwell.  If I ask you any

13  questions you don't understand, just let me know, and I'll try

14  to rephrase them.  Okay?

15  A.   Okay.

16  Q.   You were the owner's representative on the Project First

17  Light Casino development in Taunton for the Mashpee Gaming

18  Authority, correct?

19  A.   Yes.

20  Q.   And what that means is obviously that you were to control

21  the project for the owner and make certain that everything was

22  done properly, right?

23  A.   Correct.

24  Q.   And you worked on the project from, I believe you

25  testified 2012 to about 2014; is that right?

A.   That is correct.

Q.   Okay.  And the architect on the project at that time was

JCJ?

A.   Yes.

Q.   And JCJ was staffed by a fellow by the name of William

Dow; is that right?

A.   It was one of the architects, yes.

Q.   All right.  And do I understand that initially you were

surprised that they were terminated from the project but you

had believed that they would be terminated?

A.   That's correct.

Q.   And was that because there were some delays in their

deliverables, like the design and development documents?

A.   I don't recall about the delays.  There were questions in

terms of whether the design was meeting the intent of the

Gaming Authority.

Q.   Okay.  And you had mentioned earlier before the break that

there wasn't this wow factor, right?

A.   Initially that was a concern, yes.

Q.   Okay.  And you also had mentioned, I think, that there was

a disagreement between yourself and JCJ or Mr. Dow about the

design and the construction of the proposed development; is

that right?  Let me ask it a different way.

     Did you disagree with the design component that these

S-shaped or curved building would be built in Phase 1 on top of

1   a podium -- excuse me -- built in Phase 2 on top of a podium

2   that were to be constructed in Phase 1?

3   A.   That is correct, I had a concern about that.

4   Q.   All right.  And your concern was that it would be too

5   disruptive; is that right?

6   A.   My concern was primarily if we're going to build a podium

7   in Phase 1, which is the base of the building that housed the

8   casino, restaurants and so forth, and that people arrived and

9   we were still trying to construct a tower up above in an

10  S shape, I expressed some concerns about our ability to reach

11  it all with a crane without disrupting the entrance to the

12  casino.

13  Q.   Understood.  And obviously, and you had mentioned this on

14  direct examination, it's important to be first to market,

15  right?

16  A.   Yes, in that particular case it was.

17  Q.   And that's because both MGM out in Springfield and Wynn in

18  Everett were also moving as quickly as they could to be first

19  to market, right?

20  A.   True.

21  Q.   And you wanted to be able to complete this project as

22  quickly as possible so you could attract that loyal customer

23  base, right?

24  A.   Yes.

25  Q.   It just makes good business sense, doesn't it?

1   A.   It does.

2   Q.   And you've worked in casino projects in the past, right?

3   A.   Yes, I have.

4   Q.   And you had developed a relationship with Genting Resorts

5   World, is it called?  I guess it's a subsidiary of Genting.

6   A.   Correct.

7   Q.   And you've worked with them on projects in the past?

8   A.   I have.

9   Q.   All right.  And is it fair to say that during the course

10   of your two years working this project, I think you testified

11   on direct examination you had almost daily contact with JCJ?

12   A.   Correct.

13   Q.   And was your contact with Resorts World or Genting

14   somewhere around the same sort of frequency?

15   A.   Probably not daily but at least weekly.

16   Q.   Okay.  And you would appear at the Gaming Authority

17   meetings, right?

18   A.   I did.

19   Q.   All right.  And how often were those meetings held, if you

20   recall?

21   A.   Yeah, I don't really recall.  We scheduled at different

22   times.

23   Q.   Right.  And obviously there would be an agenda or an

24   itinerary for the meeting, right?

25   A.   Yes.

1  Q.   And then that meeting would begin with an introduction and

2  you would follow the agenda, and the members of the Gaming

3  Authority would discuss whatever the business was for that

4  meeting, right?

5  A.   Correct.

6  Q.   And Mr. Cromwell was obviously prepared for the meetings

7  and he discussed it, right?

8  A.   Yes, he was.

9  Q.   And I think you mentioned the name Harding, Mark Harding,

10  he was also prepared for the meetings and discussed the agenda?

11  A.   He was.

12  Q.   And were there other members of the Gaming Authority that

13  were present at these meetings?

14  A.   Yes, there were.

15  Q.   All right.  And do you remember the names Trish Keliinui

16  and Charles Foster?

17  A.   Yes, I do.

18  Q.   Were they present at the meetings and were they open about

19  their discussions, too?

20  A.   When there were things that they were concerned about or

21  had an interest in, yes.

22  Q.   Does the name Yvonne Avant ring a bell?

23  A.   Yes.

24  Q.   Was she also present on the Gaming Authority?

25  A.   She was.

1  Q.   And she participated as well, right?

2  A.   Very much so.

3  Q.   Okay.  So do I understand at these Gaming Authority

4  meetings that each and every one of those five members all

5  voiced their opinions, shared their concerns, and there was a

6  dialogue back and forth?

7  A.   Yes.

8  Q.   And it became apparent to you at some point, did it not,

9  that some of the gaming member authorities -- Gaming Authority

10  members, excuse me, were somewhat displeased with the

11  performance of JCJ?

12  A.   I would not -- I would not state it that way.

13  Q.   Okay.

14  A.   The way I would state it is that they were disappointed in

15  some of the design elements associated with the design.

16  Q.   Okay.  Fair enough.  And obviously you're familiar with,

17  you know, the relationship that Genting has with all of these

18  casino projects as you've worked on some of them in the past,

19  right?

20  A.   Yes.

21  Q.   And you knew that in this case, in this particular project

22  with the Mashpee Wampanoag Tribe, not only were they providing

23  financing for the project but they were also going to be an

24  operator, right?

25  A.   Yes.

1  Q.  And by the very nature of that, you had to have contact

2  with them, right?

3  A.  Yes.

4  Q.  And is it fair to say that your communication with them

5  may have been to a greater frequency than your communication

6  with the Gaming Authority or Chairman Cromwell?

7  A.  Correct.

8  Q.  All right.  And Chairman Cromwell expressed some -- I'm

9  not sure what the correct word is, maybe frustration or

10  displeasure with that?

11  A.  Yes, he did.

12  Q.  All right.  But you would agree with me, wouldn't you,

13  Mr. D'Amato, that you and Chairman Cromwell had a good

14  relationship, right?

15  A.  Yes, we did.

16  Q.  He was a gentleman to you and you were a gentleman to him,

17  right?

18  A.  Yes.

19  Q.  Fair to say that you enjoyed one another's company and

20  that there were no personal animosities or ill will harbored

21  between the two of you, right?

22  A.  There was not.

23  Q.  Yeah.  And you mentioned earlier, and I probably should

24  have started with this, that you responded to an RFP and went

25  to an interview process, right?

1   A.   Yes.

2   Q.   And so members of the Gaming Authority in addition to

3   Mr. Cromwell were present at the interview process, right?

4   A.   Yes.

5   Q.   Was there an attorney by the name of Steve Burr there?  Do

6   you remember him?

7   A.   Yes, I do.

8   Q.   That's a fellow that insisted on that AIA contract, right?

9   A.   Yes.

10  Q.   Was he heavily involved in the interview process?

11  A.   He was involved, yes.

12  Q.   Okay.  And he's the one that -- well, I guess, insisted on

13  the contract which led to the definition of you as a

14  construction manager in the email as opposed to the owner's

15  representative, right?

16  A.   Yes.

17  Q.   But you had an exhibit that cleared that up, right?

18  A.   Yes, we did.

19  Q.   During your two years working for the Gaming Authority in

20  this project was D'Amato Builders & Advisers paid for your

21  work?

22  A.   Yes, we were.

23  Q.   It was on an hourly basis, right?

24  A.   Yes.

25  Q.   And I know you made mention of some fee that might have

1    been associated.  Do you know if you had that structured in

2    this contract?

3    A.    I believe this contract was purely an hourly rate.

4    Q.    Okay.  And is that normal for the industry when you're an

5    owner's rep?

6    A.    It varies significantly.

7    Q.    Okay.  Now, ultimately D'Amato was terminated from the

8    project, right?

9    A.    That is correct.

10   Q.    All right.  But nonetheless you agreed, you were asked and

11   you agreed to work with the Gaming Authority to hand over some

12   of the work that was done to the next owner's rep that was

13   coming on the project, right?

14   A.    Yes.

15   Q.    All right.  And you were paid for that work, too; do you

16   recall?

17   A.    I don't recall.  There was an agreement that said I would

18   be paid.  But I'm assuming I was.  I don't recall specifically.

19   Q.    Okay.  And you're familiar with the land in trust process,

20   right?

21   A.    Yes, I am.

22   Q.    And would you agree with me that that is a complicated and

23   arduous process?

24   A.    Yes, it is.

25   Q.    That it requires discussions, negotiations and advocacy in

1  the United States Congress on behalf of a tribe, right?

2  A.   Yes.

3  Q.   That this can be a big lift, a lot of work, right?

4  A.   Yes, it is.

5  Q.   That not every tribe has its land in trust in order to

6  pursue, I guess it's called a casino gaming license, right?

7  A.   That's correct.

8  Q.   And it's a competitive process, right?

9  A.   Can you rephrase that?  Competitive with whom?

10  Q.   I probably used the wrong term.  It's just a difficult

11  process which requires a lot of advocacy with a lot of

12  officials from across the country, right?

13  A.   Correct.

14  Q.   And it also involves advocacy with the Department of the

15  Interior, right?

16  A.   Yes.

17  Q.   And ultimately the Secretary of the Department of the

18  Interior makes a decision about whether or not a particular

19  tribe's land will be placed in trust for the benefit of that

20  tribe, right?

21  A.   That's who the determination comes from, yes.

22  Q.   And when this happens for a tribe, this is a significant

23  milestone or accomplishment, is it not, sir?

24  A.   It is.

25  Q.   And that's because it opens the pathway for a tribe to get

1  into casino gaming and develop revenues for its nation, right?

2  A.   Yes.

3  Q.   Okay.  And you're aware that Mr. Cromwell successfully did

4  this on behalf of his nation, the Mashpee Wampanoag Tribe?

5  A.   Yes.

6  Q.   All right.  Were you familiar also with the compact that

7  the tribe was able to enter into with the Commonwealth of

8  Massachusetts?

9  A.   Somewhat.

10  Q.   And do you recall, if you know -- and if you don't, that's

11  fine -- that the tribe, through Chairman Cromwell and I suppose

12  others, was able to negotiate with the Governor of

13  Massachusetts for the exclusive right to have the casino gaming

14  license in the southeastern region of Massachusetts?

15  A.   Yes.

16  Q.   And that, again, is another significant milestone, is it

17  not?

18  A.   It is.

19  Q.   And some -- well, I won't put words in your mouth.

20       Would you call this a pretty tremendous accomplishment?

21  A.   It is.

22  Q.   Because that gives you the exclusive region, right?

23  A.   It does.

24  Q.   And part of what, I guess, JCJ and other people who are

25  involved in master planning of the development of casinos look

1    at are the potential demographics and that helps to understand

2    what kind of a facility should be built to support the demand

3    or the customer demand, right?

4    A.    Well, that's not only looked at by the architect, but it's

5    very important to the operator, and he would have probably more

6    knowledge than the architect in terms of what elements of the

7    casino would be necessary for the demographics in the region.

8    Q.    That makes complete sense, sir.  So Genting would be

9    involved in all of that, too, right?

10   A.    Yes.

11   Q.    All right.  And I know you testified on direct examination

12   that you were a little surprised that D'Amato was terminated

13   from the project, right?

14   A.    Yes.

15   Q.    And that's because you felt you were doing good work on

16   behalf of the Gaming Authority, right, representing its

17   interests?

18   A.    Correct.

19   Q.    And as far as you know or I suppose the only reason for

20   that was a lack of communication or a difference of

21   communication between you and the Gaming Authority?

22   A.    I would only be speculating on that.  I'm not certain of

23   that.

24          MR. FLAHERTY:  Fair enough, sir.  Okay.  I have no

25   further questions, Your Honor.

```
 1          THE COURT:  All right.  Mr. Weinberg.
 2          MR. WEINBERG:  Thank you, Your Honor.
 3   CROSS-EXAMINATION BY MR. WEINBERG:
 4   Q.   Good afternoon, Mr. D'Amato.
 5   A.   Good afternoon.
 6   Q.   I have a few questions about the contract.  Do you recall
 7   the AIA contracts that were signed by construction managers on
 8   these construction projects?
 9   A.   Yes.
10   Q.   And that was the format of contract that Attorney Burr
11   asked you to negotiate and settle upon; is that correct?
12   A.   Correct.
13   Q.   Those contracts require the client, in this case the
14   Gaming Authority, to essentially nominate a representative who
15   could be available in case of change orders or in case issues
16   arise on the job; is that correct?
17   A.   Yes.
18   Q.   And in this case Chairman Cromwell was that
19   representative, correct?
20   A.   Yes.
21   Q.   The AIA contract that was entered between D'Amato and the
22   Gaming Authority also had provisions for termination, did it
23   not?
24   A.   Yes, it did.
25   Q.   And do you recall any end date on the contract between
```

1  D'Amato and the Gaming Authority?

2  A.   I believe, I believe it was a 36-month contract, but I am

3  not absolutely certain of that.

4  Q.   Okay.  It had time periods where there would be, for

5  instance, if there was termination for cause, there would be

6  how many days' notice?

7  A.   Seven.

8  Q.   And if there was termination without cause, do you recall

9  how many days' notice?

10 A.   I do not.

11 Q.   But there were termination clauses in these contracts,

12 correct?

13 A.   Yes.

14 Q.   That was an ordinary part of the negotiation and an

15 ordinary part of the AIA model contract that was often used?

16         THE COURT:  Mr. Weinberg, I'm sorry, but if you can

17 speak into the microphone so the court reporter can pick up

18 your voice.

19         MR. WEINBERG:  Sorry, Your Honor.  Sorry, Kelly.

20 Q.   The AIA contract is a model contract that's used in many

21 different situations, correct?

