# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

————————————

**Nos. 23-1115**
**23-1116**
**23-1138**
**23-1139**

————————————

**UNITED STATES,**
**Appellee/Cross-Appellant,**

**v.**

**David DeQuattro; Cedric Cromwell,**
**Defendants-Appellants/Cross-Appellees.**

————————————

**JOINT**
**APPENDIX**
**VOLUME VI**
**(Pages 2029 - 2303)**

————————————

**Kimberly Homan**
**20 Park Plaza, Suite 1000**
**Boston, Massachusetts 02116**
**(617) 448-2812 (Telephone)**
**homanlaw@aol.com**

**Martin G. Weinberg**
**20 Park Plaza, Suite 1000**
**Boston, Massachusetts 02116**
**(617) 227-3700 (Telephone)**
**owlmgw@att.net**

**Michael Pabian**
**20 Park Plaza, Suite 1000**
**Boston, Massachusetts 02116**
**(617) 227-3700 (Telephone)**
**pabianlaw38@gmail.com**

**Counsel for David DeQuattro**

**Karen L. Eisenstadt, AUSA**
**US Attorney's Office MA**
**1 Courthouse Way Suite 9200**
**Boston, Massachusetts 02210**
**(617) 748-3412 (Telephone)**
**karen.eisenstadt@usdoj.gov**

**Robert F. Hennessy**
**25 Bank Row, Ste. 2S Boston,**
**Greenfield, Massachusetts 01301**
**(413)325-8541 (Telephone)**
**rhennessy@schnipperhennessy.com**

**Counsel for United States**

**Counsel for Cedric Cromwell**

**TABLE OF CONTENTS**

**Caption**                                                         **Page**

**VOLUME I**

Docket Entries . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

Indictment, Document 1 . . . . . . . . . . . . . . . . . . .    44

Superseding Indictment, Document 65 . . . . . . . . . . . .    67

Motion, Document 131. . . . . . . . . . . . . . . . . . . . . . .    98

Opposition to Motion, Document 143 . . . . . . . . . . . . .    111

Pretrial Hearing Memo, Document 169 . . . . . . . . . . .    116

Motion Hearing, Document 172 . . . . . . . . . . . . . . . .    121

Trial Transcript, 4/22/22. . . . . . . . . . . . . . . . . . . . . .    182

**VOLUME II**

Trial Transcript, 4/25/22. . . . . . . . . . . . . . . . . . . . . .    407

Trial Transcript, 4/26/22 . . . . . . . . . . . . . . . . . . . . .    567

**VOLUME III**

Trial Transcript, 4/27/22 . . . . . . . . . . . . . . . . . . . . .    750

Trial Transcript, 4/28/22 . . . . . . . . . . . . . . . . . . . . .    927

Hearing Transcript, 4/29/22 . . . . . . . . . . . . . . . . . . .    1006

**VOLUME IV**

Trial Transcript, 5/3/22 . . . . . . . . . . . . . . . . . . . . . .    1123

Trial Transcript, 5/4/22 . . . . . . . . . . . . . . . . . . . . . .    1296

Trial Transcript, 5/5/22 . . . . . . . . . . . . . . . . . . . . . .    1378

Exhibit 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1400

Exhibit 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1406

Exhibit 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1413

Exhibit 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1414

Exhibit 5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1415

Exhibit 6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1416

Exhibit 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1417

Exhibit 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1418

Exhibit 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1419

Exhibit 13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1421

Exhibit 14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1438

Exhibit 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1455

Exhibit 16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1458

Exhibit 17 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1460

Exhibit 18 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1462

Exhibit 19 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1464

Exhibit 20 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1466

Exhibit 21 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1473

Exhibit 22 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1475

Exhibit 23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1477

Exhibit 24 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1479

Exhibit 25 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1481

Exhibit 27 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1522

Exhibit 28 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1523

Exhibit 31 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1524

Exhibit 32 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1557

Exhibit 33 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1559

Exhibit 39 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1560

Exhibit 43 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1568

Exhibit 48 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1571

Exhibit 49 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1573

Exhibit 50 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1578

Exhibit 51 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1580

Exhibit 55 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1581

Exhibit 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1585

Exhibit 57 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1586

Exhibit 58 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1587

Exhibit 59 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1590

Exhibit 60 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1592

Exhibit 63 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1599

Exhibit 67 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1608

Exhibit 68 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1622

Exhibit 69 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1623

Exhibit 71 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1627

Exhibit 102 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1628

Exhibit 104 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1629

**VOLUME V**

Exhibit 105 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1631

Exhibit 109 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1633

Exhibit 122 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1634

Exhibit 125 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1636

Exhibit 134 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1637

Exhibit 147 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1638

Exhibit 164 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1639

Exhibit 166 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1692

Exhibit 174 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1695

Exhibit 183 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1748

Exhibit 184 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1751

Exhibit 188 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1753

Exhibit 199 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1754

Exhibit 201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1758

Exhibit 301 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1760

Exhibit 302 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1768

Exhibit 303 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1769

Exhibit 304 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1771

Exhibit 305 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1774

Exhibit 306 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1775

Exhibit 307 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1776

Exhibit 308 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1778

Exhibit 309 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1780

Exhibit 310 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1785

Exhibit 311 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1787

Exhibit 312 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1789

Exhibit 313 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1790

Exhibit 314 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1792

Exhibit 320 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1794

Exhibit 321 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1799

Exhibit 322 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1800

Government Brief . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1801

Verdict, Document 235 . . . . . . . . . . . . . . . . . . . . . . . . .    1809

Jury Instructions, Document 238 . . . . . . . . . . . . . . . . . .    1813

Redacted Indictment, Document 239 . . . . . . . . . . . . . . . .    1836

Motion, Document 242 . . . . . . . . . . . . . . . . . . . . . . . . .    1846

Defendant DeQuattro's Post-Trial Memo, Document 252
. . . . . . . . . . . . . . . . . .                               1848

Defendant Cromwell's Post-Trial Memo, Document 253
. . . . . . . . . . . . . . . . .                                1870

Govt Opp. to DeQuattro's Post-Trial Memo, Document 258
. . . . . . . . . . . . . . . . .                                1881

Defendant DeQuattro's Reply to Govt Opp., Document 262
. . . . . . . . . . . . . . . . .                                1905

Defendant DeQuattro's Supp. Memo, Document 272
. . . . . . . . . . . . . . . . .                                1918

Supp. Opp. to Defendant's Post-Trial Memos, Document 273
. . . . . . . . . . . . . . . . .                                1942

Defendant Cromwell's Supp. Memo, Document 274
. . . . . . . . . . . . . . . . .                                1955

Motion Hearing, Document 286 . . . . . . . . . . . . . . . . .   1970

**VOLUME VI**

Sentencing Transcript, 11/15/22 . . . . . . . . . . . . . . . . .   2029

Govt's Statement, Document 288 . . . . . . . . . . . . . . . .   2152

Teleconference Transcript, 11/22/22 . . . . . . . . . . . . . .   2154

Govt's Supp. Brief, Document 301 . . . . . . . . . . . . . . .   2180

Govt's Brief on Restitution, Document 307 . . . . . . . . .   2188

Defendant DeQuattro's Response, Document 313          2194
. . . . . . . . . . . . . . . . . .

Govt's Supp. Brief, Document 314 . . . . . . . . . . . . . .   2213

Transcript of Status Conference, 12/20/22 . . . . . . . . .   2214

Govt's Reply, Document 323  . . . . . . . . . . . . . . . . . .   2234

Defendant DeQuattro's Sur-Reply, Document 326 . .          2249

Govt's 2nd Supp. Brief, Document 328 . . . . . . . . . . .          2257

Hearing Transcript, 1/18/23 . . . . . . . . . . . . . . . . . . .          2259

Defendants' Notices of Appeal . . . . . . . . . . . . . . . . . . .          2301

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,    )
                             )
            Plaintiff,       )          Criminal Action
                             )          No. 20-10271-DPW
v.                           )
                             )
CEDRIC CROMWELL and          )
DAVID DEQUATTRO,             )
                             )
            Defendants.      )
                             )

BEFORE THE HONORABLE DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

SENTENCING

November 15, 2022

John J. Moakley United States Courthouse
Courtroom No. 1
One Courthouse Way
Boston, Massachusetts  02210

Kelly Mortellite, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 3200
Boston, Massachusetts  02210
mortellite@gmail.com

```
 1    APPEARANCES:
      Counsel on behalf of United States:
 2    Christine J. Wichers
      Jared C. Dolan
 3    United States Attorney's Office MA
      1 Courthouse Way
 4    Suite 9200
      Boston, MA 02210
 5    617-748-3278
      Christine.wichers@usdoj.gov
 6    Jared.dolan@usdoj.gov

 7    Counsel on behalf of Defendant Cedric Cromwell:
      Timothy R. Flaherty
 8    699 Boylston Street, 12th Flr.
      Boston, MA 02116
 9    617-227-1800
      Timothyrflaherty@gmail.com
10
      Counsel on behalf of Defendant David DeQuattro:
11    Martin G. Weinberg
      Maksim Nemtsev
12    Martin G. Weinberg, PC
      20 Park Plaza
13    Suite 1000
      Boston, MA 02116
14    617-227-3700
      Owlmgw@att.net
15

16

17

18

19

20

21

22

23

24

25
```

```
 1              P R O C E E D I N G S

 2              (The following proceedings were held in open court

 3   before the Honorable Douglas P. Woodlock, United States

 4   District Judge, United States District Court, District of

 5   Massachusetts, at the John J. Moakley United States Courthouse,

 6   One Courthouse Way, Courtroom 1, Boston, Massachusetts, on

 7   November 15, 2022.)

 8   (Case called to order.)

 9              THE COURT:  Well, there are a couple of housekeeping

10   matters I want to take up first.  I have Mr. DeQuattro's

11   assented-to motion to seal the filings regarding his motion for

12   judgment of acquittal.  I assume there's no objection to that

13   from anyone.  It's been outstanding for a while.  So I'm going

14   to allow it.  The only thing that I think that's going to

15   remain under seal are the certain bank records that touch on

16   matters that were not introduced in the trial.

17              Second, I have some uncertainty about what's going on

18   with the victim witness statements.  I look at the procedural

19   order that was entered here.  It requires that the government

20   provide the Probation Office with written statements setting

21   forth the names of victims and their contact information and so

22   on as of May 12.  I don't believe that was done or there was

23   any notification.  The Presentence Report at paragraph 63 says,

24   "There are no identifiable victims."  And then all of a sudden,

25   a series of documents were produced through the U.S. Attorney's
```

```
 1   Office that purport to be victim witness statements.
 2          So was the government unaware of these victims at the
 3   time that it was obligated to provide the information to the
 4   Probation Office?
 5          MS. WICHERS:  No, Your Honor.  The issue is that, I
 6   think the lack of clarity of the term "victim" in the relevant
 7   statutes.  We had --
 8          THE COURT:  I'm not even getting to that.  You had
 9   notice that there were people who purported to be victims and
10   you didn't notify the Probation Office?
11          MS. WICHERS:  No, we did not, we did not have notice
12   that there were individuals of the tribe who --
13          THE COURT:  What about the tribe itself or someone who
14   purports to be speaking for the tribe itself?
15          MS. WICHERS:  We did not give them a -- we did not
16   give them the deadline, but we also did not --
17          THE COURT:  It was not their deadline.  It's yours.
18   You were supposed to notify Probation so Probation can prepare
19   in response to that because Probation actually does look at
20   these, as do I.  And so you were aware that there was someone
21   purporting to speak on behalf of the tribe who said they were
22   victims here as of May 12 and it wasn't disclosed to Probation,
23   right?
24          MS. WICHERS:  Almost right.  We were not aware that
25   someone was prepared to speak on behalf of the tribe.
```

```
 1    Otherwise, your statement is correct.
 2            THE COURT:  Well, the tribe purported to be --
 3            MS. WICHERS:  Yes.
 4            THE COURT:  And was the tribe speaking apart from some
 5    other human being?  I mean, the tribe made you aware.  How did
 6    they make you aware?  Who spoke for the tribe to make you
 7    aware?
 8            MS. WICHERS:  We learned of that last week when we met
 9    with the tribe.
11:00 10        THE COURT:  But you said that you knew as of May 12
11    that the tribe was purported to be a victim, right?
12            MS. WICHERS:  Correct.
13            THE COURT:  How did you know that?
14            MS. WICHERS:  From the facts of the case.
15            THE COURT:  Pardon me?
16            MS. WICHERS:  From the fact of the case.
17            THE COURT:  So you thought that they were a victim?
18            MS. WICHERS:  Yes.
19            THE COURT:  And why didn't you disclose that to the
11:00 20   Probation Office?  I'm asking a fairly specific question.  I
21    don't understand the answer to it.
22            MS. WICHERS:  I guess one would call it oversight.
23            THE COURT:  Okay.  So the oversight resulted in a
24    filing that was made relatively recently here through the U.S.
25    Attorney's Office raising some significant issues, apparently
```

         1    the government recognizes it's a significant issue whether or

         2    not the tribe can be viewed as a victim --

         3          MS. WICHERS:  Yes.

         4          THE COURT:  -- under these circumstances.  It would be

         5    nice to know that ahead of time so that we don't have a hearing

         6    in which we have to take this matter up belatedly.  But then we

         7    have other things that are filed, a series of things that were

         8    filed by persons who request that their letter be submitted

         9    under seal, but they're addressed to me, sent along through the

11:01   10    U.S. Attorney's Office.

        11          There is actually two, one in which was transmitted to

        12    Ms. Victoria as of yesterday at 3:25 p.m. that says, the

        13    individual has asked that the letter be submitted under seal to

        14    Judge Woodlock and not be made public.  The short of it is I

        15    don't receive those kinds of letters.  If somebody wants to be

        16    heard on the question of sentencing, and this person apparently

        17    does want to be heard on the question of sentencing, it has to

        18    be known to both sides.  Otherwise I simply strike it.  I can't

        19    imagine why it would be thought otherwise.  Then --

11:02   20          MS. WICHERS:  We --

        21          THE COURT:  If I may.  Then shortly thereafter, as of

        22    3:59, another letter comes in with a communication to

        23    Ms. Victoria.  This one, too, just received.

        24          Now, I guess I'm supposed to interpolate that that

        25    means that this person also wishes to have this under seal, not

1  to be disclosed.  Is that right?

2          MS. WICHERS:  Yes, Your Honor.

3          THE COURT:  Okay.  Well, so long as these people don't

4  want to have their observations pressing me to take particular

5  action with respect to the sentence available for the defendant

6  to review and others to review to evaluate their bona fides for

7  it, I'm going to strike both of those letters here.

8          Now, I have one letter that doesn't seem to fall in

9  that category.  It was submitted apparently to the U.S.

11:04 10  Attorney's Office from Mr. Kelly, and that was done at 6:14

11  yesterday -- well, actually 6:14 this morning and then

12  communicated at 7:43 through the U.S. Attorney's Office.

13  Little hard to absorb things like that.  Mr. Kelly I know has

14  represented the tribe, or I gather he's represented the tribe

15  in various matters here.  But I assume that the defendants have

16  seen this letter.  Have you, Mr. Flaherty?

17          MR. FLAHERTY:  I'm aware of it, Judge.  I haven't

18  absorbed it either.

19          THE COURT:  Okay.  But this is a letter from Gayle

11:05 20  Andrews, in parens, Peters, who is a member of the tribe.

21          MR. FLAHERTY:  Thank you, yes.

22          THE COURT:  Okay.  So I want to be sure that we can

23  move ahead with matters with these delayed submissions.  Do the

24  defendants have any objection to moving ahead at this point?

25          MR. WEINBERG:  Not from the defendant DeQuattro, Your

| | |
|---|---|
| 1 | Honor. |
| 2 | THE COURT:  Mr. Flaherty? |
| 3 | MR. FLAHERTY:  No, sir, no objection. |
| 4 | THE COURT:  All right.  So then let's turn to a |
| 5 | separate question that was raised in connection with the |
| 6 | motions for judgment of acquittal, which I've been thinking |
| 7 | about quite a bit.  The issue really has to do with the |
| 8 | integrity of the tribe and its immunities and the immunities |
| 9 | that extend to those who are their leaders.  Put it that way. |
| 11:06 10 | The issue is not precisely developed as yet in the |
| 11 | larger sense, but my own view is that the Supreme Court and the |
| 12 | First Circuit have been moving in the direction of saying, |
| 13 | Look, if you want to take away the immunity of a tribe or its |
| 14 | leaders, Congress is going to do that with specificity.  That |
| 15 | in fact is what they did with respect to 666(a).  The statute |
| 16 | was amended in I think 1984 or so.  And almost immediately the |
| 17 | Tenth Circuit, dealing with a case then under appeal said, you |
| 18 | know, if you want 666 to apply to Indian tribes, you've got to |
| 19 | say so directly, and they the granted acquittal.  Within |
| 11:07 20 | several months, Congress amended again to make it direct that |
| 21 | Indian tribes were included, Indian tribes and their officials |
| 22 | were included. |
| 23 | Now, what do I draw from that?  Well, first that it's |
| 24 | very important, having in mind the integrity of tribal |
| 25 | governments and their relationships that they have as |

sovereigns, to observe the parameters.  It is the case that no
one would suggest that section 201, which is the traditional
bribery statute, applies to tribes.  In fact, it's so unclear
whether it applies at all to state and local officials,
although the government from time to time in the past anyway
has tried to pursue it on those grounds.

What happened is 666 was amended to make it clear, but
we also have here an extortion claim, extortion under color of
official right.  That does not specify tribes or tribal leaders
as officials.  And my view is I have to grant acquittal with
respect to that.  That is a statute that just doesn't apply,
unless we are to just run roughshod over the particular
attributes of sovereignty that Indian tribes have.

Now, the issue is percolating along in the Supreme
Court.  It's percolating as a result of at least one case
coming from the First Circuit.  It's been identified by
Mr. Flaherty and Mr. Weinberg in their pleadings, and that's
the *Chippewa v. Coughlin* case that the First Circuit dealt with
earlier this year.  It's the subject of a petition for
certiorari now.  The petition and the opposition have been
filed.  The time for a reply hasn't run and the court hasn't
set it for a conference yet, or at least they hadn't as of this
morning because I looked at it this morning.  Nevertheless,
there is filed as an amicus curae a brief by the group of
people who have styled themselves as professors of federal

1    Indian law in support of the petitioners who were essentially

2    saying, you know, you can't do this unless you've called out

3    with specificity the application to the tribes.  Interestingly

4    enough, the counsel in the case and among the federal Indian

5    law professors, Matthew Fletcher, who was a tribal member as I

6    understand it, was the reporter of this document.

7         It's through the statement of the law, the law of

8    American Indians.  It was issued in this form on September 26

9    of this year, although it was adopted I believe by the ALI

11:11  10   subject to revision back in 2019.  It's not directly on point,

11   but it I think gives pretty clear indication that this is an

12   area in which everybody has to tread carefully, lest

13   enthusiasms to pursue things that people might find

14   objectionable and certain people don't undermine the authority

15   of the relevant tribal sovereign.

16         The language that the tribal or the Indian law

17   practitioners offer at the end of the brief is, "Tribal

18   sovereign immunity persists unless a native nation clearly

19   waives it or Congress unequivocally says otherwise.  Congress

11:13  20   did not do so when it enacted the bankruptcy code," which was

21   the original issue, "and it has not done so since.  Native

22   nations may therefore raise sovereign immunity as a defense to

23   claims for damages under the code."

24         All of that I read to mean that the use of the Hobbs

25   Act in this area -- and I actually solicited from the

1    government materials regarding it.  I never received that.

2    Perhaps that was an oversight.

3         There seems to be a quizzical look, so let me be more

4    specific.  I asked for this when I said, "Had this ever been

5    done before?"  And I was told that it had been.  It had been

6    done in Oklahoma.  I said, "Where are the materials," and I was

7    told that they were not available.  I asked to have them

8    searched for and didn't hear anything since.  I'm not aware of

9    any reported decisions with respect to the Hobbs Act applying

11:14 10    to Indian tribes.  Are you, Ms. Wichers?

11         MS. WICHERS:  No, Your Honor.

12         THE COURT:  Okay.  So it comes back to this, that I'm

13    going to grant the motion for judgment of acquittal with

14    respect to the Hobbs Act, which applies only to Mr. Cromwell.

15         Now, having said that, I solicited Ms. Victoria to

16    look at the guidelines in this area, and I believe that she's

17    provided the outcome of her exploration to counsel.  It doesn't

18    make a difference under the guidelines, at least the way in

19    which Ms. Victoria speaks of it, and of course this is

11:15 20    consistent with the idea of overcharging that this area has

21    generated.  But the government is entitled to charge any

22    applicable statute and apparently they believe no potential

23    applicable statute to apply.  So I've looked at it and decided

24    that it must be disregarded here.  That is part of the

25    materials that the tribe itself included, or at least the

1  current leadership of the tribe itself included in its argument

2  here.

3          One of the things that's critical in getting this

4  early rather than late is to be able to sort through what's

5  going on because there are arguments that are made in

6  Mr. Weeden's letter on behalf of the tribe that one might think

7  were evidentiary in nature.  That is the assumption or

8  argument, whether supported or not in the evidence is another

9  matter that we'll get to, but the assumption that the Gaming

11:16 10  Commission and the tribe are both within the ambit of 666(a).

11  Properly, timely provided with the information, presumably

12  counsel would be able to argue against it.  I've tried to sort

13  through this as best I can to be sure that I'm not influenced

14  by that any more than I'm influenced by somebody who sends a

15  letter and says they don't want anybody else to know about it;

16  it's just for me.

17          So I guess that's where we are.  The first order of

18  business, as far as I'm concerned, is to deal with the

19  outstanding motion for acquittal here, which is now focused as

11:17 20  a result of the action I've taken with respect to the Hobbs Act

21  on 666(a).  And I don't know if the defendants have anything

22  more that you want to say in anticipation of going through that

23  and then moving on to the calculation of the sentence, assuming

24  that it's going to be calculated as well.

25          MR. WEINBERG:  If I could just have five minutes to

1     address the Rule 29 as to Mr. DeQuattro and the limitation of

2     the jury verdicts to the Bowflex in August 2016 and the hotel

3     suite in 2017.

4              What strikes me, Judge, and I understand the

5     instruction and the finding of law by the Court that you could

6     have multiple motives, but one of them has to be criminal in

7     order to qualify the acts as a 666 violation.  The government

8     theory has been protect the contract, although there was no

9     direct evidence of that.  And circumstantially, by August of

11:18 10  2016, it was impossible that the contract needed protection or

11    was at objective risk given 28 years of successful -- 28 months

12    of successful performance.

13             But if the contract was in play and if there was

14    pressure or demands by Mr. Cromwell, the last donation, which

15    was the acquitted donation of Count Four in November 2015,

16    there was never again a request for a $10,000 donation.  The

17    only allegation of anything of value that was requested by

18    Mr. Cromwell and paid to him by Mr. DeQuattro in August of 2016

19    or during the entire 2016 year was the Bowflex, which was

11:19 20  completely consistent with the man's medical condition, his

21    coming out of a hospital.

22             THE COURT:  Well, let me break that in part.  Are you

23    challenging the idea that, which seems to suffuse bribery law,

24    that so long as one of the purposes is bribery or to cause

25    someone to depart from their fiduciary obligations, if we're

1    speaking more broadly, is bad law?

2            MR. WEINBERG:  No, I'm not challenging that.

3            THE COURT:  Okay.  So then we're saying, as I

4    understand your argument, you're saying that submission of the

5    Bowflex is only for a medical condition and is an act of

6    friendship?

7            MR. WEINBERG:  I guess what I'm saying is there was an

8    insufficient evidentiary predicate for the jury to have found

9    that --

11:20 10            THE COURT:  Okay.  But I want to be sure it's not a

11    categorical argument.  So it is that the jury could not have

12    found that part of the consideration here or concern here was

13    that the request for a Bowflex would be something that would be

14    taken into consideration by Mr. Cromwell in his actions?

15            MR. WEINBERG:  I guess it's one step beyond that.  The

16    *McDonnell* case and the *Silver* case in the Second Circuit and

17    Your Honor's instructions to the jury required proof beyond a

18    reasonable doubt that before or at the time of the Bowflex

19    request that an official act had been promised in exchange.

11:21 20    Otherwise it's a gratuity, which *Bravo Fernandez* takes out --

21            THE COURT:  Right, I understand that.  So what it is

22    is that the jury disregarded the instructions in this case?

23            MR. WEINBERG:  I think what it is, Judge,

24    respectfully, is that in our judgment of acquittal motion there

25    was an evidentiary insufficiency on three separate grounds.

```
 1    One being the quid, which requires a corrupt intent, that none
 2    of the motives were proven in this case, in this unique case.
 3    Forget the legitimacy of the allegation.  Yes, under some sets
 4    of facts you could charge a Bowflex being a bribe, but in this
 5    case, without there being a witness, without Mr. Cromwell
 6    having done anything or proven to have done anything with a
 7    friendship and with a motive to motivate future business that
 8    you heard from from the expert, although it did not come in
 9    before the jury, that you don't need an expert to know that
11:22 10    Mr. DeQuattro had a business motive.  This gift, the price of
11    the gift was consistent with gifts given by businesses
12    nationwide, sports tickets, concert tickets, Super Bowl trips.
13         THE COURT:  Those are all the kind of generalized
14    statements from the court, Supreme Court, on things that are
15    outside.  The question was is this inside?  That was the
16    specific question.  Is there sufficient evidence in this case
17    for someone to say a portion of an aspect, an element of the
18    reward, was to influence Mr. Cromwell in the exercise of his
19    authority as a tribal leader.
11:23 20         MR. WEINBERG:  Or to incentivize Mr. DeQuattro to give
21    a gift.  Did Mr. Cromwell in any way communicate at or before
22    the time --
23         THE COURT:  Well, now we're into the question of what
24    constitutes communication and at what point does it break down
25    for purposes of circumstantial evidence.
```

 1          MR. WEINBERG:  Your Honor instructed clear and

 2     unequivocal proof was required in order to find an

 3     understanding by Mr. DeQuattro whatever Mr. Cromwell's

 4     intentions, again remembering we're here in a very unique

 5     factual circumstance where there was no direct evidence, where

 6     there was no threat to the contract, where there was no act by

 7     Mr. Cromwell that would send a message that I'm going to do

 8     something negative or could do something positive.  Unlike all

 9     the other cases, there's no pattern of official acts.

11:24 10          And here we're dealing with the only request in the

 11    entire 15-month period between November 15 and January 17.  If

 12    Mr. Cromwell was really demanding payments in order to protect

 13    the contract, to demand a Bowflex as the only request in the

 14    context of acquittals or the antecedent request, there's simply

 15    not a basis to find that he believed, understood, that the

 16    contract was in peril.

 17          THE COURT:  Is that an argument for inconsistent

 18    verdict?

 19          MR. WEINBERG:  It's an argument for saying there's an

11:24 20    insufficient predicate.

 21          THE COURT:  No.  Is this an argument for inconsistent

 22    verdict?  That is to say, in order for the jury to find with

 23    respect to the Bowflex, they would have had to find with

 24    respect to the extension of --

 25          MR. WEINBERG:  I would say two things to that.  One is

1   that the government did not have a stream of benefits theory

2   and therefore needed to establish the quid pro quo on a

3   request-by-request basis.

4          THE COURT:  Okay.  So then it's not inconsistent.

5          MR. WEINBERG:  It is not inconsistent.  If anything --

6   I think you could find inconsistent verdicts, but the effect of

7   an inconsistent verdict is not to prohibit the conviction on

8   the inconsistent conviction because there was an

9   inconsistent --

11:25 10       THE COURT:  I'm focused on the question of whether it

11  was inconsistent for the jury to have found, in the absence of

12  an argument of stream of benefits, for the jury to have found

13  or acquitted with respect to other payments for the benefit of

14  Mr. Cromwell and the Bowflex.

15         MR. WEINBERG:  I think there was an inconsistency in

16  the conviction on the Bowflex.  And the government says so.  On

17  page 1 of the sentencing memo they say you can't uphold -- to

18  quote accurately, Your Honor, they say on page 1, "The fact

19  that these items were bribes in exchange for Cromwell's promise

11:26 20  to protect the contract as the jury found makes no sense if

21  viewed in isolation.  They only make sense when viewed as part

22  of the government's proof."

23         But here we have a conspiracy acquittal that had no

24  statute of limits instruction because Your Honor was going to

25  weigh that if there was a conviction of the only donations that

1   were within the statute they were acquittals, so you have to

2   infer that the jury found that none of the donations were

3   supported by sufficient evidence under Your Honor's

4   instructions to warrant a conviction.

5            Here you have $1,700 equipment, so much consistent

6   with an ordinary business gift that when you compare it to the

7   donations, yes, it's inconsistent, but the inconsistency is in

8   the convictions, not the acquittals.  And beyond the

9   inconsistencies, there's just not a predicate to find, Judge,

11:27 10   that the man didn't give that gym equipment because he was a

11   friend of Mr. Cromwell, he saw his suffering.  He bought him a

12   piece of equipment.  He came over to his house.  It was bought

13   in their own names.  There was no concealment.  There was no

14   RGB involvement.  He and Mr. Beretta went on -- Mr. Beretta

15   went on the internet and they found the equipment.

16            THE COURT:  I don't know how you can say there is no

17   RGB involvement when the two principals are deeply involved in

18   it.  You can make various portions of that.  That's the one

19   that goes too far.

11:27 20            MR. WEINBERG:  But all of the circumstantial evidence

21   that the government offered that would be outside the paradigm

22   of a business gift went to the donations, from the attorneys to

23   CM International, to Mr. Mitrokostas.  This was just a

24   non-concealed, straight-out request for a gift that they gave

25   without any evidence of either a threat, pressure, promise, and

1    without any circumstantial evidence of any conduct that

2    Mr. DeQuattro could have inferred put the contract at risk,

3    remembering, Judge, they've done 28 straight months of no

4    problems with performance.  Everybody was happy.  In a

5    construction project where people are ordinarily not happy,

6    they were happy because RGB, they honored the TERO process.

7         THE COURT:  I'm familiar with all the reasons that

8    they didn't take action.  The real question is whether or not

9    the theory that the government advanced, which is protection

11:29 10  money or protection arrangements, is sufficient, was

11   sufficiently proven to the jury.  That's the ultimate issue for

12   me, I think.

13        MR. WEINBERG:  As to these two gifts.  As to, isolated

14   out, to the two gifts that after November 2015, there were

15   three requests.  One by Mr. Katerino for $4,000 for campaign

16   dinners.  That was an acquittal.  The only other two requests

17   by Mr. Cromwell, if you really had the contract over

18   Mr. DeQuattro's head, the only thing he's asking for is a piece

19   of gym equipment and a hotel suite?  Doesn't that get to

11:29 20  inference upon inference?  Isn't that a speculative basis to

21   think this man --

22        THE COURT:  I'm not sure it does.  I raise that

23   because I'm concerned obviously about the law of circumstantial

24   evidence that's playing on my mind.  And the question for me

25   is, the broader question for me is how properly to permit the

1    issue to be evaluated under the current views of the First

2    Circuit and the Supreme Court.  But I think I understand the

3    argument that you're making.  I want to hear from Mr. Flaherty

4    if he has anything else.

5        MR. WEINBERG:  If I could just burden the court.

6        THE COURT:  Sure.  It's not a burden.  It's just to

7    make sure everybody gets their talking part.

8        MR. WEINBERG:  Two other quick points.  One being that

9    by May of 2017, the contract had less value.  Yes, there was

11:30 10   some hope that some court would reverse Judge Young's August of

11   2016 opinion, but by May of 2017, they're filling in the roads.

12   They're fixing up the infrastructure.  They're prepared,

13   there's no ongoing construction.  The invoices are down to a

14   fraction of what they were before.  And again, to infer that

15   when they gave this business gift to Mr. Cromwell at his

16   request that the motive was the RGB contract for the casino,

17   again, is so highly speculative.  By this time they've worked

18   on the project with no problems for 37 months.

19       THE COURT:  I'm not sure what that means in terms of

11:31 20   value.  It wasn't worth -- this was a contract that wasn't

21   worth $10,000 in the calendar year?

22       MR. WEINBERG:  I think it was worth that in the

23   calendar year, but when you weigh what was going on in this

24   man's head, remembering there's no bad act evidence here,

25   there's no showing of having history where he was not ethical,

1    no bad act evidence.  When you ask the ultimate question, which

2    Your Honor asked us to address when we heard argument under the

3    equipoise statute law of the First Circuit, is it more or less

4    than a likelihood that he was corrupt in giving these two gifts

5    rather than only having the non-criminal purposes, and there

6    were three, the friendship, the business motive, and even

7    saying thank you, which in this circuit is a gratuity, which is

8    outside 666, I urge the Court to find that the government just

9    didn't satisfy the requirements of the First Circuit.

11:32 10         This was speculative.  It was inference upon

11    inference.  They just didn't prove the crime.  I understand Ms.

12    Wichers thought it was to protect the contract.  They never

13    proved that, Judge.

14         THE COURT:  Okay.  I think I understand.

15         MR. WEINBERG:  And the jurisdictional issue we also

16    think is a serious one, whether because of the contract with

17    RGB exclusively being within the Gaming Authority's --

18         THE COURT:  I see, the question of whether or not this

19    extends under 666(a) to the Gaming Authority here.

11:33 20         MR. WEINBERG:  Thank you, Judge.

21         THE COURT:  Mr. Flaherty, anything?

22         MR. FLAHERTY:  Thank you, Your Honor.  I think I share

23    the Court's concern about the circumstantial nature of the

24    evidence in this case which resulted in the conviction.

25         THE COURT:  It's not a concern.  It's just an

1    observation about that's where it is.  The question is whether

2    or not that's going to be sufficient to permit the case to

3    survive a motion for judgment of acquittal.

4         MR. FLAHERTY:  Then maybe I stand alone with my

5    concern, Judge.  I didn't mean to make an assumption of the

6    Court.

7         THE COURT:  It's different roles.

8         MR. FLAHERTY:  Different roles.  But the rule of

9    equipoise, if the evidence viewed in the light most favorable

11:33 10   to the verdict gives equal or nearly equal circumstantial

11   support to a theory of guilt and a theory of innocence of the

12   crime charged, this Court must reverse the conviction.

13        And in my mind, Judge, I understand the government's

14   theory, and it's a theory, and it's a theory from which the

15   entire case was driven, that the money was paid for protection

16   of the contract, a contract that was never at risk.  There was

17   no proof that the contract was ever at risk.  And this is a

18   theory, a circumstantial theory that in my view of the

19   evidence, of the record evidence, was unsupported by anything.

11:34 20        There was no direct evidence of an official act.

21   There was no, as I saw it, circumstantial evidence of an

22   official act.  There was no evidence of a quo whatsoever, but

23   there was this theory, sort of a theory built on winks and

24   nods, a silent suggestion that the parties privately knew what

25   each were doing, but there was no proof of any exchange of

1    communication or intent between the parties.

2         In the *Pothier* decision that the Court pointed out and

3    we went back and looked at, there are reasonable alternatives

4    when the evidence is viewed in that case.  The *Stewart* case is

5    incredibly troubling to me, Judge, because I know the *Stewart*

6    case.  I know the neighborhood.  I grew up in that area.  I

7    understand the footprint and actually went back and looked at

8    it and visited the scene after reading it.  And I think the

9    only reason that I can think that this Court's decision to

11:35 10   grant habeas was overturned is because of the statement of the

11   driver in *Stewart* where he lied and said he was alone, which

12   must have, I guess in the Court's view, imputed knowledge of

13   the act that occurred previously on Cambridge Street and

14   therefore created some evidence of consciousness of guilt that

15   therefore supported the theory of joint venture.

16        But again, Judge, I'm totally troubled by the *Stewart*

17   decision, and I think that it's bad law, frankly.

18        THE COURT:  Well, nobody's overruled it, so it can be

19   bad but still viable.

11:35 20        MR. FLAHERTY:  But not controlling in this case.

21        THE COURT:  It's controlling in the sense that it's a

22   directive from the First Circuit.

23        MR. FLAHERTY:  But the reason why I say that, Judge,

24   is in this case, in this case, the record evidence in this case

25   is dissimilar.  There was no evidence of any consciousness of

guilt, any statement.  There was no evidence that indicated,

that supported the theory of protection of the contract.  And I

understand the government's theory that there was a necessarily

coercive environment just because of the relationship that this

must have been for this.  And I think the jury, when I think

back and analyze this, must have assumed, well, something was

happening here.  But did they exclude any other alternative

explanations beyond a reasonable doubt, as I point out in my

memorandum.

11:36    And I'm not trying to be fanciful or fantastical with

the suggestions that I make.  But could have they excluded the

reasonable possibilities?  And in my view, Judge, on the record

evidence, they couldn't have.  And that's why my argument is

that the circumstantial evidence in this case or what's

referred to as circumstantial evidence in this case, and I

suggest to the Court that there really isn't any circumstantial

evidence to support the theory of protection of the contract,

all of the concealment evidence, that was acquitted conduct,

all of that evidence to me indicated that the concealment could

11:37    have been for other reasons.  And we know about other

activities that were happening in Mr. Cromwell's life that

could have supported a reason for concealment.

There were explanations, in my view, of what I will

refer to as the gratuities, the hotel stay and the Bowflex,

activities that were happening, events that were happening in

1  Mr. Cromwell's life that are reasonable explanations for those

2  items being given to him, the $10,000 donation to One Nation

3  Development and the change in the letters submitted to RGB

4  about that, there's reasonable explanations for that which

5  point to maybe an alternative intention between the parties

6  that has nothing at all to do with the violation of 666 that

7  doesn't support the theory of protection of the contract or any

8  quo.

9       So for all of those reasons, Judge, I say that in my

11:38 10  view the record evidence in this case, the so-called

11  circumstantial evidence is simply a theory and nothing more;

12  that it doesn't support the idea -- and I say this with all due

13  respect, Judge -- the idea that what was happening here was a

14  protection of the contract.  It is simply the wrongheaded view

15  of what was transpiring.  And for those reasons, I think under

16  the equipoise rule, the convictions must be reversed.  Thank

17  you for the opportunity.

18       THE COURT:  All right.  Ms. Wichers.  And I want you

19  to focus on your theory, which was protection of the contract.

11:39 20       MS. WICHERS:  Yes, Your Honor.

21       THE COURT:  I mean, I don't know of any other theory

22  that you were pursuing.  You weren't pursuing stream of

23  payments.

24       MS. WICHERS:  No.  You're correct.

25       As we pointed out in our memorandum, Your Honor asked

        1    us to address *Stewart v. Colter* and the *Pothier* case, and they

        2    make clear that there's a two-step process that has to be done

        3    here.  Mr. Weinberg talked about when you isolate out the

        4    Bowflex and the hotel stay, and that is not what *Colter* and

        5    *Pothier* say.  The two-step process that a Court must engage in

        6    in deciding insufficiency of the evidence in a Rule 29 motion

        7    context is first to view all the evidence and all reasonable

        8    inferences therefrom in the light most favorable to the

        9    government in the aggregate, not in isolation.

11:39  10         Secondly, viewing all of that, the question is could

       11    any reasonable jury find that evidence and those inferences

       12    proof of the elements beyond a reasonable doubt.  That's what

       13    the evidence showed.  And more specifically to address the

       14    defendants' specific arguments, when we were here before you

       15    last, Your Honor pointed out this quote.  Quote, "A conjecture

       16    consistent with the evidence becomes less and less a conjecture

       17    and moves gradually toward proof as alternative explanations

       18    are discarded or made more likely."  And in this case, that is

       19    what we proved.

11:40  20         They argued, the defendants argued the first $50,000

       21    political donation, political donation, each one, and the

       22    jury -- certainly the evidence was there from which a

       23    reasonable jury could conclude, All right, maybe the first one

       24    was a political donation.  The second one is more suspect, it's

       25    right on its heels.  The third one is even more suspect.  Then

1   the fourth, then the fifth to this One Nation Development is

2   really suspect, and now you're talking about something else

3   with a different explanation that's clearly not a political

4   donation.  You're talking about a Bowflex and then a hotel

5   stay.  You've really, over time, as Your Honor pointed out,

6   this has become more and more toxic.  And those two items

7   viewed in that ladder, if you will, clearly a jury could

8   find --

9           THE COURT:  So it's a number of acquitted conducts can

11:41 10   be added to the sum?

11           MS. WICHERS:  Yes.

12           THE COURT:  Okay.

13           MS. WICHERS:  And then my only other point here is

14   that both counsel have said you have to look at whether there's

15   any other possible reasonable explanation and did the

16   government prove that there was no other reasonable

17   explanation.  Could the jury have found there was no reasonable

18   other explanation.  We don't have to prove that.  That is not

19   the burden of proof of the government.  That is not the correct

11:42 20   standard.

21           THE COURT:  Well, it becomes more persuasive if you

22   can do something like that, and I take it you don't undertake

23   to do it.

24           MS. WICHERS:  No.  We certainly did.  We argued why it

25   wasn't a gift, why it wasn't a gratuity, why it wasn't --

<pre>
 1              THE COURT:  I'm more focused on the Bowflex, or maybe
 2       we're focused on the Bowflex than the stay here.
 3              MS. WICHERS:  Yes.
 4              THE COURT:  But I guess I want to understand why I
 5       shouldn't, starting with the Bowflex, look at that as a humane
 6       gift under the circumstances and maybe, you know, not as well
 7       received or as gratefully received as it might otherwise have
 8       been by the defendant.  But do you really mean to tell me that
 9       that was enough to keep from a modification of the contract?
11:43 10             MS. WICHERS:  Was it enough to keep from the --
11             THE COURT:  It has to have been, ahead of time, they
12       had to have known that they were going to protect themselves by
13       giving things to Mr. Cromwell, presumably whenever he asked.
14       And this falls in that category, a gift of a used Bowflex,
15       reconstructed by Mr. DeQuattro in his home that was treated
16       with disregard by the defendant himself, Mr. Cromwell himself.
17             MS. WICHERS:  When looked at under the viewpoint
18       principle and not in isolation, yes, the jury legitimately
19       found that it was more and more implausible, the defendants'
11:44 20       explanations are more and more implausible.  And once they got
21       to the Bowflex, it was really implausible, and the government
22       proved the elements beyond a reasonable doubt.  I understand
23       that there was an argument that it was a gift, but the jury --
24       and I don't know that it's terribly relevant that Mr. Cromwell
25       was ungrateful.
</pre>

```
 1              THE COURT:  Why isn't it?  I mean, you know, if you're
 2     worried about influencing someone, an unhappy recipient is
 3     probably not the most effective influence.
 4              MS. WICHERS:  True.
 5              THE COURT:  And so you short-sheet him on something he
 6     wants.  He wants out-of-the-box rather than somebody's reused
 7     Bowflex.
 8              MS. WICHERS:  Right.
 9              THE COURT:  And he expresses that.
11:44 10         MS. WICHERS:  Yes.
11              THE COURT:  Isn't that element -- isn't that evidence,
12     too, here?
13              MS. WICHERS:  It is evidence but I don't think it is
14     the most important evidence.  The most important evidence was
15     the lead-up to the Bowflex.
16              THE COURT:  The things on which there was an
17     acquittal.  Isn't that important evidence?
18              MS. WICHERS:  It is the cumulative nature.
19              THE COURT:  Right.  But all of the lead-up is things
11:45 20    that don't work before the jury, and now you say that's enough
21     to create the toxicity.  I mean, I use Paracelsus, but I'm not
22     sure he was speaking directly to this case.  But that's the
23     theory the government has --
24              MS. WICHERS:  That is the theory that under the
25     viewpoint principle, looking at all of the evidence not in
```

1    isolation, the evidence and the inferences in the light most

2    favorable to the government that, yes, absolutely, it's not

3    inference upon inference; you have to look at it as a

4    cumulative set of bribes.

5         And so the Bowflex was not in and of itself -- I mean,

6    their argument sounds more persuasive when you say how can one

7    Bowflex and one hotel stay be things that a vendor gives to

8    protect the contract.  But that again is viewing it in

9    isolation.  It's not looking at it under the standard required

11:46 10    by *Pothier* and *Stewart*.

11         THE COURT:  Okay.  Well, I guess what I have to say is

12    that I'm affected by a legal environment that is uncertain.

13    It's uncertain with respect to what precisely is necessary for

14    purposes of an analysis of a circumstantial case.  I outlined

15    it by presenting what might be called the Yin and Yang of these

16    kinds of cases, *Pothier* at one end and *Stewart* at another, that

17    reflect developments within the First Circuit in this time

18    period.  But I think it's sufficient here, at least under some

19    case law within the First Circuit, to view this kind of

11:46 20    increased toxicity as justifiable for the verdict.

21         I also look at this more generally.  One can say that

22    the defendant Cromwell's demands or at least inquiries were

23    pretty limited for this.  But that just means that he was on

24    offer for relatively modest amounts of money.  It doesn't mean

25    it's a violation or doesn't mean that it isn't within the scope

of the statute here.  I have looked of course at the question

of whether or not under these circumstances the so-called

jurisdictional argument that Mr. Weinberg made reference to is

applicable.

My own view is that it's fairly clear to me that

Congress intended it to extend to affiliates of the tribes

themselves, and this was clearly that kind of affiliate.  I

state these in general terms so we can move along on it.  In

any event, I'm not going to grant the judgment of acquittal

11:48 10  with respect to the 666(a) claim here.

MR. WEINBERG:  Judge, I don't want to burden you, but

could I at least make clear on the record that not only do we

move for the judgment of acquittal, but I respectfully object

to the government's position that is so heavily predicated on

an argument that all facts get weighed in favor of the

government when those facts have been rejected by the jury.

They've relied substantively --

THE COURT:  I understand all of that, and I have to

tell you that my view is that, as a legal matter, irrespective

11:49 20  of the overstatement, I have to say, of the government's

position by Ms. Wichers, that this still falls within the range

of things that have been accepted by the First Circuit in

evaluation of circumstantial evidence.

One of the dangers in this area is this gestalt, and

trying to tease it out into various elements only emphasizes

1   that you can't disentangle it effectively.  Would I have done

2   what the jury did is not the standard for me.  The question is

3   was the jury properly instructed and was there enough for them

4   to come to this conclusion, and I find that there was, under I

5   will call it the *Stewart* Yin of the Yin and Yang of

6   circumstantial evidence evaluations within the First Circuit.

7          So that's where I end up on it.  I think I understand

8   your point.  I don't think you have left a stone unturned in

9   making the argument.  Nobody is going to say that you haven't

11:50 10   here.  So that then brings us to the question of the

11   guidelines.

12          MS. WICHERS:  Your Honor, before we go there, the

13   government does object and reserve its right to appeal the

14   judgment of dismissal on the extortion counts.

15          THE COURT:  Why do you have to make that objection?

16   I'm just interested in the idea that you have to make an

17   objection like that.

18          MS. WICHERS:  Because the appellate unit told me to.

19          THE COURT:  Where?  I see, the appellate, your

11:51 20   appellate unit runs the game here, and so they told you you had

21   to do something like that, and so you do it.

22          MS. WICHERS:  That's correct.

23          THE COURT:  Okay.  I mean, it's -- in any event, I

24   shouldn't interfere with the advice of co-counsel in these

25   matters.

```
 1          So we're now faced with the issue of what do we do in

 2     light of the insights that Ms. Victoria has brought to bear in

 3     this case.  I'm not sure, first Mr. Flaherty and then

 4     Mr. Weinberg, if there are any remaining guidelines challenges

 5     to be made here.  I looked carefully at the Presentence Report,

 6     and this has been narrowed down to what I think is capable of

 7     being advanced, but perhaps I've missed something.  So are you

 8     going to go first, Mr. Weinberg?

 9          MR. WEINBERG:  I think there's at least probably two

11:52 10     common challenges.  One being to Ms. Victoria's finding or view

11     that the four-level enhancement for an elected public official

12     should be added to the base guideline, which elevates the

13     guideline from 14 to 18.

14          THE COURT:  But why isn't that a fair way of referring

15     to a sovereign's position?  I've said, you know, he was the

16     voice of the sovereign here.  Isn't it demeaning to Indian

17     tribal sovereignty to say he's a second-class official?

18          MR. WEINBERG:  I would contend to Your Honor that,

19     just as in the statutory analysis for 1951, the Sentencing

11:53 20     Commission and implicitly Congress has every ability to write

21     the text to include a tribal sovereign for an enhanced

22     sentence, and there was nothing in the face of these guidelines

23     that expand them to include the leader of a Commonwealth, the

24     leader of a territory, political leaders that are not elected

25     but they omit and do not mention anything to do --
```

1          THE COURT:  Does it cover state and local officials?

2          MR. WEINBERG:  It does cover state and local

3   officials.

4          THE COURT:  So it's only as to representatives of the

5   tribal sovereignty.  That's the argument that you're making.

6          MR. WEINBERG:  They're omitted where the Sentencing

7   Commission in its text included so many others.  But then they

8   have a list of factors that you go through.  Is it within 201?

9   No.  Are they state or local elected officials?  No.  Are they

11:54 10   -- you know, the emphasis is on public and every one of these

11   guideline criteria, Mr. Cromwell, whatever his leadership of a

12   2600-member tribe is, it's not a public tribe.

13          THE COURT:  But you're making this Manichean

14   distinction between public and Indian sovereign, and I would

15   suggest that Indian sovereign means a special kind of public.

16          Now, is this language infelicitous?  Yes, it is.  The

17   guidelines at every turn make clear how difficult it is to

18   capture things on the run.  And of course we only now are

19   getting a commission that's capable of even doing anything with

11:55 20   the guidelines.  We've been dealing not with the dysfunctional

21   Sentencing Commission, a nonfunctional Sentencing Commission.

22   But reading this language from a broader perspective, I wonder

23   whether that makes sense.

24          MR. WEINBERG:  The Commission did try to address the

25   scope of -- in that, I think section E, and he talked about, is

1    this somebody who is acting under color of law or official

2    right, just like as to language of the Hobbs Act official

3    right.  Is he different than, you know, somebody who is elected

4    by the public in terms of an open-ended public?  And that's

5    what all of the other criteria mentioned, except one where they

6    exclusively talk about someone who is a political leader almost

7    anticipating the Supreme Court's case in *Percoco* or however I

8    pronounce that.

9         THE COURT:  I note, as you just have, that *Percoco* is

11:56 10   going to be argued at the end of this month.  The briefing was

11    only completed yesterday.

12         MR. WEINBERG:  Lastly, Judge, if we remember what the

13    act is that Mr. Cromwell is being punished for and that it

14    risks an elevation of Mr. DeQuattro's sentence, it's

15    Mr. Cromwell's conduct as the chairman of the Gaming Authority,

16    not the chairman of the tribe.  He wasn't elected to the Gaming

17    Authority.  He was appointed because he was the head of the

18    tribe.  He was one of five members.  It was a business

19    transaction.  It didn't deal with legislation.  It didn't

11:56 20   deal --

21         THE COURT:  But that's not a requirement, that it deal

22    with legislation.

23         MR. WEINBERG:  No.  The requirement is that it be an

24    elected public official whose conduct as an elected public

25    official is at the heart of 666.  He was a member of a Gaming

```
 1   Authority that --

 2          THE COURT:  You mean you have to be elected at each of

 3   the levels separately?

 4          MR. WEINBERG:  If there's the separation, as there

 5   is --

 6          THE COURT:  And if I say there isn't?

 7          MR. WEINBERG:  The Gaming Authority insulated the

 8   tribe from any liability for any decision made by Mr. Cromwell,

 9   any decision about federal program funds.  So in this case --

11:57 10        THE COURT:  I'm not sure I understand what you mean by

11   that, insulated the tribe?

12          MR. WEINBERG:  Well, from Mr. DeQuattro's perspective,

13   he's dealing with Mr. Cromwell not as the head of the tribe as

14   he did when they built the government center but as the head of

15   the Gaming Authority.  They signed the contract that said that

16   no liability by the Gaming Authority to RGB can obligate the

17   tribe.  You can't sue the tribe.

18          THE COURT:  But you could sue the Gaming Authority.

19          MR. WEINBERG:  You could sue the Gaming Authority.

11:58 20        THE COURT:  So the Gaming Authority is simply a

21   subordinate entity of the tribe?

22          MR. WEINBERG:  But he wasn't elected to the Gaming

23   Authority, Judge.

24          THE COURT:  I think I understand that argument.

25          Anything else, Mr. Flaherty?
```

1          MR. FLAHERTY:  Just, not to repeat and reiterate

2     Mr. Weinberg's arguments, but I think the catch-all clause,

3     subsection paragraph E of 2C1.1 does not include tribal

4     officials, Judge.  And I know that you said are we then to say

5     that tribal sovereign officials are second-class citizens.  No,

6     not at all, or second-class officials.  But they're not public

7     officials.  Tribal government affairs, the Mashpee Wampanoag

8     tribe is no more public than the Edgartown Yacht Club, Your

9     Honor.

11:59 10         THE COURT:  The government hasn't yet gone after the

11     Edgartown Yacht Club for breach of fiduciary duty or some

12     property crime, wire fraud.  That's not the issue.  The issue

13     is whether or not we're dealing with a sovereign who can be

14     swept up in this particular guideline.

15          MR. FLAHERTY:  But to reiterate my arguments in Rule

16     29 and my memorandums afterwards post-conviction, public means

17     just what it means, Judge.  And the elections were limited to

18     the 2,600-member Mashpee Wampanoag Tribe.  I couldn't

19     participate.  You couldn't participate.  Any other person who

11:59 20     is not an enrolled member of the tribe couldn't participate.

21     That membership is guided by ancestral lineage, bloodlines, and

22     the tribe by its very existence, by its definition, is not

23     public.

24          Article I Section 8 recognizes independence of tribes.

25     And that's going back to 1787.  And I know it's been abrogated

in many respects over the years, but here the sentencing

guidelines are silent.  1951 is silent.  And for those reasons,

Judge, the court has I know thought very long and hard about

it, I would suggest that that particular enhancement on

sentencing not be applied in this case or any tribal case

specifically because the language is not included therein

describing tribal officials as elected public, public

officials.

THE COURT:  Well, I'm not going to allow the

enhancement, and the reason I'm not going to is basically the

same way in which I dealt with 666(a) here.  If an entity, a

government entity like the Sentencing Commission wants to do

it, they know how to do it.  The language is clear in this area

that it requires them to apply.  They haven't drawn the tribe

into this directly.  They've given a generality, a generality

generated I think by where they were at the time that they

entered that guideline.  Maybe they'll tidy it up.  They've got

a lot of work to do.  This will become part of their work if

that's what they want to do.  But until they do, it seems to me

that this is not a guideline that I'm going to honor for these

purposes.  So I exclude that.

Now I ask a separate question with respect to this.

It's a larger question that's raised by these kinds of

guidelines, and I don't know whether the parties -- well, the

parties will be heard on it.  I don't know whether they've

1    considered it deeply, but it's this.  It's pretty clear to me

2    that the Sentencing Commission at least is making a distinction

3    between the persons who offer a bribe and the persons who

4    solicit the bribe and that the persons who solicit the bribe

5    are the more culpable in this area.

6        That hasn't really been fully developed into case law

7    under statutes, but it seems to be the thrust of what's going

8    on in the guidelines themselves.  I ask that question because

9    it's perhaps in the air in dealing with this.  It would affect

12:03 10    the question of what the proper sentence should be in dealing

11    with this.  And I don't know whether the parties want to be

12    heard with respect to that before we move on, because I think

13    that's the only guideline issue.  Perhaps there's another

14    guideline issue that you want to raise.

15        MR. WEINBERG:  There's just one other guideline issue,

16    Your Honor, and that's the multiple bribe, two-level

17    enhancements for the multiple gifts.  I want to make sure, I

18    argued in the Rule 29 that Your Honor could consider one rather

19    than both.

12:03 20        THE COURT:  Why would I do that?  I mean, where?

21    They're two discrete things.

22        MR. WEINBERG:  They're discrete gifts, but they have a

23    common object, according to the government theory.

24        THE COURT:  Every gift that has a common object

25    becomes a single gift?  Gift, I shouldn't say.  Bribe.  That

is, they break it up.  You know, the Bowflex wasn't brought to

the hotel room.  It's not part of the same kind of activity.

MR. WEINBERG:  The guideline is not crystal clear, but

the case law kind of says the first factor, this is the *Arshad*

case quoted by Ms. Victoria, had a number of different ways to

uphold the multiple bribe allegation.  But it said the first

factor, which the Court found determinative, is whether the

payments were made to influence a single action.  The

government theory here is that you can't take the Bowflex

12:04 without taking the acquitted conduct and considering it, even

though they don't have a stream of payments.

THE COURT:  So protecting a contract is a single

action.

MR. WEINBERG:  That would be the argument, is that the

government theory was that there's a singular purpose to these

multiple requests and multiple gifts.

Now, they didn't occur at the same time.  Certain

cases go off and talk about whether it's an installment

program.  The Court has discretion when there's a single

12:05 purpose to multiple gifts to not impose the multiple bribe

guideline, and this would be an appropriate case for not

imposing it.

THE COURT:  Okay.  I don't accept that argument.  The

language in this area can be, even in the judicial decisions,

Delphic at best.  But taking away the distinctions between the

         1    separate kinds of bribes that are made in this case seems to me

         2    to really conflate beyond actual recognition of what's going

         3    on, the government's theory of the case.  So I decline to do

         4    that.

         5         So let's go back then to where the guidelines are,

         6    unless the government wants to be heard in some fashion on

         7    this?

         8         MS. WICHERS:  Just on the issue that Your Honor raised

         9    about whether the guidelines place more culpability on the

12:06   10    recipient of the bribe than the payor.

        11         THE COURT:  Okay.

        12         MS. WICHERS:  I don't see that in the guidelines.  I

        13    do see, obviously, that people, the public official is more

        14    culpable, a public official is a more culpable than a

        15    non-public official.

        16         THE COURT:  So let's go look at the special offense

        17    characteristics and particularly the language, the 203 language

        18    that says, "An elected official or any official holding a high

        19    level decisionmaking or sensitive position" -- now that's not

12:07   20    necessarily who we're dealing with here -- "is subject to a

        21    more significant recognition reflecting the Commission's

        22    conclusion that, in general, public corruption offenses

        23    previously did not receive punishment commensurate with the

        24    gravity of the offense," and that the government, the

        25    Sentencing Commission meant to reflect the Commission's view

1   that "offenders who abuse their positions of public trust are

2   inherently more culpable than those who seek to corrupt them

3   and their offenses present a somewhat greater threat to the

4   integrity of the governmental process."

5       Now, it may be a little bit different under other

6   circumstances.  The variety of ways in which people are

7   corrupted or offer themselves up for corruption are more

8   complex, but this is one in which it seems to me possible to

9   say that Mr. DeQuattro was on a different level than

12:08 10   Mr. Cromwell here, and I don't know why I wouldn't look at it

11   from that perspective.  Whether or not it's applying the

12   guidelines is simply to alert you to my view about relative

13   culpability of offers and solicitors.

14       MS. WICHERS:  Well, certainly I think the government

15   agrees that Mr. Cromwell is more culpable in the sense that he

16   is a public official, and he exerted the influence and the

17   power of that public office to his benefit.  And I take your

18   point -- I think I take your point that Mr. DeQuattro is

19   perhaps less culpable in the sentencing context because he did

12:09 20   not offer the bribes.  They were solicited by Mr. Cromwell, and

21   he complied and he paid them, rather than offering, rather than

22   being the first person to offer the bribes.

23       I don't know that that makes him less -- I see the

24   point, but I don't know that it makes him less culpable in the

25   sense that you've got to have a quid and you have to have a

```
 1    quo.

 2            THE COURT:  Well, that flattens the landscape

 3    substantially, and that's a problem.  That is to say, once

 4    you're guilty, you're guilty.  You're in for a dime, you're in

 5    for a dollar.  It's a lack of proportion.  And I have to make a

 6    proportionate determination.  It may be the same proportion; it

 7    may not.  But to say, Gee, everybody's culpable here, don't

 8    make a distinction.

 9            MS. WICHERS:  Again, I think the culpability really, I

10    certainly agree that Mr. Cromwell is more culpable.  But I

11    think the government's point is that is because he was a public

12    official and exerted his influence and power.  Mr. DeQuattro

13    was not.

14            THE COURT:  Okay.  I understand the point I think.

15    I'm sorry, Mr. Weinberg, something else?

16            MR. WEINBERG:  Yes.  Speaking for Mr. DeQuattro, I

17    would think there's a related factor, and it really goes to the

18    heartland or what is the paradigm of bribery, which is two

19    factors that are important in Your Honor's consideration of

20    this issue.

21            You know, one is the government agrees that he had,

22    again under the Court's ultimate determination, multiple

23    motives, that the government says in their objection to the

24    Presentence Report, "The government does not dispute that based

25    on the trial evidence the jury could have found that friendship
```

1    and/or desire to generate future business was one reason why

2    Mr. DeQuattro gave Cromwell the Bowflex, paid for his hotel

3    stay."  That may not make him innocent to the extent the Court

4    found sufficient evidence of an --

5         THE COURT:  That I guess is the point.  If we were

6    assuming that there was an acquittal on these counts and

7    somehow it came into the context of calculating the guidelines,

8    I'd be obligated I think to observe the choice that the jury

9    made on that subject, irrespective of whether it might be

12:11 10    construed differently.  It doesn't quite arise in that context

11    because it doesn't arise in that context when the government

12    raises the claim or when the government is not faced with

13    acquittal.

14         MR. WEINBERG:  But if somebody has multiple motives,

15    and let's say the predominant motive, as I would contend, was a

16    gift to Mr. Cromwell because of his health conditions, the

17    predominate motive for the hotel was future business, not the

18    RGB contract, even if there was sufficient evidence of the RGB

19    contract submitted to a jury, it matters for sentencing that

12:12 20    this was different than the paradigm of somebody --

21         THE COURT:  It may.  But I want to be sure that I'm

22    not missing an argument that you're making that multiple

23    motives categorically exclude bribery here, if there's more

24    than simple bribery involved in this.

25         MR. WEINBERG:  I don't think if you had an incidental

1    motive that you're like the person you're bribing and wanted to

2    give him something that that immunizes you --

3        THE COURT:  That isn't the question, as you know.  And

4    so I'm taking it that you are not challenging, there doesn't

5    seem to be a basis to challenge the idea that if there is among

6    the mixed motives bribery, that's sufficient as I instructed

7    the jury.

8        MR. WEINBERG:  I didn't object to that instruction

9    then and I'm not going to object to it now.  I don't think that

12:13 10    if you have mixed motives that you can immunize the criminal

11    motive with the benign motive, but I do think to the extent

12    that Your Honor thinks that the benign motive was there

13    juxtaposed with the illegal motive and even predominated as the

14    principal motive, I think that's a very significant sentencing

15    factor as is the fact, Your Honor, that he never initiated any

16    conduct.  He never asked for anything.  He never asked for a

17    benefit.  He never received one.  He never asked to go and

18    initiate a payment.  I think that, too, is supportive of the

19    distinction between he who receives and who he gives in this

12:14 20    case.

21        I don't think you have to make it global.  If there

22    was somebody that was pushing money on a public official, Your

23    Honor might find in that paradigm there shouldn't be

24    distinctions.  But with Mr. DeQuattro in this case and these

25    facts, I believe they strongly spell out a case that's outside

1   the heartland.  And as the statistics we gave you, 27 to 35

2   percent of bribery convictions under 2C1.1 end up with

3   probations and home confinements.  And I know we're not at

4   sentencing yet, but we're getting there.  And I believe that

5   Mr. DeQuattro's offense conduct on the unique facts of this

6   case and what he didn't do cry out for a strong consideration

7   along with all the other factors that we've provided to the

8   Court.

9           THE COURT:  All right.  Thank you.  Mr. Flaherty,

12:15 10   anything you want to add to that?

11          MR. FLAHERTY:  Just to say, Judge, I don't see any

12   specific language in the sentencing guidelines that says that

13   the solicitor should be held more culpable than any other

14   party.  And I understand the undercurrent, Judge.  I just ask

15   the Court to exercise its discretion with proportionality.

16          THE COURT:  All right.  Well, what I'm making

17   reference to is the kind of language that the Commission was

18   using during the course of its amendment process, which is

19   perhaps useful, perhaps not in this context, but it's certainly

12:15 20   not obligatory in this setting.

21          So we go back then to the guideline calculation.  As

22   always, Ms. Victoria, I need help on that.  I take it now we're

23   dealing with a total offense level of 14.  Is that right?

24          U.S. PROBATION:  Are we talking about Mr. DeQuattro?

25          THE COURT:  Yes.

1        U.S. PROBATION:  Yes.  So for Mr. DeQuattro, you are

2  correct, Your Honor.  It's base offense level two plus two for

3  more than one bribe, adjusted offense level and total offense

4  level of 14.

5        THE COURT:  Okay.  And that generates guidelines of?

6        U.S. PROBATION:  With a Criminal History Category I,

7  that generates an advisory guideline range of 15 to 21 months,

8  one to three years of supervised release and a fine range of

9  7,500 to 75,000.

12:16 10        THE COURT:  And he is eligible for probation, isn't

11  he?

12        U.S. PROBATION:  No, Your Honor.  With a total offense

13  level of 14, it falls within Zone D of the sentencing table.

14  So under the guidelines, no, but per the statute, yes, one to

15  five years.

16        THE COURT:  Okay.

17        U.S. PROBATION:  If you were to impose probation, it

18  would have to be a variance or a departure from the guidelines.

19        THE COURT:  And why wouldn't I do that if that was --

12:17 20        U.S. PROBATION:  Yes, you certainly can.

21        THE COURT:  This kind of distinction between

22  supervised release and probation is increasingly artificial.  I

23  just want to be sure I haven't missed something other than the

24  bucket that the Sentencing Commission would like us to put

25  things in.

1          U.S. PROBATION:  No, Your Honor.  I think practically

2   speaking, time served, you know, one day and supervised release

3   and a year or however many years of probation are essentially

4   practically the same thing.

5          THE COURT:  Right, right.  Okay.  All right.  Any

6   dispute about those guidelines as a basis for the discussion

7   that I've had so far?

8          MR. WEINBERG:  No, Your Honor.

9          MS. WICHERS:  Yes, Your Honor.  We disagree about your

12:18 10   rejection of the public official enhancement.

11          THE COURT:  Right, I understand that, but now I've

12   made those calculations.

13          MS. WICHERS:  Yes.

14          THE COURT:  Do you disagree with anything that we have

15   here, not in the past, just now disagree with any of it?

16          MS. WICHERS:  I agree that 12 plus two is 14 and it

17   falls outside of the -- falls in Zone D.

18          THE COURT:  Mr. Weinberg, same thing?

19          MR. WEINBERG:  I agree, yes, Your Honor.

12:18 20          THE COURT:  Okay.  So let's turn to Mr. Cromwell for

21   the calculations.

22          U.S. PROBATION:  Your Honor, with respect to

23   Mr. Cromwell, the parties had raised a couple of other

24   objections in the PSR.  I don't know if they're pursuing them

25   today.

1          THE COURT:  Maybe, Mr. Flaherty, if you want to go to

2     those, anything else that you want to raise?

3          MR. FLAHERTY:  Well, the calculation of the loss,

4     Judge, I think it's a six-level enhancement, and the

5     calculation of loss that Probation and the government I guess

6     agree on is 53,000, and it includes acquitted conduct.

7          THE COURT:  Right.

8          MR. FLAHERTY:  And I'd like to vigorously argue,

9     Judge, that the calculation of the loss should only be the

12:19 10   value of the Bowflex and the hotel suite and the $10,000 check

11     for which Mr. Cromwell was convicted by the jury.  And the

12     Court has denied the motion for judgment of acquittal on that.

13     And, you know, my argument I guess is what's the reason to have

14     a trial?  And we spent many months, Judge --

15          THE COURT:  Well, but acquitted conduct is something

16     that the courts are permitted to consider, and the question is

17     why shouldn't I, I guess?

18          MR. FLAHERTY:  Well, I would suggest you shouldn't,

19     Judge, because it's otherwise bad policy to consider it.  I

12:20 20   think that we want to encourage jury trials.  I think we want

21     to encourage parties to make principled challenges to evidence.

22     I think we want to encourage parties to not seek the benefit to

23     plead guilty and a reduction for an acceptance of

24     responsibility.

25          THE COURT:  That's a different issue.  Acceptance of

1    responsibility is a different issue under these circumstances.

2    And nobody's, at least in this session, getting dinged for

3    going to trial.  But once they go to trial, I have to make

4    reasoned judgments about various factors that bear on

5    sentencing.  Among them, other activity.  Maybe even uncharged

6    activity as well.  And I'm not sure why I wouldn't do that,

7    under these circumstances, assuming that there has been shown

8    by a fair preponderance that the transactions took place.

9        MR. FLAHERTY:  I suppose, Judge, I would ask the Court

12:21 10    to respect the jury's verdict of acquittal.  And I understand

11    that the Court is not obligated to consider the acquitted

12    conduct, but I think in this case I would ask the Court not to

13    include it for the purposes of loss in the six-level

14    enhancement that dramatically changes the guidelines

15    calculation with respect to Mr. Cromwell because the jury

16    rejected that proposition that these were bribes.

17        And I'd simply say, Judge, that it just strikes me

18    that if a party puts himself at the bar at prejudice and

19    suffers all the prejudice of going to trial and then is

12:22 20    acquitted after a very what I would say a well-tried case by

21    the government, by the parties and by the Court, and if the

22    jury does acquit, the benefit of the acquittal should inure to

23    the defendant, most respectfully, Your Honor.

24        And I recognize the fact that there is that sort of

25    element of these transactions occurred, they were charged, but

1    the criminality of them was rejected by the jury.  And for

2    those reasons, I would ask the Court not to sentence

3    Mr. Cromwell with respect to that loss and limit the loss to

4    only those dollars and the value of the gifts or the items that

5    he received for which he was convicted by this jury.

6          THE COURT:  All right.

7          MS. WICHERS:  May I be heard, Your Honor?

8          THE COURT:  Yes.

9          MS. WICHERS:  The jury convicted Mr. Cromwell on the

12:23  10    extortion counts, including conspiracy to commit extortion.  So

11    we agree that the Court should respect the jury's verdict, but

12    that would include all of the $50,000 and the Bowflex and the

13    hotel stay.

14          THE COURT:  I'm not sure I understand that.

15          MS. WICHERS:  I believe that Mr. Flaherty was arguing

16    that his client was not convicted of conspiracy to commit 666

17    bribery and therefore Your Honor should not consider all of the

18    acts that fell within the conspiracy, including the $40,000

19    that preceded the fifth check.  He was convicted of conspiracy

12:23  20    to commit extortion, and that would include all of the $50,000.

21          THE COURT:  I'm not sure why I shouldn't -- why my

22    decision to grant judgment of acquittal with respect to the

23    Hobbs Act doesn't extend to 1951.

24          MS. WICHERS:  That is a legal decision, a decision as

25    a matter of law.  It doesn't distort or reverse the facts as

```
 1   found by the jury.
 2          THE COURT:  Right.  The question is, I guess I had
 3   been assuming that that's what I was doing.
 4          MS. WICHERS:  But the jury, Your Honor, did not reject
 5   the criminality that Mr. Cromwell even --
 6          THE COURT:  My point is, given the determinations I've
 7   made about the sovereignty concerns, don't they extend to 1951?
 8          MS. WICHERS:  Your Honor has held that they do.
 9          THE COURT:  Right.  And it's not a foolish consistency
10   to try to be consistent.
11          MS. WICHERS:  Well, our point is that the jury found
12   that Mr. Cromwell extorted 50,000 plus the Bowflex and the
13   hotel stay from RGB.
14          Now, Your Honor has held, okay, that's true, but he
15   cannot be held liable under the statute because he's a tribal
16   official.
17          THE COURT:  Right.  I mean, this will give you some
18   more things to talk about with your appellate advisors, right?
19   But it's consistent with the decision that I've made to have
20   that extend to the conspiracy to extort.
21          MS. WICHERS:  We disagree, but I take your point, Your
22   Honor.
23          THE COURT:  You keep saying you disagree.
24          MS. WICHERS:  Yes.
25          THE COURT:  You've got to be clear about it.  I really
```

12:25 at line 10
12:26 at line 20

           1   am trying to be sure that I give every party their due, and so

           2   I ask the questions over and over again to make sure that I

           3   haven't missed something here.  But you don't like the

           4   determination that I've made with respect to Hobbs Act

           5   extortion.  Okay, I understand that.  But I've made it.

           6        Now, there was a conviction for an extortion count

           7   here, and that's the conspiracy to extort, and I don't know why

           8   that isn't swept up in what you believe to be the erroneous

           9   determination that I've made about the Hobbs Act.

12:27 10        MS. WICHERS:  Because we believe, the government

          11   believes that in the context of sentencing, we have to go with

          12   the jury's verdict.  As a matter of law, Your Honor has said --

          13        THE COURT:  Okay, but I have to do that for purposes

          14   of the guidelines, don't I?

          15        MS. WICHERS:  I've made my point.  Thank you.

          16        THE COURT:  Not entirely.  You obscured it.  So I

          17   guess, Ms. Victoria, under the circumstances in which I've

          18   dismissed the Hobbs Act matters or judgment of acquittal, is

          19   there any reason why conspiracy to commit extortion would be

12:27 20   included in the guidelines?

          21        U.S. PROBATION:  No, it wouldn't be included.  That's

          22   not the reason that I included the additional payments.  I

          23   think that just under general relevant conduct principles you

          24   could include them, but I think your analysis is correct.  You

          25   shouldn't be considering if you've acquitted on those counts.

1   You can, in your discretion, consider it for the guidelines,

2   but to be consistent, you may not want to.

3          THE COURT:  Right.  I think I'm not going to do it for

4   the guidelines.  So that then takes me back to what I consider

5   to be the proper calculation of the guidelines.  It may be that

6   I look at acquitted conduct in various ways, as Ms. Victoria

7   indicated, but that's the next step in this.  So if we're

8   dealing with that, we've got under $25,000 I guess, right, as

9   the loss?

12:28 10        U.S. PROBATION:  You're saying excluding the other

11   four $10,000 payments?

12          THE COURT:  Right.

13          U.S. PROBATION:  Yes, it would be 13,000 or so of

14   loss.

15          THE COURT:  Right.  So what's the relevant guideline

16   for that?

17          U.S. PROBATION:  That would be a two-level loss

18   enhancement instead of six.

19          THE COURT:  Okay.  So that then takes us to --

12:29 20        MS. WICHERS:  Your Honor, the government had one more

21   objection.

22          THE COURT:  Okay.  I'll hear that, but I want to do

23   these serially rather than all merged together.

24          U.S. PROBATION:  Your Honor, just to explain, under

25   2B1.1, subsection (b)(1)(B), because the loss would be more

         1    than 6,500 but not more than 15,000, it would be a two-level

         2    increase for loss.

         3            THE COURT:  Or alternatively stated reduce the total

         4    offense level to 24?

         5            U.S. PROBATION:  No, Your Honor.  So far we have that

         6    the base offense level would be 12 because you've determined

         7    that the defendant is not a public official.  So it would be a

         8    base offense level of 12, plus two for more than one bribe,

         9    plus two for the loss.  So now we're at a 16.

12:30   10            THE COURT:  Right.

        11            U.S. PROBATION:  We've taken out the four-level for

        12    elected public official as well.

        13            THE COURT:  So, okay.  I think that deals with your

        14    objections, Mr. Flaherty.  I do want to hear from the

        15    government obviously.

        16            MR. FLAHERTY:  Yes, sir.

        17            THE COURT:  Okay.  So, Ms. Wichers.

        18            MS. WICHERS:  Yes, Your Honor.  The government is

        19    asking for and believes that it's appropriate for a two-point

12:31   20    enhancement under 3B1.1(c) because Mr. Cromwell supervised

        21    Constantinos Mitrokostas in the criminal activity, specifically

        22    directing him to use his shell company CM International

        23    Consulting as a passthrough for Mr. DeQuattro's checks and to

        24    then use that passthrough to pay him, Mr. Cromwell, in

        25    anonymous treasurer's checks.

```
 1          THE COURT:  All right.  Let me look at this again.

 2    Remind me, did you designate Mr. Mitrokostas as an unindicted

 3    co-conspirator?

 4          MS. WICHERS:  We did not, Your Honor, because we did

 5    not believe that he knew about the ultimate purpose of why he

 6    was asked to basically launder the checks.

 7          THE COURT:  So why isn't that relevant here when we

 8    talk about 3B1.1 which defines a participant as someone who is

 9    criminally responsible for the commission of the offense but

12:33 10   need not have been convicted?

11          MS. WICHERS:  What was the portion you just read?  I'm

12    sorry, Your Honor.

13          THE COURT:  3B1.1 defines a participant as someone who

14    is -- I'm reading of course from the Probation Office's

15    response to the addendum -- as someone who is criminally

16    responsible.  You go to your assistant and say, "Mail this

17    letter."  Have you now brought yourself within that aggravating

18    offense as an organizer, leader?

19          MS. WICHERS:  No.  And we're actually arguing under

12:33 20   3B1.1(c) specifically not talking about a participant but that

21    Mr. Cromwell supervised Mr. Mitrokostas in the criminal

22    activity, and it wasn't just mailing a letter, but it was, "I

23    want you to use one of your shell companies, let's try" -- I

24    can't remember the name of it -- "the CM International

25    consulting.  Oh, that's dead.  We'll use the other one.  Oh,
```

 1    that's dead."  Then he goes back to CM International after

 2    reinstating it through the Secretary of State.  "Now take these

 3    checks," and the initial check was for $10,000 from

 4    Mr. DeQuattro, and Mr. Cromwell says, "I want you to take that

 5    to the bank on different dates.  Take it to the bank, deposit

 6    it, and then on different dates get anonymous treasurer's

 7    checks in smaller amounts, and don't make it out to my full

 8    name.  Make it out to C. Cromwell or C.D. Cromwell.  Do that."

 9    And we don't have any evidence that he told him why but he

12:34 10    supervised him in that way and in that way allowed the checks

11    to be laundered.

12         THE COURT:  But I still don't understand how you would

13    respond to my asking the assistant to make a change in the file

14    with the Secretary of State or something like that.  That is,

15    the assumption is because the government took the position that

16    Mr. Mitrokostas was not a co-conspirator, that he was not

17    criminally responsible here.  And so it kind of captures, you

18    pick it up by C.  And why isn't C applicable to the

19    hypothetical that I've raised, someone who is unaware?  If

12:35 20    they're aware, that's a different issue.  Then we're talking

21    about are they criminally culpable, and of course they're not.

22    Mr. Mitrokostas is not.

23         MS. WICHERS:  Understood, but we're reading any

24    criminal activity as criminal activity of Mr. Cromwell, not

25    Mr. Mitrokostas.  We're not arguing that Mr. Mitrokostas --

1          THE COURT:  So I'm back to my hypothetical.  Why

2     doesn't that apply?  You're saying Mr. Mitrokostas doesn't have

3     to be criminal.  He's just being supervised, right?  Okay.  So

4     let's take the assistant who is told first to mail the letter,

5     then told to go to the Secretary of State's office and change

6     or submit 50 bucks or whatever it is that you submit, and

7     consequently, he goes in and does that.  Are they captured by

8     C?

9          MS. WICHERS:  I think it's obviously a balancing test

12:36 10   how much of the -- sorry.

11          THE COURT:  But what's the balance?  What's the

12     tipping balance?  Culpability, isn't it?  That is, you've

13     referred to Mr. Mitrokostas as being aware of what's going on

14     under these circumstances.  If he was aware of what's going on,

15     you think he would be a co-conspirator.

16          MS. WICHERS:  We have not said that he was aware of

17     what was going on in terms of the ultimate goal of RGB bribing

18     Mr. Cromwell.  But this wasn't just a "Go mail the letter."

19     This was a specific scheme that Mr. Cromwell supervised in

12:37 20   terms of getting Mr. Mitrokostas to do some of the --

21          THE COURT:  Let's assume, as I tried to, that all of

22     the activities that the assistant performs are the same ones

23     that Mr. Mitrokostas performed.  Are you saying that the

24     assistant would be sufficient to cause the application of C?

25          MS. WICHERS:  Yes.  If the assistant had a shell copy

```
 1   and Mr. Cromwell asked the assistant, "I want you to reinstate

 2   your shell company and take those checks that you're going to

 3   get from Mr. DeQuattro and then funnel them through your shell

 4   company and get me anonymous treasurer's checks," and that

 5   person happened to be his assistant, then yes.

 6            THE COURT:  Okay.  Ms. Victoria, any thoughts about

 7   that?  It's a refinement that's been developed here.

 8            U.S. PROBATION:  Your Honor, yes.  The way that we've

 9   always viewed the leadership enhancement under 3B1.1, whether

10   you're under A, B or C, there has to be at least one other

11   criminal participant that you're supervising.  So as

12   "participant" is defined, it's somebody who is criminally

13   responsible for the commission of the offense.

14            THE COURT:  But isn't that importing into C something

15   that only appears in A and B?

16            U.S. PROBATION:  Well, A and B have a minimum of five

17   or more.

18            THE COURT:  Right, but they talk about participants.

19   This one does not.  I understand the numbers that are involved.

20            U.S. PROBATION:  I do see what you're saying.  C

21   doesn't specifically list the word "criminal participant."  But

22   implicitly a criminal activity would have more than one

23   participant.  And if he were an organizer, leader, manager or

24   supervisor, I suppose it could be over a criminal activity with

25   no other participants, but we've always interpreted it as there
```

1   needs to be somebody that you're instructing that could be

2   criminally liable for the offense.

3        Your Honor, actually, application note 2, "To qualify

4   for an adjustment under this section, the defendant must have

5   been an organizer, leader, manager or supervisor of one or more

6   other participants."  So then that refers you back to the

7   definition in application note 1 of who criminal participants

8   are.

9        THE COURT:  Right.

12:40  10   U.S. PROBATION:  So you had to have authority over one

11   other criminal participant.  And in this case it wasn't clear

12   to Probation.  Your Honor presided over the trial, so you may

13   have a different view.  It wasn't clear from the offense

14   conduct information that Mitrokostas could be considered a

15   criminal participant.

16        THE COURT:  So that's why I asked the question to be

17   reminded about the government's position, which is, it should

18   be applied consistently, I think, of whether or not there's a

19   co-conspirator, and he was not designated as co-conspirator.

12:41  20  There may be strategic judgments involved in that, but the

21   government finds itself facing that choice that was made here.

22        It has always been my view that there had to be

23   culpability, criminal culpability for anything in the

24   aggravating role setting.  No one else has been suggested here

25   other than Mr. Mitrokostas, and the only criminal culpability

1    that he might have had here is as a co-conspirator.  So I

2    decline to add that.  And the government's objection is

3    anticipated and noted here.

4        So back to the calculation.  We come to a 16.  And

5    Ms. Victoria, what would that be?

6        U.S. PROBATION:  It would be a total offense level of

7    16, and with a Criminal History Category of I, the advisory

8    guideline range would be 21 to 27 months, which is in Zone D of

9    the sentencing table, one to three years of supervised release.

12:42 10    Probation, he would be eligible for one to five years of

11    probation under the statute, ineligible as a guideline

12    sentence.  The fine range becomes 10,000 to 95,000.

13        THE COURT:  Okay.  All right.  So those are the

14    guideline ranges.  I've made it clear in the past that I do not

15    consider myself a slave of the guidelines.  But I have an

16    obligation to try to get them right to orient myself in this

17    area.  This is the best calculation I think I can make with

18    respect to the guidelines.

19        So I'm prepared to hear anything orally that has to be

12:43 20    said by any of the persons who are prepared to stand up as

21    victims in this case.  I understand them to be Mr. Weeden on

22    behalf of the tribe as the current chair of the tribe and Gayle

23    Andrews Peters.  I recognize that they've also made

24    recommendations.  I'll hear their recommendations, that's

25    ancillary to the question of what loss if anything they have

|     |     |
| --- | --- |
| 1   | experienced or the tribe has experienced.  I've got this |
| 2   | generalized statement by Mr. Weeden of costs and so on.  They |
| 3   | haven't been liquidated.  I don't know what they're asking for, |
| 4   | whether the Bowflex should be returned or what.  So before we |
| 5   | go any further, I'm interested in whether either of them wants |
| 6   | to speak. |
| 7   | MS. WICHERS:  Yes, Your Honor.  Just to make sure |
| 8   | there's no confusion, there was one letter put on the public |
| 9   | docket by Mr. Weeden on behalf of the tribe and I believe three |
| 12:44 10 | letters by tribal members submitted by Mr. Kelly to us and then |
| 11  | through Ms. Victoria, but they were very late to Ms. Beatty at |
| 12  | the same time.  Those three individuals do not wish to be |
| 13  | heard. |
| 14  | THE COURT:  Okay.  Well, as I said with respect to two |
| 15  | of the individuals who did not, merely not wish to be heard but |
| 16  | didn't wish to be seen to have attempted to influence any |
| 17  | decision, I'm striking those two from the record here.  They |
| 18  | can't do that.  And so I'm not even considering them.  And I |
| 19  | understand that Ms. Peters, if I have it right, just simply |
| 12:45 20 | doesn't want to speak here; is that right?  She's the only one |
| 21  | left, with the exception of Mr. Weeden.  We'll get to that in a |
| 22  | moment. |
| 23  | MS. WICHERS:  Yes.  I'm just confused as to why you're |
| 24  | striking two of the letters and not all three. |
| 25  | THE COURT:  Because one of the people in the letters |

1  said that, she didn't provide a limitation on the submission of

2  it.  She did it publicly.  The other one said they didn't want

3  anybody to know that they had submitted something to the judge

4  that was supposed to influence the judge in his determinations.

5  Is that distinction not clear?

6      MS. WICHERS:  It is, Your Honor, but maybe I

7  miscommunicated.  Mr. Kelly communicated to me that none of

8  those three wanted to be heard publicly.

9      THE COURT:  Do you mean to tell me that I made

12:46 10  reference to Ms. Peters publicly and I shouldn't have?

11      MS. WICHERS:  No.  We are not treating them like

12  victims of, for example, a CP crime.  Their names are fine.

13  They just didn't want to put their letters on the docket.

14      Your Honor may disagree with that decision.  I'm just

15  telling you what Mr. Kelly communicated to us.  The person who

16  does want to speak here, Mr. Weeden, is unavailable, but the

17  vice chair of the tribe, Mr. Carlton Hendricks, is here as are

18  several other members of the tribe, and he would like to speak

19  on behalf of the tribe.

12:47 20      THE COURT:  Is there quality control in the submission

21  of victim statements through the United States Attorney's

22  Office?  I read carefully what is submitted, and I get this

23  email late in the day that suggests that -- not suggests, says

24  to me or any fair reading of it is that they don't want their

25  name to be known at all.  I mean, it's not a useful way to

```
 1    proceed.
 2         So are you telling me that -- well, I'm not exactly
 3    sure what you're telling me.  Are the two letters that I was
 4    prepared to strike available to be placed not under seal on the
 5    record in this case?
 6         MS. WICHERS:  None of the three are prepared for that,
 7    Your Honor.
 8         THE COURT:  And why was it that I was not told that
 9    with respect to the third one submitted this morning?
10    MS. WICHERS:  The way that our office, the victim
11    assistance specialists handled this, as I was told, is if the
12    victim wants their letter to be public, we file it on the
13    docket, which we did only with Mr. Weeden's letter, and
14    otherwise we submit them through probation and then to Ms.
15    Beatty.
16         I apologize that letter was submitted early this
17    morning.  I apologize if the communication that that writer did
18    not want her statement to be filed on the docket was not made
19    clear.
20         Your Honor asks about quality control.  I'm not quite
21    sure how to answer that, except to say we don't, it is our
22    position as representatives of the public that we don't strike
23    letters.  We don't say, "You're not in time, you can't be" --
24         THE COURT:  Something that clearly identifies for
25    Probation, for me, for Ms. Beatty what it is that is being
```

1    offered, and I don't want to willy-nilly put somebody's name on

2    the record if they don't want their name on the record.  By the

3    same token, I don't consider them, I won't.

4         MS. WICHERS:  Understood.

5         THE COURT:  And filing it under seal doesn't do

6    anything, except suggest that I've looked at it or peeked under

7    the sheets to see what they're saying.  I don't.

8         And so unless there's some mechanism within the U.S.

9    Attorney's Office that makes clear we are submitting this under

12:49 10   seal and the Court can take whatever action it wants, it's very

11   hard for us to do that and particularly to do it when it comes

12   in at the last minute.  But the short of it is, as you've

13   explained it, I'm not considering any of those three letters.

14        MS. WICHERS:  Yes, Your Honor.

15        THE COURT:  And they will be stricken from the docket.

16   In the case of one of them, it's already on the docket.  The

17   other ones I was holding off.

18        MS. WICHERS:  The one that's on the docket is the

19   letter written on behalf of the tribe?

12:50 20        THE COURT:  No.  There are more than one.

21        MS. WICHERS:  No.

22        THE COURT:  Hold on just a second.  Ms. Beatty was

23   anticipatory enough to realize that this created a tremendous

24   problem.  She has not put it on the record.  So it's not

25   stricken.  It's simply not something I'm going to consider.

          1           MS. WICHERS:  Mr. Weeden's letter?  Okay, Your Honor.

          2    Mr. Weeden's letter is the only one you will consider?

          3           THE COURT:  Yes, that's right, that's right.

          4           MS. WICHERS:  Thank you.  So Mr. Carlton Hendricks,

          5    the vice chair of the tribe is here and would like to speak on

          6    behalf of the tribe if Your Honor permits.

          7           THE COURT:  Well, is Mr. Kelly here?  And I would add

          8    one other thing.  I did receive from Mr. Hendricks a motion

          9    during the course of the proceedings to see the grand jury

12:51  10    material.  He then withdrew that motion in this case, but he is

         11    listed as an interested person in the case as well.  So

         12    Mr. Hendricks, I'll hear from you.

         13           MS. WICHERS:  Where would you like him to stand?

         14           THE COURT:  Wherever he's comfortable.  It's probably

         15    best, Mr. Hendricks, to use the microphone over there.  Stand

         16    behind that podium there.

         17           MR. HENDRICKS:  Good afternoon, Your Honor.  I

         18    appreciate the time to hear from me.  I'd also like to submit,

         19    Councilman Aaron Tobey is present.  He submitted a letter also

12:52  20    that didn't get into the record.

         21           THE COURT:  Why was that?  Who did he submit it to?

         22           MR. HENDRICKS:  Attorney Paul Kelly.

         23           THE COURT:  So it wasn't submitted through Mr. Kelly

         24    at least as far as we know.

         25           MS. WICHERS:  It was, it was one of the three letters.

1    Just to be clear, I think Your Honor knows we did copy the

2    defense on all of these letters.

3         THE COURT:  I'm sorry?

4         MS. WICHERS:  We did copy the defense when we

5    submitted these letters when we received them from Paul Kelly,

6    just to be clear.

7         THE COURT:  Yes.  The problem is that this is an open

8    proceeding, and the idea is that the public gets to see these

9    things, and now I'm told that this is a letter that you want

12:53 10    the public to see.  Is that right?  Mr. Tobey wants the public

11    to see it, is that it?

12         MR. HENDRICKS:  Correct.

13         MS. WICHERS:  You want this on his public docket?

14    Aaron Tobey is here.  He wrote one of those three letters.

15    Maybe there was a miscommunication between Mr. Kelly and me,

16    but he would like that document on the public docket.  I

17    apologize for the confusion.

18         THE COURT:  So if somebody submits it, I look at it

19    and I put it on the public record.  I may not accept it, but I

12:53 20    accept the propositions included in it, but that will be in

21    addition to Mr. Weeden's letter, which will be transmitted

22    orally by Mr. Hendricks.  I'll include Mr. Tobey's letter.

23         MR. HENDRICKS:  Is the letter on behalf of the Tribal

24    Council not being accepted either?

25         THE COURT:  No.  It is, it is.  I understand you to be

```
 1    speaking on behalf of Mr. Weeden for that; is that right?

 2          MR. HENDRICKS:  I'm speaking on behalf of myself.  I

 3    didn't write a letter.  I okayed the letter that was submitted

 4    on behalf of Mr. Weeden, correct.  I'm not here to read that

 5    letter, but I'm just here to make sure it's in the record.

 6          THE COURT:  It is in the record.  But I'll raise, as I

 7    did earlier, a couple of questions.  It makes references to

 8    losses that are experienced by the tribe, but there's no

 9    calculation of the losses at all.  Losses in terms of cost and
```
12:54 10    that sort of thing, losses in terms of presumably the value of
```
11    the bribes as I've identified them.

12          MS. WICHERS:  May I be heard on that, Your Honor?

13          THE COURT:  Yes.

14          MS. WICHERS:  We learned last week meeting with the

15    tribe that they incurred close to $200,000 complying with grand

16    jury subpoenas, collecting all the records, reviewing the

17    records, attorneys' fees, and so we learned about it late, so

18    we didn't put it --

19          THE COURT:  Last week?
```
12:55 20          MS. WICHERS:  Yes, Your Honor.
```
21          THE COURT:  Late is, at least as the government seems

22    to understand it, the morning of the day of the hearing.  You

23    received liquidated damages that they said --

24          MS. WICHERS:  No, no.  We were simply told that it was

25    approximately this amount.  They'd have to go back and
```

1  calculate it.  We're not asking for that today.  What we're

2  asking for --

3          THE COURT:  When might you sometime ask for it?

4          MS. WICHERS:  Today we are asking that Your Honor in

5  the future allow the parties to brief the issue of restitution

6  of those expenses, whether the tribe is eligible for

7  reimbursement of those expenses, specifically under 18, U.S.C.,

8  3663(a)(B)(4) which provides --

9          THE COURT:  Why was I not notified that this was what

12:56 10  you were going to ask for, I mean, that this was not going to

11  be completed today?

12          MS. WICHERS:  We understand, Your Honor, and I

13  apologize for that, but the government is allowed to ask for

14  this.

15          THE COURT:  It is, but it's got to ask.

16          MS. WICHERS:  We're asking for it now.

17          THE COURT:  And the point is that you gave no notice

18  ahead of time.  We scheduled this hearing.  I tried to move

19  forward.  I pressed the parties to respond to various

12:56 20  late-rising contentions.  And now you say, "But, wait, there

21  will be more."

22          MS. WICHERS:  Well, under 3664 section (d)(5), "The

23  government shall inform the Court if the victims" -- I

24  apologize.

25          We are asking for Your Honor -- and obviously it's

          1    late, is for Your Honor to schedule an evidentiary hearing

          2    later on to determine whether the tribe is eligible and, if so,

          3    for how much in restitution.

          4          THE COURT:  What's the position of the government as

          5    to whether they're eligible?

          6          MS. WICHERS:  We think that they are eligible, and

          7    we're not asking for other costs.

          8          THE COURT:  If you say they're eligible, that's not

          9    yours to ask for.  That's yours to convey.

    12:57 10          MS. WICHERS:  No, I understand, but that is our

         11    position.  And we are only asking -- obviously Your Honor can

         12    reject it, but we're asking we be heard in consultation with

         13    them after receiving their records to identify what we believe

         14    is the loss they incurred in complying with the subpoenas.

         15          THE COURT:  I want to wrap this all up together here.

         16    The defendants may say they want to go forward at this point

         17    but I do not.  I do not want to take extra time like this.  Now

         18    it's clear that there's going to have to be a second hearing

         19    for which the government was aware before today.  And late

    12:58 20    disclosure was now.  It's just wrong.

         21          So I'll hear any objections that the defendants have

         22    about extending the period of time, but I want to set a time to

         23    deal with this because apparently it's going to be raised.

         24          MR. WEINBERG:  Respectfully, Your Honor, I don't

         25    think, even if the tribe was a victim, and I know Mr. Flaherty

1    will dispute that, and requests restitution, whether it's late

2    or not is a separate issue.  They're not requesting it from

3    Mr. DeQuattro.  He has no restitution obligations to the tribe,

4    and I would respectfully ask for him to be sentenced today.

5            THE COURT:  Okay.  Mr. Flaherty?

6            MR. FLAHERTY:  Your Honor, today is the day for

7    sentencing.  I'm not prepared to respond to a request for

8    restitution.  I didn't receive any notice of it.

9            THE COURT:  You just did.  You just did.  That's when

12:59 10    the government thinks it's a good time to give notice of their

11    concern about restitution.

12            MR. FLAHERTY:  But I do read the definitions under

13    3663, and I don't see under the facts and circumstances of the

14    convictions here that the tribe is a victim as related to the

15    convictions here.

16            THE COURT:  I have to order briefing and order a

17    hearing with respect to your client now.  Mr. Weinberg says he

18    wants to go forward.  I'm not sure I feel the same way, but in

19    any event, now there has to be another hearing.

12:59 20            MS. WICHERS:  Your Honor, we believe that the Court

21    has the ability to sentence both defendants.

22            THE COURT:  I do, I do.  But you know what?  Part of

23    this is to take all of this information together at the same

24    time to make a truly informed decision.  We go through all of

25    these steps to do that.  And, you know, I spent a fair amount

1   of time reading and rereading the record in this case to be

2   sure that I wasn't going beyond *Stewart* in my judgment about

3   it.  But the parties are entitled to have the judge make a

4   determination like this.  This is not, you know, are there some

5   questions of, did the -- was the uber expense for this, for

6   delivering of this kind of document.  This is fundamental to

7   all of it.

8        I am not going forward with the sentencing today on

9   this.  I'm going to reschedule it for the hearing on loss.  I

01:01 10   am going to hear from you, Mr. Hendricks, because I know you

11   are here and you want to be heard on your own on this, and I'll

12   permit you to speak on your own.  But too much time was spent

13   trying to get this properly in place.  We went through a

14   variety of different proposals on it, and then to have it

15   pretermitted in this fashion is just not the way I want to

16   proceed in imposing sentence.

17        I understand the issues, have understood the issues

18   that Mr. DeQuattro in particular has faced here, and that's why

19   I tried to expedite the case but not in a disorderly fashion.

01:02 20        So we'll figure a time to get this done.  I assume

21   that the government will be cooperative in telling us what they

22   want to have done in this case and that there are people who

23   wish to be heard with respect to the sentencing and can't be

24   heard some other time, and I'll hear them now.

25        MR. FLAHERTY:  Judge, for purposes of expedience, can

1    I join in the government's request to the Court that sentencing

2    proceed today and the issue of restitution be separated for an

3    additional hearing that's related I think just for

4    Mr. Cromwell.  I know the parties have been here and have

5    anticipated this and have undergone all of the anxiety in

6    anticipation of today's date.  And but for this late

7    development, I think they expected some finality, some closure

8    at least as to this step in the proceedings.  And for those

9    reasons, Judge, I think it's incumbent upon me to agree with

01:03 10    the government's suggestion that sentencing proceed as to this

11    aspect.  And then as to restitution, we can separate it out and

12    deal with it later with respect to Mr. Cromwell if the Court

13    would entertain that suggestion.

14        THE COURT:  I'll entertain it.  It's the parties'

15    choice ultimately on that.  I've got the government saying that

16    we're going to have another hearing in this case.  You don't

17    get a choice about being here for that hearing.  You're going

18    to have to be here for that hearing and respond to whatever it

19    is that the government submits.

01:03 20        Mr. Weinberg tells me that he views this, I think

21    views this as not relevant to Mr. DeQuattro's circumstances

22    here.  But you understand that Mr. DeQuattro will have a

23    conviction at the end of the day here on the basis of what I've

24    done so far.  And that, it seems to me, to be something that is

25    relevant for purposes of licensing and so on there, and

1  treatment of the sentence may have a mitigating effect; it may

2  not.

3      MR. WEINBERG:  I do, Your Honor.  And whether it

4  occurs today or whether it occurs in a month, there will be

5  consequences to the conviction that Your Honor upheld today,

6  and absent a successful appeal, he's going to lose his

7  architecture license.

8      THE COURT:  Right.  It's going to be suspended, as I

9  understand it, during the period of conviction.

01:04 10      MR. WEINBERG:  I'm not clear on whether or not the

11  conviction would be interpreted by the Rhode Island

12  Architectural Board as a judgment that would result in an

13  extinction of the license or not.

14      My guess is, Mr. DeQuattro's guess is that the license

15  is in peril as of Your Honor's decision to uphold the jury

16  verdict and as of the sentence.  And again, the reason he would

17  want to go forward is just to be able to have the finality to

18  tell his people and --

19      THE COURT:  I hear what you have to say, and I'm

01:05 20  prepared to go forward then.  But Mr. Hendricks, you've been

21  interrupted.  I'll hear from you on what you want to say.

22      MR. HENDRICKS:  Your Honor, would you allow Mr. Aaron

23  Tobey to read his own letter?

24      THE COURT:  I've read it now.  I read it earlier.  I

25  wasn't going to consider it.  Now I'm considering it.

1    MR. HENDRICKS:  So you read it into the record.

2    Again, good afternoon, Your Honor.  My name is Carlton

3    Hendricks, Jr.  I am the vice chairman of the Mashpee Wampanoag

4    Tribe.  I was elected to vice chairman in 2001, May 16.  I've

5    sat on Tribal Council since 2010, a year after Mr. Cromwell was

6    elected as chairperson.

7    I'm not here to really discuss the legal arguments

8    that are going on, but I will say that it's pretty

9    disheartening to know where we are as a tribe, that we should

01:06 10    have 3,000 people, roughly about 700 tribal members in a

11    50-mile radius of Mashpee, Mashpee being our home, that we're

12    here on only talking about $23,000, $30,000.  When Mr. Cromwell

13    was elected in 2010, the tribe's current debt with interest was

14    $25 million.  When I was elected in May 16, 2021, the tribe's

15    debt was $867 million.

16    Our tribe consists and runs off grant funding.  80

17    percent grant funding is how we operate and how we service our

18    people.  And I'd like to acknowledge the elders that did come

19    up today to see this.  This is our second chairperson that's

01:07 20    been convicted of corruption, extortion, bribery, second in a

21    row.  When do we actually say enough is enough to our people

22    that we're truly hurting and crushing?

23    He created this Gaming Authority in 2012.  2012, this

24    Gaming Authority was used as a personal piggybank, the way it

25    was run with five council members or five tribal members that

1    they were paid to vote on all these contracts that came

2    through, every single one of them.  What does the tribe have

3    for the intangibles from RGB or any of these contracts?  I

4    haven't seen any of the intangibles as of yet of over $350

5    million, never mind the 23,000 that we're kind of discussing

6    right now.

7          When you talk about the damage, the damage of the

8    division of our tribal people, quite honestly, he was paid

9    $189,000 a year as chairman of the tribe.  Never once, never

01:08 10    once in 12 years of being there did we ever have any economic

11    development plan to be self-sufficient on our own.  It was all

12    in the casino, all in the contracts.  But he did find enough

13    time to create five businesses for himself, never once thinking

14    about how can the tribe benefit and the tribal members benefit.

15    It was always about self, self, self.  And it's just, to know

16    that we've come to this and we're in the bracket of 12, 23

17    months.  The last chairman received three years for pretty much

18    the same thing.  And I just think we have to send some type of

19    deterrent for public officials, tribal officials, that this

01:09 20    just can't happen.  Our opiate overdoses, no filing audits, no

21    budget presented to the tribe.  Constitution, we should have a

22    budget every single year.  We didn't have a budget for four

23    years while he was the chairman of the tribe.  And there's

24    really no difference between chairman of the tribe or Gaming

25    Authority.  It's one in the same because the tribe is still

1    sitting with the same debt that the Gaming Authority is sitting

2    with.  So how do we as a tribe get out of $867 million and say

3    that is the Gaming Authority, well, that is the Gaming

4    Authority.  But now the tribe can't file for grants because all

5    of our audits, no budget was passed, no audits can be done.

6    How do we support our tribal members?  How do we dig out of

7    this hole?

8          When we talk about the 200,000 that we may come to a

9    hearing, we had to hire consultants, lawyers to get and gather

01:10 10   this evidence to give to the government to make this

11   conviction.  Where does that money come from, from a tribe that

12   operates off of grants?  How do we -- I mean, we just last

13   month alone we buried over six tribal members that requested

14   funding.

15         So the damage that has been done, never mind the

16   second chairman in a row, to our credibility and our

17   respectability amongst tribal nations and amongst ourselves

18   just in our own community, the things that we have to rebuild

19   and build a reputation of being respectful good human beings in

01:10 20   our own community, never mind outside of our community, is

21   immeasurable.  I really can't measure it.

22         And when the U.S. Attorney came down last week, first

23   time they've ever come down to our building without a subpoena

24   quite honestly.  But it was nice to actually have them hear our

25   side of the version.  And when does it end?  It's every single

```
 1   day that these acts are causing us a reflex to do something
 2   else to get us out of this hole.
 3           So again, the tribe, myself, we're asking for the most
 4   severe penalty that you can possibly give under the guidelines
 5   with your discretion.  I've been -- and I do want to
 6   acknowledge Laura Miranda.  She was a council member with me,
 7   sat on the council with me since on 2010.  We have voted no
 8   consistently against the Gaming Authority, against every single
 9   contract that came through.  You see in my minutes that I voted
10   no consistently, along with Laura.  For them ten years of going
11   on, we was traitors, we was against the casino.  So when I say
12   it caused a division amongst families and tribal members, some
13   of them damages that have been caused, they can't reconnect.
14   They can't reconnect.
15           And again, living in the heart of Mashpee, living in
16   the heart of the tribe is a little bit different when you leave
17   your people and you live amongst your people than in Attleboro.
18   It's just a different -- it's a different connect when you live
19   amongst your people that you're leading.
20           So again, we're looking for the most possible
21   sentence, extreme sentence that you can give for these crimes.
22   And that's all I have to say for right now.  Thank you and I
23   appreciate the time.
24           THE COURT:  Thank you, Mr. Hendricks.  I think a
25   couple --
```

```
 1          MS. WICHERS:  Will you permit Mr. Tobey, Aaron Tobey

 2     to be heard from?  He wrote one of the letters.

 3          THE COURT:  He did, but I understand he was simply

 4     going to read the letter again.  Is that it or not?  I've read

 5     the letter, Mr. Tobey.  The discussion I was having with

 6     counsel was over the question of whether or not it would be

 7     part of the record under circumstances in which there was

 8     apparently some miscommunication about whether or not you

 9     wanted it on the record or didn't want it on the record.

01:13 10          I now understand you want it on the record.  It will

11     be on the record, and I've read it, and I will include it in my

12     consideration.  I don't know if there's anything further that

13     you want to say at this point?

14          MR. TOBEY:  If I may, Your Honor?

15          THE COURT:  Sure.

16          MR. TOBEY:  Do you mind if I refer to my letter?

17          THE COURT:  You can refer to it, but I'd rather that

18     you not read it.  If there's something more that you want to

19     say, I'd be glad to hear it.  It's just that the parties are

01:14 20     interested in getting to this promptly, as you heard, and I

21     want to honor that.  But I also want to be sure that I've heard

22     everything that you want to say.

23          MR. TOBEY:  I just wanted to re-emphasize that, I

24     believe the first sentence of that letter was that I wanted my

25     statement to be on the record.
```

```
 1          My name is Aaron Tobey, Jr.  I served with Cedric from
 2   2009 until 2012.  He was elected the chairman, and I was
 3   elected the vice chairman.  Somewhere along those lines in his
 4   second term, he was able to -- somewhere along those lines he
 5   got involved -- if you don't mind, if I could just --
 6          THE COURT:  Sure.
 7          MR. TOBEY:  Thank you.
 8          The reason why this is important to me, and it's not
 9   just for you to listen, but we also have tribal members here as
10   well as the elders.
11          In 2009, the tribal citizens elected Cedric Cromwell
12   as chairman.  If I could.  I'm currently an elected Tribal
13   Councilman and the tribal elders chairman.  I am one of
14   approximately 2,000 enrolled Mashpee Wampanoag tribal citizens.
15   All enrolled Mashpee Wampanoag citizens are related by blood.
16   We're one family.
17          In 2009, the tribal citizens elected Cedric Cromwell
18   as chairman and elected me as the vice chairman.  We served
19   four years together.  Our mission was to maintain and foster
20   our tribal culture, to protect our homeland, to conserve and
21   develop its natural resources, to promote the socioeconomic and
22   spiritual well-being of our tribal family and advance the
23   common good of our tribe for future seven generations.
24          By Cromwell's second term in office, he had political
25   power, access to money, and he was intoxicated by fame.  He was
```

1    loved and trusted by many tribal citizens who believed he would

2    advance the common good of our tribe.  Although the tribe had

3    only two sources of income, grants and investor loans, the

4    tribe paid Cromwell more than $1 million during his tenure as

5    chairman and president of the Mashpee Wampanoag tribe and

6    Gaming Authority.  Yet he betrayed us by using his elected

7    position to line his own pocket.  His reckless greed and no

8    conscience -- his reckless greed had no conscience, nor shame.

9         As a community, we need to heal from his abuse and

01:16  10   misdeeds and take appropriate action to deter any public

11   servant from using his or her political office for personal

12   gain.  I'm praying that the Court takes into consideration our

13   pain of betrayal and help us deter such crimes from happening

14   to us again by having Cromwell serve the maximum sentence

15   available under the law.  Thank you.

16        THE COURT:  Thank you, Mr. Tobey.

17        MR. TOBEY:  Appreciate it.

18        THE COURT:  So I don't know if any counsel need a

19   break.  We're ready to go forward, so we will.  So I'll hear

01:17  20   the government's recommendations.

21        MS. WICHERS:  In a moment, Your Honor.  I'm sorry.

22        Your Honor, this is a statement in regard to both

23   defendants.

24        THE COURT:  All right.

25        MS. WICHERS:  The Mashpee Wampanoag are a proud

people.  They have a unique culture and language going back

12,000 years.  They have always treated their most vulnerable

members with particular respect.  And they are a sovereign

nation with their own government.  Their government is led by

their Tribal Council, whose members are elected by the tribe.

The leader of the Tribal Council is the chair.  The primary

responsibility of the chair is to protect the welfare of the

members of the tribe, to look out for their best interests, not

his own.

01:18    The tribe elected Cedric Cromwell to be their

chairman, their leader, their protector.  They respected him.

They trusted him to use his office to put their interests first

and foremost, and they paid him a generous salary.  When the

tribe voted to build a casino, it was the biggest decision in

their history because the tribe's primary source of income for

generations, as you've heard, had been federal grants.  They

had very limited other sources of income because this country

has taken away their land and their source of sustenance and

decimated their population and forced them to give up their way

01:19    of life.

The tribe voted to build a casino in order to become

economically self-sufficient, to no longer rely on federal

grants.  And not to build just any casino but a fabulous

billion-dollar casino and resort.  The investment firm they

hired loaned hundreds of millions of dollars to the tribe to

1  hire vendors and to design and build the casino.

2      Cedric Cromwell saw that money coming in, and he

3  wanted some of it.  As the chairman of the tribe and the

4  president of the Gaming Authority, he knew that he had the

5  power to use his office to pressure vendors for some of that

6  money, and that's exactly what he did.  He monetized his

7  position.

8      One of those vendors was Robinson Green Beretta, and

9  RGB's manager for the casino project, as Your Honor knows, was

01:20 10  Mr. Cromwell's co-defendant David DeQuattro.  Mr. Cromwell

11  asked Mr. DeQuattro for $10,000 to put in his own pocket.

12  Mr. DeQuattro gave him that money, so Mr. Cromwell asked for

13  another $10,000, and again Mr. DeQuattro complied, again and

14  again and again.  And then Mr. Cromwell asked for a piece of

15  exercise equipment, and Mr. DeQuattro gave it to him.  And

16  finally Mr. Cromwell asked for a fancy hotel stay for his

17  birthday weekend, and Mr. DeQuattro gave it to him.

18      Mr. Cromwell asked for those bribes, and Mr. DeQuattro

19  and his co-conspirator, Joseph Beretta, paid those bribes in

01:20 20  order to protect RGB's contract from termination by

21  Mr. Cromwell and the tremendous power and influence that he

22  had.  It was a quid pro quo.  It was a two-way street.  One

23  person accepts the bribe and another pays him.  This was a

24  pay-to-play arrangement.  They were and they are equally

25  culpable.

1         Mr. Cromwell concealed his bribery by asking his
2    friend Constantinos Mitrokostas to funnel Mr. DeQuattro's
3    checks through a shell company and by converting those checks
4    into anonymous treasurer's checks.  Mr. Cromwell was not only
5    greedy, he was cunning and deceptive.  Mr. Cromwell took all of
6    that bribe money and spent it on personal expenses, all of it.
7    The Bowflex was also for him and the hotel stay was also for
8    him.  None of this money went to the tribe.

9         Mr. Cromwell betrayed the tribe.  He abused their
01:21 10   trust.  This was public corruption, pure and simple.  He even
11   betrayed the trust of other tribes by falsely representing that
12   his LLC, One Nation Development, to which Mr. DeQuattro paid
13   $20,000, helped tribes across Indian country with economic
14   development.  That was false.  Money paid to One Nation
15   Development went into Mr. Cromwell's pocket.  His public
16   representations on his public website about helping other
17   tribes were all lies.  He was in it for himself.

18         Both defendants have submitted, as we acknowledge,
19   letters of support from family and friends.  And there's no
01:22 20   dispute, Your Honor, that in all other regards, other than
21   their crimes, they have been well-respected community leaders.
22   But that, Your Honor, is the face of a white-collar defendant.
23   White-collar defendants hide behind the fact that they are
24   respected in their professions and their communities, and they
25   care for their families and their neighbors.

 1          The sentences that the government is requesting are

 2   sufficient but not greater than necessary to satisfy the goals

 3   set forth in section 3553, in particular to reflect the

 4   seriousness of their crimes, to promote respect for the law and

 5   to deter others.

 6          General deterrence is critical in this case.  Your

 7   Honor, if these defendants are given a lenient sentence, the

 8   message that would send to other would-be white-collar

 9   criminals is that all they would stand to lose is some portion

01:23 10  of their ill-gotten gains and practically none of their

11   liberty.

12          After all, RGB lost the bribe money it paid to

13   Mr. Cromwell, but Mr. DeQuattro benefited greatly from the

14   contract that he paid to protect.  When the contract was in

15   effect, his salary went up and up.  And he's not being asked to

16   repay any of those increases.

17          Your Honor, public corruption is a serious problem in

18   this country, as you well know.  Pay-to-play schemes cannot be

19   tolerated.  We cannot function in this country if we cannot

01:23 20  trust our elected officials.  Democracy in our nation and

21   states and cities and tribes depends on elected officials

22   serving their constituents, not lining their pocket with

23   ill-gotten gains.

24          The Mashpee Wampanoag placed their trust in

25   Mr. Cromwell and he abused it.  He monetized his position.  Not

1    just by soliciting and accepting bribes from RGB but also in

2    ways that are not public but are described in the Presentence

3    Report.

4          For these reasons, the government requests the

5    following sentences:

6          For Mr. Cromwell, that he be sentenced to 78 months in

7    prison, one year of supervised release, a fine of $25,000,

8    forfeiture of the Bowflex and a forfeiture money judgment in

9    the amount of $50,503.34.  Also, as we have gone over, the

01:24 10    government requests a future briefing and hearing on the issue

11    of restitution to the tribe for expenses incurred in complying

12    with the grand jury subpoenas.

13          With respect to Mr. DeQuattro, the government requests

14    that he be sentenced to 27 months in prison, one year of

15    supervised release, and a fine of $250,000, given his

16    substantial assets.  Thank you.

17          THE COURT:  Let me ask a couple of questions with

18    respect to it.  You said they're equally culpable.  Why aren't

19    the recommendations the same?

01:25 20          MS. WICHERS:  Because the guidelines are different.

21          THE COURT:  So this is driven entirely by the

22    guidelines?

23          MS. WICHERS:  The recommended sentences are driven

24    entirely by the guidelines as we have calculated them, yes.

25          THE COURT:  Okay.  So I understand that aspect of it.

1   Now, the forfeiture money judgment, in light of the

2   determinations that I've made about the actual amount of money

3   that is involved for purposes of this case, why is the

4   forfeiture money judgment $50,000 -- 50,000 and some change

5   here, as opposed to wrapping that up, as the government

6   indicates it intends to do, in the restitution discussion?

7        MS. WICHERS:  So restitution obviously is separate,

8   just going to what we've already discussed.

9        THE COURT:  It is.  The question always in my mind is

01:26 10   double-dipping by the government on forfeiture and on

11   restitution, and so I'm trying to make sure that I've teased

12   this out accurately.

13        MS. WICHERS:  As Your Honor knows, they serve

14   different purposes.  And restitution, if any, awarded by Your

15   Honor would go to the tribe.  Forfeiture goes to the

16   government.  In terms of what is the right amount of the money

17   judgment that we should be requesting, I defer to the

18   forfeiture specialist who filed the motion for forfeiture.  I

19   don't --

01:26 20        THE COURT:  Before the determinations were made

21   regarding the guidelines?

22        MS. WICHERS:  Well, that's -- I don't know honestly

23   whether -- we would argue that relevant conduct, even Your

24   Honor having stricken the conspiracy to commit extortion, that

25   the relevant conduct still be included in the forfeiture money

1   judgment.  If I am wrong as a matter of law, that can be

2   stricken, but we would ask that it be included for the amount

3   just stated.

4        THE COURT:  And if you're wrong as a matter of law,

5   what happens?  It just sits there for a while and then somebody

6   else makes the determination, not me?  Are you just saying pass

7   it down the line, Your Honor?

8        MS. WICHERS:  Well, no.  The motion for forfeiture

9   money judgment has been filed.

01:27 10        THE COURT:  I have to act on it, right?  And I have to

11   act on it in a legal way.  And so I'm asking these questions to

12   get answers that deal with precisely that issue.  And as I hear

13   you, you're saying, you know, just enter it.  We'll clean it up

14   afterwards.

15        MS. WICHERS:  I'm not trying to be that flippant about

16   it, Your Honor.  What I'm saying is I believe that the relevant

17   conduct that you can consider would include not just the 10,000

18   that he was convicted of and the value of the hotel stay, but

19   the previous $40,000 as well as relevant conduct can be

01:27 20   included in the forfeiture order.  If I am wrong as a matter of

21   law, the AUSA who filed that motion who is a specialist in

22   forfeiture, which I am not, will let me know by tomorrow, and

23   we will file something if that is wrong, and the judgment can

24   be modified, or frankly it can be modified before Your Honor

25   even enters judgment if Your Honor waits a day or two.

1          I promise this will be done promptly and that we will

2    notify, if Your Honor agrees with that, that we would notify

3    the Court immediately one way or the other whether we believe

4    it is the correct amount or not and here is why.

5          THE COURT:  Okay.  Mr. Flaherty.

6          MR. FLAHERTY:  May I, Your Honor?

7          I just ask the Court to accept the principle that no

8    man can be judged by the single worst episode or episodes of

9    his life; that that's not the definition of the entirety of the

01:28 10    man.

11          And in my dealings with Mr. Cromwell over the past two

12    and a half, three, three and a half years, I can only tell the

13    Court that he has always been nothing but the epitome of a

14    gentlemen.  He's kind, he's insightful, he's thoughtful, he's

15    unfailingly polite.  And I don't know if there are adequate

16    words really to describe his character as I have seen it, but

17    there's a goodness to him, Judge.  There's a decency.  There's

18    an authenticity to his intentions.

19          And as I know the Court knows, he's a man that has

01:29 20    suffered physical disabilities and injuries throughout his

21    lifetime.  He had cancerous growths as a child.  He has since

22    2010 suffered from IBM.  He can't even give his lawyer a proper

23    handshake because he can't grip my hand, Judge.  And I know the

24    Court knows that he fell in the corridor here during a pretrial

25    hearing.  And through all of that, through the multiple

1    surgeries, through the difficulties, I've never heard a single

2    word or utterance of a complaint from him.

3         And there's a decency to him, Judge.  There's a

4    goodness to him.  And I know there's an undercurrent through

5    all of this of a hubris or an arrogance, an ungratefulness with

6    a gift he received in the trial record.  I've never seen

7    anything like that, anything even approaching any of that,

8    Judge, and I'd just like the Court to recognize that.

9         In 2010, he was diagnosed with this Inclusion-Body

01:30 10   Myositis, which is that chronic neuromuscular disease that

11   gives him difficulty in walking, standing, up and downstairs.

12   Like I say, he can't grip.  He has severe weakness in his

13   muscles.  I know the Court knows this.  As a matter of fact,

14   what the Court probably doesn't know and what I didn't know is

15   the assistance he needs.  On one of the final court appearances

16   we had before today, when I was leaving I had to use the men's

17   room, and I saw Mr. Cromwell receiving assistance from his wife

18   at the urinal.  I mean, that's the degree of assistance that he

19   needs on a daily basis.

01:31 20        He's also always, and I know it's detailed in the

21   report, suffered from spinal stenosis for many years.  He's had

22   four very serious and invasive spinal surgeries which obviously

23   exacerbated the IBM that he suffers from.  He's had a

24   laminectomy, decompression, fusion, his L5-S1, L2 vertebras.

25   These surgeries happened in 2016, 2020, in February of 2022

1    just before the beginning of this trial and then in July of

2    2022 when he fell at home after doing some sort of just daily

3    activities.  And each time after the surgeries, he spent many

4    weeks at the Spaulding Rehabilitation Center in Charlestown

5    going through extensive rehabilitation which still renders him

6    really, he sits here today in a wheelchair, Judge, with the

7    assistance of a walker.

8          And I know the Court looked at the letters that were

9    submitted and probably looked closely at Exhibit U, which is a

01:32 10    letter that was drafted by his primary care physician, Dr.

11    Leslie Fang who is associated with Harvard University and Mass.

12    General.  And he points out that in his daily activities he

13    needs assistance, that he can't care for himself.

14          In 2017, he suffered from a pulmonary embolism.  He

15    had blood clots in his lungs.  2016, total left hip replacement

16    surgery.  He suffers from high blood pressure, high cholesterol

17    and Type II diabetes.

18          In my view, Judge, any, any term of incarceration to

19    Mr. Cromwell not only will interrupt the treatment and further

01:33 20    debilitate him, maybe rendering him in a wheelchair for the

21    remainder of his life, but it will put him at risk.  It will

22    put him at risk for life expectancy.  A single day that this

23    man serves behind bars will be tantamount to a month or many

24    months of an able-bodied man.  It will be that difficult for

25    him.

1      The government noted and I congratulate them that he

2  has led an otherwise exemplary life.  He married a woman.  He's

3  57 years old now, Judge.  He's been married for 16 years.  He

4  married a woman who had several children from a prior

5  relationship.  And despite none of those being his biological

6  children, he fathered them in every sense of the word.  He was

7  there emotionally.  He provided them support, a home, a roof

8  over their heads.  He was there for them spiritually.  He was

9  there for them financially.  He did all that he could for them.

01:34 10  And that, Judge, I would submit is an uncommon trait that

11  speaks to his goodness and his decency as a man.

12      We see this current running through his life.  His

13  mother he took in in her later years and she lived with him

14  until her death.  And they had a special relationship, which

15  I'm sure weighs on Mr. Cromwell very heavily, especially today.

16  And, you know, he spent time with her, and this was reflected

17  in some of the letters that were submitted, and people

18  recognized that.  And again, this speaks to his goodness.  And

19  it's uncommon, Judge.  As a friend, Robert White who submitted

01:35 20  a letter, when he was deployed overseas as a member of the

21  United States military, Mr. Cromwell took it upon himself to

22  look after his two young daughters.  Again, some uncommon

23  goodness about him.  As a mentor, and there was a letter

24  submitted by a young African American man by the name of, I

25  hope I'm saying it right, Afolabi Jalaoso, and he wrote, Judge,

1    and this resonated with me, that he could have been dead or in

2    jail.  Statistics spoke to this.  He could have been dead or in

3    jail, but Cedric made sure that that was never an option.  He

4    mentored this young man.  He injected himself into his life,

5    and he made certain this fellow became a Division I scholar

6    athlete at the University of Kansas.  Again, it speaks to his

7    decency and goodness.

8             His in-laws, the Thorntons, submitted letters.  They

9    spoke about how he took it upon himself to be involved in a

01:36 10   young man, their nephew Darrell's life, and taking him to tai

11   kwon doe practices and tournaments and enrolling him in college

12   preparatory classes.  And he did this because he was a young

13   man who didn't have a father.  And through his church groups,

14   participating in Bible study and scripture and men's group,

15   I've seen it, Judge, I've witnessed this spirituality.  It's

16   real, and it's very authentic, and it guides him.  And Bishop

17   Williams speaks of his contrition.

18             There were other letters submitted by leaders of other

19   tribes who respected him, recognized his work ethic, saw the

01:37 20   accomplishments and the passion that he had committed to the

21   tribe.  And, you know, the Court heard the statements from

22   Mr. Hendricks and Mr. Tobey.  It's clear I think, and I hope,

23   when Mr. Hendricks was very, you know, forthcoming to the

24   Court, he voted no on the casino.  They have been political

25   opponents.  They're on opposite sides of the issue.  And I

1    credit that.  That's what makes government work, opposite

2    ideas.  But that doesn't mean that they're a sort of, those

3    animosities that may be driven by political disagreements have

4    a place here in court for sentencing.

5         This man, Judge, spent years working 16-hour days on

6    behalf of the Mashpee Wampanoag Tribe, and he accomplished

7    great things.  He helped them get their land into trust.  He

8    helped them become federally recognized after many years.  He

9    helped them negotiate host community agreements with Taunton

01:38 10   and Mashpee, entering a compact with the Commonwealth of

11   Massachusetts, created a pathway to economic sustainability

12   with a very visionary and aggressive and I would say wonderful

13   prospect of having the exclusive right for a casino in the

14   southeast region of Massachusetts.

15        And, you know, there was an internal audit commission

16   by the tribe, and this was to see whether or not claims made

17   against Mr. Cromwell, that there was embezzlement of funds from

18   Genting and the tribe could be found, and there was not a

19   single dollar found from any of that, Judge, none of it.  There

01:38 20   was no misappropriation of funds or taking of funds from

21   Genting or the tribe.  None of that has ever been demonstrated.

22   And, you know, in this case the Court has already heard from me

23   about my -- I guess I'll use the word again, concern about the

24   standard of circumstantial proof in this case.

25        I would just ask the Court to consider Mr. Cromwell as

1  the whole person that he is.  He's suffered greatly as a result

2  of this.  This is a dramatic and tragic fall from grace.  He's

3  been convicted of serious offenses before this Court.  He

4  recognizes the severity of this.  He recognizes what has

5  transpired here.  And I would ask you, Judge, most specifically

6  to not incarcerate the man, that what's occurred here is, as I

7  said, a tragic, tragic fall from grace.  There is no way that

8  Mr. Cromwell will go on from here and ever be entrusted with a

9  position that would enable something like this ever to occur

01:40  10  again.  It just won't happen in his lifetime.  The necessary

11  components of sentencing right now have been accomplished, and

12  there will be no further, I would suggest to the Court, benefit

13  to incarcerating the man.

14         So I would ask the Court to consider, most

15  respectfully, departing from the guidelines, giving him a

16  probationary sentence of whatever term the Court thinks is

17  appropriate with home confinement which would allow him at

18  least to survive, not flourish but survive, and whatever type

19  of community service that the Court thinks is appropriate.

01:41  20         He is a man that has something to offer.  And I hope,

21  I hope for him and I hope for his family that the future is

22  something that he'll be able to participate in, if not enjoy.

23  So I would just ask the Court to consider him as the full

24  person.

25         THE COURT:  All right.  Thank you.

 1              Mr. Cromwell, I'll hear from you if there's something

 2     that you'd like to say at this point.  You can remain seated if

 3     you want.

 4              MR. CROMWELL:  Thank you, Your Honor.  Again, Your

 5     Honor, thank you for allowing me to address the court.  The

 6     greatest love I feel in my heart is for my wife who has

 7     supported me throughout the most challenging moments in our

 8     marriage and our life together.  My children are my pride, my

 9     joy, my inspiration and my tribe.  The Mashpee Wampanoag nation

01:41 10     is the most resilient and proud --

11              THE COURT:  Mr. Cromwell, if you could go a little bit

12     slower so that I can absorb it and the court reporter can

13     record it.

14              MR. CROMWELL:  I stand here before the Court and my

15     God.  I ask for some measure of mercy for my mistakes and my

16     errors of judgment that have brought me shame, humiliation and

17     great personal pain to all of those whom I love, especially my

18     family and my tribe and all those who have supported me and the

19     mission of the Mashpee Wampanoag Tribe.

01:42 20              I will spend the rest of my life seeking redemption

21     and trying to regain the trust many have placed in me.  It was

22     my great honor and privilege to serve the people of my tribe.

23     And I pray that my errors will not interrupt the mission and

24     that our nation will achieve the economic sustainability,

25     tribal self-determination and good health and prosperity that I

1    worked so hard for so many years to help realize.

2        I've spent many hours in prayer contemplating my

3    mother's legacy with the tribe, and there are no words to

4    adequately describe my remorse for damaging her good name.  My

5    life's greatest regret is that I have brought dishonor to our

6    tribe and my family, and I'm deeply sorry.

7        I hope that this experience will make me a better man.

8    I know that I have learned from my mistakes, and I know that

9    life's most important lessons are often life's most difficult.

01:43 10    I'm committed to my faith and the Lord.  I trust in the Lord

11    and I repent for my sins.  And I can only hope that, with mercy

12    from the Court, I will someday feel some peace.  Thank you.

13        THE COURT:  Thank you, Mr. Cromwell.

14        Mr. Weinberg.

15        MR. WEINBERG:  Thank you, Your Honor.

16        I'm not a lawyer that always speaks unequivocally

17    positively about my clients' characters.  I've been a criminal

18    defense lawyers for 50 years and have represented the spectrum

19    of clients both federally and state, but I can say to you

01:43 20    honestly what I've said almost never before.  I've never

21    represented a better man than David DeQuattro.  It's like he's

22    a man from a different generation, I used to know people when I

23    was young, the World War II generation.

24        The words in the Presentence Report reflect some of

25    what his background is, well-respected, loves to mentor, loves

1    to give back, hardworking, family-oriented, ethical, follows

2    the rules, loves to help his community, proud of his military

3    service, generous, humble, loyal, faithful, supportive of

4    others.

5         I was considering putting him on the witness stand as

6    a testifying defendant.  We investigated his whole life in

7    preparation for what we understood would be a difficult

8    cross-examination.  There is simply nothing in his life, not

9    even no 404(b), nothing unethical, nothing he's done that he's

01:44  10   not proud of.  His fiance who he will soon marry who was with

11   him every day in court talks about, the first statement in her

12   letters are high integrity, honor, patriotism, proud of his

13   military service, supportive of veterans.  And the letters from

14   the veterans group show he gives not just money but time, he

15   has created with his architectural skills buildings for

16   veterans.  He's taught Boy Scouts architecture.

17        In a letter from his sister, the words she used are

18   family-oriented, hardworking, organized, calm.  From John

19   Racine, a key employee, says, "Dave is a family man, supported

01:45  20   his son and daughter through school and sports.  Has been a

21   coach, mentor and adviser to his own kids and those of his

22   employees."  And they talk about how his employees are like a

23   second family to him, and he mentors and teaches their

24   children.  Neighbors that talk about in a blizzard -- I don't

25   have neighbors like this.  He had a generator, invites them in

1    to take showers.  He and Monica take soup out to them because

2    it's cold and their houses are cold.  The kind of stuff that I

3    grew up with, with a family that was a World War II generation,

4    but I don't experience in my life in my neighborhood, amongst

5    my friends.

6          This is just such an aberration to his life.  I ask

7    myself how it could occur that he would even walk close to the

8    line, and reserving where the line is, I think Your Honor

9    struggled, and I'm not here at sentencing to challenge the

01:46  10   Court's principled decisions, but this is not the paradigm of a

11   corrupt briber.

12         Even the government in its statements said they

13   recognize that it was multiple purposes and that the evidence

14   supported it, friendship and business.  He started, his mother

15   wanted to be an architect, but again, the times were not there

16   for her to undertake a profession.  She instilled in him the

17   desire to be an architect.  He went to technology school for a

18   year.  He worked his way through Roger Williams for four years

19   both by working in a store and by military service.  Not only

01:47  20   did six years in the Air Force National Guard, he did a second

21   six years.  Not only did it in the states but volunteered for

22   drug interdiction.  It's just who he is.  He's proud to be an

23   American.  He's proud of his business.  He's proud of his

24   profession.

25         Collateral consequences matter.  And, you know, this

2127

architecture license that he went for five years of school and
then five years internship and then went to RGB and became the
head of architects, it matters deeply to him.  It's his
profession.  And as I understand, when he allocutes, Your
Honor, he can restate that if there's a non-custodial sentence,
he's got a chance someday to reapply get his license back, a
license that means so much to him.  It's like a law license
would mean to me.  It would be the worst consequence of a
conviction to not do what my passion is, not do what I've done
for 50 years, what he's done for somewhat less.

He also worked so hard at his business.  He didn't
come from the Rhode Island elite like Mr. Beretta whose dad
opened the door for him to be the owner of RGB.  He worked the
old-fashioned way, 50 to 70 hours a week, and gradually he got
more and more responsibility.  He learned business as well as
teaching architecture.  He became the head of the architects.
Then he became the head of marketing, then he became vice
president, then he became a minority owner.  And finally, with
Mr. Beretta's retirement, he became the owner of RGB.

Any sentence that would imprison him, Your Honor,
would deeply imperil his ability to have this company sustain
itself in a coming recession, and with the publicity that would
accompany that sentence, it's already so difficult for the
company to survive.  They rely on school boards, city boards.
They build for veterans.  They build for the Rhode Island State

1    Police, police departments.  They were trusted for many years,

2    Mr. DeQuattro was trusted, and it's a very difficult time for

3    him to help his company survive and help it survive not just

4    for his own financial interests but help it survive because he

5    is the head of the company who treats the company like his

6    family.  He has 24 families depending on him.  And the fact is

7    that there's simply nobody in that company, nobody that can do

8    what he does, which is not only be architects.  They have many

9    architects.

01:50 10        Mr. Grieco wrote a letter that was accompanying our

11   supplemental memo.  He's here today.  Mr. Racine wrote a

12   letter.  He's one of the longtime architects.  What they say is

13   that there's nobody with Dave DeQuattro's business skills along

14   with architectural skills.  There's nobody that can do the

15   contracts, manage the budget, bid on projects, go to the school

16   boards, go to the city boards and make RGB compete with the

17   other firms that are looking for business.  That, too, we would

18   ask Your Honor to consider.

19        The pre-Booker third party harm that was the subject

01:51 20   of debates, whether it even was a legitimate or principled

21   basis for departure, now the Court can consider third-party

22   harm along with the consequences to Mr. DeQuattro and his

23   passion for architecture and his business.

24        Your Honor might ask, Why?  And I think part of the

25   reason is that his clientele that he tried to develop were

1    happy clients, clients that worked with him, clients that he

2    worked next to.  The tribe was one of them, and he built their

3    government center along with tribe members that he taught.  One

4    of them is today an RGB employee, a tribe member named David

5    Greene.  He honored the TERO project which tried to teach

6    tribal members on projects.  He tried to do everything right

7    for the tribe, tried to help them build a casino, tried to

8    protect them from vendors that weren't doing their job.

9    Genting, the developer, trusted them to look at each invoice.

01:52 10    The Gaming Authority did as well.  He's done nothing but try to

11    do the right thing for the tribe.  In fact, in 2020 when there

12    were problems in some of their projects, they asked him to come

13    back and try to help them.

14          He grows up in a business and he watches how

15    Mr. Beretta deals with clients and the amount of gifts that

16    were given and the playing at golf courses and lights to

17    education school presidents and donations to schools, and it

18    probably depressed his vigor at knowing where the line was in

19    this case, Your Honor, because he wanted to develop clients.

01:53 20    And as you were told, one of the clientele that he was hoping

21    to develop with the help of Mr. Cromwell was to gain some

22    entry, some credibility from the good work he did in Mashpee

23    and in Taunton with others.

24          This is not a heartland corrupt briber.  There was

25    mixed motives that don't occur in many cases.  The government

1    cites to all of these other cases in their sentencing brief,

2    from Wilkinson to DeMasi.  This is not any of those people.

3    This is a good person that just didn't walk too close to the

4    line, in the Court's judgment, walked over the line.

5         As I said before, the statistics show that 27 to 35

6    percent of people convicted of this crime get probation.

7    Nobody looking at what's occurred to him, the anxiety, the loss

8    of business, the loss of his license, you know, would not be

9    deterred if they were subject to being deterred.  I understand

01:54  10    the government's argument about general deterrence, but it

11    doesn't need to be applied by imprisoning every defendant, and

12    again between 27 and 35 percent of federal judges have found

13    that the deterrence and punishment purposes of sentencing in

14    the correct case have been met by a non-custodial sentence.  A

15    non-custodial sentence would keep a conviction, would allow him

16    someday to reply for a license, would allow him to keep this

17    company alive, would allow the company and it employees to have

18    the best chance to survive.

19         So finally, Judge, I just beg you.  This is a decent,

01:55  20    decent man.  He's been through a lot.  And if ever there was a

21    defendant in this kind of case that was an appropriate

22    consideration for a non-custodial sentence, it's Mr. DeQuattro.

23         The government's recommendations act as if there was a

24    conviction on every count, and the plus four guideline, they

25    ask for an upward variance.  I ask Your Honor to please

2131

1    consider a three-level downward variance, make him eligible for

2    home confinement, any kind of community service.  He does it

3    already.  He would do it with the veterans, any monetary

4    penalty that would add to the collective consequences of the

5    crimes of conviction, Your Honor, but please don't put him in

6    jail.  Please give him a chance.  Please give his company a

7    chance.  Thank you, sir.

8         THE COURT:  Thank you.  Mr. DeQuattro.

9         MR. DEQUATTRO:  Thanks, Your Honor.

01:56 10         I've made a lot of good decisions in my life.

11   Probably having Mr. Cromwell's friendship was probably not the

12   best decision I've ever made in my life.  For the last two and

13   a half years, I've felt horror, shame and embarrassment these

14   charges were brought against me.

15        I worked my entire life to where I am professionally

16   today.  My motivation has always been to help other people.

17   The dream of owning my own architectural firm started when I

18   was six years old.  I became a licensed architect at 28.  I

19   worked diligently and hard in that firm to grow that firm and

01:56 20   to own that firm.  The year I owned the firm was the year I got

21   indicted.

22        Through the indictment, trial and conviction, I've

23   suffered with embarrassment and shame in front of my clients,

24   colleagues and my friends.  When the story went viral, I lost

25   many friends and clients, and one-third of my office quit on

2132

1  me.  My son David, who shares the same name, had people

2  confused with him and me in this unforgiving world of social

3  media.  My daughter learned of my indictment through her

4  college friend over the internet, and I can hardly even

5  understand what she must have gone through when she read that.

6  Google is always going to be here.  The story will follow me

7  the rest of my life.

8       During the last two years, people in my firm that

9  remained are more than my employees.  I consider them my

01:57 10  friends.  We've met several times and talked about strategies

11  of continuing their employment, continuing the business.  And

12  we've been successful.  Although they are great, talented

13  professionals, they've acknowledged that they are not in a

14  position to manage an architectural firm with over 100 projects

15  that are currently in design and construction.

16       I manage the financial process of the scheduling

17  oversight and I oversee every project.  My physical presence

18  and experience over the last ten years of working through bad

19  economies and good economies are what made that company survive

01:58 20  and those people stay in those jobs.  If I would likely not be

21  there, the company would likely fail, and the people would

22  potentially lose their jobs.

23       I humbly ask Your Honor for a non-custodial service --

24  sentence rather, one that would allow me to manage the business

25  and the families that have stuck by me that would retain their

```
 1   jobs.  After today's judgment, I'll lose my license.  The

 2   license as I used to be on the registration board, I got off

 3   the registration board when I got indicted out of respect for

 4   the registration board.  The other board I got off was the

 5   National Accreditation of Architectural Registration Board.

 6   It's a national board.

 7         In those boards, I was on the committee that looked at

 8   people like myself that were convicted.  Probation, you can

 9   could potentially get your license back through probation.

10   When you were convicted and went to jail, you didn't get your

11   license back.  If that were to happen, that would cause me not

12   to practice the rest of my life.  And more importantly, it

13   would cause the employees a better -- with the practice and

14   would financially spare the fate of a 76-year old company from

15   going out of business.

16         Your Honor, there's one thing I learned from serving

17   honorably for 12 years in the military, is that I know how to

18   take orders and I know how to listen.  So, Your Honor, I

19   respect any judgment you make in sentencing, and I thank you

20   for listening to me today.

21         THE COURT:  Thank you.

22         So the course of this case has been a challenging one

23   in a variety of different senses.  It's one in which the legal

24   issues bristle with alternatives in which the questions are

25   substantial.  I've tried to resolve those legal issues in the
```

1    best way I know in light of the directives I've received from

2    the courts whose judgments I must follow.

3        This is a case in which I will be entertaining the

4    prospect of bail pending appeal here because of the nature of

5    the matters that will be raised by both parties here because,

6    as today illustrated, neither party is -- neither of the

7    parties, none of the parties is satisfied with the legal

8    judgments.

9        I'm not, as I said, a slave to the guidelines.  They

02:00 10    provide some orientation, but having dealt with political

11    corruption cases throughout my professional life, I think I

12    have a broader understanding of what the range of alternatives

13    are and the range of activities that come within the ambit of

14    political corruption.

15        Like everyone, I've been increasingly sensitized to

16    the issues that confront tribes and the duty both to respect

17    the tribes and to respect their immunities in making a judgment

18    in this case, and it's I suppose the hope of all of us that at

19    some point Congress is going to get this better, if not right.

02:01 20        But I have to make the judgment now.  And in doing so,

21    I advert directly to the larger principles of sentencing, which

22    are set forth in Section 3553.  They're familiar ones but they

23    require some nuance.

24        First, the question of the seriousness of the offense

25    or offenses.  I think of political corruption as being the most

1    corrosive of white-collar crimes.  It eviscerates the sense

2    that those who are engaged in a political community feel about

3    their agency.  It happens in the broadest sense in the federal

4    courts with the core federal bribery guideline which is used as

5    a kind of standard generally as the court, particularly the

6    Supreme Court has developed this more fully.  But the short of

7    it is that this is a sentence that deserves -- this is a crime

8    which on its face deserves substantial sentences.

9         I listened of course to the people from the tribe and

02:03 10   read their reputations in the victim context little bit

11   irregularly, but I think I understand where this stands now for

12   them, and I can't disagree with anything they said.  That is to

13   say that this tribe has been ill used, ill used by the federal

14   government and ill used by certain of its leaders of whom

15   Mr. Cromwell is an example.

16        The references that I've made to the various ways in

17   which the criminal law, federal criminal law has come to

18   recognize the responsibility of tribal leaders are not truly

19   kind of lawyer talk.  They go to the fundaments of concern

02:04 20   here.  We do a great disservice to the tribe if we do not

21   recognize the loss that they've received at the hands

22   particularly of Mr. Cromwell, and I don't want to in any way

23   derogate from that.  And of course the impulse is to say I want

24   the maximum, either the maximum as stated in the submissions by

25   the victims, but the maximum stated by the government of

maximum guideline. But this is not the most serious offense

that I've encountered in the context of political corruption

cases. It is a serious one to be recognized with a serious

period of time of imprisonment, but that's not the only

dimension to it.

So I turn to the nature and characteristics of the

defendants. Both defendants have presented very compelling

life stories in different ways. And it's clear that they both

continue to try to do their best in other circumstances not to

curry favor with some judge who has to sentence them, but

that's because that's who they are. But it is important to

emphasize in response to Mr. Flaherty's observation, which is

an observation frequently made, that a person is not to be

recognized in terms of, evaluated in terms of the worst thing

they've done in their life, that they're here because they've

done something bad, fundamentally bad. Equal culpability, not

in the slightest. It's an almost robotic trope for there to be

equality between the two expressed by the government but

equally responsible for their acts, despite all the other good

things they have done and are continuing to do and I think will

continue to do. I have no doubt about that.

I won't dwell on the letters here. I will focus on

what's been taken from their tribe in the case of Mr. Cromwell

and the inability to recognize that what he was being drawn

into was something that could be viewed as political corruption

1    on the part of Mr. DeQuattro.

2         So what do we do in evaluating things?  Well, we look

3    to questions of deterrence.  It's generally broken up into

4    specific deterrence and general deterrence.  Specific

5    deterrence is how do we keep them from doing this again?  It is

6    frequently the case that one can fairly say that someone in the

7    positions that Mr. Cromwell and Mr. DeQuattro have been in

8    never get a chance to do it again.  I'll put to one side

9    Mr. Cromwell's particular health problems.  But that's not

02:08 10   always true.

11         Mr. Weinberg made reference to Ms. Wilkinson who was

12   convicted, served her time and then convicted again.  There is

13   a tendency to be immune from what the norms ought to be at a

14   certain point for people, and I've evaluated that.  I think

15   that both Mr. Cromwell and Mr. DeQuattro understand, have

16   internalized those norms.  There is no danger, even if they had

17   that opportunity, of this to happen again.

18         So then I look at general deterrence.  What's general

19   deterrence?  It says to the other people out there who are

02:09 20   similarly situated to Mr. Cromwell or Mr. DeQuattro, Don't do

21   this.  It's not worth it.  It's going to cost you

22   fundamentally.  And of course general deterrence is a legal

23   fiction.  We have no going rate for general deterrence.  We

24   can't say this much would be enough but not more than.

25         In point of fact I've viewed sentences as such as the

1    worst -- not the worst, the least effective form of general

2    deterrence.  The most effective form of general deterrence

3    would be swift and certain punishment, but in a regime of due

4    process, not to denigrate a regime of due process, but in a

5    regime of due process, certainty is not certain and swiftness

6    comes very slowly.  And so we're left with imposing this crude

7    instrument of time served or to be served.

8         Then I turn to the question that was fundamental to

9    the sentencing guidelines, which frankly were something that

02:10  10    came into existence after I started practicing, in existence

11    when I went on the bench but I followed carefully because I

12    think that they were an important innovation.  The idea that

13    you do the crime, you do the time.  There's going to be

14    transparency, and there's going to be equity, a much abused

15    word nowadays but equity between people who commit white-collar

16    crimes and those who commit crimes with other uniforms.  It's a

17    stretch I think, the different kinds of crimes, the differences

18    between violence and theft are not to be ignored.  Those who

19    establish the sentencing guidelines were devotees of Judge

02:11  20    Friendly's observation that one can be just as devastating with

21    a fountain pen as one can be with a crowbar.  Something that

22    you can put on a bumper sticker I suppose.  But when you think

23    about it a little bit more, there's no there there.

24         We're talking about what is it that as a society we

25    have generally understood to be the consequences of this kind

1    of activity?  I think I have a fairly clear understanding of

2    that quite apart from the several cases that the parties have

3    pointed me to.

4        So I come back to the sentence to be imposed.  In the

5    case of Mr. Cromwell, I'm imposing a sentence of 36 months

6    incarceration.  I understand that that is a matter that is

7    likely to be cabined by extensive appeal and that there are

8    real issues for appeal.  But I am now being asked to impose the

9    sentence that best reflects the nature of the offense.  And if

02:13  10  it has to be modified, the government tells me that we can do

11   it another day or another couple of days, that kind of thing.

12   Then of course it will be modified.  But it's important for me

13   to put the seal on the seriousness of the offense.

14       It is no derogation of the Mashpee Wampanoag to say

15   it's not the most, highest, severest sentence in political

16   corruption.  To the contrary.  It's a recognition that the

17   tribe finds itself in a position of other sovereigns who are

18   frequently abused by their leaders and for which there is a

19   relative, from my perspective, kind of sentence to be imposed.

02:14  20       I'm told that I'm going to be faced with the question

21   of calculating a form of restitution in this area that really

22   has to do with the costs that were imposed on the tribe.  It's

23   not been finalized.  We'll get it finalized.  I'm not going to

24   be imposing a sentence that incorporates that at this point.  I

25   am faced with the customary problem of the government

1    frequently asking for both forfeiture and restitution.  I'll

2    sort that out as it arises in these circumstances, but I will

3    impose a monetary figure here in the form of a fine.  The fine

4    here will be $25,000.

5         I will accept the government's invitation to consider

6    how the guideline -- how the forfeiture and restitution should

7    be dovetailed in this area, so I'm not now going to sign off on

8    the forfeiture order that the government has submitted.

9         I will impose a period of one year of supervised

02:15 10   release.  The prospects for Mr. Cromwell, it seems to me, are

11   guarded, and the time period that's going to be taken in appeal

12   is likely to be lengthy.  That, it seems to me to be sufficient

13   for the core of it.  He is also, insofar as I'm concerned here,

14   the defendant is subject only to the period or the amount of

15   mandatory special assessments for the crimes for which he's

16   properly convicted, which I understand here to be Counts Two

17   and Three here.  There's a $200 special assessment I believe

18   here because, as I've indicated, I do not believe Hobbs Act

19   extortion is properly to be considered in this connection.

02:17 20        The terms of supervision are ones that require that

21   the case be finalized as far as I'm concerned.  Whether it will

22   be reached during that period of time, I do not know.  I'm not

23   making a recommendation with respect to place of confinement

24   unless the question of bail pending appeal is pressed more

25   vigorously than I would think makes sense under these

circumstances, but I leave that open.  The defendant in any

event has the obligation to pay no later than the completion of

his supervised release the fine of $25,000.  In addition, he

has the obligation to pay, if he has not paid it during the

period of confinement, the $200 special assessment.

He's obligated obviously not to commit another

federal, state or local crime.  He must not unlawfully possess

a controlled substance.  I'm waiving the question of drug

testing for him, although he must cooperate in the collection

of a DNA sample as directed by the Probation Office here.  So

long as the defendant is subject to these financial obligations

as a special condition, I am imposing the obligation that he is

prohibited from incurring new credit charges or opening

additional lines of credit without the approval of the

Probation Office while any of the financial obligations remain

outstanding.  And the defendant is obligated to provide access

to any requested financial information which may be shared with

the asset recovery unit of the United States Attorney's Office.

I'm delaying the question of surrender pending the

discussion of bail pending appeal.  I put that out as a likely

prospect, but it seems to me that, given the unanswered

questions that still remain to be dealt with, we have time to

deal with that, and I'll set up a schedule to deal with that.

I turn then to the sentence with respect to

Mr. DeQuattro.  Here I don't see equal culpability at all.  I

1    made reference to observations that the Sentencing Commission

2    has made in the past in the course of dealing with its efforts

3    to define the guidelines.  I've made clear that I don't

4    consider them to have been successful or even complete in doing

5    so, but they are something to listen carefully to, and that

6    really has to do with how do you assess culpability.  The most

7    culpable person is the leader in most circumstances.

8         Here I'm faced with a businessman who threw his all

9    into business, who was insufficiently sensitive to what it

02:20 10   might mean to acquiesce in efforts on the part of a leader to

11   receive benefits to which he was not entitled.  It is the case

12   that if there is a dual multiple purpose for payments to a

13   political figure that, so long as one of them is bribery, then

14   it involves a violation, but this is different.

15        I look at the acquitted conduct in this case and I

16   don't necessarily see increased toxicity, the argument that the

17   government has made, but I do see payments that were made for

18   purposes of advancing a business, and so I include it in my

19   evaluation.  I do it by the standard of preponderance that adds

02:22 20   $40,000 into the mix.  But I'm more concerned with the crimes

21   of conviction.  And the crimes of conviction here are ones in

22   which the defendant, Mr. DeQuattro, became overtaken with the

23   desire to be a friend, to be supportive, to be non-judgmental

24   in the way in which he addressed matters that Mr. Cromwell, as

25   far as I'm concerned and my reading of the circumstantial

1    evidence leads to a finding that he knew part of it was for

2    purposes of maintaining the kind of relationship that was

3    necessary to maintain the contracts that he had, such as he

4    had, and they were of course diminishing at the time.

5         The request that the defendant has made seems to me to

6    be an appropriate one under the circumstances.  That is to say

7    I'm not going to impose a period of incarceration.  I will

8    style it as probation.  It can be styled as supervised release

9    or probation.  I will style it as probation, with a period of

02:24 10   one year of home confinement.

11         It does amount to a conviction in this setting.

12   Mr. DeQuattro will have to deal with that and what that means

13   in the larger scheme of things for the registration boards that

14   are relevant and are going to be relevant for his colleagues.

15   It may well be that it's possible with his business skills and

16   not exercising the responsibility of a registered architect

17   that he'll be able to continue the function of the business

18   that he was so instrumental in growing.

19         I am sensitive to the collateral impacts that

02:24 20   something like this has on people who work for someone who has

21   gotten himself into this kind of fundamentally corrosive

22   activity.  But it is not the kind of political corruption by an

23   offerer that calls for an extraordinary sentence or even the

24   guideline sentence in this area unless one simply ignores the

25   whole range of impacts that are involved, so I won't impose

1    that.

2           I will however impose a sentence of $50,000 for a

3    fine.  I do it as a fine because I find really quite disturbing

4    the idea that the government double dips through forfeiture and

5    restitution and arrogates to itself the idea that they will

6    remit if they feel like remitting.  If the government wants the

7    money, they can take it as a fine.  They get it directly.  The

8    question of forfeiture and restitution and how that's allocated

9    is something to be dealt with differently, and I'm told that

02:26  10   I'm going to be learning more about that.  But that's a delayed

11   activity and I will, unless the parties are asking me to impose

12   the sentence immediately, that is execute the sentence

13   immediately, give the government a couple of days to get back

14   to me about that as they've offered to do.

15          During the period of probation obviously the defendant

16   is going to be subject to the obligation to pay the balance of

17   any fine that's imposed.  And if he does not pay the mandatory

18   special assessment here, which I believe is $100, then he will

19   be barred from incurring any new credit charges himself or

02:27  20   opening any additional lines of credit without the approval of

21   the Probation Office.  Similarly, he must provide the Probation

22   Office with access to any requested financial information which

23   may be shared with the asset recovery unit of the United States

24   Attorney's Office.

25          He is however obligated to pay the special assessment

2145

1    immediately upon the entry of the judgment in this case.  And

2    as I've indicated, I'm staying the case for purposes of

3    surrender or imposition while the question of bail and the

4    nature of the questions on appeal are under evaluation.

5        I go back to where I started, which is that measuring

6    this in terms of years is a crude instrument.  Recognizing the

7    seriousness of the offense is absolutely necessary.

8    Recognizing that someone who commits a crime like this with the

9    backgrounds and character that the defendants here have is not

02:29 10    doing anything other than the worst day of his life, but the

11    worst day of his life is the one that he's going to be

12    sentenced for, and that's the sentence that I think is

13    appropriate under these circumstances.

14        Ms. Victoria.

15        U.S. PROBATION:  When you're finished, Your Honor, I

16    have a few questions about sentences.

17        THE COURT:  Yes, go ahead.

18        U.S. PROBATION:  So for Mr. DeQuattro, what is the

19    length of the term of probation?

02:29 20        THE COURT:  One year.

21        U.S. PROBATION:  One year.  And during that one year,

22    what is the term of the home detention?

23        THE COURT:  One year.

24        U.S. PROBATION:  One year.  And will that be with

25    electronic monitoring?

```
 1              THE COURT:  I don't think it's necessary unless you

 2       do.

 3              U.S. PROBATION:  That's really the major way that we

 4       would be able to supervise him.

 5              THE COURT:  Okay.  Then I'll impose electronic

 6       monitoring for which he's responsible.

 7              U.S. PROBATION:  Okay.  And as far as the mandatory

 8       and standard conditions would apply to him, and I'd also

 9       recommend drug testing be waived with respect to Mr. DeQuattro.

02:30 10              THE COURT:  Yes.  I didn't say that and I do waive it.

11              U.S. PROBATION:  And then there may be, the only issue

12       is there may be a slight delay in getting him hooked up with

13       the electronic monitoring.

14              THE COURT:  There's a slight delay, I'm told, by the

15       government in getting to the bottom of this.

16              U.S. PROBATION:  Exactly.  So you talked about the

17       self-surrender, the restitution.  The only thing that wasn't

18       addressed in this hearing was just what's going to happen with

19       Mr. Cromwell in Counts Eleven to Fourteen which are the tax

02:30 20       counts.  I don't know how that impacts you --

21              THE COURT:  I've severed the counts.  I'm going to

22       impose judgment in this case.  That permits the time to move

23       forward on this, and I'll take up tax, if it ever becomes

24       necessary.  But this was a non-custodial case.  I advanced it

25       promptly in recognizing that it could be advanced by a separate
```

1    judgment. I can't imagine that there's going to be an

2    objection to that. It will be taken up as a tax case in due

3    course, assuming that there is a due course.

4         MR. DOLAN: Your Honor, on that subject, just for

5    purposes of preservation, we'd ask that the Court enter an

6    order of excludable delay until the restitution hearing so we

7    can deal with the tax issue.

8         THE COURT: Yes. I'm going to do that as well, but I

9    think the government should be prepared to address the question

02:31 10   why this should be advanced in some fashion for trial over

11   other cases where it had been custodial during the period of

12   the pandemic.

13        MR. DOLAN: Understood.

14        THE COURT: And my view in response to Ms. Victoria's

15   effort to clarify this, is that judgment, final judgment can

16   enter as to both of these once we get through the question of

17   restitution here. I'll set a schedule. You can think about a

18   schedule that you want, if there's going to be a contest over

19   the question of bail pending appeal. There is no question in

02:32 20   my mind that these are, as I said, prickled with issues of

21   current contention as to which the positions that the parties

22   have taken have more than colorable value. So that's my

23   general view about it. Okay?

24        Anything else with respect now to -- I guess you want

25   to move on to Mr. Cromwell.

1      U.S. PROBATION:  The tax counts were a reference to

2   Mr. Cromwell.  He was the only one with the tax counts.  So I

3   just want to make sure I'm understanding.  Have you made the

4   decision yet that their bail will extend pending appeal?

5      THE COURT:  I am extending it right now pending

6   appeal.  I'm going to permit the parties to make their

7   arguments about that and set up a schedule.  I will do that.

8   Well, perhaps what I'll do is ask the government to consult

9   with defense counsel, particularly Mr. Flaherty under these

02:33 10   circumstances but Mr. Weinberg as well, on the question of

11   staying this pending appeal and what kind of briefing if any

12   you want to do with respect to that issue here and what kind of

13   hearing you want to have with respect to that issue.

14      U.S. PROBATION:  And then the only other issue is the

15   restitution, and you did say you were going to set that up for

16   a further hearing.

17      THE COURT:  I'm told I'm going to be provided with the

18   basis for doing that.

19      U.S. PROBATION:  Right.  And the statute says the

02:33 20   restitution needs to be resolved within 90 days.

21      THE COURT:  Yes, it does, and here is hoping.  That's

22   not merely here's hoping.  I hope that the government is more

23   timely in teeing this up than it has been so far.  Is there

24   anything else?

25      Okay.  So I tried as best I can, Mr. Cromwell and

1   Mr. DeQuattro, to explain why I've done -- and frankly it's

2   important, fundamentally important that those who may be

3   considered to be victims in this case here, why I've done what

4   I've done.  You may or may not agree with it, but you're

5   entitled to a full statement of it, and I've tried to do that,

6   listening carefully to what you've had to say to the degree

7   that it may properly be included in the record of this case.

8           The larger issues are fundamental to this country.

9   And the Supreme Court has indicated a considerable degree of

02:35 10   concern that what might otherwise be ordinary political

11   activity not be turned into political corruption.  That's why I

12   made the instructions as hard as I did on quid pro quo.  I

13   think they are as good as they can be under these

14   circumstances, but mine will not be the last word, I suspect,

15   on these issues.

16           Thank you very much.  We will be in recess.

17           (Adjourned, 2:35 p.m.)

18

19

20

21

22

23

24

25

```
 1               CERTIFICATE OF OFFICIAL REPORTER

 2

 3          I, Kelly Mortellite, Registered Merit Reporter

 4    and Certified Realtime Reporter, in and for the United States

 5    District Court for the District of Massachusetts, do hereby

 6    certify that the foregoing transcript is a true and correct

 7    transcript of the stenographically reported proceedings held in

 8    the above-entitled matter to the best of my skill and ability.

 9                    Dated this 18th day of November, 2022.

10

11               /s/ Kelly Mortellite

12               _____

13               Kelly Mortellite, RMR, CRR

14               Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | Criminal No. 20-10271-DPW |
| | ) | |
| (1) CEDRIC CROMWELL and | ) | |
| (2) DAVID DEQUATTRO, | ) | |
| | ) | |
| Defendants | ) | |

**GOVERNMENT'S STATEMENT REGARDING REVISED FORFEITURE MONEY
JUDGMENT AMOUNT, AND MOTION FOR HEARING ON RESTITUTION**

During the sentencing hearing on November 15, 2022, the Court asked whether the
government's motion for a money judgment order of forfeiture in the amount of $50,503.34
against defendant Cromwell (Doc. No. 275) should be in a lower amount, now that the Court has
entered judgment of acquittal on the extortion counts against him (Counts 6, 7, 8, and 10). The
answer is yes. The government now seeks a money judgment order of forfeiture against Mr.
Cromwell in the amount of $11,849.37. The government has filed a revised proposed Order of
Forfeiture (Money Judgment) in this amount. Doc. No. 285. The government still also seeks an
order of forfeiture for the Bowflex, as requested in Doc No. 275.

On the issue of restitution, the government respectfully requests that the Court schedule a
hearing in 60 days, and a pre-hearing briefing schedule, to address whether the Mashpee
Wampanoag Tribe is entitled to restitution from the defendants for legal expenses it incurred in
complying with grand jury subpoenas during the investigation of this case. *See* 18 U.S.C. §
3663A(b)(4). Through his counsel, Mr. Cromwell has assented to this request. Through his
counsel, Mr. DeQuattro takes no position on the request, reserving his right to oppose restitution
as being applicable to him.

With regard to Mr. Cromwell, against whom charges of filing false tax returns are still pending, the government respectfully requests that the Court enter an order excluding the time from November 15, 2022 until the date that the Court enters a restitution order. The ends of justice that would be served by granting this continuance outweigh the best interest of the public and Mr. Cromwell in a speedy trial. Failure to grant such a continuance would deny Mr. Cromwell's counsel or the attorneys for the government the reasonable time necessary for effective preparation, taking into account the exercise of due diligence. *See* 18 U.S.C. §3161(h)(7)(A), (B)(iv).

<div style="margin-left: 40%">

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney

By:  */s/ Christine Wichers*
Christine Wichers
Jared C. Dolan
Assistant U.S. Attorneys

</div>

**Certificate of Service**

I certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on November 18, 2022.

<div style="margin-left: 40%">

*/s/ Christine Wichers*
Christine Wichers

</div>

2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )          Criminal Action
                                   )          No. 20-10271-DPW
v.                                 )
                                   )
CEDRIC CROMWELL and                )
DAVID DEQUATTRO,                   )
                                   )
          Defendants.              )
                                   )


BEFORE THE HONORABLE DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE


TELECONFERENCE

November 22, 2022
10:01 a.m.


John J. Moakley United States Courthouse
Courtroom No. 1
One Courthouse Way
Boston, Massachusetts  02210


Kelly Mortellite, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 3200
Boston, Massachusetts  02210
mortellite@gmail.com

```
 1    APPEARANCES:
      Counsel on behalf of United States:
 2    Christine J. Wichers
      Jared C. Dolan
 3    United States Attorney's Office MA
      1 Courthouse Way
 4    Suite 9200
      Boston, MA 02210
 5    617-748-3278
      Christine.wichers@usdoj.gov
 6    Jared.dolan@usdoj.gov

 7    Counsel on behalf of Defendant Cedric Cromwell:
      Timothy R. Flaherty
 8    699 Boylston Street, 12th Flr.
      Boston, MA 02116
 9    617-227-1800
      Timothyrflaherty@gmail.com

10
      Counsel on behalf of Defendant David DeQuattro:
11    Martin G. Weinberg
      Maksim Nemtsev
12    Martin G. Weinberg, PC
      20 Park Plaza
13    Suite 1000
      Boston, MA 02116
14    617-227-3700
      Owlmgw@att.net

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

(Case called to order.)

    THE COURT:  Well, I wanted to get you in promptly to
put things in order for purposes of the judgment in the case
and also to pick up the question that I anticipate of stay
pending appeal.  It has been to some degree developed in
preliminary filings that I've received really in the last few
days.  But let me outline for you really what's on my mind as a
broader matter and then narrow it down to more specific issues.

    In cases like this, there have been several of them,
in which there are significant issues that are on the cutting
edge, I've been of the view that I would like to have the case
in a posture that the Court of Appeals can deal with it
promptly and fully.  As a consequence, for example, my larger
interest is in making sure that all of the transcripts are
prepared, they're ready to go, that sort of thing.

    In looking at the docket in the case, I noted that,
while there were a number of transcripts, not all of the
transcripts were prepared, and I don't know whether the parties
are considering asking for additional transcript for purposes
of appeal, but to the degree they are, that implicates of
question of what the issues would be for appeal.

    The example that I would use is that, in part from my
review of the docket, it did not appear that Trial Day Nine had
been asked for or prepared.  Ms. Mortellite prepared it.  It's

1   been provided to you.  And that's a critical issue with respect

2   to the question of how the jury was instructed in this case.

3   I'm also struck by and was struck by the Court of

4   Appeals decision on Friday afternoon in *Moffett*, which was a

5   case that Mr. Weinberg and Mr. Nemtsev handled as well dealing

6   with how Judge Young had handled jury matters.  I don't think

7   this has any *Moffett* dimension to it.  I don't think this case

8   has jury issues, although we did have discussions about juries.

9   In any event, I would like to be sure that I've addressed all

10:04 10   of the potential issues in the case.  So that's the broader

11   outline.

12   More narrow are a couple of things that popped up

13   during the course of the discussion that we had.  One of them

14   was the question of outstanding Hobbs Act cases that the

15   government seemed perplexed when I asked about cases that I

16   thought I was going to receive an update about, but I went back

17   and looked more intensively at document number 228, which is

18   the government's initial brief addressing jurisdictional

19   issues, and it was cross-referenced in the supplemental memo,

10:05 20   but only two cases have been identified to me involving Hobbs

21   Act extortion in the context of allegations that an officer,

22   tribal officer is someone who acts under the color of official

23   right.

24   One of the citations is to *Wikipedia*.  It appears that

25   the case is so old that it can't be found referenced elsewhere.

        1    My recollection is I asked the government to go through its

        2    files and see if you could find it somewhere.  I recognize that

        3    we've got problems arising from the amount of issues of COVID

        4    shutdown and that sort of thing, but I really would like to

        5    know a bit about the *Overton* case.

        6            Separately there is a case, *United States v. Blackhair*

        7    that was cited.  It was quiescent at the time it was cited, but

        8    I went back and looked at it.  It is -- just hold on for a

        9    second.  Can I put you on hold for a second?

10:07  10            (Off the record.)

       11            THE COURT:  Sorry, the event of the holidays means

       12    more stuff happens rather than less here.

       13            In any event, I was speaking to *United States v.*

       14    *Blackhair*, which now is apparently getting ready for trial.

       15    It's scheduled for trial in mid-December.  My quick reading of

       16    the materials in the case is that the what I'll call tribal

       17    official issue is not fully developed there, surprisingly to

       18    me.  So that's not my case, and it's not my responsibility to

       19    talk to any defense counsel involved in that case.  But I would

10:08  20    note that the critical case that made a transformation I think

       21    in Section 666 was from the Tenth Circuit pointing out that

       22    there had not been identification of the tribal officials as

       23    being the types of officials who should be considered in this

       24    context, and shortly thereafter Congress changed the statute to

       25    be explicit, and that was something that was important to me.

```
 1          In any event, I guess I would like to have developed
 2     that part of this.  And I don't know, Ms. Wichers, if you've
 3     had communications with anybody about those two cases.
 4          MS. WICHERS:  Not about *Blackhair*.  But the other one,
 5     the Oklahoma case, someone in my office was able to track down
 6     the docket number as well as the district.  We weren't sure of
 7     which district.  So we have asked for -- I was just actually
 8     emailing my paralegal to see how that was going.  He was going
 9     to check with both the U.S. Attorney's Office in that district
10:09 10   to see if they still had the records and, if not, to contact
11     NARA.
12          So I should be able to get back to Your Honor shortly
13     to see which of those two offices has the records and when we
14     can expect to get them.  And I'm also prepared, if Your Honor
15     permits, to quickly brief the issue of the Tenth Circuit case
16     that Your Honor mentioned and the effect that it had on
17     Congress' amendment of 666.
18          THE COURT:  Right.  That may be useful.  I guess I
19     want to be sure that I've outlined the issues fully here, but I
10:10 20   want to understand whether or not in the chain of command in
21     the department there was any need to consult with the public
22     integrity section or whoever it is who oversees Hobbs Act
23     extortion under color of official right to see if there are
24     other cases, any other cases involved.
25          MS. WICHERS:  We did that, Your Honor, and they are
```

```
 1   not aware.
 2           THE COURT:  Okay.  So these, so far as you know, these
 3   are the only two cases?
 4           MS. WICHERS:  Yes, Your Honor.
 5           THE COURT:  And with respect to *Blackhair*, you said
 6   you wanted to -- you might have something more that you wanted
 7   to say about the Tenth Circuit.
 8           MS. WICHERS:  Not about *Blackhair* but the Tenth
 9   Circuit case that Your Honor mentioned.
10:11 10         THE COURT:  Yes.
11           MS. WICHERS:  Yes, that case and how it then affected
12   the amendment, what the effect was in amending 666 by Congress.
13   I'm not prepared to do it now unless you give me a minute.
14   Because Skip Lockhart, the chief of our appellate unit, looked
15   at that case and had some information which I can certainly
16   brief the Court on.  I could file something today if Your Honor
17   would like.
18           THE COURT:  I think that would be helpful.  That gives
19   me a chance to absorb it.  I of course tried to track the
10:11 20   chronology of the Tenth Circuit case and the enactment within
21   really a couple of months of an amendment that I found
22   important to 666(a).  So if you could do that, that would be
23   helpful.
24           MS. WICHERS:  Yes.
25           THE COURT:  Then turning back to *Moffett* as an
```

example, I don't know what the defendants intend to raise on

appeal, but in order to have a full opportunity to address the

questions of likelihood of success on appeal and the impact

that that has on stay, I think I should know.

And so, I don't know, Mr. Weinberg, if you're prepared

to deal with that now, or Mr. Flaherty, if there are things

beyond what we've talked about so far, the issues that have

been teed up.  And particularly because of the discussions that

had to do with charging the jury, I wanted to be sure that I

was aware of them and I could speak to them if necessary.

MR. WEINBERG:  So, Judge, I don't know that this will

be one of the issues raised on appeal.  We have other issues

that the Court has labeled --

THE COURT:  Yes.

MR. WEINBERG:  -- you've heard me at length.  But one

issue that we preserve, both Mr. Flaherty and I, the period

between the oral instructions which led to the jury being

allowed to deliberate but not deliberate to finality and then

the I think two days that resulted in written instructions that

were submitted to the jury with Your Honor then liberating

them, authorizing them to review the written instructions,

treat them as final and to deliberate to verdict.  We did

object to the period where they were not permitted to reach a

verdict.

I know that's the opposite of the issues that were

1    raised in the *Pullman* case regarding whether they could

2    deliberate at all.  We did not object to the deliberation.

3    Rather we urged the Court to reconsider whether the jury should

4    be free to reach a verdict even before receiving the final

5    written instructions.

6         So I'm not waiving that issue.  I'm not admitting to

7    it being an appellate issue.  I have just not reached that

8    decision.  To some extent we have other significant issues that

9    we want to raise regarding what is the standard of review, is

10:14 10   it the Yin or the Yang in terms of Your Honor's definitions of

11   *Stewart* and the equipoise laws, a variety of other issues, but

12   that would be the one we preserve, Judge.

13        THE COURT:  Well, that's helpful I think in part

14   because it's an issue that arises both pro and con.  That is to

15   say it's arisen in cases in which I've been asked not to permit

16   the jury to deliberate to completion.  And my quick read of

17   Trial Day Nine told me that there was that issue out there.  I

18   wanted to be sure that it was there.

19        I think it's something that I will want to know about,

10:15 20   I'll want to have the parties brief here.  I'm not really

21   trying to force more briefing, but I want to be sure that I've

22   got the case in the posture that the Court of Appeals can deal

23   with it promptly here.

24        Now let me turn to more specific issues.  As the state

25   of the record stands now, I have announced my judgment in the

```
 1   case, and we all understand that the written judgment and
 2   commitment order can't depart from that.  It has to reflect
 3   that.  So what I've said I was going to do is what I'm going to
 4   do, unless of course I really do encounter some issue that
 5   gives me sufficient pause that I either enter a further
 6   judgment of acquittal or I order a new trial in a different
 7   setting.  That's what I'm thinking about right know.  I want to
 8   be sure I've got that.  I don't want to take too much time to
 9   do that, but I'd like to have that straightened away.
10           If I were to grant a stay pending appeal, there would
11   be, as you've pointed out, issues concerning the question of --
12   yet another -- I hate to impose on you, but can we reconvene at
13   11:00?  Is that possible for the parties?  I'm sorry to tie you
14   up, but I'm being pressed by another matter.  Is that
15   sufficient for everybody else?  That will give me a little bit
16   of time to talk to you as well.
17           MS. WICHERS:  Yes, Your Honor.
18           MR. WEINBERG:  Yes, Your Honor.
19           MR. FLAHERTY:  Yes.
20           THE COURT:  Ms. Beatty, is that okay with you?
21           THE CLERK:  That's fine.
22           THE COURT:  Okay.  I would prefer, as this discussion
23   develops, to take more time and not feel pressed to answer some
24   questions that I have to answer immediately.  Okay?  So we'll
25   reconvene.  Let's make it at 11:00.  Okay.  Thank you very
```

 1    much.

 2              (Recess, 10:17 a.m. - 11:01 a.m.)

 3              THE COURT:  I apologize for interrupting, but it was a

 4    matter that needed to be dealt with promptly.  I want to go

 5    back to where we were before, which is the identification of

 6    the potential issues here.

 7              Mr. Weinberg obviously has identified one particular

 8    issue that has been reserved here that I'll want to look at

 9    more carefully of course in all of this, and he promptly

11:01 10   indicated there may be other issues here.  But you understand

 11   my view, which is I'd like to be able to address anything that

 12   is likely to be presented here and have a reasonable amount of

 13   time in which the parties can brief it to me as well as prepare

 14   to go to the Court of Appeals.

 15             I don't know, Mr. Weinberg, if you have anything else

 16   that you wanted to identify?

 17             MR. WEINBERG:  No.  Just if we could have until

 18   Tuesday, given the Thanksgiving holiday.

 19             THE COURT:  No, this is not going to be a race here.

11:02 20   I want a reasonable amount of time.  I mean, I want to get to

 21   it promptly, but I want a reasonable amount of time.  Tuesday

 22   is fine, that's okay.  But we'll talk about it in just a

 23   broader sense in just a moment.  Let me go back to Ms. Wichers.

 24   You were going to offer some observations about the Tenth

 25   Circuit.

1          MS. WICHERS:  Yes.  I'd like the chance to brief it.

2    And I should say more specifically, because the appeal will be

3    handled by AUSA Karen Eisenstadt, she will need to review

4    anything that I write.  But in general, I believe that the case

5    Your Honor referenced is United States v. *Barquin*.

6          THE COURT:  Right.

7          MS. WICHERS:  And then I mean, the text at that time

8    of 666 did not refer to Indian tribal governments.  It said

9    local government agency.  And the Court held that an Indian

11:03 10   tribe is not a governmental subdivision of a state because

11   tribes are their own sovereignties and are not parts of a state

12   government.  And then Congress amended 666 to clarify that

13   tribal governments are covered.  So we don't think that is --

14   we'd like to brief it, but we don't think that is on point and

15   certainly not on point with regard to 219.51.

16          So I'd like to brief that issue as well as get

17   further -- we just heard from the Western District of Oklahoma

18   that they destroyed the case file in 2000 because Mr. James was

19   sentenced to less than ten years, and that was their practice.

11:04 20         THE COURT:  I think that was Mr. Overton.

21          MS. WICHERS:  Overton James or James Overton, that

22   gentleman.

23          THE COURT:  Okay.

24          MS. WICHERS:  So they are contacting the court to see

25   if they have a docket sheet at least.  It seems that the U.S.

1  Attorney's Office there in Oklahoma does not have anything.

2  But I'd like to follow up on that and address the effect of

3  *Barquin* and anything else that Your Honor would like briefing

4  on.

5      THE COURT: Okay. Well, that's fine. I think I, as

6  you've recognized, read the chronology of the transformation of

7  666 differently than you do on that. But I'm open obviously to

8  having this developed fully on both sides because it is a

9  question that arises about the substantiality of the appeal

11:05 10  issues that is at the foundation of a stay pending appeal.

11      So I would like to get a structure of timing. With

12  respect to what the court in Oklahoma is likely to have, it's

13  probably likely to be just like what we have here, which is

14  that, at a certain stage, the dockets were maintained

15  separately and sent to NARA, but we'll see, you'll see what's

16  involved, and you'll see what NARA has as well.

17      There was a wholesale effort in the last several years

18  to cut back on the amount of paper, and as a consequence,

19  there's been destruction of documents. In theory the documents

11:06 20  have been changed in terms of the media that's available. I

21  say that in theory because it's in my experience been that

22  large numbers of documents that I've looked for can't be found.

23  But in any event, whatever you find is more than what we have

24  now, so I welcome that.

25      Let me turn to the question of -- someone else picked

```
 1    that line up.

 2          Let me turn to the question of what I'll call broadly

 3    timing of what we want to do here and, assuming that there's

 4    going to be a stay pending appeal, what would be appropriate.

 5    I do want to get to the question of restitution, but I'm not

 6    sure there's a lot to do in restitution here.  Certainly not

 7    enough to take it out 60 days, particularly in light of the

 8    revised submission that was made by the government.

 9          I've thought about the question of the forfeiture of

11:07 10    the Bowflex.  My concern is twofold there.  Number one, I

11    suppose that's probably the best and easiest way of dealing

12    with it.  The second is that I do think that the tribe should

13    be offered the opportunity to take it.  I also recognize that

14    the tribe may under the circumstances view it as further insult

15    to be offered it.  And I don't know what proposals either you

16    or Mr. Flaherty have with respect to that issue.

17          Ms. Wichers, you know, Mr. Weeden indicated that there

18    had been some communications -- and you did too --

19    communications with the tribe before the hearing discussion

11:08 20    about the concerns of the U.S. Attorney's Office, and I don't

21    know whether this was swept into that discussion at all.  So

22    maybe you can start on that.

23          MS. WICHERS:  We did not discuss that, but we are

24    meeting with those same gentlemen today at 2:30, so I'll have

25    an answer to that.
```

           THE COURT:  Okay.  So I think my thought is this, that

1    I would otherwise, for instance, if it were a thing of value

2    that really belonged to the tribe and the tribe might want it,

3    a house or something like that, I might very well say I'm not

4    going to do a forfeiture, I'm going to do it as restitution or

5    at least have the government explain to me why it shouldn't be

6    done that way.

7          Here I think it's a little bit different for the

8    reasons that I've outlined, but if they think differently,

9    you'll advise me with respect to them there, the people

10   involved.

11         So now we're down to really a money judgment

12   forfeiture that's relatively modest in terms of number, but

13   they sure are obviously important in terms of maintaining a

14   particular position, but I'm not sure that it requires very

15   much more than me making a ruling after hearing the respective

16   views of the parties on that.

17         Mr. Flaherty, do you have any different view about

18   that?

19         MR. FLAHERTY:  I really don't, Judge.  I think it's

20   teed up for you to make a ruling.

21         THE COURT:  Okay.  If you want some further

22   opportunity to brief that question in its current form, that is

23   to say it was filed after we had the hearing or at least

24   contemporaneous with the hearing, I guess, you can have it.  I

```
 1    don't know how much time you'd want.
 2              MR. FLAHERTY:  This is on the money judgment
 3    forfeiture, the 11,000-and-some-change, Judge?
 4              THE COURT:  Yes.
 5              MR. FLAHERTY:  I don't know that a briefing will do
 6    any -- add any value to the argument, Judge.
 7              THE COURT:  That's fine, if that's the position that
 8    you want to take.  I think, Ms. Wichers, you may want to have
 9    something to say about that, and I don't know how long it would
11:10 10    take you to do it.
11              MS. WICHERS:  No, Your Honor.
12              THE COURT:  No.  Okay.  So I will address that myself
13    to decide what the restitution figure will be and the
14    forfeiture will be.  We'll get that straightened away.  Then
15    the question of fine.
16              MS. WICHERS:  Sorry, did you just ask about
17    restitution, or were you only asking about forfeiture?
18              THE COURT:  Both.
19              MS. WICHERS:  Well, so today when we meet with the
11:11 20    tribe we're expecting to receive the legal invoices, which is
21    the basis for their claim, so we will certainly submit those to
22    Your Honor.  I don't know if you want to set out a briefing
23    schedule on it.
24              THE COURT:  Yes, I do.  That's why I was raising this
25    together, these issues.  I understand, correct me if I'm wrong,
```

1    I understand that as far as both of you are concerned there's

2    nothing more that you want to file with respect to the question

3    of the money judgment forfeiture.  I will get some filing about

4    the forfeiture of the Bowflex here, whether they're prepared to

5    go forward, put that into the context of restitution.  I may

6    view the money judgment forfeiture in one of two ways, that is

7    to say no, it should be put into restitution, or,

8    alternatively, I'll simply reorder what gets paid first in this

9    area.  But it seems to me that that is probably money that

11:12 10   belongs to the tribe rather than to the government even though

11   the government has its forfeiture possibilities here.  Now

12   we'll deal with the straight restitution issue that you've been

13   talking about, and I want to get a sense from you what you

14   believe you need to tee that up by briefing.

15       MS. WICHERS:  Not much, Your Honor.  Really just the

16   legal invoices.  I don't know whether Mr. Flaherty intends to

17   argue that the tribe legally is not entitled to restitution

18   with regard to the legal bills.  If not, then I think we'll

19   just send you the legal bills.

11:13 20       THE COURT:  Well, here is what I want from you, and

21   Mr. Flaherty can think about a response, but simply the

22   position of the United States government with respect to the

23   victim status of the tribe and its entitlement to legal fees,

24   and you submit their invoices if you find them to be

25   well-founded, I mean, not that you've gone through hour by hour

```
 1    but they're suitably supported by payments and money that

 2    they've lost already.

 3         Then Mr. Flaherty can respond to that, which may well

 4    be that they're not a victim at all, and, consequently, they

 5    don't get restitution.  And it may also include that what's

 6    been submitted is not supported adequately, or if it's

 7    supported, it's inflated.  I don't know whatever claims are

 8    going to be made about that.  That, it seems to me, may take a

 9    little bit of time.  But I would think that if you can,

11:14 10   Ms. Wichers, get that basic brief to me by next Friday.

11         MS. WICHERS:  No problem.

12         THE COURT:  Not this Friday.  The 2nd.

13         MS. WICHERS:  Yes, it can be done.

14         THE COURT:  And Mr. Flaherty, then I'll give you what

15    you want, whatever that is.  What is it?

16         MR. FLAHERTY:  I will probably need until the 16th,

17    Judge.  I've got some other matters that I have to try in the

18    intervening days.  I may even ask for, from the government, in

19    connection with whatever submission that the tribe makes on

11:15 20   legal expenses, if I could have access to any grand jury

21    subpoenas that are connected to those served on the tribe.

22         THE COURT:  Let's wait and see on that.  I mean, I

23    suppose it's to check against whether or not when there's claim

24    for the need to respond there is in fact a grand jury subpoena

25    outstanding and so on.  But I don't really want to get into, I
```

 1   don't think we need to get into too much more of the grand jury

 2   stuff, except that they were asked to do stuff and they did it.

 3            So I think my view right now is you'll respond at a

 4   reasonable time, if the 16th is a reasonable time.  If you say,

 5   I need more information as well, I object, but I need more

 6   information as well, I'll look at it at that point and we'll

 7   get that straightened away as we move along.  So we've got the

 8   5th and the 16th for that aspect of the restitution issue.

 9            Now, the question of fine here.  The way in which some

11:16 10   of the case law has gone on this is to permit either security

11   or for fine to be put into the registry of the Court.  And that

12   will be, on the face of it, the way I think I would do it here.

13   The parties may have or particularly the defendants may have a

14   different view about that.  But if I were to stay, I'd

15   certainly want to have security with respect to the judgments

16   in the case that have economic dimensions to them.

17            I don't know, Mr. Weinberg or Mr. Flaherty, if you

18   have views about that that you'd like to share at this point.

19            MR. WEINBERG:  I don't have strong views, Your Honor.

11:17 20   I could offer as an alternative Mr. DeQuattro post $50,000 that

21   I would keep in escrow and, if his appeal was unsatisfactory,

22   was denied, immediately pay the fine to the clerk's office as

23   contrasted to paying the clerk and then going through the

24   process of getting it back if he prevails.

25            THE COURT:  Well, you think about it.  I'm a little

1    concerned about having counsel provide the escrow, just as a

2    difficult -- it can be a difficult issue of a different sort.

3    A way of dealing with it can be a letter of credit as well.

4    There are a variety of different security devices that can be

5    provided there.  They cost some money.  The value of putting it

6    into the registry of the Court is it doesn't.  That is to say

7    it's put in the registry of the Court.  It accrues or not,

8    according to the registry's elements.  But you take a look at

9    it and think about it.

11:18  10         I think I would like to have a response on that

11    dimension of it by, I'll use the next Friday as the date for

12    all of this, I guess just to keep it straightened away so

13    everybody understands what's involved.  And that includes the

14    additional issues that may be pressed here rather than turning

15    it around on Tuesday after the holiday.  I assume that's

16    agreeable to the parties.

17         MS. WICHERS:  Yes, Your Honor.

18         THE COURT:  Okay.  Now, I think that covers all of the

19    issues that may arise here.  My general view, as I've

11:19  20    indicated, is that I'm likely to enter a stay pending appeal in

21    this case.  I want the last opportunity to look at the issues

22    and be persuaded otherwise as to them, if I can be.  And the

23    way in which to do that is, as I said, to get the record as

24    close to what would be appropriate for the Court of Appeals to

25    be looking at as possible.  So those are the guiding principles

1    in dealing with it.

2         Are there other questions that the parties have about

3    this?  So long as this is the case, that is, we still have the

4    pronouncement of the judgment here, oral announcement, but

5    there is no judgment that's entered, I probably will -- not

6    probably.  I of course have prepared a draft of the judgments

7    in the case already, but I think I want to look at whatever it

8    is that you raise, and I'll share those with you, and then

9    we'll enter the judgment and go from there.

11:20 10         MS. WICHERS:  Your Honor, the only other question I

11   have is, since restitution, to the extent it's to be awarded by

12   the Court to the tribe, it would be restitution for their legal

13   costs incurred in collecting and producing records relevant to

14   the investigation, which was the investigation of both

15   defendants.  And so is Your Honor inclined to consider that

16   issue with restitution with regard to both defendants?

17         THE COURT:  I would.  You make the argument, you now

18   have two people fighting against it, but so long as you've got

19   a basis for an allocation between them, and I think I hear you

11:21 20   saying the basis for the allocation is equal apportionment,

21   that is, both of them were the targets of a grand jury

22   investigation at the same time and these materials were

23   addressed to the same set of issues, it may be that someone's

24   going to say there should be a different kind of apportionment,

25   I don't know.  That can make it more difficult, but we'll face

 1   that one when we have to.  But you're now in that game,

 2   Mr. Weinberg.

 3        MR. WEINBERG:  So I assume, if I can, that since I was

 4   aware that there was an investigation of Mr. Cromwell and the

 5   compelling of records from the tribe far before Mr. DeQuattro

 6   became a target, Ms. Wichers will be required, when she makes

 7   her submission on December 2, to break out when Mr. DeQuattro

 8   became a target and to only provide the documents regarding any

 9   contention that DeQuattro pay restitution for that period on

11:22 10   rather than the lengthy period before that, when the government

 11   was investigating Mr. Cromwell I think for other offenses

 12   rather than specific allegations that resulted in convictions.

 13        THE COURT:  I think that's a fair request.  Although

 14   I'm not going to put it quite that way.  I think, Ms. Wichers,

 15   you've got to give us or give them and me a basis for your

 16   allocation among them between the parties.  That is to say, to

 17   the degree that Mr. DeQuattro became a target after

 18   Mr. Cromwell did, that the time period leading up to that would

 19   not necessarily be allocated to Mr. DeQuattro.  But maybe you'd

11:23 20   say otherwise, I don't know.

 21        Second, that Mr. Cromwell's income tax violations you

 22   may or may not treat as separate.  My view of it from afar is

 23   that the government's view was that the engagement of the IRS

 24   agents fortified the basic case before I severed the counts for

 25   income tax fraud, income tax violation, and those were of

1   course added by the superseding indictment here.

2          Now, that leads me to one further point, which is to

3   say that I've indicated and I want to be sure that there's not

4   some issue about this; that my severance of the case with

5   respect to tax involving Mr. Cromwell severs that case and

6   judgment can enter with respect to the superseding indictment

7   or the original indictment, I suppose, as to the original

8   counts there.  But I just want to be sure that's understood

9   here because I want this case to move on what the jury has

11:24 10   dealt with here, and we'll get back to the question of income

11   tax violation at a later point as necessary.

12          MS. WICHERS:  Yes, that's the government's

13   understanding, that that is permissible.  Your Honor would

14   enter judgment with regard to Counts One through Ten on the

15   superseding indictment and the others would be tried later.

16          THE COURT:  Okay.  All right.  So then once the -- I

17   believe, once judgment is issued with respect to Counts One

18   through Ten as to the superseding indictment, the government

19   would be dismissing the original indictment itself.

11:25 20          MS. WICHERS:  I think that's right.

21          THE COURT:  Okay.  All right.  That's my understanding

22   as well, but I raise it because it's a touchy issue having to

23   do with double jeopardy, frankly, and the potential for finding

24   that there's a prior judgment on this issue.  But that's where

25   I think it will be.  That's the way I'll be thinking about the

1    judgment that I will be fashioning here.

2         MS. WICHERS:  Your Honor, what's the -- sorry, I'm not

3    following.  What's the potential double jeopardy issue?  I

4    hadn't thought that through.

5         THE COURT:  If you came back and said we want to try

6    him on the original indictment.  He's been found guilty or not

7    guilty on the superseding but not on the original indictment.

8    Ordinarily what happens is people supersede and then they

9    dismiss the underlying indictment afterwards.  But it may be

11:26 10   that the government will have a different view about that.

11   That's why I throw it out.  I have my own views, which is I'm

12   not fully informed yet with the particulars of this case, but

13   my guess is you've had your trial on Counts One through Ten.

14        MS. WICHERS:  Yes.

15        THE COURT:  You either win or you don't, and the Court

16   of Appeals does what it does or doesn't in terms of this, or I

17   do something with respect to it.  But in any event, that was

18   your chance to prove those charges.

19        MS. WICHERS:  Right, I think that's right.  I'll just

11:26 20   check with someone in my office, but I anticipate that we would

21   agree with that and dismiss the original indictment.

22        THE COURT:  And that would happen after the judgment

23   enters here.

24        MS. WICHERS:  Yes.

25        THE COURT:  Right.  Okay.  Anything else that we need

1    to talk about?  So we've got this thing coming up on the 5th.

2    That is the kind of witching hour for various issues here that

3    the parties will be submitting to me.  And then Mr. Flaherty

4    has until the 16th to respond.  And Mr. Weinberg, you may also

5    want to respond after you take a look at whatever is submitted

6    with respect to the additional restitution.

7            MR. WEINBERG:  Thank you, Judge.

8            THE COURT:  Okay.  Thank you very much for indulging

9    me both immediately this morning and on the cusp of

11:27  10    Thanksgiving and also for letting me break off to deal with yet

11    another inconsistent matter.  But we'll be in recess.  Have a

12    good holiday.

13            (Adjourned, 11:27 a.m.)

```
 1              CERTIFICATE OF OFFICIAL REPORTER

 2

 3          I, Kelly Mortellite, Registered Merit Reporter

 4    and Certified Realtime Reporter, in and for the United States

 5    District Court for the District of Massachusetts, do hereby

 6    certify that the foregoing transcript is a true and correct

 7    transcript of the stenographically reported proceedings held in

 8    the above-entitled matter to the best of my skill and ability.

 9                    Dated this 29th day of November, 2022.

10

11                    /s/ Kelly Mortellite

12                    _____

13                    Kelly Mortellite, RMR, CRR

14                    Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | Criminal No. 20-10271-DPW |
| | ) | |
| CEDRIC CROMWELL, | ) | |
| | ) | |
| Defendant. | ) | |

**UNITED STATES' SUPPLEMENTAL BRIEF
ADDRESSING THE HOBBS ACT COUNTS**

During the status conference on November 22, 2022, the Court invited the government to brief two issues raised by the Court on November 15, 2022 when it granted Cedric Cromwell's motion for judgment of acquittal on the Hobbs Act counts.

The first issue concerns the 1985 case of *United States v. Overton James*, No. 85-cr-25-T (W.D. Okla.). Contrary to a Wikipedia entry on Mr. James, which states that he was charged with extortion, https://en.wikipedia.org/wiki/Overton_James, it appears from the docket sheet that he was not charged with that offense. *See* Exhibit A. The docket sheet indicates that Mr. James pled guilty to an information charging him with Conspiracy, in violation of 18 U.S.C. § 371; Perjury, in violation of 18 U.S.C. § 1623; and Receiving HUD Rebates with Intent to Defraud, in violation of 18 U.S.C. § 1012. *Id.* at p.1 (listing charges), p.14 (docket entries noting plea agreement and information), p.15 (docket entries noting James was sentenced to nine months on each of the three counts, to run concurrently).[1]

---

[1] The government has ordered the following five docket entries from the National Archives and Records Administration and will submit them to the Court as soon as it receives them: (1) original indictment (DN 1); (2) second indictment (DN 58); superseding indictment (DN127); information (DN 180); and judgment (DN 184).

The second issue concerns Congress's amendment of 18 U.S.C. § 666 after the Tenth

Circuit decided *United States v. Barquin*, 799 F.2d 619 (10th Cir. 1986), and the relevance of

that amendment, if any, to Hobbs Act extortion under color of official right as it applies to tribal

officials. As explained below, Congress's amendment of Section 666 is irrelevant to the

government's position that Section 1951's prohibition of extortion under color of official right

applies to tribal officials.

The defendant in *Barquin* paid a bribe to an agent of the Northern Arapahoe Business

Council. *Id.* at 619. He argued that Section 666 did not cover tribal councils. The statute at the

time read as follows:

> (a) Whoever, being an agent of an organization, or of a State or ***local government
> agency***, that receives benefits in excess of $10,000 in any one year period
> pursuant to a Federal program involving a grant, a contract, a subsidy, a loan,
> a guarantee, insurance, or another form of Federal assistance, embezzles,
> steals, purloins, willfully misapplies, obtains by fraud, or otherwise
> knowingly without authority converts to his own use or to the use of another,
> property having a value of $5,000 or more owned by or under the care,
> custody, or control of such organization or State or local government agency,
> shall be imprisoned for not more than ten years and fined not more than
> $100,000 or an amount equal to twice that which was obtained in violation of
> this subsection, whichever is greater, or both so imprisoned and fined.

> (b) Whoever, being an agent of an organization, or of a State or ***local government
> agency***, described in subsection (a), solicits, demands, accepts, or agrees to
> accept anything of value from a person or organization other than his
> employer or principal for or because of the recipient's conduct in any
> transaction or matter or a series of transactions or matters involving $5,000 or
> more concerning the affairs of such organization or State or local government
> agency, shall be imprisoned for not more than ten years or fined not more than
> $100,000 or an amount equal to twice that which was obtained, demanded,
> solicited or agreed upon in violation of this subsection, whichever is greater,
> or both so imprisoned and fined.

> (c) Whoever offers, gives, or agrees to give to an agent of an organization or of a
> State or ***local government agency***, described in subsection (a), anything of
> value for or because of the recipient's conduct in any transaction or matter or
> any series of transactions or matters involving $5,000 or more concerning the
> affairs of such organization or State or local government agency, shall be

2

imprisoned not more than ten years or fined not more than $100,000 or an amount equal to twice that offered, given or agreed to be given, whichever is greater, or both so imprisoned and fined.

(d) For purposes of this section —

(1) "agent" means a person or organization authorized to act on behalf of another person, organization or a government and, in the case of an organization or a government, includes a servant or employee, a partner, director, officer, manager and representative;

(2) "organization" means a legal entity, other than a government, established or organized for any purpose, and includes a corporation, company, association, firm, partnership, joint stock company, foundation, institution, trust, society, union, and any other association of persons;

(3) *"government agency"* means *a subdivision of the executive*, legislative, judicial, or other *branch of a government*, including a department, independent establishment, commission, administration, authority, board, and bureau; or a corporation or other legal entity established by, and subject to control by, a government or governments for execution of a governmental or intergovernmental program; and

(4) *"local"* means of or pertaining to *a political subdivision within a State*.

Pub. L. 98-473, Title II, § 1104(a), 98 Stat. 2143 (Oct. 12, 1984) (emphasis added).

The issue for the *Barquin* court was whether a tribal council was a "local government agency." *Barquin*, 799 F.2d at 620.[2] Given the statutory definitions of "government agency" and "local," the ultimate question was whether the tribe or its business council were "subdivisions of the executive branch of a political subdivision within a state." *Id*. The court held that they were not, because they were wholly distinct from, and not subject to the authority of, any state. *Id*. at 621. Furthermore, a tribe is not a "subdivision" of any entity; it is a sovereign. *Id*. The court concluded:

---

[2] The government conceded that a tribal council was not an "organization" as that term was defined in Section 666. *Barquin*, 799 F.2d at 620 n.2.

3

Accordingly, we hold that Congress did not include Indian tribes or their business councils within the ambit of 18 U.S.C. § 666. Moreover, the narrowly drawn definitions contained within the section exclude it from the category of general federal crimes which are applicable to members of a tribe. We are therefore compelled to observe, if it is the intent of Congress to include tribes within the ambit of § 666, it must do so with specificity.

*Id.* at 621-22 (emphasis added).

A few months after *Barquin* was decided, Congress amended Section 666 to read as follows:

(a) Whoever, if the circumstance described in subsection (b) of this section exists —

(1) being an agent of an organization, or of a State, local, ***or Indian tribal government***, or any agency thereof —

(A) embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that —

(i) is valued at $5,000 or more, and

(ii) is owned by, or is under the care, custody, or control of such organization, government, or agency; or

(B) corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more; or

(2) corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of an organization or of a State, local ***or Indian tribal government***, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more;

shall be fined under this title, imprisoned not more than 10 years, or both.

(b) The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.

4

(c) This section does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business.

(d) As used in this section —

> (1) the term "agent" means a person authorized to act on behalf of another person or a government and, in the case of an organization or government, includes a servant or employee, and a partner, director, officer, manager, and representative;

> (2) the term "government agency" means a subdivision of the executive, legislative, judicial, or other branch of government, including a department, independent establishment, commission, administration, authority, board, and bureau, and a corporation or other legal entity established, and subject to control, by a government or governments for the execution of a governmental or intergovernmental program; and

> (3) the term "local" means of or pertaining to a political subdivision within a State.

Pub. L. 99-646, § 59, 100 Stat. 3592 (Nov. 10, 1986) (emphasis added).[3] Congress intended the language highlighted above to "clarif[y] that 18 U.S.C. § 666 covers programs of Indian Tribal governments and Tribal government agencies." H.R. Rep. No. 797 § 42, 99th Cong., 2d Sess. 1986, 1986 U.S.C.C.A.N. 6138, 6153, 1986 WL 311964, at *30 (Aug. 15, 1986).

Except for one small change not relevant here, Congress has never amended the Hobbs Act since enacting it in 1948.[4] There was no reason to do so in response to *Barquin* because the language in Section 666 that the *Barquin* court concluded did not encompass tribal governments ("political subdivision[s] within a State") appears nowhere in the Hobbs Act. *See Barquin*, 799

---

[3] This version of Section 666 is identical to the current version, except that the current version includes definitions of "State" and "in any one-year period."

[4] In 1994 Congress changed the amount of the fine payable under Section 1951 from $10,000 to the amount generally applicable to offenses under Title 18. *See* Pub. L. 103-322, 108 Stat. 1796 (Sept. 13, 1994).

5

F.2d at 621 (noting that it was "the specific definitions of § 666" that obligated the court to "analyze the governmental structure of the tribe and its place within the hierarchy of the governments rather than the conduct of the tribal members"). Unlike 18 U.S.C. §§ 201, 666, and 872, Congress did not write the Hobbs Act to circumscribe the types of bribers/bribees/extortioners to whom it applies. It instead extends to "whoever" commits extortion "under color of official right," which as a matter of its plain text includes tribal officials. The statute "speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion." *Stirone v. United States*, 361 U.S. 212, 215 (1960); *see also United States v. Rivera Rangel*, 396 F.3d 476, 485 n.8 (1st Cir. 2005) ("The Hobbs Act reaches anyone who actually exercises official powers, regardless of whether those powers were conferred by election, appointment, or some other method.") (internal quotation marks omitted).

Assuming *arguendo* that any Indian-specific interpretative principle applies to this unambiguous statute,[5] it would merely be the general principle—which even the *Barquin* court acknowledged—that "tribal members are subject to general federal criminal statutes unless a

---

[5]   The "clear-statement rule for abrogating [tribal sovereign immunity]" applied in *In re Coughlin*, 33 F.4th 600, 610 (1st Cir. 2022), *petition for cert. docketed*, No. 22-227 (Sept. 12, 2022), is inapt because the Hobbs Act charges in this case did not implicate the Tribe's sovereign immunity. The Tribe was not a defendant. Although the First Circuit has said in dicta that, "[a]t its most expansive, tribal sovereign immunity may extend to tribal officers," it clarified that this could apply "only when such officers are acting within the legitimate scope of their official capacity." *Narragansett Indian Tribe v. Rhode Island*, 449 F.3d 16, 30 (1st Cir. 2006). The Supreme Court in 2017 then reaffirmed the idea that merely acting "within the scope of [one's] employment with the tribe" does not cloak individuals with the tribe's sovereign immunity; such immunity applies *only* where the tribe is the "real party in interest" of the suit. *Lewis v. Clarke*, 137 S. Ct. 1285, 1288, 1291-92 (2017) ("The protection offered by tribal sovereign immunity here is no broader than the protection offered by state or federal sovereign immunity."). Cromwell was not acting in the "legitimate scope of [his] official capacity" in committing extortion, 449 F.3d at 30, and the Tribe was not the real party in interest of this prosecution.

6

particular Indian right or policy is infringed by enforcement of the law." *Barquin*, 799 F.2d at 621. The First Circuit referenced this same idea in *United States v. Boots*, where it held that tribal members are subject to the wire fraud statute because it "belong[s] to th[e] category of general offenses that apply equally to Native Americans," and the court could not "discern[] how the application of [that criminal statute] would interfere with any Native American right protected by statute or treaty, or right integral to self-government." 80 F.3d 580, 593 (1st Cir. 1996), *abrogated on other grounds by Pasquantino v. United States*, 544 U.S. 349 (2005). This principle is also articulated in the *Restatement of American Indian Law*, which states in relevant part:

> **General federal crimes.** *In general, the federal government possesses jurisdiction to enforce, in Indian country, federal crimes generally applicable throughout the United States*. Examples include drug offenses, bank robbery, felon in possession of firearm, mail fraud, embezzlement or theft from a tribal organization, theft from a tribal gaming facility, and failure to report child abuse. However, the Supreme Court has held that *when federal criminal statutes interfere with matters implicating tribal customs and laws, fede*ral law does not apply.

*Id.* § 70 cmt (h) (2022 ed.) (emphasis added).

The interest of an individual Indian criminal defendant is plainly not the same as the rights of the tribe itself. *Cf. Negonsett v. Samuels*, 507 U.S. 99, 110 (1993) (declining to equate the "benefit of dependent Indian tribes" with the "benefit of accused Indian criminals"); *United States v. Gallaher*, 624 F.3d 934, 941 (9th Cir. 2010) (noting that the Indian-law canons are concerned with the "tribal government," not "individual Indian criminal defendants"). Congress's prohibition of extortion by tribal officials does not "interfere with matters implicating tribal customs and laws," *Restatement of Indian Law* § 70 cmt (h), or any right integral to self-government. Extortion "under color of official right" refers to obtaining property to which a defendant is *not* entitled by virtue of their official position. *See Evans v. United States*, 504 U.S.

255, 268 (1992). No Mashpee Wampanoag custom or law allows its elected officials to use their political power to coerce others into giving them property to which they are not entitled. On the contrary, the Mashpee Wampanoag, like all tribes, have a strong interest in prohibiting extortion by their elected officials, which harms both the victims and the Tribe itself. Interpreting a statute containing no definitional limitations as prohibiting extortion by federal, state, and municipal officials but not tribal officials is both nonsensical and unfair to tribes.[6]

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney

By:   */s/ Christine Wichers*
Christine Wichers
Jared Dolan
Assistant U.S. Attorneys

### Certificate of Service

I certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on December 1, 2022.

*/s/ Christine Wichers*
Christine Wichers

---

[6] During the November 22 status conference, the Court stated that it might "enter a further judgment of acquittal or . . . order a new trial . . . ." Tr. at 10. The government respectfully submits that, although the Court has not yet entered judgment, it lacks the authority to modify the sentences it has already imposed based on the Section 666 counts. *See United States v. Tanco-Pizarro*, 892 F.3d 472, 477 n.1 (1st Cir. 2018) (citing 18 U.S.C. § 3582(c); Fed. R. Crim. P. 35).

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 20-10271-DPW |
| | ) | |
| CEDRIC CROMWELL and | ) | |
| DAVID DEQUATTRO, | ) | |
| | ) | |
| Defendants. | ) | |

### UNITED STATES' BRIEF ON RESTITUTION

The government respectfully requests that the Court order the defendants to pay $239,726.94 in restitution to the victim in this case, the Mashpee Wampanoag Tribe, and to hold the defendants jointly and severally liable. This request is supported by the declarations of Tribal counsel Rebekah Salguero and AUSA Christine Wichers, both of which have been filed under seal.

### ARGUMENT

The Mandatory Victims Restitution Act (MVRA) provides in relevant part: "Notwithstanding any other provision of law, when sentencing a defendant convicted of an offense described in subsection (c), the court shall order, in addition to . . . any other penalty authorized by law, that the defendant make restitution to the victim of the offense . . . ." 18 U.S.C. § 3663A(a)(1). Subsection (c) includes "an offense against property under this title." *Id.* § 3663A(c)(1)(A)(ii). The First Circuit has never defined "offense against property." *Cf.*, *e.g.*, *United States v. Collins*, 854 F.3d 1324, 1331 (11th Cir. 2017) (holding that an offense qualifies if property is its object, not simply a collateral component); *United States v. Turner*, 718 F.3d 226, 235 (3d Cir. 2013) (holding that an offense qualifies if it involves money). Depending on the facts, bribery can be an offense against property. *See United States v. Razzouk*, 984 F.3d 181,

188-89 (2d Cir. 2020), *cert. denied*, 142 S. Ct. 223 (2021). The defendants' bribery qualifies as an offense against property because items of property were the object of the crime: DeQuattro wanted RGB's valuable contract to stay in place (and got it), and Cromwell wanted cash, a Bowflex, and payment for a pricey hotel stay (and got it).

The term "victim" means "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2). A governmental entity can be a victim. *See United States v. Mei Juan Zhang*, 789 F.3d 214, 216 (1st Cir. 2015). This includes Indian tribes. *See United States v. Zander*, 742 F. App'x 358, 362 (10th Cir. 2018).

The Tribe is a victim of the defendants' crimes. Among other things, its reputation was severely damaged as a result of Mr. Cromwell's indictment, conviction, and sentence for bribery in connection with the Tribe's plans to build a resort and casino. Salguero Decl. ⁋ 12. That injury has caused distrust in potential lenders for the project, impeding the Tribe's ability to obtain financing for economic development. *Id.*

The Tribe is a victim in other ways as well. It had a relationship with Mr. DeQuattro's firm, Robinson Green Beretta (RGB), since at least 2011. *Id.* ⁋ 13. In 2014 the Tribe's Gaming Authority hired RGB to serve as the owner's representative for its casino project. *Id.* In 2018 it hired RGB to serve as the architect of record for its project to build housing for low-income Tribal members and elders. *Id.* In mid-2020 it hired RGB to serve as the architect of record for its project to build a childcare facility. *Id.* When Mr. Cromwell and Mr. DeQuattro were indicted in late 2020, the Tribe immediately terminated its relationship with RGB. *Id.* The housing project

was being built and the childcare facility had been designed. *Id.* Because of the RGB

terminations, the Tribe had to hire new architects for both projects, causing significant delays

and cost increases. *Id.* The housing project was funded by low-income housing tax credits and

the Tribe had to spend considerable time and resources assuring its investors and development

partners that it was not complicit in the Cromwell – RGB conspiracy. *Id.*

Restitution includes payment for "expenses incurred during participation in the

investigation and prosecution of the offense or attendance at proceedings related to the offense."

18 U.S.C. § 3663A(b)(4). These expenses include legal fees. *See In re: Akebia Therapeutics,*

*Inc.*, 981 F.3d 32, 38 n.4 (1st Cir. 2020) (assuming without deciding that attorney's fees are

recoverable under Section 3663A(b)(4)). The restitution calculus is not an inquiry into whether

the victim hired the least expensive attorneys, but a determination of the victim's actual loss so

that the victim can be made whole. *See id.* at 36.

The purpose of restitution is to "make the victim whole," and, "[i]n calculating the dollar

amount to be awarded, the district court need not be absolutely precise." *Id.* While the Court

undertakes a "fact specific probe," ultimately, it must make "a reasonable determination of

appropriate restitution by resolving uncertainties with a view towards achieving fairness to the

victim, including whether the restitution award has a rational basis in the record." *Id.* (internal

quotation marks omitted).

There is a rational basis in the record for the Tribe's request for restitution in the amount

of $239,726.94. This sum constitutes the total fees and disbursements that the Tribe paid to three

law firms – Todd & Weld, Jackson Lewis, and Rankin & Sultan – in connection with the

government's investigation and prosecution of both defendants, excluding the tax charges still

pending against Mr. Cromwell. *See* Salguero Decl. ¶¶ 8-11 & Exhibits A-C (invoices). Fees and

disbursements not incurred in connection with the investigation and prosecution of this case have been redacted from the invoices. Wichers Decl. ¶¶ 10-12.

The Tribe incurred $239,726.94 in order to: (a) review and produce records responsive to grand jury subpoenas; (b) provide legal representation to Tribal members who were interviewed by the government and/or testified before the grand jury or at trial; and (c) have a legal representative monitor its interests by attending hearings and the trial. Salguero Decl. ¶¶ 5-11; Wichers Decl. ¶¶ 10-16. The Tribe incurred the expenses between June 8, 2020, the day it received the first grand jury subpoena, and May 6, 2022, the day after the jury returned its verdict.

"If the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant." 18 U.S.C. § 3664(h); *see United States v. Wall*, 349 F.3d 18, 26 (1st Cir. 2003) ("a court issuing a restitution order is permitted to apportion liability among defendants according to culpability or capacity to pay, or, in the alternative, to make each defendant liable for the full amount of restitution by imposing joint and several liability"). If the court chooses to apportion liability, it need not apply any particular formula. *See United States v. Moran-Calderon*, 780 F.3d 50, 52 (1st Cir. 2015).

Mr. Cromwell and Mr. DeQuattro are equally responsible for the legal expenses incurred by the Tribe. The government's investigation into Mr. Cromwell began in 2019. Wichers Decl. ¶ 4. However, the Tribe did not begin to incur legal expenses until June 8, 2020, by which time the government had already discovered that large, suspect treasurer's checks made out to Mr. Cromwell had been purchased at Cape Cod Five by Constantinos Mitrokostas, and had

4

subpoenaed Cape Cod Five for Mr. Mitrokostas's bank records. *Id.* ¶ 5.[1] When Cape Cod Five produced those records, the government learned that the large payments to Mr. Cromwell had originated from Mr. DeQuattro. *Id.* The entire investigation and prosecution occurring thereafter – except for the tax charges against Mr. Cromwell, for which the Tribe is not seeking restitution – was focused on both defendants. It is impossible to parse the Tribe's expenses between the two defendants. The government investigated and prosecuted them as conspirators working together.

Moreover, even if it were somehow possible to parse responsibility for the Tribe's legal expenses between the two defendants and it was determined that Mr. DeQuattro bears less responsibility than Mr. Cromwell, it would still be fairer to the Tribe to hold Mr. DeQuattro jointly and severally liable. That is because he has significant income and assets and Mr. Cromwell does not, and holding him jointly and severally liable will make it far more likely that the Tribe will be paid. *See* 18 U.S.C. § 3664(h) (stating that a court may take "economic circumstances of each defendant" into account when apportioning or not apportioning restitution between multiple defendants); *Akebia*, 981 F.3d at 36 (a court must resolve any uncertainties "with a view towards achieving fairness to the victim" since the purpose of restitution is to "make the victim whole").[2]

---

[1] The first grand jury subpoena to the Tribe, which was served on or about June 8, 2020, did not request any records relating to RGB. The second subpoena, which was served on or about August 10, 2020, did. The Tribe incurred approximately $68,000 in legal fees between its receipt of the first and second subpoenas. *See* Salguero Decl., Exhibit A.

[2] The Court asked the government to inquire whether the Tribe wants the Bowflex that was the subject of Counts 3 and 5. It does not.

5

## CONCLUSION

For these reasons, the government respectfully requests that the Court order the

defendants to pay $239,726.94 in restitution to the Mashpee Wampanoag Tribe, and to hold the

defendants jointly and severally liable.

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney

By:    */s/ Christine Wichers*
Christine Wichers
Jared Dolan
Assistant U.S. Attorneys

### Certificate of Service

I certify that this document filed through the ECF system will be sent electronically to
the registered participants as identified on the Notice of Electronic Filing (NEF) on December
5, 2022.

*/s/ Christine Wichers*
Christine Wichers

6

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
_____    )
                                     )
                                     )
UNITED STATES OF AMERICA             )
                                     )
v.                                   )          No. 20-CR-10271
                                     )          Leave to File Granted on
DAVID DEQUATTRO,                     )          December 12, 2022
                  Defendant          )
                                     )
_____    )
```

## <u>DEFENDANT DAVID DEQUATTRO'S RESPONSE IN OPPOSITION TO THE GOVERNMENT'S BRIEF ON RESTITUTION</u>

Now comes the defendant David DeQuattro, by and through undersigned counsel, and respectfully submits this Response in Opposition to the government's Brief on Restitution. In sum, the request for restitution, raised for the first time as a potential issue at the sentencing hearing, is woefully untimely and raises a host of intricate legal issues, which the government's brief fails to meaningfully address. This post-sentencing demand for almost a quarter million dollars from a defendant convicted of giving a tribal leader a used piece of gym equipment and a free hotel reservation is not supported by law or fact and should be rejected by this Court for all of the reasons set forth below.

**A.      The Request for Restitution is Untimely**

The restitution statute relied upon by the government provides that "not later than 60 days prior to the date initially set for sentencing, the attorney for the Government, after consulting, to the extent practicable, with all identified victims, shall promptly provide the probation officer with a listing of the amounts subject to restitution." 18 U.S.C. § 3664(d)(1). The Presentence

1

Report ("PSR") in this case prepared on September 29, 2022 and revised on October 27, 2022

expressly stated, "[r]estitution is not applicable in this case."  It further stated that the case

involved "no identifiable victim."  Neither the government nor the Tribe, which was presumably

in contact with the government as required by statute, objected to these conclusions.  Failure to

object to a PSR finding regularly results in waiver of parties' rights.  *See, e.g.*, *United States v.*

*Aquino-Florenciani*, 894 F.3d 4, 9 (1st Cir. 2018) (citing cases).

      In the midst of the November 15, 2022 sentencing hearing, the government stated for the

first time, "[w]e learned last week meeting with the tribe that they incurred close to $200,000

complying with grand jury subpoenas, collecting all the records, reviewing the records,

attorneys' fees," and requested a date for further briefing on the issue of restitution.  Nov. 15,

2022 Tr. 68-69.  Notably, the Tribe was represented for a significant period of time by a

prominent and experienced criminal defense attorney who was also a former Assistant United

States Attorney who was monitoring the trial, aware of the charges, aware of the verdicts, and

aware of the sentencing date, but who never submitted a timely claim for restitution.[1]  Even

assuming, contrary to the pre-existing invoices itemizing the claimed expenses, that the Tribe's

losses were "not ascertainable by the date that is 10 days prior to sentencing," the statute

expressly provided that "the attorney for the Government . . . shall so inform the court."

§ 3664(d)(5).  These indisputably missed deadlines are "legally enforceable," even if they do not

"deprive the court of the power to order restitution" in the event it chooses to do so.  *See Dolan*

*v. United States*, 560 U.S. 605, 611 (2010).

---

[1] That neither the attorney for the Tribe nor the government made a timely and particularized
application for restitution implies that the current restitution request was an afterthought.

Here, the missed deadlines are far from a matter of just form.  The interests of finality to lengthy and complex district court litigation were anticipated as of the date of sentencing.  In other contexts, the government regularly raises finality to contest tardy defense motions.  Instead, the belated request for restitution raises numerous complex legal issues, all coming before the Court for the first time at and after sentencing, in a case where the defendant who is intent on exercising his appellate rights to respectfully challenge the many difficult and critical legal decisions that arose during the trial of the case, must now, instead focus on meeting the Tribe's request that he fund its legal expenses when much of the expenses had nothing to do with him or even his company and where none of the expenses have anything to do with his crime of conviction.  *See infra* Section F.  For these reasons, the defense submits that the Court can and should deny restitution based solely on the government and Tribe's failure to comply with the statute.  But assuming *arguendo* the Court disagrees, the request for restitution also fails on the merits for a number of reasons.

**B.**     **Mr. DeQuattro Was Not Convicted of an Offense "Against Property"**

Restitution under this statute is limited to certain categories of offenses, among them offenses "against property" under Title 18.  18 U.S.C. § 3663A(c)(1)(A)(ii).  As the government's own leading authority on this issue states, interpretation of this provision should "start with the rather unremarkable observation that 'against' is not the same as 'relating to' or 'concerning.'  The latter two . . . sweep much more broadly, and would encompass offenses with little more than some connection to property."  *United States v. Collins*, 854 F.3d 1324, 1331 (11th Cir. 2017) (citation omitted).  By contrast, "against" connotes a level of "directedness."  *Id.* "Property, therefore, must serve as the object of the offense, not simply a collateral component.

3

At its simplest, this understanding includes offenses in which the defendant ***intends to damage another's property*** . . . ." *Id.* (emphasis added) (citation omitted).  Indeed, the phrase "against property" has its "roots" in common law, where it "referred to a specific set of criminal conduct," namely "larceny, embezzlement, cheating, cheating by false pretenses, robbery, receiving stolen goods, malicious mischief, forgery, and uttering forged instruments." *Id.* at 1332-33 (citation omitted).

It is "not readily apparent" that bribery "will always trigger" this provision of the statute. *Id.* at 1335.  As one district court has explained, "the elements of" § 666 "do not make it an offense against property." *United States v. Adorno*, 950 F. Supp. 2d 426, 429 (E.D.N.Y. 2013) (distinguishing honest services fraud in violation of 18 U.S.C. § 1346).  According to the government's prior filings in this case, conviction does not require a showing that the recipient's "official conduct" was "influenced." *Id.* at 430; *see also* Dkt. 258 (Govt. Opp'n to Post-Trial Rule 29 Motion) at 21 ("The government was not required to prove that the Bowflex and paid hotel stay caused Cromwell to refrain from doing something he otherwise would have done.").  And there was no evidence that any action by Mr. Cromwell was so influenced.  In fact, to the contrary, the trial evidence evinced no indication that termination of RGB's contract was ever considered by anyone at any time and, to the contrary, established that stakeholders in the casino project were, without exception, completely satisfied with RGB's performance. *See, e.g.*, Dkt. 252 at 6-7.  This lack of evidence that Mr. DeQuattro's actions implicated another person or entity's property interest renders the statute relied upon by the government inapplicable. *See Adorno*, 950 F. Supp. 2d at 430; *Collins*, 854 F.3d at 1335 (suggesting that the statute may not apply where the government fails to "demonstrat[e] that any improperly influenced transaction

4

implicated someone else's property").  The cases cited by the government are all readily

distinguishable on this basis.  *See Collins*, 854 F.3d at 1335 (noting that defendant withdrew

funds belonging to the victim bank); *United States v. Turner*, 718 F.3d 226, 236 (3d Cir. 2013)

(involving "conspiracy to defraud the IRS of its *property*," namely tax dollars owed); *United

States v. Razzouk*, 984 F.3d 181, 189 (2d Cir. 2020) (involving payments from the victim for

which it "received no consideration").

      Notwithstanding its own reliance upon *Collins* and its acknowledgement that not all

bribery would necessarily trigger the statute, the government misses this issue.  In a single

sentence, it asserts that Mr. DeQuattro's offense "qualifies as an offense against property

because . . . DeQuattro wanted RGB's valuable contract to stay in place (and got it), and

Cromwell wanted cash, a Bowflex, and payment for a pricey hotel stay (and got it)."  Dkt. 307 at

2.  This logic would apply to any and all bribery.  Of course, the very definition of a bribe

requires that an item of value be offered or provided to one party.  But, under authorities like

*Collins* and *Adorno*, that alone is not sufficient to render an offense one "against property."

## C.    **The Government Has Not Proven that the Tribe Suffered a "Pecuniary Loss"**

      In addition to the requirement of an offense against property, the restitution statute

contains a separate prerequisite of "an identifiable victim or victims" that "has suffered a

physical injury or pecuniary loss."  18 U.S.C. § 3663A(c)(1)(B).  The harm to the victim must

moreover be "direct[] and proximate[]."  § 3663A(a)(2).  The legal expenses claimed as subject

to restitution cannot be "subsumed under the term 'pecuniary loss.'"  *United States v. Yu Xue*,

No. 16-CR-22, 2021 WL 2433857, at *6 (E.D. Pa. June 15, 2021).  This is because the statutory

language "distinguishes between pecuniary loss and necessary expenses."  *Id.*  "[E]xpenses for

5

legal fees and costs incurred during an investigation and prosecution of a defendant would only arise after a victim suffers a pecuniary loss 'as a result of the commission of an offense.'" *Id* (quoting 18 U.S.C. § 3663A(a)(2)).

The government does not so much as mention the requirement of "pecuniary loss." It does, however, set forth two theories as to how the Tribe was victimized. It first attempts to rely upon alleged damage to the Tribe's reputation. Such harm is self-evidently not "pecuniary" in nature. *See* Black's Law Dictionary (8th ed. 2007) (defining "pecuniary" to mean "Of or relating to money; monetary"). Any resulting "distrust in [unidentified] potential lenders," allegedly "impeding the Tribe's ability to obtain financing [in an unspecified amount] for economic development" has not been proven to be a direct or proximate result of Mr. DeQuattro's actions and remains entirely unparticularized. Dkt. 307 at 2. A similar analysis applies to the only other harm cited by the government, namely unenumerated "delays and cost increases" allegedly resulting from the Tribe's decision to terminate RGB's work on a housing project and childcare facility. Dkt. 307 at 3. There is, notably, no indication that RGB was not living up to its obligations under either contract – and of course no suggestion that RGB did not fully and competently discharge its professional responsibilities pursuant to the contract at issue in the trial. The Tribe's decision to terminate its relationship to RGB which was not a party to this case, was entirely its own. Accordingly, any allegation that the Tribe suffered any loss resulting from that decision was not proven to have been directly and proximately caused by Mr. DeQuattro. *See United States v. Cornier-Ortiz*, 361 F.3d 29, 42 (1st Cir. 2004) ("Because the work for which the . . . funds were disbursed was done, it would be an unfair windfall to HUD to

6

conclude that HUD had directly and proximately suffered a loss . . . .").[2]  There was in short not "pecuniary" loss to the Tribe from Mr. DeQuattro's crime of conviction and thus a statutory imperative for restitution against him is totally lacking.

### D.    The Government Has Not Proven that the Claimed Loss Was the Direct or Proximate Result of Mr. DeQuattro's Offense of Conviction

The government brief entirely overlooks binding Supreme Court precedent holding that the Court's authority to award restitution is limited to "the loss caused by the specific conduct that is the basis of the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 413 (1990).  Accordingly, "a defendant who is charged with multiple offenses but who is convicted of only one offense" cannot be required "to make restitution for losses related to the other alleged offenses." *Id.* at 412-13; *see also United States v. Mancillas*, 172 F.3d 341, 343 (1st Cir. 1999) (applying *Hughey* to restitution statute at issue here); *United States v. Comer*, 93 F.3d 1271, 1279 (6th Cir. 1996) (vacating restitution award "based on losses occasioned by conduct that was not charged in the indictment and losses that resulted from a charge of which the defendant was acquitted").  While the permissible basis for restitution may be somewhat broader "[w]hen the offense of conviction involves as an element a scheme, conspiracy, or pattern of criminal activity," that is not the case here.  *United States v. Lisa*, 152 F. App'x 85, 87 (2d Cir. 2005) (unpublished) (citation omitted).  Mr. DeQuattro was acquitted of conspiracy, acquitted of all the political donation allegations, and convicted of a single count of substantive bribery in connection with two standalone gifts to Mr. Cromwell: a used Bowflex machine and a hotel reservation.  The government was therefore required to prove that the claimed loss "would not

---

[2] In fact, the Tribe and RGB reached a settlement agreement, releasing each other of liability arising from these two projects.

7

have occurred but for" Mr. DeQuattro's provision of those two gifts and that "the loss is not too

attenuated (either factually or temporally)" from those gifts.  *United States v. Cutter*, 313 F.3d 1,

7 (1st Cir. 2002) (citation omitted).

The government brief reflects no attempt whatsoever to tie the claimed losses to the

specific conduct underlying Mr. DeQuattro's single count of conviction.  That striking omission

alone is fatal to the restitution claim.  *See, e.g.*, *United States v. Chan*, No. 16-CR-10268, 2019

WL 3975579, at *8 (D. Mass. Aug. 22, 2019) ("Under the MVRA, the government has the

burden of seeking and establishing a claim for restitution.").

## E.    The Claimed Legal Fees and Expenses Are Not "Other Expenses" Reimbursable Under the Applicable Subsection

The nature of the expenses claimed, namely legal fees and expenses, are also outside the

scope of the relevant subsection of the restitution statute.  The government categorically asserts

that the covered "expenses include legal fees," Dkt. 307 at 3, but the sole authority cited in

support of that proposition merely "assume[d] without deciding" that issue, which was not raised

in the case at hand.  *In re Akebia Therapeutics, Inc.*, 981 F.3d 32, 38 n.4 (1st Cir. 2020).  The

First Circuit has previously stated that "attorney's fees" will "[f]requently . . . not be

recoverable" in the context of restitution.  *United States v. Corey*, 77 F. App'x 7, 11 (1st Cir.

2003) (unpublished).  Here, the government seeks to recover the legal fees and expenses under

the statutory subsection permitting reimbursement "for lost income and necessary child care,

transportation, and other expenses incurred during participation in the investigation or

prosecution of the offense or attendance at proceedings related to the offense."  18 U.S.C.

§ 3663A(b)(4).

The Supreme Court recently had occasion to construe this same subsection.  *See Lagos v.*

8

*United States*, 138 S. Ct. 1684 (2018). The issue in *Lagos* was whether the statutory terms
"investigation" and "proceedings" "are limited to government investigations and criminal
proceedings, or whether they include private investigations and civil proceedings." *Id.* at 1687.
The Court ultimately adopted the former, narrower reading. In reaching this result, the Court
observed that the subsection "lists three specific items that must be reimbursed, namely, lost
income, child care, and transportation; and it then adds the words, 'and other expenses.' Lost
income, child care expenses, and transportation expenses are precisely the kind of expenses that
a victim would be likely to incur when he or she (or, for a corporate victim . . . , its employees)
misses work and travels to talk to government investigators, to participate in a government
criminal investigation, or to testify before a grand jury or attend a criminal trial. At the same
time, **the statute says nothing about** the kinds of expenses a victim would often incur when
private investigations, or, say, bankruptcy proceedings are at issue, namely, **the costs of hiring
private investigators, attorneys, or accountants**." *Id.* at 1688 (emphasis added) (citation
omitted). Thus, applying the *noscitur a sociis* canon of statutory construction, meaning "that
statutory words are often known by the company they keep," the Court found "both the presence
of company that suggests limitation and the absence of company that suggests breadth." *Id.* at
1688-89. *Lagos* also noted that a "broad reading" of the statute "would create significant
administrative burdens." *Id.* at 1689. The recoverable expenses must be "*necessary*," and
application of the statute to private investigations would "invite disputes" regarding the necessity
of particular expenses which "may become burdensome in cases involving multimillion dollar
investigation expenses for teams of lawyers and accountants." *Id.* "[O]ne begins to doubt
whether Congress intended, in making this restitution mandatory, to require courts to resolve

these potentially time-consuming controversies as part of criminal sentencing . . . ." *Id.*

Both the legal and pragmatic aspects of *Lagos*'s rationale are equally applicable to the issue presented here: whether "other expenses" may include legal fees and related costs incurred during a government investigation and prosecution. The Fifth Circuit recently applied *Lagos* to find that "other expenses" did not include costs of a victim assisting the FBI in investigating an alleged hacker. In reaching this result, the court observed, "[i]t would be rather strange for the specific items in a list to be the kind of expenses that a victim would be likely to incur when he or she . . . misses work, but then for the catchall phrase of the same list to mandate restitution for digital forensic services. Think about it: The costs of a babysitter, a tank of gas, a parking meter–and a 44-person digital security team." *United States v. Koutsostamatis*, 956 F.3d 301, 306 (5th Cir. 2020) (citation omitted). The combination is similarly unsupportable when one replaces "44-person digital security team" with $240,000 in legal fees and expenses. "One of these things is not like the others." *Id.* The Fifth Circuit relied on the same canon of construction cited in *Lagos*: *noscitur a sociis*. *See id.* at 307. Indeed, the Supreme Court recently held that the statutory word "expenses" did not include attorney's fees when read "alongside neighboring words" in an unrelated statute. *Id.* (citing *Peter v. Nantkwest, Inc.*, 140 S. Ct. 365, 372 (2019)). The Fifth Circuit additionally cited the cannon of *ejusdem generis*, which "limits general terms which follow specific ones to matters similar to those specified." *Id.* at 308 (citation omitted). Following that canon here, "restitution is required for 'lost income and necessary child care, transportation, and other [similar] expenses.'" *Id.* In short, "[t]ext and context both counsel against . . . expansive interpretation of 'other expenses'" that would include legal fees like those at issue here. *Id.* at 309. As *Lagos* itself recognized, the statute "says

10

nothing about . . . the costs of hiring private investigators, attorneys, or accountants." 138 S. Ct. at 1688.

Moreover, reading "other expenses" to include hundreds of thousands of dollars "for teams of lawyers" would lead to the very same "burdensome" disputes that the *Lagos* Court sought to avoid. *Id.* at 1689. This matter provides a case-in-point. As set forth below, it is far from clear that several significant line items from the submitted legal invoices were "necessary" to the Tribe's participation in the government's investigation and prosecution of Mr. DeQuattro. To hold that such expenses, as a class, may be "other expenses" (notwithstanding their lack of similarity to the other specific types of expenses expressly mentioned in the same subsection) would inevitably require courts to wade into an intricate analysis of necessity at many criminal sentencings. Here, however, for reasons set forth below, the Court may alternatively conclude that the government has failed to satisfy its burden of establishing the necessity of the expenses in many respects.

**F.  The Government Has Not Proven that the Claimed Expenses Were "Necessary" to the Tribe's Participation in the Investigation or Prosecution of Mr. DeQuattro's Offense of Conviction**

The First Circuit has described *Lagos* as "sharpen[ing] . . . focus on an important qualifier within the language of the statute: only <u>necessary</u> expenses are mandated for reimbursement." *Akebia*, 981 F.3d at 37 (emphasis in original). This statutory word requires that the claimed expenses be "integral to [the victim's] participation in the government's investigation and prosecution of the offenses." *Id.* The government here develops no argument, and indeed does not even make an assertion, that all of the claimed expenses were necessary. And there is substantial reason to doubt whether they were.

11

Attached to the declaration executed by the Tribe's attorney are 100 pages of legal bills, submitted for the first time weeks after sentencing. The government brief contains no detailed analysis of the various line items, instead simply asserting that all amounts due were incurred to "(a) review and produce records responsive to grand jury subpoenas; (b) provide legal representation to Tribal members who were interviewed by the government and/or testified before the grand jury or at trial; and (c) have a legal representative monitor its interests by attending hearings and the trial." Dkt. 307 at 4.

1. *Lack of proof connecting claimed expenses for subpoena response to Mr. DeQuattro's offense of conviction*

The temporal and factual context of the subpoenas undercuts any suggestion that the vast majority of the expenses incurred in response were directly and proximately caused by Mr. DeQuattro's conduct underlying his conviction. The government served four subpoenas on the Tribe between June 5 and October 28, 2020. *See* C. Wichers Decl. ¶ 6. The first subpoena, by the government's own account, "did not request any records relating to RGB." Dkt. 307 at 5 n.1. There is no indication that that subpoena was related in any respect to Mr. DeQuattro's conduct, and the $68,000 allegedly spent by the Tribe in responding to it therefore cannot be attributed to him.

The government represents that the second subpoena, served August 10, 2020, did request certain unspecified records regarding RGB, in addition to other materials. The defense notes that the government has not submitted the subpoenas in support of its request for restitution and declined to produce the subpoenas or seek Rule 6(e) authorization to disclose the subpoenas in response to specific request to disclose those subpoenas to the defendant in preparation for this filing (instead providing a generalized statement of which subpoenas related in whole or part to

12

RGB).  The government's omission on this point alone dooms its restitution claim due to an utter

lack of evidence that extra time was billed for any RGB-related request.  In fact, the supporting

invoices do not even mention RGB until September 8, 2020, the date that the third subpoena,

which the government represents related specifically to RGB, issued.  Moreover, as set forth

above, Mr. DeQuattro's acquittals in connection with all payments made to Cromwell preclude

him from being jointly and severally liable for any expenses to the Tribe arising from such

payments.  The government provides no information whatsoever regarding to what degree any of

the subpoenas related to the conduct underlying Mr. DeQuattro's conviction, namely the

Bowflex and the hotel reservation.  It seems far more likely that the subpoenas would have

issued irrespective of these largely *de minimis* gifts because they were motivated primarily, if not

entirely, by the payments for which Mr. DeQuattro was acquitted, and even more, the conduct of

Mr. Cromwell having nothing to do at all with Mr. DeQuattro.  Thus, the government has not

proven that Bowflex and hotel suite were a but-for or proximate cause of the claimed expenses.

The government's failure to provide the four grand jury subpoenas has diminished Mr.

DeQuattro's ability to distance his offense of conviction from the goals of the subpoenas.

Likewise, the unparticularized legal bills have prevented any meaningful ability to apply a time

charge to legal work relating to the conviction.  The burden is on the government, which should

have sought Rule 6(e) permission to disclose rather than opposing the defense request.

Similarly, given the caselaw, the government should have required a more particularized

showing of why legal billings were applicable to each of the defendants.

Indeed, Mr. DeQuattro was not even informed that he was a target of the investigation

until September 4, 2020, after two of the four subpoenas had already issued (and just four days

prior to issuance of the third) and thousands of dollars in claimed expenses had already been incurred.  It was not until the day the fourth and final subpoena issued, October 28, 2020, that Mr. DeQuattro's former business partner Joseph Beretta met with the government and incriminated him in the suspected crimes.  The government also represents that the fourth subpoena was for Mr. Cromwell's email account records and other records relating to Mr. Cromwell.  This subpoena would almost certainly have issued irrespective of Mr. DeQuattro's gifts of a Bowflex and hotel reservation thus all fees attributable to this fourth subpoena should be completely inapplicable to Mr. DeQuattro.

The foregoing makes clear that the government's investigation began with a focus on the Tribe and Mr. Cromwell, with no focus whatsoever on Mr. DeQuattro.  Even after the government began focusing on Mr. DeQuattro, its primary (if not sole) interest appears to have been in payments he made to Mr. Cromwell, for which he was subsequently acquitted.  These circumstances demand a far more detailed accounting of expenses than the government or the Tribe has thus far provided to ensure that the amounts claimed were the direct and proximate result of Mr. DeQuattro's offense of conviction.  Mr. DeQuattro cannot be held responsible for reimbursing costs incurred in the government's unrelated investigation of Mr. Cromwell or other parties, or its investigation of conduct by Mr. DeQuattro that the jury determined to be non-criminal.  The descriptions in the invoices produced in support of the restitution request utterly fail to differentiate between (a) Mr. DeQuattro's offense of conviction, (b) his acquitted conduct, and (c) investigations relating to Mr. Cromwell and others.  Neither the invoices themselves nor the government's description of the expenses even mentions the Bowflex or the hotel reservation.  The only mention of Mr. DeQuattro in the supporting documents is for 30 minutes

14

of time spent reviewing and communicating about his motion to dismiss (which was not, in any respect, necessary to the Tribe's participation in the prosecution). Further delay in complying with the statutory requirements should not be countenanced and the unparticularized appending of 100 pages of legal bills should be determined to not meet the government's burden as to Mr. DeQuattro.

2. *Lack of proof that certain expense items were necessary to any subpoena response at all*

Various invoice line items appear to have been unnecessary to the Tribe's participation in any government investigation. Some, for example, reflect research and analysis of sovereign immunity issues, presumably in an effort to ***resist***, not comply with, the subpoenas. *See* R. Salguero Decl., Ex. A at 8/13/20-8/18/20 (reflecting 13.8 attorney hours with entries relating, at least in part, to sovereign immunity issues). Due to block-billing of multiple tasks in single time entries, it is impossible to determine precisely how much of that time was spent on sovereign immunity issues. *See Chan*, 2019 WL 3975579, at *7 n.8 (excluding entries due to block-billing). A similar analysis applies to document review for attorney-client privilege and related research. While the Tribe was certainly within its rights to consider asserting all lawful privileges available to it, doing so was not "necessary" to its participation in the government investigation nor did it relate in any way to Mr. DeQuattro. Other line items reflect key term document searches, presumably in a voluntary effort on the part of the Tribe and its counsel to develop an internal understanding of relevant events. *See id.* at 9/1/20-9/10/20 (reflecting 15.6 attorney hours with entries relating in part to key term searches). Again, these expenses were not "necessary" in the strict sense required by the caselaw.

15

3.  *Lack of proof that Tribe's payment of a witness's legal fees was a "necessary" expense*

Almost $14,000 in claimed expenses relates to legal invoices for representation of ███ ████████████████████████████████████████████████████████████ R. Salguero Decl. ¶ 11.  A declaration executed by an attorney for the Tribe represents that it paid all such invoices in full, but it provides no indication that the Tribe was legally required to do so. *See id.*  The government has submitted no evidence of any indemnification obligations between the Tribe and members of the Gaming Authority.  The invoices are, on their face, addressed to the tribal member individually.  *See* R. Salguero Decl., Ex. C.  Equally problematic, the descriptions included in the tribal member's legal bills contain no reference whatsoever to subject matter.  Instead, they consist exclusively of generic references to items such as ████████████████████████████ *Id.*  This makes it impossible to determine whether any individual entry was, in fact, necessary to the government's investigation.  Although counsel understand the need to protect work product and the professionalism of Mr. ████████████ retained counsel, the generic method of billing fails to satisfy the government's burden to prove that Mr. DeQuattro is liable for Mr. ████████████ legal bills.

4.  *First Circuit precedent undermines the necessity of attorney attendance at trial and witness preparation*

The government also, despite citing *Akebia* for another reason, neglects to mention that the First Circuit in that case affirmed an order excluding from restitution two of the exact same types of legal expenses at issue here, namely "attorneys' time accrued for their attendance at the criminal proceedings" and "time spent making . . . witnesses available" to the DOJ for trial

16

preparation.  981 F.3d at 38-39.  On the former issue, the district court in *Akebia* persuasively reasoned, "while many individual victims would greatly appreciate having an attorney watch and report on all proceedings relating to the crime, the mandatory restitution scheme supports no such fee shifting provision for individual or corporate victims.  The court finds such a luxury unworkable and unjust in a mandatory restitution scheme.  Indeed, such a statutory construction would create a bizarre incentive where defendants could not afford to go to trial and would need to minimize the moments they appear in court or the documents they file on the public docket, knowing that they could be charged at sentencing with legal fees for every moment of court time." *Chan*, 2019 WL 3975579, at *8.  On the second point, the First Circuit affirmed the district judge's conclusion that "the government prosecutors were responsible for preparing . . . witnesses for trial testimony." *Akebia*, 981 F.3d at 38-39.  The defense respectfully submits that this Court should follow Judge Talwani in excluding the foregoing expenses from any restitution calculation.

5. *Lack of proof that other post-indictment expense items were necessary to the Tribe's participation in the government prosecution*

Other miscellaneous post-indictment line items reflect tasks such as drafting press releases and discussions of unspecified "strategy" following the indictment.  *See* R. Salguero Decl., Ex. A at 11/13/20-11/19/20 (reflecting 9.2 hours of attorney time devoted, at least in part, to such matters).  There has been no showing that such efforts were "necessary" to the Tribe's participation in this case.  Some other line items were clearly outside the scope of assisting the government's prosecution.  For example, ███████████████████████████ ███████████ was in no way necessary to that end. *Id.* at 11/16/20.  Perhaps most glaringly, Mr. DeQuattro should not be responsible for reimbursing the Tribe for its counsel's ███████████

17

████████████████████ to the prosecutors after the verdict. R. Salguero Decl., Ex. B at 5/5/22. And counsel's ████████████████████ is facially outside the scope of the reimbursement provision. *Id.* at 5/6/22. The inclusion of the foregoing expenses in the government's restitution request makes clear that, weeks after sentencing, the invoices have not yet been subject to the type of detailed review required to ensure the necessity of each line item.

### G.    Even if the Court Orders Restitution, It Should Be Apportioned Based on Culpability

Finally, to the extent that, contrary to the foregoing arguments, the Court concludes that some restitution Order against Mr. DeQuattro is appropriate, it should reject the government's invitation to impose joint and several liability. As the government brief acknowledges, this Court has the discretion, though not an obligation, to apportion restitution "according to culpability." Dkt. 307 at 4. The Court has already observed that this case is "not in the slightest" one involving "[e]qual culpability" among defendants. Nov. 15, 2022 Tr. 109. The defense respectfully submits that, for this reason, apportionment based on culpability is appropriate. *See Chan*, 2019 WL 3975579, at *9 (imposing 90% and 10% apportionment among two defendants where "it was [the former defendant's] actions that drove the expenses . . . incurred").

Respectfully Submitted,
DAVID DEQUATTRO
By His Attorneys,

**/s/ Martin G. Weinberg**
Martin G. Weinberg, Esq.
Mass. Bar No. 519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net

18

                                                    **/s/ Michael Pabian**
                                                    Michael Pabian, Esq.
                                                    20 Park Plaza, Suite 1000
                                                    Boston, MA 02116
                                                    (617) 227-3700
                                                    pabianlaw38@gmail.com

                                                    **/s/ Maksim Nemtsev**
                                                    Maksim Nemtsev, Esq.
                                                    20 Park Plaza, Suite 1000
                                                    Boston, MA 02116
                                                    (617) 227-3700
                                                    menemtsev@gmail.com

Dated: December 12, 2022

## CERTIFICATE OF SERVICE

I, Martin G. Weinberg, hereby certify that on this date, December 12, 2022, a copy of the foregoing document has been served via email.

                                                    **/s/ Martin G. Weinberg**
                                                    Martin G. Weinberg, Esq.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 20-10271-DPW |
| | ) | |
| CEDRIC CROMWELL and | ) | |
| DAVID DEQUATTRO, | ) | |
| | ) | |
| Defendants. | ) | |

## UNITED STATES' SUPPLEMENTAL BRIEF ON RESTITUTION

The government respectfully increases its restitution request for the Mashpee Wampanoag Tribe from $239,726.94 to $244,406.94. The $4,680 increase is supported by the Revised Declaration of Rebekah Salguero (filed today under seal), ¶¶ 4 and 10. It is based on the Tribe's receipt of one additional invoice for legal services. The invoice, dated December 8, 2022, is for services provided from November 4 to 30, 2022. A copy is attached to Exhibit B to Attorney Salguero's revised declaration.

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney

By:  */s/ Christine Wichers*
Christine Wichers
Jared Dolan
Assistant U.S. Attorneys

## Certificate of Service

I certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on December 15, 2022.

*/s/ Christine Wichers*
Christine Wichers

<pre>
 1                  UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
 2

 3

 4
         * * * * * * * * * * * * * *
 5     UNITED STATES OF AMERICA     *
                                    *     CRIMINAL ACTION
 6               v.                 *     No. 20-10271-DPW
                                    *
 7     CEDRIC CROMWELL,             *
       and DAVID DEQUATTRO          *
 8                                  *
         * * * * * * * * * * * * * *
 9

10

11

12          BEFORE THE HONORABLE DOUGLAS P. WOODLOCK
                   UNITED STATES DISTRICT JUDGE
13                 VIDEO STATUS CONFERENCE
                        December 20, 2022
14

15

16

17
                              Courtroom No. 1
18                            (Via Videoconference)
                              1 Courthouse Way
19                            Boston, Massachusetts 02210

20

21

22

23              James P. Gibbons, RPR, RMR
                    Official Court Reporter
24          1 Courthouse Way, Suite 7205
              Boston, Massachusetts  02210
25              jamesgibbonsrpr@gmail.com
</pre>

```
 1    APPEARANCES:

 2          UNITED STATES ATTORNEY'S OFFICE, (By AUSA Christine
       J. Wichers) 1 Courthouse Way, Suite 9200,  Boston,
 3    Massachusetts, 02210, on behalf of the United States of
       America
 4
             LAW OFFICE OF TIMOTHY R. FLAHERTY, (By Timothy R.
 5    Flaherty, Esq.) 699 Boylston Street, 12th Floor, Boston,
       Massachusetts, 02116, on behalf of Cedric Cromwell
 6
             MARTIN G. WEINBERG P.C., (By Martin G. Weinberg,
 7    Esq.) 20 Park Plaza, Suite 1000, Boston, Massachusetts
       02116, on behalf of David Dequattro
 8
             LAW OFFICE OF MAKSIM NEMTSEV, (By Maksim Nemtsev,
 9    Esq.) 20 Park Plaza, Suite 1000, Boston, Massachusetts,
       02116, on behalf of David Dequattro
10
             MICHAEL PABIAN LAW OFFICE, LLC, (By Michael Pabian,
11    Esq.) 20 Park Plaza, Suite 1000, Boston, Massachusetts
       02116, on behalf of David Dequattro
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                  P R O C E E D I N G S

 2                  (VIA VIDEOCONFERENCE)

 3           THE CLERK:  This is Criminal Action No.20-10271,

 4      United States versus Cromwell and Dequattro.

 5           THE COURT:  Well, thank you for responding so

 6      promptly here for the scheduling of this.  This was prompted

 7      by Ms. Wicher's request for additional time to respond to

 8      the briefing with respect to restitution.

 9           There is a request, it doesn't ask for how much time,

10      and so it occurs to me that it might be important to set

11      some time parameters for this but also to understand exactly

12      what we're undertaking here.

13           I guess, Ms. Wichers, how much time do you want?

14           MS. WICHERS:  I can file it tomorrow, your Honor.

15           THE COURT:  All right.  I mean, if it's not a, you

16      know, kind of a rush-it-out sort of thing, I suppose that's

17      fine here.

18           But it raises -- I should say that the request for

19      restitution raises some larger issues for me of

20      apportionment in light of the way in which the government

21      has responded to it.

22           There are three charges of bills.  Two of them seem to

23      fall within a category of matters that one would expect a

24      victim to pay.  Whether or not that's going to be my outcome

25      is another matter, but they seem fairly clear.
```

1    The one that's a little bit unclear is the

2    Rankin & Sultan bill, and that has to do with -- ultimately

3    has to do with someone who felt the necessity to obtain a

4    recognition that, A, his Fifth Amendment rights were

5    implicated; and, B, that he wouldn't testify in the absence

6    of that.

7    And that, in turn, raises a question about whether or

8    not there is a separate aspect of the investigation that I

9    need to explore and understand for purposes of what was

10   happening before the grand jury and what was generating the

11   Rankin & Sultan bills.

12   I would propose to do that ex parte, assuming that it

13   might compromise some grand jury materials and perhaps other

14   investigations that the government is engaging in.

15   But, that having been said, I'll receive the memorandum

16   when you want to file it.  If you say it's tomorrow, then

17   that's fine.  If that's a stretch, I understand that, but

18   you tell me at this point.

19        MS. WICHERS:  That's fine.  I can file it tomorrow.

20        THE COURT:  Okay.  So I'll assume that it will be

21   filed tomorrow.

22   Now, let me step back a little bit further and talk

23   about some of the developments, some of which have been

24   noted, some of which have not.

25   The Supreme Court has set the *Chippewa v. Coughlin* case

```
 1    down for its conference on January 9.  It is I think
 2    possible that at least three alternative steps will be taken
 3    on the 9th.  They can deny cert there.  They could hold it
 4    for a relisting at a later point if someone is interested in
 5    the case, and, because it has larger implications, they may
 6    well ask for the views of the Solicitor General.
 7         With respect to denying certiorari, that would end it.
 8         With respect to relisting or requesting the views of
 9    the Solicitor, that may extend the period of time.
10         My own view is that I am not going to wait for the
11    relisting process, if it comes to that, or the views of the
12    Solicitor General.  I'm outlining that time period so that
13    the parties have that as a data point of something that is,
14    I think, going to be important to me in understanding how I
15    approach the larger question of Hobbs Act extortion, which,
16    as you know, is something that I've already expressed my
17    views about.
18         The second development is while I've received the
19    materials from the government with respect to the Overton
20    James matter -- if we have the right order of name on
21    that -- indicating that, Wikipedia to the contrary
22    notwithstanding, this was not a successful prosecution or,
23    in fact, a pursued prosecution with respect to the Hobbs Act
24    extortion, and, in fact, the judgment entered with respect
25    to other statutes than Hobbs Act extortion.
```

```
 1        But the government had also raised another case, and
 2   that's the Blackhair case, although I have not received an
 3   update from the government, so I did some research of my
 4   own.
 5        Mr. Blackhair pled, and he pled to Hobbs Act extortion.
 6   The sentencing in that case is scheduled for March 29, 2023.
 7        I did not choose to pursue anything in that case, even
 8   talking or making a communication with the Clerk's Office,
 9   because I didn't want to be understood to be showing some
10   untoward interests in a case.  It's for the parties to
11   pursue it.
12        Nevertheless, I'm somewhat perplexed by the choice to
13   plead there, and I would intend to capture my views in
14   writing before the sentencing in that case, for what it's
15   worth to the parties there.  So that's another data point.
16        I don't know, Ms. Wichers, if you were aware of the
17   outcome in Blackhair.
18             MS. WICHERS:  No, your Honor, I wasn't.
19             THE COURT:  Okay.
20        Then the larger issue, I guess, is to be sure that I
21   understand what's going on in the parties' minds with
22   respect to briefing, if any, the motion to stay pending
23   appeal.  My expectation is that all of the parties here will
24   have something that at least they'd like to preserve an
25   appeal regarding when Judgment finally enters in the case.
```

1      From my perspective, I would welcome the opportunity to

2  be able to tie the matter up with my observations, written

3  observations, about it.  But I don't want to tie it up too

4  long, obviously.  And I can't tell from the agreements that

5  the parties have with respect to stay and so on,

6  particularly having to do with Mr. Dequattro's circumstance,

7  whether the anticipation is that the parties do not intend

8  to be briefing a question of stay pending appeal in this

9  matter.

10      So maybe, Mr. Weinberg, you can go first on that.

11          MR. WEINBERG:  Thank you, Judge.

12      Yes, the government has the assented to my request for

13  their consent, of course subject to your Honor's discretion,

14  for a stay of the probation, the home detention part of the

15  probation, and for Mr. Dequattro to be required to put the

16  $50,000 fine into a separate account.  And I would make

17  disclosures to Ms. Wichers regarding the identity of the

18  account so the parties would all know that if we were to

19  lose the appeal, the fine would be immediately paid.

20      The reason for that, Judge, is I'm told by local

21  licensing lawyers that the payment of the fine would appear

22  to the Architectural Licensing Board as if it's a concession

23  of wrongdoing and could have an adverse effect on his

24  continuing to operate during the stay period as an

25  architect.

1        Other than that, he is clearly not a risk of flight,

2    not a danger, and I believe that the issues here merit

3    appellate review and are significant.

4        I wasn't planning on briefing it because I truly

5    believe, Judge, that this case, you know, has raised

6    important issues at the -- if I could call it the perimeter

7    of 666, and I would hope that if your Honor would find the

8    substantiality based on our history of the case without

9    additional briefing on issues that would be a lot of

10    (inaudible) need of Rule 29 and some of the motions in

11    limine that were granted prior to trial.

12        THE COURT:  Well, you know, I am not interested in

13    constraining the parties in the way in which they proceed.

14        I am interested in making sure that there is clarity in

15    the record with respect to the way in which, and the reasons

16    for which, I acted on various matters that might be

17    challenged.

18        But it is, it seems to me, the case that with respect

19    to Mr. Dequattro's appeal and the circumstances that you've

20    outlined, I don't think that I need briefing to deal with

21    that issue.

22        This is not directed at any of the parties here, but I

23    have had experience in the past in which I felt to some

24    degree sandbagged by recharacterization of what I did, and

25    blame myself in the past for not explaining more fully what

1    I did.  But ultimately I think I have to deal on the merits

2    with any motion that's made once the Judgment is entered.

3    And if it can be allowed without any further briefing, then

4    it would be allowed without further briefing.

5         I just offer that issue -- or offer that observation

6    with respect to it.

7         With respect to the government's position, although I

8    haven't acted on the restitution, I have indicated I have a

9    somewhat more -- I'll call it "nuance," but, in any event, a

10   different view about the restitution issues that I assume

11   the government will be appealing from if I go in the

12   direction I think I'm going.

13        In addition, a question of, with respect to

14   Mr. Cromwell in particular, the Hobbs Act extortion decision

15   that I made, that it's not applicable in this case, will be

16   a matter for appeal.

17        And I assume that that's not going to be a matter for

18   some sort of stay motion of any kind to move this case

19   along.  Is that a fair statement of it, Ms. Wichers?

20        MS. WICHERS:  You're asking me whether the

21   government would move for a stay based on the Hobbs Act

22   ruling?

23        THE COURT:  Yeah.

24   Or any other reason.  I just don't see the government

25   staying.  The government will consult with whoever they

1     consult with within the Department about these matters, and

2     I'm sure there will be a protective -- or likely to be a

3     protective appeal. No one has filed. Whether it will be

4     pursued is another question.

5         But, in any event, I don't see that as a timing issue

6     here.

7             MS. WICHERS: We agree.

8             THE COURT: So then, Mr. Flaherty, I guess it goes

9     to you as well, which is the question of stay pending appeal

10    under these circumstances and whether or not you would be

11    briefing such a matter or want to brief such a matter.

12        I have to say that, as I've indicated, that there are,

13    I think, rather significant issues involved in the case here

14    and ones that may adversely affect -- will adversely affect

15    your client.

16        I am, however, concerned not to advance the

17    incarceration of the defendant in light of certain

18    circumstances having to do with his medical condition. And

19    I want to be sure that there's nothing more that you want to

20    offer in this case, or we can set a schedule that's

21    realistic with an entry of Judgment.

22        Mr. Flaherty, anything further that you want to offer

23    on that?

24            MR. FLAHERTY: Unless the Court -- unless the Court

25    wants me to further brief it, I wasn't planning to further

 1    brief the motion for stay penning appeal, Judge.  All of the

 2    issues have been laid out, from Rule 29 through the motions

 3    in limine, and the Court, from my view, has made very clear

 4    decisions on all of it.

 5         I will not be handling the appeal on behalf of

 6    Mr. Cromwell.

 7              THE COURT:  Okay.

 8              MR. FLAHERTY:  I can tell the Court that my view is

 9    that all of your rulings and orders have been very clear to

10    me.  So I can't imagine any counsel trying to misrepresent

11    what the Court's position has been --

12              THE COURT:  Oh, no.  I shouldn't have --

13              MR. FLAHERTY:  -- but I will not be --

14              THE COURT:  -- said it that way.  I just have to

15    tell you that I've had that experience in the past.

16              MR. FLAHERTY:  I think we all have, Judge.

17              THE COURT:  Okay.

18         So, in any event, I will work on the assumption that

19    the entry of Judgment, which will include the restitution,

20    will move the case out of my hands and into the appellate

21    setting, and the parties will pursue whatever they want to

22    pursue.

23         I will add one further thing.

24         Ms. Wichers, are you going to seek to have Mr. Cromwell

25    begin his sentence immediately?

```
 1              MS. WICHERS:  Seek -- I'm sorry.  Seek to have him

 2    begin his sentence...

 3              THE COURT:   Immediately?

 4              MS. WICHERS:  Yes.  We briefed that in Docket 295.

 5    We oppose the motion.

 6              THE COURT:  I know that.  I just want to be sure

 7    that you continue to take that position.

 8              MS. WICHERS:  Yes, your Honor.  But we understand

 9    that you've indicated that you disagree with it.

10              THE COURT:  No, but I just want to be sure that

11    I've addressed that.

12         So that will be finally addressed as well with the

13    Judgment in the case.

14         So now back to the restitution issue.  I would like to

15    have a final hearing on that.  And at an appropriate time, I

16    would like to have the opportunity to discuss the matter ex

17    parte with Ms. Wichers having to do with the Rankin & Sultan

18    bills here.  I say ex parte for the reasons I have

19    indicated.  First, that it strikes me that it's going to get

20    me into grand jury material that may or may not be

21    appropriate for other parties to hear and may or may not

22    involve me in some larger understanding of what the nature

23    of the government's investigations before the indictment and

24    perhaps continuing are.

25              I would note, as we all know, that the victim-witness
```

1     statements have elicited commentary about internecine

2     disputes within the Tribe, and in the case of several of

3     them I've put them under seal because they didn't seem to me

4     to be either timely or properly to be understood as victim

5     statements, but they are in the record, and you're aware of

6     them.

7         So does any of the -- do any of the defendants have any

8     objection to me consulting Ms. Wichers ex parte regarding

9     the underlying circumstances which may have given rise to

10    the Sultan & Rankin bills?

11            MR. WEINBERG:  No, your Honor.

12            THE COURT:  Mr. Flaherty?

13            MR. FLAHERTY:  No objection, your Honor.

14            THE COURT:  So, Ms. Wichers, when do you think

15    would be a reasonable time for us to do that, for you to

16    kind of pull together your thoughts about that?

17            MS. WICHERS:  Probably not this week, but after

18    Christmas.

19            THE COURT:  After Christmas is fine if you think

20    you need it.  I mean, I don't -- I anticipate that I'm going

21    to be asking fairly pertinent questions about the billing.

22    As I understand it, but maybe I'm reading it wrong, those

23    bills have been paid by the Tribe; is that correct?

24            MS. WICHERS:  Have been, yes.

25            THE COURT:  And so they are perhaps to be

1     considered either as the kind of payments that would be the

2     subject of a victim request or internal indemnification of

3     the Triable officer.

4          I note that Mr. Flaherty filed an additional document

5     dealing with continued issues of dispute within the Tribe.

6     I don't quite know how I'm going to do deal with that,

7     although I tend to think that other than saying, They're

8     internal disputes and here are of materials that I've relied

9     on, that I will do anything other than that in this case.

10         But it does raise some challenging issues, I think, for

11    purposes of restitution.

12         I think, Ms. Beatty, if you have a date that we can set

13    after the holiday for a final hearing with respect to the

14    restitution question, and before that a date that I can

15    discuss this with Ms. Wichers ex parte.

16              THE CLERK:  For the restitution hearing, would you

17    want it in January, but like mid January?

18              THE COURT:  I think so.  At least after the *cert*

19    petition is considered in *Coughlin*, just so the parties have

20    that data point in mind in case it has some effect on their

21    views.  But I think something like that.  We have, if I

22    recall correctly, Burgess being tried that first week after

23    the holiday week.  Perhaps the next week.

24              THE CLERK:  So January 18, which is a Wednesday.

25              THE COURT:  Okay.  Does that work for the parties?

```
 1            MR. WEINBERG:  Yes, your Honor.

 2            THE COURT:  So that's what we'll use as the date

 3    for a final hearing with respect to restitution, and my

 4    expectation is that at the conclusion of that, or relatively

 5    shortly thereafter, I'll be able to enter Judgment in the

 6    case.

 7            MR. WEINBERG:  Would your Honor consider delinking

 8    the restitution issue from the Judgment issue for

 9    Mr. Dequattro?

10            THE COURT:  No.

11            MR. WEINBERG:  Okay.

12            THE COURT:  I want one and all wrapped up together

13    here.  I don't think that it should cause an issue with

14    respect to Mr. Dequattro here.  The question of stay is --

15    seems to be resolved between the government and

16    Mr. Dequattro unless there is something specific that --

17            MR. WEINBERG:  No, it's --

18            THE COURT:  -- other than delayed resolution of the

19    matter.

20            MR. WEINBERG:  No.  It's just a concern that the

21    government and the counsel for the Tribe, instead of

22    conforming to the time requirements or objecting to the PSR,

23    suddenly at sentencing sprung this restitution --

24            THE COURT:  I understand the argument.  That will

25    be an argument that I will hear.
```

1           MR. WEINBERG:  Thank you, Judge.

2           THE COURT:  But I want to hear it in an orderly

3  fashion.  I'm not sure that the law is as clear on that

4  issue as perhaps you believe.  But, in any event, I'll add

5  my voice to the sum of human knowledge on that issue at that

6  time in a timely fashion.  I will be spending a lot of time

7  on that.

8           MR. WEINBERG:  Thank you, Judge.

9           THE COURT:  It may or may not be a further grounds

10  for the government to appeal.

11     Okay, so we have got that time.

12     And then, Ms. Beatty, what about the -- next week may

13  be difficult, I mean, just in terms of organizing something

14  by Zoom, but it's possible I suppose.  The alternative is

15  that following week when Burgess is being tried.

16           THE CLERK:  We have the week before, which is the

17  week of January 2.

18           THE COURT:  The second itself, yeah.

19           THE CLERK:  Well, the week of the 2nd.  The 2nd is

20  a holiday, so we can do it later in the week.  Either the

21  4th, 5th or 6th.

22           THE COURT:  How does that work for you, Ms.

23  Wichers?  Are any of those dates okay?

24           MS. WICHERS:  That's fine, your Honor, or the week

25  after Christmas.  Any of those is fine.

1          THE COURT:  Okay.  That's actually the week after

2    New Years.

3          MS. WICHERS:  Yes, either.

4          THE COURT:  Okay.  So why don't we say -- well,

5    Ms. Beatty and I will consult and set a date that

6    corresponds for our schedules as well.  Okay?

7          MR. WEINBERG:  Judge, one other thing.

8          THE COURT:  Yes.

9          MR. WEINBERG:  I would have no objection if your

10   Honor was to receive from the government the four grand jury

11   subpoenas that seem to be the cause of a great deal of the

12   legal fees to determine the extent to which the contents and

13   requests to produce documents related to Mr. Dequattro.

14      I've asked the government whether they would provide

15   them.  Ms. Wichers was kind enough to give me a summary of

16   the four different subpoenas, which I included in my filing

17   on restitution.

18      I have no objection if your Honor felt that it would

19   further your Honor's knowledge of the broad context of these

20   legal fees and the extent to which they could be isolated on

21   Mr. Dequattro or his counts of conviction or even isolated

22   on this investigation, rather than related investigations

23   that might have been the genesis of a lot of the document

24   requests that took time to respond to.

25          THE COURT:  I think that's a useful suggestion.

```
 1          Ms. Wichers, do you have any problem with filing the
 2     subpoenas themselves, the grand jury subpoenas, that gave
 3     rise to what I alternately referred to as the
 4     Rankin & Sultan bills?
 5               MS. WICHERS:  For your Honor's eyes only?
 6               THE COURT:  It will be filed under seal for these
 7     purposes.
 8               MS. WICHERS:  Yes.
 9               THE COURT:  And if you could do that tomorrow, that
10     would be helpful for me to start thinking about that as
11     well, unless that's a problem?
12               MS. WICHERS:  No problem.
13               THE COURT:  I think that's going to shape my views
14     concerning it here.
15          I probably should have the grand jury -- I don't think
16     I do have it -- the grand jury testimony to which those
17     subpoenas relate.  Is that available?
18               MS. WICHERS:  The subpoenas are for records.
19               THE COURT:  Yes.
20          And so is it simply a return of records that took
21     place, without compromising anything?  I just don't know if
22     there is something, some grand jury transcript, that deals
23     with this.
24               MS. WICHERS:  No, your Honor.  It's just's the
25     records we subpoenaed and the records we received.
```

```
 1              THE COURT:  Okay.  And so someone reported that
 2     they were received, or didn't even report it.  It just
 3     became part of the grand jury material.
 4              MS. WICHERS:  That's right.
 5              THE COURT:  Okay.
 6         All right.  So, in any event, the subpoenas themselves
 7     will be helpful for me, and I would like to receive those
 8     then.
 9         So I think we've got a schedule now, and I think I have
10     a full understanding of the parties' positions with respect
11     to it.  I will get this dealt with as promptly as I think I
12     can, which is more promptly than I wish I had time to do
13     because of my desire to unburden myself about what I do at
14     great length all the time.
15         But we'll take it up then on the -- is it the 18th,
16     Ms. Beatty?
17              THE CLERK:  Yes.
18         I didn't give the time.  Is 11 o'clock in the morning
19     okay with everybody?
20              MR. WEINBERG:  Yes.
21              MS. WICHERS:  Yes.
22              MR. FLAHERTY:  Yes.
23              THE COURT:  We'll take it up then.
24         Thank you very much.
25         We will be in recess.
```

```
 1          MR. WEINBERG:  Happy Holidays, your Honor.

 2          MS. WICHERS:  Happy holidays.

 3          THE COURT:  Happy holidays to you all.

 4          MR. WEINBERG:  Take care.

 5       (Proceedings adjourned.)

 6

 7                  C E R T I F I C A T E

 8

 9       I, James P. Gibbons, Official Court Reporter for the

10   United States District Court for the District of

11   Massachusetts, do hereby certify that the foregoing pages

12   are a true and accurate transcription of my shorthand notes

13   taken in the aforementioned matter to the best of my skill

14   and ability.

15

16

17       /s/James P. Gibbons          March 6, 2023
            James P. Gibbons

18

19

20

21              JAMES P. GIBBONS, CSR, RPR, RMR
                   Official Court Reporter
22                1 Courthouse Way, Suite 7205
                  Boston, Massachusetts 02210
23                 jamesgibbonsrpr@gmail.com

24

25
```

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 20-10271-DPW |
| | ) | |
| CEDRIC CROMWELL and | ) | |
| DAVID DEQUATTRO, | ) | |
| | ) | |
| Defendants. | ) | |

## UNITED STATES' REPLY BRIEF IN SUPPORT OF RESTITUTION

The government submits this reply brief in support of its request for an order holding the defendants jointly and severally liable for restitution payable to the Mashpee Wampanoag Tribe. As noted below, the government agrees that $11,188 of the legal time billed to the Tribe should be excluded. Therefore, the government requests a restitution order in the amount of $244,406.94 - $11,188 = $233,218.94.

Both defendants have raised the following arguments in their oppositions: (1) the government's request for restitution was untimely; (2) the defendants supposedly were not convicted of an offense against property; (3) the Tribe allegedly did not suffer a pecuniary loss; and (4) the Tribe supposedly was not directly and proximately harmed as a result of the defendants' crimes and therefore is not a victim. (DN 313 at 1-8; DN 316 at 1-4.) In addition, Mr. DeQuattro contends that: (5) the Tribe's legal fees and expenses are not "other expenses" reimbursable under Section 3663A(b)(4); (6) the Tribe's legal fees and expenses were not necessary to the Tribe's participation or prosecution of Mr. DeQuattro; and (7) any restitution that the Court orders should be apportioned based on culpability rather than joint and several. (DN 313 at 7-18.) As explained below, none of these arguments have merit.

## ARGUMENT

### 1. The Court Should Not Deny Restitution Based on Defendants' Timeliness Argument

The Court has the power to order restitution in this case despite the government's having missed the deadline in 18 U.S.C. § 3664(d)(1) because the error has not resulted in the Court missing the 90-day deadline set forth in Section 3664(d)(5), which, in any event, is a claims-processing rule and not a jurisdictional requirement. *Dolan v. United States*, 560 U.S. 605, 611 (2010). The Court should exercise its power because a wholesale denial of restitution would effectively punish the Tribe. The MVRA's "efforts to secure speedy determination of restitution is primarily designed to help victims of crime secure prompt restitution rather than to provide defendants with certainty as to the amount of their liability." *Id.* at 613.

### 2. The Defendants Were Convicted of an Offense Against Property

The defendants' bribery was an "offense against property." 18 U.S.C. § 3663A(c)(1)(A)(ii).[1] The appellate court that most recently examined this language is the Second Circuit. *United States v. Razzouk*, 984 F.3d 181 (2d Cir. 2020), *cert. denied*, 142 S. Ct. 223 (2021). Razzouk, a utility employee, accepted bribes from his friend to cause the utility to pay the friend's company for phantom work. *Id.* at 184. The *Razzouk* court held, first, that the question of whether a particular bribery scheme was an "offense against property" must be decided by considering the facts of the crime of conviction rather than the elements of the offense. *Id.* at 186. The court then held that the defendant's bribery was an offense against

---

[1] If the Court determines that the defendants' bribery was not an "offense against property," or that the Tribe did not suffer a "pecuniary loss" (*see infra*), the government respectfully requests that the Court exercise its discretion to award restitution under the Victim and Witness Protection Act, 18 U.S.C. § 3663. Neither of these is a requirement under Section 3663.

2

property because the defendant "deprived [his employer] of a property interest in its funds through his facilitation of its payments to [the friend's company] for phantom work." *Id.* at 189.

The defendants' bribery in this case was a crime against property because the bribes were given in order to protect a property interest: money being paid month after month to RGB under its contract with the Gaming Authority. Although not all bribes are paid in exchange for a property interest, *see, e.g., Salinas v. United States*, 522 U.S. 52, 55 (1997) (affirming Section 666 bribery conviction against deputy sheriff who accepted bribes from prisoner in exchange for allowing conjugal visits), the requirement was met here.[2]

### 3. The Tribe Suffered a Pecuniary Loss

As relevant here, the MVRA applies "in all sentencing proceedings for convictions of . . . any offense— (A) that is . . . (ii) an offense against property under this title . . . and (B) in which an identifiable victim . . . has suffered a . . . pecuniary loss." 18 U.S.C. § 3663A(c)(1)(A)(ii), (B).

The defendants argue that the Tribe's legal expenses and fees incurred in assisting the government in its investigation and prosecution cannot constitute the "pecuniary loss" required by Section 3663A(c)(1)(B) as a matter of law. This argument is without merit. The statute does not say that a "direct" pecuniary loss is required. Moreover, Section 3663A(c)(1)(A) states that restitution for "other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense" is due "in *any* case," not just a case in which the victim has suffered a pecuniary loss, much less a direct pecuniary loss.

---

[2] The defendants' reliance on *United States v. Adorno*, 950 F. Supp. 2d 426 (E.D.N.Y. 2013), ignores *Razzouk*. The Second Circuit distinguished *Adorno* on the grounds that the harm on which the restitution request was based could not be documented. *Razzouk*, 984 F.3d at 189 n.10. That problem did not exist in *Razzouk* and it does not exist here.

3

(Emphasis added.) There can be no question that the Tribe's legal fees and expenses are an indirect pecuniary loss that it incurred during the participation in the government's investigation and prosecution and attendance at proceedings related to those offenses. The Tribe also suffered indirect pecuniary loss in the form of construction project cost increases resulting from its termination of Mr. DeQuattro's firm based on the defendants' bribery. *See* DN 307 at 2-3.

The defendants neglect to mention that two decisions from the Southern District of New York have rejected the argument they raise here. *United States v. Avenatti*, 19-CR-373-PGG, 2022 WL 452385, at *7 (S.D.N.Y. Feb. 14, 2022); *United States v. Kuruzovich*, No. 09-CR-824-DC, 2012 WL 1319805, at *4-5 (S.D.N.Y. Apr. 13, 2012) (Chin, J., sitting by designation), *abated due to defendant's death*, 541 F. App'x 124 (2d Cir. 2013).

The defendant in *Kuruzovich* demanded payments from the company that had fired him, threatening that he would contact various government authorities and allege insider trading and other illegal activity by the company if it did not pay him. He pled guilty to one count of blackmail, in violation of 18 U.S.C. § 873. In the course of its participation in the government's investigation and prosecution of the defendant, the company had retained outside counsel to review documents requested by the government and to address concerns over confidentiality and privilege. The company sought restitution covering its legal fees. The defendant objected that the company had suffered no injury as a result of his conduct. *Kuruzovich*, 2012 WL 1319805, at *4. Judge Chin rejected the defendant's argument, holding that the company's legal fees constituted the "pecuniary loss" required under Section 3663A(c)(1)(B). *Id.*

The defendant in *Avenatti*, attorney Michael Avenatti, represented the coach of a Nike-sponsored youth basketball program. The coach claimed that Nike had terminated its sponsorship of his program because he had refused to engage in alleged corruption by certain Nike

employees. Avenatti threatened Nike that he would hold a press conference that "would take billions of dollars off the company's market cap" unless Nike paid the coach a $1.5 million settlement and paid millions to Avenatti personally to conduct an internal investigation at Nike. *Avenatti*, 2022 WL 452385, at *1-2. A jury convicted Avenatti of transmitting interstate communications with intent to extort, Hobbs Act extortion, and honest services wire fraud. *Id.* at *1.

The government sought restitution for Nike's legal fees and expenses incurred in responding to subpoenas and requests from the government in connection with assisting in the prosecution, preparing witness who testified at trial, and preparing materials in support of the request for restitution. *Id.* at *5. Avenatti argued that Nike could not recover these fees because they did not constitute a "pecuniary loss." The court rejected this argument, relying on *Kuruzovich*. It also relied, as did the *Kuruzovich* court, on *United States v. Amato*, 540 F.3d 153 (2d Cir. 2008), *abrogated in part by Lagos v. United States*, 138 S. Ct. 1684 (2018).[3] Although the *Amato* court did not directly address the "pecuniary loss" language in the MVRA, it held that the victim's legal fees incurred in assisting the government's investigation and prosecution of the defendants were a direct and foreseeable result of the defendants' offenses. *Id.* at 162; *see also United States v. Afriyie*, 27 F.4th 161, 166 (2d Cir. 2022) (same, where defendant was convicted

---

[3] *Lagos* holds that the phrase "reimburse the victim for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense," as used in Section 3663A(b)(4), includes only expenses incurred as part of government investigations and criminal proceedings, not private investigations or civil or bankruptcy proceedings. *Lagos*, 138 S. Ct. at 1687. The government is not seeking restitution for expenses incurred by the Tribe as part of any private investigation.

of trading on inside information misappropriated from his employer), *cert. denied*, 143 S. Ct. 326 (2022).

The only case on which the defendants rely is *United States v. Yu Xue*, CR 16-22, 2021 WL 2433857 (E.D. Pa. June 15, 2021), which the *Avenatti* court found unpersuasive, 2022 WL 452385, at *7. The defendant *Yu Xue* was convicted of stealing GlaxoSmithKline's trade secrets for which there was no fair market value. 2021 WL 2433857 at *2 n.4. The court held that GSK had suffered no pecuniary loss because there was no direct financial loss, and, therefore, GSK was not entitled to restitution for the legal fees it had incurred in hiring outside counsel to support the government's investigation and prosecution.

*Yu Xue* is distinguishable, however, because GSK's own admissions in that case showed that its legal fees did not meet the language of Section 3663A(b)(4). Specifically, GSK admitted that "the vast majority of the work [outside counsel] undertook was in reaction to the litigation strategies and tactics of Defendants' counsel, as well as particular Court Orders requiring GSK to take certain actions in discovery at Defendants' insistence," which was "perforce not done at the request of or required by the Government." *Id.* at *3. Those are not the facts here. In addition, *Yu Xue*'s rejection of *Kuruzovich* does not hold up. The *Yu Xue* court stated: "Tellingly, expenses for legal fees and costs incurred during an investigation and prosecution of a defendant would only arise after a victim suffers a pecuniary loss "as a result of the commission of an offense." *Id.* at *6 (quoting Section 3663A(a)(2)). But the language of the statute does not contain that chronology. Nor does *Yu Xue* address the fact that the statute does not require a *direct* pecuniary loss.

For these reasons, the Tribe suffered a pecuniary loss, as required by Section 3663A(c)(1)(B).

6

### 4. The Tribe Was Directly and Proximately Harmed as a Result of the Defendants' Crimes

As noted in the government's principal brief, the Tribe was directly and proximately harmed by both defendants' bribery. DN 307 at 2-3. The harm includes damage to the Tribe's reputation caused by Mr. Cromwell's conviction, and construction project delays and lost resources caused by Mr. DeQuattro's conviction, which left the Tribe no choice but to fire RGB.[4] The defendants create a false construct by trying to parse their bribery convictions from the counts of acquittal. One cannot say that the Tribe's reputation was somehow less injured because Mr. Cromwell was acquitted of bribery conspiracy, or that the Tribe's decision to fire RGB was based only on the bribery counts on which Mr. DeQuattro was acquitted. Unlike some cases, all of the charges that went to the jury in this case (on which the Court did not issue a judgment of acquittal) were for the same crime: bribery or conspiracy to commit bribery. In terms of the direct and proximate harm that the defendants' bribery convictions caused to the Tribe, the counts of acquittal cannot be untethered from the counts of conviction. The Tribe was directly and proximately harmed by the defendants' bribery, period. That harm includes the legal fees and expenses the Tribe incurred during its participation in the investigation and prosecution of the crimes of conviction. *See, e.g., Avenatti*, 2022 WL 452385, at *5 n.4.

---

[4] Mr. DeQuattro implies that the harm caused to the Tribe when it fired RGB was self-inflicted. *See* DN 313 at 6 (asserting that RGB "was not a party to this case" and the Tribe's decision to fire RGB "was entirely its own"). That is absurd. Mr. DeQuattro owned RGB. RGB paid for the Bowflex and the hotel stay which Mr. DeQuattro gave to Mr. Cromwell as bribes. It would have been impossible for the Tribe to continue doing business with a company owned by a person convicted of bribing the Tribe's Chairman.

### 5. The Tribe's Legal Fees and Expenses Are "Other Expenses" Reimbursable Under Section 3663A(b)(4)

In a post-*Lagos* case, Judge Talwani held that a victim's legal fees are recoverable under the MVRA as "other expenses" if they were necessary. *United States v. Chan*, 16-CR-10268-IT, 2019 WL 3975579, at *5 (D. Mass. Aug. 22, 2019), *restitution award aff'd sub nom. In re Akebia Therapeutics, Inc.*, 981 F.3d 39 (1st Cir. 2020). The defendants were convicted of securities fraud and conspiracy to commit same. The case concerned, among other things, the defendants' purchases of the stock of Akebia Therapeutics while one of them worked there.

Judge Talwani awarded Akebia restitution for its legal fees in the amount of $170,476.46. *Id.* at *1. This included reimbursement for certain hours spent by outside counsel to compile and produce documents subpoenaed by the government, hours spent by counsel preparing Akebia employees for government interviews and attending the interviews, some hours spent by attorneys assisting with the restitution request, and the transportation expenses of lawyers who attended court proceedings. *Id.* at *7-8. Judge Talwani excluded from her restitution order hours spent for lawyers to prepare Akebia employees to testify at trial, and to watch the trial and other court proceedings, as well hours she deemed were excessive and unnecessary. *Id.*[5]

The First Circuit affirmed. *In re Akebia Therapeutics, Inc.*, 981 F.3d 32, 39 (1st Cir. 2020). It rejected any notion that *Lagos* had overruled *United States v. Janosko*, 642 F.3d 40 (1st Cir. 2011), and emphasized the continuing applicability of *Janosko*, which holds: "While 'expenses' qualifying for restitution are not unlimited, . . . they will pass muster if they would not have been incurred in the absence of the offense, were not too attenuated in fact or time from

---

[5] Outside counsel's invoices included hours spent by paralegals, litigation support technicians, litigation support analysts, associates, counsel, and partners. Judge Talwani approved hourly rates spanning from $194.75 to $997.50. *Chan*, 2019 WL 3975579 at *8-9.

the crime, and were reasonably foreseeable." *Id.* at 42 (citation and internal quotation marks

omitted), *quoted in Akebia*, 981 F.3d at 38. The *Akebia* court assumed without deciding that legal

fees are recoverable "other expenses" under the MVRA. 981 F.3d at 38 n.4. The court held that

the district court had not abused its discretion in denying certain hours. It reasoned:

> The reality is that determining an award of restitution is a fact-specific undertaking
> and will vary case-by-case. The district court has the discretion to determine, for
> each case, which expenses were necessary and foreseeable, and therefore
> reimbursable. The district court's task is to reasonably determine an appropriate
> amount for restitution and to ensure the amount awarded has a rational basis in the
> record. We have previously acknowledged that, to some degree, any line drawn
> which has the effect of denying part of a request for reimbursement of expenses is
> arbitrary. Regardless of the heavy weight the district court placed on the Supreme
> Court's guidance in *Lagos*, it painstakingly considered each category of expenses
> presented to it, as well as each item within each category, to determine a reasonable
> award to Akebia based on its determination of whether each category and item was
> necessary and foreseeable. As we stated above, we see no improper exercise of its
> discretion in its application of the relevant law, and no abuse thereof in its series of
> decisions, expressed in the order, or in the resulting award to Akebia.

*Id.* at 39 (citations omitted).

The *Chan* court's finding that legal fees can be "other expenses" under the MVRA, and

the First Circuit's assumption to that effect, are consistent with the majority rule. *See United*

*States v. Afriyie*, 27 F.4th 161, 166 (2d Cir. 2022), *cert. denied*, 143 S. Ct. 326 (2022); *United*

*States v. Sexton*, 894 F.3d 787, 801 (6th Cir. 2018); *United States v. Hosking*, 567 F.3d 329, 332

(7th Cir. 2009), *abrogated in part by Lagos v. United States*, 138 S. Ct. 1684 (2018); *United*

*States v. Gordon*, 393 F.3d 1044, 1057 (9th Cir. 2004), *abrogated in part by Lagos v. United*

*States*, 138 S. Ct. 1684 (2018). *But see United States v. Koutsostamatis*, 956 F.3d 301, 303 (5th

Cir. 2020) (holding that Section 3663A(b)(4) "other expenses" must be similar to lost income

and expenses for childcare and transportation, and overturning $552,651 restitution order for

expenses victim company incurred in using its own digital security team and outside contractors

to find the defendant, an employee hacker who had blackmailed the company). They are also

consistent with the overarching purpose of the MVRA, which is to make victims whole. Therefore, this Court should follow *Chan* and the Second, Sixth, Seventh, and Ninth Circuits.

### 6. The Claimed Expenses Were Necessary to the Tribe's Participation in the Investigation and Prosecution of Both Defendants' Offenses of Conviction

The Court should reject Mr. DeQuattro's request for disallowance of legal fees that the Tribe incurred while the government was investigating suspect treasurer's checks received by Mr. Cromwell, but before the government discovered that the payor was Mr. DeQuattro. The government could not have investigated Mr. DeQuattro's role without first investigating the treasurer's checks. It was all part of the same investigation.

The government's investigation into Mr. Cromwell began in 2019. In March 2020, the government discovered suspect treasurer's checks payable to Mr. Cromwell in the amounts of $3,000, $3,000, $4,000, $5,000, $5,000, and $8,800. (Trial Ex. 1 at 1-6.) On June 5, 2020, the government learned that the purchaser of these treasurer's checks was Constantinos Mitrokostas. The government served its first subpoena on the Tribe that same day (although the subpoena did not request any records relating to the treasurer's checks).[6] The Tribe began incurring legal expenses on June 8, 2020, in connection with its response to the first subpoena. Salguero Decl., Ex. A at 2. On June 22, 2020, the government learned that Mr. DeQuattro was the source of the funds that Mr. Mitrokostas had converted into treasurer's checks to Mr. Cromwell. On July 7, 2020, FBI agents interviewed Mr. DeQuattro, who made statements about Mr. Cromwell and Mr. Mitrokostas which the government believed (and later came to know) were untrue. On July 31, 2020, Mr. DeQuattro, accompanied by counsel, gave a proffer-protected interview at the U.S.

---

[6] The government has given the Court, *ex parte*, copies of the four subpoenas served on the Tribe.

Attorney's Office. On August 10, 2020, the government served the Tribe with a second

subpoena; all of the requested records pertained to RGB and Mr. DeQuattro. On September 8,

2020, the government served the Tribe with a third subpoena, which sought only records relating

to RGB. On October 28, 2020, the government served the Tribe with the fourth subpoena,

seeking all of Mr. Cromwell's email files – which necessarily included emails with Mr.

DeQuattro and electronic invitations for meetings involving Mr. DeQuattro.

The defendants were indicted on November 12, 2020. They were both charged with the

Bowflex, the hotel stay, and Mr. DeQuattro's $10,000 check from November 2015 as Section

666 bribes. And they were both charged with conspiracy to commit Section 666 bribery. They

were both convicted with regard to the Bowflex and the hotel stay, and Mr. Cromwell was

convicted on the $10,000 check. Although Mr. DeQuattro paid the check, the jury acquitted him

of that count. Both were acquitted on the conspiracy count.

The government's investigation from March 2020 until the indictment was returned on

November 12, 2020 was focused on both defendants. The discovery that Mr. DeQuattro had paid

Mr. Cromwell $50,000 in five separate checks, the first four through Mr. Mitrokostas's shell

company and the fifth to Mr. Cromwell's shell company, was highly indicative of a bribery

scheme. To confirm this, the government needed, *inter alia*, more records from the Tribe.

Records obtained from the Tribe (and RGB and other entities) and witness statements/testimony

confirmed the scheme.

The fact that Mr. DeQuattro was convicted only on the Bowflex and the hotel stay does

not mean that the Tribe's recoverable legal fees are limited to those associated with investigation

specifically of the Bowflex and the hotel stay. Such a narrow view is inconsistent with the reality

of a criminal investigation of a scheme or conspiracy. The Bowflex and the hotel stay cannot be

11

viewed in isolation. The jury's finding that they were bribes necessarily depended on context – specifically, the $50,000 Mr. DeQuattro had already paid Mr. Cromwell, Mr. DeQuattro's defense that the money was political donations, and the fact that Mr. DeQuattro could not claim that defense for the Bowflex or the hotel. The investigation was aided by numerous records produced by the Tribe, including the Tribe's constitution and policies; the Gaming Authority ordinance; Tribal election records, Gaming Authority meeting minutes; the casino contract between the Tribe and RGB; invoices received and checks paid under that contract; other contracts between RGB and the Gaming Authority; and emails relating to RGB. Of course, as in any investigation, it was critical for the government to know not only what records the Tribe had but also what records it did not have or which did not even exist.

Mr. DeQuattro asserts that it was unnecessary for the Tribe to have its counsel investigate sovereign immunity issues. (DN 313 at 15.) On the contrary, the Tribe wanted to comply with the subpoenas (and did so) but needed to ensure it would not waive its sovereign immunity in doing so. Production letters from Todd & Weld stated, "The Tribe is producing these documents voluntarily and without waiving and while expressly reserving its right to object on sovereign immunity grounds."

Mr. DeQuattro also asserts that it was unnecessary for the Tribe to ask its counsel to review documents for attorney-client privilege before producing them. (DN 313 at 15.) That is also untrue. Virtually every entity that receives a grand jury subpoena for records asks its counsel to withhold privileged documents. When a victim entity produces records to the government as part of its participation in a criminal investigation, its privilege review and withholding of privileged documents is a normal and necessary part of the process. A victim should not have to risk waiving its privileges in order to be entitled to restitution.

Next, Mr. DeQuattro complains that the Tribe's counsel developed and used key word search terms in reviewing mails. (DN 313 at 15.) But that is the only way entities produce emails. When the government subpoenas a company, organization, or tribe for emails pertaining to certain matters, it is routine for the government and the recipient to agree on search terms. It is necessary for the recipient to search for emails responsive to the subpoena, and the most common and effective way to do so is by using search terms.[7]

Next, Mr. DeQuattro asserts that fees for the Tribe's counsel to attend court proceedings are not necessary. (DN 313 at 16-17.) He relies on the district court's opinion in *Chan*. Respectfully, the *Chan* court was wrong. Section 3663A(b)(4) provides that a defendant may be ordered to "reimburse the victim for lost income and *necessary* child care, transportation, and *other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense*." In some cases it may not be necessary for a crime victim's representative to attend the court proceedings. But it was necessary here. This was the second chairman of the Mashpee Wampanoag Tribe to be criminally prosecuted. The Tribe needed to ensure that its interests were being protected, that nothing which occurred in court could be misinterpreted as a waiver of its sovereign immunity, and that the Tribe could tell the government if either defendant represented – directly or through counsel – something which the Tribe knew was untrue. Moreover, the defendant was not just any Tribal member. He was the former Chairman accused of engaging in bribery behind the Tribe's back regarding a Tribal contract for the most important economic development project in the Tribe's history. And the victim was not a single person. The Tribe is a nation run by its Tribal Council. It needed a

---

[7] The government will address Mr. DeQuattro's complaint No. 3 on page 16 of his brief during the *ex parte* hearing scheduled for January 5.

13

representative to attend the proceedings and report back to the Tribal Council on what was happening. The most logical representative was someone who would understand the court proceedings: the Tribe's lawyer.[8]

The government agrees with Mr. DeQuattro that time billed by the Tribe's counsel on November 13-19, 2020 was unnecessary for the Tribe's participation in the investigation or prosecution. *See* Salguero Decl., Ex. A. That time totals $10,343. The government also agrees that counsel's time entry for May 6, 2022 was unnecessary for the Tribe's participation in the investigation or prosecution. *See* Salguero Decl., Ex. B. That time totals $845.[9] The time entry for the day before was necessary, however. The attorney charged 1.2 hours for attending court for the verdict and then notifying the Tribe. The fact that he spoke briefly with the prosecutors and extended thanks on behalf of the Tribe while in the courtroom is no reason to exclude his time.

Mr. DeQuattro has pointed to no other time entries he contends were unnecessary.

### 7. The Restitution Order Should Be Joint and Severable.

Mr. DeQuattro has asked the Court to exercise its discretion to apportion any restitution order according to culpability. DN 313 at 18. While the government acknowledges the Court's finding that Mr. DeQuattro was far less culpable than Mr. Cromwell, apportioning restitution in this case would be inconsistent with the fact that the Tribe incurred legal expenses in connection

---

[8] Mr. DeQuattro also points to *Akebia*'s affirmance of the district court's denial of reimbursement for time spent by lawyers preparing Akebia witnesses for trial testimony, "because the government prosecutors were responsible for preparing these witnesses for trial testimony." *Akebia*, 981 F.3d at 38-39. That is not an issue here. The Tribe is not seeking reimbursement for its counsel preparing witnesses for trial.

[9] Thus, the government agrees that $10,343 + $845 = $11,188 should be excluded.

14

with the entire investigation, which led to parallel charges of bribery against the defendants, and parallel convictions except for the $10,000 check from November 2015. Furthermore, ordering joint and severable liability would be fairer to the Tribe because it would make it far more likely that the Tribe could enforce the order. See DN 307 at 5. It would he consistent with the overarching purpose of the MVRA: to make victims whole.

<h2 style="text-align:center"><strong>CONCLUSION</strong></h2>

For these reasons, the government respectfully requests that the Court order the defendants to pay $233,218.94. in restitution to the Mashpee Wampanoag Tribe, and to hold the defendants jointly and severally liable.

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney

By:  */s/ Christine Wichers*
Christine Wichers
Jared Dolan
Assistant U.S. Attorneys

<h3 style="text-align:center"><strong><u>Certificate of Service</u></strong></h3>

I certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on December 21, 2022.

*/s/ Christine Wichers*
Christine Wichers

<div style="text-align:center">15</div>

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 20-CR-10271 |
| | ) | Leave to File Granted on |
| DAVID DEQUATTRO, | ) | December 22, 2022 |
| Defendant | ) | |
| | ) | |

**DEFENDANT DAVID DEQUATTRO'S SUR-REPLY REGARDING RESTITUTION**

**A.     The Government Has Made No Showing that the Tribe's Legal Expenses Were Caused by Mr. DeQuattro's Sole Offense of Conviction**

The government, even in Reply, utterly fails to address the Supreme Court's holding that restitution must be limited to "the loss caused by the specific conduct that is the basis of the offense of conviction" and that "a defendant who is charged with multiple offenses but who is convicted of only one offense" cannot be required "to make restitution for losses related to the other alleged offenses." *Hughey v. United States*, 495 U.S. 411, 412-13 (1990). While the government criticizes the defendants for "trying to parse their bribery convictions from the counts of acquittal," that is precisely the analysis the caselaw requires. Dkt. 323 at 7. The complete absence of any attempt to establish that Mr. DeQuattro's provision of the Bowflex and hotel reservation to Mr. Cromwell, as opposed to the lawful campaign contributions for which he was acquitted and/or Mr. Cromwell's own unilateral conduct, was a but-for and proximate cause of the Tribe's claimed loss, in itself, dooms the restitution claim. The government notably fails to cite a single authority for its contrary position. Zeroing in on the specific counts of conviction, it is readily apparent that all of the subpoenas would have issued irrespective of Mr.

1

DeQuattro's conduct.  The government investigation was focused on Mr. Cromwell and his suspected misuse of Gaming Authority funds, as well as on political donations he received from Mr. DeQuattro and others.  Under *Hughey*, the foregoing is all beyond the scope of restitution.

Even if the court determines (over the defense objection) that the absence of a conviction for the donation-related conduct does not fully bar restitution as a matter of law, the expenses that can be individually assigned as both necessary and attributable to Mr. DeQuattro are very small.  Despite the defense raising this issue in its Opposition, neither the Tribe nor the government has sought to individualize the claimed expenses to one or both defendants, and the supporting invoices similarly fail to do so.[1]  To award the requested restitution without an individualized showing would infringe upon Mr. DeQuattro's Due Process rights.  *See Hughey*, 495 U.S. at 420 n.5 ("To order a defendant to make restitution to a victim of an offense for which the defendant was not convicted would be to deprive the defendant of property without due process of law." (quoting H.R. Rep. No. 99-334, p. 7 (1985)).

Nor has the Tribe provided revised invoices addressing the issue of block-billing.  For example, the government persists in claiming that a May 5, 2022 time entry including "███████ ███████████████████████████████████████" was necessary.  R. Salguero Decl., Ex. B at 5/6/22.  It reasons that the same time entry included other tasks like "attending court for the verdict" and "notifying the Tribe."  Dkt. 323 at 14.  But this is precisely the issue caused by block-billing: even assuming, contrary to the defense argument, that such other tasks are compensable, there is no way to determine how "brief[]" the conversation thanking the

---

[1] *Cf. U.S. ex rel. Lovell v. AthenaHealth, Inc.*, No. 22-1246, 2022 WL 17829026, at *3 n.3 (1st Cir. Dec. 21, 2022) (affirming, in civil *qui tam* action, order applying "an across-the-board percentage reduction" in attorney fee award "because counsel had not distinguished between time spent on each claim," only one of which was within the statute).

2

prosecutors was.  Accordingly, under authorities like *Chan* and *Avenatti*, the entirety of this entry

must be disallowed.  Other entries include time spent to protect the Tribe's own interests, rather

than on tasks required by the government.  *See* R. Salguero Decl., Ex. A at 7/13/20 ("███████

█████████████████████████████████"), 11/5/20 (review of "███████

████████████████████"), 11/6/20 (analysis of "█████████" regarding

potential indictment of Mr. Cromwell, "█████████████" and "███████████

████████████").  Similarly, many time entries include preparation for or attendance at

Tribal meetings and/or other communications to Tribal members, akin to client relations.  *See id.*

at 6/17/20, 6/23/20, 6/24/20, 8/6/20, 8/17/20, 8/26/20, 8/28/20, 9/21/20, 11/4/20, 11/6/20,

11/9/20, 12/1/20, 12/2/20, 12/30/20; Ex. B at 6/9/21, 8/4/21.  While it is certainly understandable

why the Tribe might want its counsel to attend such meetings, there has been no showing that

these expenses meet the strict definition of necessity required by the caselaw.[2]

## B.    Mr. DeQuattro Was Not Convicted of an Offense "Against Property"

There was no evidence that Mr. DeQuattro's conduct was "directed[]" against anyone's

property interest.  *United States v. Collins*, 854 F.3d 1324, 1331 (11th Cir. 2017).  More

specifically, there was no hint that Mr. DeQuattro's providing a Bowflex or hotel reservation to

Mr. Cromwell influenced the latter's decision-making in any respect, and particularly not to any

economic disadvantage of the Tribe, nor that RGB failed to provide valuable services in

exchange for the Gaming Authority's payments.  This is, in short, the antithesis of *Razzouk*

where the victim paid "for phantom work."  Dkt. 323 at 3 (citation omitted).  Instead, Mr.

DeQuattro's conduct of conviction is reminiscent of that which courts have suggested does not

---

[2] Alternatively, the defense contends that the Court may decline to award restitution because of "complex issues of fact related to" causation that threaten to unjustifiably "complicate or prolong" sentencing.  § 3663A(c)(3)(B).

trigger the statute.  *See* Dkt. 313 at 4 (citing *Collins* and *United States v. Adorno*, 950 F. Supp. 2d 426, 430 (E.D.N.Y. 2013)).[3]

The government cites no authority for its contention that bribery constitutes a crime "against property" so long as the bribe is "given in order to protect a property interest."  Dkt. 323 at 3.  Indeed, as discussed in Mr. DeQuattro's Opposition, the caselaw requires harm to another's property interest, not protection of such an interest.  This is a necessary implication of the statutory word "against."

The government suggests in a footnote that, if the Court rules for the defendant on this issue, it nonetheless should Order restitution under a different statute, not previously cited in any request for restitution by the Government or the Tribe.  *See* Dkt. 323 at 2 n.1 (citing 18 U.S.C. § 3663).  The government has waived any entitlement to restitution under this provision by (a) failing to mention the statute until its Reply brief and (b) failing, even in Reply, to develop any argument as to why the Court should Order restitution under the statute.

## C.   The Government Has Not Proven that the Tribe Suffered a "Pecuniary Loss"

The element of "pecuniary loss," much like that of an offense "against property," is a threshold requirement to the applicability of "[t]his section," *i.e.*, 18 U.S.C. § 3663A, including the subsection permitting reimbursement of "other expenses," § 3663A(b)(4).  The latter subsection's preface "in any case" must self-evidently mean in any case subject to § 3663A.  *See United States v. Chan*, No. 16-CR-10268, 2019 WL 3975579, at *4 n.4 (D. Mass. Aug. 22, 2019) (describing § 3663A(b)(4) as applicable "in all cases *subject to the MVRA*" (emphasis added));

---

[3] The government's attempt to distinguish *Adorno* based on documentation of "the harm on which the restitution request [i]s based," *i.e.*, the legal fees and expenses, see Dkt. 323 at 3 n.2, misses the mark.  The existence of "an offense against property" is a threshold requirement to the applicability of § 3663A, including the subsection permitting recovery of "other expenses," § 3663A(b)(4).

4

*United States v. Yu Xue*, No. 16-CR-22, 2021 WL 2433857, at *4 (E.D. Pa. June 15, 2021)

("While the Government is correct that the MVRA provides for reimbursement of necessary

expenses under § 3663A(b)(4) 'in any case,' the MVRA in its entirety only applies if the victim

'has suffered a physical injury or pecuniary loss.' Thus, despite the presence of the language 'in

any case,' the fact that [the victim] suffered no pecuniary loss precludes application of

§ 3663A(b)(4)." (citation omitted)). Otherwise, restitution would be mandatory in any federal

criminal case in which the victim incurs legal fees.

     The statute also requires, on its face, that the "pecuniary loss" be suffered by "an

identifiable victim or victims." 18 U.S.C. § 3663A(c)(1)(B). The word "victim" is, in turn,

limited to "a person directly and proximately harmed as a result of the commission of an

offense." § 3663A(a)(1)(2). Accordingly, courts have construed the statute to require that

pecuniary loss follow as a direct and proximate result from the offense of conviction. *See, e.g.*,

*Morillo v. Attorney General*, 751 F. App'x 335, 338 (3d Cir. 2018) (unpublished) (crediting

government argument that "a court can order restitution only if it 'finds that an identifiable

victim or victims has suffered a physical injury or pecuniary loss as a direct[] and proximate[]

result of the offense.'"). This reading is consistent with explicit Congressional intent. *See* S.

Rep. 104-179, p. 19 (1995) ("The committee intends this provision to mean . . . that mandatory

restitution provisions apply only in those instances where a named, identifiable victim suffers a

physical injury or pecuniary loss directly and proximately caused by the course of conduct under

the count or counts for which the offender is convicted.").

     Here, the government concedes that the Tribe's legal fees and expenses are an "indirect"

pecuniary loss. Dkt. 323 at 4. This, in itself, is sufficient to place them outside the mandatory

<div align="center">5</div>

restitution statute.[4]  This concession also distinguishes the two authorities relied upon by the government where the legal expenses found to constitute the requisite pecuniary loss were specifically described as the "direct" result of the defendant's conduct.  *See United States v. Kuruzovich*, No. 09-CR-824, 2012 WL 1319805, at *5 (S.D.N.Y. Apr. 13, 2012); *United States v. Avenatti*, No. 19-CR-373, 2022 WL 452385, at *7 (S.D.N.Y. Feb. 14, 2022).

**D.     The Claimed Legal Fees and Expenses Are Not Necessary "Other Expenses"**

The defense maintains that the statutory language "other expenses" should not be read to include hundreds of thousands of dollars in legal fees.  *See* Dkt. 313 at 8-11.  In arguing to the contrary the government relies in large part on pre-*Lagos* precedents, as well as cases from the Second and Sixth Circuits applying circuit precedent from before *Lagos*.  *See* Dkt. 323 at 9.[5]

Even assuming *arguendo* that attorneys' fees may be recoverable, they still must be **necessary**.  In *Avenatti*, the court denied the initial request for restitution "because of inadequate submissions from the Government and from Nike," and limited recovery to "investigatory activities that the government expressly and specifically invited or requested."  2022 WL 452385, at *3-4.  It found not recoverable fees for "[a]nalyzing court filings and engaging in motion practice," and "[a]ttending hearings and the trial" when Nike witnesses were not testifying, *id.* at *9, both of which are included in the restitution request here.  *Avenatti* also held that the court could not "attempt to extricate recoverable expenses from non-recoverable expenses in block-billing entries."  *Id.* at *10.  Ultimately, the court ordered restitution of

---

[4] The government's continued reliance upon the Tribe's decision to fire RGB is particularly problematic.  This is the epitome of an **in**direct result.  And the government neglects to mention that RGB agreed to forgo more than $87,000 in fees for work performed as part of its settlement agreement with the Tribe regarding these projects.

[5] To the extent the Court finds any statutory ambiguity on this issue, the rule of lenity requires it to be resolved in Mr. DeQuattro's favor.  *See Hughey*, 495 U.S. at 422.

6

approximately $260,000, down from an initial request of $1 million. *See id.* at *3, 11. *Chan*

reflects a similar approach. *See* 2019 WL 3975579, at *5. As explained in the defense

Opposition, Judge Talwani proceeded to exclude some of the same types of expenses at issue

here. *See* Dkt. 313 at 15-17. Contrary to the government's representation, *see* Dkt. 323 at 14

n.8, the submitted bills reflect significant time entries for attendance at pre-trial interviews or

"prep sessions" with witnesses. *See* R. Salguero Decl., Ex. B at 8/12/21, 4/15/22, 4/25/22.

### E.    It Would Be Unfair to Hold Mr. DeQuattro Jointly and Severally Liable for the Full Claimed Loss Amount

Even assuming *arguendo* the Court imposes restitution, it should reject the government's

request for joint and several liability. As this Court has already noted, this case involves a clear

asymmetry in culpability. The government theory was that Mr. Cromwell pressured Mr.

DeQuattro to make the gifts at issue, as well as campaign donations. While Mr. DeQuattro may

have greater resources than Mr. Cromwell, his business has already been deeply burdened, and

will continue to be, by the accusation and subsequent conviction. It would be unjust to require

Mr. DeQuattro to be jointly and severally liable when so many of the legal expenses were

focused on Mr. Cromwell[6] and where the evidence and counts of conviction so clearly

distinguished the two defendants.[7]

Respectfully Submitted,

---

[6] The government has represented that the first subpoena sought no records related to RGB and the fourth was directed exclusively at Mr. Cromwell's emails. These subpoenas clearly would have issued irrespective of Mr. DeQuattro's conduct of conviction and expenses associated with them must therefore be excluded from any restitution award.

[7] The government also persists in its inaccurate characterization of Mr. DeQuattro's interview with Agent Crandall. As Mr. DeQuattro has already discussed at length, his statements were true and, in fact, demonstrated significant transparency. *See* Dkt. 262 at 10-11. It was Mr. DeQuattro who volunteered that his checks were for campaign contributions for Mr. Cromwell and who identified "Dino" although he did not recall the name Constantinos Mitrokostas six years after the first donations. In any event, Agent Crandall's testimony related exclusively to the donation counts, and the jury's acquittal of Mr. DeQuattro on all such counts belies the government's continued claim that he lied.

7

DAVID DEQUATTRO
By His Attorneys,

**/s/ Martin G. Weinberg**
Martin G. Weinberg, Esq.
Mass. Bar No. 519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net

**/s/ Michael Pabian**
Michael Pabian, Esq.
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
pabianlaw38@gmail.com

**/s/ Maksim Nemtsev**
Maksim Nemtsev, Esq.
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
menemtsev@gmail.com

Dated: December 30, 2022

## CERTIFICATE OF SERVICE

I, Martin G. Weinberg, hereby certify that on this date, December 30, 2022, a copy of the foregoing document has been served via email on AUSA Wichers.

**/s/ Martin G. Weinberg**
Martin G. Weinberg, Esq.

8

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 20-10271-DPW |
| | ) | |
| CEDRIC CROMWELL and | ) | |
| DAVID DEQUATTRO, | ) | |
| | ) | |
| Defendants. | ) | |

## UNITED STATES' SECOND SUPPLEMENTAL BRIEF ON RESTITUTION

The government respectfully increases its restitution request for the Mashpee Wampanoag Tribe from $233,218.94 (*see* DN 323) to $249,628.74. The $16,409.80 increase is supported by the Declaration of Rebekah D. Salguero Regarding Three Additional Invoices from Rankin & Sultan (filed today under seal), ⁋7, and the three invoices attached thereto. The invoices, which are dated September 13, 2021, January 3, 2022, and April 26, 2022, are for legal services provided by Rankin & Sultan between July 26, 2021 and April 22, 2022. These invoices should have been included as part of Exhibit C attached to the first declaration of Attorney Salguero (DN 308, filed under seal). They were inadvertently omitted due to an oversight by the undersigned AUSA.

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney

By: */s/ Christine Wichers*
Christine Wichers
Jared Dolan
Assistant U.S. Attorneys

**<u>Certificate of Service</u>**

I certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on January 9, 2023.

<u>/s/ Christine Wichers</u>
Christine Wichers

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


```
                                )
UNITED STATES OF AMERICA,        )
                                 )              Criminal Action
          Plaintiff,             )              No. 20-10271-DPW
                                 )
v.                               )
                                 )
CEDRIC CROMWELL and              )
DAVID DEQUATTRO,                 )
                                 )
          Defendants.            )
                                 )
```


BEFORE THE HONORABLE DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE


MOTION HEARING
January 18, 2023
1:47 p.m.


John J. Moakley United States Courthouse
Courtroom No. 1
One Courthouse Way
Boston, Massachusetts  02210


Kelly Mortellite, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 3200
Boston, Massachusetts  02210
mortellite@gmail.com

```
 1    APPEARANCES:

 2    Counsel on behalf of United States:
      Christine J. Wichers
 3    United States Attorney's Office MA
      1 Courthouse Way
 4    Suite 9200
      Boston, MA 02210
 5    617-748-3278
      christine.wichers@usdoj.gov
 6
      Counsel on behalf of Defendant Cedric Cromwell:
 7    Timothy R. Flaherty
      699 Boylston Street, 12th Flr.
 8    Boston, MA 02116
      617-227-1800
 9    timothyrflaherty@gmail.com

10    Counsel on behalf of Defendant David DeQuattro:
      Martin G. Weinberg
11    Maksim Nemtsev
      Martin G. Weinberg, PC
12    20 Park Plaza
      Suite 1000
13    Boston, MA 02116
      617-227-3700
14    owlmgw@att.net

15

16

17

18

19

20

21

22

23

24

25
```

|      | P R O C E E D I N G S |
|------|------|
| 1    | |
| 2    | (The following proceedings were held in open court |
| 3    | before the Honorable Douglas P. Woodlock, United States |
| 4    | District Judge, United States District Court, District of |
| 5    | Massachusetts, at the John J. Moakley United States Courthouse, |
| 6    | One Courthouse Way, Courtroom 10, Boston, Massachusetts, on |
| 7    | January 18, 2023.) |
| 8    | (Case called to order.) |
| 9    | THE COURT:  Well, there are a number of loose ends |

1   P R O C E E D I N G S

2   (The following proceedings were held in open court

3   before the Honorable Douglas P. Woodlock, United States

4   District Judge, United States District Court, District of

5   Massachusetts, at the John J. Moakley United States Courthouse,

6   One Courthouse Way, Courtroom 10, Boston, Massachusetts, on

7   January 18, 2023.)

8   (Case called to order.)

9   THE COURT:  Well, there are a number of loose ends

01:57 10   that I want to tie up quickly, having in mind in particular the

11   desire of Mr. DeQuattro to move on here in a way that does not

12   compromise his position and profession or minimize in any event

13   that.  Nevertheless, in going through the papers I've

14   encountered a number of loose ends, is a broad way of speaking

15   to it, various filings that were made that are a little

16   difficult to understand.

17   So what I thought would be useful as an order of

18   battle here is to go through the outstanding motions that are

19   listed on the motions report for this case.  I think that that

01:58 20   probably will narrow the issues quite substantially.  I note as

21   well that there is an agreed-upon motion for stay here with

22   Mr. DeQuattro which has led to a brevis motion itself without

23   disclosing the precise grounds on which there are said to be

24   substantial issues.  I have some sense of what they are.  I'll

25   talk to them a bit, but there may be some additional

```
     1   observations I want to make with respect to that.

     2        Finally there is an issue with respect to

     3   Mr. Cromwell's medical condition and the ability of the Bureau

     4   of Prisons to address that promptly.  I'm not satisfied that I

     5   have before me anything that tells me that the Bureau of

     6   Prisons will be able during the course of appeal to deal with

     7   that, and that will affect my judgment with respect to the

     8   government's opposition to Mr. Cromwell's motion for stay.

     9        But let me turn to the motions themselves.  There is

01:59 10   on the docket anyway a motion in limine concerning evidence and

    11   argument relating to the 2015 tribal elections.  My

    12   recollection, although the transcripts are not complete in this

    13   area, there are snippets from various of the days, whether

    14   that's going to be tied up for purposes of appeal remains to be

    15   seen I suppose, my recollection is that I gave directions with

    16   respect to it, as I always do, and that the proper way of

    17   dealing with this motion in limine is simply to say denied to

    18   the extent of the directions that I gave with respect to it.

    19   Another way of looking at it is it's moot at this point.

02:00 20        But just so the record is clear, consistent with my

    21   practice with respect to motions in limine, I welcome them as

    22   opportunities to learn a bit more about what issues are in the

    23   case and to provide the parties with some sort of guidance

    24   about what properly they can argue and what they can't so we

    25   don't have to unring bells in various ways.  But I think the
```

1    best way, as I said, is to say with respect to motion number

2    208, it's denied to the extent of directions provided to the

3    parties by the court.

4        The next one is Motion For Forfeiture of Property.

5    It's number 275, but 275 has been abandoned as such by the

6    government.  Why this remains here and something hasn't been

7    substituted for it, I don't know.  There is a motion in this

8    realm that we'll call 285, which deals with forfeiture in this

9    area.  And then there's a Motion For a Hearing on Restitution,

02:02  10   and Statement in re Revised Forfeiture Motion Amount, and

11   Motion For Excludable Delay, which amalgamates things which I

12   think require a bit of unbundling.

13       But turning to the question of forfeiture here, it is

14   applicable, as I understand it.  And Ms. Wichers or Ms. Head is

15   present, she can do that as well, advise me regarding it.  This

16   is only applicable, that is forfeiture is only applicable with

17   respect to Mr. Cromwell.  Is that right, forfeiture?

18       MS. WICHERS:  Let me think about this.  I know that we

19   asked for the forfeiture of the Bowflex, then we asked for a

02:02  20   money judgment in the reduced amount.

21       THE COURT:  I'm talking about forfeiture.

22       MS. WICHERS:  Yeah.

23       THE COURT:  Is it applicable to Mr. DeQuattro?  Is

24   there anything out there applicable to Mr. DeQuattro in the

25   realm of forfeiture?

         1              MS. WICHERS:  I don't believe so.

         2              THE COURT:  Right.  Ms. Head, maybe you can confirm

         3     that just so we're --

         4              MS. HEAD:  Correct, true.

         5              THE COURT:  Now I turn to Mr. Cromwell and forfeiture

         6     as to him.  As the government is aware, I am concerned about

         7     the order of priority between forfeiture and restitution in

         8     cases.  We haven't gotten to the question of restitution quite

         9     yet.  But ordinarily, my view is that it's important to get

02:03   10     victims their money and less important in the order of payment

        11     to provide for forfeiture amounts.  That's a little bit

        12     different I think in this setting because it seems to me that

        13     the forfeiture that we're talking about is something that

        14     properly can particularly in the somewhat roiled, r-o-i-l-e-d,

        15     context of tribal politics best be administered by receipt of

        16     the monies in the first instance by the government.  The amount

        17     of forfeiture seems to me to be appropriate in its revised

        18     form, that is 285.

        19              The question of the Bowflex is not fully developed in

02:05   20     the order for forfeiture.  But as I understand it, the tribe

        21     itself has indicated that it does not want the Bowflex back.

        22     Under these circumstances I assume that the forfeiture

        23     authorities of the federal government will get the highest and

        24     best return for the disposition of that, and so I will forfeit

        25     to the government the Bowflex itself plus the money judgment

1    amount that the government is looking for here.

2         I think, of course I'll hear anything further that you

3    want to say about that, Mr. Flaherty, but we're talking here

4    about a revised amount reflected in document 285 of $11,849.37.

5    That constitutes the $10,000 received in November of 2015 and

6    1849.37 for the hotel stay that was received in May 2017.  It

7    seems to me that that is a fair characterization of monies that

8    constitute the proceeds of the offenses of which Mr. Cromwell

9    is convicted.  That's really 666 here, as I indicated, because

02:06 10   as I indicated, and I'll indicate again, I do not believe that

11   Hobbs Act extortion under color of official right applies to a

12   tribal official exercising tribal responsibilities in these

13   circumstances.

14        But is there any objection, any further objection,

15   Mr. Flaherty, as to the entry of that order of forfeiture money

16   judgment?

17        MR. FLAHERTY:  I don't have a credible argument to

18   make to the court.  I suppose I should just object for the

19   record to preserve our rights.

02:07 20       THE COURT:  Okay.  The record will receive your

21   objection, but I'll deny it.

22        MR. FLAHERTY:  But Mr. Weinberg reminds me I should

23   ask you to stay it.

24        THE COURT:  I'm sorry?

25        MR. FLAHERTY:  I should ask you to stay the order of

1  forfeiture.

2       THE COURT:  Well, I don't know what we've got now.

3  We've got this amount of money that's been crystalized.  Let me

4  take it up when I get to the stay question, but in any event, I

5  will enter the order of forfeiture revised of 285, and so I

6  treat the motion number 275 as being superseded by 285, which I

7  allow for the reasons that I've indicated here, including

8  further forfeiture of the Bowflex.

9       And I suppose it would be helpful under these

02:08 10  circumstances for the government to submit a further order to

11  get the Bowflex brought into the forfeiture regime.

12       MS. WICHERS:  I think, Your Honor, if I'm not

13  mistaken, there should be two motions, one for the Bowflex and

14  one for the money order.

15       THE COURT:  There should be.  Where is the second one

16  for the Bowflex?

17       MS. WICHERS:  It's numbered consecutive.  I don't have

18  the number in front of me.

19       THE COURT:  Okay.  So let me take a look at the

02:08 20  docket, which is, as I said, somewhat difficult to read under

21  these circumstances with the various submissions.  I have

22  number 285, which was filed on 11/16/2022, styled as proposed

23  orders submitted as to Mr. Cromwell, but I didn't see a second

24  order.  It's said to be filed by Ms. Head.

25       Ms. Head, was there a second order?

|       |                                                              |
|-------|--------------------------------------------------------------|
| 1     | MS. HEAD:  Your Honor, I believe -- and I apologize          |
| 2     | for not necessarily having it at hand here -- that when we   |
| 3     | filed the first motion, I know that the money judgment was   |
| 4     | subsequently amended.  We would have filed a motion for      |
| 5     | preliminary order of forfeiture for the Bowflex, it would have |
| 6     | remained unchanged.                                          |
| 7     | THE COURT:  Yes.  Well, I think that since it's been         |
| 8     | superseded, assuming that's true --                          |
| 9     | MS. HEAD:  We will submit an updated order.                  |
| 02:10 10 | THE COURT:  There should be another order so we've got   |
| 11    | that squared away so that Mr. Flaherty can be sure what it is |
| 12    | he's trying to stay under these circumstances because this kind |
| 13    | of movable feast of demands of various kinds of funds by the |
| 14    | government is making it difficult to make precise judgments, |
| 15    | and that's part of what I want to do at this point.         |
| 16    | Then I have -- and I'm dealing with Mr. Cromwell here       |
| 17    | for the moment.  I have what's styled as a Motion For Hearing |
| 18    | on Restitution.  That's been allowed.  We've had several    |
| 19    | hearings about it.  That part of it, this motion for a question |
| 02:10 20 | propounded in court will be stricken as duplicative because |
| 21    | then it says "And Statement Re Revised Forfeiture Judgment  |
| 22    | Amount," which is back-reference to 285, and we've I think   |
| 23    | dealt with that, and then a Motion For Excludable Delay, and |
| 24    | that I think has to do with the anticipation that a separate |
| 25    | judgment will be entered with respect to this case, staying  |

1    whatever the government wishes to do with respect to the pure

2    tax case here.  And I don't see a problem with that latter part

3    of it, that is the motion for excludable delay.

4         Mr. Flaherty, any objection to that?  And I assume the

5    parties will talk about whether it makes any sense to be moving

6    forward on the separate tax case.

7         MR. FLAHERTY:  No objection, Your Honor.

8         THE COURT:  Okay.  So I think that deals with that.

9    Then we come to the question of stay and bail, but I'll skip

02:11 10    that for a moment.

11         And now, I've indicated in the various materials that

12    I filed my initial view, which I've reviewed again concerning

13    the question of the entry of judgment here, first dismissing or

14    vacating and finding it doesn't state a crime.  And the

15    government can obviously appeal from that, the use of Hobbs Act

16    extortion under color of official right to deal with activities

17    by a tribal officer in furtherance of the sovereignty of the

18    tribal entity.

19         The Supreme Court, as you probably know, on Friday

02:12 20    afternoon granted certiorari in *Lac du Flambeau Chippewa*.  The

21    case comes in a somewhat different posture.  Obviously it comes

22    out of a bankruptcy case from the First Circuit here, and it's

23    not obviously directly on all fours, but I think what it does

24    indicate is a heightened concern on the part of the Supreme

25    Court and the lower federal courts to careful analysis of the

1    special sovereignty of Indian nations such that there is a

2    requirement that Congress be quite clear if it chooses to

3    displace the sovereignty of the tribal nations.

4         The First Circuit in the Chippewa case, *Chippewa v.*

5    *Coughlin*, said that they were clear enough in that case.  And

6    whether that's true or not, it's clear that even under the

7    First Circuit law, this, from my perspective, this choice to

8    proceed under the Hobbs Act would be inappropriate.  That's why

9    I granted the motion.

02:14 10        That's a brief statement of it.  I want to get this

11   moving along, as I've indicated, and I suspect that we're going

12   to be learning in the next year or so a good deal more about

13   the contours of some law that at least at its margins has been

14   somewhat uncertain.  And I would add of course what should be

15   obvious, that if at any particular point there is some sort of

16   definitive resolution of aspects of these cases, I have the

17   right to issue an indicative ruling regarding what I would do

18   if the matter were returned to me for disposition.  That

19   applies to this question of Hobbs Act extortion under color of

02:15 20   official right but other aspects as well.

21        I then turn more broadly to the questions of 666(a)

22   here.  I believe it is applicable to both of the defendants in

23   this case, and I won't be dismissing the counts or vacating the

24   counts with respect to 666.  That, it seems to me, is an

25   expression of the supervening power of the federal government

1     to say particularly with reference to matters in which the

2     federal government is directly involved, that is its programs,

3     that it may displace whatever sovereign role an Indian tribe

4     might have.  And more broadly, that in doing so, they've

5     identified an area in which the mere fact that friendship might

6     be involved, as I believe it was here as one of the motivating

7     forces for the actions of Mr. DeQuattro, so long as one aspect

8     of this is the attempt improperly to influence the judgment of

9     the tribal officer on matters that are the subject of tribal

02:17 10   concern, broadly conceived, perhaps expressed as they are here

11    through a somewhat different tribal authority, that the 666

12    conviction should stand.  I haven't outlined in great detail

13    because of the need to move this along promptly and the state

14    of the briefing with respect to it much more concerning that

15    issue.

16          The short of it is that the judgment as I outlined it

17    is going to stand with respect for Mr. DeQuattro and

18    Mr. Cromwell.  In the case of Mr. Cromwell, we're talking about

19    a term of imprisonment of 36 months on each count to be served

02:18 20   concurrently, followed by one year on each count to be served

21    concurrently of supervised release.  There is in addition a

22    special assessment that is mandatory of $200, and there is a

23    fine of $25,000 imposed in connection with that.  Restitution

24    to be taken up in just a moment.

25          With respect to Mr. DeQuattro, the sentence was and is

1    probation for a term of one year.  There is a series of special

2    conditions of supervision that we may have to talk about a

3    little bit because they will constrain, depending on how the

4    monies are deployed, Mr. DeQuattro's ability to engage in any

5    additional lines of credit without the approval of the

6    Probation Office and the requirement that he provide access to

7    any requested financial information, which may be shared with

8    the United States Attorney's Office, but in the case of

9    Mr. DeQuattro, we have a special assessment of $100, that is

02:19  10   mandatory, and we have a fine of $50,000.

11        So I think that touches or deals with the underlying

12   offenses upon which the question of restitution will depend

13   here, unless there's something more that the parties want me to

14   deal with other than the restitution argument here.

15        Is there anything else that the parties would ask me

16   to address?

17        MR. WEINBERG:  Only, Your Honor, that we've agreed

18   that Mr. DeQuattro will put the $50,000 fine in escrow in an

19   account with disclosures to the government which would be a

02:20  20   potential alternative to the extra special conditions that Your

21   Honor just listed.

22        THE COURT:  Well, the real question is what happens if

23   there's restitution, as I think you must assume there's going

24   to be restitution of some sort.  That is, he's got some

25   additional monetary responsibilities.  We can get back to that

1    in a moment.  I would assume that some form of escrow

2    arrangement and immediate payment of the $200 special

3    assessment would be appropriate for that.  And then if the

4    conviction is overturned, then the $200 can be applied to the

5    escrow and returned and that sort of thing.

6           MR. WEINBERG:  Yes, the special assessment will be

7    paid immediately, Your Honor.

8           THE COURT:  I'm sorry?

9           MR. WEINBERG:  The special assessment will be paid

02:21 10    whenever the judgment is entered.

11           THE COURT:  Okay.  Let's then talk to restitution.  As

12    you know, I had ex-parte communications with the government to

13    get a better understanding of the development of the

14    government's case here because the question of restitution

15    turns in part on what the status of the tribe was, what the

16    status of individual members of the tribe were.

17           There are three sets of attorney bills involved, two

18    that are directly on behalf of the tribe itself, one on behalf

19    of Mr. Hendricks who received separate counsel in the case in a

02:22 20    fashion that made clear that he was concerned himself about

21    potential political -- potential criminal exposure, or he and

22    his attorneys were.  And I probed that a bit as well and I have

23    an affidavit indicating that the tribe had no indemnification

24    provisions at all.

25           One thing that I did not clarify, and Mr. Flaherty,

1    perhaps you'll be able to do that and perhaps Ms. Wichers can

2    as well, did Mr. Cromwell receive payment for any of his legal

3    fees in connection with this?

4         MR. FLAHERTY:  No, Mr. Cromwell has had no ability to

5    fund his defense from the beginning, Judge.  He's received no

6    payments from the tribe.

7         THE COURT:  Okay.  And is that for lack of asking?

8         MR. FLAHERTY:  No, it was not.  I reached out to

9    counsel from Todd & Weld, Ben Wish, and spoke to him early on

02:23 10   on this, and he explained to me that there was no

11   indemnification provision from the tribe.  And at this point

12   Mr. Cromwell was then the chairman of the tribe, and he said it

13   would have to go to vote in front of the Tribal Council at a

14   public hearing.  It would have to disclose the nature of the

15   investigation.  And the reality is that it would never be

16   approved.  And I took him at face value and the investigation

17   continued the way it did.

18        THE COURT:  Okay.  So I guess the question for you,

19   Ms. Wichers, is why I should authorize any victim amounts to

02:24 20   the tribe for the representation of Mr. Hendricks?  We had, as

21   you know, we discussed earlier perhaps at great points at the

22   point at which Mr. Hendricks' activities came within the direct

23   attention of the investigation as it developed here, and I

24   thought about that.  But I guess my view is that the tribe can

25   ask for monies for the tribe.  If the tribe has no

1   indemnification provisions or a political process, that means

2   that indemnification provisions are going to require that a

3   defendant make a choice between seeking indemnification or

4   giving up the rights to confidential communications from his

5   own counsel, that I should not impose any restitution amount.

6           I recognize the tribe has asked for it.  They paid it.

7   As I've also indicated it appears from materials that are both

8   public and private that -- private in the sense of sealed at my

9   instance that the tribe has, as I said a roiled political

02:25 10   environment that suggests that the tribe has no tribal view

11   with respect to particular issues like this.  That's a broad

12   way of saying that this does not appear to me to be a tribal

13   matter, that is indemnification of someone like Mr. Hendricks

14   or Mr. Cromwell.  So why shouldn't I exclude it?

15           MS. WICHERS:  Well, it is a tribal matter from the

16   tribe's perspective.

17           THE COURT:  They paid money improvidently.  Apparently

18   Mr. Wise, is it, from Todd & Weld, advised Mr. Flaherty that

19   they weren't going to pay money.  The choice arbitrarily and

02:26 20   capriciously to decide who among the people anticipate that

21   they face criminal prosecution individually should receive

22   money suggests to me that this is not a tribal matter, at least

23   one that should be placed on the shoulders of those who have to

24   pay restitution in this case.

25           MS. WICHERS:  The Tribal Council voted not to

1    indemnify Mr. Cromwell, that is true.  He had been indicted

2    when the request came down, he was indicted in his role as

3    chairman of the tribe for alleged bribery.  And the Council

4    made an appropriate decision not to indemnify him for that.

5    Mr. Hendricks is a different situation, as we've discussed

6    ex-parte, and he is the only tribal member that -- there were

7    others who were called as witnesses, and they were not

8    indemnified, the tribe did not pay for their legal fees.

9    Mr. Hendricks was the first.

02:27 10         THE COURT:  Did they have separate counsel?

11         MS. WICHERS:  One did -- two did.

12         THE COURT:  And they never asked for the

13    indemnification?

14         MS. WICHERS:  I don't know if they asked.

15         THE COURT:  Well, in any event, I'm not presented with

16    that.

17         MS. WICHERS:  Correct.

18         THE COURT:  And someone who is individually concerned

19    about their role doesn't get to make the -- get to make the

02:28 20    choice with respect to that as far as I'm concerned.

21         MS. WICHERS:  As we've discussed with Mr. Hendricks,

22    at the time that the tribe received that subpoena, it did not

23    know what the nature of the grand jury investigation was about,

24    and it was subpoenaing not just any tribal member but the

25    former treasurer of the tribe and the gaming authority.

1      THE COURT:  Well, they were also investigating the

2    former chair, and it was clear we're not going to pay for that.

3    So what we have here is an arbitrary and capricious

4    determination with respect to indemnification of individuals

5    here.  If they had an indemnification arrangement, that would

6    be a different matter.  They didn't.  And they're clear that

7    they didn't here.

8      MS. WICHERS:  I guess I would say it's not arbitrary

9    and capricious because at the time that Mr. Cromwell asked to

02:28 10    be indemnified, he had already been indicted by a grand jury in

11    a criminal case.

12      THE COURT:  Had he incurred financial -- had he

13    incurred attorneys' fees before the indictment itself?

14      MS. WICHERS:  Not to my knowledge.

15      THE COURT:  Mr. Flaherty?

16      MR. FLAHERTY:  The request was made prior to the

17    indictment.

18      THE COURT:  Were there attorneys' fees prior to the

19    indictment?

02:29 20      MR. FLAHERTY:  Yes.

21      THE COURT:  Okay.  That seems to me to be an elusive

22    point of difference.  "Elusive" in the sense of e-l-u-s-i-v-e.

23      MS. WICHERS:  If there were attorneys' fees, I believe

24    it was in connection with his company's response to a keeper of

25    the records subpoena.

1         With regard to Mr. Hendricks, it's a different animal

2    because he was called into the grand jury early -- not early on

3    but, as I say, he was the first person to receive a subpoena

4    before anyone knew in the tribe, including Mr. Cromwell, what

5    any of this was about, the tribe's first notice of any

6    investigation.

7         THE COURT:  Okay.  So having heard your argument, I am

8    not going to permit indemnification for the attorneys' fees for

9    Mr. Hendricks, the Rankin & Sultan attorneys' fees here, so

02:30 10    they're excluded.

11         Now we turn to the attorneys' fees for the tribe as a

12    tribe, and here I think it's important to address the order of

13    questions that are raised by Mr. DeQuattro in his opposition to

14    the government's restitution requirement, and I'll go through

15    those.  They've been the subject of supplemental filings and so

16    on.  Some of them are not persuasive to me.  Some of them have

17    some degree of persuasiveness that I'll talk about in a moment.

18         The first topic is that the request for restitution is

19    untimely.  The problem here is I think it's fair to say that

02:31 20    there was not a regularized orderly approach to determining

21    what restitution amounts were available.  There were competent

22    attorneys involved here, aware of the requirement that there be

23    a prompt provision to the probation office listing in the

24    amounts of restitution.  But as the government said, it really

25    was on the eve of the hearings in these matters that the

1    government, and I quote, "learned last week at a meeting with

2    the tribe that they incurred close to $200,000 combined with

3    grand jury subpoenas, collecting all records and reviewing

4    records, attorneys' fees," and they requested some additional

5    time to deal with that.

6         My experience generally, and it's focused here, is

7    that there is a need for greater regularity in the way in which

8    victim submissions are made.  The government functions kind of

9    like a maitre 'd in this process, that is, it's got a victim

02:33 10   witness advocate who is supposed to help gather the material

11   and facilitate the submission of it, but that does not

12   necessarily mean that the government endorses a particular view

13   with respect to it.  Then there are hearings and the parties

14   are not necessarily -- victims are not necessarily aware of

15   those hearings, although I think they were here.

16        So then I think, well, what's the touchstone for me in

17   this?  And the touchstone for me is to make sure that every

18   victim gets proper restitution, irrespective if there have been

19   shortcomings in the process or the attentiveness or the

02:33 20   regularity that has been applied for by the various parties in

21   the case.

22        The short of it is the missing of deadlines such as

23   they are is contrary to the position that Mr. DeQuattro and I

24   assume as well Mr. Flaherty was making, but I'm referring to

25   the more lengthy memorandum of Mr. DeQuattro, really a matter

 1    of form.

 2         And while I'm not going to look the other way to the

 3    failure to obtain formalities here, I think in this litigation

 4    it would be unfair to the tribe as an entity to say that they

 5    were untimely because of the process that was involved here.

 6    There is no prejudice to the defendants under these

 7    circumstances except prejudice that they may have to pay money

 8    for restitution.  But there's nothing in particular here that

 9    causes a problem, as we'll see in a moment when I talk about

02:35 10   the particularities from my perspective, the particularities of

11    the submissions that were made.

12         Then I come to the question of the so-called property

13    offense, that is that Mr. DeQuattro was not convicted of an

14    offense against property or Mr. Cromwell either, that is, the

15    666 case, and that the government hasn't proved a pecuniary

16    loss that involves identifiable victims.  This is something of

17    a hot issue in the broader area, that is, what is property

18    generally.

19         The Varsity Blues cases now under advisement have

02:36 20   raised these issues in ways that may give us greater clarity in

21    this area.  My own view is that more fundamentally bribery like

22    this in which a faithless employee is encouraged to accept

23    monies that presumably would have gone to the tribe itself is

24    engaged in the property crime.

25         That's a broad view of it.  It is one that leads me to

 1   conclude that there's no windfall involved here to the tribe.

 2   It is simply that we have a pecuniary loss that the tribe has

 3   received which in these contexts thinking in zero sum terms

 4   about what would be otherwise provided in a contractual

 5   arrangement, but for the faithless employee, one could properly

 6   say we're dealing with a property crime, and we're also dealing

 7   with pecuniary loss.  In any event, I'm prepared to say that

 8   and I will for purposes of dealing with this.

 9          I then come to the question of relatedness here.  Was

02:37 10   this a direct and proximate result of Mr. DeQuattro's offense

 11   of conviction or Mr. Cromwell's?  And again, I'm of the view

 12   that we're dealing with specific conduct that is the basis of

 13   the offense of conviction in a way in which I've discussed it.

 14   And so I'm not of the view that I would deny restitution on

 15   those grounds.

 16          I then turn to the question of whether or not legal

 17   fees and expenses are reimbursable under the subsection, and I

 18   believe they are.  An entity like the tribe that is called upon

 19   to respond to grand jury subpoenas and investigations and

02:38 20   conduct their own investigations and consult with attorneys

 21   generally are, I believe, entitled to restitution in this area.

 22          I recognize it's a question that may result in some

 23   further clarification perhaps in this case, but for present

 24   purposes I'm prepared to accept that.  This is not a question

 25   of the costs of a babysitter or a tank of gas or a parking

1    meter and 44-person digital security team as was referenced by

2    the Fifth Circuit.  This is core kind of necessary responses

3    that appropriately from my perspective are under the statute

4    reimbursable for a tribal entity, and I'm prepared to enter the

5    restitution amount for the two other firms.

6           Now what I'm faced with is a problem of the kind of

7    billing that is reported here, and there is a full-throated

8    attack on the lack of proof to connect the claimed expenses to

9    the kinds of responses which I would consider to be

02:40 10   appropriately reimbursable.  I spent a fair amount of time

11   trying to understand both in my ex-parte communications with

12   the government to get a sense of the development of their

13   investigation and what would be anticipated as proper response

14   by the tribal entity and what's publicly available in this

15   area.

16          I sometimes, when I deal with matters like this,

17   require the other side to submit its own billing so that I can

18   see who is spending what time on what.  They're not apples and

19   oranges, but they provide a measure of understanding of what

02:41 20   people faced with very demanding circumstances are prepared to

21   spend reasonably on this, if they've got the money to spend on

22   it.  I haven't thought that that was necessary in this case

23   because I think I do have a pretty clear understanding of what

24   was going on here.

25          I look at, you know, these kind of block billing

1   submissions on the part of the tribe or the attorneys for the

2   tribe.  I look at the fact that there was a change midstream of

3   attorneys.  But that's not unusual in other kinds of litigation

4   in which criminal defendants, even criminal defendants under

5   the Criminal Justice Act, switch their attorneys and there's

6   compensation provided for the transitional amounts bringing

7   somebody up to speed.

8          The short of it is, while in other circumstances I

9   would be looking at this in a much more fine-grained fashion

02:42  10   because it would raise red flags about whether or not there is

11   overbilling or billing beyond what is necessary, I don't find

12   it here.  I'm satisfied that this is a matter that was billed

13   properly by firms who can in the market claim more substantial

14   reimbursement and that there was no unnecessary -- only

15   activity that was necessary on behalf of the tribal entity, the

16   tribal entity itself.

17         The relationship between the tribe's assisting in this

18   preparation of witnesses and consulting with the government

19   regarding the way in which the government is engaging in the

02:44  20   activity seems to me to be properly reimbursable here.  Is the

21   tribe thinking about other possible civil claims that are

22   outside the scope of reimbursement?  Probably.  But what they

23   billed for is also in the scope of what I think properly

24   reimbursable, so I will reimburse it.

25         That then brings me to the question of apportionment.

1   And here my view is that Mr. DeQuattro can properly claim that

2   there be, for purposes of the joint and several

3   responsibilities that otherwise arise in reimbursement,

4   probably can maintain that he is only responsible as of the

5   time that the investigation had focused on him.  And that is

6   some period of time after the initiation of the investigation

7   in the beginning of the charging of bills to the tribe by the

8   law firms here, really the first law firm I think.

9          And so I think we go back, Ms. Wichers, to a matter

02:45 10   that we discussed a bit ex parte in trying to find where that

11   date might properly be identified where enough had come to the

12   attention of the investigators to put Mr. DeQuattro on the

13   radar screen there.  Do you want to speak to that?

14          MS. WICHERS:  Yes, Your Honor.  The government

15   believes that that date is August -- excuse me -- June 22,

16   2020, which was after the first subpoena that we served on the

17   tribe for documents.  The second subpoena was then August 10,

18   2020, and that's where we began requesting RGB records.

19          And the reason that I say that June 22, 2020 is the

02:46 20   key date is that that is the date when we learned from the Cape

21   Cod Five Bank records that the person -- excuse me.  We already

22   knew that there were these large suspect treasurer's checks

23   that had been paid to Mr. Cromwell.  By then we had found out

24   they were purchased by Mr. Mitrokostas.  And as of June 22,

25   2020, we knew that the person who had originally paid that

1    money to Mr. Mitrokostas was Mr. DeQuattro, and that's when we

2    began focusing on him.

3          THE COURT:  Okay.  And as we discussed, that date

4    provides a point at which Mr. DeQuattro comes on the radar

5    screen.  There is a little bit different circumstance with

6    respect to the tribe.  That is to say the tribe is unaware at

7    that point that it's Mr. DeQuattro.  It's not until the August

8    date the tribe is aware.

9          MS. WICHERS:  Correct.

02:47 10          THE COURT:  Okay.  So it's not for lack of interest in

11    the arguments that you make, Mr. Weinberg, that I march through

12    your discussions.  Trust me, I've thought about them.  I don't

13    think there's a need for anything more, but on this one I do

14    want to know your view about it.

15          MR. WEINBERG:  Thank you, Your Honor.  I guess I have

16    three or four factual responses.  One is that when

17    Mr. DeQuattro's checks first came on the government's radar

18    from their review of the bank records of Mr. Mitrokostas, that

19    began an investigation.  It did not make Mr. DeQuattro a

02:48 20    target.

21          THE COURT:  Well, I'm not sure that he has to be a

22    target or even perhaps a subject, although I think he becomes a

23    subject in August.

24          MR. WEINBERG:  I think by August, and I've not seen

25    subpoena two, but I accept Ms. Wichers's representations that

                    1    at least some part of that subpoena going to the tribe dealt

                    2    with RGB or Mr. DeQuattro.

                    3         THE COURT:  My sense, and of course I have seen it,

                    4    we've been going back and forth because of the keeping it under

                    5    seal because of the confidentiality of grand jury materials,

                    6    but my sense and informed to some experience in this area is

                    7    that's the proper point to make that distinction.

                    8         MR. WEINBERG:  I guess what I would say is that I

                    9    don't disagree that's the earliest time because the tribe was

02:49          10    not responding to the government directive that would have

                   11    caused them to do legal work that related to RGB or the RGB

                   12    contract until they got that second subpoena.  So August 10

                   13    should be the earliest time.

                   14         But then I would contend, Judge, two or three things.

                   15    One is that he was acquitted of all of the counts that were the

                   16    subject of the August 10 subpoena.  Again, I don't have it, but

                   17    I'm guessing that those subpoenas were based on, you know,

                   18    whether or not there was any evidence that RGB was improperly

                   19    paid.

02:50          20         THE COURT:  Well, I think there my view is that the

                   21    formalities of the charge themselves, that is, the difference

                   22    between Hobbs Act extortion under color of official right and

                   23    666(a) kind of dissolve.  That is to say that it's relevant

                   24    conduct, was relevant conduct, is properly reimbursed as

                   25    relevant conduct if they're in full acquittal, I view it

1    differently, but it was not, and I believe it's within the

2    scope.

3         MR. WEINBERG:  If I could, just for the record, the

4    statute seems to contemplate and the Supreme Court in *Huey*

5    contemplate that the government's restitution requests, unlike

6    sentencing perhaps, exclude acquitted conduct.  Here there was

7    a not guilty on conspiracy.  I think the court should limit

8    restitution to the amount of necessary expenses that correlate,

9    not to donations which were certainly a central focus of the

02:51  10   government.

11         They looked into whether there were campaign

12   violations by Mr. Cromwell.  They looked into a lot of things

13   other than Mr. DeQuattro, but other than a Bowflex and a hotel

14   suite, and so I would ask the court to particularize the extent

15   to which he's paying restitution to the offense of conviction

16   not include relevant conduct, which is more of a sentencing

17   preponderance theory --

18         THE COURT:  I think the problem with that is that it's

19   viewing this as the law of excluded middle.  That is to say, if

02:51  20   it relates to acquitted conduct, then it can't relate to

21   conduct of conviction, and it was both, and so I don't apply

22   the law of excludability.  That's my view from the perspective

23   of *Huey*.

24         MR. WEINBERG:  My last argument would be -- and, you

25   know, I accept the court has addressed all of the prior

 1    arguments that were written about it and now the argument about

 2    limiting the restitution to acquitted conduct is that when Your

 3    Honor is thinking joint and several, I don't think in this case

 4    with these expenses that's an appropriate parameter for this

 5    reason.  It's not just disproportionate proof.  It's not just

 6    disproportionate verdicts.  It's that a great deal of the

 7    government's compulsions on the tribe dealt with Mr. Cromwell

 8    and not exclusively with Mr. DeQuattro or RGB.

 9            The fourth subpoena, which they spent a lot of time

02:53 10    looking for, was an exclusively Cromwell subpoena.  RGB was

 11    cooperative.  They didn't need subpoenas with RGB.  Mr. Sinnott

 12    and Mr. DeQuattro gave them what the government asked for.  So

 13    I think it's not as if all of the legal work was done jointly

 14    because of this narrow allegation about Mr. Cromwell and

 15    Mr. DeQuattro.  That might be subject to joint and several.  I

 16    believe the government investigation was faster.  If it was

 17    only the RGB tribe allegations, there would have been narrower

 18    subpoenas and much less legal time.

 19            I don't think he should be paying because the

02:53 20    government was looking for more crimes against Mr. Cromwell.

 21    They were not looking only for the donation offenses.  They

 22    were looking to see what they could indict Mr. Cromwell for,

 23    and it went beyond RGB and beyond Mr. DeQuattro.

 24            THE COURT:  I think my response to that, I've thought

 25    about it to some degree because you made that argument before,

Case: 23-1115   Case: 1:20-cr-10271-NMG   Document 350   Document 2848   Filed 02/02/23   Filed 02/02/23   Page 230 of 42   Entry ID: 6583371

30

```
 1    is that this question of joint and several is a difficult
 2    question.  And when there are disproportionate dimensions to
 3    the investigation that make someone very small and someone very
 4    large, great care has to be taken.
 5        I don't view that as this case.  I view this as a case
 6    in which the government was looking at both sides of
 7    transactions between a major vendor in an important federal
 8    program and a faithless tribal officer.  And having narrowed it
 9    to when the vendor comes on the scene, that is with the August
10    10, I think I've narrowed it as much as I'm required to and as
11    appropriate in the context of this particular case.  It is
12    always possible to look at the end and say, They only got one
13    out of however many.  And so what I'm going to do is say it's
14    in direct proportion to whatever the numerator is and whatever
15    the denominator is.  That's not this case.  So I think that I'm
16    going to make the point of break the August 10 subpoena on
17    there and make it be joint and several after that.
18        MR. WEINBERG:  Okay.  My last argument, not to burden
19    this, I understand Your Honor's decisionmaking, is that he was
20    under the evidence.  Mr. DeQuattro is somebody that never
21    harmed the tribe economically.  He never, his company never did
22    anything wrong.  He never asked for a favor.  He never got an
23    advantage.  He never sought the chairman's help in expediting
24    invoices and giving them more at the end when things fell
25    apart.
```
(02:55 at line 10, 02:56 at line 20)

 1          I think some consideration should be given that, if

 2    the government theory really is that he acquiesced to pressure

 3    but never sought an economic benefit, I think that's a strong

 4    argument against joint and several.

 5          THE COURT:  I don't know that that's the government's

 6    view, but it's certainly not mine.  There was -- and it was

 7    taken into consideration for purposes of sentencing, all of the

 8    points that you've made about this, that commendable concern

 9    for a fellow human with whom he developed a relationship in a

02:57 10   vulnerable community is all to the good.

11          The problem is that that cannot go hand in hand with

12    what the jury necessarily found in this case, which was a

13    violation of the obligation not to let that infect federal

14    government programs and that at least part of the conduct of

15    Mr. DeQuattro, oblique perhaps in its presentation but not

16    entirely, was the hope to take advantage in a federal

17    government program of a relationship that had at its foundation

18    corruption.

19          So I've taken into considering for sentencing

02:58 20   certainly those issues but not for purposes of restitution.

21    The tribe is out of it, out of this money as a result of it,

22    and Mr. DeQuattro is responsible on this record as it exists

23    now.

24          MR. WEINBERG:  I won't re-echo our jury arguments --

25          THE COURT:  Right.  I think I understand them.  And I

| | |
|---|---|
| 1 | have to say I'm not disregarding them at all.  This is an area |
| 2 | that is going to be developed more fully I believe in coming |
| 3 | years as the courts start to have to grapple with issues like |
| 4 | this and disproportion and competing considerations between the |
| 5 | -- excuse me -- I just had a jury out and charged them earlier, |
| 6 | we'll get the verdict later. |
| 7 | So I look not to prolong it, but I look at the most |
| 8 | recent statement by the Department of Justice that for purposes |
| 9 | of organizational defendants, they're going to get great |
| 02:59 10 | discounts of various kinds if they offer up the officers.  And |
| 11 | I wonder about proportion generally always in making these |
| 12 | kinds of judgments, but I'm left with what I have right now. |
| 13 | What I have right now seems to me to be appropriate to impose |
| 14 | that restitution from the period as to August 10 for joint and |
| 15 | several. |
| 16 | I don't know if you can say right now, Ms. Wichers, |
| 17 | what that figure is, what the precise amount is.  I'm not |
| 18 | requiring it, but I want to get to it as quickly as I can. |
| 19 | MS. WICHERS:  Yes.  Can I send it, file it later |
| 03:00 20 | today? |
| 21 | THE COURT:  Yes, if you would, just that this is the |
| 22 | calculation.  I think all of the bills are out there for the |
| 23 | two law firms and I think it's really only the first law firm |
| 24 | that would be at the breakpoint, second law firm is thereafter. |
| 25 | MR. WEINBERG:  I take it, Judge, I would be |

1   essentially exhausting your patience if I went through the

2   bills and point out the different --

3          THE COURT:  No, you wouldn't be exhausting my patience

4   but exhausting the time I have available to listen to well

5   founded arguments.  And I don't deny if I was dealing with this

6   in another context with less familiarity than I have with the

7   nature of the investigation and the comparative activities of

8   the parties in connection with it I'd feel differently.  I just

9   don't think there's fat in here.  There's perhaps richer fodder

03:00 10  because the tribe was paying firms that can command more in

11  terms of rates, but I don't think that they did unnecessary

12  activity, and so that's why I give up the opportunity to learn

13  about billing at firms.

14         MR. WEINBERG:  And I respectfully, because of my fear

15  of waiver, renew the objections that we raised in

16  our materials.

17         THE COURT:  Yes, you may.

18         MR. WEINBERG:  Thank you.

19         THE COURT:  So let's turn to the question of bail

03:01 20  here.  There will be some figure that I think is in the

21  $200,000 range, something like that, Ms. Wichers, as the joint

22  and several part of it.

23         MS. WICHERS:  Something less than that.

24         THE COURT:  Okay.  So what do we do under those

25  circumstances, I guess is the question.  Because ordinarily

1  there would be, and I'm sensitive to Mr. DeQuattro's, you know,

2  understandable concern that he preserve his position within the

3  profession or at least not have it compromised by the pendency

4  of a piece of appeal in a highly contested case.  But I don't

5  know how I can not impose those additional conditions having to

6  do with the availability of records being turned over to the

7  government, not opening up additional lines of credit and that

8  sort of thing with this outstanding like that.

9       Now, if the government appeals and says no, it should

03:02 10  be more, maybe that would be a different issue.  I don't know

11  if they're going to do that, but I'm pretty firm on this one.

12  Can that be put in escrow, I guess is the question.  You may

13  have to discuss it with Mr. DeQuattro to see what the

14  availability of that is as a way of avoiding that limitation on

15  activities that may be activities that will be in service of

16  the company that he's still affiliated with but not in the same

17  professional level.

18       MR. WEINBERG:  I would ask, since I have not previewed

19  this issue with Mr. DeQuattro, that if Your Honor is to set

03:03 20  special conditions of bail or of the stay that you put them in

21  the alternative, that these conditions apply unless a sum that

22  equals the fine and restitution be placed in escrow in an

23  identifiable account as disclosed to the government but not

24  disbursed absent a final ruling from the Court of Appeals.

25       THE COURT:  Right.  I think that I would be prepared

1    to encompass a restitution amount, designated restitution

2    amount in that I would not I think be prepared to say only fine

3    not restitution on it.  But you'll want to discuss it with

4    Mr. DeQuattro.  It's to some degree obviously -- not just to

5    some degree.  It's a financial choice that he has to make here.

6            MR. WEINBERG:  I would just say this on his behalf.

7    He's going to be here for a lot of decades, with health

8    permitting.  He's not running from obligations.  Putting that

9    amount of money in escrow in this kind of fluid economic terms

03:04 10    could be a burden.  I don't know that the government is going

11    to require 100 percent of the restitution that's stayed to be

12    in escrow.

13            THE COURT:  It's really, talk to the government about

14    it.  Talk to see what you want to do.  What I want to be sure

15    of is that I've got a consistency in dealing with financial

16    responsibilities the parties have.  But, you know, when we talk

17    about bail, sometimes we talk about a cash bail being a portion

18    of the full amount, that kind of stuff.  It's not an unusual

19    circumstance.  I will leave it to the parties to decide how to

03:05 20    proceed on that.

21         As to the question of bail itself, as I indicated, a

22    concern, and I expressed it with Mr. Flaherty and he responded

23    promptly and I think accurately to my concern about seeing a

24    case on appeal and saying I don't remember that case when

25    arguments were made that weren't framed in quite the same way

 1    to me.  But that having been said, I want to have had an

 2    opportunity, I wanted to have had the opportunity to speak to

 3    these various issues.

 4         You know, one that's latent that was brought up was

 5    fractional written instructions to the jury.  That came into

 6    focus with *Correia*.  It arises as well with *Pullman* and *Lynch*,

 7    and they're all in different directions, and they were the

 8    result of my carefully trying to understand how properly to get

 9    the case to the jury and get their determination, deliberation

03:06 10  in light of objections that were made to me.

11         But beyond that I don't think I can say much at this

12    point, and certainly having in mind, you know, something that

13    Mr. DeQuattro from the very beginning has made clear he wants

14    to get this resolved promptly, he'd like to have it resolved

15    favorably, too, but he'd like to have it resolved promptly, and

16    I've tried to do that as best I could in this context with the

17    competing considerations.  But now we're where we are.

18         You want to get moving along, I recognize that, and

19    that's something I should do.  And so that's about all I'm

03:07 20  going to say about that, except to say that I may say more

21    about it in some other context or comparative context perhaps

22    in *Pullman* and *Lynch*, perhaps in dealing with some other cases

23    because the challenge of a complex case of assuring that the

24    jury has the kind of materials for purposes of their

25    deliberation that they need is an abiding one, particularly if

```
 1   cases move slowly or very quickly, although the time periods

 2   are perhaps more than should have been anticipated because

 3   nobody wants to irritate a judge who says, You told me it was

 4   only going to be this long and now it's that long.

 5            But in any event, I just throw those issues out.  So I

 6   will get from the government the amount that we're dealing with

 7   here and perhaps identifying a bill -- where the bills begin

 8   for that time period more specifically.  And I understand that

 9   the tribe hasn't paid all their bills to these attorneys.  They
```
03:08 10   did pay on behalf of Mr. Hendricks but not to these attorneys.
```
11   It was shorter money, too.  That there will be a discussion

12   about the question of escrow, whether how much if at all

13   Mr. DeQuattro is in a position to provide and whether or not

14   the government will be satisfied with a less than full coverage

15   for this is of course the case that Mr. DeQuattro has been here

16   all along.  He hasn't been disappearing, and he has strong

17   roots in the community, but that's not the same issue.  But

18   you'll look at that and get back to me, I would hope, let's say

19   for that by Friday.  Is that possible?
```
03:09 20           MR. WEINBERG:  Yes, Your Honor.
```
21           THE COURT:  Close of business, which, if the First

22   Circuit -- Third Circuit gets its way will be 5:00 on Friday.

23   There's a bungling dispute in the Third Circuit that says

24   having something done by, on a particular date, should be no

25   later than 5:00 as opposed to 11:59 and 59 seconds.  And we'll
```

1     see whether that succeeds, but in any event that's out there.

2          I however impose a very specific request, make it by

3     5:00 so I've got a chance to absorb it fully over the weekend

4     because I'll try to issue the judgment by Monday morning or

5     Monday here.  I think we've touched on everything that we need

6     to touch on there.

7          Turning to Mr. Cromwell, I understand the government's

8     opposition with respect to that as well.  There is a somewhat

9     different view, as I've indicated, with respect to

03:10 10     Mr. Cromwell.  I'm satisfied, as I've indicated, that there are

11     medical reasons that have not fully been addressed here and

12     cannot be fully addressed I think during the period of appeal

13     because the ability of the Bureau of Prisons to deliver pretty

14     demanding medical attention to inmates has I think been

15     compromised during the pandemic and continues to be compromised

16     in the various ways.

17          In short, of course I look at anything that the

18     government submits concerning its ability to provide the

19     services.  I've reviewed such submittals in the past.  They

03:11 20     tend to be in my mind boilerplate.  While boilerplate is okay

21     for some things, it's not okay for what we're talking about

22     here that Mr. Cromwell is facing.

23          And so given the amount of time that may be involved

24     here, I don't see sending him to prison during that time period

25     is appropriate, even with the outstanding obligations of

1 restitution but with an understanding that the government will

2 be taking whatever steps it chooses to take to fulfill the

3 restitution.

4       I step back with respect to Mr. Cromwell as well by

5 saying that I do think what I've said with respect to

6 Mr. DeQuattro is that there are substantial issues here.  We're

7 in an area in which the Supreme Court, First Circuit, the

8 courts generally are trying to come to grips with what I will

9 call corruption crimes and what they mean in certain contexts

03:12 10 here.  Of course we've got the special considerations of tribal

11 involvement.  And I look forward, like everybody else, to

12 learning more from my superiors about how this works.  But I

13 don't see that I can, I don't believe that I can say with the

14 kind of certainty that I sometimes am able to say or sometimes

15 purport to say or undertake the conceit that I can say that

16 there's nothing here.  There's something that is substantial

17 enough to justify appeal.

18       Do I think it's going to turn out differently?  No.

19 But that's not the standard, what I think.  The standard is

03:13 20 whether or not there's a substantial issue that some jurors

21 could view this differently, and I believe that there is.  So

22 for those reasons, I will be allowing the stay with respect to

23 Mr. Cromwell as well as Mr. DeQuattro.

24       Now, I think I've covered everything.  I said I was

25 going to do it brevis.  Brevis for me, as you realize, ends up

1   being an hour 15 minutes, but I wanted to be sure that I had at

2   least given you my views about all of these issues.

3           Are there any others that we haven't touched on?

4   Understanding that that's not a waiver.  It's simply a

5   recognition that we have limited amounts of time.

6           MS. WICHERS:  Your Honor, the government asks simply

7   that the judgment, ask that the judgment state that restitution

8   be due and payable immediately.  That just helps us with

9   collection efforts.

03:14 10        THE COURT:  Yes.

11          MS. WICHERS:  And then could we have a separate order

12   on excludable delay?

13          THE COURT:  Yes.  I think that what I would ask for is

14   you submit a separate order.  I mean, it's in that kind of

15   smorgasbord motion where I can pick and choose various things.

16   Just give me the a la carte version of it.

17          MR. WEINBERG:  We of course would ask for the

18   restitution to be within the stay, and there are no other

19   issues to raise for the court.

03:15 20        THE COURT:  Right.  But just so you know, I think that

21   I'm going to say that the restitution begins immediately but

22   doesn't have to be paid immediately here.  If there's a request

23   for -- Ms. Head has left you defenseless.  The distinction I'm

24   drawing here is that they can go out looking for restitution

25   and they can recover those restitution amounts.  If they

```
 1   recover it in some fashion and it's supposed to go back to
 2   Mr. DeQuattro or Mr. Cromwell, then it will go back to them,
 3   and at the end of the case they'll have to pay it back there.
 4   But I will permit them to protect their interests by searching
 5   for them.
 6        MR. WEINBERG:  And if I was to put the full amount in
 7   escrow, would it deter the court from issuing such an order?
 8        THE COURT:  I think that's better.  I think that does
 9   it.  It's more a problem I think for Mr. Cromwell than it is
10   than Mr. DeQuattro because you put the full amount in.  The
11   full amount is going to be presumably getting interest in
12   whatever bank account you have on it, and they'll get the
13   benefit of that money, and they've got it secured.  So I would
14   not anticipate that I would permit the government then to go
15   out levying against the restitution amount.
16        MR. WEINBERG:  Thank you, Judge.  We'll report to you
17   on or before 5:00 on Friday.
18        THE COURT:  All right.  Thank you very much.  We will
19   be in recess.
20             (Adjourned, 3:16 p.m.)
21
22
23
24
25
```

```
 1                CERTIFICATE OF OFFICIAL REPORTER

 2

 3            I, Kelly Mortellite, Registered Merit Reporter

 4    and Certified Realtime Reporter, in and for the United States

 5    District Court for the District of Massachusetts, do hereby

 6    certify that the foregoing transcript is a true and correct

 7    transcript of the stenographically reported proceedings held in

 8    the above-entitled matter to the best of my skill and ability.

 9                        Dated this 2nd day of February, 2023.

10

11                        /s/ Kelly Mortellite

12                        _____

13                        Kelly Mortellite, RMR, CRR

14                        Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____   )
                                  )
                                  )
UNITED STATES OF AMERICA          )
                                  )
v.                                )          No. 20-CR-10271
                                  )
DAVID DEQUATTRO,                  )
                Defendant         )
                                  )
_____   )

## DEFENDANT DAVID DEQUATTRO'S NOTICE OF APPEAL

Now comes the defendant David DeQuattro, by and through undersigned counsel, and

hereby notices his appeal to the United States Court of Appeals for the First Circuit from the

judgment of conviction and sentence entered in the above-captioned case on January 31, 2023.

<div style="margin-left:40%">

Respectfully Submitted,
DAVID DEQUATTRO
By His Attorney,

**/s/ Martin G. Weinberg**
Martin G. Weinberg, Esq.
Mass. Bar No. 519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net

</div>

Dated: February 1, 2023

## CERTIFICATE OF SERVICE

I, Martin G. Weinberg, hereby certify that on this date, February 1, 2023, a copy of the
foregoing document has been served via Electronic Court Filing system on all registered
participants.

<div style="margin-left:40%">

**/s/ Martin G. Weinberg**
Martin G. Weinberg, Esq.

</div>

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 20-CR-10271 |
| | ) | |
| CEDRIC CROMWELL, | ) | |
| Defendant. | ) | |

## DEFENDANT CEDRIC CROMWELL'S NOTICE OF APPEAL

Now comes the defendant Cedric Cromwell, by and through undersigned counsel, and hereby notices his appeal to the United States Court of Appeals for the First Circuit from the judgment of conviction and sentence entered in the above-captioned case on January 31, 2023.

Respectfully Submitted,
CEDRIC CROMWELL
By His Attorney,

**/s/ Timothy R. Flaherty**
Timothy R. Flaherty
Flaherty Law Offices
699 Boylston Street, 12th Floor
Boston, MA 02116
(617) 227-1800
BBO No. 557477
TimothyRFlaherty@gmail.com

Dated: February 1, 2023

## CERTIFICATE OF SERVICE

I, Timothy R. Flaherty, hereby certify that on this date, February 1, 2023, a copy of the foregoing document has been served via Electronic Court Filing system on all registered participants.

**/s/ Timothy R. Flaherty**
Timothy R. Flaherty