# UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

_____

## Nos. 23-1115, 23-1139

_____

## UNITED STATES OF AMERICA,
### Appellee/Cross-Appellant

*v.*

## DAVID DEQUATTRO,
### Defendant – Appellant/Cross-Appellee

_____

### On Appeal from a Judgment of the United States District Court
### for the District of Massachusetts

_____

## RESPONSE AND REPLY BRIEF OF
## APPELLANT/CROSS-APPELLEE DAVID
## DEQUATTRO

_____

**Kimberly Homan**
**20 Park Plaza, Suite 1000**
**Boston, Massachusetts 02116**
**(617) 448-2812 (Telephone)**
**homanlaw@aol.com**

**Michael Pabian**
**20 Park Plaza, Suite 1000**
**Boston, Massachusetts 02116**
**(617) 227-3700 (Telephone)**
**pabianlaw38@gmail.com**

**Martin G. Weinberg**
**20 Park Plaza, Suite 1000**
**Boston, Massachusetts 02116**
**(617) 227-3700 (Telephone)**
**(617) 338-9538 (Fax)**
**owlmgw@att.net**

# TABLE OF CONTENTS

STATEMENT OF FACTS……………………………………………………1

SUMMARY OF ARGUMENT………………………………………………..5

ARGUMENT……………………………………………………………….5

I.    THE EVIDENCE WAS INSUFFICIENT TO SUPPORT
DEQUATTRO'S CONVICTION. …………………………………....5

    A.    The Evidence Did Not Suffice to Permit a Reasonable Jury to
Conclude Beyond a Reasonable Doubt that the BowFlex and Hotel
Stay Gifts Were Intended by DeQuattro as *Quid-Pro-Quo*
Bribes………………………………………………………...5

    B.    The Legal Bases for DeQuattro's Arguments Are Accurate and
Sound..……………………………………………………19

        1.    Law of the Case…………………………………………19

        2.    Reliance on acquitted conduct to find the
evidence sufficient on the count of conviction………..………21

        3.    Standard of Review………………………………………...25

II.    THERE WAS INSUFFICIENT EVIDENCE TO SATISFY §666's
JURISDICTIONAL ELEMENT…………………………………………...26

III.    THE DISTRICT COURT ERRONEOUSLY EXCLUDED
TESTIMONY FROM THREE PROFFERED DEFENSE
WITNESSES ………………………………………………………35

    A.    The District Court Erroneously Excluded Testimony from Two
Witnesses that They Gave Cromwell Gifts Virtually Identical to
Those Underlying DeQuattro's Convictions without any *Quid Pro*

        *Quo*……………………………………………………………..35

    B.     The District Court Erroneously Excluded a Defense Expert whose Testimony Was Highly Relevant and Exculpatory…………………38

    C.     Exclusion of the Foregoing Witness Testimony Was Not Harmless…………………………………………………..........43

IV.   THE DISTRICT COURT ERRONEOUSLY PRECLUDED THE JURY FROM REACHING A VERDICT UNTIL RECEIVING WRITTEN INSTRUCTIONS…………………………………………...45

V.    THE DISTRICT COURT'S RESTITUTION ORDER WAS LEGALLY ERRONEOUS IN SEVERAL RESPECTS………………...47

VI.   THE COURT SHOULD REJECT THE GOVERNMENT'S CROSS-APPEAL OF DEQUATTRO'S SENTENCE……………………………...50

CERTIFICATE OF COMPLIANCE……………………………………..56

CERTIFICATE OF SERVICE…………………………………………57

# TABLE OF AUTHORITIES

**Cases**

*Bond v. United States*, 572 U.S. 844 (2014) ............................................................30

*Dubin v. United States*, 599 U.S. 110 (2023) .......................................................29

*Dunn v. United States*, 284 U.S. 390 (1932)........................................ 21, 22, 23, 24

*Fischer v. United States*, 529 U.S. 667 (2000) ................................................. 31, 32

*Kelly v. United States*, 140 S. Ct. 1565 (2020) ......................................................30

*Lagos v. United States*, 584 U.S. 577 (2018)........................................................49

*Lund v. Henderson*, 807 F.3d 6 (1st Cir. 2015)....................................................37

*Marinello v. United States*, 138 S. Ct. 1101 (2018) ..............................................30

*McDonnell v. United States*, 579 U.S. 550 (2016) ................................................30

*Musacchio v. United States*, 577 U.S. 237 (2016)..................................................20

*Percoco v. United States*, 598 U.S. 319 (2023) ............................................... 29-30

*Sabri v. United States*, 541 U.S. 600 (2004)................................................... 27, 28

*United States v. Adorno*, 950 F. Supp. 2d 426 (E.D.N.Y. 2013) .................... 47, 48

*United States v. Afriyie*, 27 F.4th 161 (2d Cir. 2022) ............................................49

*United States v. Alicea*, 205 F.3d 480 (1st Cir. 2000) ...................................... 22, 23

*United States v. Andino-Rodriguez*, 79 F.4th 7 (1st Cir. 2023) ...............................6

*United States v. Barquin*, 799 F.2d 619 (10th Cir. 1986) .....................................52

*United States v. Biaggi*, 853 F.2d 89 (2d Cir. 1988) ...................................... 12, 13

*United States v. Biyaga*, 9 F.3d 204 (1st Cir. 1993)……………………………51

iii

*United States v. Carmona*, 688 F. App'x 31 (1st Cir. 2017) (unpublished).... 53, 54

*United States v. Carrasco*, 79 F.4th 153 (1st Cir. 2023) ................................. 28, 31

*United States v. Cianci*, 378 F.3d 71 (1st Cir. 2004)....................................... 23, 28

*United States v. Collins*, 854 F.3d 1324 (11th Cir. 2017)................................. 47, 48

*United States v. Corey*, 77 F. App'x 7 (1st Cir. 2003) (unpublished) .....................50

*United States v. de Leon-De La Rosa*, 17 F.4th 175 (1st Cir. 2021) ......................23

*United States v. Decines*, 808 F.3d 785 (9th Cir. 2015) .........................................38

*United States v. Doran*, 854 F.3d 1312 (11th Cir. 2017)................................. 32, 33

*United States v. Falcon-Nieves*, 79 F.4th 116 (1st Cir. 2023) ...............................28

*United States v. Fernandez*, 722 F.3d 1 (1st Cir. 2013) .................................. 29, 36

*United States v. Figueroa-Encarnacion*, 343 F.3d 23 (1st Cir. 2003) ....................22

*United States v. Garcia-Sierra*, 994 F.3d 17 (1st Cir. 2021) .................................43

*United States v. George*, 761 F.3d 42 (1st Cir. 2014)...........................................37

*United States v. Gracie*, 731 F.3d 1 (1st Cir. 2013) ...............................................9

*United States v. Guerrero-Narvaez*, 29 F.4th 1 (1st Cir. 2022) ........................7, 26

*United States v. Heslop*, 694 F. App'x 485 (9th Cir. 2017) ...................................29

*United States v. Iwuanyanwu*, 69 F.4th 17 (1st Cir. 2023) ...................................51

*United States v. Koutsostamatis*, 956 F.3d 301 (5th Cir. 2020) ............................50

*United States v. Lachman*, 521 F.3d 12 (1st Cir. 2008).........................................42

*United States v. Lane*, 435 F. App'x 857 (11th Cir. 2011) (unpublished) ....... 54-55

*United States v. Lupton*, 620 F.3d 790 (7th Cir. 2010)............................... 29, 31-32

iv

*United States v. McLean*, 802 F.3d 1228 (11th Cir. 2015) ......................... 32, 33, 34

*United States v. Miller*, 738 F.3d 361 (D.C. Cir. 2013) .........................................47

*United States v. Moffett*, 53 F.4th 679 (1st Cir. 2022) ...........................................47

*United States v. Ng Lap Seng*, 934 F.3d 110 (2d Cir. 2019) ...................................28

*United States v. Pothier*, 919 F.3d 143 (1st Cir. 2019) ..........................................25

*United States v. Powell*, 469 U.S. 57 (1984) ....................................... 21, 22, 23, 24

*United States v. Roberson*, 998 F.3d 1237 (11th Cir. 2021)....................................17

*United States v. Rosado-Perez*, 605 F.3d 48 (1st Cir. 2010) ..................................42

*United States v. Royle*, 86 F.4th 462 (1st Cir. 2023) ..............................................25

*United States v. Sawyer*, 85 F.3d 713 (1st Cir. 1996) .............................................36

*United States v. Sexton*, 894 F.3d 787 (6th Cir. 2018) ...........................................49

*United States v. Soler-Montalvo*, 44 F.4th 1 (1st Cir. 2022) ......................... *passim*

*United States v. Sotomayor-Vazquez*, 249 F.3d 1 (1st Cir. 2001) ...........................28

*United States v. Souza*, 749 F.3d 74 (1st Cir. 2014) ..............................................38

*United States v. Taylor*, 848 F.3d 476 (1st Cir. 2017) ...........................................37

*United States v. Urciuoli*, 613 F.3d 11 (1st Cir. 2010).......................................7, 13

*United States v. Valladares-Quintana*, 1998 WL 1085780 (1st Cir. July 30, 1998) (unpublished)...............................................................................................23

*United States v. Willis*, 844 F.3d 155 (3d Cir. 2016)……………………….…...29

*United States v. Woodward*, 149 F.3d 46 (1st Cir. 1998)...................................7, 13

*United States v. Zannino*, 895 F.2d 1 (1st Cir. 1990) .............................................51

*Van Buren v. United States*, 141 S. Ct. 1648 (2021) ...............................................30

*Yates v. United States*, 574 U.S. 528 (2015)...........................................................30

**Constitutional Provisions**

Fifth Amendment, United States Constitution………………………………………42

Necessary and Proper Clause, United States Constitution………………………..27

Sixth Amendment, United States Constitution…………………………………………47

**Statutes and Rules**

18 U.S.C. §1001………………………………………………………………………...5

18 U.S.C. §666 ................................................................................................ *passim*

Fed. R. Evid. 403…………………………………………………………..35, 37, 38, 43

**Other Authorities**

S. Rep. No. 98-225 (1983) ...................................................................................27

U.S.S.G. §2B4.1.....................................................................................................52

U.S.S.G. §2C1.1(b)(3) ................................................................................ 50, 51, 52

U.S.S.G. §4C1.1.....................................................................................................55

## Note on Citations to the Record

Material contained in the Joint Appendix is cited in the Brief as "App:____."