22 A.   Yes.

23 Q.   It wasn't ideal for an owner's rep, but that's what the

24 Gaming Authority wanted, and that's what you executed, correct?

25 A.   Yes.

```
 1   Q.   And model contracts under the AIA have termination
 2   clauses, correct?
 3   A.   Yes, they do.
 4   Q.   Mike Speller is an executive with Resorts World?
 5   A.   Yes.
 6   Q.   And Resorts World operates casinos for Genting, the
 7   Malaysian company, the multinational company?
 8   A.   They do.
 9   Q.   And one of the casinos is Resorts World New York?
10   A.   Yes.
11   Q.   Others are Resorts World Las Vegas and other such casinos,
12   correct?
13   A.   Yes, that is correct.
14   Q.   You worked with Speller in New York, did you not?
15   A.   Yes, I did.
16   Q.   You had never worked with the Gaming Authority in Mashpee
17   before, had you?
18   A.   I had not.
19   Q.   You had no relationship to either Mr. Cromwell or anyone
20   on the Gaming Authority before you went for your interview,
21   correct?
22   A.   I did not.
23   Q.   But you did with Genting and you did with Mr. Speller,
24   correct?
25   A.   Yes.
```

1  Q.   And to your knowledge, Mr. Speller referred you to the

2  Gaming Authority, endorsed you, supported you for the job of

3  owner's rep?

4  A.   I don't know for a fact that he referred me, but he was

5  there in the interview process.

6  Q.   Okay.  And he had an important role in the beginnings of

7  the casino project, did he not?

8  A.   Yes, he did.

9  Q.   He represented the company that was funding the casino?

10 A.   Yes.

11 Q.   Represented the company that was going to operate the

12 casino on behalf of the Gaming Authority and the Mashpee Tribe,

13 correct?

14 A.   Yes.

15 Q.   He was at Gaming Authority meetings, correct?

16 A.   Yes, he was.

17 Q.   Ran some?

18 A.   Yes, he did.

19 Q.   And to your knowledge was an important participant in

20 major decisionmaking during the years you were the owner's rep

21 for the Gaming Authority, correct?

22 A.   That is correct.

23 Q.   You were interviewed several -- sorry.  You were

24 interviewed several times by the FBI, correct?

25 A.   You're talking relative to this particular case?

1   Q.   Yes.

2   A.   Yes.

3   Q.   And I think once was by phone and once was in person at

4   your offices?

5   A.   Yes.

6   Q.   Okay.  Do you remember volunteering to them that, if there

7   was a time to switch teams, that the time was the spring of

8   2014 when both you and JCJ were terminated?

9        MR. DOLAN:  Objection, hearsay.

10       THE COURT:  No.  He may answer the question whether he

11  recalls saying that.

12  A.   I do recall saying that, that in all projects if there is

13  a particular time to change -- it's never a good thing to

14  change, but if there's some -- some times are better than

15  others, and this happened to be a clearcut time at the end of

16  design development.

17  Q.   It would be worse to change owner's reps as you approached

18  the beginning of breaking ground in construction, correct?

19  A.   Well, I would never recommend changing an owner's rep, but

20  in terms of design team, that's the particular time.

21  Q.   And in terms of causing delay in the overall project, it

22  would be better to switch owner's reps at the time they did

23  with you after you'd finished your environmental work and

24  before a lot of the pre-construction work was done, correct?

25  A.   As I stated, it's always better to have a clearcut time,

1    and that would have been the time.

2    Q.   That would have been the spring of 2014 when, in fact,

3    they decided to make a change in a new team of architects and

4    owner's reps, correct?

5    A.   Yes.

6    Q.   Because schedule and delay was important to both Genting,

7    the developer and funder, and the Gaming Authority, correct?

8    A.   Yes.

9    Q.   As I think you said on direct, they were competing with

10   two other casinos that had not yet opened but were scheduled to

11   be built and opened in Massachusetts, correct?

12   A.   Yes.

13   Q.   And it was important to the tribe and important to the

14   Gaming Authority and particularly important to Genting, the

15   experienced funder of casinos, to be the first to open,

16   correct?

17   A.   Yes.

18   Q.   And delay was in conflict with that goal of being the

19   first to open, correct?

20   A.   Correct.

21            MR. WEINBERG:  If I could have a moment, Your Honor.

22            THE COURT:  Yes, you may.

23   Q.   Now, you testified that you were not very surprised that

24   JCJ was terminated, given the issues that had arisen between

25   the Gaming Authority and JCJ about the wow factor and whether

1  the architect was at all times meeting that goal, correct?

2  A.   Yes.

3  Q.   You were more surprised that you were terminated with JCJ

4  even though you later learned that the Gaming Authority decided

5  to go with a new team for the next stage in its construction of

6  this casino, correct?

7  A.   Yes.

8        MR. WEINBERG:  I have no other questions.  Thank you

9  very much, Mr. D'Amato.

10       THE COURT:  Mr. Dolan, anything?

11       MR. DOLAN:  No, Your Honor.

12       THE COURT:  All right.  You may step down,

13  Mr. D'Amato.  Thank you.

14       You may call your next witness.

15       MR. DOLAN:  Government calls Robbie Hendricks.

16       ROBERT HENDRICKS, Sworn

17       THE CLERK:  Please be seated and state your full name

18  and spell your last name.

19       THE WITNESS:  Robert Hendricks, H-e-n-d-r-i-c-k-s.

20       THE COURT:  You may inquire, Mr. Dolan.

21  DIRECT EXAMINATION BY MR. DOLAN:

22  Q.   Sir, where do you live, city and state?

23  A.   Mashpee, Massachusetts.

24  Q.   How long have you lived in Mashpee, Massachusetts?

25  A.   For about 18 years.

```
 1    Q.    Are you employed?

 2    A.    Yes.

 3    Q.    How are you employed?

 4    A.    Self-employed.

 5    Q.    Doing what?

 6    A.    Property management.

 7    Q.    What does that entail?

 8    A.    Yards and everything outside of the house.

 9    Q.    Are you familiar with the Mashpee Wampanoag Tribe?

10    A.    I am.

11    Q.    How are you familiar with the tribe?

12    A.    I'm a tribal member.

13    Q.    Are you familiar with the term "enrolled member"?

14    A.    Yes.

15    Q.    What does that mean?

16    A.    It's to be on the tribal roll.

17    Q.    What's the significance of being on the tribal roll?

18    A.    When the tribe recognizes you as a tribal member.

19    Q.    Is that something that's important to the tribe?

20    A.    Yes.

21    Q.    Why is that?

22    A.    So that way, outsiders or anybody else just can't come in

23    and be on the roll, be a member.

24    Q.    How big is the tribe?

25    A.    2,600 tribal members currently.
```

1    Q.    How long has the Mashpee Wampanoag Tribe been in

2    existence?

3    A.    Forever, since day one.

4    Q.    What do you mean by "forever"?

5    A.    Since the existence of our ancestors, we've been there

6    forever.

7    Q.    Can you describe your understanding of the relationship

8    between the Mashpee Wampanoag Tribe and the federal and state

9    governments?

10   A.    Any specific --

11   Q.    What's your understanding of the Mashpee Wampanoag's

12   tribal governance related to other systems of government,

13   federal or state?

14   A.    Being federally recognized, is that what you're asking?

15   Q.    Yes.

16   A.    We are federally recognized, which is recognized by the

17   feds, by the federal government.

18   Q.    And does the Mashpee Wampanoag Tribe have its own system

19   of government?

20   A.    Yes.

21   Q.    How is the Mashpee Wampanoag Tribe governed?

22   A.    By the Tribal Council.

23         MR. DOLAN:  Your Honor, I'd move Exhibit 13 into

24   evidence, please, at this time.

25         THE COURT:  It's without objection.  It will be

1    received.

2              (Exhibit 13 admitted into evidence.)

3              MR. DOLAN:  Published, please.

4    Q.   Do you recognize Exhibit 13 on the screen, Mr. Hendricks?

5    A.   Oh, I'm sorry.  Yes.

6    Q.   What is Exhibit 13?

7    A.   It is the tribe's constitution.

8    Q.   So you mentioned the Tribal Council.  What does the Tribal

9    Council do?

10   A.   They oversee, govern and oversee the tribe.

11   Q.   Is that an entity that's established by the Mashpee

12   Constitution?

13   A.   Excuse me?

14   Q.   Is that an entity that is established by the Mashpee

15   Constitution?

16   A.   Yes.

17   Q.   Who is on the Tribal Council?

18   A.   There's 11 members, nine elected, two appointed.

19   Q.   And are there specific roles that those 11 members have on

20   the Council?

21   A.   Yes.

22   Q.   What are those?

23   A.   Well, there's a chair, the vice chair, secretary,

24   treasurer, and five Council members that have different roles,

25   and then there's two appointed, which is a chief and a medicine

1  man.

2  Q.  Can you describe the difference between the chief who is

3  appointed and the chair?

4  A.  The chief that's appointed is more of a cultural leader

5  for the tribe, where the chair is of the operations and

6  governance of --

7       MR. DOLAN:  Can we go to page 6 of the exhibit,

8  please.  One more page, please.  I apologize.

9  Q.  Do you see --

10 A.  Yes.

11 Q.  Do you see here in the constitution where it describes the

12 duties of the chair of the Mashpee Wampanoag Tribe?

13 A.  I do.

14 Q.  Is that consistent with your understanding?

15 A.  Yes.

16      MR. DOLAN:  We can take it down, please.

17 Q.  Sir, have you ever participated in tribal government?

18 A.  I have.

19 Q.  What -- how did you participate?

20 A.  I was the tribal treasurer.

21 Q.  During what time period did you serve as the treasurer of

22 the Mashpee Wampanoag Tribe?

23 A.  2013 to 2017.

24      MR. DOLAN:  Your Honor, at this time we move Exhibit

25 15 into evidence.

1    THE COURT:  It's received without objection.

2    (Exhibit 15 admitted into evidence.)

3    MR. DOLAN:  Publish it, please.  Go to the following

4 page, please.

5 Q.   Do you see Exhibit 15 before you, Mr. Hendricks?

6 A.   Yes.

7 Q.   And is this the election in 2013 when you won treasurer?

8 A.   It is.

9 Q.   Do you see at the bottom -- I'll pull it up for you -- a

10 vote tally?

11 A.   I do.

12 Q.   Is that vote tally -- is that similar or dissimilar than

13 the typical number of voters that vote in an election of the

14 Mashpee Wampanoag Tribe?

15 A.   This one was pretty big because it's of the officers, all

16 the officers, they were all up for election.  They stagnate

17 between other Council members.  So this one is bigger than the

18 other ones in general.

19 Q.   And why was this one bigger?

20 A.   Because of the office's elections.

21 Q.   What offices were up in 2013?

22 A.   Chair, the vice chair, secretary and treasurer.

23 Q.   Who was elected as -- what was the nature of the election

24 for chair in 2013?  Who was up for chair in 2013?

25 A.   Cedric and -- who was the other one?  David.

```
 1    Q.    I won't test your memory.
 2            MR. DOLAN:  Can we go to page 1 of the exhibit,
 3    please.
 4    Q.    Well, I did test your memory.  I'm not going to test your
 5    memory any longer.
 6    A.    No problem.  I remember David.  I don't remember who else
 7    it was.  Richard was the other one.
 8    Q.    Zooming in, you mentioned David.  Were you referring to
 9    David Pocknett?
10    A.    Yes.
11    Q.    And Richard Oakley?
12    A.    Yes.
13    Q.    And a number of write-in candidates?
14    A.    Correct.
15            MR. DOLAN:  We can take it down.
16    Q.    Did you campaign for your election?
17    A.    I did.
18    Q.    What did that campaign consist of?
19    A.    Of a lot.  I had signs.  I had a lot of cards, T-shirts,
20    and going to each of the socials or any event that was
21    available to talk.
22    Q.    Approximately how much money did you spend on your
23    campaign?
24    A.    I'd say about between 2,500 and 3,500.
25    Q.    How did you pay for that?
```

1   A.   I paid for it.

2   Q.   Did you fundraise at all?

3   A.   No.

4   Q.   Okay.  Why didn't you spend more money on your campaign?

5   A.   Well, to be honest with you, I think mine was pretty

6   elaborate considering some of the other ones I've seen in the

7   past as far as doing the extra things with the signs and the

8   T-shirts and so forth.  So I think that was a pretty good

9   amount.

10  Q.   You described going to socials.  What did that consist of

11  during your campaign for treasurer?

12  A.   There were different events that would come up.  We have

13  yearly socials, and so at that time you meet and greet and get

14  a chance to talk with everybody.

15  Q.   When you're doing those types of meet and greets, are you

16  generally meeting people you haven't met before as constituents

17  or people that know you or know of you?

18  A.   Probably basically everybody you know.  Once in a while

19  there's a few people that will come in from out of town or just

20  family that I wouldn't know personally but then get to meet

21  them there.  But basically it's mostly everybody who knows me

22  or I know of them.

23  Q.   Why is that, how do you know of everybody that you're

24  meeting in a campaign?

25  A.   It's a small -- Mashpee is small, and I grew up there, so

1  being related and affiliated with everybody, it's small.

2  Q.   I would like to turn to 2017.  Did you run for

3  re-election?

4  A.   No, I did not.

5  Q.   Why not?

6  A.   My son was going into high school, and I had missed a lot

7  of his games and times those four years, and I didn't want to

8  miss his high school and any more games.

9  Q.   When did you make that decision?

10  A.   It was probably eight months, ten months prior to the

11  February election of the prior year, 2016.

12  Q.   Do you recall if Chairman Cromwell ran for re-election?

13  A.   He did.

14      MR. DOLAN:  Move Exhibit 16 into evidence.

15      THE COURT:  It's received.

16      (Exhibit 16 admitted into evidence.)

17      MR. DOLAN:  Publish it, please.

18  Q.   Do you see Exhibit 16 before you?  Is that consistent with

19  your memory of what happened in that 2017 election?

20  A.   Yes.

21  Q.   Did you know Aaron Toby?

22  A.   I do.

23  Q.   Who is Aaron Toby?

24  A.   He's a tribal member.

25  Q.   Did you know him before the election?

1    A.    Yes.

2          MR. DOLAN:  You can take it down, please.

3    Q.    Going back to your term as treasurer during 2013 and 2017,

4    who was the chair of the Tribal Council during that time period

5    when you served?

6    A.    Cedric Cromwell.  Sorry.

7    Q.    I understand.  How well do you know Mr. Cromwell?

8    A.    Excuse me?

9    Q.    How long have you known Mr. Cromwell?

10   A.    Just about my whole life.

11   Q.    How old are you?

12   A.    I'm 44.

13   Q.    You described the duties of the chair earlier.  Is that

14   consistent with Chairman Cromwell's duties when you were

15   serving on Tribal Council with him?