Material contained in the Sealed Appendix is cited as "SA:____."  The Principal

and Response Brief for the United States is cited as "GB:_____."  Brief of

Appellant David DeQuattro is cited as "DB:_____."

**STATEMENT OF FACTS**

The government's Statement of Facts omits evidence essential to a fair evaluation of the sufficiency of the evidence, suggests bases for favorable inferences which have no evidentiary support, and relies predominantly on evidence admitted solely as to the acquitted counts.

1.  Cromwell did not suddenly, without advance discussion, move to terminate JCJ's and D'Amato's services. *See* GB:4. While it may not appear in the Gaming Authority's formal minutes, *see id.*, there were informal discussions among the Authority's members for several weeks before the vote. App:335-36. Those discussions may have been instigated by Cromwell, but the vote to terminate was 4-1, with other board members affirming at trial that they had judged the matter independently, on the merits. *See* App:475, 490-92. The Authority may have chosen to style its termination as one for convenience, *see* GB:4, but there had, in fact, been dissatisfaction with D'Amato's performance and questions about where his primary loyalties lay. App:281, 294-96, 333-34.

2.  Cromwell may have advocated hiring Steelman Partners to replace JCJ and RGB to replace D'Amato, GB:4, but these were logical choices endorsed by Genting, the company providing *all* the funding for the project, and by the entire board due largely to the Authority's decision to build a five-star, as opposed to the previously

conceived four-star, casino to compete with the casino that Wynn was planning to open. App:277-78, 292-93, 341. Steelman had a relationship with Genting, App:374, and RGB had just completed another tribal construction project to everyone's complete satisfaction. App:380-81. To the extent that the government is seeking to imply that there was something suspect in RGB's selection because of its relative lack of prior casino experience, GB:5, nothing in the record suggests that RGB was other than completely qualified to manage the project, as its subsequent performance demonstrated, or that its extensive experience as owner's representative on other types of projects was not readily transferable to the casino project. Nor is there any basis in the record to suggest that Cromwell advocated RGB's selection because he believed that he could successfully extort monies from it.

3. Most of the government's Statement of Facts is devoted to the checks written by DeQuattro. It bears repeating here that DeQuattro was acquitted on all counts relating to these checks.

4. As to the first check, while Beretta testified that DeQuattro told him that Cromwell had asked for a personal check, App:782-83, there was no evidence that Cromwell told DeQuattro that he did not want RGB's name on the check. *See* GB:6.

Any conversations of this nature that Cromwell had were with Mitrokostas,[1] not DeQuattro. App:555-58. In any event, it was RGB's policy not to write corporate checks for political contributions but for the partners instead to write personal checks and be reimbursed by the company. App:721-22. There was no evidence that DeQuattro knew anything about the workings (or lack thereof) of CM or FMR. *See* GB:6-7. Nor was there any evidence that DeQuattro was aware of the substance of any conversations between Cromwell and Mitrokostas.

5. Dowling did not advise against making the contribution. *See* GB:7. Quite the contrary: in a July 8, 2014, email Dowling advised DeQuattro only that he should be sure that the payee was "a living entity" and that he should investigate the background of CM's owners. App:1787. Beretta's cousin, who, like Dowling, had no experience with either criminal law or tribal election law, described his advice as "pragmatic" rather than legal. App:918-19. Beretta chose the amount of the bonus reimbursement, *see* GB:9, because taxes would be owed on the reimbursement, and he "figured [DeQuattro] could use the extra money to either continue business promotion or doing the political contributions." App:793.

6. As to each of the checks, the government points to Cromwell's having used

---

[1] Mitrokostas was not simply a restauranteur, GB:6; he had long been involved in tribal activities. App:608-09.

the money for personal purposes. GB:9, 10, 11, 13, 14. There was, however, no evidence that DeQuattro was aware of the manner in which Mitrokostas was transferring the money to Cromwell or that Cromwell was using the money for purposes other than those he had represented to DeQuattro, *i.e.*, campaign contributions.

7. The reason that Beretta did not want the second reimbursement check to be only for $10,000, *see* GB:10, was so that DeQuattro could "use the money again for business development." App:799.

8. As for the check to One Nation, GB:12, RGB did in fact request and receive a follow-up letter, albeit not a particularly detailed one. App:814-15. There was no evidence that DeQuattro was aware of One Nation's lack of activity. Anyone investigating One Nation would have found professional-quality promotional materials detailing its purported functions. App:1568-70, 1760-68.

9. Cromwell may not have asked DeQuattro for another payment after the project was halted, GB:15, but, as will be discussed further in the next section, the critical focus here is on DeQuattro's state of mind, not Cromwell's. Moreover, the tribal election was in February 2017, App:598, so there would have been no reason for requests for additional campaign help after the January 2017 check.

10. The government points to purported lies DeQuattro told the FBI. GB:15-

16. However, as demonstrated at pages 17-18, *infra*, DeQuattro was quite open with the agents and statements that the government characterizes as lies are more plausibly understood as failures of memory so long after the fact.[2]

## SUMMARY OF ARGUMENT

The defense arguments in Sections I-V are summarized in DeQuattro's opening brief. DB:10-14.

VI. The government has waived its cross-appeal of DeQuattro's sentence for lack of developed argument. Even overlooking that waiver, the district court did not abuse its discretion in declining to apply the disputed enhancement. Finally, any error was harmless given the district court's substantial downward variance based on non-guideline factors.

## ARGUMENT

I. **THE EVIDENCE WAS INSUFFICIENT TO SUPPORT DEQUATTRO'S CONVICTION.**

    A. **The Evidence Did Not Suffice to Permit a Reasonable Jury to Conclude Beyond a Reasonable Doubt that the BowFlex and Hotel Stay Gifts Were Intended by DeQuattro as *Quid-Pro-Quo* Bribes.**

The government's "protection of the contract" theory cannot survive an

_____

[2] Although Beretta was threatened with prosecution for false statements under 18 U.S.C. §1001, App:828-30, DeQuattro was not.

examination of the record evidence. There was, in sum, no evidence that RGB's contract was ever in need of "protection" or that DeQuattro had any reason to believe that it might be. The government identifies the putative "quo"—protection of the contract—and the "quid"—the BowFlex and the hotel stay, GB:21—but what is missing here is the essential "pro"—proof of an agreement to exchange this for that (or even proof that DeQuattro believed that Cromwell was promising to protect a contract that did not need protection in exchange for the gifts). The government later acknowledges that, not having relied on a stream-of-benefits theory, it was required to prove a separate *quid pro quo* as to both the BowFlex and the hotel stay. GB:31. This it failed to do.[3] DeQuattro has hardly "ignore[d] the government's theory of the case." GB:34. Substantial portions of his opening brief were devoted directly to demonstrating its fallacy and lack of evidentiary support.

Yes, the payments were made and the contract survived, GB:21, but that simple

---

[3] In assessing the government's arguments, it is important to recognize the extent to which it has fudged the issues by lumping DeQuattro and Cromwell together as "they" or "Defendants." Guilt must be judged on an individual, not a collective basis. *See, e.g., United States v. Andino-Rodriguez*, 79 F.4th 7, 29 (1st Cir. 2023). Thus, whether DeQuattro had the specific intent to provide Cromwell with things of value in exchange for Cromwell's not terminating the contract must be determined based individually on the evidence against him, not on what Cromwell may have thought or intended, particularly given the absence of evidence as to the content of communications between DeQuattro and Cromwell.

correlation does not establish the requisite intentional causation on DeQuattro's part, *i.e.*, that the BowFlex and hotel stay (or even the checks) were specifically intended by DeQuattro to ensure that Cromwell did not take adverse action against RGB's contract. Cromwell was a powerful tribal leader, GB:22, but the government's argument presupposes that he could convince a majority of the Authority's board to act in a manner so highly antithetical to the Authority's interest in prompt and successful completion of the casino project and that DeQuattro had reason to fear that he would ever try to do so. This the evidence simply does not support. As more fully developed in DeQuattro's opening brief, when Cromwell requested the BowFlex, RGB had been acting as owner's representative for 28 months, to the Authority's complete satisfaction, and a change in owner's representative at that juncture would have jeopardized the Authority's goal of opening a five-star casino before Wynn could do so. *See* DB:28-31.[4] The fact that Cromwell, at the time of the BowFlex gift,

---

[4] In support of its argument, the government cites *United States v. Urciuoli*, 613 F.3d 11 (1st Cir. 2010), and *United States v. Woodward*, 149 F.3d 46 (1st Cir. 1998). In both those cases, the recipient of the things of value was a state legislator who had the unilateral power to act in the payor's interests and was being paid to exercise that power. In *Urciuoli*, moreover, there was evidence that the defendant had requested that the legislator promote the hospital's interests in dealings with insurers. 613 F.3d at 16. And, as this Court has said, albeit in another context, "an individual's capacity to do harm tells us nothing about his intention to cause harm at that particular time." *United States v. Guerrero-Narvaez*, 29 F.4th 1, 14 (1st Cir. 2022). *Moreover, in both* Urciuoli *and* Woodward *there was an ongoing pattern of official action in*

had recently been released from the hospital following back surgery and was suffering from physical ailments that exercise could ameliorate, App:519-20, makes friendship and the desire to cultivate future business opportunities a far more plausible purpose than the government's speculation that the BowFlex was given as part of a *quid-pro-quo* exchange for protection of the contract.

When Cromwell requested the hotel stay, RGB had been successfully operating the project for more than three years, but the project had effectively come to a halt due to a federal court injunction. While RGB may have been hoping at the time of the BowFlex gift that the injunction would be reversed, *see* GB:24, no such hope remained at the time of the hotel stay gift. In short, there was little left to "protect," *see* DB:33-34. Even though DeQuattro's text expressed frustration with Cromwell's request, at that late juncture the likelihood of the hotel stay's being a birthday gift to a good client (and personal friend) to promote RGB's interest in obtaining future business from the Tribe far outweighs any speculative inference that the hotel stay was part of a *quid-pro-quo* exchange for protection of the contract.  A client asking for a gift may evoke a reaction without the request having anything to do with a promise not to cancel a contract if he does not get a gift.