16   A.    Yes.

17   Q.    Are you familiar with Project First Light?

18   A.    I am.

19   Q.    What is Project First Light?

20   A.    It was our casino development.

21   Q.    Where was the casino going to be built?

22   A.    In Taunton.

23   Q.    Was that something that was important for the tribe?

24   A.    Yes.

25   Q.    Is it important for the tribe?

```
 1    A.    Yes.

 2    Q.    Why is that?

 3    A.    It gives us our availability -- ability for another

 4    revenue outside of the federal funds to be self-sufficient and

 5    sovereign.

 6    Q.    What was your involvement, if any, in the management of

 7    Project First Light?

 8    A.    I was hands-on with it.

 9    Q.    Did you have a formal role?

10    A.    Excuse me?

11    Q.    Did you have a formal role?

12    A.    Yes, I did.

13    Q.    What was that?

14    A.    It was the treasurer.

15    Q.    Are you familiar with the Mashpee Wampanoag Tribal Gaming

16    Authority?

17    A.    I am.

18    Q.    What is the Tribal Gaming Authority?

19    A.    It's an entity that was created by the tribe to manage,

20    operate, oversee all gaming, and it also put on a protection

21    for the tribe from all liabilities.

22    Q.    Now, you mentioned you were treasurer of the Tribal

23    Council.

24    A.    Correct.

25    Q.    Just to be clear, did you have a specific role in the
```

1  Gaming Authority?

2  A.   Yes.

3  Q.   What was that?

4  A.   Same, as a treasurer.

5        MR. DOLAN:  Your Honor, I'd move Exhibit 14 into

6  evidence.

7        THE COURT:  It's received.

8        (Exhibit 14 admitted into evidence.)

9        MR. DOLAN:  Publish, please.

10  Q.   Do you recognize this?

11  A.   I do.

12  Q.   What is it?

13  A.   It's the Tribal Gaming Authority Ordinance.

14  Q.   And what is the -- how did the gaming ordinance come into

15  effect; how does that work?

16  A.   It was created with the Tribal Council, and then it's the

17  resolutions with the Indian Gaming, IGRA, Indian Gaming

18  Regulatory Act.

19        MR. DOLAN:  Zoom out, please.  Can we go to page 7,

20  please.

21  Q.   Do you see in section 6 where it discusses who is on the

22  Gaming Authority and the Authority officers and the board of

23  directors?

24  A.   I do.

25  Q.   How is the membership of the Gaming Authority comprised,

1  just to summarize your understanding of this document based on

2  your role as treasurer?

3  A.  When you're elected as the chair or the treasurer, as the

4  to Council, you automatically assume the seats on the Gaming

5  Authority.

6  Q.  Was there anybody else on the Gaming Authority besides the

7  chair and the treasurer?

8  A.  Yes.

9  Q.  Who is that?

10  A.  There was three other members, tribal members.

11  Q.  You mentioned that the chair is also on the Gaming

12  Authority.  Does the chair have a different title in his role

13  as a representative of the Gaming Authority?

14  A.  It's the same role, except on the Gaming Authority he's

15  the person who has the ability to vote.

16          MR. DOLAN:  Can we go to the next page of the exhibit,

17  please.

18  Q.  Just drawing your attention to CI, do you see where it

19  says, "Any individual then duly serving as chairperson of the

20  Tribal Council shall automatically serve as president of the

21  board of directors"?

22  A.  I do.

23  Q.  Just to be absolutely clear, chair, president, you said

24  it's the same role.  Is it a different title?

25  A.  Yeah.  I think the chair is with the Council.  The

1  president is with the Gaming Authority.

2  Q.   I understand.

3       MR. DOLAN:  Take that down, please.

4  Q.   During the time that you were on the Gaming Authority as

5  treasurer, who were the other members?

6  A.   On the Gaming Authority you asked?

7  Q.   Yes.

8  A.   Bobby -- well, Charles Foster, Trish Keliinui, Yvonne

9  Avant.

10 Q.   How long did the Gaming Authority meet?

11 A.   In the first year and a half, not too often.  I'd say

12 maybe once a month or so.  As we ramped up about a year after,

13 year and a half, we met regularly weekly, sometimes two, three

14 times a week at times.

15 Q.   Is there a reason why it started ramping up?

16 A.   Yes, we were pushing to open the casino.

17 Q.   When the Gaming Authority had meetings, who had the

18 ability to vote?

19 A.   All of the members.

20 Q.   Who set the agenda for the Gaming Authority meetings?

21 A.   The chairman.

22 Q.   During the meetings, if another member of the Gaming

23 Authority wanted to speak, was there -- how did that work?

24 A.   You spoke.  We weren't too formal as far as procedures, so

25 you could speak freely.

| | |
|---|---|
| 1 | Q. Are you familiar with Genting? |
| 2 | A. I am. |
| 3 | Q. What is Genting? |
| 4 | A. Genting was our investor, the tribe's investors. |
| 5 | Q. You said "investors" in this project? |
| 6 | A. Correct. |
| 7 | Q. Do you know who Michael Speller is? |
| 8 | A. I do. |
| 9 | Q. Who is Michael Speller? |
| 10 | A. He worked with Genting. |
| 11 | Q. Did he have a vote on the Gaming Authority? |
| 12 | A. No. |
| 13 | Q. Are you familiar with JCJ Architects? |
| 14 | A. Yes, I am. |
| 15 | Q. What is JCJ Architects? |
| 16 | A. They were our architects in the beginning for the project. |
| 17 | Q. Did anybody representing JCJ Architects have a vote on the |
| 18 | Gaming Authority? |
| 19 | A. No. |
| 20 | Q. Are you familiar with D'Amato & Associates? |
| 21 | A. I am. |
| 22 | Q. What is D'Amato & Associates? |
| 23 | A. He was the project manager. |
| 24 | Q. When you say "he," do you mean Mike D'Amato? |
| 25 | A. Sorry, correct. Mike D'Amato was our project manager. |

1   Q.   Did Mr. D'Amato have a vote on the Gaming Authority?

2   A.   He did not.

3   Q.   When he served as the project manager or owner's rep, what

4   was your level of interaction with him?

5   A.   Frequent.

6   Q.   What kind of scale when you say "frequent"?

7   A.   Well, each of those meetings, he was there in

8   conversations for each of them.  So in the beginning, again,

9   the meetings were once a month or so.  That's how often I

10  probably talked to him.  And then when we ramped up a little

11  before, it was a little more often.

12  Q.   I'd like to bring your attention to April 2 of 2014.  Do

13  you recall the Gaming Authority meeting on that date?

14  A.   I do.

15       MR. DOLAN:  Okay.  Your Honor, I move Exhibit 19 into

16  evidence at this time.

17       THE COURT:  It's received.

18       (Exhibit 19 admitted into evidence.)

19       MR. DOLAN:  Publish it, please.

20  Q.   Let me say first, do you recognize Exhibit 19?

21  A.   I do.

22  Q.   What is it?

23  A.   It's the minutes for the Gaming Authority.

24  Q.   For what date?

25  A.   For April 2, 2014.

```
 1   Q.   Can you -- you may be able to touch this.  We'll give this
 2   a shot.  Can you circle where it shows that on the screen just
 3   so it's clear.
 4        Drawing your attention to the motions, do you recall what
 5   happened at that meeting?
 6   A.   I do.
 7   Q.   What happened at the meeting?
 8   A.   That was the vote for terminating JCJ.
 9   Q.   Was JCJ the only entity that was terminated from its work
10   on Project First Light during this April 2 meeting?
11   A.   During that day, yes.
12   Q.   I'd like to bring your attention to the third paragraph
13   down.  Other than JCJ, was there any other entity that was
14   terminated on that day?
15   A.   That was the same day.  Mike D'Amato also then.
16   Q.   Does that refresh your recollection?
17   A.   Yes, it does.  Apologize.
18   Q.   Was there any discussion of terminating JCJ prior to the
19   Gaming Authority meeting on that date?
20   A.   Yes.
21   Q.   When did the possibility of discussion of terminating JCJ
22   first arise?
23   A.   I'd say about two weeks, a few weeks before this meeting.
24   Q.   Who suggested that course of action?
25   A.   Cedric.
```

1    Q.   What did he say?

2    A.   He was bringing it up to the Gaming Authority that they

3    weren't going to be able to do the job.  We were going big,

4    bigger than what we initially planned and didn't feel as if

5    they were going to be able to handle that job.

6    Q.   How did you vote on the motion to terminate JCJ from the

7    project?

8    A.   I voted no.

9    Q.   Why is that?

10   A.   I was very happy and content with their work that I had

11   seen that far and felt that they could hold the job going

12   forward.

13   Q.   Is that how the votes are reflected on the motions during

14   the minutes of this Gaming Authority, is that consistent with

15   your memory as to who voted yes and who voted no for the

16   termination?

17   A.   It is.

18   Q.   Similarly, was there any discussion of terminating D'Amato

19   & Associates prior to this April 2 meeting?

20   A.   There was.

21   Q.   When did that first come up?

22   A.   Probably around the same time, few weeks prior to this

23   meeting.

24   Q.   Who suggested that course of action?

25   A.   Cedric had brought it to the Gaming Authority.

1    Q.    What did he say?

2    A.    We were going again bigger and didn't think Mike was going

3    to be adequate and able to do the big project that we were

4    moving towards.

5    Q.    Why did you vote against the termination?

6    A.    I was comfortable with him and thought he could do the job

7    with the resources available.

8    Q.    Now, you mentioned the timeline of a couple of weeks.

9          MR. DOLAN:  I'd like to go back a little bit, and I

10   move to admit Exhibit 17 at this time.

11         THE COURT:  I'm sorry, separately?

12         MR. DOLAN:  Yes, Exhibit 17.

13         THE COURT:  It's received.

14         MR. DOLAN:  Sorry, I'll be more clear next time.

15         (Exhibit 17 admitted into evidence.)

16   Q.    Do you recognize this exhibit?

17   A.    Looks like another Gaming Authority meeting, yes.

18   Q.    Going to the second page, at this meeting do you see any

19   discussion of terminating JCJ or D'Amato?

20   A.    We did have discussions.  "Meeting with the City of

21   Taunton" -- sorry, I was reading.

22   Q.    If you wouldn't mind reading silently just for the court

23   reporter.

24   A.    It says "The introduction of the new JCJ design, Craig

25   Neely," with background and resume.

1  Q.  Take your time, read the whole thing, and just let us know

2  if there was any discussion during that meeting of terminating

3  JCJ.

4  A.  Oh, there was.  There was -- at this meeting I don't

5  believe there was discussion of terminating him.

6  Q.  There was not?

7  A.  No.

8      MR. DOLAN:  Okay.  Can we go back to the first page of

9  the exhibit, please.

10  Q.  Do you know who Bill Dow is?

11  A.  Bill Dow, yes.

12  Q.  Was he at this meeting?

13  A.  I don't remember off the top -- does it say it there?

14  Q.  You don't have an independent recollection?

15  A.  He was there.

16  Q.  He was there, but you know that from the minutes?

17  A.  I know that from the minutes, correct.

18  Q.  Okay.

19  A.  The different meetings are coming up.  So I'm just trying

20  to remember.

21      MR. DOLAN:  We can take that down, please.

22  Q.  So I'd like to move to the March 20 meeting.

23      MR. DOLAN:  I offer Exhibit 18 into evidence.

24      THE COURT:  It's received.

25      (Exhibit 18 admitted into evidence.)

1        MR. DOLAN:  Can we go to the second page of the

2  exhibit, please.

3  Q.   Take your time.  Take a look at the minutes for this

4  meeting.  Then I'm going to ask you the same question.  Was

5  there any discussion at the meeting of terminating either JCJ

6  or D'Amato?

7        MR. DOLAN:  Would you mind zooming in a little bit,

8  please.

9        THE WITNESS:  Thank you.

10        MR. DOLAN:  Sorry.  That was my fault.

11  A.   I don't see any discussion of termination at that time.

12  Q.   So we already talked about the April 2 meeting.

13        MR. DOLAN:  We can take that down, please.

14  Q.   After JCJ and D'Amato were terminated, did the Gaming

15  Authority move forward to hire a new architect and an owner's

16  representative?

17  A.   They did.

18        MR. DOLAN:  Okay.  I move Exhibit 20 into evidence.

19        THE COURT:  It's received.

20        (Exhibit 20 admitted into evidence.)

21        MR. DOLAN:  Publish it, please.

22  Q.   Looking at the exhibit, at the minutes from the March 9

23  meeting -- April 9 meeting, at the very bottom, do you recall

24  the discussion after the termination of JCJ and D'Amato

25  regarding whether it would cause any delay in the project?

1  A.   No, it -- terminating wasn't going to cause a delay.

2  Q.   So you recall it wasn't going to cause a delay?

3  A.   Correct.

4  Q.   Was that something important to the Gaming Authority?

5  A.   Yes, we wanted to move along quickly.

6       MR. DOLAN:  Go to the following page, please, of the

7  exhibit.

8  Q.   Do you see the third bullet down where there was -- you

9  were starting -- what does, "Board review draft RFP for new

10 owner's rep" mean?

11 A.   We were taking on a new owner's rep, we were interviewing

12 them as they were coming in.  There was, I think, three or

13 four, if I remember.

14      MR. DOLAN:  If you could take it down, please.

15      At this time I'd move Exhibit 21 into evidence.

16      THE COURT:  It's received.

17      (Exhibit 21 admitted into evidence.)

18 Q.   Do you see the date on the minutes for this meeting?

19 A.   I do.

20 Q.   What is the date?

21 A.   April 10, 2014.

22 Q.   I want to bring you down to the third paragraph where it

23 talks about Genting management team to negotiate with Steelman

24 Partners.  Do you know who Steelman Partners are?

25 A.   I do.

```
1   Q.   Who are they?

2   A.   They're our architects.

3   Q.   When you say "they're our architects" --

4   A.   For the Project First Light.

5   Q.   After JCJ?

6   A.   After JCJ, correct.

7            MR. DOLAN:  We'll take this one down, please.

8            Your Honor, I'd move Exhibit 22 into evidence.

9            THE COURT:  It's received.

10           (Exhibit 22 admitted into evidence.)

11  Q.   Do you see the date on this agenda?

12  A.   It's not on the screen.

13  Q.   April 21.

14  A.   No, it's not on my screen, sir.

15  Q.   Oh, it's not.  Is it now?

16  A.   No.  Yes.  I got it.

17           MR. DOLAN:  Okay.  Very good.  Can we go to the

18  following page, please.

19  Q.   So do you see on this meeting, what was the status of the

20  new owner's rep project?  This is now about two, three weeks

21  after the termination of D'Amato & Associates.

22  A.   What was the question?

23  Q.   What was the status of the new owner's rep as of the date

24  of this meeting?

25  A.   We were bringing on, looks like we were bringing on RGB at
```

1  that time -- no, I'm sorry.  I apologize.