_____

*favor of the payor, as opposed to, as here, ongoing inaction where there was no reason to fear action.*

The only thing to which the government points to suggest that DeQuattro would fear that RGB's contract would meet the same fate as D'Amato's if he did not satisfy Cromwell's requests is the bare fact that Cromwell had moved to have D'Amato's contract terminated and speculation that DeQuattro might have feared a similar fate. GB:23. The record is, however, devoid of evidence that DeQuattro had any reason to so fear at the time of the BowFlex or hotel stay gifts, when RGB had already been working on the project for several years (or at any earlier time). There was no evidence that Cromwell had ever threatened such adverse action or even so much as subtly implied that such a danger existed if RGB did not provide what he asked for.[5] Gaming Authority board members testified that there was never any suggestion that RGB's contract might be at risk. App:375, 495, 498. The hypothetical—and unlikely—possibility that Cromwell might decide, years after the contract had been awarded, to act in such an irrational and arbitrary manner—and that he could convince a majority of the board that had unanimously chosen RGB to do so as well—cannot substitute for proof of DeQuattro's intent to effectuate a *quid pro quo* at the time of those gifts. Termination of the contract was not, contrary to the

---

[5] In *United States v. Gracie*, 731 F.3d 1, 3 (1st Cir. 2013), on which the government relies, GB:34, the payee had, unlike this case, affirmatively demanded payment in exchange for continuing to act as the payor wished.

government's argument, a "realistic risk." GB:34.

Moreover, the ouster of D'Amato and the prior architect had not been arbitrary, as the government seeks to suggest, and would not have given RGB cause for concern for the security of its ongoing contract. The Gaming Authority had decided 4-1 that the architect was not up to the task of designing a five-star casino, App:301, 305, and there was dissatisfaction with D'Amato based on the perception that its loyalties lay more with Genting than with the tribe.[6] App:281, 294-96, 306, 333-34. RGB, in contrast, had already demonstrated its loyalty to the tribe's interests, through its work on a prior tribal construction project, and its ability to communicate effectively with tribal representatives, which had continued throughout the casino project. Witness after witness testified to the Authority's (as well as Genting's) complete satisfaction with RGB, App:347, 375, 389, 477, 494-95, 498, as witness the Authority's

---

[6] The government suggests that Cromwell's dissatisfaction with D'Amato stemmed from Cromwell's belief that D'Amato was insufficiently loyal *to him*. GB:35. D'Amato clearly testified that when Cromwell discussed his concerns with him, he questioned whether D'Amato's loyalties lay more with Genting than with *his client*, the Gaming Authority, as evidenced by his communicating with Genting about matters that would have been more properly discussed with the Authority. App:296, 311. Thus, there is no basis for the government's insinuation that Cromwell wanted to give the contract to someone who would prove more loyal to him personally. RGB was in no sense "beholden" to Cromwell, GB:35, any more than any firm chosen as owner's representative would have been.

continuing to devolve additional responsibilities on RGB, App:1636-37, a reality at odds with any danger that the Authority board would suddenly vote to terminate RGB's contract. Evidence also showed that, while terminating D'Amato when the Authority did would not have caused a setback for the project, termination later into RGB's contract would have had serious consequences for the Authority's ability to achieve its goals.[7] To the extent that the government is seeking to suggest something suspect in RGB's selection by pointing out its lack of casino experience, GB:23, RGB was not hired for its casino experience but rather for its experience as owner's representative, and RGB's lack of casino experience did not affect its ability to

---

[7] The government seeks to suggest that replacement of RGB with another owner's representative would have had little impact on the Authority's ability to meet its goal of opening its casino before that of a competitor. GB:35. The evidence plainly shows otherwise. D'Amato himself testified that if a change were to be made, the time to do so was when he was terminated, not after construction began, and that delay would conflict with the Authority's goals. App:316-17. *See* App:276 (delivering results quickly is important in casino projects); App:293 (Authority wanted to be the first to open a casino); App:317 (any delay would conflict with Authority's goal to be first to open). The owner's representative role is not simply "advisory," GB:35; the owner's representative monitors and oversees the project on behalf of the owner, App:281, acting as a "liaison between the owner trying to take his vision for a project and translating that vision to the other consultants and people that worked on the project." App:282. The transition from D'Amato to RGB may have occurred relatively seamlessly, GB:35, but would have been considerably more complicated once construction had begun and RGB was fully enmeshed in the project.

satisfactorily perform its responsibilities under the contract.[8]

The government argues that $50,000 is not "a typical token of goodwill," GB:23, but the inquiry here is limited to the sufficiency of the evidence to prove that DeQuattro intended the BowFlex and hotel stay gifts to be part of a *quid-pro-quo* exchange. Whatever feelings of entitlement Cromwell may have had (if any), do not supply evidence of *DeQuattro's* intent. Cromwell did not "instruct" DeQuattro; he requested a check payable to CM for campaign expenses, and he certainly did not instruct DeQuattro on how to get him *cash*, *see id.*, as there was no evidence of any cash payments by RGB or DeQuattro to Cromwell and no evidence that DeQuattro knew of Cromwell's taking the money for his personal use.

The government itself distinguishes between solicitation of $50,000 and solicitation of gifts. GB:23. And that is precisely what the BowFlex and hotel stay were—gifts. In support of its argument, the government cites *United States v. Biaggi*, 853 F.2d 89 (2d Cir. 1988), for the proposition that an official would not have requested the gifts "without offering something more than his friendship in return."

---

[8] The government's description of RGB as "small" is also misleading. RGB had 27 employees and had been in existence since 1946, App:699, and was fully qualified to take on the casino project, as its subsequent performance amply demonstrated.

GB:23-24.[9] The question here, however, is not Cromwell's motivation, but DeQuattro's intent *at the time of the BowFlex and hotel stay gifts*. The cost of those gifts were comparable to gifts RGB gave to other persons or entities in a position to steer future business RGB's way, App:863-64, 866-67, 1599-1607, and at the time of those gifts, RGB was hoping to generate future business opportunities with the tribe, App:701-02, 852, 865-66, thus, along with DeQuattro's friendship with Cromwell, providing an entirely innocent explanation for the gifts which the government's arguments fail to refute. Giving gifts—even lavish gifts such as tickets to million-dollar suites at the Super Bowl—is every-day business practice by companies seeking to generate future business opportunities with clients. And again, one must ask why, if RGB was intent on protecting the contract at all costs, it would risk incurring Cromwell's ire by giving him a used, rather than a new, BowFlex? The government provides no answer to this essential question.[10] And, notably, there was no evidence that DeQuattro *ever*, in the entire course of the contract, asked Cromwell for anything

---

[9] As in *Urciuoli* and *Woodward*, *see* note 4, *supra*, there was evidence in *Biaggi* of ongoing action in favor of the payor.

[10] The government's encasing the word friends in quotation marks, GB:24, cannot detract from the uncontroverted evidence that, in the course of RGB's work on the prior project, a personal friendship did develop between Cromwell and DeQuattro, App:518, 637, as DeQuattro openly told the FBI when he was interviewed. App:948.

in exchange, even when a substantial sum remained unpaid to RGB at the end of the contract.

The government has never, either in the district court or before this Court, attempted to justify DeQuattro's conviction without relying on evidence admitted exclusively with respect to the acquitted counts, nor has it sought to explain how that evidence would have been admissible in a separate trial of the BowFlex and hotel stay charges. However, even if that evidence is considered, *but see* DB:36-47; pages 21-24, *infra*, it has little or no bearing on whether DeQuattro gave Cromwell the BowFlex in August 2016 and the hotel stay in May 2017 as part of a *quid-pro-quo* exchange to ensure protection of the contract.

DeQuattro and Beretta did not treat Cromwell's requests for the checks "as demands they were obligated to meet" to protect the contract. GB:24. If they felt that they had to make the payments to insulate the contract from adverse action by Cromwell, why would they seek legal advice rather than simply make the payments outright? Why would DeQuattro, following the attorneys' advice, not write the first check until he was assured that CM was a corporation in good standing? And if DeQuattro was intent on committing *quid-pro-quo* bribery, why would he write checks on his personal account as opposed to arranging some more clandestine form of payment? The government argues that DeQuattro "obviously" knew the tribe too

well to believe that so much money was needed for tribal campaign purposes, GB:25, but there was in fact no evidence that DeQuattro knew anything about the expenditures required for a successful campaign for tribal chief.

Beretta and DeQuattro did, to be sure, grumble a bit about Cromwell's requests for the BowFlex and the hotel stay, GB:25-26, but the government leaves unanswered some pivotal questions. Why, so long into the successful operation of the contract, would they fear for the continuation of the contract if they did not give Cromwell what he asked for? What factual basis was there in the evidence for a conclusion, without impermissibly piling inference upon inference, that DeQuattro ever believed that the contract was at risk but would be protected by giving Cromwell gifts totaling $3,549.37 (or, for that matter, campaign contributions)? At that late juncture, it is considerably more plausible that the gifts were borne of friendship and a desire to aid Cromwell's recovery or were geared toward hoping for favorable consideration for future tribal projects. And even if Cromwell's expressed disappointment that the BowFlex was not new may have illustrated *his* state of mind, it suggests something quite the opposite for DeQuattro's—that he had no concern that disappointing Cromwell would jeopardize the contract.

The government's arguments relating to concealment, GB:26-27, are equally unpersuasive. First of all, there was no concealment as to the either the BowFlex or

the hotel stay gifts. Beretta bought the BowFlex in his own name, App:1581-84, and DeQuattro dealt openly with the seller, even choosing to be present when the seller delivered the machine to Cromwell's house to help set up the machine—another indication of personal friendship. App:520. The hotel stay was paid for with RGB's credit card; Cromwell's name appeared in the hotel records, and the charge appeared on RGB's Amex account. App:1587-91, 1597. Both gifts were entirely transparent; not only did they not try to hide these gifts "in the same manner," GB:26, they did not try to hide them *at all*.