2  Q.   Sorry.  Take a minute.

3  A.   We were discussing the transition of switching over the

4  documents and everything that was going to be needed and

5  required.

6         MR. DOLAN:  Can we take it down, please.  And I would

7  move Exhibit 23 into evidence.

8         THE COURT:  It's received.

9         (Exhibit 23 admitted into evidence.)

10 Q.   Showing you minutes from the April 29 meeting, do you see

11 the second paragraph talking about a motion to approve RGB as

12 lead candidate for the OPR for Project First Light?

13 A.   I do.

14 Q.   Do you recall what that means, "as lead candidate"?

15 A.   Yes.  We were switching from the original design to

16 something new and different, and in order to get a bid on it,

17 we had to get more information, more personal information that

18 we had, and so voting on the lead -- RGB is a lead candidate,

19 we were able to get more information to get a better bid, more

20 accurate number.

21        MR. DOLAN:  Take it down, please.

22        THE COURT:  Mr. Dolan, is this a point we can break

23 for our afternoon break?

24        MR. DOLAN:  Yes, Your Honor.

25        THE COURT:  If you want to go farther, I just want to

```
 1    find a convenient time.
 2              MR. DOLAN:  This would be a perfect time to stop,
 3    absolutely.
 4              THE COURT:  So we're going to take our afternoon break
 5    at this time, ladies and gentlemen, about 15 minutes.  We'll be
 6    back here at 2:45.
 7              (Jury exits the courtroom.)
 8              THE COURT:  Anything we need to talk about?  Okay.
 9    Come back at 2:45.
10              (Recess, 2:33 p.m. - 2:50 p.m.)
11              THE COURT:  Ready for the jury?
12              MR. DOLAN:  Yes.
13              (Jury enters the courtroom.)
14              THE COURT:  You may inquire, Mr. Dolan.
15              MR. DOLAN:  Thank you, Your Honor.
16    Q.   Mr. Hendricks, I'll just go right to it.
17              MR. DOLAN:  Your Honor, at this time I move Exhibit 24
18    into evidence.
19              THE COURT:  It's received.
20              (Exhibit 24 admitted into evidence.)
21    Q.   Do you see -- it's not on your screen yet.  Now it is.  Do
22    you see it now?
23    A.   I do.
24    Q.   So do you recognize these as the minutes of the May 1
25    meeting?
```

1  A.   Yes.

2        MR. DOLAN:  Can we go to the following page, please.

3  Q.   I want to draw your attention to the third line down

4  beginning with the word "Discussion."  Do you see that?

5  A.   I do.

6  Q.   Can you describe what that means based on your

7  recollection, "Discussion on lead owner's representation

8  candidate and steps moving forward."

9  A.   Again, that was the -- if I remember correctly, that was

10 the discussion of giving them more information of the new

11 project.

12       MR. DOLAN:  I see.  Take it down, please.  At this

13 time I'd move Exhibit 25 into evidence.

14       THE COURT:  It's received.

15       (Exhibit 25 admitted into evidence.)

16 Q.   Looking at these minutes, do you see the date of May 7,

17 2014?

18 A.   I do.

19 Q.   And looking at the third line down, "Motion to amend to

20 remove Steelman scope and resolution from agenda by Treasurer

21 Hendricks.  No second."  Do you recall what that was about?

22 A.   There was language in there that I wasn't content with.  I

23 don't remember the exact verbiage of it, but it was giving too

24 much of a scope of work to Steelman.

25       MR. DOLAN:  Can we go to the following page, please,

following page of the same exhibit.

Q.   Drawing your attention to the second one down of the

"Consultant services agreement, owner's representative with RGB

Architects."  Do you recall that vote?

A.   Yes.

Q.   Was this the vote to approve RGB as the architect for

Project First Light?

A.   It was.

Q.   I'd like to talk to you for a moment about the Authority,

Gaming Authority.  When there's a contested vote like this, how

is the ultimate resolution decided?

A.   By the vote.

Q.   Do any of the five members of the Gaming Authority have

more power or -- does any vote of the five count more than

another?

A.   No.

Q.   So with five, is it, if you get three votes, you win?

A.   It is.

        MR. DOLAN:  Take that down, please.  Move Exhibit 26

into evidence at this time, Your Honor.

        THE COURT:  It's received.

        (Exhibit 26 admitted into evidence.)

Q.   Drawing your attention to the following meeting minutes

after that last one on May 8, do you see the approval for

Steelman as the architect for Project First Light?

1  A.   I do.

2        MR. DOLAN:  Take it down, please.

3  Q.   So when RGB was ultimately hired by the Gaming Authority,

4  and you discussed this a moment ago in one of your answers, did

5  the Gaming Authority enter into a contract with RGB?

6  A.   We did.

7        MR. DOLAN:  Your Honor, at this time I move Exhibit 31

8  into evidence.

9        THE COURT:  It's received.

10       (Exhibit 31 admitted into evidence.)

11       MR. DOLAN:  Take that down, please -- sorry, un-zoom

12  it.  I should have been more clear.  I apologize.  We'll start

13  here.

14 Q.   Do you recognize this document?

15 A.   I do.

16 Q.   What is it?

17 A.   It's the consultant service agreement.

18 Q.   Is this the agreement that you were just describing?

19 A.   Yes.

20 Q.   Do you see the date on that first paragraph of May 7,

21 2014?

22 A.   Yes.

23 Q.   Is that the date of the effective agreement for this

24 consulting services agreement?

25 A.   Yes.

1    MR. DOLAN:  Can we go to page 2 of the contract,

2  please.

3  Q.   I'm going to have you read this to yourself.  Then I'm

4  going to ask you a question.

5  A.   Okay.  (Pause.)  Okay.

6  Q.   Were you familiar with the termination clause for the

7  contract?

8  A.   Yes.

9  Q.   And what's the time period in the contract for a

10  termination clause -- for termination of the contract for

11  convenience of one of the parties?

12  A.   This says a month.

13    MR. DOLAN:  Can we take that down, please.

14  Q.   When RGB was hired to replace D'Amato as owner's rep, did

15  the Gaming Authority give RGB a budget?

16  A.   No.  They ended up -- the budget was already passed for

17  the tribe at that time and so they assumed the existing budget

18  that was there of D'Amato's.

19  Q.   I see.  And did RGB work within that budget?

20  A.   Yes, during the time.

21  Q.   Okay.  What involvement, if any, did you have in the

22  review of invoices for RGB's work?

23  A.   I would review all invoices.

24  Q.   In your view, they reflected the work that RGB was doing?

25  A.   Yes.

1  Q.   Who approved RGB's invoices?

2  A.   I did.

3  Q.   Did you approve them for reasons you just stated?

4  A.   Excuse me?

5  Q.   Did you approve them for the reasons you just stated; they

6  did the work?

7  A.   Yes.

8  Q.   Any complaints about the quality of their work?

9  A.   For the quality, no.

10  Q.   Did you have complaints about anything else?

11  A.   It's money.  It's a lot of money that would go out, so I'd

12  scrutinize it pretty entailed to find out what was the

13  justification of the amounts.  But I've done that with all

14  subjects of the tribe.

15  Q.   So going beyond those types of details that are specific

16  to any type of project involving a large amount of money, you

17  didn't have any specific complaints about the quality of their

18  work?

19  A.   No.

20       MR. DOLAN:  At this time, Your Honor, the government

21  moves Exhibit 33.1 into evidence.

22       THE COURT:  That's received.

23       (Exhibit 33.1 admitted into evidence.)

24       MR. DOLAN:  Page 1, please.

25  Q.   Do you recognize this check?

1    A.    I do.

2    Q.    How do you recognize it?

3    A.    Because my signature is on there.

4    Q.    Can you circle where your signature is.

5    A.    Okay.

6    Q.    What is this check for?

7    A.    For RGB.

8    Q.    Did you regularly sign checks for RGB?

9    A.    I did.

10   Q.    And was this related to Project First Light?

11   A.    It was.

12   Q.    For the things that you've been discussing during your

13   testimony?

14   A.    Correct.

15          MR. DOLAN:  I'd like to move ahead to page 6 of the

16   exhibit, please.  One more page, please.  Another page, please.

17   Q.    Do you recognize that signature?

18   A.    I do.

19   Q.    Whose signature is that?

20   A.    Cedric Cromwell's.

21   Q.    How do you know that?

22   A.    Because I've seen it thousands and thousands of times.

23          MR. DOLAN:  Can we zoom it out, please.

24   Q.    Did the chairman have signature authority on the checks as

25   well?

1   A.   Yes.

2   Q.   Did there come a time -- you can take the exhibit down,

3   please.

4        Did there come a time when you introduced a new

5   requirement for checks?

6   A.   Yes.

7   Q.   What was that requirement?

8   A.   To have two signatures on here.

9   Q.   Why did you introduce that?

10  A.   The prior treasurer had just a single signature that was

11  all that was needed.  I felt it was, with the discussion with

12  my finance department, that it would be better protected to

13  have two signatures.

14  Q.   So no specific concern, just abundance of caution in

15  furtherance of additional discussions?

16  A.   Correct.

17            MR. DOLAN:  Can I have one moment, please, Your Honor.

18            THE COURT:  You may.

19  Q.   Mr. Hendricks --

20            MR. DOLAN:  At this point, Your Honor, the government

21  moves to admit 32.1.

22            THE COURT:  It's received.

23            (Exhibit 32.1 admitted into evidence.)

24  Q.   This is a long exhibit, so I'm just going to have you look

25  at this first page here.  Do you recognize this?

1    A.    Yes.

2    Q.    What is this first page of Exhibit 32.1?

3    A.    RGB invoice.

4    Q.    What, if anything, did this have to do with Project First

5    Light?

6    A.    That was the services provided at that time, I believe.  I

7    don't remember this exact invoice, but that's what the services

8    were.

9    Q.    In the scope of your duties as treasurer, did you review

10   invoices like this?

11   A.    Yes.

12   Q.    Closer in time to when it actually happened?

13   A.    Correct.

14         MR. DOLAN:  We can take it down, please.

15   Q.    Do you know Constantinos Mitrokostas?

16   A.    I do.

17   Q.    How do you know him?

18   A.    He owns a local bar and restaurant in Mashpee.

19   Q.    Does Mr. Mitrokostas have a nickname?

20   A.    Yes, Dino.

21   Q.    Do you know how Mr. Mitrokostas was employed back in 2014?

22   A.    For the tribe?

23   Q.    Or at all.  You mentioned he owned a pizza restaurant in

24   Mashpee.  Was that true in 2014 as well?

25   A.    Yes.

```
 1   Q.   Do you know if Mr. Mitrokostas has a relationship with
 2   Mr. Cromwell?
 3   A.   Yes.
 4   Q.   How do you know that?
 5   A.   I know them both, and I've seen them and witnessed it
 6   where they know each other.
 7           MR. DOLAN:  Nothing further at this time, Your Honor.
 8           THE COURT:  All right.  Mr. Flaherty.
 9           MR. FLAHERTY:  Thank you.
10   CROSS-EXAMINATION BY MR. FLAHERTY:
11   Q.   Good afternoon, Mr. Hendricks.  My name is Timothy
12   Flaherty.  I'm an attorney.  I represent Mr. Cromwell.  If I
13   ask you any questions you don't understand, just tell me, and
14   I'll try to rephrase them.
15   A.   Thank you kindly.
16           MR. FLAHERTY:  Could we pull up Exhibit 17 in
17   evidence, please, Your Honor, Mr. Nemtsev.
18   Q.   Do you see that, sir?
19   A.   Yes.
20           MR. FLAHERTY:  I'll have to come over here and take a
21   look at it myself.  I think it's on the second page.
22   Q.   Is there a reference on the second page to Mr. D'Amato
23   appearing at this meeting by telephone?  Do you see that there?
24   Did I read that correctly?
25   A.   It says, yeah, "via phone," I do see that.
```

1    Q.   "Via phone."  Do you see that?

2    A.   I do.

3    Q.   Do you recall -- obviously Mr. D'Amato was the owner's

4    rep, right?

5    A.   Correct.

6    Q.   Do you recall him attending Gaming Authority meetings by

7    telephone?

8    A.   Not often, not too much then, no.  Appears to be --

9    Q.   Okay.

10   A.   -- which if you can't make a meeting, but in general he's

11   mostly there.

12   Q.   And this was all obviously before COVID.  It was back in

13   2014, right?

14   A.   Correct.

15           MR. FLAHERTY:  Okay.  We can take that down.

16   Q.   Mr. Hendricks, obviously you're a member of the Wampanoag

17   Tribe, right?

18   A.   Yes.

19   Q.   And you were the former treasurer?

20   A.   Yes.

21   Q.   You were the treasurer both for the Tribal Council and

22   also for the Gaming Authority, right?

23   A.   I was.

24   Q.   It's fair to say that you took that role seriously, right?

25   A.   I did, very seriously.

1  Q.   You looked at every single invoice, right?

2  A.   I did.

3  Q.   You verified every single thing that came across your

4  desk, right?

5  A.   Yes.

6  Q.   That was your duty and obligation on behalf of both the

7  tribe for its operations and the Gaming Authority, right?

8  A.   Yes.

9  Q.   Would it be fair to say that you were a stickler, sir?

10 A.   I was.

11 Q.   Okay.  Now, the Mashpee Wampanoag Tribe is a sovereign

12 nation, right?

13 A.   Yes.

14 Q.   And they've been in existence for, you said, since I guess

15 the beginning of time, but maybe -- my records only go back

16 about 400 years.

17 A.   Yeah, well, our ancestors were here forever before the

18 records were even recorded.

19 Q.   And obviously the tribe has its own form of government,

20 right?

21 A.   It does.

22 Q.   And that includes, the tribe has its own health services,

23 correct?

24 A.   Yes.

25 Q.   And you have your own police force, right?

1  A.   Yes.

2  Q.   You have your own court system, right?

3  A.   Yes.

4  Q.   Your own education department, right?

5  A.   Yes.

6  Q.   Are you familiar with what's referred to as the Old Indian

7  Meeting House?

8  A.   I am.

9  Q.   Am I correct that was constructed in Mashpee in 1864 and

10  it's the oldest Native American church in the United States?