The government's concealment argument deals predominantly with the checks, but even there it does not hold water. How could DeQuattro's use of his own personal checks possibly facilitate concealment? The government's argument presupposes that DeQuattro knew that payments to CM and One Nation were ploys to "funnel" money to Cromwell for his personal use. *See* GB:26. There is, however, no evidence that would support such a supposition. Beretta's reimbursements of DeQuattro in amounts greater than the amount of the checks were unilateral decisions on his part, and not the product of a concerted effort at concealment by Beretta and DeQuattro. Moreover, the amount of the reimbursement check could not conceal the fact that DeQuattro wrote the checks on his personal account, which was readily

identifiable as such. *See* App:1400-05.[11]

Lastly, the government points to purported lies told to the FBI by DeQuattro. GB:27-28. This discussion, too, deals solely with the acquitted checks, and, even as to those, the evidence does not support the characterization of his statements as "lies." The FBI confronted DeQuattro at his office without warning six years after the first check was written and 3 ½ years after the last one. App:933-34, 938. While DeQuattro initially said, not surprisingly so long after the fact, that he did not recognize the name CM, he immediately acknowledged it when the agents refreshed his memory with the first check. App:941. When shown the check, DeQuattro volunteered that it was a political donation to Cromwell, whose name had not been previously mentioned by the agents, App:948-49, evidencing a lack of attempt to conceal their relationship. DeQuattro may have said that first check was for "campaign help," but that was in fact the purpose of the check, as he explained to the agents and to Beretta in informing him of the request. App:780.

Similarly, the fax from Mitrokostas was sent in 2014, before the first check, again six years earlier, App:1560-67, making it much more likely that this was not a

---

[11] The multiple instances of active and deliberate concealment to which the court pointed in *United States v. Roberson*, 998 F.3d 1237, 1249 (11th Cir. 2021), on which the government relies, GB:26, bear no resemblance to this case, particularly given DeQuattro's use of his own personal checks.

lie, but a failure of memory. Although DeQuattro did not recognize Mitrokostas' full name or his photograph, as soon as the agents provided Mitrokostas' nickname "Dino", DeQuattro immediately acknowledged the acquaintance, adding that he had encountered Mitrokostas at tribal events and that Mitrokostas catered events for the tribe, App:935-36, 941, adding credibility to DeQuattro's belief at the time the first check was written that it was for a tribal fundraiser.

DeQuattro also freely acknowledged $40,000 as the amount of the checks to CM and even volunteered to check his records to be sure. App:945-46. DeQuattro also affirmatively denied that the payments were in any way related to the casino project. App:949-50. When DeQuattro told the agents that he had not given Cromwell money, he was distinguishing between money given directly to Cromwell and the political donations made via CM. App:948-49. The check to One Nation was written in November 2015, four years and eight months earlier, and, because DeQuattro was told that the check would be used for charitable and political purposes, he is unlikely to have thought of One Nation as being a "business" "owned" by Cromwell, *see* App:937; GB:27-28, if he remembered it at all.[12]

---

[12] The government accuses DeQuattro of citing the transcript misleadingly, GB:27 n.5, but he did not. Beretta did tell the FBI that he would never have agreed to the contributions had he believed that they were in any way related to the casino contract, an averment that was not contradicted by his trial testimony, and about which he did *not* testify that he had lied to the FBI.

In sum, there was no evidence that would support reasonable inferences that RGB's contract needed protection, or that DeQuattro believed that it did and feared that Cromwell would move to terminate the contract if he were not provided with the BowFlex or the hotel stay, or that Cromwell had promised to protect the contract in exchange for the gifts (or that DeQuattro believed that he had), or that the BowFlex and hotel stay were given as part of a *quid-pro-quo* exchange for protection of the contract. The government's theory rests on nothing more than speculation and piling inference upon inference. DeQuattro's convictions should be reversed.

### B. The Legal Bases for DeQuattro's Arguments Are Accurate and Sound.

Having failed to demonstrate the sufficiency of the evidence as a factual matter, the government then turns to attacking DeQuattro's legal arguments as erroneous. In doing so, the government misapprehends the arguments actually advanced by DeQuattro and ignores dispositive distinctions between this case and cases on which it relies.

### 1. Law of the Case.

The government does not contest that it affirmatively acquiesced in the instructions given, nor does it contend that the instructions were patently incorrect, thus waiving any such argument. It also does not dispute that the instructions cited

by DeQuattro, *see* DB:26 required it to prove beyond a reasonable doubt that there was a clear and unequivocal agreement between DeQuattro and Cromwell that Cromwell, in exchange for the BowFlex and the hotel stay, would protect RGB's contract from termination. Its sole argument on the point is that application of the law-of-the-case doctrine is foreclosed by *Musacchio v. United States*, 577 U.S. 237 (2016). GB:32. In that, it is mistaken.

The government's discussion of *Musacchio* (limited to a single sentence) overstates the case's holding. What the Court held in *Musacchio* was that "when a jury instruction sets forth all the elements of the charged crime *but incorrectly adds one more element*, a sufficiency challenge should be assessed against the elements of the charged crime, not against the erroneously heightened command in the jury instruction." *Id.* at 243 (emphasis added).[13] This is so, the Court reasoned, because, if the evidence suffices to prove the statutory elements of the offense beyond a reasonable doubt, then the defendant has received all that due process requires. *Id.* at 243-44. Thus, the "heightened" instructional standard, GB:32, rejected by the *Musacchio* Court was the requirement that the government prove the erroneously added element of the offense.

---

[13] In *Musacchio*, the statute charged the crime in the disjunctive but the instructions were phrased in the conjunctive, requiring the government to prove both statutory alternatives rather than just one. *Id.* at 241.

The government makes no attempt to explain how the instructions here added an element of the offense. Such an attempt could not succeed in any event, as the instructions did not add an element beyond the statutory definition of the offense but instead simply defined for the jury the central element of the §666 *quid-pro-quo* bribery offense—the *quid-pro-quo* agreement—and told the jury what it was required to find in order to conclude that the government had proven that element beyond a reasonable doubt. Thus, the law-of-the-case doctrine remains fully applicable in these circumstances. In any event, however, the evidence failed to prove *any quid-pro-quo* agreement between DeQuattro and Cromwell with respect to the BowFlex and hotel stay gifts.

### 2. Reliance on acquitted conduct to find the evidence sufficient on the count of conviction.

DeQuattro, as he explained in his opening brief, is *not* making an inconsistent verdict argument, nor is he seeking an exception to the "*Dunn/Powell* rule." That being the case, DeQuattro's arguments do not "contravene[] binding precedent," GB:28, as the precedents on which the government relies are, with one possible exception, *see* note 15, *infra*, inconsistent verdict cases that reflect rules and reasoning not applicable here.

In *Dunn v. United States*, 284 U.S. 390 (1932), the defendant was charged in

three counts with offenses relating to the unlawful sale of liquor. The evidence was
the same for all three counts, but the jury acquitted the defendant only on two of the
three counts. *Id.* at 391-92. The Court explained its reasoning for upholding the
conviction on the remaining count:

> Consistency in the verdict is not necessary. Each count in an indictment is
> regarded as if it was a separate indictment. . . . If separate indictments had
> been presented against the defendant for possession and for maintenance of a
> nuisance, and had been separately tried, *the same evidence being offered in
> support of each*, an acquittal on one could not be pleaded as res judicata of the
> other. Where the offenses are separately charged in the counts of a single
> indictment the same rule must hold.

*Id.* at 393 (emphasis added).

United States v. Powell, 469 U.S. 57 (1984), was to similar effect. The
defendant in *Powell* was charged with conspiracy and substantive counts relating to
possession/distribution of narcotics and use of the telephone to facilitate those drug
offenses. The jury convicted her only on the telephone counts. *Id.* at 59-60. The
defendant argued that her convictions on the compound counts could not stand in
light of the jury's acquittals of the predicate offenses. As in *Dunn*, the same evidence
was admissible on all counts. *Powell was a straight application of the Dunn rule,
stressing again that each count in an indictment should be regarded as a separate
indictment. Id.* at 62-63.[14] *See United States v. Alicea*, 205 F.3d 480, 484 (1st Cir.

---

[14]    *United States v. Figueroa-Encarnacion*, 343 F.3d 23 (1st Cir. 2003), on

2000)("[A]cquittal on one or more counts does not preclude conviction on other counts *based upon the same evidence* as long as that evidence is legally sufficient to support a finding of guilt on the count(s) of conviction." (emphasis added)).[15] In contrast to those cases, treating the check counts and the gift count as separate counts, as required for purposes of the analysis, the same evidence would *not* have been admissible in a separate trial limited to the BowFlex and hotel stay, as

_____

which the government relies in support of its argument regarding how "entrenched" the "*Dunn/Powell* rule" is, GB:28-29, was a case precisely like *Powell*, with the defendant arguing that his conviction of the compound crime (possession of a weapon in furtherance of a drug trafficking crime) could not be upheld because it was inconsistent with his acquittal of the predicate crime (drug trafficking). Other cases on which the government relies are to similar effect. In *United States v. de Leon-De La Rosa*, 17 F.4th 175, 183 (1st Cir. 2021), GB:29, the defendants' argument was predicated upon the inconsistency between the jury's acquitting them of controlled substances offenses while convicting them of destroying evidence subject to forfeiture, *i.e.*, the controlled substances at issue. In *United States v. Valladares-Quintana*, 1998 WL 1085780 (1st Cir. July 30, 1998), the defendant's argument was predicated on the inconsistency between the verdict acquitting him of participating in a narcotics conspiracy but convicting him of laundering the proceeds of narcotics trafficking. *See id.* at *5.

[15] Unlike this case, the defendants in *United States v. Cianci*, 378 F.3d 71 (1st Cir. 2004), on which the government relies, GB:28-29, were seeking an exception to the *Dunn/Powell* rule, contending that the jury's special verdicts rejecting certain substantive RICO predicates precluded their convictions of RICO conspiracy as a matter of law. *Id.* at 91. This Court again stressed that substantive RICO and RICO conspiracy were separate counts and that "[i]n a single, multi-count trial, acquittal on one or more counts does not preclude conviction on other counts *based upon the same evidence*, as long as that evidence is legally sufficient to support a finding of guilt on the count(s) of conviction." *Id.* at 93, *quoting Alicea*, 205 F.3d at 484 (emphasis added).

DeQuattro has demonstrated in his opening brief.