11  A.   That it is.

12  Q.   Okay.  Because the Mashpee Wampanoag Tribe is its own

13  sovereign nation, it has its own constitution, right?

14  A.   Yes.

15  Q.   And you looked at and referred to the constitution earlier

16  today in your direct examination?

17  A.   I did.

18  Q.   And that constitution is the guiding document of the

19  Mashpee Wampanoag Tribe, right?

20  A.   Yes.

21  Q.   And in the section that was referred to about the duties

22  and responsibilities of the chairman, the chairman's chief role

23  is as spokesperson for the tribe, right?

24  A.   Yes.

25  Q.   He's chiefly and solely, I guess singularly responsible

1  for public relations on behalf of the tribe?

2  A.   For the -- yeah, basically the majority, yes.

3  Q.   Okay.  But any powers are those that are delegated to him

4  by the Tribal Council, right?

5  A.   Yes.

6  Q.   Put another way, the chairman can't do anything without

7  approval of the Tribal Council, right?

8  A.   It depends on what you're referring to, but no.  I mean,

9  you need to follow the Council's lead.

10  Q.   Right.  And the same thing is true for the president of

11  the Gaming Authority.  The president of the Gaming Authority

12  can't do anything without approval of the Gaming Authority,

13  right?

14  A.   To what we deal with at the table, correct.

15  Q.   All right.  And both the Gaming Authority and the Tribal

16  Council have votes, right?

17  A.   Yes.

18  Q.   These are meetings which are attended by members of each

19  of those entities, right?

20  A.   They are.

21  Q.   And specifically with respect to the Gaming Authority,

22  when you were a member, when you were the treasurer of the

23  Gaming Authority, there were five members, right?

24  A.   Yes.

25  Q.   Each person or each member of the Gaming Authority had one

1  vote and no vote was more important or powerful than anyone

2  else, right?

3  A.   Correct.

4  Q.   And it's true, is it not, sir, that you wanted to make

5  certain that no individual had too much power in any way, shape

6  or form with respect to the casino, correct?

7  A.   Yes.

8  Q.   All right.  Now, as part of being an elected member of

9  both the -- of the Tribal Council, you had campaigns, right?

10  A.   I did.

11  Q.   And you said that you had certain activities, like signs,

12  posters, T-shirts, right?  You attended social events and spoke

13  with members of the tribe, right?

14  A.   Yes.

15  Q.   There were some 2,600 members of the tribe, correct?

16  A.   Yes.

17  Q.   And some people came from out of town on occasion to

18  participate?

19  A.   Correct.

20  Q.   All right.  Would you agree with me that some of these

21  campaigns were contentious?

22  A.   Yes.

23  Q.   All right.  Am I correct that you were not a direct

24  political supporter of Mr. Cromwell?  You kind of did your own

25  thing, right?

1    A.    Yeah, I did my own thing.

2    Q.    Now, you had mentioned just a minute ago Constantinos

3    Mitrokostas, right; he's the fellow that owns the pizza shop in

4    Mashpee?

5    A.    Yes.

6    Q.    Would you agree with me that he was politically active

7    with respect to the tribe?

8    A.    Yes.

9    Q.    And what we call Dino's, for lack of a better term, a

10   pizza shop, it is also a tavern, a local watering hole, right?

11   A.    Yes.

12   Q.    Is it fair to say that members of the tribe would

13   congregate there, get together for a drink, socialize?

14   A.    Yes.

15   Q.    Many members of the tribe actually worked there; is it

16   fair to say?

17   A.    Tribal members do work there.

18   Q.    Yes.  And is it fair to say that because of that and

19   because of Mr. Mitrokostas' ownership and role, that he became,

20   I guess, in the know of tribal politics, right?

21   A.    True.

22   Q.    Was he somebody that was sought out for advice on

23   occasion?

24   A.    Not from us, no.

25   Q.    Okay.  And was Dino's a location where fundraisers or

1　political events were often held?

2　A.　Yes.

3　Q.　Okay.　Now, you're familiar with the history of the

4　Mashpee Wampanoag Tribe and its efforts to become recognized

5　federally as a Native American tribe, right?

6　A.　Correct.

7　Q.　And this began sometime in the 1970s, right?

8　A.　Yes.

9　Q.　It was a long, drawn-out battle.　In fact, it was a

10　lawsuit to try and reclaim native tribal lands from the Town of

11　Mashpee, correct?

12　A.　Yes.

13　Q.　And these were tribal lands that were taken from your

14　nation, from your people by English colonists through force,

15　right?

16　A.　Correct.

17　Q.　The reason they wanted them is because you had game, fish,

18　timber, plentiful natural reserves, right?

19　A.　Correct.

20　Q.　And after maybe the better part of 50 years or so, the

21　tribe ultimately was recognized federally, right?

22　A.　Yes.

23　Q.　And that was a big deal, was it not?

24　A.　It was.

25　Q.　Quite an accomplishment for the tribe, correct?

1   A.   Correct.

2   Q.   And did that happen sometime around 2007, if you know?

3   A.   2007 to be federally recognized, yes.

4   Q.   And in 2009, Mr. Cromwell was elected chairman, correct?

5   A.   I don't remember his first year.

6   Q.   All right.  Was his mother an elected member of the Tribal

7   Council?

8   A.   Was she an elected member?  No.

9   Q.   Was she a secretary?

10  A.   Not in my time -- oh, in the past?

11  Q.   In the past.

12  A.   Yes.  I'm sorry.  I believe she was, yes.

13  Q.   She was very active and participated in tribal affairs,

14  right?

15  A.   Yes.

16  Q.   And it's fair to say that you've known her most of your

17  life, right?

18  A.   Yes.

19  Q.   And he's always been active and involved in tribal

20  affairs, as you have, correct?

21  A.   Speaking of Cedric or the mother?  They both --

22  Q.   Yeah.

23  A.   -- have been around, yes.

24  Q.   Now, at or about the time that Mr. Cromwell was first

25  elected as chairman of the Mashpee Wampanoag Tribe, this was

1    after the tribe had been recognized federally, and this gave

2    you an opportunity to seek to have land placed into trust,

3    right?

4    A.   Yes.

5    Q.   And you're familiar with that term and you know what it

6    means, correct?

7    A.   Correct, I do.

8    Q.   And this was also another uphill battle for the tribe, was

9    it not?

10   A.   It was.

11   Q.   And am I correct that Mr. Cromwell, along with other

12   members of the tribe and other assistants, advocated on behalf

13   of the tribe before the United States Congress to have land

14   placed into trust; is that right?

15   A.   Yes, Council did.

16   Q.   And this was an effort that took several years, was it

17   not?

18   A.   It was.

19   Q.   There was a lot of travel to D.C., a lot of meetings in

20   D.C., a lot of advocacy, right?

21   A.   Yes.

22   Q.   And ultimately the Department of the Interior did allow

23   land to be taken into trust for the benefit of the Mashpee

24   Wampanoag Tribe to create a reservation, right?

25   A.   Yes, they did.

1   Q.   And that was land both in Mashpee and also in Taunton,

2   right?

3   A.   Correct.

4   Q.   And at or about the same time Massachusetts was

5   considering legalized gaming, right?

6   A.   Mm-hmm.

7   Q.   And this was a hot issue, I guess, for the Mashpee

8   Wampanoag Tribe, because obviously if you were successful in

9   getting land into trust, you could pursue a gaming license,

10   correct?

11   A.   Correct.

12   Q.   And when we say "gaming license," we're not talking about

13   a Bingo hall.  We're talking about a Las Vegas resort-style

14   casino, right?

15   A.   Yes.

16   Q.   And this was a very important project for the tribe

17   because it would make transformational change, would it not?

18   A.   Yes, that was the plan and goal.

19   Q.   And Mr. Cromwell advocated on behalf of this, right?

20   A.   Yes, Council did.

21   Q.   He had policies that he was supporting and ideas about

22   what to do with the revenue, including substance abuse

23   treatment, college education for children of the Mashpee

24   Wampanoag Tribe, capital improvements, et cetera, right?

25   A.   Yes, it was Council's discussions.

1  Q.  And not everybody in the tribe was in favor of pursuing

2  gaming, right?

3  A.  Correct.

4  Q.  It was a contentious issue at times?

5  A.  It was.

6  Q.  There were political opponents of Mr. Cromwell's, were

7  there not?

8  A.  Yes.

9  Q.  And they championed their cause against Mr. Cromwell and

10 against the casino, right?

11 A.  Yes.

12 Q.  And these issues surfaced in elections, and at times, I

13 guess, the campaigning was robust and vigorous, right?

14 A.  Yes.

15 Q.  All right.  And I guess I'm asking a question that needs

16 no real answer except for the record.  But getting the land in

17 trust and pursuing the compact with the Governor of

18 Massachusetts to get an exclusive right to have gaming in the

19 southeastern region of Massachusetts was an incredible

20 accomplishment for the Mashpee Wampanoag Tribe, right?

21 A.  It was.

22 Q.  And Mr. Cromwell led those efforts as chairman, right?

23 A.  Yes.

24 Q.  Okay.  Now, at some point Mr. Cromwell also was able to

25 secure a partnership with Genting International, this Malaysian

1  firm that was going to provide financing for the development of
2  the casino, correct?
3  A.   Correct.
4  Q.   And they were also going to be the operator of the casino
5  for a number of years, right?
6  A.   Yes.
7  Q.   And then the casino and the operation and the profits
8  would be turned over entirely to the tribe, right?
9  A.   Yes.
10  Q.   All right.  And if I understand this correctly, as the
11  financier and the operator, Genting had a role in some of the
12  decisions that the Gaming Authority made on behalf of the
13  casino project, right?
14  A.   They had discussions with us, correct, but the ultimate
15  decisions lays with the Gaming Authority.
16  Q.   The ultimate decisions lays with the Gaming Authority, and
17  those decisions are made by vote at a public meeting, right?
18  A.   It's not a public meeting.
19  Q.   Sorry.  I didn't mean public.  But I mean between and
20  amongst --
21  A.   The --
22  Q.   -- members, right.  And you're familiar with the name Mike
23  Speller, right?
24  A.   I am.
25  Q.   And you're familiar with the name Christian Goode, right?

1  A.   I am.

2  Q.   And these are fellows that worked for Genting

3  International, and you worked closely with them, did you not?

4  A.   Yes.

5  Q.   You are familiar with the name Wei Yih Choong, right?

6  A.   Yes.

7  Q.   He was a fellow that worked with Genting, did he not?

8  A.   He was.

9  Q.   Okay.  Now, the treasurer before you was a fellow named

10 Mark Harding, right?

11 A.   Yes.

12 Q.   Didn't he have -- or do you know, did he have a company

13 named Womp Works?

14 A.   Yes.

15 Q.   That was involved in political consulting, was it not?

16 A.   No, it was construction.

17 Q.   It was construction?  Do you know whether or not it did

18 work in the lines of political consulting, helping other

19 candidates?

20 A.   No, I never heard of it.

21 Q.   Do you know whether or not Womp Works obtained any

22 contracts for work on the Taunton site, pre-construction work?

23 A.   They did.

24 Q.   And they did some fencing, I guess, and site mitigation or

25 things of that nature?

1    A.    Yes.

2    Q.    All right.  So it wasn't uncommon, I guess, for a member

3    of the tribe, maybe even an elected member, like a treasurer,

4    to have an independent business and derive a source of income

5    that way?

6    A.    If it was towards the tribe itself, I mean, the conflict

7    of interest, the gaming wouldn't, no.

8    Q.    Now, as I understand it correctly, there were no laws

9    promulgated within the Mashpee Wampanoag Tribe about conflicts

10   of interest, right?

11   A.    We did have some with the Council as far as getting bids

12   and stuff.

13   Q.    If I understand correctly, Mr. Hendricks, there was no

14   Office of Campaign and Political Finance, right?

15   A.    No.

16   Q.    There were no rules and regulations about how money could

17   be raised for political activities, right?

18   A.    Correct.

19   Q.    There were no rules and regulations about how money was to

20   be collected and kept in a bank account, if at all, right?

21   A.    Correct.

22   Q.    There were no rules and regulations about making

23   expenditures for campaigns, correct?

24   A.    Correct.  Again, we were new.  Everything was just

25   starting, as you understand.  So getting the infrastructure was

 1   new to us.  Everything hasn't been placed.  As of today, it's

 2   still a work in progress.

 3   Q.   Right.  And the Mashpee Wampanoag Tribe obviously is a

 4   sovereign nation.  It's within their right to either promulgate

 5   such rules or not, correct?

 6   A.   Correct.

 7            MR. FLAHERTY:  Now, Mr. Nemtsev, could we take a look

 8   at Exhibit Number 142 [sic].

 9            THE COURT:  I assume you're offering it and it's

10   received.

11            MR. FLAHERTY:  Thank you, Your Honor.  You beat me to

12   the punch.

13            (Exhibit 147 admitted into evidence.)

14            THE COURT:  I just don't want to have anything shown

15   to the jury until --

16            MR. FLAHERTY:  Thank you.  Could we go to page 2.  I'm

17   not sure if we can rotate that to get a better look at it or

18   not.

19            THE COURT:  Maybe we can turn it.  Rather than us

20   turning, you can turn it.

21            MR. FLAHERTY:  Thank you very much, Mr. Nemtsev.

22   Q.   Mr. Hendricks, have you seen this flowchart before?

23   A.   Yes.

24   Q.   Are you familiar with what it represents?

25   A.   Yes.

1   Q.   And you're familiar with the term "drawdown," right?

2   A.   I am.

3   Q.   And as the treasurer of the Gaming Authority, you

4   participated in reviewing all invoices from all vendors, right?

5   A.   Correct.

6   Q.   You insisted on verification for bills submitted, right?

7   A.   Yes.

8   Q.   And you specifically took responsibility to make certain

9   that the work that was done was verified and the bills that

10  were paid were accurate and precise, right?

11  A.   Whatever reflected -- as far as work being done and

12  everything that was reflected on the invoice is what I could go

13  on.  And, again, there was thousands of invoices.  So you do

14  have to go through them.  But you can -- I could only review

15  what was given.

16          THE COURT:  Just so the record is clear, Ms. Beatty

17  and I are trying to find 142 as a flowchart.