The difference between this case and *Powell* and *Dunn* is that defendants in those cases argued that the jury's acquittals on some counts *required* that they be acquitted on the counts of conviction because the acquittals *necessarily* meant that the jury found insufficient evidence of an element of the convicted offenses. That is not at all the argument presented by DeQuattro. For example, Count Five was duplicitous in that it charged three separate things of value—the BowFlex, the $4,000 check, and the hotel stay—each with its own separate evidence. DeQuattro is not arguing that the acquittal on the check charge is inconsistent with the BowFlex/hotel stay convictions but instead that the sufficiency of the evidence must be assessed on a charge-by-charge basis, as the jury did in acquitting DeQuattro on the $4,000 check charge included in Count 5.

Because DeQuattro is not arguing that the jury's acquittals on the charges relating to the checks require that he be acquitted on the BowFlex/hotel stay charges or that those acquittals are inconsistent with the BowFlex/hotel stay convictions, the government's discussion of how to make sense of the divergent verdicts, GB:30-31, is quite beside the point. The dichotomy drawn by the government between campaign finance contributions and tangible gifts, GB:30-31, does not explain how a rational jury could have concluded beyond a reasonable doubt that the gifts, given

so long after the inception of the contract, were part of a *quid-pro-quo* exchange for protection of RGB's contract.

### 3.    Standard of Review.

Even drawing all *reasonable* inferences in favor of the government, *see* GB:37-38, the government's discussion of the evidence which it contends supports its "protection of the contract" theory of *quid-pro-quo* bribery falls far short of establishing its theory as the most plausible "scenario [that] describe[d] what happened." *United States v. Royle*, 86 F.4th 462, 481 (1st Cir. 2023), *quoting United States v. Pothier*, 919 F.3d 143, 147 (1st Cir. 2019). *Royle* and *Pothier* provide a useful contrast. In *Royle*, the defendant lived alone, and the government's evidence eliminated any realistic likelihood that the child pornography found on the defendant's computer was downloaded by someone other than the defendant. In *Pothier*, the defendant shared the residence with other people, any of whom could have used the defendant's computer, and the government's evidence failed to adequately eliminate that scenario.

This case falls squarely on the *Pothier* side of the line. There were two competing scenarios: the government's, that the BowFlex and hotel stay gifts were *quid-pro-quo* bribes to protect RGB's contract from termination, and DeQuattro's, that the two gifts were prompted by friendship and the desire to promote further

business opportunities with the tribe. The government's evidence did not suffice to show that its scenario was the more probable (much less to prove it beyond a reasonable doubt) at the time of the BowFlex gift, 28 months into RGB's successful performance under the contract, or at the time of the hotel stay gift, three years after the inception of the contract when the contract was all but at an end. Thus, the equipoise rule remains fully applicable here. Where, "[a]t best, viewing the evidence in the light most favorable to the government gives equal or nearly equal circumstantial support to theories of guilt and innocence, . . . [t]hat is not good enough to meet the government's burden to prove its case beyond a reasonable doubt." *United States v. Guerrero-Narvaez*, 29 F.4th 1, 16 (1st Cir. 2022). Such was the case here.

## II. THERE WAS INSUFFICIENT EVIDENCE TO SATISFY §666'S JURISDICTIONAL ELEMENT.

The government does not dispute that the Tribe and the Gaming Authority are legally separate entities, or that only the former received federal funds. It further accepts that the only business or transaction impacted by the alleged bribery here was RGB's contract with the Gaming Authority, to which the Tribe, *i.e.*, the only recipient entity, was not a party and under which it was completely immunized from liability both by the contract itself and the relevant tribal ordinance. The government's contention that the evidence was sufficient to satisfy §666's

jurisdictional element is, therefore, entirely predicated upon the argument that the Tribe and the Gaming Authority are meaningfully indistinguishable, such that their legal independence can be essentially disregarded. Because the government's argument on this point runs headlong against the explicit Congressional purpose underlying §666, is utterly unsupported by precedent, and would create a direct conflict with existing out-of-circuit precedent, this Court should reject it.

Section 666 was enacted to "protect the integrity of the vast sums of money distributed through Federal programs from theft, fraud, and undue influence by bribery." *Sabri v. United States*, 541 U.S. 600, 606 (2004)(quoting S. Rep. No. 98-225, 370 (1983)). Indeed, it is this very connection to federal spending that provided the Constitutional authority to pass the statute. *See Id.* at 605 (citing Congress's "authority under the Necessary and Proper Clause . . . to see to it that taxpayer dollars appropriated under [the federal spending] power are . . . not frittered away in graft or on projects undermined when funds are siphoned off or corrupt public officers are derelict about demanding value for dollars"). Proof of a specific connection between a defendant's bribery and federal funds flowing to the victimized entity is not required for the simple reason that "[m]oney is fungible" and "bribed officials are untrustworthy stewards of federal funds." *Id.* at 606. In other words, "officials are not any the less threatening to the objects behind federal spending just because they

may accept general retainers." *Id.*; *see also United States v. Cianci*, 378 F.3d 71, 97 (1st Cir. 2004)(citing court of appeals opinion in *Sabri* for proposition that "no connection between the offense conduct and a ***case-specific*** federal interest is required" (emphasis added)).

The government, however, cites no precedent applying §666 where, as here, the federal funds were received by a different, legally distinct entity than that victimized by bribery. *See, e.g.*, *United States v. Falcon-Nieves*, 79 F.4th 116, 125-26 (1st Cir. 2023)(holding that federal benefits flowing to one Puerto Rico agency were not sufficient to bring bribery of an official of another Puerto Rico agency within the statute).[16]   In fact, to the contrary, the government's own caselaw acknowledges that §666 "focuses on the integrity of federal funding and, thus, requires proof of such receipt by the" impacted organization. *United States v. Ng Lap Seng*, 934 F.3d 110, 128 (2d Cir. 2019); *see also United States v. Sotomayor-Vazquez*, 249 F.3d 1, 8 (1st Cir. 2001)("[A]n outside consultant with significant managerial responsibility [over recipient entity] may pose as significant a threat to the integrity of federal funds . . . ."); *United States v. Carrasco*, 79 F.4th 153, 157 & n.3 (1st Cir. 2023)(defendant attorney accepted bribes in his representation of three

---

[16] Here, there was no evidence of federal dollars (or any money for that matter) flowing from the Tribe to the Gaming Authority, as the government attempted to prove in *Falcon-Nieves*.

municipalities which all received requisite federal benefits); *United States v. Fernandez*, 722 F.3d 1, 9 (1st Cir. 2013)(holding that bribe recipients were "properly considered agents of the Commonwealth of Puerto Rico," which received federal benefits); *United States v. Willis*, 844 F.3d 155, 165 (3d Cir. 2016)("[W]e conclude the Legislature is part and parcel of the Government of the Virgin Islands, and it received federal funds."); *United States v. Lupton*, 620 F.3d 790, 801 (7th Cir. 2010)(noting "[a]mple evidence" that defendant "was authorized to act on behalf of the State"); *United States v. Heslop*, 694 F. App'x 485, 487 (9th Cir. 2017) (unpublished)(defendant "pled guilty to stipulated facts that refer[red] either to the Tribe alone, or to both the Tribe and its corporate entities together").[17]

The Supreme Court has "traditionally exercised restraint in assessing the reach of a federal criminal statute." *Dubin v. United States*, 599 U.S. 110, 129 (2023) (citation omitted).  In recent years, the Court has repeatedly rejected government attempts to expand the scope of such criminal statutes beyond the Congressional purpose they were enacted to serve.  *See id.* at 122 (rejecting "broad reading" of aggravated identity theft "covering any time another person's means of identification is employed in a way that facilitates a crime"); *Percoco v. United States*, 598 U.S.

---

[17] *See also United States v. Heslop*, No. 14-50321 (9th Cir.), Doc. 65 at 38 (government brief pointing out that "[t]he factual basis plainly states that the transactions at issue were with [the] Tribe specifically").

319, 332 (2023)(rejecting government argument that "a private citizen owes a duty to render honest services when the person exercises the functions of a government position with the acquiescence of relevant government personnel" (citation omitted)); *Van Buren v. United States*, 141 S. Ct. 1648, 1661 (2021)(rejecting government interpretation of statute that "would attach criminal penalties to a breathtaking amount of commonplace computer activity"); *Kelly v. United States*, 140 S. Ct. 1565, 1568 (2020)(noting that "the federal fraud statutes . . . do not criminalize all" conduct involving "deception, corruption, [and] abuse of power"); *Marinello v. United States*, 138 S. Ct. 1101, 1110 (2018)("Just because a taxpayer knows that the IRS will review her tax return every year does not transform every violation of the Tax Code into an obstruction charge."); *McDonnell v. United States*, 579 U.S. 550, 573-74 (2016)(rejecting government's "expansive interpretation" of official act requirement); *Yates v. United States*, 574 U.S. 528, 540 (2015)(opining that federal obstruction statute "was not intended to serve as across-the-board ban on the destruction of physical evidence"); *Bond v. United States*, 572 U.S. 844, 863 (2014)(rejecting government interpretation that "would transform the statute from one whose core concerns are acts of war, assassination, and terrorism into a massive federal anti-poisoning regime that reaches the simplest of assaults").

Section 666 is no different. The Supreme Court has explicitly stated that the

statute was not intended to "turn almost every act of . . . bribery into a federal offense." *Fischer v. United States*, 529 U.S. 667, 681 (2000). Rather, its application must turn on the relevant entity's receipt of federal benefits. Accordingly, consistent with the foregoing string of Supreme Court decisions, this Court should reject the novel interpretation advanced by the government, unsupported by a single citation to precedent applying the statute where the entity receiving federal benefits is separate from that allegedly victimized by the defendant's conduct.