18          MR. NEMTSEV:  It's 147, Your Honor.

19          MR. FLAHERTY:  I apologize, Your Honor.  I misspoke.

20          THE COURT:  So 147 is introduced and we can wait and

21  see about 142.

22          MR. FLAHERTY:  Thank you, Your Honor.

23          THE COURT:  I just note -- I'll talk to counsel about

24  it afterwards, but we're trying to keep a running list of the

25  description of the exhibits, and the description of the

exhibits that is on the exhibit list that the parties submitted

jointly doesn't correspond with that.  But in any event, this

is 147, and that's my last and final determination about it.

Okay?

MR. FLAHERTY:  Thank you, Your Honor.

Q.   Now, Mr. Hendricks, when I look at this flowchart, it

appears to me to indicate that there were multiple layers of

review for any so-called drawdown, right?

A.   This -- I created this flowchart.  It was pretty -- when I

got in there, it wasn't organized too well from the prior

treasurer.  This is what I came up with to try to come up with

some type of system to mainstream the invoices.

Q.   Okay.  And --

A.   But it wasn't -- this was my personal flowchart.

Q.   Was this followed?

A.   I would try to follow it the best I can because I had a

small team to work a lot of things.  So, yes.

Q.   Okay.  And who are the members of your team associated

with the tribe?

A.   Talking about from the Gaming Authority?

Q.   Yeah.

A.   Again, there was five of us:  Chairman Cromwell, myself,

Charles Foster, Trish Keliinui and Yvonne Avant.

But outside of that, I had worked closely with Louis

Catarina and Stephanie and Melissa who helped, played a big

1 role.  They actually had more hands on with this than the
2 Gaming Authority members as far as the three of them.
3 Q.   All right.  So if I understand correctly, in this drawdown
4 process -- and "drawdown" was a term that was, I guess, used to
5 communicate when monies were received from Genting to pay
6 outstanding invoices.  Is that a fair description?
7 A.   Correct.
8 Q.   And if we follow this correctly, do I understand that the
9 first step in the process would be that a vendor or a
10 consultant would perform the work, right?
11 A.   Yes.
12 Q.   And then the second was there was an invoice request,
13 right?
14 A.   Yes.
15 Q.   And then that invoice request would be submitted to
16 something called MWTFTP site, right?
17 A.   Yes.
18 Q.   Is that called the file transfer portal, that FTP, is that
19 what that stands for?
20 A.   It was.  It was brought to us I believe by RGB and to
21 mainstream the invoices there.
22 Q.   Okay.  So everything was submitted into this file transfer
23 portal which was basically a computer software system that the
24 invoices were submitted into, right?
25 A.   Correct.

1    Q.   So they could all be in a centralized location and

2    everybody could see them and work on them, right?

3    A.   Yes.

4    Q.   Anybody with authority could see them, correct?

5    A.   Correct.  Well, this was mainly to gather it for Genting

6    to review.

7    Q.   Okay.  So that brings us to what's indicated as number

8    three, the invoice would be submitted to Genting, correct?

9    A.   Where are you --

10   Q.   I'm sorry.  Number two, the Gaming Authority would review

11   and approve any invoices?

12   A.   Yes.

13   Q.   All right.  And then they would be resubmitted back into

14   the file transfer portal, correct?

15   A.   Correct.

16   Q.   And then they would go to Genting for review and approval,

17   right?

18   A.   Yes.

19   Q.   And in Genting, Wei Yih Choong, if I'm saying that

20   correctly, would be your counterpart on the sort of

21   investor/operator side that would go through all these

22   invoices, and if he had any questions, he'd direct them, right?

23   A.   He would, yes.

24   Q.   All right.  So after that dual-layer approach, the Genting

25   invoice review and approval would be sent back to the file

1  transfer portal, right?

2  A.  Yes.

3  Q.  And then again would be submitted for drawdown review and

4  approval, right?

5  A.  Yes.

6  Q.  And then after all of that happens, would this be voted on

7  by the Gaming Authority?

8  A.  It would.

9  Q.  All right.  So there's multiple layers of review with

10  multiple checks and balances, correct?

11  A.  Correct.

12  Q.  And there's no individual with any singular authority or

13  responsibility for this review or for the approval of invoices

14  or for the payment of any monies associated with the casino

15  project, right?

16  A.  As far as invoices, no.

17  Q.  Okay.  Now, you voted no to terminate JCJ and D'Amato,

18  right?

19  A.  Correct.

20  Q.  And you testified on direct examination you were happy

21  with their performance, right?

22  A.  I was.

23  Q.  You felt as though JCJ and D'Amato were doing the job and

24  would be able to handle it going forward, right?

25  A.  Yes.

1  Q.   And that wasn't an opinion shared by the rest of the

2  Gaming Authority, right?

3  A.   They didn't feel that way, no.

4  Q.   Right.  And that's why the vote was four to one, right?

5  A.   Yes.

6  Q.   Okay.  And did you have concerns with JCJ meeting its

7  deadlines for deliverables?

8  A.   I don't recall deadlines.

9  Q.   Do you recall sometimes that they weren't giving you like

10 design review documents or D and D documents in time prior to

11 Gaming Authority meetings?

12 A.   I don't recall the specifics, no, but overall nothing is

13 always on time.  So if we had a meeting and something was

14 supposed to come, sometimes it would get delayed, but that

15 would be across the board for all consultants.

16 Q.   Okay.  And you'd agree that D'Amato sort of didn't

17 communicate very well with the Gaming Authority, right?

18 A.   No.  He communicated.

19 Q.   Well, were other members of the Gaming Authority concerned

20 with his communication?

21 A.   They were.  There was reasons, correct.

22 Q.   And other members of the Authority were concerned with

23 JCJ's timing of the deliverables and being able to produce

24 certain things on time, like design docs, construction docs?

25 A.   The timing, I don't recall it being a concern.  I think it

1   was the fact of them not being able to do the big job.

2   Q.   This relates to the design of the two curved-shaped

3   buildings, or S towers I think they've been referred to in the

4   past, and whether or not they were capable of actually

5   performing, right?

6   A.   Correct, that was the discussions.

7   Q.   Were you aware that there was some disagreement between

8   JCJ and D'Amato about how the construction process would go

9   forward?

10  A.   Specifically I'm not sure what you're referring to, but

11  there was always discussions going back and forth of

12  constructions, what you can do -- I mean, what you want to do

13  and what you can do and the reality, there was always back and

14  forth.

15  Q.   But ultimately the Gaming Authority, that five-member

16  board, was the board that voted to terminate the contracts of

17  both JCJ and D'Amato, right?

18  A.   Yes.

19  Q.   All right.  And there was nobody twisting any arms or

20  pushing anybody for their vote on that, right?  This was an

21  open discussion?

22  A.   There was discussion outside of the meeting where it would

23  come up about them not being able to perform, we should get rid

24  of them and so forth.

25  Q.   All right.  But you'd agree with me, would you not, that

1   you don't recall any occasion ever during your tenure as

2   treasurer of the Gaming Authority where Mr. Cromwell, Chairman

3   Cromwell tried to independently assert his authority over

4   anything, right?

5   A.   No.  I've seen it plenty of times.

6   Q.   But the Gaming Authority was the Gaming Authority that

7   voted on any decision, right?

8   A.   Correct.

9   Q.   All right.  And Mr. Cromwell would make discussions, would

10  discuss in meetings what he felt, and there would be a back and

11  forth between all of the Gaming Authority members, right?

12  A.   Correct.

13  Q.   And there was no -- you have no memory at any point in

14  time of Mr. Cromwell advocating for RGB and his contract in any

15  way, shape or form, right?

16  A.   He was, he did.

17  Q.   There were no favoritism showed for RGB in any way, shape

18  or form?

19  A.   Pushing for both JCJ to go out and Steelman to come in and

20  RGB to come on.

21  Q.   And Steelman was associated with Genting, was it not?

22  A.   Yes.

23  Q.   All right.  And the members of the Authority had an open

24  discussion and voted to approve these contracts, did they not?

25  A.   They did.

1    Q.   All right.  And other members of the Authority thought

2    that was the correct path to go on, right, because they voted

3    in favor of it?

4    A.   They did, yes.  I voted no on all of them.

5    Q.   I understand.  Fair enough.

6    A.   Okay.

7    Q.   Fair enough.  And there was never any time after RGB

8    executed its contract with the Gaming Authority that you had

9    any reason to believe that RGB was not performing adequately

10   under the contract, right?

11   A.   No.  I was satisfied with RGB.

12   Q.   Is it fair to say you were pleased with them?

13   A.   Yeah, I liked -- I mean, I had a great relationship with

14   John Racine and RGB.  Everything that we asked, they would

15   deliver an answer for.  So I was very happy with that, that I

16   could actually talk to hands-on.

17   Q.   And there was never any hint, as far as you're aware, of

18   RGB and its contract ever being at risk with the Gaming

19   Authority, right?

20   A.   Not that I know of.

21   Q.   All right.  And it was important, was it not, to be first

22   to market, right, because of the Wynn casino and MGM, right,

23   these are competitors?

24   A.   (Nods.)

25   Q.   And you're aware, are you not, that there were steps made

1   to speed up the process and improve the construction timeline,

2   right?

3   A.   Yes.

4   Q.   Do you recall meeting with the FBI for an interview on

5   October 20 of 2020?

6   A.   Yes.

7   Q.   And do you recall --

8   A.   Excuse me.  I'm not sure of the exact date that you're

9   referring to.

10  Q.   Okay.

11  A.   But I do remember meeting with federal agents.

12  Q.   All right.  Do you remember saying that you did not recall

13  Cromwell showing or demonstrating favoritism to RGB?  Do you

14  remember saying that?

15  A.   At the time, no.  I mean, I don't remember which federal

16  agent or discussion, no.

17  Q.   Well, does it sound right to you right now?  Does it sound

18  correct to you?

19  A.   No, because it was pushed for.

20  Q.   Well, but there was no demonstration of favoritism for

21  RGB, correct?  Isn't that what you told the FBI in October of

22  2020?

23  A.   I don't recall.  Because that -- no.  It was always pushed

24  to try to have Steelman and RGB come in from Mr. Cromwell.

25          MR. NEMTSEV:  Ms. Beatty, can we have the screen for

1    the witness.

2              THE COURT:  Pardon me?

3              MR. NEMTSEV:  Could we just have the screen for the

4    witness to show a prior statement?

5              THE COURT:  No, because we're not going to use it.

6    The witness denies that he recalls that, so it's not a matter

7    of refreshing recollection.  It's not introduced for past

8    recollection recorded.  There's no basis to introduce it or

9    even show it to the witness, if it exists.

10   Q.   So it's your testimony here today you never made that

11   statement?

12   A.   I don't recall it.

13   Q.   Okay.

14   A.   Again, I'm not sure which meeting -- I met with them a few

15   times -- that you're referring to, but, no, I don't recall that

16   specific statement.

17   Q.   And when you mentioned, you know, Mr. Cromwell pushing for

18   RGB, this means to have them hired along with Steelman to make

19   the project move forward, right?

20   A.   For them to come on to the project, yes.

21   Q.   Okay.  And that was in the context of public -- well, not

22   public discussion but Gaming Authority meetings in front of the

23   Gaming Authority with the five members present?

24   A.   Correct.

25   Q.   Correct.  Okay.  Just so we understand one another.  All

```
1   right.
2         So this was legitimate advocacy on behalf of an item that
3   he believed was the right thing for the tribe?
4            MR. DOLAN:  Objection.
5            THE COURT:  So long as it's so much as you know about
6   what he believed and that sort of thing.  Can you answer that
7   question?
8            THE WITNESS:  Can you repeat it, please?  Sorry.
9   Q.  All of the advocacy that Cedric Cromwell made that you're
10  referring to was made in the context of Gaming Authority
11  meetings, correct?
12  A.   No.  There was a lot of discussions outside of that.  He
13  would talk to each one individual, including myself and other
14  people, in his office or, you know, around.
15  Q.   So all the Gaming Authority members would discuss things,
16  correct?
17  A.   Correct, we would discuss it.
18  Q.   Sort of like you discussed JCJ and you would discuss
19  D'Amato, right?
20  A.   Correct, yes.
21  Q.   And this was a matter that was brought to the Gaming
22  Authority for discussion; everybody said their piece, right?
23  A.   Yeah.
24  Q.   And ultimately the Gaming Authority made a vote, right?
25  A.   Correct.  I was just saying it wasn't just at meetings.
```

1  The discussions happened throughout the week and time and other
2  personal one-on-one conversations.
3  Q.   And you disagreed -- fair enough.  In your role, you
4  disagreed, correct?
5           MR. DOLAN:  Objection.
6           THE COURT:  I think we've been over this a bit now.
7  I'm not sure there's any new ground to be walked through on
8  this.
9           MR. FLAHERTY:  Okay.  Fair enough.  Mr. Hendricks,
10  thank you.  No further questions.
11           THE WITNESS:  Thank you.
12           THE COURT:  Mr. Weinberg.
13           MR. WEINBERG:  Thank you, Your Honor.
14  CROSS-EXAMINATION BY MR. WEINBERG:
15  Q.   Good afternoon, Mr. Hendricks.
16  A.   Good afternoon, sir.
17  Q.   Other than seeing you on the second floor, we've never
18  met, correct?
19  A.   Correct.
20  Q.   Okay.  I want to take you back to the period right before
21  April 2, which is the date that I represent to you that the
22  minutes of the Gaming Authority show there was a four-to-one
23  vote to terminate both JCJ and D'Amato.
24  A.   Okay.
25  Q.   For the two-year period before then, RGB was working on a

1  separate project for the Mashpee Wampanoag Tribe, correct?

2  A.   Yes.

3  Q.   And they were the owner's rep for the tribe in the

4  construction of the Government Center, correct?

5  A.   They were.

6  Q.   And the Government Center was nearing completion in April

7  of 2014, correct?

8  A.   Yes.

9  Q.   And you know members of the tribe were very positive about

10 the work that RGB did on Government Center and very proud of

11 the success of the Government Center, correct?

12 A.   Yes.

13 Q.   Kind of elevated the -- it was one of the nicer buildings

14 in the Mashpee area, correct?

15 A.   Very nice.

16 Q.   And there was a feeling that RGB was loyal to the tribe in

17 the construction of Government Center, correct?

18 A.   Correct.

19 Q.   They were honoring the TERO policy of trying to bring

20 people from the tribe to work on these construction projects,

21 correct?