This case presents a unique situation: the only entity to have received a single federal dollar was specifically immune from liability under the only contract alleged to have been affected by bribery. The result is a complete separation of the federal benefits from any bribery that could conceivably pose a threat to those funds. What the government denigrates as a matter of "commercial liability" instead goes to the very Constitutional underpinnings of Congress's power to legislate. GB:42. The undisputed contractual arrangement may, therefore, plainly be considered by the Court in assessing whether the statutory jurisdictional element has been satisfied. *See Carrasco*, 79 F.4th at 160 (rejecting argument that defendant's contracts with relevant municipalities were "inadequate on their own to supportably show that a defendant is an 'agent' of a local government"). Any concern about "contract[ing] around" application of the statute is misplaced. GB:43 (citation omitted); *cf. Lupton*,

620 F.3d at 800 (rejecting defense argument that contract disclaimed agency relationship with state).   Where, as here, a recipient of federal benefits is expressly exempt from liability pursuant to a contract executed by a different but affiliated entity, any bribery affecting that contract does not implicate the integrity of federal funds and cannot therefore constitute the "business" or "transaction" of the recipient entity under §666.  That is so regardless of the fact that the Gaming Authority was created by, and affiliated (in a strictly non-financial sense) with the Tribe.[18]

The only circuit to have squarely addressed the issue held that §666 does not apply in these circumstances.  *United States v. Doran*, 854 F.3d 1312 (11th Cir. 2017), contrary to the government's suggestion, did not rely entirely upon the court's prior decision in *United States v. McLean*, 802 F.3d 1228 (11th Cir. 2015).  It also observed, consistent with DeQuattro's argument here, that the government had failed to "demonstrate[] any federal interest" sufficient to trigger the statute, citing *Fischer* for the proposition that §666 was not intended to be all-encompassing.  854 F.3d at 1316.  The government's attempts to distinguish *Doran* are unconvincing.  While *Doran* did involve alleged embezzlement, the requirement that "the organization,

---

[18] Any "in-kind" support provided by the Tribe to the Gaming Authority does not implicate federal benefits received by the former entity.  GB:44.  And the record does not support the government's assertion that the Gaming Authority's use of the Government Center building was "free of charge."  *Id.*

government, or agency" in question "receives . . . [federal] benefits in excess of $10,000" applies equally to both subsections. 18 U.S.C. §666(b). And *Doran* relied on *McLean*, a bribery case. The government's argument that the non-profit entity in *Doran* was not a "subsidiary"[19] or an "arm and [] instrumentality" of the university is little more than semantics. GB:45 (citation omitted). As noted in DeQuattro's opening brief, the relationship between the two affiliated entities in *Doran* was similar in many respects to that at issue here. *See* DB:54-55.[20]

The government's brief in *McLean* extensively discussed the close connection between the City and the redevelopment agency in support of an argument that the latter entity received federal benefits indirectly through the City. *See United States v. McLean*, No. 14-10061 (11th Cir.), Dkt. 21 at 16-20, 42, 46-48. As noted in DeQuattro's opening brief, and not disputed by the government, "the connection

---

[19] The government's repeated use of this word to describe the relationship of the Gaming Authority to the Tribe is untethered to any quotation from the record.

[20] The publicly filed Articles of Incorporation for the non-profit entity in *Doran* expressly stated, "The Corporation shall be operated exclusively for the benefit of The Florida State University. The Corporation is . . . organized and operated exclusively to receive, hold, invest, and administer property for the benefit of The Florida State University." Florida Division of Corporations (last visited Jan. 22, 2024), *available at* https://search.sunbiz.org/Inquiry/CorporationSearch/ConvertTiffToPDF?storagePath=COR%5C2009%5C0112%5C39679738.Tif&documentNumber=N09000000222.

between" the two entities "in *McLean* was closer than that between the Tribe and the Gaming Authority here." DB:56. Nevertheless, the Eleventh Circuit rejected the indirect beneficiary argument. *See* 802 F.3d at 1243.

In *McLean*, the government could have, but did not, argue on appeal that the district court's grant of a judgment of acquittal should be reversed because of the City's (as opposed to its affiliated redevelopment agency) receipt of federal benefits. The government's failure to do so likely reflected its determination that any such argument to stretch the statute beyond its facial language would be unsuccessful, especially given the dearth of supporting caselaw.

In sum, the evidence was insufficient to support a finding beyond a reasonable doubt that the Gaming Authority's "casino contract with RGB . . . constituted business of the Mashpee Wampanoag Tribe." App:1823. To the contrary, the undisputed evidence showed that the Tribe was entirely disassociated from any risks or liabilities under that contract. Even assuming *arguendo*, and contrary to the defense contention *supra*, that Cromwell was corrupt in his dealings with RGB, such corruption could not have resulted in the misuse of even one single federal dollar. Accordingly, DeQuattro's conviction must be reversed.

III.  **THE DISTRICT COURT ERRONEOUSLY EXCLUDED
      TESTIMONY FROM THREE PROFFERED DEFENSE WITNESSES.**

  A.  **The District Court Erroneously Excluded Testimony from
      Two Witnesses that They Gave Cromwell Gifts Virtually
      Identical to Those Underlying DeQuattro's Convictions
      without any *Quid Pro Quo*.**

The proffered testimony of Paul Steelman and Mark Tilden held significant

probative value.  Indeed, the government does not dispute that such testimony was

relevant to establish a "common scheme or plan" by Cromwell "to solicit gifts that

were not bribes."  GB:49 (citation omitted).  The government claims, however, that

such probative value "depended on whether" Steelman and Tilden's "payments

were (a) not themselves bribes and (b) similar to RGB's."  *Id.*  As an initial matter,

with respect to DeQuattro, the focus on "payments" is misplaced.  The analysis

should instead turn on the relationship between the witnesses and the two gifts for

which DeQuattro alone stands convicted.  Moreover, despite referring to the two

cited issues as "contested," the government does not even attempt to contradict the

defense proffer which unequivocally supported a finding favorable to the defense

on both points.  *See* App:1110-13.

While the district court, of course, had discretion to exclude testimony under

Fed. R. Evid. 403, that discretion is not unlimited.  Indeed, "the default rule is that

relevant evidence will be admitted."  *United States v. Soler-Montalvo*, 44 F.4th 1,

16 (1st Cir. 2022). As the government acknowledges, "the critical factual dispute in this case . . . was whether quid-pro-quo bribery occurred," GB:54, meaning whether DeQuattro acted with the corrupt intent "to give . . . something of value" to Cromwell "*in exchange* for an official act." *Fernandez*, 722 F.3d at 19 (citation omitted). Gifts intended "to cultivate friendship rather than to influence an official act" cannot support conviction. *United States v. Sawyer*, 85 F.3d 713, 741 (1st Cir. 1996). Steelman and Tilden were prepared to testify that, while in a business relationship with Cromwell, they offered and gave him gifts materially indistinguishable from those for which DeQuattro stands convicted (*e.g.*, hotel reservations and exercise equipment). The witnesses would have further testified that they viewed these gifts as ordinary business development and/or acts of friendship, as opposed to prohibited exchanges for Cromwell's official acts. Steelman and Tilden's testimony on these issues would have made it more likely that DeQuattro, who was in a similar relationship with Cromwell, understood Cromwell's overtures and the gifts he provided in response in a similarly innocent manner. The government is wrong in suggesting a lack of authority for inferring a defendant's intent from others' reactions to comparable circumstances. In *Soler-Montalvo*, the government advocated just such an inference of a defendant's guilty intent, "suggest[ing] that since [the defendant] responded to codewords like others

who actually intended to keep their intentions masked . . . , the jurors should not buy [the defendant's] feigned innocence." 44 F.4th at 17. If the government can rely on evidence that others engaging in conduct similar to a defendant's harbored criminal intent, a defendant must logically be permitted to offer evidence that other people engaging in substantially the same conduct as him harbored no such intent.

The sole Rule 403 concern cited by the government as weighing against the foregoing probative value is the purported danger of a "minitrial" regarding "the circumstances surrounding" the other gifts. GB:49. The cases cited by the government on this issue all involved evidence with marginal, if any, relevance, in sharp contrast with that proffered here. *See Lund v. Henderson*, 807 F.3d 6, 11 (1st Cir. 2015)("It is difficult to see how such evidence would have been admissible at all."); *United States v. Taylor*, 848 F.3d 476, 485 (1st Cir. 2017)(affirming exclusion of letter identifying uncharged co-conspirator where other evidence established the government's belief that he "may have been involved"); *United States v. George*, 761 F.3d 42, 57 (1st Cir. 2014)(affirming exclusion of co-conspirator's plea colloquy and cooperation agreement which did not include offenses charged to suggest that co-conspirator "was not guilty" of those offenses and, therefore, "neither [wa]s [defendant]"). Given the "significant probative value" of the excluded evidence in this case, any lengthening of the trial from its

admission would not constitute "*undue* delay" or "*wasting* time," within the meaning of Rule 403. *United States v. Decines*, 808 F.3d 785, 792 (9th Cir. 2015)(citation omitted); *see also Soler-Montalvo*, 44 F.4th at 18 ("Given the high probative value of the evidence, we expect the countervailing interests weighing against admission to be great to exclude the evidence."). The government, of course, would have had ample opportunity to cross-examine the two witnesses regarding their interactions with Cromwell and the intent with which they offered him gifts. The government fails to provide any reason why this exercise would be unwieldy. In any event, the government routinely introduces evidence of uncharged misconduct, as it sought to do in this case, *see* SA:13-14, without regard to concerns about a mini-trial. *See, e.g.*, *United States v. Souza*, 749 F.3d 74, 85 (1st Cir. 2014)(affirming admission notwithstanding "the prejudice that can attend a 'mini-trial' on uncharged conduct" (citation omitted)). Any concern of juror "speculat[ion]" about the government's failure to charge Steelman and Tilden, GB:49, was readily curable by an instruction for "the jury to focus on the charged conduct." *Souza*, 749 F.3d at 85.

### B. The District Court Erroneously Excluded a Defense Expert whose Testimony Was Highly Relevant and Exculpatory.

Proffered expert Skip Durocher was prepared to testify that "gift-giving in the tribal culture is generally understood and accepted and in some instances

expected." App:134. The government does not contest the relevance of Durocher's testimony, thus again triggering "the default rule . . . that relevant evidence will be admitted." *Soler-Montalvo*, 44 F.4th at 16.

Contrary to the government's suggestion, the district court did not cite "three independent grounds" for its exclusion of Durocher. GB:51. Rather, the court ruled that Durocher's "statements with respect to future opportunities, business opportunities" were "interesting but, on the basis of what is available to me right now, not material to this case." App:165. Rather, the issue at hand was whether there was "a payoff in this case." App:165. Whether "someone th[ought] that they'd curry favor with somebody else in the future as a result of that" was "a different issue." App:165. In other words, as argued in DeQuattro's opening brief, the court ruled that "a jury finding of quid-pro-quo bribery would moot Durocher's testimony." DB:67; *see also, e.g.*, App:148-49 (court saying, "the core of this is whether or not [Durocher] has any view with respect to quid pro quo because that's all this case is about is quid pro quo. . . . I don't understand him to be saying that if the government proves a quid pro quo that that is countenanced in Indian country").