22 A.   They were.

23 Q.   As they did on the casino project, correct?

24 A.   Yes.

25 Q.   And the TERO policy, because it's probably a new set of

1    letters, was a policy to encourage people working on tribal

2    matters to try to train and rely upon the work of tribal

3    members, giving them some experience and perhaps setting them

4    up for employment once the project was over, correct?

5    A.    Yes.

6    Q.    And, in fact, you knew that RGB had worked, had done that

7    with a man named Dave Greene, who was a tribal member?

8    A.    Yes.

9    Q.    And Dave became an employee of RGB, correct?

10   A.    He did.

11   Q.    And Dave would speak positively about RGB to the tribal

12   members, correct?

13   A.    Definitely.

14   Q.    So when it came time to decide whether or not a new

15   owner's rep was advisable, the members of the Gaming Authority

16   had two years of positive experience with RGB, correct?

17   A.    Yes.

18   Q.    But RGB was not selected or voted on or even interviewed

19   before the decision was made on April 2 to terminate D'Amato,

20   correct?

21   A.    Correct.  I mean, there was discussions.  No, not at that

22   time, no.

23   Q.    Sure.  And D'Amato came, if you know -- because I know you

24   became treasurer in 2013.  So you were not there in 2012 when

25   D'Amato was chosen, correct?

A.   Correct.

Q.   But you have no knowledge that D'Amato ever did other work

for the tribe, correct --

A.   Not that I'm aware of.

Q.   -- in contrast to RGB?

A.   Yes.

Q.   And only Mr. D'Amato appeared at Gaming Authority

meetings, correct?

A.   Did you say "only"?

Q.   Representing his group, he was the sole person that

appeared at Gaming Authority meetings?

A.   Yes.

Q.   Whereas, when RGB came in, you met Mr. DeQuattro, correct?

A.   Correct.

Q.   You had a positive relationship with Mr. DeQuattro?

A.   Yeah.

Q.   You respected his work?

A.   RGB's altogether, yes.

Q.   You believed that he discharged his responsibilities with

professionalism, correct?

A.   As far as what I was aware of, yes.

Q.   On a more frequent basis, you met John Racine, correct?

A.   I did.

Q.   John worked with David DeQuattro at RGB?

A.   Yes.

1  Q.   John was the project manager?

2  A.   He was.

3  Q.   John was a person you saw at almost every Gaming Authority

4  meeting, correct?

5  A.   We worked closely.

6  Q.   And Dave Greene, too, was there on many occasions, if not

7  all occasions?

8  A.   Dave came in later, yes, he was there.

9  Q.   And John -- I don't want to go over the invoice process

10  again that Mr. Flaherty went over.  It's been a long day.  But

11  can I remind you that John Racine was also involved in

12  validating and reviewing invoices, correct?

13  A.   He was.

14  Q.   In other words, RGB was helping the Gaming Authority and

15  helping Genting review the invoices of all the technical

16  people, correct?

17  A.   They would review their invoices, not all the invoices.

18  Q.   They would review the invoices --

19  A.   The RGB's invoices.

20  Q.   Don't you recall that RGB was asked by Wei Yih Choong to

21  review the technical invoices, meaning the invoices of the

22  architects and some of the engineers, consultants?  Not that

23  you didn't do it, but they were doing it also?

24  A.   I'm not -- I don't remember which area you're referring

25  to, but as the owner's rep, we did ask them to advise us, you

1  know, does this make sense to cost this much, does this make

2  sense?  So they would definitely give it a review of some of

3  the projects that were going on.

4  Q.   Sure.  Let me just show you a very short exhibit, 134.

5       MR. WEINBERG:  If we can load that up and put a yellow

6  mark at the bottom email.

7  Q.   This, if you recall, is --

8       THE COURT:  I'm not sure this is the same one, at

9  least on the exhibit book that I have.  I'm having a little

10  problem with it.

11       THE CLERK:  This isn't admitted, is it?

12       THE COURT:  No, it's not.  Are you talking about 134

13  or 132?

14       MR. DOLAN:  Can the exhibit be taken down, please.  I

15  think the jury has it up.

16       THE COURT:  Yes.

17       MR. WEINBERG:  This is an exhibit that I don't think

18  is disputed.

19       THE COURT:  It may not be, but it's not clear what its

20  proper number is.  132 is what I'm looking at.

21       MR. NEMTSEV:  This is 134, Your Honor.

22       THE COURT:  134, that is what I'm supposed to look at

23  here to be sure it's the same.  All right.  So it's received as

24  134.

25       (Exhibit 134 admitted into evidence.)

1          MR. WEINBERG:  If I misstated the number, I apologize,

2     Judge.

3          THE COURT:  I want to be sure -- we'll tidy this up

4     later.  Putting together these big binders is demanding, but

5     I'm going to demand some more.

6     Q.   Just to refresh your memory, I know it's now been eight

7     years since 2014 and a lot has happened in everyone's lives.

8     Can you take a look at this email from Wei Yih Choong, who was

9     the -- am I correct he was the financial analyst that Genting,

10    the developer and funder, had worked with you?

11    A.   He was.

12    Q.   And he would be responsible to do the second level review

13    after the Gaming Authority did its review on that chart that

14    you created?

15    A.   Correct.

16    Q.   That Mr. Flaherty reviewed, correct?

17    A.   Correct.

18    Q.   And here he is emailing with a copy to you and a copy to

19    Mr. Catarina -- and to identify Mr. Catarina, he worked

20    regularly with the Gaming Authority, as one of the people

21    trying to facilitate the project?

22    A.   Yes.

23    Q.   He was saying "Robbie and Lou, is it possible to get our

24    owner's rep to sign off on the technical bits of invoices."

25    And then he lists "HSH, FST, Steelman, et cetera.  Just need

1   assurance from our side that what we are billed for is valid,"

2   correct?

3   A.   Correct.

4   Q.   Does that refresh your memory that John Racine was working

5   with you and with the Genting financial analyst to try to make

6   sure that this incoming set of invoices from all of the dozens

7   of consultants, you know, were accurately reviewed, accurately

8   represented the work that was done during a given period and,

9   therefore, could be approved by this multiple-level approval

10  process that you, Rob Hendricks, the treasurer, set up?

11  A.   Yes, there was -- as you see, there was multiple vendors

12  that we would ask for their expertise on.

13  Q.   Sure.  And Steelman, the Steelman referred to here is the

14  architect, correct?

15  A.   Yes.

16  Q.   And some of his invoices included other consultants that

17  he was incorporating into his invoices that sometimes ran over

18  100 pages?

19  A.   It did.

20  Q.   And it was important to review them, correct?

21  A.   Correct.

22  Q.   The job of the people who were reviewing invoices was to

23  make sure that no one was getting overpaid and nobody was

24  getting underpaid, correct?

25  A.   That everything was validated as far as what was on the

1  invoice, correct.

2  Q.   And to end this part of the examination, you trusted John

3  Racine to exercise professionalism, accuracy and judgment to

4  assist you as the treasurer of the Authority?

5  A.   I did.  I did.

6  Q.   Thank you.  To go back to April 2, that was the date of

7  the four-to-one vote, correct?  I represent it was April 2.

8  A.   Okay.

9  Q.   And it was not until thereafter that the Gaming Authority

10  sought discussion putting out an RFP for a new owner's rep,

11  correct?

12  A.   No.  The discussions prior terminating JCJ and D'Amato,

13  there was discussions prior to that meeting of terminating

14  them.

15  Q.   But am I right -- I'm sorry.  Go ahead.

16  A.   No.  I'm saying -- and then bringing on a new team.

17  Q.   Right.  But it was not until April 9, the week after, that

18  the RFPs were discussed, meaning that the formal procedure to

19  give other candidates, not just RGB --

20  A.   Correct.

21  Q.   -- but multiple other candidates an opportunity to answer

22  questions, come in and interview and be considered to be the

23  new owner's rep, correct?

24  A.   Correct.

25  Q.   Whatever Mr. Cromwell sensed that RGB did a good job on

1    Government Center, there was a number of candidates that were

2    being considered for the role, correct?

3    A.   I believe there was two other ones, yes, or three.

4    Q.   And they came in for interviews, correct?

5    A.   They did.

6    Q.   And there was a discussion amongst all Gaming Authority,

7    correct?

8    A.   Yes.

9    Q.   And on April 29 or 27 days after the termination of

10   Mr. D'Amato, RGB was labeled the lead candidate, correct?

11   A.   Yes.

12   Q.   And that was a unanimous vote that you concurred in?

13   A.   Correct.

14   Q.   And then there was some further discussions, and

15   eventually they were selected to be the new owner's rep,

16   correct?

17   A.   Afterwards they were.

18   Q.   And one of the reasons they were selected was a sense that

19   they would be loyal to the Gaming Authority and not just to the

20   developer, correct?

21   A.   Correct.  I was very happy and satisfied and comfortable

22   with RGB.  I let them know that at that time and I voted no

23   because I didn't like the verbiage in the contract giving the

24   chairman power.

25   Q.   Understood.  But from the time they were selected, which

1  was in May of 2014, to the very end of your tenure as

2  treasurer, you worked with RGB and were personally happy with

3  their performance?

4  A.   I was.

5  Q.   You trusted them and relied on them, and they acted with

6  professionalism to the extent that you observed their role?

7  A.   I could work with John closely and feel comfortable.

8  Q.   And they rose to the occasion, and when the Gaming

9  Authority needed them to take on projects, they took them on,

10  correct?

11  A.   They did.

12  Q.   And they had the manpower to meet all of the

13  responsibilities in this very complicated casino project,

14  correct?

15  A.   We did the best -- they did the best they could, yes.

16  Q.   And there was issues with the City of Taunton and their

17  municipal authorities, correct?

18  A.   Yes.

19  Q.   Issues with the state environmental people?

20  A.   Yes, there was.

21  Q.   I could probably spend 30 minutes talking about all of the

22  different challenges that the Gaming Authority had and that RGB

23  was there for them 100 percent every month every year that you

24  were there?

25  A.   RGB was.

1  Q.  And that's why, when you were interviewed by the FBI, you

2  said not just that you were happy with the performance of RGB

3  but you said, if you recall, everyone was happy with RGB's work

4  on the proposed casino project?

5  A.  I'm very happy.  I've always felt comfortable with RGB.

6  Q.  And others in the Gaming Authority also felt comfortable,

7  correct?

8  A.  They did.

9  Q.  And others who were working on the project felt

10  comfortable, correct?

11  A.  Yes.

12  Q.  And Genting felt comfortable?

13  A.  Yes.

14  Q.  In other words, they met their responsibilities in a very

15  challenging work environment, correct?

16  A.  They did.

17       MR. WEINBERG:  May I have just a moment, Your Honor?

18       THE COURT:  Yes, you may.

19       MR. WEINBERG:  One last quick area.

20  Q.  The cosigning of the checks began in approximately the

21  start of 2016?

22  A.  I don't recall when, but probably about two years after

23  coming in, so yes, probably around that time.

24  Q.  And that was kind of a check and balance that you set up,

25  correct?

1   A.   Yes.

2   Q.   But the checks that were cosigned were cosigned by either

3   Mr. Cromwell or one of the other people on the Gaming

4   Authority?

5   A.   No.  Just myself and Cedric.

6   Q.   You were the principal signature on the check, correct?

7   A.   Correct.

8   Q.   And when they were ready for signature, that was after all

9   of the reviews of the invoices by the Gaming Authority, the

10  review by Genting of the invoices, the approval of the

11  invoices, the loan drawdown that was required to get funds to

12  pay the invoices, correct?

13  A.   Correct.

14  Q.   And you were the principal representative of the Gaming

15  Authority on those different levels because they were financial

16  and you were a skilled treasurer, correct?

17  A.   I was.

18  Q.   And the chairman, as well as the other members of the

19  Gaming Authority, relied on you in your expertise and your

20  enormous hard work in reviewing these invoices?

21  A.   Correct.  And everything was always -- what's not shown on

22  that flowchart is everything would always get brought back to

23  the Gaming Authority.  So they were well aware of it to be

24  voted on.

25  Q.   Sure.  And signing the checks was just the end of a

1  process?

2  A.   End of it, yeah.

3  Q.   And it was the ability to say we're funded and now we can

4  pay these past bills that have been waiting for the funding,

5  correct?

6  A.   Correct.

7  Q.   The past bills that were represented by invoices that were

8  reviewed in great detail in the manner in which you diagrammed

9  and Mr. Flaherty reviewed?

10  A.   Yes.

11        MR. WEINBERG:  Thank you very much, Mr. Hendricks.

12        THE COURT:  Mr. Dolan.

13  REDIRECT EXAMINATION BY MR. DOLAN:

14  Q.   Mr. Hendricks, during the cross-examination discussion

15  that you had with Mr. Flaherty, he asked you -- one moment --

16  he asked you whether you've seen Chairman Cromwell assert his

17  authority in his position as president of the Gaming Authority

18  and you said, "I've seen it plenty of times."

19        Do you remember that question and your answer?

20  A.   I do.

21  Q.   Can you describe what you were mentioning when you said

22  that you've seen Chairman Cromwell assert his authority plenty

23  of times?

24  A.   Well, from Council to Gaming Authority, I mean, you guys

25  got the idea of just building the casino and all the things

1  that come up.  So between that and Council, there's a lot of

2  decisions, there's a lot of things that come up.  As the

3  chairman, he had his way of pushing the way that he -- as

4  anybody would, what they wanted.

5  Q.   What was his way, based on your observations?

6  A.   Well, there was millions of different times that, you

7  know, would come up, again for specific -- specifics I don't

8  remember.  It's just the content.  If something came up, he

9  would bring you, he would talk to you one-on-one, seeing if you

10  could go along with the JCJ or Steelman and so forth.  Also, on

11  Council there's been times when votes come up, but a lot of

12  people would voice their opinion the way they felt.

13  Q.   You described one-on-one conversations about contentious

14  issues outside of the Gaming Authority meetings.  How often did

15  those occur, based on your observations?

16  A.   Between?

17  Q.   Between you and Cedric, Mr. Cromwell, or to the extent you

18  have knowledge of it, other than Mr. Cromwell.

19  A.   It would come up once in a while.  Not everybody sees eye

20  to eye about things.  So it would come up frequently.

21  Q.   Did that occur with regards to the termination of JCJ

22  between you and Mr. Cromwell?