DeQuattro's trial defense was that he did not provide any of the payments or gifts to Cromwell with the requisite corrupt intent to engage in a *quid-pro-quo*

exchange for Cromwell's official acts, but that he instead acted for lawful and legitimate purposes of friendship and/or business development. *See* DB:31-32, 35. The court erred in depriving the jury of witness testimony that would have provided the evidentiary predicate to its ability to weigh alternative possible motivations for DeQuattro's conduct in deciding whether or not a *quid pro quo* was one such motivation. *See* DB:67-68.

Second, the district court relied on Durocher's lack of specific experience with the Mashpee Wampanoag Tribe. *See* App:166. But Durocher's opinion "was based on shared characteristics of the dozens of tribes he had worked for over the course of his career." DB:65. Durocher did not simply "assum[e]" that "all tribes have" the relevant characteristics "in common." GB:51. Rather, he reached that conclusion based on decades of experience working with many different tribes. *See, e.g.*, App:164-65 ("I believe, based upon my experience, there are certain more general customs that I believe tribes share. . . . [B]ecause of their hundreds of years of maltreatment, they have developed a general distrust. And that is why I think they make different decisions or they have a different way of making decisions than other entities that a jury or any factfinder might be familiar with or comfortable understanding."). In light of tribes' general distrust of non-tribal members seeking to do business with them, Durocher testified, "it makes sense in Indian Country for

someone to try to establish a rapport and a relationship with someone like Chairman Cromwell to benefit their future business and not to secure some quid pro quo." App:159. Such intent could be "an independent basis for . . . DeQuattro to make a political donation or contribution that would be independent of any quid pro quo." App:159.[21] In arguing that Durocher's lack of experience with the particular tribe warranted exclusion of his testimony, the government does not even attempt to distinguish the contrary caselaw cited in DeQuattro's opening brief, *see* DB:70-71, or cite a single authority of its own.

The government's additional argument, which the district court did not expressly rely upon, regarding the purported lack of helpfulness of Durocher's testimony is rooted in a fundamental misunderstanding of the rules governing expert opinions. Durocher, of course, was not in a position to speak directly to DeQuattro's state of mind. But he was prepared to testify that DeQuattro's gifts to Cromwell were "consistent with" his experience of legitimate gift-giving and business development in tribal culture, App:162-63, "allowing the jury to infer the defendant's state of mind." *Soler-Montalvo*, 44 F.4th at 14. The government

---

[21] Despite DeQuattro's acquittal on all counts arising from political donations, the government continues to rely on those donations in this appeal and does not even attempt to defend the sufficiency of the evidence independent of such conduct. *See* GB:23-31.

routinely has been permitted to offer similar expert opinion testimony regarding the consistency of proffered facts with a defendant's guilt. *See* DB:69-70 (citing cases). Again, the government makes no attempt to address the caselaw cited in DeQuattro's opening brief.

Conditioning the admissibility of such commonplace expert evidence, when offered by the defense, on the defendant's own testimony regarding his state of mind would unfairly burden the Fifth Amendment right not to testify and undermine the government's Constitutional obligation to prove the defendant's guilt beyond a reasonable doubt. The sole case cited by the government on this issue involved factual (not opinion) evidence, discovered post-trial, regarding the government's purported interpretation of a regulation in a manner arguably consistent with defendants' conduct. *See United States v. Lachman*, 521 F.3d 12, 18 (1st Cir. 2008). Such evidence carried little relevance absent any indication that the defendants "had relied on [it] or any comparable material." *Id.* at 19. By contrast, Durocher was prepared to testify as an expert, based on his specialized experience and DeQuattro's own alleged conduct, that such conduct was consistent with lawful behavior. Experts, unlike other witnesses, are permitted to draw such conclusions beyond the scope of their own personal knowledge. *See, e.g.*, *United States v. Rosado-Perez*, 605 F.3d 48, 55 (1st Cir. 2010). Moreover, in contrast to *Lachman*,

there was substantial evidence in the record supporting DeQuattro's good-faith defense. *See* DB:31-32; App:1054 (court ruling, "I will be doing a good faith instruction here. I think there's enough evidence in the case to permit that").

Finally, with respect to Rule 403, which again the district court did not explicitly rely upon, any purported danger of misleading the jury could have been readily addressed by a simple instruction that it was the jury, not Durocher or any other witness, who had to decide whether the government proved DeQuattro's corrupt intent beyond a reasonable doubt, and that, if the government satisfied its burden of proving all offense elements, the jury should convict DeQuattro. *See Soler-Montalvo*, 44 F.4th at 18-19.

## C. Exclusion of the Foregoing Witness Testimony Was Not Harmless.

The government fails to establish the requisite "high[] probab[ility]" that exclusion of the three proffered witnesses' testimony "did not contribute to the verdict." *United States v. Garcia-Sierra*, 994 F.3d 17, 35 (1st Cir. 2021)(citation omitted). As set forth above, the evidence of DeQuattro's guilt was far from overwhelming. There was, assuming *arguendo* the Court rejects the defense argument *supra* Section I, minimally sufficient circumstantial evidence from which a jury could infer that DeQuattro provided the BowFlex and hotel reservation to Cromwell with the requisite corrupt intent. In these circumstances, evidence that

two similarly situated business people provided or agreed to provide materially indistinguishable gifts to Cromwell with no intent to influence his official acts certainly had the potential to impact the jury's verdict.

The government's arguments to the contrary are unconvincing. Again, with respect to DeQuattro, the focus on "payments" is misplaced. GB:55. While the hotel stays paid for by Steelman may have been loosely "work-related," *id.*, that is self-evidently not true of the massages included in those stays, $400 Super Bowl bet, funeral blanket, flight ticket, and exercise equipment, all of which were offered or given by Steelman or Tilden. In any event, the government's proffered distinctions are matters that should have been evaluated by the jury, and they are far from clear enough to provide assurance that jurors would have agreed with the government's view. Durocher's testimony stood for more than just an "abstract proposition." GB:56. It was probative and important to explain to jurors how the historical oppression of Native American tribes continues to impact their dealings with non-tribal businesses today, and how gifts may be permissibly used, and are often expected by tribes, to overcome such distrust.

## IV.  THE DISTRICT COURT ERRONEOUSLY PRECLUDED THE JURY FROM REACHING A VERDICT UNTIL RECEIVING WRITTEN INSTRUCTIONS.

As correctly stated in DeQuattro's opening brief, for all practical purposes, the district court prohibited the jury from returning a verdict until about a day and a half after it began deliberations.  At approximately 3:00pm the first day, while the court (as noted by the government) told jurors, "you can make your determination whenever you choose to make your determination," that was immediately followed by, "but I would encourage you to understand how much time the parties have put into this case, how much they've invested in the idea that you're going to look at all the evidence before you make your determination . . . , and it may occur to you that you wouldn't want people taking a straw vote and say let's get out of here." App:1275.  It also told jurors, "we will have available for you written instructions tomorrow morning . . . ." App:1273.  The jurors asked to be excused for the day just over an hour later.  The following morning, the court unequivocally prohibited the jury from reaching a verdict.  *See* App:1306.  That prohibition remained in effect for a full day, even though the jury (understandably given the restrictions imposed by the court) asked to go home early.[22]

---

[22] Given DeQuattro's repeated objection to this prohibition, the Court should reject the government's suggestion, unsupported by any citation to authority, that he somehow forfeited an argument that the district court's action became more

The government cites no precedent affirming any similar limitation on the jury's exercise of its Constitutional function. While there are circumstances in which a court may refuse to accept a verdict,[23] that entails no comparable impact on the jury's deliberative process. A prospective instruction that the jury may not return a verdict until receiving further written instructions cannot help but affect the manner in which jurors discuss and think about the case.

The district court's repeated emphasis on the written instructions, over the course of two trial days, and its statements that the jury could not return a verdict until receiving those instructions inevitably elevated their importance in the minds of jurors. *See* App:1273-74, 1305-06. Indeed, in asking to be excused on the second day of deliberations, the jury expressly stated, "We feel that we are at a stopping point for the day until we receive the written instructions." App:1366. It is in this context, as a direct result of the district court's error, that the fractional nature of the written instructions subsequently provided became problematic.

---

unreasonable and prejudicial as time passed.

[23] None of the cases cited by the government, however, involved an appellate challenge to the rejection of the verdict itself.

The government cannot satisfy its burden of proving harmless error, under any standard,[24] given the, at best, minimally sufficient evidence to support the verdict, and the inherent difficulty of assessing the precise impact the error had on the jurors' internal deliberative process. *See United States v. Miller*, 738 F.3d 361, 386 (D.C. Cir. 2013)(rejecting harmless error argument based, in part, on observation that "there [wa]s no way to know whether [the court's action] produced the jury's verdict" (citation omitted)).

## V.  THE DISTRICT COURT'S RESTITUTION ORDER WAS LEGALLY ERRONEOUS IN SEVERAL RESPECTS.

The government does not dispute the consensus of persuasive authority that not all bribery constitutes "an offense against property" under the MVRA. *See United States v. Collins*, 854 F.3d 1324, 1331 (11th Cir. 2017)(observing that it is "not readily apparent" that bribery "will always trigger" this statute); *United States v. Adorno*, 950 F. Supp. 2d 426, 429 (E.D.N.Y. 2013)(explaining that "the elements of" §666 "do not make it an offense against property").  But the government's

---

[24] DeQuattro correctly noted in his opening brief that the Sixth Amendment requires the jury to be free "from judicial pressure [i]n the exercise of its functions." *United States v. Moffett*, 53 F.4th 679, 685 (1st Cir. 2022) (citation omitted). Because this right is of "constitutional dimension," the defense maintains that the government must prove harmlessness beyond a reasonable doubt. *Id.* at 691 n.5 (citation omitted).  But the Court need not decide the issue because the government cannot make the requisite showing even under the standard for non-constitutional errors.

interpretation of the statutory language would sweep in any conceivable bribery and most financial crime. *See* GB:69 (arguing that the "offenses plainly implicated someone else's property because the RGB Contract with its attendant right to payment . . . was the object of the bribes" (citation omitted)). *Collins* began its analysis "with the rather unremarkable observation that 'against' is not the same thing as 'relating to' or 'concerning.'" 854 F.3d at 1331 (citation omitted). The latter two standards "sweep much more broadly, and would," like the government's proposed standard here, "encompass offenses with little more than some connection to property." *Id.* Offenses "against property," at common law, "referred to a specific set of criminal conduct" including "larceny, embezzlement, cheating, cheating by false pretenses, robbery, receiving stolen goods, malicious mischief, forgery, and uttering forged instruments." *Id.* at 1333 (citation omitted). The conduct at issue here is far afield from these common law roots and beyond the scope of the statute. *See Adorno*, 950 F. Supp. 2d at 430 n.5 (noting, in ruling that MVRA did not apply, lack of evidence that alleged bribery "caused contract prices to be inflated").[25]

---

[25] The government's suggestion that the remedy for the foregoing error should be remand for consideration of discretionary restitution is doubly waived. The government neither developed any argument regarding this separate restitution provision in district court nor cites any authority in support of its request on appeal.