23  A.   It did.

24  Q.   What about the termination of D'Amato?

25  A.   It did.

1    Q.   What about the hiring of RGB?

2    A.   Yes.  Well, no.  I'm sorry.  It was with Steelman was the

3    one I was contentious with.  RGB I was happy with as far as

4    their work, besides the verbiage in the contract of giving the

5    power.

6    Q.   So there was not a one-on-one conversation where you met

7    with Chairman Cromwell about RGB, like the ones that you just

8    described?

9    A.   No.

10   Q.   And what would happen in those -- was there a general --

11   what would happen in those one-on-one meetings?

12   A.   Just as anybody would say, his point of view, he wanted

13   Steelman, for example, for reasons, and mine wasn't seeing the

14   same.  So we discussed that.

15   Q.   Do you know if other people had similar meetings?

16   A.   Yes.

17   Q.   How do you know that?

18   A.   I was on the Gaming Authority and hearing from Bobby or

19   Trish at the time or Yvonne, and they would say that they would

20   talk to Cedric about whatever the discussion was.

21            MR. FLAHERTY:  I have to object, Your Honor.

22            THE COURT:  I think I'm going to exclude that here

23   because -- I'm not going to give you a long essay about

24   hearsay, but that's hearsay.  That's hearing what somebody else

25   said who wasn't present there, and I'm not going to permit it

1   under some exceptions that might be available.

2   Q.   I guess my question is, did you ever actually see the

3   chairman take someone aside to have one of those private

4   conversations?

5   A.   Well, if I'm not in the conversation I can't --

6   Q.   Right.  So you never saw him being pulled into a side room

7   or whatever?

8   A.   No.  Just coming out of his -- he would be in his office.

9   I'd see someone come out and then later on discuss what was

10  happening.

11          MR. DOLAN:  Nothing further.

12          THE COURT:  Okay.  Mr. Flaherty.

13          MR. FLAHERTY:  May I inquire?

14          THE COURT:  Yes, from there.

15  RECROSS-EXAMINATION BY MR. FLAHERTY:

16  Q.   There was discourse between and among all the Gaming

17  Authority members, right?

18  A.   On issues, yes.

19  Q.   And you asserted your authority when you talked to people

20  just like anybody else did to you, right?

21  A.   Same way, same way.

22  Q.   And --

23  A.   Mine would be at the meetings, though.

24  Q.   All right.  Now, I asked you earlier about October 20 of

25  2020.  Do you recall coming to this building with your

1 attorney, Mr. Sultan?

2 A.    I do.

3 Q.    And do you recall being in an interview session here in

4 this building?

5 A.    A couple times.

6 Q.    All right.  And while you spoke by the telephone, you were

7 on a video.  Then you came in in person to this building on

8 October 20, 2020.

9 A.    Okay.

10 Q.    All right.  And do you recall Ms. Wichers being present in

11 the meeting?

12 A.    Was that the Zoom one that you're referring to?  Or was it

13 here?

14 Q.    Here.

15 A.    Yes, she was here.

16 Q.    And do you recall Agent Ott, who is sitting in the back,

17 next to the court security officer, being present?

18 A.    He was.  He was at the meetings.

19 Q.    And was he taking notes during the meeting?

20 A.    I don't remember.  I don't remember who was taking the

21 notes.

22 Q.    All right.  Was Ms. Wichers taking notes?

23 A.    She had her stuff already ready.  So she would ask me the

24 questions.  So she wasn't taking the notes, I don't believe.

25 Q.    And was your attorney, Mr. Sultan, who is present here

1  today, was he taking notes as well?

2  A.    Yes.

3  Q.    And it's your testimony here today that you don't recall

4  making the statement that I asked you, right?

5  A.    What was the statement again?

6  Q.    The statement was that you did not recall Cromwell showing

7  or demonstrating favoritism to RGB?

8  A.    I don't remember that.

9  Q.    Is your present memory exhausted to that?  Is there

10 anything that might refresh your memory?

11 A.    With what?

12 Q.    Maybe the report that was generated as a result of your

13 interview.

14      THE COURT:  There was no report generated that's

15 available to the jury now that can't be introduced by the back

16 door.  So the jury will disregard any reference to reports.  We

17 have the witness's testimony he doesn't recall.  That's where

18 it stands.

19      MR. FLAHERTY:  I did ask if there was anything that

20 would refresh his memory, Judge.

21      THE COURT:  You did, and there wasn't an objection,

22 but there was on this, and now I'll be comprehensive about it.

23 There is a special way to deal with statements.  And the way it

24 stands right now is there's no such statement.  So I'm not

25 going to permit any further examination with respect to this.

1      MR. FLAHERTY:  Fair enough.  Thank you very much, Your

2  Honor.  No further questions.

3           THE COURT:  All right.  Anything else?

4           MR. DOLAN:  No, Your Honor.

5           THE COURT:  Okay.  You can step down then,

6  Mr. Hendricks.  Thank you.

7           THE WITNESS:  Thank you so much.

8           THE COURT:  Ladies and gentlemen, there may be

9  occasions on which we'll have further discussions about some of

10  the rules that are enforced here, but there are a variety of

11  rules that are designed to focus the jury on precisely what a

12  witness says.  And what we're really interested in is what the

13  witness says right here and not what someone may have said

14  somewhere else.  That's generally hearsay and, of course,

15  developments of various kinds of materials during the course of

16  an investigation.  But unless there's some showing that the

17  witness himself has ratified some notes that somebody has made,

18  I'm not going to let it come in.

19           So you'll understand that that's the kind of rule that

20  I'm applying here.  And the parties have an opportunity to test

21  that, and it may be that we'll test it some more in this.  But

22  right now, the state of the record is he doesn't recall.  Okay?

23           So let's then turn to the weekend, which is what you

24  want to turn to, and that is, enjoy it.  Enjoy the entire

25  weekend, but don't talk to anybody in any way about this case.

1  Put it out of your mind because, obviously, I'm going to ask
2  you at the end of the weekend whether or not there are any
3  matters that were brought to your attention that I've been
4  asking about all along.
5      We'll be going back -- not going back. We're going to
6  be on to the morning schedule, that is 9:00 to 1:00. We'll
7  have a break in the middle of the day, middle of the morning
8  there. So maybe a 15-minute break. But that's basically what
9  we're going to be dealing with with the witnesses, and you can
10 plan your activities around that.
11     I will, as you can see, try to keep pretty closely to
12 the record here and keep everybody else closely to the record,
13 and if a witness hasn't been completed by 1:00, we will
14 probably invite the witness to come back and talk to us some
15 more so you can rely on our schedule, which is 1:00.
16     So enjoy the weekend. We'll see you on Monday, when
17 I'm certain that you'll all respond you've had no conversations
18 or anything that touches on this case because you're going to
19 listen to only the evidence that's actually introduced.
20         (Jury exits the courtroom.)
21     THE COURT: So you can be seated. As you have
22 gathered, I'm a hawk on the question of the introduction of
23 statements, generally at the use of reports unless, first,
24 there's some showing that the witness himself has embraced the
25 report, in fact, has ratified the report. And ratification

1    does not take place in this courtroom by showing it to the

2    witness.  That's just not going to happen in that fashion.

3    There are other ways that it may come in, but that's not one of

4    them, and I'm going to be fairly consistent about the idea of

5    extrinsic proof of statements even under certain circumstances

6    of inconsistency because, frankly, listening to it, I think

7    that there's not a lot of there there among the conversations

8    that we're going on.

9         It struck me and continues to strike me it's a little

10   bit argumentative here.  But there's no striking difference in

11   what the witness testified here to and what the witness was

12   being encouraged to say that he didn't recall.  So I offer that

13   observation so the parties know how I'm going to be treating

14   this kind of issue.  Part of it is basic federal rules having

15   to do with hearsay.  But another part of it is 403, to exercise

16   control with respect to extraneous matters that will distract

17   the jury.  You all got what you wanted, as far as I can see in

18   this case.  I don't know whether hammering some more is going

19   to do very much, but you'll make your proffers and I'll rule on

20   your proffers, but you're entitled to know which way the wind

21   is blowing on this stuff.  Okay?

22        Second thing is, we really do try to keep track of the

23   numbers and the exhibits, and we want to be sure that we've got

24   the right numbers and exhibits, and there was a sinking feeling

25   that we did not.  Now, part of it may well have been mishearing

1  on our part or my part of the numbers of particular exhibits.

2  It may be that the exhibits aren't quite in order, but one

3  thing I do know is that that flowchart was nowhere to be found

4  or nowhere to be found easily, and it doesn't fit in the list

5  of exhibits.  So it's now got a number.

6          MR. NEMTSEV:  Your Honor, it's 147.  It's an

7  attachment to the email.  So it's the second page of that

8  email.

9          THE COURT:  Let me tell you something.  This has got

10  to be done in a clean fashion.  You just can't do it that way,

11  even on agreed exhibits.  I'm creating a record that can be

12  reviewed, and I want the folks who may be reviewing the record,

13  including you, but anybody who is reviewing the record to know

14  what they're looking at rather than paging through.

15          So I've deemed it to be 147, and if somebody tries to

16  introduce the email itself or wants to make reference to the

17  email itself, it's going to have to be something else.  It may

18  be 147A.  But at this point the flowchart is 147.  Okay?

19          And now, because I think the government is going to be

20  scrivener on this, it is my view that the government should

21  each day produce an exhibit list that you believe has been

22  introduced here.  Ms. Beatty has been keeping track.  I've been

23  keeping track.  But we want to be sure that there's nothing

24  missing because there's a lot of paper here that's going to be

25  introduced to the jury and go into the JERS system.  We want to

1   make sure that nothing goes in that hasn't been received in

2   evidence or brought to the attention of the jury in some

3   fashion.  It can be summary fashion.

4       I think the jurors know they could look, if they want

5   to look, at a lot of invoices, but they know that somebody else

6   has looked at those invoices.  In any event, if they want to

7   look at those invoices, they're there in evidence and they know

8   where to find them in evidence.

9       Now, are there any other things we ought to be taking

10  up now?

11      MR. DOLAN:  Your Honor, I don't know that it needs to

12  be taken up now, but just for the Court's information, and

13  counsel knows this, either tonight or over the weekend I'll be

14  submitting a motion for immunity for a witness that will be

15  called either Monday or Tuesday.  I expect that witness will be

16  present with his attorney at 8:30 on Monday morning.

17      THE COURT:  At 8:30?

18      MR. DOLAN:  At 8:30.  If the court was just having an

19  inquiry about the validity --

20      THE COURT:  I take it the witness is simply saying

21  they won't testify and are not providing any -- or not

22  providing a basis that you think is adequate.

23      MR. DOLAN:  Yes, but unlike the last time we dealt

24  with this, I don't really want to argue it, and so I have the

25  motion and we're ready to request immunity for the witness.

1          THE COURT:  Do you think there's going to be an

2     occasion for me to inquire of the witness myself?

3          MR. DOLAN:  I don't think it's necessary, but I wanted

4     to make it available.

5          THE COURT:  So if there's any possibility, I'd like to

6     have the witness here, and I'll do it in court with counsel

7     present.

8          MR. DOLAN:  I should clarify.  I've been told through

9     counsel that the witness is going to invoke.  So we'll have the

10    order ready.  He'll be here at 8:30 with counsel.  If there's

11    an inquiry, that's fine, but I'll be submitting the paperwork

12    over the weekend.

13         THE COURT:  Okay.  So is there a possibility that the

14    witness will continue to decline to testify after an order?

15         MR. DOLAN:  I don't believe so.

16         THE COURT:  But I will be informing the witness of the

17    First Circuit's local rule with respect to that, gives them

18    about two days to think about it.

19         MR. DOLAN:  Understood.

20         THE COURT:  Otherwise, I'm just going to assume that

21    I'll issue the order, tell him what the order means, and when

22    it's time for him to be called or her -- I don't know who it

23    is -- that the witness will come in and testify subject to the

24    compulsion of the order.

25         MR. DOLAN:  Right.

1      THE COURT:  Okay.  All right?  Anything else that we

2  need to talk about?

3      I hope to have a revised version of the redacted

4  indictment, which I'm now, as I indicated to you, working from

5  the superseding indictment because that seems to me to be the

6  charging document you're moving on in this case by asserting

7  that you have a stream of benefits theory in the case.  And so

8  I'll have that, and at some point we will want to talk about

9  that, including whether or not there are specific special

10  questions not merely for the substantive counts but also for

11  the conspiracy count itself here.

12      So anything else to talk about?

13      MR. DOLAN:  No, Your Honor.

14      THE COURT:  Okay.  Well, thank you very much.  This

15  has moved along very effectively, I think, and efficiently,

16  which is all I can ask for, and I'll continue to ask for it

17  here.  Okay?

18      MR. WEINBERG:  Have a nice weekend, Judge.

19      THE COURT:  Yeah, you too.

20      MS. WICHERS:  What time on Monday, Your Honor?

21      THE COURT:  8:30 is when we're going to be here for

22  the witness, and then we'll go from there.  Okay?  If there are

23  other matters that come up, we'll deal with them then.  I know

24  that there are disputes about exhibits.  I don't know whether

25  they're ripe enough now for me to rule on.  "Ripe" means that

1    I'm prepared to eat them.  It doesn't mean that you're prepared

2    to offer them without -- in some less than succulent fashion.

3            MR. DOLAN:  I suspect Monday afternoon may be an

4    appropriate time to start looking at some of those.

5            THE COURT:  It may be but not with me because I have

6    other things on my docket, but I really want to -- give me a

7    little bit of advance notice, and I'll deal with them, but this

8    is the point at which you say, "You know enough, Your Honor.

9    You can rule on this stuff."

10            MR. DOLAN:  Understood.

11            THE COURT:  That's the standard that I'm using.  I

12    want to do it outside of the presence of the jury.

13            MR. DOLAN:  Very well.

14            (Adjourned, 4:13 p.m.)

15

16

17

18

19

20

21

22

23

24

25

```
1                    CERTIFICATE OF OFFICIAL REPORTER

2

3              I, Kelly Mortellite, Registered Merit Reporter

4     and Certified Realtime Reporter, in and for the United States

5     District Court for the District of Massachusetts, do hereby

6     certify that the foregoing transcript is a true and correct

7     transcript of the stenographically reported proceedings held in

8     the above-entitled matter to the best of my skill and ability.

9                    Dated this 9th day of May, 2022.

10

11              /s/ Kelly Mortellite

12              _____

13              Kelly Mortellite, RMR, CRR

14              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```