The government does not dispute that, in order for the MVRA to apply, "pecuniary loss [must] follow as a direct and proximate result from the offense of conviction." DB:80 (citing authorities). The government brief fails to so much as mention its concession below that the only pecuniary losses cited here, the Tribe's legal fees, were "indirect" results of the defendants' conduct. DB:81 (citation omitted).

To the extent that, as the government suggests, the district court found that the full amount of the restitution award against DeQuattro was caused (both proximately and in a but-for sense) by the two standalone gifts for which he was convicted, such finding constituted clear error. None of the documentation submitted in support of the government's restitution request contained a single mention of the BowFlex or hotel reservation, and the government failed to make any showing that the subpoenas it issued to the Tribe were related to either gift. *See* App:2206-07.

The Court should hold that legal fees are not "other expenses" within the meaning of the relevant subsection of the MVRA in the wake of the Supreme Court's opinion in *Lagos v. United States*, 584 U.S. 577 (2018). The cases cited by the government on this issue either pre-date *Lagos* or rely on pre-*Lagos* circuit precedent. *See United States v. Afriyie*, 27 F.4th 161, 163 (2d Cir. 2022); *United States v. Sexton*, 894 F.3d 787, 800 (6th Cir. 2018). The defense submits that this

Court, which is constrained by no such circuit precedent,[26] should reach the opposite result for reasons set forth in its opening brief. The Fifth Circuit's opinion in *United States v. Koutsostamatis*, 956 F.3d 301 (5th Cir. 2020), is highly persuasive. While the government correctly notes that *Koutsostamatis* did not involve legal fees, its rationale, *i.e.*, that other expenses recoverable under the statute did not include hundreds of thousands of dollars incurred in assisting the government's investigation of an alleged hacker, is readily applicable here.

Finally, DeQuattro has not waived any right to have the restitution award vacated and unnecessary expense items excluded. The government makes no attempt to argue that the expenses cited in DeQuattro's opening brief were necessary to its investigation or prosecution of this case. *See* DB:85.

## VI. THE COURT SHOULD REJECT THE GOVERNMENT'S CROSS-APPEAL OF DEQUATTRO'S SENTENCE.

The government's cross-appeal of DeQuattro's sentence, contending that the district court erroneously declined to enhance his GSR under U.S.S.G.

---

[26] The Court's unpublished opinion in *United States v. Corey*, 77 F. App'x 7, 9 (1st Cir. 2003), dealt with an entirely different subsection of the MVRA and says nothing at all about the proper interpretation of the other expenses provision. And *Corey* itself stated that "the clear weight of authority has held that restitution does not encompass attorney's fees," before going on to acknowledge an exception (not applicable here) "where the attorney's fees were part of the intrinsic worth of the subject property." *Id.* at 11.

§2C1.1(b)(3), occupies just a single page of legal argument. The government cites no case, or other authority, supporting application of the enhancement in circumstances remotely analogous to those at issue here. And it makes no attempt to respond to the various arguments raised by the defense below on this issue.[27] Instead, the government relies almost entirely on its analysis of a clearly distinct legal issue, namely the sufficiency of Cromwell's convictions under the Hobbs Act. As this Court has long held, "[i]t is not enough" for a party briefing an issue on appeal "merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990). The government's lack of "developed argumentation" on this issue should constitute waiver of its cross-appeal. *Id.*

Even overlooking the foregoing waiver, the district court did not abuse its discretion in declining to apply the enhancement. *See United States v. Iwuanyanwu*, 69 F.4th 17, 21 (1st Cir. 2023)(explaining that this standard of review applies to "judgment calls" under the guidelines (citation omitted)). Section 2C1.1(b)(3) applies "[i]f the offense involved an elected public official or any public official in

---

[27] While the district court did not rely on those arguments, this Court may "affirm on any grounds supported by the record." *United States v. Biyaga*, 9 F.3d 204, 206 n.2 (1st Cir. 1993).

a high-level decision-making or sensitive position." Cromwell was not a ***public*** official in any sense of the word. Rather, the Mashpee Wampanoag Tribe was made up of approximately 2,600 members, who were voluntarily enrolled "based on lineage." App:319, 446. Cromwell was elected by these enrolled members, who chose to join the Tribe and qualified to do so based on ancestry, and it was their interests that he represented in his role as Chairman. He was not, in any respect, accountable to the public at large, nor did he wield official power over anyone other than those who made the affirmative decision to join the Tribe.

Undersigned counsel is aware of no published order of any court holding §2C1.1(b)(3) applicable based on an individual's official role in a Native American tribal government. And, again, the government cites no such case. The guideline provision itself says nothing about Native American tribes, and the application notes to another section of the guidelines characterize §2C1.1 as encompassing "officials of federal, state, or local government, foreign governments, or public international organizations." U.S.S.G. §2B4.1. Any reference to tribal leaders is conspicuously absent. *See United States v. Barquin*, 799 F.2d 619, 621 (10th Cir. 1986)("[I]t is . . . evident that a tribe, even though physically located within the geographic boundaries of a state, is not a 'local' government agency.").

Even assuming *arguendo*, and contrary to the foregoing, that Cromwell could be viewed as a "public official" in his capacity as Chairman of the Tribe, all charges against DeQuattro were predicated on the theory that he sought to influence Cromwell in "his role as the President of the Mashpee Wampanoag Tribal Gaming Authority." App:1823. As the defense has argued at length, the Tribe and the Gaming Authority are independent entities with respect to which Cromwell exercised different roles. *See* DB:53-54. As President of the Gaming Authority, Cromwell's role was akin to that of a private developer and did not implicate any core governmental functions.

Finally, any error in the district court's failure to apply the guideline enhancement was harmless. The record leaves no doubt that the GSR "was not the basis for [DeQuattro's] sentence." *United States v. Carmona*, 688 F. App'x 31, 34 (1st Cir. 2017)(unpublished). After rejecting the enhancement at issue, the court calculated DeQuattro's GSR as 15-21 months. *See* App:2075. The district court judge expressly added, "I do not consider myself a slave of the guidelines." App:2089. In imposing sentence, the court did not rely on the GSR, but instead took its direction from "the larger principles of sentencing, . . . set forth in Section 3553." App:2135. With respect to specific deterrence, the court found that neither defendant was likely to reoffend. *See* App:2138. The court then stated its view that

criminal sentences were "the least effective form of general deterrence." App:2139. Between the two defendants before it, the court did not "see equal culpability at all." App:2142. It described DeQuattro as "a businessman who threw his all into business, who was insufficiently sensitive to what it might mean to acquiesce in efforts on the part of a leader to receive benefits to which he was not entitled." App:2143. He was "overtaken with the desire to be a friend, to be supportive, to be non-judgmental in" his dealings with Cromwell. App:2143. The court also noted the collateral consequences conviction would carry for DeQuattro. *See* App:2144. Ultimately, the court ruled that a sentence of incarceration was not appropriate. *See* App:2144. It stated that DeQuattro's case was "not the kind of political corruption by an offer[o]r that calls for an extraordinary sentence or even the guideline sentence in this area unless one simply ignores the whole range of impacts that are involved." App:2144. The government does not challenge any aspect of the foregoing reasoning, and so has waived any contention that the court acted unreasonably in varying downward from the 15-21 month GSR.

The district court's "statements [at sentencing] and the . . . significant downward variance" indicate "that the court's choice of sentence did not depend on whether [DeQuattro's] GSR was calculated with or without the [4-level] enhancement." *Carmona*, 688 F. App'x at 34; *see also United States v. Lane*, 435

F. App'x 857, 858-59 (11th Cir. 2011) (unpublished)("Although the district court did not explicitly state that the sentence . . . was independent of the guideline calculation, there is no question that this sentence was not imposed pursuant to the guidelines, because the . . . sentence reflects a substantial downward variance from the guideline range . . . ."). Additionally, in light of the newly enacted 2-level downward adjustment for defendants with no criminal history points, *see* U.S.S.G. §4C1.1, application of the disputed enhancement would only raise DeQuattro's total offense level by 2, yielding a GSR of 21-27 (as opposed to 15-21). The record makes clear that this modest difference would have had no impact on the sentence ultimately imposed on DeQuattro. Accordingly, any error was harmless.

Respectfully submitted,
David DeQuattro
By his Attorneys,

**/s/ Kimberly Homan**
Kimberly Homan
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 448-2812 (Telephone)
homanlaw@aol.com

**/s/ Michael Pabian**
Michael Pabian
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 227-3700 (Telephone)
pabianlaw38@gmail.com

**/s/ Martin G. Weinberg**
Martin G. Weinberg
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 227-3700 (Telephone)
(617) 338-9538 (Fax)
owlmgw@att.net

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

1.      This document complies with Fed. R. App. P. 28.1(e)(2)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), the document contains 12,995 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because the document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman, 14-point font.

**/s/ Michael Pabian**
Michael Pabian

Dated:  February 22, 2024

## CERTIFICATE OF SERVICE

I, Michael Pabian, hereby certify that on this 22nd day of February 2024, this Brief was filed with the Court through its CM/ECF system, thus effectuating service on all parties to this appeal.

**/s/ Michael Pabian**
Michael Pabian

Dated:  February 22, 2024